# GIBBONS

CLAUDIA VAN WYK
Counsel

Gibbons P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Direct: (973) 596-4811 Fax: (973) 639-6231
cvanwyk@gibbonslaw.com

April 24, 2008

**VIA FEDERAL EXPRESS**

Traci Kenner, Esq.
AUSA
Eastern District of Texas
110 North College, Suite 700
Tyler, TX  75702

> **Re:  United States v. Shannon Agofsky**
> **No. 1:07-cv-0511**

Dear Ms. Kenner:

As you know, Shannon Agofsky's motion for postconviction relief pursuant to 28 U.S.C. § 2255 was filed on January 17, 2008, and the proceedings were held in abeyance until the conclusion of his resentencing appeal.  We are taking the opportunity, while the case is inactive, to request your help in obtaining certain items that we plan to seek in discovery, by motion if necessary, when the case resumes.  We request that you provide the following documents.  If, as to any of these requests, you provide some of the requested documents and withhold others, please provide a summary of the categories of documents withheld and an explanation for withholding them.  In addition, if any of these requests is denied in part, please provide us with all segregable portions of the otherwise withheld material.

**Bureau of Prisons Records of Mr. Agofsky**

1.     For the reasons explained below, Mr. Agofsky requests the following records, whether they are to be found at the institutions where he was incarcerated or at the central office of the Bureau of Prisons ("BOP"):

(a)     All records contained in Mr. Agofsky's "central file."

(b)     Intake assessments and institutional transfer memoranda and other records;

(c)     Program participation records, records of educational programs, institutional treatment programs, work programs, and self-help groups;

(d)     Records of trustee status and security levels;

Exhibit 1
04-24-08 Letter to Traci Kenner

GIBBONS P.C.

Traci Kenner, Esq.
April 24, 2008
Page 2

(e)    Visiting records; visiting lists; attorney sign-in records; recordings of conversations between Mr. Agofsky and others; any and all transcripts, reports, or other written records of such conversations; and any and all copies of correspondence between Mr. Agofsky and others and reports, analyses, or other written records of such correspondence;

(f)    All records relating to Mr. Agofsky's mail contained in any mail log book, including both the regular mail log book and any mail log books kept by the SIS.

(g)    All records relating to Mr. Agofsky's disciplinary history, including without limitation all incident reports issued to Mr. Agofsky, even such incident reports as may have been canceled or rescinded; disciplinary hearing records; infraction fact reports or investigation reports; and other disciplinary reports;

(h)    All records relating to Mr. Agofsky's inmate classification;

(i)    All records relating to Mr. Agofsky that were provided to the Bureau by any other federal agency, including without limitation the FBI, the Bureau of Alcohol, Tobacco, and Firearms, the Drug Enforcement Administration, the United States Attorney's Office, the Department of Justice, and the United States Marshals Service.

(j)    All records relating to Mr. Agofsky's initial placement at the United States Penitentiary, Administrative Maximum, Florence, Colorado ("ADX");

(k)    All records relating to Mr. Agofsky's unit and/or range placements within U.S. Penitentiaries, ADX, or any other BOP institution, including all SHU records and SHU reviews;

(l)    All cellmate and recreation records, including records relating to cell rotations for Mr. Agofsky;

(m)    Segregation and separation files, security threat group files, and behavior citations;

(n)    Parole and pardon investigations;

(o)    Alcohol and drug reports and assessments;

(p)    All records relating to administrative remedies or "cop-outs" submitted by Mr. Agofsky, and all records relating to any responses thereto;

(q)    All medical records relating to any health care requested by or provided to Mr. Agofsky, including without limitation records relating to medical, psychological, psychiatric, or mental health care, alcohol or drug treatment, dental care, such as doctor's notes,

Gɪʙʙᴏɴꜱ P.C.

Traci Kenner, Esq.
April 24, 2008
Page 3

nurse's notes, laboratory reports, radiological or imaging reports, and other medical records and reports;

(r)    All records relating to Mr. Agofsky's commissary account and privileges;

(s)    All records relating to any internal memoranda relating to Mr. Agofsky, including without limitation memoranda between a Warden of a U.S. Penitentiary, ADX, or other BOP institution and a BOP Regional Director;

(t)    All other correspondence between a Warden of a U.S. Pentitentiary, ADX, or other BOP institution and a BOP Regional Director relating to Mr. Agofsky;

(u)    All records relating to any reviews of Mr. Agofsky's housing placements within a U.S. Pentitentiary, ADX, or any other BOP institution;

(v)    All records relating to Mr. Agofsky's potential eligibility for, or consideration for, or progress in, the step-down program at ADX;

(w)    All records encompassed in Mr. Agofsky's SENTRY file and PARACONS file.

The term "records" includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audio tapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies.

2.    These records include but not are not limited to the records of the following institutions:

(i)    FMC Rochester;

(ii)    MCFP Springfield;

(iii)    FTC Oklahoma City;

(iv)    USP Lompoc;

(v)    USP Atlanta;

GIBBONS P.C.

Traci Kenner, Esq.
April 24, 2008
Page 4

        (vi)     USP Beaumont;

        (vii)    USP Florence ADMAX;

        (viii)   USP Terre Haute.

3.     All records generated or maintained by any and all medical and/or mental health providers or contractors for medical and/or mental health services to the including, but not limited to:

        (a)     University of Texas Medical Branch, Galveston, Texas (including surgery in August 2000);

        (b)     Northeastern Tribal Health System (NTHS), P.O. Box 1498, Miami, OK 74355 (including treatment for an ulcer in the early to mid-1990s).

4.     Mr. Agofsky's § 2255 motion challenges his trial counsel's deficient performance in the investigation, preparation, and presentation of the defense case, at both the guilt/innocence phase and the penalty phase of his capital trial. Because the government offered in aggravation both the convictions that originally placed Mr. Agofsky in BOP custody in the early 1990s and disciplinary infractions spanning the decade, and because the government's guilt phase proofs concerned two incidents that occurred while he was under BOP custody in 2000 and 2001, trial counsel needed to obtain and review Mr. Agofsky's entire BOP file. Although trial counsel provided to postconviction counsel a number of BOP materials turned over to the defense a few months before trial, various materials appear to be missing, including cellmate logs and some recreation logs.

**BOP Data**

5.     For the reasons below, the defense requests the following statistical information from the BOP:

        (a)     Key indicator system data and/or correctional services significant incidents data on assaults on inmates (with and without weapons) and killings of inmates (Code #s 100 and 101) for United States Penitentiaries from 1992-2004;

        (b)     Key indicator system data and/or correctional services significant incidents data on assaults on staff (with and without weapons) and killings of staff (Code #s 100 and 101) for United States Penitentiaries from 1992-2004;

GIBBONS P.C.

Traci Kenner, Esq.
April 24, 2008
Page 5

        (c)     Key indicator system data and/or correctional services significant incidents data on weapon possession infractions (Code #s 104 and 108) for United States Penitentiaries from 1992-2004;

        (d)     Key indicator system data and/or correctional services significant incidents data on drug infractions (Code #s 110, 111, 112, 113) for United States Penitentiaries from 1992-2004;

        (e)     A list of all inmates under indefinite solitary confinement in BOP custody.

6.     This evidence is relevant to Mr. Agofsky's claim that trial counsel presented a poorly investigated and prepared case on future dangerousness, and should have collected, or asked their experts to compile, BOP data to support their opinions and the defense. Evidence concerning the rates of assault and weapons possession would have been relevant to assessing the circumstances surrounding the Plant incident and Mr. Agofsky's self-defense claim and also would have been relevant to the jurors' assessment of disciplinary infractions offered by the prosecution at the penalty phase. Evidence concerning drug infractions would have been relevant to Luther Plant's reputation as a drug dealer and drug user. Finally, a list of all inmates under indefinite solitary confinement would have been relevant to the defense argument that the BOP was capable of isolating inmates from other inmates when necessary, a proposition that the government disputed at trial.

## BOP Records of Other Inmates

7.     For the reasons below, the defense requests the BOP central files of the following inmates, each of whom figured in the government's case against Mr. Agofsky at either the guilt-innocence or the penalty phase, or both. Mr. Agofsky asserts that trial counsel were ineffective for failing to conduct a reasonable investigation, which should have included a more thorough investigation of these inmates:

        (a)     Michael Miele (FRN 17599-038): Mr. Agofsky's disciplinary infraction for assaulting Miele was introduced at the guilt-innocence phase pursuant to Federal Rule of Evidence 404(b). The defense investigation suggests that the full context of the fight between them did not come out at trial. The records turned over to postconviction counsel by trial counsel include a few of Miele's records (his inmate profile, a list of his prior disciplinary infractions, his prison placements, and his cell assignments) but the records are incomplete. For example, the records turned over do not include all of his cellmate records in both the SHU and general population, or his disciplinary hearing reports or incident reports.

GIBBONS P.C.

Traci Kenner, Esq.
April 24, 2008
Page 6

(b)      Curry (Kerry) Edelen (FRN 02372-000):   Mr. Agofsky's disciplinary infraction for a fight with Edelen in the SHU at Atlanta USP in 1999 was introduced as an aggravating factor, and the government argued that Mr. Agofsky assaulted Edelen because he did not like black inmates.  The postconviction investigation suggests that the fight was set up by guards who knew that the unwritten inmate code required inmates of different races to fight each other if forced to cell together.  Edelen's file may contain information about his version of events or otherwise provide context to the incident.  For example, they may contain information concerning previous assaults with which Edelen was charged and may indicate whether any of those incidents were interracial.  The records turned over to postconviction counsel by trial counsel do not include any of Edelen's institutional records.

(c)      Richard Ward (FRN 12020-018):   Ward testified against Mr. Agofsky on behalf of the government.  Although the records turned over to postconviction counsel by trial counsel include a part of Ward's BOP file, it does not appear to be complete.  For example, a chronological disciplinary record printed on April 6, 2004, includes an infraction on September 22, 2000 for use of drugs, for which Mr. Ward received 30 days of disciplinary segregation, suspended pending 180 days clear conduct.  However, the records turned over to postconviction counsel do not include any records pertaining to that infraction, which, apparently, was partially responsible for Ward's confinement in the SHU in December 2000 and January 2001.  Furthermore, records pertaining to Ward's hospitalization at UTMB in Galveston, following a suicide attempt in December 2000, are not included among those turned over to postconviction counsel.

(d)      Luther Plant (FRN 02882-078):  Plant's reputation and character were crucial to the self-defense case argued by trial counsel.  In addition, the § 2255 motion alleges that Plant had a reputation for selling and using drugs inside USP Beaumont, carrying and selling weapons, and behaving aggressively.  Mr. Agofsky's § 2255 motion alleges that trial counsel's investigation of self-defense and of Plant's reputation was unreasonably deficient.  Full discovery of his BOP records is therefore essential.  Although the records turned over to postconviction counsel by trial counsel include a part of Plant's BOP file, it does not appear to be complete.  Specifically, for example, the records do not include Plant's work records, cell logs, or visitor logs.

(e)      Phil Killatet, FRN 59220-065, Robert Borton, FRN 89553-012, and Chris Londholm, FRN 99858-011: Government witness Michael Mattie charged these three inmates with disciplinary infractions during the Lompoc incident in 1998.  Mattie charged that he saw them involved in the fight that broke out on the compound while he watched from the guard tower, but they were exonerated when other guards charged them with infractions in other locations at the same time.

GIBBONS P.C.

Traci Kenner, Esq.
April 24, 2008
Page 7

       (f)     Inmate Dennis Patterson, FRN 05578-097: this inmate also was charged with a disciplinary infraction arising from the Lompoc incident in 1998, and was exonerated, but was not charged by Officer Mattie.

       8.     For each of these inmates, Mr. Agofsky requests the records enumerated in ¶1.

**FBI Files**

       9.     For the reasons below, the defense requests FBI files concerning the following individuals or incidents, which may contain relevant information for the reasons specifically explained:

       (a)     Gant Sanders: Mr. Agofsky's § 2255 petition asserts that trial counsel failed to conduct a reasonable investigation of his prior conviction for the Noel State Bank case. Sanders was a government witness who received consideration for his testimony. The FBI file likely contains other information concerning Sanders that trial counsel could have used to attack the Noel State Bank conviction if they had conducted a reasonable investigation.

       (b)     Buddy Coussatte. The defense investigation has uncovered evidence that Mr. Agofsky's uncle, Buddy Coussatte, was a suspect in both the Noel State Bank case and the firearms possession charges on which Mr. Agofsky was convicted. In addition, Coussatte was previously convicted or suspected of insurance fraud. The FBI file likely contains additional information about Coussatte that trial counsel could have used to attack Mr. Agofsky's prior convictions, or to provide context to the jurors who were required to weigh them against the mitigating evidence, if counsel had conducted a reasonable investigation.

       (c)     Shannon Agofsky: The records that trial counsel has turned over to postconviction counsel contain only a small portion of the records that counsel believes were created in the course of the FBI's investigation of the Noel State Bank case and the Luther Plant incident. The FBI file likely contains additional information that trial counsel could have used to defend Mr. Agofsky, at both the guilt/innocence phase and the penalty phase, if counsel had conducted a reasonable investigation.

       (d)     Luther Plant: The records that trial counsel has turned over to postconviction counsel contain only a small portion of the records that counsel believes were created in the course of the FBI's investigation of the Luther Plant incident. The FBI file likely contains additional information that trial counsel could have used to defend Mr. Agofsky, at both the guilt/innocence phase and the penalty phase, if counsel had conducted a reasonable investigation.

GIBBONS P.C.

Traci Kenner, Esq.
April 24, 2008
Page 8

(e)      Richard Ward: Ward testified for the government, in return for sentencing consideration, about the Luther Plant incident. The records that trial counsel has turned over to postconviction counsel contain only a small portion of the records that counsel believes were created in the course of the FBI's investigation of the Luther Plant incident. For example, trial counsel turned over a report by Agent Bolin stating that, on May 4, 2004, he consulted an Assistant United States Attorney who authorized him to promise Ward a Rule 35 time cut in return for cooperation, but the records received from trial counsel include no report by the Assistant United States Attorney and no other documentation of this promise. The FBI file likely contains additional information that trial counsel could have used to defend Mr. Agofsky, at both the guilt/innocence phase and the penalty phase, if counsel had conducted a reasonable investigation.

(f)      The 1998 "riot" at USP Lompoc: Mr. Agofsky's involvement in this incident was an aggravating factor at the penalty phase of trial. His § 2255 motion asserts that counsel failed to conduct a reasonable investigation of the incident. The records that trial counsel has turned over to postconviction counsel contain only a small portion of the records that counsel believes were created in the course of the FBI's investigation of the Lompoc incident. The FBI file likely contains additional information that trial counsel could have used to defend Mr. Agofsky, at both the guilt/innocence phase and the penalty phase, if counsel had conducted a reasonable investigation. For example, the file may contain information reflecting that charges against inmates Phil Killatet, Robert Borton, and Chris Londholm, which were initially brought by Officer Michael Mattie, were later dropped when other officers charged them with conduct in other locations at the same time.

**BOP and Government Employees**

10.      Because the defense investigation and the evidence at trial suggests that several federal employees were untruthful in their testimony, the defense requests access to materials relevant to their credibility, specifically any performance reviews or disciplinary materials pertaining to their performance in Mr. Agofsky's matters or in other investigations. The defense requests these materials for each of the following witnesses:

(a)      Christopher Matt: Officer Matt, the first officer to respond to the Plant incident, testified at trial that Mr. Agofsky made statements following the incident that, the prosecution argued, were incriminating. Matt did not tell anyone about these statements until an FBI agent re-interviewed him in September 2001. Although he was interviewed in January 2001 by internal BOP investigators, he never reported the statements to them or to anyone else until the FBI interview months later.

GIBBONS P.C.

Traci Kenner, Esq.
April 24, 2008
Page 9

(b)     Ladell Farley: Agent Farley was the first witness called at the penalty phase of Mr. Agofsky's capital trial.  He testified about Mr. Agofsky's prior convictions, which served as the basis for three of the aggravating factors alleged by the government in procuring a sentence of death against Mr. Agofsky.  Mr. Farley was the lead agent in the investigation of Mr. Agofsky's prior convictions and testified multiple times at his prior trials.  Postconviction counsel have reviewed over 1,000 pages of his testimony and have found that he gave inconsistent testimony on different occasions, failed to pursue numerous suspects brought to his attention, and procured questionable fingerprint and duct tape analyses from the FBI crime lab.  In addition, he abused his authority by, for example, calling a subpoenaed defense witness the night before his scheduled testimony and attempting to convince him not to come to court.

(c)     Michael Mattie: Officer Mattie testified that he saw Mr. Agofsky from a guard tower at Lompoc USP in 1998, arguing with black inmates just before a fight erupted on the recreation yard.  This incident was used as an aggravating factor at the penalty phase.  In some key respects, Mattie contradicted every other BOP employee whose account appears in the materials turned over to postconviction counsel, and also contradicted information acquired in the postconviction investigation.  Specifically, unlike any other source, Mattie denied on the witness stand that the fight erupted after a disputed call by white inmates assigned to referee a football game between two all-black teams, and denied that a black inmate threw the first punch.

(d)     Arthur Tobias:  Officer Tobias, who worked at Atlanta USP in  1999, testified that Mr. Agofsky and another inmate were in a cell when he placed a black inmate, Curry Edelen, into the cell with them and Agofsky attacked Edelen without provocation.  Tobias's account contradicts other accounts acquired through the postconviction investigation, suggesting that the incident was part of a pattern at that institution in which guards often placed inmates of different races together, in violation of the unwritten inmate code, to provoke trouble.

Please let me know if you have any questions, and thank you for your attention to this request.

Very truly yours,

Claudia Van Wyk
Counsel

Jennifer Merrigan

Attorneys for Shannon Agofsky