# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### BEAUMONT DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Respondent,** | ) |
| | ) |
| **v.** | )      No.    1:07-cv-00511 |
| | ) |
| **SHANNON WAYNE AGOFSKY,** | ) |
| | ) |
| **Petitioner.** | ) |
| _____ | ) |

---

## SUPPLEMENT TO DEFENDANT'S AMENDED MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO 28 U.S.C § 2255

---

**Leigh Skipper, Esq.**
**Chief Federal Defender**

**Claudia Van Wyk**, **Esq.**
**Billy H. Nolas, Esq.**
**David Zuckerman, Esq.**

Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
The Curtis Center, Suite 545 W
Independence Square West
Philadelphia, PA 19106
(215) 928-0520 - phone
(215) 928-0826 - telefax
claudia_vanwyk@fd.org

**Jennifer Merrigan, Esq.**
Public Interest Litigation Clinic
305 E. 63rd Street
Kansas City, MO 64113
Telephone (816) 363-2795
Facsimile (816) 363-2799
jmerrigan@pilc.net

*Attorneys for Shannon Agofsky*

**Name of Defendant:**              **Shannon Agofsky**
**Defendant's Prison Number:**       **#06267-045**
**Defendant's Place of Confinement:** **USP Terre Haute, U.S. Penitentiary**
**PO Box 33**
**Terre Haute, IN 47808**

**TABLE OF CONTENTS**

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      GROUND 12.1: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE GUILT-INNOCENCE PHASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.      Trial Counsel's Role in the Case (Bennett Deposition Testimony) . . . . . . . . . . . 6

      C.      Trial Counsel Failed To Make Reasonable Efforts To Interview Government Witnesses Or Otherwise Attempt to Neutralize Their Testimony . . . . . . . . . . . 11

      D.      Trial Counsel Failed To Investigate And Present Readily Available Evidence To Support The Justification And Heat Of Passion Defenses Upon Which They Relied At Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            1.      Eyewitnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            2.      Background Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      E.      Trial Counsel Failed To Present Witnesses Their Investigator Had Interviewed Who Were Willing To Testify And Who Could Provide Support For The Justification Or Heat Of Passion Defenses, And Failed To Elicit Other Helpful Information Available From Witnesses They Did Call. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      F.      Counsel Failed To Obtain And Present Expert Testimony At The Guilt Phase, Despite Its Availability and Relevance To Their Self-Defense And Heat Of Passion Strategies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

      G.      Counsel Relied Primarily On Records Supplied By the Government, And Made Few Independent Efforts To Obtain Documentary Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

I. Counsel Provided Ineffective Assistance During The Guilt-Innocence Phase Of Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

 2. Counsel Failed To Object To Erroneous Instructions. . . . . . . . . . . . . . . 49

  a. Counsel Failed To Object To Burden-Shifting Murder and Manslaughter Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

   i. The Dueling "Malice" Instructions . . . . . . . . . . . . . . . . . . . -49-

   ii. The "Progression" Instructions . . . . . . . . . . . . . . . . . . . . . . -56-

  b. Counsel Failed To Object To The Erroneous Murder Instruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

  c. Counsel Failed To Object To The Inconsistent and Confusing Malice Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

  d. Counsel Failed To Object To The Confusion Engendered By The Conflation of "Federal Murder" and "Murder by Life Prisoner" Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

  e. Trial Counsel Failed To Seek An Instruction On The Lesser Included Offense Of Second-Degree Murder On Count 2. . . . . . . . . . . . . . 62

 3. Counsel Was Ineffective For Failing To Object To Prosecutorial Summation Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

 4. Counsel Failed To Cross-Examine Witnesses On Specific Instances of Violent Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

 5. Counsel Was Ineffective For Failing To Seek Severance Of The "Murder By Life Sentenced Prisoner" Count From The Federal Murder Count To Prevent The Jury From Drawing Prejudicial Conclusions When Considering the Question of Petitioner's Guilt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

J. The Cumulative Effect Of Trial Counsel's Guilt-Innocence Phase Deficiencies

Prejudiced The Defense At Both Phases Of Trial. . . . . . . . . . . . . . . . . . . . . . . 78

II.    GROUND 12.2: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

1.    Mr. Bennett Did Not Conduct A Mitigation Investigation . . . . . . . . . . . 82

2.    Dr. Roberts And Other Experts Did Not Conduct A Mitigation Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

B.    Counsel Failed To Conduct An Independent Investigation Of The Government's Case In Aggravation Or To Present Evidence Providing Context For The Aggravating Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

1.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

2.    Noel State Bank Robbery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

4.    1992 Refusal to Clean Cell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

5.    1994 Lompoc Serving Line . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

6.    1998 Lompoc Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

7.    1999 Edelen Assault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

8.    1999 and 2000 Possession of Weapons in Atlanta and Beaumont . . . . 120

9.    2000 Michael Miele Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

10.    Trial Counsel's Failure To Investigate Mr. Agofsky's Prior Convictions And Infractions, Cumulatively, Prejudiced His Defense. . . . . . . . . . . . . . . . 126

C.    Counsel Completely Failed To Compile And Present A Social History Of Mr. Agofsky's Life Before His Incarceration. . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

1.      Trial Counsel Neither Conducted A Social History Investigation Nor
        Delegated That Task To A Qualified Expert Or Any Other Person  . . . 129

2.      The Defense Never Learned, and Never Made Sure That The Jury Learned,
        That Mr. Agofsky Is A Beloved Member Of A Family Marked By

        Tragedy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

3.      The Defense Never Uncovered Or Presented Evidence That Mr. Agofsky
        Was Raised To Offer Refuge and Protection To Vulnerable Family And
        Friends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

4.      The Defense Never Uncovered Or Presented Evidence That Mr. Agofsky Has
        The Support of Extended Family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

6.      The Defense Did Not Seek Out Local Friends And Teachers . . . . . . . . 155

D.  Counsel Failed To Investigate or Present Readily Available Prison

    Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

E.  Counsel Failed To Obtain And Present Appropriate Mental Health

    Evaluations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

F.  Counsel Presented A Poorly Investigated And Prepared Case On Future
    Dangerousness.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

G.  Counsel Failed To Advocate For The Introduction Of Admissible Mitigating
    Evidence, To Object to Misleading Cross-Examination And Summation Arguments,
    Or To Object To The Submission Of Factually Unsupported Or Inadmissible Non-
    Statutory Aggravating Factors To The Jury.  . . . . . . . . . . . . . . . . . . . . . . . 185

    1.      Counsel Failed To Advocate Effectively For Clearly Admissible Mitigating
            Evidence That The Court Erroneously Excluded . . . . . . . . . . . . . . . . . 185

2.    Counsel Failed To Object To Unfounded Cross-Examination About Mr. Agofsky's Non-Existent Antisocial Personality Disorder And Other Improper Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

3.    Counsel Failed To Object To The Prosecutor's Inflammatory Summation Remarks Arguing That It Was the Jury's Patriotic Duty to Sentence Mr. Agofsky to Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

5.    Counsel Failed To Seek A Unanimity Of Theory Charge As To The Non-Statutory Aggravating Circumstance, Future Danger . . . . . . . . . . . . . . 191

H.    Counsel's Deficient Performance Prejudiced The Defense . . . . . . . . . . . . . . . . 195

III.    GROUND 12.3: APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -197-

B.    Appellate Counsel's Role In The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -197-

C.    Appellate Counsel Failed To Provide Reasonably Vigorous Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

1.    The Inconsistent Verdict Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

2.    The Claim Concerning The Jury's Note . . . . . . . . . . . . . . . . . . . . . . . 206

3.    The "Heinous and Cruel" Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

4.    The Claims Barred By Circuit Precedent . . . . . . . . . . . . . . . . . . . . . . . 209

5.    The Claims Not Raised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

a.    The Fifth Amendment Claim . . . . . . . . . . . . . . . . . . . . . . . . . . 209

v

b.    The Morgan Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

c.    The Claim Concerning the Burden-Shifting And Erroneous Murder Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

d.    The Failure To Admonish Jurors To Consider Certain Testimony With Caution  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

e.    The Erroneous Exclusion of Mitigating Evidence . . . . . . . . . . . 223

f.    The Improper Cross-Examination and Argument On Antisocial Personality Disorder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

6.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

IV.    GROUND 12.4: MORGAN-EXCLUDABLE JURORS WERE SEATED ON THE FINAL JURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

V.    GROUND 12.5: THE GOVERNMENT WITHHELD FAVORABLE EVIDENCE THAT WAS MATERIAL TO GUILT OR INNOCENCE AND TO PUNISHMENT . . . . . . . 229

VI.    THE TRIAL COURT ERRED IN FAILING TO DISMISS THE INDICTMENT WITH PREJUDICE FOR PRE-ARREST DELAY AND VIOLATION OF PETITIONER'S CONSTITUTIONAL AND STATUTORY SPEEDY INDICTMENT RIGHTS, WHERE THERE DELAY WAS INTENTIONAL AND DESIGNED TO HAMPER THE DEFENSE AND MR. AGOFSKY WAS PREJUDICED.    ALL PRIOR COUNSEL WERE INEFFECTIVE FOR FAILING TO ADEQUATELY RAISE, LITIGATE AND BRIEF THIS ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

VII.    NEW EVIDENCE ESTABLISHES THAT PETITIONER WAS CONVICTED IN THE SHORT CASE AND SENTENCED TO DEATH IN THE PLANT CASE ON THE BASIS OF INACCURATE AND UNRELIABLE EXPERT SCIENTIFIC TESTIMONY, IN VIOLATION OF HIS DUE PROCESS AND EIGHTH AMENDMENT RIGHTS . . . 238

A.    The National Academy of Sciences Report . . . . . . . . . . . . . . . . . . . . . . . . . 238

B.      The Due Process and Eighth Amendment Standards Governing Analysis of the
        New Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

C.      The Unreliable Fingerprint Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

D.       Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

VIII.   MR. AGOFSKY IS INNOCENT OF CAPITAL MURDER . . . . . . . . . . . . . . . . . . . . . 247

IX.     TRIAL COUNSELS' AFFIDAVITS CONTAIN FACTUALLY INACCURATE AND
        NON-RESPONSIVE    ALLEGATIONS,    SPECIFICALLY    NEGATED    BY    THE
        TESTIMONY AND STATEMENTS OF NUMEROUS PERSONS, INCLUDING MR.
        AGOFSKY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 249

        A.      Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 249

        B.      Luther Plant Investigation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

        C.      Trial Counsel's Interactions With Mr. Agofsky  . . . . . . . . . . . . . . . . . . . . . . . 255

        D.      Trial Counsel's Inadequate Investigation Of Mr. Agofsky's Background . . . . . 261

                1.  Mr. Agofsky's Prior Convictions and Infractions . . . . . . . . . . . . . . . . . . . . 261

                2.  Family and Childhood . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263

                3.      Prison Mitigation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271

                4.      Consultations with Experts Concerning Mental Health Issues and
                        Future Dangerousness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271

        E.      Trial  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

                1.      Jury selection  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

2.     Counsel's Conduct of the Guilt-Innocence Phase of Trial . . . . . . . . . . . 274

3.     Counsel's Conduct of the Penalty Phase of Trial   . . . . . . . . . . . . . . . . 275

F.     Trial Counsel's Interactions With Postconviction Counsel . . . . . . . . . . . . . . . . 278

G.     Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 283

## INDEX TO SUPPLEMENTAL APPENDIX

**VOLUME I**

**Deposition of Jay Bennett, June 30, 2009** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 000540

**VOLUME II**

**Bennett Deposition Exhibits**

| | | |
|---|---|---|
| 1. | Deposition Subpoena . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | SA 000612 |
| 2. | Inmate Interview Summaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | SA 000615 |
| 3. | Letter to Bennett from Shannon Agofsky, November 8th . . . . . . . . . . | SA 000638 |
| 4. | Recreation Cage Occupancy List . . . . . . . . . . . . . . . . . . . . . . . . . . . | SA 000641 |
| 5. | Letter to Bennett from Shannon Agofsky, May 24th . . . . . . . . . . . . . | SA 000642 |
| 6. | Letter to Lopez from Bennett, April 26, 2004 . . . . . . . . . . . . . . . . . . | SA 000644 |
| 7. | Letter to Farrugia from Bennett, May 24, 2004 . . . . . . . . . . . . . . . . . | SA 000645 |
| 8. | History of Arrest/ Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | SA 000646 |
| 9. | Address Book . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | SA 000648 |
| 10. | Hand Written Notes from Shannon Agofsky to Bennett . . . . . . . . . . . | SA 000672 |
| 11. | Letter to Caillier from Shannon Agofsky, February 8th . . . . . . . . . . . | SA 000674 |
| 12. | Letter to Bennett from Shannon Agofsky, January 23rd . . . . . . . . . . . | SA 000675 |
| 13. | Letter to Bennett from Shannon Agofsky, May 24th . . . . . . . . . . . . . | SA 000678 |
| 14. | Letter to Bennett from Shannon Agofsky, June 9th . . . . . . . . . . . . . . | SA 000680 |
| 15. | Letter to Caillier from Shannon Agofsky, April 28th . . . . . . . . . . . . . | SA 000684 |
| 16. | Letter to Bennett from Shannon Agofsky, April 10th . . . . . . . . . . . . . | SA 000687 |
| 17. | Letter to Bennett from Shannon Agofsky, March 15th . . . . . . . . . . . . | SA 000690 |
| R1. | (Respondent's Exhibit) Letter to McKinn from Bennett, May 5, 2004 | SA 000691 |

**VOLUME III**

**Deposition of Dr. Dan Roberts, July 2, 2009** . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 000692

**Roberts Deposition Exhibits**

1.   CV of Dr. Dan Roberts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 000889

2.   List of Documents Sent to Dr. Dan Roberts . . . . . . . . . . . . . . . . . . . SA 000893

3.   Dr. Roberts Correspondence and Notes . . . . . . . . . . . . . . . . . . . . . . . SA 000896

**VOLUME IV**

**Roberts Deposition Exhibits (continued)**

4a.   BOP Documents Provided to Dr. Roberts by Barlow . . . . . . . . . . . . . SA 000965

**VOLUME V**

**Roberts Deposition Exhibits (continued)**

4b.   BOP Documents (continued) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 001315

**VOLUME VI**

**Roberts Deposition Exhibits (continued)**

5.    Declaration of Marilyn Romanowski, LCSW . . . . . . . . . . . . . . . . . . . SA 001672

6.    Supplemental Declaration of Marilyn Romanowski, LCSW . . . . . . . . SA 001692

7a.   Declaration of Dr. Michael Gelbort . . . . . . . . . . . . . . . . . . . . . . . . . . SA 001695

7b.   CV of Dr. Michael Gelbort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 001702

8a.   Declaration of Dr. Ruben Gur . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 001709

8b.   CV of Dr. Ruben Gur . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 001720

9a.   Declaration of Dr. Lawson Bernstein . . . . . . . . . . . . . . . . . . . . . . . . . SA 001757

9b.   CV of Dr. Lawson Bernstein . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 001772

10a.  Declaration of Dr. Erin Spiers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 001788

10b.  CV of Dr. Erin Spiers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 001806

11a.  Declaration of Dr. Paula Lundberg-Love . . . . . . . . . . . . . . . . . . . . . . SA 001816

11b.    CV of Dr. Paula Lundberg-Love ............................... SA 001828

12.    Declaration of Dr. Mark Cunningham ......................... SA 001853

13a.    Supplemental Declaration of Dr. Mark Cunningham ............. SA 001875

13b.    CV of Dr. Mark Cunningham ................................ SA 001883

14a.    Declaration of Dr. Craig Haney ............................. SA 001893

14b.    CV of Dr. Craig Haney .................................... SA 001899

15.    Declaration of Joe Agofsky ................................ SA 001930

16.    Declaration of Sheila Agofsky .............................. SA 001950

17.    Declaration of Trevan Billbe ............................... SA 001966

18.    Declaration of Peggy Black ................................ SA 001970

19.    Declaration of Therry Bryant. .............................. SA 001978

20.    Declaration of Robert Duggan .............................. SA 001982

21.    Declaration of Gerald Edmonson ............................ SA 001987

22.    Declaration of Joy Johnson ................................ SA 001992

23.    Declaration of Leon G. Rondeau Jr. .......................... SA 002000

24.    Declaration of Jan Varner ................................. SA 002005

25.    Declaration of Mark Allen ................................. SA 002007

## VOLUME VII

26.    Declaration of Brian Berry ................................. SA 002011

27.    Declaration of Andres Campillo ............................ SA 002014

28.    Declaration of Pete Carrion ............................... SA 002017

29.    Declaration of Ralph Cutchins ............................. SA 002021

30.    Declaration of Russell Dinovo ............................. SA 002024

31.    Declaration of Kerry Dixon ................................ SA 002028

32.    Declaration of Artie Dufur ................................ SA 002031

33.    Declaration of Frank Early ................................ SA 002035

34a.    Declaration of Robert Ecker ............................... SA 002040

34b.    Declaration of Robert Ecker (handwritten) .................... SA 002044

35.    Declaration of Kerry Edelen. .............................. SA 002049

36.    Declaration of Thomas Farrugia ............................ SA 002055

37.    Declaration of Michael Fitzgerald .......................... SA 002057

38a.    Declaration of Reginald Thaddeus Gilbert-Bey . . . . . . . . . . . . . . . . . .    SA 002062

38b.    Declaration of Reginald Gilbert-Bey   . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002065

39.    Declaration of Todd Gilbertson . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002068

40.    Declaration of Charles Glave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002071

41.    Declaration of Lonnie Griffin   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002076

42.    Declaration of Melvin Hauser   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002079

43.    Declaration of Scott Lawson   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002082

44.    Declaration of Matt Lindsay   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002087

45.    Declaration of William Massey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002090

46.    Declaration of Robert McKinn   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002097

47.    Declaration of Michael Miele   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002100

48.    Declaration of Jeffrey Milton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002102

49.    Declaration of George Rivera   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002105

50.    Declaration of Roderic Scott Russell . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002108

51.    Declaration of Billy Santiago . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002113

52.    Declaration of Randy Seitzinger   . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002117

53.    Declaration of Jaycob Vidana   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002121

54.    Declaration of Richard Charles Ward (handwritten) . . . . . . . . . . . . . .    SA 002128

55.    Declaration of Gary Welch   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002136

56.    Trial Testimony of Dr. Dan Robert, July 14, 2004   . . . . . . . . . . . . . . .    SA 002140

57.    "Tuff Man" DVD[108]

58.    Trial Transcript Digest of Guilt and Penalty   . . . . . . . . . . . . . . . . . . .    SA 002169

59.    DSM-IV-TR, p. 706, "Antisocial Personality Disorder" . . . . . . . . . . .    SA 002293

**Additional Family Declarations**

Declaration of Deborah Cousatte . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002295

Declaration of Rhonda Polvado . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    SA 002298

---

[108]  This exhibit was provided to opposing counsel at the Roberts deposition and a copy will be forwarded to the Court along with the courtesy copy of the Supplement and Appendix.

**Additional Inmate Declarations**

Declaration of Gerald Miller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 002305

Declaration of  Bruce Spring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 002307

Declaration of Gene Sides . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 002313

**VOLUME VIII**

**Attorney / Client Affidavits**

Affidavit of G. Patrick Black, March 13, 2009 . . . . . . . . . . . . . . . . . . . . . . . . SA 002316

Affidavit of Douglas M. Barlow, March 13, 2009 . . . . . . . . . . . . . . . . . . . . . . SA 002330

Affidavit of Brent E. Newton, March 4, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . SA 002349

Affidavit of Shannon Wayne Agofsky, August 6, 2009  . . . . . . . . . . . . . . . . . SA 002359

**Ward Documents**

Letter to PO Taylor from Wright re: Ward and CCC, February 9, 2004 . . . . . SA 002378

Ward Program Review Report, January 13, 2004 . . . . . . . . . . . . . . . . . . . . . . . SA 002379

Ward FBI Interview report, June 19, 2004  . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 002382

Richard Ward incident report, May 27, 2001  . . . . . . . . . . . . . . . . . . . . . . . . . SA 002386

**Miscellaneous Documents**

Correspondence from Trial Counsel's File  . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 002393

ESI Materials Received In Discovery  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 002429

ESI Mini-Manual on Unarmed Tactics  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 002460

Edelen Injury Assessment and Followup Report, April 20, 1999  . . . . . . . . . . SA 002491

Declaration of Andrew Jensen, January 7, 2009  . . . . . . . . . . . . . . . . . . . . . . . SA 002494

Letter from Shannon Agofsky to Caillier April 14, 2004  . . . . . . . . . . . . . . . . SA 002498

Letter from Bennett to Shannon Agofsky April 13, 2004  . . . . . . . . . . . . . . . . SA 002500

Luther Plant Pre-sentence Report  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 002502

Miele Injury Assessment and Followup Report, July 17, 2009 . . . . . . . . . . . . SA 002520

United States v. Agofsky, 458 U.S. 369 (5th Cir. 2006) . . . . . . . . . . . . . . . . . .  SA 002521

United States v. Agofsky, 516 U.S. 280 (5th Cir. 2008) . . . . . . . . . . . . . . . . .  SA 002529

Declaration of Brenda Bryson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002535

Declaration of Midge Malchupa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002537

Transfer Order, Richard Ward, June 24, 2004 . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002542

Letter to Bennett from Shannon Agofsky, April 14, 2004 . . . . . . . . . . . . . . . .  SA 002543

Letter from Caillier to Shannon Agofsky, April 20, 2004 . . . . . . . . . . . . . . . .  SA 002545

Request to Staff Member, May 6, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002546

Response to Request to Saff Member, May 19, 2004 . . . . . . . . . . . . . . . . . . . .  SA 002547

Richard Ward Interview Report, May 14, 2004 . . . . . . . . . . . . . . . . . . . . . . . .  SA 002548

Letter to Chandler from Mosquera, January 24, 2001 . . . . . . . . . . . . . . . . . . .  SA 002550

Jaycob Vidana Interview Report, August 8, 2001 . . . . . . . . . . . . . . . . . . . . . .  SA 002551

James Stephens Interview Report, December 19, 2001 . . . . . . . . . . . . . . . . .  SA 002553

Letter from Shannon Agofsky to Jay Bennett, February 2, 2004 . . . . . . . . . . .  SA 002554

Letter of Introduction from Shannon Agofsky to Thomas Farrugia . . . . . . . .  SA 002556

Letter to Sheila Agofsky From Shannon Agofsky, October 10, 2003 . . . . . .  SA 002557

Letter to Sheila Agofsky From Shannon Agofsky, November 1, 2003 . . . . . .  SA 002562

Notes from Shannon Agofsky re: Questions for BOP Officers . . . . . . . . . . . .  SA 002566

Letter to Bennett from Shannon Agofsky, June 9, 2004 . . . . . . . . . . . . . . . . .  SA 002567

Letter to Black from Stevens, March 9, 2004 . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002570

Memorandum to Townsend from McIntosh, June 30, 2003 . . . . . . . . . . . . . .  SA 002573

Letter from Shannon Agofsky to Bennett, January 27, 2004 . . . . . . . . . . . . .  SA 002579

CJA 30 Form, Douglas M. Barlow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002580

CJA 31 Form, David W. Barlow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002626

CJA 31 Form, Dr. Edward Gripon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002632

CJA 31 Form, Dr. Mary E. Pelz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002638

CJA 31 Form, Charles T. Pelz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002642

CJA 31 Form, Dr. Dan Roberts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002646

CJA 31 Form, Harvey Cox . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002651

## VOLUME IX

### Miscellaneous Documents (continued)

U.S. Court of Appeals 5th Cir., Brief for Appellant . . . . . . . . . . . . . . . . . . . . .  SA 002658

U.S. Court of Appeals 5th Cir., Appellant's Petition for Rehearing En Banc  .  SA 002688

U.S. Supreme Court, Petition for writ of Certiorari . . . . . . . . . . . . . . . . . . . . .  SA 002714

U.S. Supreme Court, Petitioner's Reply to the Brief  . . . . . . . . . . . . . . . . . .  SA 002738

District Court Guilt Phase Verdict Form . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002753

District Court Penalty Phase Verdict Form  . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002755

### Expert Declarations

Supplemental Declaration of Ruben Gur . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002779

Supplemental Declaration of Michael Gelbort  . . . . . . . . . . . . . . . . . . . . . . .  SA 002783

Supplemental Declaration of Erin (Spiers) Nelson  . . . . . . . . . . . . . . . . . . . .  SA 002785

Declaration of Dr. Edward Gripon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002788

Declaration of Dr. Mary Elizabeth Pelz . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002798

Declaration of Charles Terry Pelz  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002805

Declaration of Harvey Cox  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002814

### Noel State Bank Robbery Materials

NAS Report on Forensic Science (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002817

Russell Davey Missouri Trial Testimony  . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002880

Robert Webb Missouri Trial Testimony  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002936

Missouri Prosecutor's Closing Statement  . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 002953

## VOLUME X

### Noel State Bank Robbery Materials (continued)

Russell Davey Oklahoma Trial Testimony  . . . . . . . . . . . . . . . . . . . . . . . . . .  SA 003001

**VOLUME XI**

**Noel State Bank Robbery Materials (continued)**

Robert Webb Oklahoma Trial Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 003439

Oklahoma Prosecutor's Closing Statement . . . . . . . . . . . . . . . . . . . . . . . . . . SA 003571

Brandon Mayfield Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 003624

**VOLUME XII**

**Noel State Bank Robbery Materials (Continued)**

CV of Kenneth Eng . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 003753

Declaration of Kenneth Eng . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 003756

CV of Dr. Simon Cole . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 003763

Declaration of Dr. Simon Cole . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 003786

Representative Press Regarding Brandon Mayfield Case . . . . . . . . . . . . . . . . SA 003806

## Preliminary Statement

In 2001, inmates Shannon Agofsky and Luther Plant had a fight in a recreation cage at the United States Penitentiary in Beaumont, Texas. Plant later died of his injuries. Twenty-eight other inmates were in the recreation yard during the fight, and the government provided a list of their names and register numbers to the defense in 2004, when Mr. Agofsky was tried, convicted, and sentenced to death for Plant's murder. Although nine inmates could have testified that Plant was the initial aggressor and Mr. Agofsky acted in self-defense, the jury heard from only two, because trial counsel conducted an unreasonably limited investigation and did not locate or call the others. The government's case rested on the word of a single inmate, Richard Ward, who testified in exchange for promises that the government never disclosed to the defense. Ward has now recanted.

At the penalty phase, again because of counsel's deficient investigation and other deficient performance, the jury never learned about evidence that the fingerprint "match" that supported the prior conviction introduced as an aggravating factor was inconclusive. They never heard testimony that could have rebutted or explained prison disciplinary infractions, also introduced in aggravation of punishment. Nor did the jury learn anything about extensive mitigating evidence, including a history of trauma and neuropsychological impairment, available from Mr. Agofsky's family, friends, teachers, other inmates, and experts. Many family members and others who knew Mr. Agofsky were willing, even eager, to describe him to the jury as a compassionate survivor who extended protection to the weak and defenseless. Experts could have provided a comprehensive explanation of his development and functioning. Nevertheless, all the jury heard from the defense in mitigation was that the Bureau of Prisons – maybe – could keep him away from other inmates. The defense "strategy" did not work and the jury sentenced Mr. Agofsky to death.

Mr. Agofsky has filed a motion for relief from judgment pursuant to 28 U.S.C. § 2255,

arguing that his trial attorneys provided ineffective assistance at the guilt-innocence and penalty phases of his trial because of their limited investigation and other deficient performance. He also argues that his jury was not life-qualified, that appellate counsel provided ineffective assistance, that the government withheld exculpatory information from the defense, that he was deprived of a speedy trial, and that newly-discovered evidence requires a new penalty trial. Finally, he argues that his innocence of capital murder requires relief.

On February 10, 2009, this Court granted Mr. Agofsky's motion for court-authorized depositions of the trial investigator, Jay Bennett, and the trial mental health expert, Dr. Dan Roberts. Simultaneously, the Court granted the government's motion to authorize affidavits from Mr. Agofsky's trial attorneys, G. Patrick Black, Esq., and Douglas M. Barlow, Esq., and his appellate attorney, Brent E. Newton, Esq. (Doc. 70). All three attorneys served their affidavits on counsel for the defense and the government in March 2009. SA 2316, 2330, 2349.[1] Mr. Bennett's and Dr. Roberts's depositions took place on June 30 and July 2, 2009. SA 540, 692. The Court entered an Order on July 16, 2009 (Doc. 98), granting Mr. Agofsky's unopposed motion to submit this post-deposition Supplement to his Amended § 2255 Motion.

The evidence summarized below, including the deposition testimony of Bennett and Roberts, contradicts many of Black's, Barlow's, and Newton's allegations and demonstrates that they provided ineffective assistance of counsel at both the guilt-innocence phase and penalty phase of trial, and on appeal, and that his additional claims also require relief. The supplemental evidence is extensive. It comprises, not only the deposition testimony and exhibits and the affidavits of Black, Barlow, and Newton, but also forty-eight declarations from family members, friends,

_____

[1] "SA" refers to the Appendix to this Supplement. "A" refers to the Appendix to the Amended § 2255 Motion, filed October 6, 2008.

-2-

teachers, and inmates, a social history report by a licensed social worker, and declarations from nine experts retained by postconviction counsel. All five of the experts retained by trial counsel in 2004 have provided declarations or deposition testimony describing how they could have provided more helpful testimony or advice, if trial counsel had given them more information and direction. In addition, Mr. Agofsky himself has submitted an affidavit responding in detail to his attorneys' allegations.

For the reasons below and in the Amended § 2255 Motion, this Court must order an evidentiary hearing and grant the Motion.

I.    **GROUND 12.1: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE GUILT-INNOCENCE PHASE.**

    A.    **Introduction**

In Point I of his Amended § 2255 Motion, Mr. Agofsky argues that trial counsel conducted an unreasonably limited investigation and provided deficient representation in their preparation for and presentation of the guilt-innocence phase of his 2004 trial. *See* Amended § 2255 Motion at 13. Although counsel advanced justification and heat of passion defenses, they failed to uncover seven available witnesses who would have testified from first-hand knowledge that the deceased, Luther Plant, started the fight. Counsel failed to develop evidence from the witnesses they did present, and from numerous other available witnesses, to describe Plant's reputation, the violent atmosphere, and the prison culture that made it reasonable for Mr. Agofsky to perceive a need to defend himself from lethal force. They failed to uncover helpful evidence from potential and actual government witnesses, to present helpful expert testimony, or to engage in other reasonably effective advocacy before and during the trial. Counsel's incomplete, superficial investigation and error-laden trial presentation were deficient. Moreover, because the government's case rested on the word of a single inmate eyewitness, these deficiencies prejudiced the defense. There is a reasonable probability that, if counsel had reasonably investigated and presented the case for self-defense and heat of passion, using the numerous readily available witnesses and other evidence, the jury would have acquitted Mr. Agofsky, found him guilty only of manslaughter, or, at a minimum, would not have sentenced him to death.[2]

---

    [2] *See Strickland v. Washington*, 466 U.S. 668 (1984); *Richards v. Quarterman*, 566 F.3d 553, 568-71 (5th Cir. 2009) (granting relief for cumulative effect of counsel's deficiencies); *Virgil v. Dretke*, 446 F.3d 598, 612-14 (5th Cir. 2006) (granting relief for trial counsel's ineffectiveness); *Miller v. Dretke*, 420 F.3d 356 (5th Cir. 2005) (same); *see also Soffer v. Dretke*, 368 F.3d 441, 478-79 (5th Cir. 2004) (assessing effect of attorney errors cumulatively under

The ensuing sections supplement the evidence in support of Mr. Agofsky's claims. He presents evidence from the seven additional inmates who could have testified that Luther Plant attacked Mr. Agofsky. Numerous other inmates could have provided background information about Plant's violent reputation and his behavior in the days leading up to the incident. Two of the inmates who testified for the defense (like the third, whose statement is summarized in the Amended § 2255 Motion) describe the detailed testimony they could have given if counsel had developed and elicited it, instead of the meager eighteen pages of testimony elicited from them at trial. Mr. Agofsky presents the statements of experts whose testimony could have supported his defense. In addition, he presents the deposition of trial counsel's investigator, Jay Bennett, who confirms Mr. Agofsky's allegations concerning the defense's inadequate investigation of his case. Finally, he presents the deposition of trial psychologist Dr. Dan Roberts and declarations from retained trial experts Terry and Elizabeth Pelz, Dr. Edward Gripon, and Harvey Cox, all of whom state that trial counsel never asked their advice about the guilt-innocence stage of trial.

This evidence, with the evidence outlined in the Amended § 2255 Motion, demonstrates that Mr. Agofsky is entitled to an evidentiary hearing and a new trial of his guilt or innocence and/or of the penalty, because of the ineffective assistance he received from his trial counsel. U.S. Const. amend. VI.

---

*Strickland* standard).

### B.    Trial Counsel's Role in the Case (Bennett Deposition Testimony)

In Section I.B of Mr. Agofsky's amended motion, he describes trial counsel's conduct of the case from its inception to its conclusion.  Counsel failed to take an active role in case preparation, leading to a delayed and incomplete investigation and poorly prepared lay and expert witnesses for the defense.  *See* Amended § 2255 Motion at 14-19.  Because trial counsel refused to speak to current counsel, many of the allegations contained in the Amended Motion relied upon the trial file turned over to postconviction counsel by lead trial counsel, Mr. Black.  Since filing, Mr. Agofsky has uncovered additional facts to support these claims.  The depositions of Jay Bennett and Dr. Dan Roberts, as well as declarations obtained from the trial experts, Drs. Edward Gripon and Elizabeth Pelz, Terry Pelz, and Harvey Cox, support Mr. Agofsky's claims that counsel took an unreasonably limited role in preparing, investigating, and presenting Mr. Agofsky's case.

Mr. Bennett's deposition confirms the picture painted in Mr. Agofsky's amended motion of a chaotic defense marked by little attorney involvement.[3]  Bennett testified that he is the only investigator in his office and is involved in investigating the office's entire caseload of approximately 200 cases.  SA 542.  Bennett does not independently investigate; he receives his assignments on a case from the attorneys.  SA 543.

Mr. Bennett confirmed Mr. Agofsky's claims that the defense team was delayed in its investigation.  He did not meet with Mr. Agofsky until November 2003, despite the fact that Mr. Agofsky was indicted in August.  SA 547, 638.  The majority of witnesses he interviewed were not

---

[3]  Furthermore, Dr. Roberts and the other experts consulted by trial counsel – Dr. Elizabeth Pelz, Terry Pelz, Harvey Cox, and Dr. Edward Gripon – have all confirmed that their interaction with counsel was sparse and that counsel did not seek their advice concerning potentially helpful opinions they could have offered at both phases of trial.  SA 725 (Roberts), SA 2798-99, 2810 (E. Pelz), SA 2807-8 (T. Pelz), SA 2815 (Cox), SA 2789 (Gripon).

seen until 2004.

In Mr. Agofsky's case, Bennett testified that he largely maintained the following protocol. He was responsible for interviewing witnesses for the defense. After a witness interview, he typed up a summary of his notes and delivered that to the attorneys. SA 544. Of the six inmates who were subpoenaed in Mr. Agofsky's case, Bennett recalled interviewing five. He recalled no contact with the sixth, Michael Fitzgerald, and did not know why the attorneys had subpoenaed inmate Fitzgerald. SA 554. The attorneys did not give Bennett topics for witness interviews and they did not ask him to talk to witnesses about prison culture, or violence in the prisons. SA 547, 555.

Bennett testified that he did not obtain any documents in Mr. Agofsky's case. He further reported that trial counsel did not instruct him to investigate Luther Plant's criminal history or background. SA 558. Although Plant had multiple state convictions prior to his federal incarceration, trial counsel did not ask Bennett to investigate any of those. Bennett acknowledged that the defense team had only documents from Plant's central federal BOP file. *Id.* Trial counsel likewise did not ask Bennett to obtain any documents from Mr. Agofsky's background. SA 27. Bennett recalled that the only documents obtained by the team in relation to Mr. Agofsky were from his BOP file. *Id.*

Initially, the defense team did not have the government's list of inmates in the recreation yard at the time of the altercation between Mr. Agofksy and Luther Plant. SA 547. For over half of the investigation, the defense team was in fact relying upon Mr. Agofsky's recollection of who the inmates on the yard that day were. Mr. Agofsky told his team how to obtain his address book from the Administrative Maximum Facility "ADX" Florence, Colorado, where his property remained after he was transferred to the Liberty County Jail to await trial. SA 556. In it, Mr. Agofsky had contact information for family members, friends, and other potential mitigation

-7-

witnesses.  In addition, after the incident with Plant three years earlier, Mr. Agofsky had written down the names and register numbers of inmates who were on the yard on the day of the fight and had witnessed the fight.  SA 566.  Mr. Bennett obtained the address book and kept a copy for himself.  SA 580.

The defense team finally received the BOP list of potential eyewitnesses from the government in March 2004.[4]  Mr. Bennett acknowledged in his deposition that every witness on the recreation list was a potential eyewitness.  SA 581.  He admitted that the only way to determine whether or not they actually witnessed the fight would be to interview them.  SA 547.  Yet Mr. Bennett only interviewed six of the twenty-eight inmates on the list.

Bennett simply did not follow through on many investigative tasks.  For example, he wrote letters to several of the remaining twenty-two potential eyewitnesses, but made no further effort to contact them if they did not write him back.  Bennett wrote a letter to Robert McKinn because he identified McKinn as a potential eyewitness.  SA 581, 691.  When McKinn did not write him back, Bennett made no further effort.  *Id*.  McKinn states now, and would have stated then, that he witnessed Luther Plant start the fight with Mr. Agofsky and that no one from Mr. Agofsky's trial team ever contacted him.  SA 2097.  Had Bennett followed up with McKinn, he could have testified on Mr. Agofsky's behalf.  The same is true for Charles Glave and Andres Campillo.  Bennett wrote one letter to each of them and failed to follow up with them when they did not respond.  SA 2056, 2543.  Both Glave and Campillo witnessed Luther Plant start the fight and would have been willing to testify on Mr. Agofsky's behalf.  SA 2071, 2014.

In addition, Bennett testified that he believed that, because he visited Beaumont USP, his

---

[4] Discovery turned over by the government to lead counsel, Mr. Black, indicates that the government had that list at least one year before, in June 2003.  SA 2573.

"presence was known" among the inmates and any inmates who wanted to speak to him about the case would simply have contacted him.  SA 570.  Although Bennett admitted that most of the potential eyewitnesses were no longer housed at Beaumont USP at the time of his visits, he believed that word would travel through the prison grapevine to other prisons. SA 582.

Bennett and trial counsel speculated about who the government's informants were and developed changing theories.  At one point, they believed that Jaycob Vidana was the government informant.  Yet Bennett did not make an attempt to interview Mr. Vidana.  Instead, as Bennett testified, when he learned that someone was a "snitch," he would ask other inmate witnesses about that person.  SA 547; *see also* SA 644, 645.[5]  Ben Masters was the one exception to this.  According to Bennett, "I didn't want to put that word out like that because he's in -- in the Aryan -- Aryan Brotherhood and you just don't go -- I wasn't going to go talk -- for Shannon's safety I wasn't going to go start spreading rumors that he's a -- a snitch 'cause he might not be-."  SA 555.

Bennett testified that Mr. Agofsky was responsible for the shifting suspicions about who the informant was.  However, Bennett's letters reflect that the government's discovery suggested who the informant might have been.  SA 644.  Letters from Mr. Agofksy to Bennett indicate that trial counsel did not turn over discovery to him until mid- April, only a few months before the case was to go to trial.  SA 687.  Once Mr. Agofsky was able to review the discovery, he was able to have actual input into who might be testifying against him.  *Id*.  Before then, he was only relying upon his memory of an event which had occurred over three years before in trying to help his attorneys.

---

[5]  As discussed in Point IX, *infra*, this practice could have placed Mr. Agofsky in danger by suggesting that Mr. Agofsky was accusing various inmates of cooperating with the government, before the defense had any clear evidence that it was so.

The new evidence supports the assertions in the Amended § 2255 Motion that Mr. Agofsky's counsel were deficient for failing to conduct a timely and reasonably thorough investigation. As discussed below, their deficiencies resulted in ineffective assistance from the time of indictment through the imposition of sentence.

### C.    Trial Counsel Failed To Make Reasonable Efforts To Interview Government Witnesses Or Otherwise Attempt to Neutralize Their Testimony.

Trial counsel made only one documented (and unsuccessful) effort to interview any government witnesses and did not investigate other means to impeach them or provide context to their testimony.  As the Amended § 2255 Motion describes, counsel's failure to conduct a reasonable investigation of the government's case was unreasonable and prejudicial.  *See* Amended § 2255 Motion at 19.[6]  The motion explains that counsel's deficient performance prejudiced the defense by depriving Mr. Agofsky of the helpful testimony of two of his martial arts teachers, Robert Duggan (who testified for the government at trial) and Gerald Edmondson (who was subpoenaed by the government and present in the courthouse during the government's case but never called).  Both could have testified that if Mr. Agofsky suspected that Plant was carrying an edge weapon and Plant attacked Mr. Agofsky, then any use of force by Mr. Agofsky was reasonable. *See id.* at 24-25.

Assertions by Mr. Agofsky's trial counsel about their contact with Duggan are contradicted by documentary evidence.  Mr. Black and Mr. Barlow allege that Mr. Agofsky had told them that his relationship with Duggan ended on less than favorable terms, which made them believe that Duggan would not provide any helpful information.  SA 2324 (Black), SA 2338 (Barlow). However, letters from Mr. Agofsky written to his trial counsel and turned over by Patrick Black to postconviction counsel indicate otherwise.  In one letter, he specifically tells counsel that he "believes that [Mr. Duggan's] testimony can be made very beneficial to us."  SA 642.  In another

---

[6]  The motion erroneously states, at 19, that the defense made no documented efforts to contact any government witnesses.  In fact, Bennett made one documented effort to interview Richard Ward.  SA 623.

letter, Mr. Agofsky writes, "[A]ll I can think of that the pros. may want him for is to say that Hwa Rang Do incorporates restraint/control techniques, which I could have used instead of killing. If that's not it, I cannot guess." SA 685. These letters show that Mr. Agofsky expected that Duggan would give favorable testimony and that he communicated that fact to his defense team. Trial counsel's assertions that Mr. Agofsky discouraged them from speaking with Mr. Duggan are simply untrue.

Black and Bennett allege that the defense team actually spoke with Robert Duggan and that he "informed the investigator that he had no personal recollection of Mr. Agofsky attending his academy and that during the entire time he may have only taught one or two classes to Mr. Agofsky." SA 2324. Bennett testified that he had planned an interview with Duggan but was derailed because of a snowstorm. Instead, Bennett states that he had a brief telephone conversation with Duggan, in which Duggan told him that he did not recall many details about Mr. Agofsky. SA 560. Bennett does not recall taking any notes during the interview and none have been produced to current counsel. SA 561.

Mr. Agofsky and Duggan contradict these assertions as well. In his accompanying affidavit, Mr. Agofsky maintains that neither his lawyers nor Bennett ever told him that they had contacted Duggan. SA 2368. Likewise, Duggan recalls that no one from Mr. Agofsky's defense ever spoke with him about Mr. Agofsky. A33, A36. As discussed in the Amended § 2255 Motion, the defense's failure to effectively interview Duggan meant that the jury did not hear accurate information that would have been helpful to Mr. Agofsky, and in fact heard testimony that actually harmed Mr. Agofsky. *See* Amended § 2255 Motion at 20-25.

Had trial counsel spoken with Duggan, they would have learned that the government misled Duggan about the prosecution's theory of the case, telling Duggan that Mr. Agofsky was a hired hit

-12-

man.  Had trial counsel informed Duggan of the true circumstances of the case: that Plant struck first, that he and Mr. Agofsky were locked in a 30 foot cage with three other inmates, and that inmates at Beaumont USP were regularly armed,  Duggan's testimony would have been drastically different.  Instead of testifying that Mr. Agofsky used excessive force, he would have testified that the amount of force was reasonably necessary for survival.  A34-36.

To excuse his failure to conduct or arrange for a proper interview with Duggan, Mr. Black, in his affidavit, claims that "Mr. Agofsky said he left martial arts school on 'bad term's and trial counsel was concerned that due to such Duggan and the other instructors might testify adversely to Mr. Agofsky's interest at trial."  SA 2325.   If believed, those circumstances would have made it even more important that the team interview Duggan. Counsel knew that the government intended to call Duggan as a witness. Their failure to conduct an adequate interview and investigation of Mr. Duggan in order to at least neutralize his testimony was deficient.

A reasonably thorough defense investigation would also have yielded prior inconsistent statements from and impeaching background information about the government's only eyewitness, Richard Ward.[7]  Scott Lawson, who testified for the defense at trial, shared a cell with Ward and defense witness Robert Ecker.  Lawson could have testified to conversations he had with Richard Ward and Robert Ecker after the fight.  Lawson was in the cell when Ward and Ecker returned from recreation on the day of the incident.  When they came back to the cell, both Ward and Ecker told

---

[7] As explained in Point V, *infra*, the government withheld *Brady* information concerning Ward.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Although Ward now states that he did not see how the fight between Plant and Mr. Agofsky started, government agents convinced him to testify that Mr. Agofsky initiated it, by promising Ward a "clean start" in the form of release to Texas, admittance to the witness protection program, and suspension of his supervised release. They instructed him not to mention those promises when he testified, and coached him repeatedly.

Lawson that Plant had started a fight with Mr. Agofsky.  Ward said that Plant had slapped Shannon, who then knocked Plant down and kicked him.  Ward and Lawson shared their surprise that Plant would do this.  Ward said to Lawson more than once, "I cannot believe that Tootie swung on Shannon" and was laughing in surprise that Plant had attacked Mr. Agofsky.  Plant was alive when Ward and Ecker left the yard so no one knew at that time that Plant had died.  Lawson told the defense investigator this information, yet Lawson was not questioned about it by the defense on the witness stand.  SA 2082.

Robert Ecker, also called by the defense at trial, could have testified about a conversation he had with Ward after the fight.  Ecker could have explained that he and Ward were surprised and in total shock when Plant swung at Mr. Agofsky.  He and Ward went back to the cell and talked about how they could not believe that Plant had turned on or swung at Mr. Agofsky, and how Plant "must have been crazy."  SA 2041.

The defense could also have obtained evidence that would have helped explain why Ward would lie.  This would have been important because, as Ward testified, he had only "a couple of months left" before his release. Tr. Vol. 19, 232.  Thus it appeared that he would have little to gain by testifying, and the prosecution argued in summation that Ward "has not been guaranteed any benefits for his testimony and that is absolutely true." Tr. Vol. 20, 373.[8]  George Rivera could have testified that Richard Ward, like Plant himself, was a drug courier who carried drugs and held both

---

[8]  As explained in Point I.I.1, ¶¶ 168-69, trial counsel also failed to make use of the most substantial piece of impeachment material he did have, a report that Ward received a clear promise of a "Rule 35" time cut.  And Point V describes the government's failure to disclose even more substantial impeachment evidence (given the limited impeachment value of the time cut because of Ward's already imminent release), in the form of promises the government had made to Ward that he would be placed in the witness protection program and would not have to report for supervised release once he was out of prison.

knives and drugs for Rivera. Indeed, a few months after the Plant incident, Ward was caught with seven knives in his cell. SA 2111. Ward owed a lot of money to inmates in general population and did not want to leave the SHU to face his creditors. SA 2105. Ward was transferred to another facility immediately after he agreed to testify for the government. SA 2542. All of this information could have explained why cooperation would have been attractive and beneficial to Ward even though he was so close to release.

Robert Ecker could have also testified about Ward's reputation to help undermine his credibility. Ecker told Mr. Agofsky's attorneys before trial that Ward was a severe drug addict and a "sick guy." Ward would talk really fast and "go off", then later he would be calm. SA 2046. Mr. Black and/or Barlow told Ecker that they were going to ask him about Ward's character, drug use, and mental illness, but they never did. SA 2048.

If the jury had heard from several witnesses that the government's only eyewitness had previously stated that Plant attacked Mr. Agofsky, and that he had something more substantial to gain by testifying than a few weeks off his sentence – a way to escape his debts in Beaumont – the information could have been fatal to the government's case.[9] If, in addition, the jury had known that Mr. Edmondson and Mr. Duggan would have supported the defense, if anyone had informed them of the evidence presented by the defense witnesses, the government's case would have been undermined still further. There is a reasonable probability that, but for trial counsel's unreasonable failure to undertake basic investigation of the government's case, the outcome would have been

---

[9] If the jury had also learned about the promises of witness protection and no supervised release, which the government failed to disclose, and which provided a more convincing explanation for Ward's decision to cooperate than his insistence that he just wanted to square his debt to society by doing the right thing, the likelihood of acquittal would have increased dramatically. *See* Point V.

different and the jury would have found Mr. Agofsky not guilty or imposed a non-death sentence.

*See Catalan v. Cockrell*, 315 F.3d 491 (5th Cir. 2002) (failure to impeach prosecution witness was deficient performance); *Martinez-Macias v Collins*, 810 F. Supp. 782, 808-13 (W.D. Tex. 1991) (counsel's failure to investigate or present evidence contesting government witnesses was ineffective), *aff'd on opinion below*, 979 F.2d 1067 (5th Cir. 1992).   Thus, alone and in conjunction with other deficient performance described in this summary and Mr. Agofsky's amended petition, this instance of trial counsel's deficient performance prejudiced the defense.

 **D.** **Trial Counsel Failed To Investigate And Present Readily Available Evidence To Support The Justification And Heat Of Passion Defenses Upon Which They Relied At Trial.**

  **1.** **Eyewitnesses**

As explained in Point I.D.1 of the Amended § 2255 Motion, trial counsel conducted an unreasonably limited, superficial investigation of the Luther Plant incident and thus could not present much evidence to establish that Mr. Agofsky acted in self-defense. *See* Amended § 2255 Motion at 27. They presented only two eyewitnesses, Billy Santiago and Robert Ecker, who saw the beginning of the fight. Both testified only briefly that Plant attacked Mr. Agofsky first. In addition to other deficient performance, trial counsel failed to uncover and/or present numerous other eyewitnesses who would have supported the accounts of Santiago and Ecker. The amended motion summarizes the potential testimony of several of these other eyewitnesses. Randy Seitzinger saw Plant begin the fight by attacking Mr. Agofsky first, and Pete Carrion and Lonnie Griffin could have described other circumstances on the recreation yard which supported a heat- of-the-moment defense. All of them would have been willing to testify**.** *See* Amended § 2255 Motion at 27-35, ¶¶ 36 to 64.

 An additional six eyewitnesses could have provided further testimony that Mr. Agofsky was defending himself, bringing the tally of directly supportive eyewitnesses whom counsel did not present at trial to seven. Melvin Hauser, who was in the cage next to Mr. Agofsky's cage during the fight with Plant, saw Plant swing first. Hauser could have been particularly persuasive to a jury because he was an impartial observer. Before January 5, 2001, he knew who Shannon Agofsky was, but they were not friends and he never had any dealings with him. Hauser is African-American and would have also been able to testify that he never had any problems with Mr. Agofsky. Hauser also knew who Plant was, but had only seen him in the Special Housing Unit (administrative segregation

or "SHU"). They were not friends. SA 2085.

Hauser recalls the details of January 5, 2001 very clearly. That morning, Hauser was in the recreation yard in the SHU. He was in Cage #2, in the cage next to Cage #3, which held Mr. Agofsky and Luther Plant. At that time, inmates were generally placed in each recreation cage in order. Inmates were brought out one by one, first to Cage #1 until it was full, then Cage #2, then Cage #3, and so on. Cage #6 would be filled last. SA 2085.

Hauser was getting exercise that morning by walking back and forth across Cage #2, and happened to be walking in the direction of Mr. Agofsky's cage when the incident happened. Mr. Agofsky and Plant were also walking and would pass each other as they walked back and forth across Cage #3. The inmates in Cage #1 were playing handball. The inmates in the first few cages had been on the recreation yard for a while before the incident occurred. The inmates in Cage #1 might have had enough time to finish one handball game and start the next game. SA 2085.

Hauser saw that Mr. Agofsky and Plant were having some words as they walked back and forth, but did not hear what they were saying and did not know if the conversation was positive or negative. He was not paying close attention because he had no idea that something was about to happen. Suddenly, Hauser saw Plant try to make a move on Mr. Agofsky by swinging at him. He could not tell if Plant actually landed a blow or just attempted to hit Mr. Agofsky but had no doubt that Plant swung at Mr. Agofsky first. Then Mr. Agofsky knocked Plant to the ground and kicked him. The whole thing was over quickly. It could have been over in eleven seconds. Hauser did not notice any officers in the yard when this happened, but was not paying close attention to their location. It took a long time for the officers to get into the cage to help Plant. Hauser could hear that Plant was gurgling because he had blood in his throat, and shouted for the officers to turn him on his side. The officers just told the rest of the inmates to get back even though there really was

-18-

nowhere to get back to.  One of Plant's legs was twitching in the air and the officers kept telling him to put his leg down.  SA 2079.

Even though Hauser was not friends with Mr. Agofsky, he shouted at him, after the incident, to have someone talk to him, since he had seen what had happened and did not want anyone telling lies about it.  The authorities came to the SHU within a day or two after the incident trying to take statements, but Hauser would not talk to them because he did not want other inmates to consider him a "snitch."  SA 2080.  No one from Mr. Agofsky's defense ever came to speak to Hauser after the incident.  Bennett testified that he did not interview Hauser, but would have done so had the attorneys requested it.  SA 581.  Hauser would have been willing to testify on Mr. Agofsky's behalf.  SA 2080.

Trial counsel could also have presented the testimony of Reginald Gilbert-Bey, who was in the same cage as Hauser, Cage #2, next to Mr. Agofsky's and Plant's cage, Cage #3, on January 5, 2001.  Gilbert-Bey was working out and noticed that Plant was getting loud and aggressive with Mr. Agofsky.  Plant suddenly charged at Mr. Agofsky, who put up his arm to defend himself, knocked Plant down, and kicked him.  SA 2065.  Gilbert-Bey could have explained why he never gave a statement to the FBI.  Immediately after the incident, the FBI came to talk to him along with three other inmates.  They met the FBI in a group and declined to give a statement.  Gilbert-Bey declined, along with the others, because he is not a government informant and did not want other inmates to think he was an informant.  SA 2072.

No one from Mr. Agofsky's defense ever talked to Gilbert-Bey about the Luther Plant incident or any other subject before the 2004 trial.  Bennett testified that he would have interviewed Gilber-Bey, had the attorneys asked him to do so.  SA 581.  If asked, Gilbert-Bey would have been willing to testify on Mr. Agofsky's behalf.  SA 2064.

-19-

Robert McKinn was three cages down from the cage where Mr. Agofsky and Plant were fighting and witnessed the incident. McKinn, like Hauser and Gilbert-Bey, was not a friend of either Mr. Agofsky or Luther Plant. McKinn could have testified that as he was walking back and forth in his recreation cage he heard people talking and looked over at the cage Mr. Agofsky and Plant were in. At that point McKinn saw Plant swing at Mr. Agofsky. Plant lunged at Mr. Agofsky with a "roundhouse punch." McKinn believed that Plant had something in his hand, possibly a "fist pack" or a knife. McKinn thought the "roundhouse" nature of the punch was odd, but thought that maybe Plant was trying to get more leverage and make the hit more powerful. If called to testify, McKinn could have explained that Mr. Agofsky defended himself and the only thing you can do in a recreation cage if someone "pops" you is to "pop" them back. SA 2097-98. McKinn did not see any guards on the yard at that time and did not think any guards were around at the time of the incident. McKinn thought it was possible that the guards were aware of the incident and let it happen, as guards have been known to stage things. SA 2097.

McKinn could also have explained to the jury why he never gave a statement to the FBI. After the fight, the FBI came to talk to him. McKinn was in the shower and said that he did not want to speak to them. McKinn and others were told that they had to talk to the FBI and if they did not come out of the shower then officers would come in and get them. McKinn told the FBI that he did not know anything because if you speak to the FBI for too long you will be deemed a snitch. McKinn did not want to get hurt and did not want any problems or anyone thinking he was a snitch. SA 2098.

McKinn's name and inmate number were listed in Mr. Agofsky's address book, in the possession of the defense team. SA 670. In addition, Mr. Agofsky made references to McKinn in his correspondence with the team. SA 685. Although Bennett wrote McKinn a letter, SA 691, when

-20-

McKinn did not respond, no one from Mr. Agofsky's defense ever followed up with him. SA 581.

Charles Glave was also on the recreation yard that day; in Cage #5, just two cages away from Mr. Agofsky. Glave heard Plant "running his mouth on the day of the fight. When I looked Tooty was swinging at Shannon. His arms were flailing." SA 2073. Glave could have explained to the jury that he did not talk to the FBI after the fight because "It is an unwritten rule. No man talks to the cops, either way. Never. You don't want to spend too much time there or others will think you are a snitch." SA 2074.

No one from Mr. Agofsky's defense ever spoke with Glave. SA 2071. One letter from Mr. Agofsky to Bennett, which was turned over by trial counsel to habeas counsel, indicates that. Bennett had written to Glave, whom Mr. Agofsky did not know, in Victorville. SA 2498. Bennett did not follow up with Glave. SA 551. Bennett testified that he would have passed along the information from Glave - that he saw Plant swing first - to the attorneys, had he interviewed Glave. SA 551. Glave would have been willing to testify at Mr. Agofksy's trial, had counsel ever asked. SA 2071.

Andres Campillo was also on the yard, and witnessed the beginning of the incident between Mr. Agofsky and Plant. Campillo heard Plant say something nasty to Mr. Agofsky and then saw Plant strike Mr. Agofsky first. SA 2014. After the incident, Campillo was taken into a room by the FBI who tried to pressure him to say things that would be bad for Mr. Agofsky. The FBI threatened Campillo and told him he would "get a case" if he did not speak with them. Campillo had to refuse to speak several times before they would allow him to leave. Campillo told the FBI to talk to his lawyer and they finally left him alone. SA 2014.

On April 13, 2004, Bennett wrote to Mr. Agofsky that he would be going to ADX in Florence to interview Campillo. SA 2501. Mr. Agofsky responded, urging Bennett to just ask the

-21-

"standard stuff" with Campillo – "did he see Tootie swing on me, how long it lasted, etc." Mr. Bennett never went to see Mr. Campillo, however. SA 551.

Frank Early was on the recreation yard on January 5, 2001, in a recreation cage adjacent to Mr. Agofsky's. Early could have testified that he witnessed Plant getting "loud and aggressive...and too close to" Mr. Agofsky before the incident. SA 2036. He then heard a scuffle but did not stare because that is against proper prison etiquette. When he looked up again, Plant was on the ground. "It's definitely not true that Shannon just walked up to Tootie and hit him for no reason." SA 2037. Early could have also helped explain to the jury why the inmates did not talk to the FBI. "I know and any inmate knows, that if he's seen with the FBI too long then he will be in trouble because people will think he's snitching." SA 2037.

Early was interviewed by Bennett but was not subpoenaed. According to Bennett's interview with Early, Early stated that he witnessed the fight but would not go into detail. SA 634. According to Bennett, Early did not want to get involved in Mr. Agofsky's business. SA 571. Early stated in 2008, however, that Bennett simply did not ask him these questions. SA 2038.

If, in addition to the superficial trial testimony elicited at trial from Santiago and Ecker, the jurors had heard from seven other eyewitnesses that Plant started the fight, Mr. Agofsky's acquittal would not have been just a reasonable probability but a virtual certainty. At the very least, there is a reasonable probability that a jury that had heard this evidence would have convicted Mr. Agofsky of a lesser offense or would not have sentenced Mr. Agofsky to death. The government's only eyewitness was Richard Ward, a drug user and courier with drug debts to other inmates, who originally told the FBI that he did not see the attack and told other inmates that Plant had started the fight. Thus, alone and in conjunction with other deficient performance described in this Supplement and Mr. Agofsky's Amended § 2255 Motion, this instance of trial counsel's deficient performance

-22-

prejudiced the defense.

### 2.        Background Witnesses.

Trial counsel not only failed to present all the eyewitnesses who could have testified that Plant started the fight, but, as explained in Point I.D.2 of the Amended § 2255 Motion, failed to develop and present evidence that could have supported their own defense by establishing Plant's reputation and behavior, the violent atmosphere at USP Beaumont in 2001, and other background information. *See* Amended § 2255 Motion at 35. The motion sets forth the available testimony of eight witnesses,[10] who would have testified about Plant's violent reputation, pervasive prison violence, and prison culture.

Additional background evidence was available from other witnesses. Melvin Hauser could also have testified that Beaumont was a very violent institution. People called it "gladiator school" because there were so many fights. There were a lot of knives around. It was a new prison and it was easy to find metal in the dirt on the compound left over from construction. Hauser saw a lot of violence with his own eyes, including a white inmate's stabbing in the chest and a black inmate's murder by another black inmate over a gambling dispute. SA 2080. Hauser could have described an example of the dangerous way Beaumont was run. Even though the prison was so violent, seven inmates in wheelchairs were part of the general population and not in a unit by themselves. Hauser thought that those inmates were vulnerable and that their presence in general population was an invitation for trouble. In his experience, other, less dangerous institutions have housed handicapped inmates separately. At Beaumont, he himself looked out for one of the inmates who was in a wheelchair, to protect him. SA 2080.

---

[10]  Brian Berry, Gerald Miller, Jeffrey Milton, Ralph Cutchins, Russell Dinovo, Mike Fitzgerald, Joseph Agofsky, and Roderick Russell.

Hauser could also have explained the practice of "checking in."  Attacking Mr. Agofsky could have been Plant's way of trying to get himself out of the institution.  Hauser had seen inmates do similar things many times to get off the compound and into a SHU, or out of an institution altogether.  He could have testified that an inmate who uses drugs is usually in debt because drugs are much more expensive in prison than on the street and inmates cannot support a habit without a really good source of income.  Inmates will often try to escape debts, or other inmates who are hostile to them for other reasons, by "checking in."  They can "check in" either by asking the authorities for protection in the SHU or by committing an infraction that will get them placed in the SHU or transferred to another prison.  It is considered more honorable to commit an infraction than to ask for protection, especially since an inmate who asks for protection comes under suspicion of being an informer.  SA 2080.

Reginald Gilbert-Bey could also have described both the atmosphere at Beaumont and Luther Plant's reputation.  In 2001, Beaumont was an extremely violent place, the most violent institution Gilbert-Bey had been in.   Inmates commonly called it the "Thunderdome" or "Terrordome."  Guards used to allow and encourage fighting and could not control the inmates. Things got so bad that some inmates filed administrative grievances about the lax security.  If an inmate slept in his cell in the daytime, he had to lock the door.  In fact, to avoid trouble, Gilbert-Bey's religious group required its members to lock their cell doors if they slept in the daytime, or pay a penalty.  Knives were easily available at Beaumont and stabbings were common.  Gilbert-Bey witnessed many stabbings, including one in the very same recreation cage shortly before the Plant incident.  Gilbert-Bey could have testified that Mr. Agofsky would have had good reason to assume that Plant had a weapon.  Anyone at Beaumont would assume that if someone smaller attacked him, the other inmate must be armed.   SA 2065.

-24-

Plant had a drug habit, and had acquired heavy debts and many enemies. Gilbert-Bey knew that Plant had been caught transporting drugs into the institution and now owed money both to the owners of those drugs and to other people for previous debts, whom he had been planning to pay with the percentage he expected for his transportation services. He was afraid of retaliation and had good reason to want to get out of the institution. He could have attacked Mr. Agofsky deliberately to incur an infraction that would lead to his transfer. SA 2065.

The defense could have called Robert McKinn to describe the violence at Beaumont. According to McKinn, everyone at Beaumont carried a knife. McKinn always carried a knife to protect himself. It was easy to make knives and there were many ways to do it. The inmates would pull pieces of metal off the bottom of the doors or they would find pieces of metal in the yard. Another way to make knives was from the food trays. Inmates would break the food trays until they got to the aluminum and then they would use the two edges of the tray and tie them together a string. SA 2097.

Similarly, Charles Glave would have testified that Beaumont was a "dangerous facility" where guards treat inmates "like animals. There is no empathy at all. They hate their jobs and hate us....We're like dogs in a kennel." SA 2071. In Beaumont, the guards would frequently put a third cellmate in a two-man cell, forcing one inmate to sleep on the floor. Because Beaumont was a "lock- down" facility, inmates spent twenty-three hours a day in their cells. SA 2072. The third inmate had to "keep all his stuff in his mattress and roll it up under the bottom bunk or sit on it." This increased tension in the prison and frustrations with the guards and prison administration. Glave had witnessed stabbings at Beaumont and witnessed a murder on the yard there over a book of stamps. SA 2072.

Glave was incarcerated with Plant at Beaumont USP and at Lompoc USP and described him

as someone who "was doing everything you shouldn't do in prison." SA 2073. Plant made and sold knives on the prison yard. "He owed money and had enemies." *Id.* Glave knew that Plant owed money on the yard because he would buy drugs on credit. Plant would then do something to get into trouble, so that he could get more time to pay off his debts. Glave saw this happen with Plant at Lompoc. According to Glave, Plant "has a 'track record' for this." SA 2073.

The defense could have asked Andres Campillo, who knew Mr. Agofsky during his time at USP Beaumont, to describe the environment there. Beaumont was a very violent place. Fights were not one-on-one, they were after three or four people against one. SA 2014. During his time at Beaumont, Campillo witnessed fifteen to twenty stabbings and was aware of three or four deaths. In another incident, he was jumped and his teeth were kicked out, even though it turned out he was not the intended target. He could have also described an incident were the prison chaplain was attacked with a weapon. No one was safe in Beaumont. SA 2014.

The defense could have interviewed and presented testimony from Jeff Milton, who was incarcerated at USP Lompoc during 1996-99, when both Luther Plant and Shannon Agofsky were there. Although Mr. Agofsky suggested that the defense interview Milton, and Bennett at one time planned to do so, Bennett never spoke to him. SA 558, 2543-44, 2545. Milton could have testified that Plant was known as a predator who carried a knife and preyed on weaker inmates if he thought he could get away with it. Plant would follow Milton around the yard at Lompoc and hang out wherever he was. Milton had no tattoos and looked very young at that time, and believed that Plant was following him because he appeared to be vulnerable. He avoided Plant because he knew his reputation. One day Plant, accompanied by two other inmates, came up to Milton near the bathroom on the yard at Lompoc. Plant said aggressively, "You're with me now." Milton asked him what he was talking about and they had a heated argument. Milton believed that if he had not defended

-26-

himself, Plant and his companions would have preyed on him.  SA 2102.

Milton wrote two or three letters to Mr. Agofsky's attorneys in 2004, but no one ever contacted or visited him.  He would have been willing to testify if he had been asked.  SA 2103.

The defense could also have called William Massey, who knew Mr. Agofsky during his time in the SHU at USP Beaumont.  Massey could have described the atmosphere at Beaumont, and could have testified that it was a very dangerous prison commonly known as "Gladiator School" and "Bloody Beaumont."  During Massey's stay there, the institution was locked down three times because of inmate murders.  SA 2090.  Massey and Mr. Agofsky were cellmates for two years in the SHU and Massey could have explained that the reason they both worked out every day was because there was nothing else to do and because inmates had to protect themselves on the "Gladiator Compound."  SA 2090.

Massey could have also described the behavior of the guards at Beaumont.  The guards would intentionally put inmates in cells with other inmates who they knew would assault them.  On one occasion a guard came to Massey's cell saying he wanted to put another inmate in Massey's cell with him.  The guard said that this inmate was causing problems and indicated that he wanted Massey to take care of the inmate.  Massey told the guard not to put the inmate in his cell.  The guard said "you should handle this, we have taken care of you."  Massey again told the guard no.  At that point Massey was taken out of his cell by guards and taken to recreation.  SA 2091.  When Massey returned to his cell the problem inmate was there.  Massey told the inmate he needed to get out of his cell.  The inmate banged on the cell door and told the guards he wanted out.  The guards left the inmate in the cell with Massey.  The inmate was an informant.  These are the worst people to be associated with in prison, and the guards knew that.  Since this type of individual was placed in Massey's cell, he had to handle the situation or there would be repercussions for him later.

-27-

Massey could have explained that there are unwritten rules in prison – you stay with your own people, you do not mix races and you do not associate with informants. SA 2091.

No one from Mr. Agofsky's defense ever came to speak to Massey. Mr. Agofsky repeatedly asked his attorneys and Bennett to interview Massey. He gave Bennett Massey's address and telephone number. SA 668. Correspondence between Mr. Agofsky and his defense indicates that they could not find a correct telephone number for Massey. SA 2509, 2500, 2543-45. However, Massey is still at the same telephone number in Mr. Agofsky's address book. SA 648. Had trial counsel contacted Massey, he would have been willing to testify on Mr. Agofsky's behalf.

Trial counsel based their entire defense on twelve pages of eyewitness testimony by Santiago and Ecker and a few more pages of background testimony by Lawson, Plant's cellmate. The jury had no context in which to assess the credibility of the defense evidence that Plant attacked first or the reasonableness of Mr. Agofsky's response. There is a reasonable probability that if the jurors had learned the background information a reasonable investigation would have uncovered – concerning Plant's reputation, prison culture, and the violent atmosphere at USP Beaumont – that they would have found Mr. Agofsky not guilty, convicted on a lesser offense, or imposed a non-death sentence. Thus, alone and in conjunction with other deficient performance described in this supplement and Mr. Agofsky's amended motion, this instance of trial counsel's deficient performance prejudiced the defense.

**E.      Trial Counsel Failed To Present Witnesses Their Investigator Had Interviewed Who Were Willing To Testify And Who Could Provide Support For The Justification Or Heat Of Passion Defenses, And Failed To Elicit Other Helpful Information Available From Witnesses They Did Call.**

As discussed in Mr. Agofsky's Amended § 2255 Motion, the defense failed to adequately present witnesses interviewed during their unreasonably truncated investigation. *See* Amended § 2255 Motion at 43. Interview memos from Mr. Bennett reflect that he interviewed a total of seventeen witnesses. At his deposition, Bennett stated that he prepared witness summaries for each of the prisoners he interviewed, and that he had not interviewed anyone else. SA 551. There are seventeen summaries; seven of these pertain to eyewitnesses. SA 615-37.

The defense subpoenaed only six witnesses, and put only three on the stand. Billy Santiago and Robert Ecker were both eyewitnesses who testified. Scott Lawson also testified. The defense subpoenaed but decided not to call George Rivera, Michael Fitzgerald, and Bruce Spring, none of whom were on the recreation yard at the time of the Plant incident. Mr. Black and Mr. Barlow decided whom to subpoena solely on the basis of the brief memos by Mr. Bennett summarizing inmate interviews. SA 615-37. Bennett testified that the determination of whom to call was made by the attorneys, although he did provide input or suggestions. SA 553, 554, 556-57. Bennett did not know why some inmates were subpoenaed, but did not testify. *Id.*

Bennett acknowledged that Beaumont USP was well known as a "very dangerous" place. SA 550. However, he admitted that he did not ask any of the inmates he interviewed about specific experiences of violence in prison, other than the fight between Mr. Agofsky and Luther Plant. SA 554. According to Bennett, he was not directed to ask inmates about prison culture evidence. SA 547. Nor did Black or Barlow direct Bennett to investigate Luther Plant's criminal history. SA 558.

-29-

Although the defense did interview and call inmate Robert Ecker, who was in the same recreation cage as Mr. Agofsky and Luther Plant on January 5, 2001, the defense failed to elicit important details from him. Ecker testified that on the day of the incident, Plant was leaning on the wall facing Cage #4 talking to an unidentified inmate. Mr. Agofsky was walking back and forth with inmate Williams. Ecker heard Plant say to Mr. Agofsky, "Shannon, I want to holler at you." Ecker testified that Mr. Agofsky turned towards Plant, and as Plant was walking towards Mr. Agofsky, Plant just "charged." Ecker then testified that Plant swung or threw the first blow at Mr. Agofsky. Then Mr. Agofsky hit Plant and Plant went down. Ecker also testified that Richard Ward had his back turned when the fight happened and therefore Ward did not see the fight. Tr. Vol. 19, 306-07.

If prepared by the defense team, Ecker could have responded to the government's cross-examination about his failure to provide a statement to the FBI before trial. Ecker could have explained that the reason that he did not want to speak to the FBI because he did not want to look like a "snitch." Ecker could have explained that in Atlanta, the FBI or guards had once separated him from the other inmates and made him look like a snitch. This could have had Ecker killed. SA 2042.

Ecker could also have provided important information about Plant's reputation. Plant was a severe drug addict. Both Ward and Plant were using about three hundred dollars' worth of drugs each day. Plant was a "mule" who kept the flow of marijuana, heroin and knives coming into the institution. Ecker could have explained that Plant may have been trying to "check in" by hurting or hitting Mr. Agofsky and that Plant may have been suicidal. Plant owed a lot of money, and "checking in" would have offered a way to escape his debts. Ecker could have also described how Plant started working out sometime before the fight with Mr. Agofsky. Plant would wrap his legs

-30-

up on the toilet and do sit-ups and push-ups.  Ecker could also have told the jury that Plant was in withdrawal at the time and was sick.  The defense team told Ecker that they were going to ask him about Plant's character and drug use, but they never did.  SA 2042, 2044-45 2047.

In addition, Ecker could have described Beaumont as a violent institution where several stabbings occurred each day.  Ecker could have described a horrible stabbing that he witnessed on the yard where an inmate was stabbed in the back.  After the stabbing, the guards fired a warning shot, which means the inmates have to get down or they will be shot.  An inmate lost a finger when the guards then fired shots into the yard.  Ecker could have described the effects of being housed in a violent prison like Beaumont.  Ecker describes himself as nervous and "waiting to be stabbed," and never being able to get over the fear of being in a place like Beaumont.  SA 2042.

Although Scott Lawson was interviewed and called to testify by the defense, trial counsel failed to elicit important details from him.  In addition to testifying that he heard Plant make threats towards Mr. Agofsky in the days leading up to the fight, Lawson could have explained further to the jury that Plant said "he was growing sick of Shannon and he was going to jump on him."  Lawson did not tell Mr. Agofsky about the threats Plant was making because Lawson did not take Plant seriously at the time.  Additionally, Lawson could have explained why Plant was acting like this and making these threats.  Plant was in trouble in the prison and he wanted to get transferred to another institution.  Plant was a junkie, he used heroin, and he owed money all over the yard to all kinds of people.   Mr. Agofsky had nothing to do with Plant's problems but Plant knew that he could get away from those people if he started a fight with Mr. Agofsky.  Plant was using Mr. Agofsky to get himself out of trouble.  Lawson was Plant's cellmate at the time and could have explained that every time they went to recreation Mr. Agofsky's cell went also.  Plant knew that he would be in a recreation cage with Mr. Agofsky.   Plant knew that if he attacked Mr. Agofsky, the prison would

list Plant as a separatee from Mr. Agofsky and they would transfer Plant to a different institution. Lawson could have explained that Plant would most likely have been transferred because Mr. Agofsky was friends with everyone on the yard.  SA 2082.

Lawson could also have explained the practice of "checking in" to the jury.  Lawson explains that it is pretty frequent in United States Penitentiaries for one inmate to start an altercation with another inmate in order to "check-in" to the hole (SHU) or to get transferred out of that penitentiary entirely. If an inmate was trying to get separated from someone, they would often cause an altercation in front of a corrections officer.  SA 2082.

Lawson could have explained to the jury that in prison inmates must take threats seriously or it could cost them their lives.  Inmates have to deal with threats right on the spot or it will be a much bigger problem involving more people.  If Mr. Agofsky had not defended himself, he would have had to watch his back for the rest of his time at Beaumont.  Plant was known for carrying knives and Mr. Agofsky would not have known whether or not Plant had a knife that day in the cage. SA 2084.

Lawson could have described the environment at Beaumont.  When Lawson arrived in Beaumont in 2000, the institution was known as "Bloody Beaumont."  It was a dangerous and violent prison with drugs and knives everywhere.  Inmates witnessed stabbings and killings and eventually become desensitized.  Lawson saw three or four stabbings at Beaumont and was almost stabbed himself by four inmates with knives.  Another time an inmate ran up behind Lawson with a lead pipe.  Lawson could have explained that you had to stay alert and watch your surroundings as there was violence every day.  The inmates had to learn how to read people so they would know if people were coming after them.  If an inmate was in a fight he had to watch to make sure another inmate did not come up behind and stab him.  SA 2084.

Lawson could have described the behavior of the guards at Beaumont.  The guards would cause fights by identifying the sex offenders to the other inmates.  The staff hated the sex offenders just as much as the inmates did.  The people in charge of the shops and trades had access to the computer database covering all of the inmates and their charges.  This is how they would identify who the sex offenders were.  Guards would also tell inmates who the snitches were.  The guards would purposely put snitches and sex offenders in recreation cages with inmates to start fights between them.  This was common in most of the penitentiaries    SA 2084.

Lawson could have provided other information about Ward's reputation. Ward was a heroin addict, was "really strung," and had tried to kill himself at least two or three times.  Ward was placed in the "suicide cells" numerous times.  SA 2083.

Lawson could have also provided valuable information about Plant's reputation.  Lawson could have described Plant as a heroin addict and was always high on the yard and frequently out of control.  Plant jeopardized his family by having them bring drugs to him in the visiting room of the prison.  He had to move drugs through them to pay off his habit, and everyone knew about this. Lawson could have explained that Plant was a liar and told a lot of stories that were untrue.  Because of his lies Plant was not trustworthy.  Lawson could have explained that in prison you get credit on your word, but Plant could not get any more credit because he was a liar.  Plant had trouble with inmates on the yard because of his debt.  Lawson told the defense investigator this information, yet defense counsel failed to elicit it from Lawson when he testified.  SA 2083.

The defense investigator failed to conduct a meaningful interview of Lawson.  Bennett took a few notes and told Lawson that he would testify.  Lawson did not speak to anyone from Mr. Agofsky's defense team again until he was transported to Texas for the trial. Defense counsel Black spoke to Lawson and the other inmate witnesses in a group setting for about ten to fifteen minutes.

Black never spoke to Lawson individually, never asked him any questions, and never prepared him for the what the prosecution would ask him.  Black spoke to the inmates very generally about what he was going to ask them, but never went into any detail.  Black told them to keep their answers short with a "yes" or "no" answer.  The defense team provided two blue suit coats for the six inmates to share.  When Lawson took the stand he did not know what questions defense counsel was going to ask him.  It was the first time he had ever testified and he was nervous.  He testified for a couple of minutes but did not have an opportunity to explain any of the things that he told the investigator about Plant, Ward, or Mr. Agofsky.  SA 2084.

George Rivera was not called as a defense witness, although the defense did subpoena him. Before the trial in 2004, Rivera received a visit in Coleman, Florida, from the defense investigator, who discussed the violence at USP Beaumont and background information about both Plant and Mr. Agofsky.  Rivera was subpoenaed and transported to Beaumont.  Although one of Mr. Agofsky's trial lawyers met with Rivera a couple of days before the trial and asked him about Ward's background, and the other lawyer spoke to Rivera briefly on the day he was to testify, the defense never called him to the stand.  SA 2106.

Rivera could have described both USP Beaumont and Luther Plant.   From 1999 to 2001, Rivera was an inmate at Beaumont and knew Mr. Agofsky, Luther Plant, and Richard Ward, but was not in the SHU on January 5, 2001.  Beaumont was a very violent institution.  Rivera used to shower wearing boots and a knife on a rope around his neck, for protection in case someone attacked him. Also, it was common for the guards to set up cockfights by putting inmates together who shouldn't be together.  Drugs were easy to get and there were more drug charges than at any prison Rivera had known.  SA 2105.

Rivera could have described Luther Plant, whose nickname was Tootie, as a "dope fiend"

who transported drugs from the visiting room into the prison.  Plant's parents used to visit him often.  They were old and his mother used a walker.  Plant would use the visits to receive drugs from his outside contacts.  Eventually, Plant was caught bringing drugs in after a visit and was placed in the SHU.  He then owed money both to the people for whom he was carrying the drugs and to other inmates whom he had planned to pay after receiving his percentage for delivering them.   Rivera remembered that Plant was desperate to get out of Beaumont because he was afraid of getting out of the SHU and having to face trouble in general population.  He wanted either to stay in the SHU or get himself transferred out of Beaumont.  Rivera had seen similar incidents before.  SA 2105.

Bruce Spring was also subpoenaed but did not testify.  Spring knew Mr. Agofksy during his time at USP Beaumont.  Spring and Mr. Agofksy were cellmates during the time period when they were both on the compound in general population at Beaumont.  He could have described the environment at Beaumont and Luther Plant, whose nickname was "Tootie."  SA 2307.

Spring describes Beaumont as an extremely violent and dangerous prison where almost everyone carried a knife for protection.  Inmates had to be on guard twenty-four hours a day and often referred to the prison as " Bloody Beaumont."  Spring worked out every day to keep himself in shape in order to defend himself.  Spring witnessed three stabbings a week and inmates were murdered all the time at Beaumont.  Spring could have described how the guards facilitated fights and killings between inmates.   For example, the guards would intentionally put gang members together on the yard who were supposed to be separated.  SA 2307.

Plant was a drug addict and owed money all over the yard in drug debts.  Spring knew that Mr. Agofsky and Plant were around each other daily.  Mr. Agofsky would walk the track with Plant and another inmate named Mike McLarty for exercise.  Additionally, Mr. Agofsky helped Plant out many times, paying off his drug debts to prevent other inmates from going after him.  Mr. Agofsky

-35-

did not like Plant's drug use, but he did not have any problems with him, and looked out for him. SA 2309.

Spring remembered that Mr. Agofsky got caught with a knife and was placed in the SHU. While Mr. Agofsky was in the SHU there was no one to look out for Plant and his increasing drug use and drug debts on the yard. There was hostility brewing on the yard towards Plant from other inmates. A couple of weeks later Plant was placed in the SHU also. At this point Plant owed so much money on the yard that everyone knew that he could not go back. Plant knew that if he attacked Mr. Agofksy he would get transferred to another institution and not have to go back to the yard to face his debts. Spring would have testified that Mr. Agofsky was serving a life sentence and everyone knew, including Plant, that Mr. Agofksy would not get transferred out of Beaumont over a fight. Plant knew that if he attacked Mr. Agofsky he would get transferred out of Beaumont immediately and would not have to go back to the yard. SA 2309.

Bennett's summary of his interview with Spring is twelve lines long. SA 628 . It is the only information the attorneys received about Spring before making the decision to subpoena him. SA 554. None of the information above was contained in that memorandum. According to Bennett, he and trial counsel met with Spring at the county jail before trial for approximately 30 minutes, at the same time they met with the other five inmates subpoenaed by the defense. SA 553. Spring stated that counsel came to see him at the county jail and asked him "what can you tell me?" SA 2312. Spring estimates that Mr. Agofsky's counsel spent approximately two minutes with him. *Id*. Spring was brought to the courthouse but did not testify. SA 2311.

Frank Early was interviewed by Bennett but was not subpoenaed. Early was present on the recreation yard that day. Early had a knife on him that day, because "all the inmates knew that if they were going to survive they couldn't survive passively. They had to protect themselves." He

could have explained to the jury that "Because of the atmosphere at Beaumont, Shannon did what he had to do to stay alive. In the circumstances, Shannon had to assume Tootie could be armed. It didn't matter who was taller. A knife is an equalizer." SA 2038.

Early could have told the jury about the extreme level of violence at Beaumont USP. Early characterized Beaumont as "the most violent USP I have ever been in, the most violent in the BOP. It was a killing field." Early would have testified that "fights and stabbings and killings were common. Early himself had seen "fifty to sixty stabbings and four killings with my own eyes in two years." SA 2035. In addition, Early found the level of corruption at Beaumont to be unprecedented. SA 2038. It was common for Beaumont officers to stage fights and put bets on them. Frequently, officers would place inmates in cells that should not have been placed together. In addition, officers would "watch fights occur without interceding." SA 2038.

Although Bennett spoke with Early, he did not elicit the foregoing information. Early stated that Bennett did not tell Early that he was interested in the level of violence at Beaumont. "If Bennett had asked about these subjects, I would have told him about them. I would have been willing to testify in Shannon's behalf and I am willing now." SA 2038.

Bennett interviewed Kerry Dixon, but the defense did not subpoena him for trial either. Dixon would have been willing to tell Mr. Agofsky's jury about the dangerous environment at Beaumont. He would have testified that, "Everybody had a shank, or access to on if they needed it." SA 2028. The high level of violence at Beaumont has also led to the prevalence of gangs. Dixon believes that inmates "belonged to gangs in order to have other to back them up and protect them against the horrific inmate violence." SA 2028.

Although Bennett interviewed Dixon, his summary does not reflect any information about the level of violence at Beaumont USP. SA 629. Dixon was in Beaumont at the time of the

-37-

interview and Bennett noted in his memo that he might interview him again. However, he never did and the attorneys decided not to subpoena him for trial. SA 554.

These witnesses could have provided the jury with background information about Beaumont and Luther Plant to help them understand why Mr. Agofsky reasonably believed that his life was in danger when Plant lunged toward him in the recreation cage. Although these witnesses were contacted by the defense team, they were not adequately questioned about Plant or prison violence. According to Bennett, Black and Barlow did not direct him to question witnesses about prison culture evidence or their experience of violence in prison. SA 547, 555. Thus, jury was deprived of this important information in making a determination of whether Mr. Agofsky was acting in self defense and if he should be sentenced to die. Counsel's deficient performance prejudiced Mr. Agofsky. Mr. Agofsky was sentenced to death for his participation in an unarmed fight after being attacked by another inmate while locked in a cage with him. Evidence or information which helped the jury to understand why Mr. Agofsky would reasonably fear for his life could have led the jury to acquit or convict him of a lesser offense, or could have led at least one juror to vote for life.

**F.      Counsel Failed To Obtain And Present Expert Testimony At The Guilt Phase, Despite Its Availability and Relevance To Their Self-Defense And Heat Of Passion Strategies.**

The Amended § 2255 Motion challenges trial counsel's failure to develop and present expert testimony concerning prison violence, which would have supported their argument to the jury that Mr. Agofsky was defending himself. *See* Amended § 2255 Motion at 48. Two experts the defense called at the penalty phase – criminologist Elizabeth Pelz and prison consultant Terry Pelz – provide declarations detailing the helpful testimony they could have given at the guilt-innocence phase of trial. *See* Declaration of Dr. Mary Elizabeth Pelz (SA 2798); Declaration of Charles Terry Pelz (SA 2805).

Dr. Elizabeth Pelz, a criminologist and the Dean of the of the College of Public Service at the University of Houston, received no information from Mr. Barlow except for institutional records and case discovery material. SA 2798. She was unable to visit Mr. Agofsky because arrangements were initiated too close to the onset of trial. *Id.* She has now reviewed materials provided by postconviction counsel, including family, teacher, and inmate declarations, a social history report, and expert reports. SA 2798-99. If she had received similar information from trial counsel, she could have supported the justification defense by testifying about features of inmate societies such as the practice of "checking in," the unwritten rule that inmates cannot use minimal force to protect themselves, the need for vigilance and the role that Mr. Agofsky's own hypervigilance could have played; the tendency of drug users in prisons to accrue large debts; and the unwritten prison rule against cooperating with the government or appearing to be a "snitch," SA 2799, 2800-02.

Terry Pelz, a prison consultant who spent over twenty years as a corrections officer and warden, had little communication with Mr. Barlow and never spoke to Mr. Black. SA 2805. Like Dr. Pelz, he received only BOP records and case discovery materials from Barlow, who never gave

him other records Pelz requested.[11]  SA 2806.  Mr. Pelz has now reviewed the same postconviction materials as Dr. Pelz.  *Id.*.  He, too, could have provided support for the justification defense if he had received similar information before trial:

> Mr. Barlow did not ask me to give an opinion on the incident involving Luther Plant and Mr. Agofsky.  However, if asked, I could have testified about common inmate behavior in these types of situations.  I went to USP Beaumont and looked at the recreation cage where the incident occurred.  I could have also explained that inmates know that if they are attacked in a recreation cage, they cannot expect the guards to come in and help them, but they must do the best they can to protect themselves from inmates who carry weapons.  Additionally, the many inmate statements I have reviewed depict the USP Beaumont as an extremely violent place where many inmates routinely carried shanks (homemade knives) for protection. There were stabbings on a regular basis and many of the inmates report witnessing murders.  Any inmate locked in a cage in a violent institution like the USP Beaumont would be on guard at all times and hypervigilant.

SA 2808.

Additionally, trial counsel could have presented mental health testimony at the guilt-innocence phase that would have supported their own strategy.  The evidence would have aided the jury in determining whether Mr. Agofsky acted reasonably during the altercation with Luther Plant and whether he possessed the requisite intent to kill.  Numerous factors in Mr. Agofsky's background and resulting mental health impairments were crucial to understanding Mr. Agofsky's conduct.  SA 1757 (Declaration of Dr. Lawson F. Bernstein). SA 2788 (Declaration of Dr. Edward Gripon).  Trial counsel were ineffective for failing to develop this evidence and present it to the jury.

Based on his examination, testing conducted on Mr. Agofsky, and other records and declarations, Dr. Bernstein concluded:

---

[11]  The Amended § 2255 Motion erroneously states that Terry Pelz never met with Mr. Agofsky.  *See* Amended § 2255 Motion at 11; *but see id.* at 166 (stating that Pelz interviewed Mr. Agofsky).  In fact, Terry Pelz (although not Dr. Elizabeth Pelz) interviewed Mr. Agofsky at the Liberty Jail.  Tr. Vol. 22, 238-41.

- Shannon Agofsky suffers from what would be described a "Mood Disorder Not Otherwise Specified" with features of both Adjustment Disorder with Depressed Mood and Major Depressive Disorder. He is obviously at risk for future depressive episodes based on this propensity. Although Mr. Agofsky does not meet the technical criteria for PTSD, he exhibits symptoms associated with the disorder, including marked hypervigilance. Hypervigilance is an enhanced state of sensory sensitivity accompanied by an exaggerated intensity of behaviors whose purpose is to detect threats and often resulting in extreme response to perceived threats of harm. Hypervigilance is also accompanied by a state of increased anxiety which can cause exhaustion. Other symptoms include: abnormally increased arousal, a high responsiveness to stimuli and a constant scanning of the environment for threats. Hypervigilance in such a context may be accompanied by perseverance, tunnel vision, loss of auditory function, and amnesia.

- Significantly, Mr. Agofsky has a history of multiple head injuries, which is likely another etiology for his discrete mood disorder episodes. This is consistent with testing done by Dr. Michael Gelbort and findings of Dr. Ruben Gur. Drs. Gelbort and Gur found organic brain damage specifically in the frontal lobe region which is associated with impulse control.

- The psychological and neuropsychological tests administered by Dr. Gelbort are standardized, reliable and accurate. These tests have for many years been widely administered by psychologists and neuropsychologists to assess questions regarding brain damage. The results of neuropsychological testing from qualified practitioners such as Dr. Gelbort, including whether the testing demonstrates the existence of organic brain damage, are routinely relied upon by psychiatrists and other medical doctors. *See*, *e.g.*, Kaplan & Sadock, *Comprehensive Textbook of Psychiatry* (6th ed.), pp. 343-44, 860-87; Yudofsky & Hales, *The American Psychiatric Press Textbook of Neuropsychiatry* (3rd ed.), pp. 181-204; Lezak, *Neuropsychological Assessment* (3rd ed.), pp. 333-806; Berg, Franzen & Wedding, *Screening for Brain Impairment* (2nd ed.), p. 174 ("Comprehensive neuropsychological assessments ... have been shown for several years to be effective in differentiating brain-damaged from psychiatric and normal patients.").

- The brain damage is likely a result of head trauma and is consistent with reported concussions and the history of staged boxing and martial arts contests. This damage impaired Mr. Agofsky's ability to perceive threat, and to modulate his response in the face of a perceived threat. The symptomatology I observed and as are reflected in the records is consistent with these findings. Kaplan and Sadock's *Comprehensive Textbook of Psychiatry* (8th ed.), pp. 392-98, explains that the "clinical presentation" of organic disorders includes "associated" symptoms such as anxiety features

(including apprehensive expectation and hypervigilance); affective features and mood problems (including depressed or irritable mood and its cognitive and vegetative concomitant features); features usually associated with personality disorders; emotional features (including impaired impulse control and judgment), and cognitive impairment features (including disturbance of attention and orientation).

SA 1763-65.

Had counsel fully investigated the case and obtained expert assistance, the jury could have been greatly assisted in it guilt-phase deliberations. Dr. Bernstein explained:

- A person suffering from the mood disorder, hypervigilance, and brain damage which Mr. Agofsky suffered on January 5, 2001 would have great difficulty perceiving the true extent of the threat posed by Luther Plant, and controlling or moderating his response in the short time frame described in the record.

- Shannon Agofsky's conduct on January 5, 2001 was due to an acute stress reaction, prompted by his omnipresent "hypervigilance" and the perceived threats, and exaggerated as a result of his brain organicity which rendered him substantially incapable of a measured, contemplative response. His reaction on that date is properly characterized as a sheer survival response.

- Assuming Mr. Agofsky's response was triggered by the perceived aggression on the part of Mr. Plant, it is my opinion that Mr. Agofsky could not have formed the specific intent to kill and was not capable of a premeditation in the short time frame described. The record shows the jury struggled with the question of intent. Had this information been made available at the time of trial, a mental health expert could have explained to the jury that the brain damage reported affected Mr. Agofsky's ability to recognize and assess threats. Further, frontal lobe damage has a direct, immediate and substantial impact on the capacity to form intent. This limitation is proportional to the perceived seriousness of the threat and the reaction time-frame. This conclusion is supported by the history of hypervigilance, that the decedent was known to be a violent drug user and the short duration of the incident as reported by the correctional officer on the scene.

SA 1765-66.

Dr. Edward Gripon, a psychiatrist from Beaumont, Texas, whom Mr. Barlow retained but did not call as an expert at trial, has reviewed the declarations of Dr. Bernstein and other experts,

-42-

the social history report of Marilyn Romanowski, and family, teacher, and inmate declarations. SA

2792. He concurs with Dr. Bernstein's conclusions and states that he himself could have provided

similar testimony in support of the justification defense at the guilt-innocence phase. SA 2794-96.

Evidence that could assist the jury in determining whether Mr. Agofsky acted lawfully, or

in a state of mind inconsistent with first degree murder, was admissible.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods reliably to the facts of the
> case.

 Fed. R. Evid. 702.

Federal courts have consistently recognized the value of such expert testimony to assist the

jury in judging the reasonableness of a defendant's actions, and have permitted such testimony in

cases similar to Mr. Agofsky's.[12] The evidence was also probative of whether Mr. Agofsky had the

specific intent to kill.[13] Similarly, it could have assisted the trier of fact in assessing whether Mr.

---

[12]  *See, e.g., United States v. Whitetail,*  956 F.2d 857, 859 (8th Cir. 1992) (in murder
prosecution for killing live-in boyfriend, defendant presented two experts who testified with
regard to battered-woman syndrome); *United States v. July*, No.1992 WL 57428, *1 (9th Cir.
1992) (in prosecution for murder of her husband defendant presented psychologist "to assist the
trier of fact in judging the reasonableness of her response to the actions of her husband"); *United
States v. Gordon*,  812 F.2d 965 (5th Cir. 1987) (evidence of "Battered Women's Syndrome,
dependent personality disorder, depression, and alcohol abuse" presented to challenge
voluntariness of confession); *United States v. Grant*, No. 2008 WL 2485610, *1  (D. Neb. 2008)
(battered spouse syndrome).

[13]  *United States v. Pohlot*, 827 F.2d 889, 897 (3d Cir. 1987)  (diminished capacity);
*United States v. Fazzini,* 871 F.2d 635, 641 (7th Cir.1989) (diminished capacity); *United States
v. Twine*, 853 F.2d 676, 678 (9th Cir. 1988) (diminished capacity);  *United States v. Bartlett*, 856
F.2d 1071, 1077 (8th Cir.1988) (diminished capacity); *United States v. Erskine,* 588 F.2d 721,
722-23 (9th Cir.1978) (diminished capacity).

Agofsky acted under heat of passion, which would have negated malice. *See Beardslee v. United States*, 387 F.2d 280, 293 (8th Cir. 1967) (expert opinion presented that the defendant acted out of heat of passion).

Trial counsel failed to reasonably investigate, develop and present the evidence of Mr. Agofsky's background and its resulting psychological effects through lay and expert witnesses. Had trial counsel obtained the available background data, they would have been able to present testimony about Mr. Agofsky's cognitive deficits and mental health issues. This evidence would have assisted the jury in determining whether Mr. Agofsky acted completely lawfully, or alternatively whether he possessed the specific intent to kill at the time of the offense or acted under heat of passion.

Trial counsel's failure to consider or to reasonably investigate the available evidence that could have been provided by a criminologist, prison consultant, and/or a psychiatrist constitutes deficient performance, and counsel's deficiency prejudiced the defense at the guilt-innocence phase of trial. The jury was charged that Mr. Agofsky could reasonably use force "likely to cause death or great bodily harm is justified only if *[he] reasonably believe[d]* that such force is necessary to protect himself from what *he reasonably believe[d]* to be a substantial risk of death or great bodily harm." Tr. Vol. 20, 351. A full expert exposition of prison culture, Mr. Agofsky's life experiences and mental impairments, and the interrelationship of the two, was critical to understanding why Mr. Agofsky acted reasonably.

The jurors would have learned the influence of prison culture and prison conditions on Mr. Agofsky's behavior. They would have learned how the confluence of a mood disorder, hypervigilance, and brain damage would have impacted Mr. Agofsky's perceptions of the threat posed by Plant and his ability to moderate his response. They would have learned that the brain damage reported – governing impulse control – affected Mr. Agofsky's ability to recognize and

assess threats.  They would have learned that these deficits are relevant to whether Mr. Agofsky had formed the specific intent to kill.

The jurors struggled with the question of intent, as evidenced by their penalty-phase finding that Mr. Agofsky lacked intent to kill.  SA 2755.  They rendered their verdict without the benefit of full background history or knowledge of Mr. Agofsky's prison environment, his impairments, or any expert elucidation of why these factors were relevant to his guilt or innocence.  For these reasons, and those in the Amended § 2255 Motion, there is a reasonable probability that but for counsel's deficient performance in failing to develop and present expert testimony relevant to the guilt-innocence phase, the jury's verdict at that phase would have been different or, at a minimum, Mr. Agofsky would not have received a death sentence.  Counsel's deficient performance in this respect prejudiced the defense both alone and in combination with the other instances of deficient performance set forth in the Amended § 2255 Motion and this Supplement.

**G.    Counsel Relied Primarily On Records Supplied By the Government, And Made Few Independent Efforts To Obtain Documentary Information.**

In Point I.G of Mr. Agofsky's Amended § 2255 Motion, he argues that trial counsel's performance was deficient because they relied primarily on records supplied by the government and made few independent efforts to obtain documentary information that would have supported their own defense. *See* Amended § 2255 Motion at 50. In his deposition, Mr. Bennett confirmed this allegation. Although Bennett is "sometimes" responsible for requesting documents in a case, he only does so when the attorneys so instruct. SA 543. Bennett testified that he requested "no records" in Mr. Agofsky's case. SA 546. Bennett further testified that he did not obtain any further documents regarding Luther Plant's criminal history. SA 547. He stated that he believed that the attorneys already had all of that information in Plant's federal central BOP file. *Id*. He was not responsible for obtaining the BOP file. *Id*.

Despite their affidavits to the contrary, counsel did not obtain any documents from Mr. Agofsky's former teacher, Robert Duggan. Mr. Agofsky asked his defense to obtain several documents from Mr. Duggan, including "mini-manuals" that had been used for his training at ESI, which discussed techniques for responding to lethal force and the tachy-psyche effect. SA 642-43; *see also* SA 2367. However, counsel failed to request these manuals. Mr. Black asserts in his affidavit that the defense did in fact obtain course materials and books from Duggan, which were used to cross-examine him. SA 2325. However, all materials used by the defense to cross-examine Duggan, which were turned over to current counsel, bore the government's bates numbers and appear to have been provided by the government. Indeed, Bennett admitted in his deposition that he had never requested any documents from Mr. Duggan and that counsel did not ask him to do so. SA 560.

As explained in the Amended § 2255 Motion, counsel could have used these materials in their cross-examination of Duggan to help explain to the jury why the force displayed by Mr. Agofsky was reasonable in defending his own life. *See* Amended § 2255 Motion at 22-23. Even though the defense knew that Duggan was going to testify, SA 579, counsel made no effort to obtain such materials in order to prepare for his cross-examination, despite their client's repeated requests that they do so. Mr. Agofsky explicitly warned his trial team that the government might try to use the texts against them at trial and explained how the documents themselves would not support the government's theory.

> As I stated before, I believe that pros. focus on the martial arts will be on 'control techniques to say I had options other than to kill Plant. They may introduce the 'mini-manuals' Duggan wrote on cants and goosenecks, which are part of the ESI course syllabus, emphasis on non-lethal control. All of those things are addressed in the 2 firearms 'mini manuals' used at ESI, you may want to obtain copies. They are not meant for possible multiple opponent situations, not meant for life threatening situations, etc.

SA 642.

The trial court's docket does not reflect any efforts by trial counsel to obtain, through discovery or other motions, information the government had failed to turn over voluntarily. This could have included:

- Information about promises made to the government's only eyewitness, Richard Ward, that were not reflected in the material the government did turn over;

- Transcripts from the multiple Grand Juries convened in Mr. Agofsky's case;

- Records indicating payment for testifying and non-testifying government witnesses.

As stated in Mr. Agofsky's motion, trial counsel's deficient performance prejudiced the defense. *See* § 2255 Motion at 51-52, ¶¶ 21-22. Had counsel conducted an independent investigation into the case, obtaining documents outside of discovery handed over by the

government, cross-examination of both Ward and Duggan would have been radically different. Documents about Ward's deal with the government would have further undermined his already questionable testimony. Documents from Duggan's training school could have transformed Duggan's testimony and actually supported the defense theory that Mr. Agofsky used force which he reasonably believed was necessary to defend his life. There is a reasonable probability that but for counsel's deficiencies in this respect, alone and in combination with the other deficient performance described in the Amended § 2255 Motion and this Supplement, Mr. Agofsky would have been acquitted or convicted of a lesser offense, or the jury would not have sentenced him to death.

I.    **Counsel Provided Ineffective Assistance During The Guilt-Innocence Phase Of Trial.**

2.    **Counsel Failed To Object To Erroneous Instructions.[14]**

a.    **Counsel Failed To Object To Burden-Shifting Murder and Manslaughter Instructions**

As the Amended § 2255 Motion describes, trial counsel failed to object to erroneous instructions, including instructions that obscured the mirror relationship between "malice" murder and "heat of passion" manslaughter, and failed to instruct the jury that the government must disprove heat of passion before it could obtain a conviction of murder.   See Amended § 2255 Motion at 80-83.[15]  In addition, the "progression" charge – instructing the jury to resolve the murder charge before considering its manslaughter instructions – precluded the jury from even considering whether the heat of passion evidence negated malice.  Both aspects of the instructions unconstitutionally shifted or lightened the government's burden. *In re Winship*, 397 U.S. 358 (1970); *Mullaney v. Wilbur*, 421 U.S. 684 (1975).  Trial counsel was ineffective for failing to object.[16]

i. **The Dueling "Malice" Instructions.**

The court gave two malice instructions, one applicable for murder only and the second

_____

[14]   Mr. Agofsky's presentations in support of Point I.H and I.I.1 appear in the Amended § 2255 Motion at 52 and 74.

[15]   On each of the murder counts, the court correctly listed as the final element "that the defendant did not act in self defense," Tr. Vol. 20, 360, 356, but it did not instruct the jury to make the same finding respecting heat of passion.

[16]   *Strickland v. Washington*, 466 U.S. 668 (1984); *Reagan v. Norris*, 365 F.3d 616 (8th Cir. 2004) (counsel ineffective for failure to object to instructions); *Gray v. Lynn*, 6 F.3d 265 (5th Cir. 1993) (counsel ineffective for failure to object to erroneous jury instruction on elements of attempted murder); *United States v. Stracener*, 959 F.3d 31 (5th Cir. 1992) (counsel ineffective for failure to object to erroneous instruction on aiding and abetting); *Hall v. State*, 161 S.W.3d 142 (Tex. Crim. App. 2005) (counsel ineffective for failure to object to erroneous instructions).

applicable only if the jury failed to convict on murder and turned to voluntary manslaughter. The Court mentioned the mutually exclusive relationship between malice and heat of passion only in the manslaughter instruction, where it mis-allocated the burden of proof, and said nothing at all about heat of passion in the murder instruction. This was error. The "murder" malice instruction was as follows:

> To kill "with malice aforethought" means to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life. To find malice aforethought, you need not be convinced that the defendant hated the person killed or felt ill will toward the victim at that time.
>
> In determining whether the killing was with malice aforethought, you may consider the use of a weapon or instrument in the manner in which the death was caused.

Tr. Vol. 20, 360.

Conspicuously absent from this charge was any consideration of "heat of passion," which under statute circuit law negates malice, or any indication that the government had the burden of proving that the killing *was not* a result of "heat of passion." The court then gave the following instructions on how the jury was to deliberate on the greater offense of capital murder (Count 2):[17]

> If, after reasonable efforts have been unsuccessful, the jury is unable to reach a verdict as to whether or not the government has proven each element of the offense charged in Count 2 of the indictment, the jury should then consider whether defendant, Shannon Wayne Agofsky, is guilty or not guilty of the crime of voluntary manslaughter which is necessarily included in the offense of murder charged in Count 2 of the indictment.
>
> Of course, if the government has not proved beyond a reasonable doubt that the defendant committed voluntary manslaughter, your verdict must be not guilty of all charges as to Count 2.

Tr. Vol. 20, 362.

The Court went on to instruct on the lesser-included offense of voluntary manslaughter,

---

[17]    The court gave substantially the same instruction on Count 1. Tr. Vol. 20, 357.

instructions the jury was only to consider in the event it failed to convict of murder:

> Title 18, United States Code, Section 1112, makes it a crime for anyone to unlawfully kill another human being, without malice.
>
> For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> First: That the defendant unlawfully killed Luther Plant;
>
> Second: *That the defendant did so without malice, that is, upon a sudden quarrel or heat of passion;*[18]
>
> Third: That the killing took place within the territorial jurisdiction of the United States; and
>
> Fourth: That the defendant did not act in self defense.
>
> The term "heat of passion" means a passion of fear or rage in which the defendant loses his normal self-control as a result of circumstances which would provoke such a passion in an ordinary person, but which did not justify the use of deadly force.

Tr. Vol. 20, 363 (emphasis added).

This charge – already erroneous because it confined the consideration of absence of malice only to the manslaughter deliberations – also failed to allocate the burden of proving that Mr. Agofsky *did not* act under heat of passion to the government. These instructions therefore misstated the law and misled the jurors. Voluntary manslaughter is, by definition, a homicide committed without malice. 18 U.S.C. § 1112(a) ("Manslaughter is the unlawful killing of a human being *without malice* . . . upon a sudden quarrel or heat of passion.") (emphasis added). Provocation, i.e., sudden quarrel or heat of passion – of which there was considerable evidence here – negates malice. Accordingly, the prosecution bears the burden of "*disprov[ing]* the existence of adequate provocation when the evidence suggests that it may be present." *United States v. Browner*, 889 F.2d

---

[18]     Defendant's proposed instructions also contained this sentence. A121.

549, 552 (5th Cir. 1989) (citing *United States v. Comosona*, 848 F.2d 1110 (10th Cir. 1988).[19]

The jury instructions fell far short of this requirement, instead improperly telling the jury that the prosecution must affirmatively prove the sudden quarrel or heat of passion. The instruction thus presumed an element of the crime – the absence of heat of passion and provocation – and implicitly imposed a burden on the defendant to disprove the element. If the jurors had a reasonable doubt on the question whether the government had proven malice and disproven heat of passion, Mr. Agofsky was entitled to acquittal of the greater offense and the appropriate verdict was voluntary manslaughter. The instructions deprived Mr. Agofsky of the benefit of such a reasonable doubt, and should have prompted trial counsel's objection.

The Fifth Circuit's opinion in *United States v. Molina-Uribe*, 853 F.2d 1193, 1203-04 (5th Cir. 1988), *overruled on other grounds*, *United States v. Bachynsky,* 934 F.2d 1349 (5th Cir. 1991), does not control this case. In *Molina-Uribe*, the defendant complained that the jury should have been instructed that the government had the burden of disproving heat of passion, relying on the Supreme Court precedent of *Mullaney*, 421 U.S. 684 (finding unconstitutional Maine instruction presuming malice unless heat of passion proved by defendant by the preponderance of the evidence). The court declined to follow *Mullaney,* noting a key distinction; in *Mullaney* malice was implied, whereas under the instructions in *Molina-Uribe* it was not. *Molina-Uribe*, 853 F.2d at 1204 (no requirement to "prove the absence of heat of passion ... when the element of malice is neither

---

[19]    *See also United States v. Lincoln*, 630 F.2d 1313 (8th Cir. 1980); *United States v. Lopez*, 575 F.2d 681 (9th Cir. 1978); *United States v. Reagan*, 453 F.2d 165 (6th Cir. 1971)) (noting that as a consequence convictions for voluntary manslaughter as lesser included offenses on indictments for murder are not uncommon); *see also United States v. Quintero*, 21 F.3d 885, 890 (9th Cir. 1994) ("[T]he burden is on the Government to prove beyond a reasonable doubt the absence of a sudden quarrel or heat of passion before a conviction for murder can be sustained." (citing *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975)).

presumed nor required to be disproved by the defendant"). Thus in the absence of implied malice, there was no unfair burden-shift to the defense to negate a required element. In Mr. Agofsky's case, however, in the language of the jury instruction and on these facts, malice *was implied*. As to first degree murder, the jury was charged on to the elements the government had to prove:

> First: That the defendant unlawfully killed Luther Plant;
>
> Second: That the defendant killed Luther Plant with malice aforethought;
>
> Third: That the killing was willful[], deliberate, malicious and premeditated;
>
> Fourth: That the killing took place within the special territorial jurisdiction of the United States; and
>
> Fifth: That the defendant did not act in self defense.

Tr. Vol. 20, 360.

The court then defined malice in relevant part as follows: "To kill 'with malice aforethought' means to kill another person *deliberately and intentionally*. . ." *Id*. Under this tautological instruction, malice was not only presumed, it was compelled by the jury's finding that the murder was "willful", "deliberate," and "premeditated", also necessary elements under the court's instruction. This compelled finding is no different than the presumption instruction in *Mullaney*. The relegating of any consideration of heat of passion to the voluntary manslaughter deliberations could only have been taken by the jury to mean that malice was otherwise presumed as to their murder deliberations in light of their concurrent finding of premeditation (as it was explicitly instructed). Thus, under the instructions as given in this case, *Mullaney*, not *Molina-Uribe*, controlled.

Also, the burden-of-proof charge in *Molina-Uribe*, unlike the charge in this case, did not affect the defendant's right to present a defense. The defense in *Molina-Uribe* was that someone

else was the killer, 853 F.2d at 1200 ("Molina's defense ... was that it was not he who shot Ramos, but rather that Ramos was the victim of a conspiracy and assassination by fellow DEA agents"), and thus the failure to give the burden of proof charge did not undermine Molina-Uribe's right to present a defense. In contrast, in this case, the defense was that Plant was the initial aggressor, and accurate instructions were crucial to the success of that defense. The instructions here left the jury with no way to meaningfully apply the defense evidence to its deliberations. It has long been established that, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal citations omitted) (*quoting California v. Trombetta*, 467 U.S. 479, 485 (1984).[20] It is equally well-established that a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor. *Mathews v. United States*, 485 U.S. 58, 63 (1988).[21] The instructions here gave the jury no guidance on how the defense evidence could apply to its deliberations on malice. Counsel had an obligation to seek an instruction that not only imposed on the government the burden of disproving heat of passion but that also required that the jury view the government's proof of malice in light of

---

[20]    *See also Holmes v. South Carolina*, 547 U.S. 319, 324-25 (2006) (affirming this principle); *see In re Oliver*, 333 U.S. 257, 273 (1948); *Washington v. Texas*, 388 U.S. 14, 22-23 (1967); *Chambers v. Mississippi*, 410 U.S. 284 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations").

[21]    *See also Stevenson v. United States*, 162 U.S. 313 (1896); *United States v. Harrelson*, 754 F.2d 1153, 1173 (5th Cir. 1985) (where "instruction concerned an important point in the trial, failure to give it seriously impaired [defendant's] ability effectively to present a given defense"); *Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002) ("[T]he right to present a defense would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense;" citations omitted).

the evidence *offered by the defense*, and if - as a result of that evidence - the jury had reasonable doubt as to malice or any other element, it must acquit.

It is also clear that *Molina-Uribe's* 1988 holding did not survive the Supreme Court's pronouncements in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002). In *Ring*, the Supreme Court, citing *Apprendi*, made clear in no uncertain terms that, "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact - no matter how the State labels it - must be found by a jury beyond a reasonable doubt." *Id*. at 602. Under *Apprendi* and *Ring* there can be no "presumption" exception to the government's burden. If it is a fact that must be proved, however characterized, it must be found by a jury beyond a reasonable doubt. Under the Circuit's law, malice means the absence of "sudden quarrel or heat of passion" and to comport with *Apprendi* and *Ring* any instructions must apprise the jury of the full extent of the government's burden.

Finally, the Eighth Amendment requires that the jury be charged as to the heat of passion burden, also taking this case out of the purview of *Molina-Uribe* (which was non-capital). The Eighth Amendment's requirements of heightened "reliability in the determination that death is the appropriate punishment in a specific case," *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976), mandates that in capital cases instructions scrupulously adhere to the burdens inuring to the government. In *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980), the Supreme Court made clear that these heightened protections extend to the guilt phase of capital trials, in that case holding that the federal Due Process Clause requires lesser included offense instructions in all capital trials so as to ensure the jury does not default to a charge greater than warranted under the facts. The same concerns apply here.

### ii.  The "Progression" Instructions.

The "progression" instructions exacerbated the harm caused by the burden-of-proof instructions, preventing the jurors from *even considering* whether the heat of passion negated the necessary malice unless they had already acquitted, or found themselves unable to agree, on murder.

As to malice the jury was instructed:

> To kill "with malice aforethought" means to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life. To find malice aforethought, you need not be convinced that the defendant hated the person killed or felt ill will toward the victim at that time.

> In determining whether the killing was with malice aforethought, you may consider the use of a weapon or instrument in the manner in which the death was caused.

Tr. Vol. 20, 360.  This portion of the charge was silent as to how the jury should view claims that Mr. Agofsky acted in the face of provocation, "sudden quarrel" or "heat of passion." Rather the jury was specifically instructed to consider provocation only in their manslaughter deliberations, which – following the court's instruction – they never reached. Tr. Vol. 20, 362 (jury to consider heat of passion, sudden quarrel, and other elements of manslaughter only if it failed to convict of murder).

Under the court's explicit instruction, the jury was not to consider the "elements" of manslaughter if it returned a guilty verdict on murder.  Only if the jury had acquitted or failed to reach a verdict was it permitted to consider the "elements" of manslaughter, including heat of passion.   The only reasonable interpretation of this charge, in contrast to the self-defense charge, was that "sudden quarrel" and "heat of passion" evidence was relevant only in the context of whether Mr. Agofsky committed manslaughter, a question it was to reach only in the event it failed to convict him of first degree murder.  Indeed, the jurors were explicitly so charged.   Instead, as explained above, the court should have instructed the jury to consider the heat of passion evidence,

not after it failed to convict on the murder count, but during its deliberations on first degree murder. And it should have instructed the jurors that they must find there was no heat of passion in order to convict of murder.

As demonstrated above and in the Amended §2255 Motion, trial counsel's performance was deficient for failing to object to erroneous instructions, instructions which absolved the government of its burden of proving each element beyond a reasonable doubt and prevented the jurors from reaching a verdict of manslaughter if they had reasonable doubts about malice.

Mr. Agofsky was prejudiced. The defense was self-defense and heat of passion. The defense presented evidence that Plant, a violent "career offender," was the initial aggressor, and engaged in an unprovoked attack of Mr. Agofsky. The jury, had it been charged correctly, could have concluded that, although he may have acted unlawfully, he did so without malice, and returned a verdict of manslaughter. At the least, a correctly instructed jury could have entertained a reasonable doubt on the question of malice, and accordingly delivered a manslaughter verdict. Such a conclusion is also supported by the jury's finding in the penalty phase that the killing was not intentional, demonstrating, at a minimum, confusion as to the government's burden. There is a reasonable probability that, but for counsel's failure to object to – and thus prevent – the unconstitutional instruction, the jury could have acquitted Mr. Agofsky outright, convicted him only of manslaughter, or imposed a sentence less than death. At the very least, there is a reasonable probability that he would have obtained appellate relief for preserved error. For these reasons and those in the Amended §2255 Motion, counsel's deficient performance prejudiced the defense and deprived Mr. Agofsky of the effective assistance of counsel.

**b.      Counsel Failed To Object To The Erroneous Murder Instruction.**

Trial counsel failed to object to other erroneous and confusing aspects of the murder instructions. Collectively, the instructions resulted in inconsistent jury verdicts regarding intent at the guilt-innocence phase (where the jury found Mr. Agofsky guilty of one count that required premeditation) and the penalty phase (where they found that he acted without intent to kill). The court gave the following instruction as to first degree murder:

> Title 18, United States Code, Section 1111, makes it a crime for anyone to murder another human being with malice aforethought. Every murder perpetrated willfully, deliberately, maliciously, *or* with premeditation is murder in the first degree.

Tr. Vol. 20, 359 (emphasis added). This instruction is erroneous. The court instructed the jury in the disjunctive, permitting it to find first degree murder if it *any* of the four options it delineated – willful, deliberate, malicious, or with premeditation – obtained. Thus, if the jury, under this instruction, found only malice (but not willfulness, deliberation, or premeditation) it was permitted to return a verdict of first degree murder. The result is that the government was absolved of its burden to prove all of the elements of first degree murder beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970).[22]

That the court elsewhere stated the elements correctly, Tr. Vol. 20, 359, does not obviate the error. There was no objection to the erroneous instruction. Nor did the court disclaim the earlier erroneous instruction as incorrect or misleading. At best the jury was left with two competing and inconsistent instructions on what it must find before it convicted of first degree murder. This created "perfect storm" conditions for an irrational and unreliable result. Even assuming that the jurors

---

[22]   *See also Cage v. Louisiana*, 498 U.S. 39 (1990); *Osborne v. Ohio*, 495 U. S. 103, 122-23 (1990); *Carella v. California*, 491 U.S. 263, 265 (1989); *Francis v. Franklin*, 471 U.S. 307, 313 (1985); *Sandstrom v. Montana*, 442 U. S. 510 (1979).

accurately recollected the court's instruction during deliberations, they still could have reached a first degree murder verdict based solely on a finding that the killing, though not intentional, was with malice ("callous and wanton disregard for human life"). Not only did the erroneous instruction render this result likely, the sentencing verdict demonstrates that this is almost certainly what happened: the jury found at sentencing that the killing was not intentional.

### c. Counsel Failed To Object To The Inconsistent and Confusing Malice Instructions

As developed at length in Sections 2.a and 2.b, the court gave two different malice definitions, one expressly applicable only to murder and the second expressly applicable only if the jury failed to convict on murder and had turned to voluntary manslaughter. The instructions were inconsistent and confusing. Although the law is clear that the jury could not convict of murder if the government failed to prove Mr. Agofsky did not act pursuant to heat of passion, it was told otherwise. The court instructed the jurors to rely on a definition that *excluded* consideration of the heat of passion in its murder deliberations, permitting the jury to find malice if it found the defendant acted "with callous and wanton disregard for human life." Tr. Vol. 20, 360. Moreover, the jury was not instructed that the government had to disprove heat of passion before it could find malice. *Id.* Rather, by its express instructions, "heat of passion" was a consideration only in the event it had failed to convict of murder. That the erroneous, confusing malice instruction resulted in an irrational and unreliable verdict is likewise borne out by the jury's later rejection at sentencing of the government case for intentional murder. It had the option of finding malice on a "reckless" standard without consideration of provocation from the victim or having to hold the government to its burden. Confusion reigned and the verdict at sentencing – finding the killing was not intentional – proves it.

**d.      Counsel Failed To Object To The Confusion Engendered By The Conflation of "Federal Murder" and "Murder by Life Prisoner" Charges**

Trial counsel sought pretrial to have one of the two murder counts dismissed for violation of double jeopardy.  The Court of Appeals later held that the motion was wrongfully denied.  *United States v. Agofsky*, 458 F.3d 369 (5th Cir. 2006) ) (SA 2521), yet denied any relief beyond vacating the extraneous charge.  Not addressed by trial counsel during the charge conference or after the court instructed the jury, however, was the that wrongful introduction into the jury's deliberations of the additional charge – and the instructions it was given – likely resulted in confusion as to what standard to apply.

As to Count One (Murder by Life Prisoner) the jury was charged that it could convict if the jury found an unlawful killing with malice.  The sole salient distinction between Count One, Murder by Life Prisoner, and Count Two, Federal Murder (as the Circuit later found), was the life sentence element.  *Id.* at 371.  In defining the two charges, the Court cross-referenced the definitions, ineluctably leading the jury to conflate the two counts.  As to Count One the jury was instructed that "United States Code, 1118 makes it a crime for anyone, while confined in a federal correctional institution under a sentence for a term of life imprisonment to commit the murder of another human being.  Murder means a *first degree or a second* degree murder as defined in Title 18, United States Code, Section 1111."  Tr. Vol. 20, 355.  While cross-referencing Section 1111,  the jury was only instructed as to the definition of *second degree* murder.  Tr. Vol. 20, 355-56.  When it reached Count Two the court did the opposite.  It began noting, "Title 18, United States Code, Section 1111, makes it a crime for anyone to murder another human being with malice aforethought," a definition that would apply to both counts.  It then proceeded to charge the charge the jury only as to first degree murder and omitted the lesser included offense of second degree murder. Tr. Vol. 20, 359-62.

-60-

Thus, because of the erroneous inclusion of the extraneous charge: The jury was given Section 1118 charge (Count One) that cross-referenced Section 1111 (Count Two). It was then informed that, "Section 1111, makes it a crime for anyone to murder another human being with malice aforethought," echoing the § 1118 charge. Once the court cross-referenced these identical statutes (save for the life sentenced element), the jury was bound to conflate the two instructions (indeed required to).

Compounding the confusion was the court's failure to charge on the respective greater and lesser-included murder offenses. Although first and second degree murder applied to both charges – and indeed was the basis of the Circuit's jeopardy ruling – the § 1118 charge only included second degree murder and the § 1111 only included first degree murder. Rather it was instructed that *Count One was controlled by the definitions found in Count Two*.

Finally, the verdict sheet failed ensure that the jury understood its instruction. As to each count it was only given the option of "guilty" or "not guilty" of murder, with reference to the degree of murder it had decided upon. Again, the inclusion of the extraneous count (because of the trial court's denial of the double jeopardy motion), the cross-referencing of the definitions, and the Court's ineffectual attempt to distinguish these otherwise identical counts was a prescription for jury confusion. It is clear it conflated the definitions – as the court had done – and likely reached unanimity at best only as to second degree murder and again this conclusion is supported by the jury's later unanimous rejection of intentional murder at the penalty phase.

Trial counsel was ineffective for failing to object to any of the erroneous instructions.[23] The

---

[23]  *Strickland v. Washington*, 466 U.S. 668 (1984); *Reagan v. Norris*, 365 F.3d 616 (8th Cir. 2004) (counsel ineffective for failure to object to instructions); *Gray v. Lynn*, 6 F.3d 265 (5th Cir. 1993) (counsel ineffective for failure to object to erroneous jury instruction on elements of attempted murder); *United States v. Stracener*, 959 F.3d 31 (5th Cir. 1992) (counsel

instructions were erroneous in a way that would benefit only the government.  There is and could

be no reason to fail to object to these erroneous instructions.  Mr. Agofsky was  prejudiced. The

erroneous instructions resulted in a diminution of the government's burden of proof, absolved it of

proving each and every element beyond a reasonable doubt, and rendered the verdict wholly

unreliable.

> **e.**     **Trial Counsel Failed To Seek An Instruction On The Lesser Included Offense Of Second-Degree Murder On Count 2.**

The court also erred by failing to instruct the jury on the lesser- included offense of second -

degree murder as to Count 2 (Federal Murder), and counsel was ineffective for failing to request

the charge and object to its omission.

Circuit law establishes when a defendant is entitled to a charge on a lesser included offense:

> a defendant is entitled to a lesser-included offense instruction when some of the elements of the crime charged constitute a lesser crime, there is an evidentiary basis for a finding of guilt on the lesser offense, and "the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense." *Sansone v. United States*, 380 U.S. 343, 350, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965). "[T]wo independent prerequisites" must be met before a defendant is entitled to an instruction on a lesser-included offense: "(1) the elements of the lesser offense must be a subset of the elements of the charged offense; and (2) the evidence at trial must be such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater". [*United States v. Browner* , 889 F2d 549, 550-51 (5th Cir.  1989)]; *United States v. Deisch*, 20 F.3d 139, 142 (5th Cir.1994).

*United States v. Harrison*,  55 F.3d 163, 166 -167 (5th Cir. 1995).[24]

---

ineffective for failure to object to erroneous instruction on aiding and abetting); *Hall v. State*, 161 S.W.3d 142 (Tex. Ct. App. 2005) (counsel ineffective for failure to object to erroneous instructions).

[24]   *See also Keeble v. United States*, 412 U.S. 205, 208 (1973)) ("[I]t is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater"); *United States v. Neiss*, 684 F.2d 570, 571 (8th Cir. 1982) (lesser-included offense

There is no question that second degree murder is a lesser offense of first degree murder.

18 U.S.C. § 1111(a) defines murder in relevant part as:

> a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; ... is murder in the first degree.

> Any other murder is murder in the second degree.

Thus, by definition, all of the elements of second degree murder, unlawful killing of a human being with malice aforethought, are found in first degree murder. *See, e.g., United States v. Chagra*, 638 F. #Supp. 1389, 1400 (W.D. Tex. 1986) ("A defendant on trial for first degree murder is automatically on trial for second degree murder because it is a 'lesser included offense' of first degree murder."). Similarly, there is no question that the facts would rationally support a finding of second degree murder. The jury could well have found that although malice was present, the government failed to prove the element of premeditation. There was evidence that the conflict was a situational one; Mr. Agofsky and the decedent were placed together in the recreation cage just prior to the incident and without advance knowledge of the identity of the cage-mates, there was no evidence of prior animus between the parties, and least at least two witnesses testified Plant was the initial aggressor. The confrontation had all the hallmarks of a prison-yard fight, without the time for cool reflection that typifies a premeditated killing. *United States v. Shaw*, 701 F.2d 367, 393 (5th Cir. 1983) ("Perhaps the best that can be said of deliberation is that it requires a 'cool mind' that is capable of reflection, and of premeditation that it requires that the one with the 'cool mind' did, in fact, reflect , at least for a short period of time before his act of killing."). Similarly, the jury

---

instruction should be given if "there is some evidence which would justify conviction of the lesser offense; [and] the proof on the element or elements differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense.").

could have found an unlawful killing in the sudden heat of passion but without adequate provocation. Thus the jury could rationally have returned a verdict of second degree murder which fell between first degree murder and manslaughter in culpability. Indeed, the Court agreed that the jury must be charged as to manslaughter, an even lesser offense.

Mr. Agofsky easily meets the *Strickland* standard for counsel's ineffectiveness. As demonstrated above, Mr. Agofsky was entitled to have the jury charged as to the lesser included offense of second degree murder, yet counsel failed to seek the instruction or object to the court's erroneous instruction. Counsel's performance was deficient.

Further, Mr. Agofsky was prejudiced by counsel's inaction. A conviction for second degree murder would have precluded the possibility of a death verdict under 18 U.S.C.A. § 1111, the remaining count for which Mr. Agofsky stands convicted, and Mr. Agofsky was already serving a life sentence. As discussed above, in light of the provocation and other evidence arguing against premeditation, there is more than a reasonable probability that the outcome would have been different had the jury been correctly charged. Additionally, at the penalty phase, the jury unanimously found that the killing was not intentional, a finding which, if made a the guilt-innocence stage, would have precluded a first degree conviction. This is an additional indication that this was a close case in the minds of the jury.[25]

The court's murder instructions shifted the burden of proof on heat of passion from the government – which should have been required to disprove it in order to obtain a first-degree murder

---

[25]While the Fifth Circuit found no due process violation in these inconsistent verdicts, *United States v. Agofsky* 458 F.3d 369, 375 (5th Cir. 2006), the fact of the inconsistency can inform this court in assessing the probability that had the jury been correctly charged a different result may have obtained. *See also* Point III, *infra* (appellate counsel's inadequate briefing of inconsistent verdict claim was ineffective)

conviction – and improperly prevented the jurors from even considering heat of passion unless they had already acquitted Mr. Agofsky of muder.  The court erroneously submitted the four mental states required for first-degree murder (willfully, deliberately, with malice, and with premeditation) alternatively instead of conjunctively.  The court failed to submit the lesser-included offense of second degree murder; it gave inconsistent and confusing malice instructions; and it conflated the two forms of first-degree murder the jury was considering.  Trial counsel's failure to object to any of these instructions was deficient performance.  The juror's evident confusion, manifested when they found premeditation at the guilt-innocence phase following these erroneous instructions but found no intent to kill at the penalty phase after clear instructions, demonstrates that counsel's deficient performance prejudiced the defense.  There is a reasonable probability that, but for counsel's deficient failure to prevent these instructions or at least preserve claims for appeal by making appropriate objections, Mr. Agofsky would have been acquitted of first-degree murder, would not have received the death sentence, or would have received appellate relief.

### 3. Counsel Was Ineffective For Failing To Object To Prosecutorial Summation Misconduct.

The Amended § 2255 Motion argues that trial counsel were ineffective for failing to object to the prosecutor's misleading summation remarks and comments on Mr. Agofsky's exercise of his Fifth Amendment rights.  *See* Amended § 2255 Motion at 87; *see also* Transcript of Initial Appearance, September 25, 2003, at 3-4.  The prosecutor also committed misconduct and violated due process at the guilt-innocence phase by urging the jury to convict Mr. Agofsky, not because it had met its burden of proving each element beyond a reasonable doubt, but because if it failed to convict, "the inmates [would be] running the penitentiary."  Tr. Vol. 20, 400.  He also injected his personal opinion in Mr. Agofsky's guilt and sought to inflame the passions of the jury by claiming

that Mr. Agofsky beat Luther Plant "unmercifully" and characterizing Mr. Agofsky as "cold blood[ed]" and "ruthless[]."   Counsel was ineffective for failing to object.

> The prosecutor made the following argument in urging the jury to convict:

> You must find him guilty. That's what the evidence cries out for. Guilty of Count 1 and 2, that's what the evidence shows, that's what the instructions show, and that's what is just. *Otherwise, the inmates are running the penitentiary.* Their defense, the inmates would have influenced you in this decision. Don't let them do that. *We are in control, people like Christopher Matt and his credibility.*

Tr. Vol. 20, 400 (emphasis added).  This argument was improper.  It functioned to inflame the passions of the jurors by raising the specter of a complete loss of control of our penal institutions, and by implication the endangerment of correctional officers and the public, if they failed to convict. The fear-mongering was explicit; if the jurors failed to convict, then "[w]e" are no longer in control of the prisons.  The argument also tied the fears of rampaging inmates to whether the jurors accepted the credibility of Officer Matt, which was also improper, as this placed the responsibility of future incidents on the jury if it dared to question Matt's credibility rather than assess his testimony as it would that of any other witness.

Due process is violated when a prosecutor's summation relies not on the evidence, but burdens the jury with societal ills extrinsic to the case.  As one court has stated:

> A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence.  Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem.  The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.

*United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir.1984).[26]

---

[26]   *See also United States v. Johnson*,  968 F.2d 768, 771 (8th Cir.1992) ("We conclude that by urging the jury to act as a 'bulwark against ... putting this poison on the streets,' the

The misconduct could not be more plain.  The prosecutor urged, "You must find him guilty . . . Otherwise, the inmates are running the penitentiary."  This is a direct appeal the jury to carry a burden with which they were neither charged nor had a right to assume.  Its duty was to assess the facts as they pertained to Mr. Agofsky, not to send a message to other inmates, or protect correctional officers or the public generally.

The prosecutor's characterization of Mr. Agofsky as cold-blooded, ruthless, and merciless was also unnecessary hyperbole designed to inflame the jury.  These are not words that are descriptive of facts alone, but rather clothed in the prosecutor's personal opinion of guilt.  *United States v. Shaw*, 701 F.2d 367, 391-392 (5th Cir. 1983) (reference to defendant as cold-blooded "improper;" isolated instance of misconduct cured by immediate admonition by judge, and where evidence of premeditation "not close").

The prosecutor also committed misconduct at the guilt-innocence phase by urging the jury to reject the defense arguments and accept the government's because defense counsel's job was only representing Mr. Agofsky "the best way he can" whereas the prosecutor represented the "United States of America."  In closing, the prosecutor stated, "I don't expect Mr. Black to agree with me at all.  He's not representing the United States of America.   He's defending the defendant the best way he can." Tr. Vol. 20, 394.  The import was clear; defense counsel was just going through the

---

prosecutor in this case appealed to the jurors to be the conscience of the community in an improper and inflammatory manner"); *United States v. Solivan*,  937 F.2d 1146, 1155 (6th Cir. 1991) (improper to urge jurors to convict in order to send message to "other drug dealers"); *United States v. Barlin*, 686 F.2d 81, 93 (2d Cir.1982) (prosecutor improperly appealed to the jury's passion and emotion by characterizing its job as "the one occasion on which you have a duty to do something about the drug traffic in our community"); *United States v. Love*, 534 F.2d 87, 89 (6th Cir.1976) (finding misconduct where prosecutor injected specter of organized crime and the Mafia); *Dunn v. United States*, 307 F.2d 883, 885-886 (5th Cir. 1962) (reversible error where prosecutor maintained the case was the most flagrant he had ever tried and remarked that all politicians take kickbacks).

motions, saddled with the burden of representing a "defendant" (thus Black's summation should be summarily rejected) whereas the prosecutor's remarks enjoyed the imprimatur of the "United States" (and thus should be accepted on those grounds).  A prosecutor may not denigrate the role of defense counsel as grounds to reject the defense case.[27]  Nor is it proper ask the jury to accept the government's case simply because the prosecutor purports to represent the "United States of America."[28]

The prosecutor further committed misconduct by injecting his personal opinion as to the credibility of government witness Officer Christopher Matt.

In arguing Matt's credibility, the prosecutor stated:

> It all boils down, really, to the strength you give to Christopher Matt and a person who *we trust, we put in harm's way, we represent[,] the Justice Department[,] there as a corrections officer*.

Tr. Vol.  20, 399 (emphasis added).

The Eleventh Circuit has articulated a standard for assessing when a prosecutor crosses the line from zealous advocacy into the realm of personal vouching:

> First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the "witness" veracity.  Secondly, a prosecutor may implicitly vouch for the "witness" veracity by indicating that information not presented to the jury supports the testimony.

*United States v. Knowles*,  66 F.3d 1146, 1161 (11th Cir. 1995). The Fifth Circuit has endorsed this

---

[27]    *United States v. Young*, 470 U.S. 1, 9 (1985) (improper for an attorney to make "unfounded and inflammatory attacks" on opposing counsel);  *United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990) (reversing conviction where prosecutor *inter alia* stated that "while some people ... go out and investigate drug dealers and prosecute drug dealers and try to see them brought to justice, there are others who defend them, try to get them off[.]").

[28]    *See United States  v. Smith*, 962 F.2d 923, 933 (9th Cir. 1992) (error for prosecutor to reinforce opinion of government's witness's credibility "with repeated comments aimed at establishing his own veracity and credibility as a representative of the government").

formulation. *Jackson v. Johnson*, 194 F.3d 641, 653 (5th Cir. 1999) ("According to this suggested inquiry [*Knowles*], a prosecutor improperly vouches for a witness by making explicit assurances of the "witness" veracity or by alluding implicitly to information not presented").

Here, the prosecutor made "explicit assurances" of Matt's credibility. He repeatedly claimed that Matt should be believed because "we" trust him, "we" put him in harm's way, and "we" represent him.[29] The prosecutor was unambiguously invoking the prestige of the government, including, explicitly, the "Justice Department['s]" endorsement of Matt, in urging the jury to accept Matt's version of events as opposed to the word of "inmates" seeking to wrest "control" of the institution. The invocation of the Matt's relationship with the Justice Department violates the alternative prong of *Knowles* as well, as it implies that Matt is an officer in good standing and one whose record would give no cause to doubt his word, all extra-record considerations.

The Fifth Circuit has not hesitated to condemn the practice of vouching for the credibility of witnesses:

> [T]he prosecutor made extremely improper remarks of two varieties, both of which have often been discussed by this Court. First, the prosecutor sought personally to bolster the credibility of its key witnesses, Juarez and Gonzales, by reference to matters which were outside the record in the case. For instance, he inserted repeatedly his opinion of their motives. Of Gonzales, for example, the prosecutor insisted, "He wants to make this a better place. He wants to improve things. He wants to make that a prettier picture on the wall than it is right now." At another point, the prosecutor asserted that Juarez and Gonzales "get up here and say that's the man. If it wasn't the man, they wouldn't have any reason to say it, ladies and gentlemen." On rebuttal he took up this cudgel again, asserting of both Gonzales and Juarez, "I think their motives are pure as the driven snow. Their motives are to get out and make this world a better place to live in." Aside from personally vouching for his witnesses' motives and general integrity, the prosecutor attempted to bolster

---

[29]There is no question that when the prosecutor used the pronoun "we," he was referring to the "United States." *See* e.g., Tr. Vol. 20, 394 (using "we" and "United States" interchangeably while urging the jury to reject the defense counsel's arguments as his duty is only to the defendant).

their credibility by maintaining that they had taken on the responsibility for doing an "unpleasant job" and that they were "professional" and "dedicated" men, doing a good job and the "right thing."

*United States v. Garza*, 608 F.2d 659, 664 (5th Cir. 1979).  The Court went on to bemoan the frequency of due process violations noting that the "court has all too often had to make such a determination."  *Id.*

The remarks here were no less damaging than the "extremely improper remarks" uttered in *Garza*.  As in *Garza*, the prosecutor vouched for the witness, describing him as someone "we trust" and "we represent."  The remark, "We are in control, people like Christopher Matt and his credibility," was an unabashed endorsement of Matt's credibility by posing him as a dedicated stalwart against those inmates who would seek take control of the institution.  And as in *Garza* the prosecutor's remarks comprised "textbook examples of what a closing argument should not be." *Id*., 608 F.2d at 664 n.3.

Counsel had no reasonable strategic or tactical reason for failing to object to these improper comments.  A timely objection – and at a minimum a request for a curative instruction – would have ameliorated the prejudice inherent in the prosecutor's vouching for his witness's credibility, expression of personal belief in Mr. Agofsky's guilt, the denigration of defense counsel while trumpeting the prestige that inures to representatives of the "United States of America," and the placing of responsibility for any future prison strife on the jury.  As developed at length elsewhere, prejudice was manifest.  The evidence of premeditation and malice was razor thin at best, the confrontation was situational and brief, and there was evidence that Plant, a violent career criminal, was the initial aggressor.  Had trial counsel objected and the prosecutor played fair, there is a reasonable probability that the jury would have acquitted Mr. Agofsky, convicted him of a lesser offense, or imposed a sentence less than death, or that he would have received appellate relief for

-70-

preserved error.

### 4. Counsel Failed To Cross-Examine Witnesses On Specific Instances of Violent Conduct

Not only was counsel ineffective for failing to investigate and put before the jury evidence of Plant's violent reputation, *see* §§ I.D.2 & I.E, counsel failed to object to evidence of Plant's "peaceful" character. Further, once the government's witness put forth evidence of Plant's character, counsel was also ineffective for failing to cross-examine him about specific instances of violent conduct, including Plant's convictions for three robberies, arson, firearms possession and drug dealing. Fed. R. Evid. 404, 405.

Evidence Rule 404(a) provides that character evidence generally "is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Fed. R. Evid. 404(a). However, an exception exists for "[e]vidence of a pertinent trait of character of the victim of the crime offered by an accused." Fed. R. Evid. 404(a)(2). As addressed above, Plant's violent character was relevant to prove he was the initial aggressor.

Rule 405 specifies the methods by which character may be proved. Subsection (a) provides that "proof may be made by testimony as to reputation or by testimony in the form of an opinion" and that, "[o]n cross-examination, inquiry is allowable into relevant specific instances of conduct." Fed. R. Evid. 405(a).

The government elicited opinion evidence from Officer Christopher Matt about Plant's character for violence, portraying him, falsely, as non-violent.

Q. OK, now, you said you saw both the defendant and Luther Plant on a daily basis?

A. Yes, sir.

Q. You dealt with them and associated with them just daily and personal face-to-face contact on a daily basis?

Q.      Okay. Did people pick on the defendant?

A.      No, sir, I've never seen anybody pick on him.

Q.      Did Luther Plant pick on the defendant?

A.      I've never seen it.

Q.      *Was Luther Plant the kind of people person who would pick a fight with the defendant?*

A.      I've never seen him pick -- engage in any kind of fights or pick fights.

Tr. Vol. 18, 66 (emphasis added).

Q.      And the -- are you aware of any, any reason that Luther Plant's drug usage would have been the cause of the initiation of this fight?

A.      No, sir.

Q.      In fact what you know is he never put up any fight at all?

A.      *I've never seen him fight, sir.*

Tr. Vol. 18, 66 (emphasis added).

The government presented Matt as competent to speak to Plant's reputation within the prison community. The government elicited that Matt knew Plant, saw him frequently, observed his interactions and associated with him on a daily basis, that he was not the "kind of person" who engages in violence and had a reputation for "not fighting." This was unquestionably reputation and opinion evidence of Plant's peaceful character, sufficient to warrant a response.[30]

---

[30]   *See, e.g., United States v. Matthews*, 440 F.3d 818, 825 (6th Cir. 2006) (impeachment as to specific acts permissible where witness testified defendant was a "good person" and that she had "never known him to do anything to get in trouble ... or do any illegal activities"; "no error in the district court treating [witness] as a character witness under Rule 405 of the Federal Rules of Evidence"); *United States v. Green*, 305 F.3d 422, 431 (6th Cir. 2002) (treating witness

Counsel's performance was deficient because they did nothing to counteract Officer Matt's opinion testimony.  Under Rule 405(a), inquiry into the basis of the opinion, including specific acts of violence, was permitted.  However, not only did counsel fail to put before the jury evidence of Plant's violent reputation, they failed to impeach the government's claim that Plant possessed a peaceful, non-violent character.[31]

Mr. Agofsky was prejudiced by counsel's inaction.  As the record stands, the jury could well have rejected the self-defense claim based on this unimpeached reputation and opinion evidence.  Since there was conflicting testimony as to whether Plant was the initial aggressor, evidence of Plant's otherwise peaceful character could well have been dispositive in the minds of the jury.

In fact, Plant had a long history of violence, weapons possession and drug dealing, evidence the jury did not hear at the guilt-innocence stage of trial:

- On March 4, 1981, Plant and a co-conspirator entered Buckley's Grocery Store in Orange, Texas, and robbed the clerk while brandishing a .22 caliber pistol.  They removed approximately $100 from the cash register and fled the scene.  Plant was convicted of Robbery.

- On December 30, 1981, Plant, along with a co-conspirator, entered Marie's Beauty Salon in Orange, Texas and robbed an elderly female cashier at the point of a .22 caliber pistol.  The two stole $100 and fled the scene.  Plant was convicted of

---

testimony that defendant was a "law-abiding citizen" as character evidence, thus opening the door to whether witnesses "were aware of an alleged seizure of $18,000 from Green at the Atlanta airport in 1979"); *United States v. Lewis*, 929 F.2d 702, 1991 WL 43903, *8 (table; text in Westlaw) (6th Cir. 1991) (by stating that he was "a law abiding citizen," defendant "opened the door" to questions relating to his past criminal conduct; that he did not intend to place his good character at issue deemed "irrelevant"); *United States v. Strong*, 17 M.J. 263, 266-67 (C.M.A. 1984) (in finding cross-examination on specific act permissible, court ruled the proponent "must accept responsibility not only for the specific evidence it offers ..., but also for the reasonable inferences which must be drawn from it").

[31]    At a motion in limine before trial, the court barred reference to Plant's prior record. Tr. Vol. 18, 3-4.  Counsel failed to recognize that Rule 405 permitted exploration of these facts on cross-examination once the government put forth evidence of good character. Tr. Vol. 18, 68.

      Aggravated Robbery.

- On January 5, 1982, Plant and a codefendant entered Sam Paradise Real Estate in Vidor, Texas, and robbed an employee of $60 at the point of a .22 caliber pistol and fled the scene.   Plant was convicted of Aggravated Robbery.

- On December 23, 1989, Plant and a co-conspirator burglarized the Texas Longhorn Club in Orange County, Texas.  They stole four money bags from one safe and tried to gain entry to another safe with a blowtorch.  That having failed, they ultimately hacksawed off the hinges and stole an additional three money bags.  The two decided they did not want to leave any evidence and both spread papers and files over the floor.  These were ignited with a cigarette lighter.  The proprietor reported that over $500,000 was taken.  Also stolen was an Iver Johnson .32 caliber revolver.  This gun was found in Plant's possession upon his February 28, 1990 arrest.  Plant was convicted of Arson of a Building Used in Interstate Commerce and Felon in Possession of a Firearm.  The Probation Department classified this conviction as violent and Plant as a career offender.

- On February 28, 1990, Plant sold 25 capsules of Phenterrnine to an undercover officer working for the special drug enforcement unit of Orange County, Texas.  Plant was convicted of Delivery of a Controlled Substance.

*See* Presentence Report, Luther Kenneth Plant.  SA 2513-14.

Contrary to the government's claims about the "kind of person" Plant was, in fact he was a violent, gun-toting drug dealer and "career offender," evidence the jury should have heard.  *See United States v. West*, 58 F.3d 133, 141 (5th Cir. 1995) (cross-examination of a witness offering character evidence can include questions regarding relevant, specific instances of conduct).  Furthermore, as set forth in § I.D.2, *supra*, if trial counsel had conducted a reasonable investigation, they could have countered Officer Matt's reputation testimony with testimony from inmates with first-hand knowledge about him.  Trial counsel did not direct their investigator to investigate Luther Plant's criminal history or background.  SA 558.  In addition, although Mr. Black alleges in his affidavit that the defense investigator spoke with  Matt, Mr. Bennett could not recall when or where he spoke with Matt and had no notes or memo of the interview, though he acknowledged that he "should have" taken notes or written a memo had he actually interviewed him.  SA 561.

Once the government had opened the door by eliciting Matt's testimony portraying Plant as having a peaceful character and reputation, counsel was ineffective for failing to impeach Matt by putting Plant's prior acts of violence before the jury. There is a reasonable probability that, if counsel had objected, Mr. Agofsky would have been acquitted or convicted of a lesser offense, that he would not have been sentenced to death, or that he would have received appellate relief.

> **5.      Counsel Was Ineffective For Failing To Seek Severance Of The "Murder By Life Sentenced Prisoner" Count From The Federal Murder Count To Prevent The Jury From Drawing Prejudicial Conclusions When Considering the Question of Petitioner's Guilt.**

Counsel sought before trial to have one of the two murder counts dismissed for violation of double jeopardy. As the Court of Appeals later held, that motion was wrongfully denied. *United States v. Agofsky*, 458 F.3d 369 (5th Cir. 2006) (SA 2521). Nevertheless, counsel unreasonably failed to take any further steps that would have prevented the jury from hearing the highly prejudicial evidence that Mr. Agofsky was serving a life sentence at the time of the incident. Rather, counsel stipulated that Mr. Agofsky was a life-sentenced prisoner and acquiesced to the jury's being so advised. Tr. Vol. 18, 33. Counsel could have sought severance of the "murder by life prisoner" count to avoid this prejudice. *See* Fed. R. Crim. P. 14 (a) ("**Relief.** If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."). Counsel's failure to seek this readily available and routinely applied remedy constituted deficient performance.

In the context of felon-in-possession counts, the Fifth Circuit has made clear the risk of prejudice where the jury hears evidence of a prior record:

> We have long recognized the obvious dangers inherent in trying a

-75-

felon-in-possession count together with other charges, as it acts as a conduit through which the government may introduce otherwise inadmissible evidence of the defendant's prior convictions, thereby potentially tainting the reliability of the verdict rendered by the jury on the other counts. For this reason, "'evidence of a prior conviction has long been the subject of careful scrutiny and use at trial' because of the danger that the jury might convict, not based on the evidence, but because it feels that the defendant is a 'bad person.'" Although the potential for prejudice resulting from introduction of prior crimes evidence in connection with a felon-in-possession charge may be lessened by limiting instructions, a proper inquiry into the propriety of trying the felon count together with the other charges requires examining not only the efficacy of the limiting measures taken by the trial court, but also the strength of the evidence of the defendant's guilt. In certain cases, the translucency of the government's ill motive for adding the felon-in-possession count is also a factor in determining whether severance was warranted.

*United States v. McCarter*, 316 F.3d 536, 538-539 (5th Cir. 2002) (footnotes omitted). McCarter was charged with drug offenses and felon-in-possession of ammunition charges. The court, finding that the evidence was not so strong as to render the error harmless, and characterizing the motives of the government in belatedly adding the felon-in-possession charge as "dubious," reversed the conviction.

As in *McCarter*, here severance of the federal murder charge from the "murder by life prisoner" count would have eliminated any risk of a tainted verdict. Other than the one-sentence stipulation, the evidence was identical for both counts. Had the jury returned a guilty verdict for murder, the second stage could then have commenced with the only remaining issue whether Mr. Agofsky was in fact a life-sentenced prisoner. This would ensure the jury's verdict was based solely on the facts and not on any extrinsic, and highly prejudicial, evidence. At the same time the process would entail a minimal burden on the court and parties.[32]

---

[32] *See United States v. Busic*, 587 F.2d 577, 585 (3d Cir.1978), *rev'd on other grounds*, 446 U.S. 398 (1980) (where defendant charged with drug offenses and with being a felon in possession of a firearm, failure to sever harmless as evidence otherwise independently admissible; however, severance should be granted "If it is determined that the convictions would not be admissible on the other counts-that were these counts to be tried alone the jury would not

Nor was the "limiting" instruction sufficient to ameliorate the taint. The instruction in its entirety was as follows:

> **Caution – Consider Only Crimes Charged:** You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or offense not alleged in the indictment. Nor are you concerned with the guilt of any other person or persons not on trial as a defendant in this case.

Tr. Vol. 18, 353. The court did not specifically reference the life sentence evidence, why it was admissible, or how it should be received. The obvious observation that the "defendant is not on trial" for other acts even falls short as an admonition not to consider the evidence for any other reason than as proof of an element of one of the two counts, and in no way was sufficient to overcome the prejudice of the jury's hearing of the prior conviction and resulting life sentence.[33]

---

hear this evidence-then severance should be granted"); *United States v. Joshua*, 976 F.2d 844, 847 (3d Cir. 1992), *abrogated on other grounds*, *Stinson v. United States*, 508 U.S. 36 (1993) (approving of bifurcated approach where the jury, having reached a verdict on other counts, would then proceed to consider the counts requiring proof of prior convictions); *United States v. Vastola*, 670 F. Supp. 1244, 1263 (D.N.J. 1987) (approving bifurcated two-stage procedure where counts involving proof of prior record deferred "to avoid the possibility of prejudice resulting from admission of such evidence").

[33]*See United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994) ("presumption that a jury will adhere to a limiting instruction evaporates where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense") (internal citations and quotations omitted); *United States v. Daniels*, 770 F.2d 1111, 1118 (D.C. Cir. 1985) ("We are not nearly so sanguine concerning the efficacy of jury instructions in curing the prejudice caused by the introduction of other crimes evidence. To tell a jury to ignore the defendant's prior convictions in determining whether he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities. In such cases, it becomes particularly unrealistic to expect effective execution of the "mental gymnastic" required by limiting instructions and "the naive assumption that prejudicial effects can be overcome by instructions to jury" becomes more clearly than ever "unmitigated fiction"") (internal citations and quotations omitted); *Government of the Virgin Islands v. Toto*, 529 F.2d 278, 283 (3d Cir.1976) (once the jury hears evidence of prior crimes, "it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence. A drop of ink cannot be removed from a glass of milk").

Mr. Agofsky was prejudiced.  While Mr. Agofsky did not contest that he killed Plant, the evidence of murder was weak, resting on the word of one inmate.  Two witnesses said Plant was the initial aggressor and provoked Mr. Agofsky.  There was evidence that knives were readily introduced into the recreation cages and that the correctional officers were not in a position to render immediate aid in the event of an attack.  Thus, the potentially inflammatory evidence that Mr. Agofsky was serving a life sentence – which was irrelevant to the justification and heat of passion defenses on which he sought acquittal or a lesser conviction – could have tipped the balance against him.  There is a reasonable probability that, had counsel sought and obtained a severance, Mr. Agofsky would have been acquitted of capital murder.

Nor is this a case where a stipulation ameliorated the prejudice.  *See Old Chief v. United States*, 519 U.S. 172, 174 (1997) (abuse of discretion found where trial court refused defendant's offer to stipulate as to defendant's prior felony conviction).  The stipulation was that Mr. Agofsky was sentenced to *life imprisonment*.  This telegraphed to the jury Mr. Agofsky had likely been convicted of a prior murder.  Thus the jury knew both the duration of the sentence and the likely crime for which he had been previously convicted.  This was far more prejudicial than the felony evidence which compelled a reversal in *McCarter*.  Trial counsel's failure to seek a severance was prejudicially deficient performance because there is a reasonable probability that Mr. Agofsky otherwise would have been acquitted or convicted of a lesser offense, that he would have received a non-death sentence, or that he would have received appellate relief for preserved error.

> **J.    The Cumulative Effect Of Trial Counsel's Guilt-Innocence Phase Deficiencies Prejudiced The Defense At Both Phases Of Trial.**

The Amended § 2255 Motion describes how trial counsel's limited investigation and slapdash trial preparation left him almost empty-handed when he stood before the jury in

summation. Not only did he have little evidence to support his argument that Luther Plant was the initial aggressor, but he made factual errors that the prosecutor promptly highlighted for the jury in his rebuttal summation. Mr. Agofsky argues that the cumulative effect of counsel's deficient performance prejudiced the defense. *See* Amended § 2255 Motion at 89-91.

The Court of Appeals granted relief because of cumulative deficiencies in *Richards v. Quarterman*, 566 F.3d 553, 568-71 (5th Cir. 2009), where it found deficient performance in counsel's failure to interview important witnesses before trial, present favorable evidence, object to inadmissible hearsay, or request a lesser included offense instruction. Observing that "we need not engage in a lengthy discussion of the prejudice prong," the court held that the cumulative effect of counsel's deficiencies prejudiced the defense. *Id.* at 571-72; *see also Martinez-Macias v. Collins*, 810 F.Supp. 782, 805, 813 (W.D. Tex. 1991) (adopting Magistrate Judge's conclusion that trial counsel's failure to investigate and present alibi testimony was ineffective) *aff'd* 919 F.2d 1067 (5th Cir. 1992).

As in *Richards*, the cumulative effect of counsel's deficient performance in Mr. Agofsky's case prejudiced the defense. If counsel had located and presented all of the testimony available from all nine of the witnesses who could have testified that Plant started the fight, along with the background information available from one witness after another concerning Plant and the violent atmosphere at USP Beaumont, and testimony from prison and mental health experts, and if counsel had engaged in appropriate advocacy in jury selection and during the testimony, summations, and jury instructions, there is a reasonable probability that the trial would have ended differently. There is a reasonable probability that, with effective representation, Mr. Agofsky would have been acquitted outright, or convicted of non-capital murder, or received a sentence of less than death, or would have obtained appellate relief for preserved error. For all these reasons and those in the

Amended § 2255 Motion, Mr. Agofsky received ineffective assistance of counsel at the guilt-innocence portion of his trial. U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984). This Court must accordingly order an evidentiary hearing and grant relief on this ground.

## II.    GROUND 12.2: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE.

### A.    Introduction

In Point II of his Amended § 2255 Motion, Mr. Agofsky challenges his trial counsel's constitutionally deficient penalty phase preparation. *See* Amended § 2255 Motion at 92. He argues that counsel failed to undertake reasonable efforts to save his life by compiling an independent social history, investigating Mr. Agofsky's prior convictions and infractions, developing prison mitigating evidence, and obtaining appropriately investigated and prepared mental health and prison adjustment evidence. He argues that, because of counsel's superficial preparation, they were in no position to make informed strategy decisions. Furthermore, counsel failed to engage in reasonable advocacy during the penalty phase trial presentation. *See Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Williams v. Taylor,* 529 U.S. 362 (2000).

Mr. Agofsky supplements his claims with the evidence summarized below. He presents a social history report by a licensed clinical social worker and declarations by fourteen family members, friends, and teachers.[34] These witnesses describe repeated head injuries in Mr. Agofsky's childhood and youth, and emotionally and physically traumatic events that affected his functioning and perception of the world. They explain the importance of his martial arts training in his development from childhood to manhood. Mr. Agofsky presents mitigating evidence from mental health experts who have determined that he suffers from organic brain damage resulting in executive

---

[34] Joe Agofsky, Jr. (SA 1930), Sheila Agofsky (SA 1950), Trevan Billbe (SA 1966), Peggy Black (SA 1970), Terry Bryant (SA 1978), Robert Duggan (SA 1982), Gerald Edmondson (SA 1987), Joy Johnson (SA 1992), Leon Rondeau (SA 2000), Jan Varner (SA 2005), Deborah Cousatte (SA 2295), Rhonda Polvado (SA 2298), Brenda Bryson (SA 2535), Midge Malchupa (SA 2537).

functioning deficits, and from post-traumatic symptoms. He presents evidence, which trial counsel could have developed, that casts doubt on his guilt of the prior convictions that served as aggravating factors, and presents the statements of multiple inmates who could have provided context or rebuttal for the seven disciplinary infractions that the government also introduced in aggravation. He presents other statements from fellow inmates who could have described Mr. Agofsky as a person who managed to keep clear of gangs in prison and played a mediating and protective role.

Finally, Mr. Agofsky presents evidence from other participants in the 2004 trial investigation and preparation. The deposition testimony of Jay Bennett and Dr. Dan Roberts confirms the irresponsibly limited nature of the defense penalty phase preparation and the value of the mitigating evidence that counsel could have developed and presented. All four of the other experts retained by trial counsel – Dr. Edward Gripon (a psychiatrist), Dr. Elizabeth Pelz (a criminologist), and Terry Pelz and Harvey Cox (prison consultants) – have reviewed the postconviction mitigating information summarized below, and have stated that it would have been helpful to them in 2004. They all could have developed and presented similar mental health and prison adjustment evidence.

The evidence detailed below and in the Amended § 2255 Motion demonstrates that counsel's unreasonable failures to fight for Mr. Agofsky's life, from the beginning of trial preparation to the end of the trial, prejudiced his penalty phase defense. The jurors sentenced Mr. Agofsky to death although there is a reasonable probability that, but for counsel's deficient performance, they would have spared him.

### 1.    Mr. Bennett Did Not Conduct A Mitigation Investigation.

As indicated, the deposition testimony of Jay Bennett, the staff investigator assigned by the Federal Defender to Mr. Agofsky's case, confirms the superficial nature of the penalty phase

investigation.  Trial counsel failed to hire a mitigation specialist, and Mr. Bennett did not and does not qualify as such a specialist.  He admitted that he does not have specialized training in mitigation investigation.  Indeed, Bennett has never attended a training on investigating mitigation in capital cases. SA 542.  Although he now attends investigation conferences which may include an occasional session about death penalty defense, Bennett acknowledged that at the time of Mr. Agofsky's trial he had not attended such a conference.  SA 543.

Trial counsel did not ask Bennett to conduct a mitigation investigation or interviews, as required by the ABA Guidelines.  SA 545-47.  They did not ask Bennett to obtain any records from Mr. Agofsky's background.  SA 546.  They did not ask him to interview Mr. Agofsky's family members, even though he had names and addresses for several of them in his possession.  Had counsel asked, Bennett testified, he would have interviewed the family.  SA 582.  Trial counsel did not give their investigator direction on topics to cover with witnesses.  For example, counsel did not ask him to interview the prison inmate witnesses about prison culture.  SA 547.  Accordingly, while he interviewed some inmates in connection with the investigation for the guilt-innocence phase, Bennett did not ask them about their own personal experiences with violence in the prison.  SA 554-55.

Although Bennett reported that he compiled a "social history" in Mr. Agofsky's case, the document he described would not qualify as the kind of social history contemplated by the ABA guidelines.  He testified that when he prepares a social history report, he relies solely upon verbal information from the client and the client's parent(s).  SA 544.  In compiling the report in this case, he spoke only with Mr. Agofsky and Mr. Agofsky's mother.  SA 546.  He did not investigate Mr. Agofsky's educational history or speak with anyone who knew Mr. Agofsky prior to or during his eleven years of incarceration.  *Id*.  Mr. Bennett testified that he delivered the "social history" report

-83-

to Mr. Barlow and did not retain a copy of it.  Current counsel have never seen it.  Bennett suggested that it may have been lost in a hurricane that destroyed Barlow's records.  SA 577.  No such report appeared among the Bennett interview memos supplied to postconviction counsel by Mr. Black.

### 2. Dr. Roberts And Other Experts Did Not Conduct A Mitigation Investigation.

Like Mr. Bennett, Dr. Dan Roberts confirmed that Mr. Agofsky's defense team did not conduct an independent mitigation investigation.  Roberts, who testified for the defense at trial, testified at a court-authorized deposition on July 2, 2009.  SA 696.  He maintains a private practice in clinical psychology in Round Rock, Texas, providing counseling, evaluations, and testing to adults and children.  He performs personality, intellectual, achievement, and neuropsychological testing, but is not board-certified in neuropsychology.  SA 704.

Douglas Barlow retained Dr. Roberts in May 2004 and sent him materials to review on May 13, 2004.  SA 714.   Barlow sent Dr. Roberts about 700 pages from Mr. Agofsky's Bureau of Prisons ("BOP") central file, including information about his prior arrests and disciplinary infractions. SA 708, 728, SA 965-1671.  Barlow said that he was interested in mitigation issues and "prediction of danger, of violence in prison."  SA 714.  Dr. Roberts interviewed Mr. Agofsky on May 21 and June 19, 2004, for about three hours each time.  He spent about an hour on June 19 conducting collateral interviews of several guards at the Liberty Jail where Mr. Agofsky was being held in pretrial detention, and interviewed Mr. Agofsky's mother by telephone for about an hour on July 6, a week before he testified.  SA 730.  He billed for two 15-minute consultations with Barlow in June and one half-hour consultation in July.  SA 715-16.  Except for time spent reviewing the records Barlow had sent him, he did no other work on the case.  SA 717.  Barlow was Roberts's main contact on the defense team.  He may have met Mr. Black and Mr. Bennett but did not recall

any substantive interactions with them. SA 717-18.

Barlow did not ask Dr. Roberts to investigate whether there might be any head injuries in Mr. Agofsky's past, nor whether there were any other neurological insults or issues. Roberts did not recall Barlow's asking him to conduct any tests. Barlow did not ask him to make referrals for any tests or to review any records except the BOP prison records. SA 718, 719, 735. When Roberts interviewed Mr. Agofsky, he asked him about past injuries in general, but never asked him about head injuries. SA 735, 736. Among the BOP records Roberts had received from Barlow were five medical reports indicating that, during his years of incarceration, Mr. Agofsky had repeatedly answered "yes" when medical personnel asked him about head injuries, and that the personnel had several times recorded further details. SA 737-40. Roberts had reviewed these records but did not remember the notations about head injuries. If Barlow had told Roberts that he was interested in potential head injuries, he would have called the notations to Barlow's attention, but he did not focus on them because he no had information about head injuries. SA 741, 823, 824. Mr. Agofsky was cooperative but did not volunteer some of the information uncovered in the post-conviction social history investigation. SA 809-12.

Roberts was not asked to review a social history report or compile one himself. Although Roberts has sometimes conducted collateral interviews in other cases, Barlow did not ask him to conduct interviews of family members or others, except for the single telephone interview of Sheila Agofsky. If asked, he could have conducted collateral interviews if the witnesses had been brought to Beaumont while he was there, or he could have interviewed them by telephone or traveled to their homes. SA 720. Dr. Roberts was doubtful that he would have had time to compile a social history report similar to the report he received from postconviction counsel in the two months he was working on Mr. Agofsky's case in 2004. SA 720.

Barlow never asked Roberts to review witness statements from family members or friends; whatever Roberts learned about Mr. Agofsky's pre-prison life he learned from Mr. Agofsky or his mother. SA 721. The only information about Mr. Agofsky's pre-prison life Roberts received from the lawyers concerned Mr. Agofsky's prior convictions. SA 721. Roberts never received a report by Bennett describing Mr. Agofsky's pre-prison life, and never received any information describing statements by Sheila Agofsky, prepared by Bennett or anyone else. He only knew what he learned by talking to her himself. SA 721, 731. Mr. Agofsky's lawyers did not set up any family interviews or ask Roberts to interview any family members besides Sheila. He did not interview, and they did not give him any statements or information from, other family members, friends, or teachers. Roberts did not travel to Noel, Missouri, Mr. Agofsky's home town, and did not interview Sheila Agofsky when she came to Beaumont. SA 758. Barlow never asked Roberts to review statements by inmates who knew Mr. Agofsky personally, or to interview guards who had known him before his incarceration at the Liberty Jail. SA 721.

In a phone conversation on June 24, 2004, after the trial was under way and about three weeks before Roberts testified, Barlow asked Roberts whether Mr. Agofsky had "any mental condition bearing on trial." SA 723, 906. Roberts told Barlow that "from a psychological standpoint, he appeared to be normal, and I didn't see any pathology." SA 723. Roberts did not learn from Barlow about any kind of trauma in Mr. Agofsky's past, "except maybe the airplane crash" that had killed his father. SA 724. Although Mr. Agofsky told Roberts that he was protecting himself in the Luther Plant incident, Roberts and Barlow did not discuss whether Roberts might be able to provide an opinion that could support the defense at the first phase of the trial. SA 724-25, 734. No one told Roberts to keep alert for disclosures about bullying, Sheila Agofsky's depression, or other similar emotionally traumatic events. SA 741-42. He was not asked to review

reports or test results from other experts, or to prepare a report himself.  SA 722.

Barlow told Roberts that future dangerousness would be a penalty phase issue, but did not ask Roberts to conduct any personality testing, to review any statements from inmates who knew Mr. Agofsky, or to gather literature or statistics that might be relevant to a future dangerousness assessment.  SA 725-26.  According to Roberts, Barlow decided not to contest future dangerousness generally.  Rather, he wished to show that Mr. Agofsky could be safely held in prison by keeping him away from other inmates.  SA 805-06, 808.

Barlow did ask Roberts to "discuss his behavior in custody."  SA 754.  To investigate this, Roberts spent an hour interviewing several guards at the Liberty Jail, where Mr. Agofsky was in pretrial detention.  SA 715, 753.  Officers Cook, Beeson, and Hendrix agreed that Mr. Agofsky was a model prisoner.  Officer Marshall told him that the maximum security unit, for violent inmates, was across the street from where Mr. Agofsky was housed, and that he had a "great sense of humor" and was protective toward females.  Officer Chapman[35] said that he was respectful and did not cause problems.  Officer Petty described an incident when Mr. Agofsky's cell door popped open accidentally and he did not try to escape, but just waved and told the guards.  She was not afraid of him.  Roberts got no negative information from the guards; they all gave Mr. Agofsky a good report.  SA 753-57.

Mr. Barlow retained four other experts, but none of them conducted anything remotely resembling a mitigation investigation.  Dr. Edward Gripon, a psychiatrist, evaluated Mr. Agofsky at Barlow's request on June 4, 2004, ten days before jury selection began.  SA 2789.  Barlow sent Gripon prison records but did not give him any materials relating to Mr. Agofsky's pre-prison life.

---

[35] Officer Chapman was the only one of the guards Roberts interviewed who testified at trial.  Tr. Vol. 22, 181.

Gripon never saw any statement from Mr. Agofsky's mother or any report prepared by Jay Bennett. Barlow did not ask him to interview anyone but Mr. Agofsky, and he did not do so.  SA 2788-89. Barlow asked Gripon to inform him whether Mr. Agofsky had any substantial mental illness, but did not ask the doctor to assess Mr. Agofsky's future dangerousness or whether he had any head injuries or neuropsychological impairment.  SA 2789.

Barlow retained Dr. Elizabeth Pelz, a criminologist at the University of Houston, to testify as an expert in prison societies.  SA 2796.  Barlow gave Dr. Pelz prison records and the case discovery, but she did not receive any social history or mental health reports.  Dr. Pelz was unable to schedule a meeting with Mr. Agofsky because she had been consulted too close to the beginning of trial, and testified only from her general academic knowledge.  SA 2796-97.  In other cases, Pelz has made a regular practice of interviewing the defendant and has sometimes had the opportunity to interview family members.  She did not have that opportunity in Mr. Agofsky's case.  SA 2802-03.

Terry Pelz, a former prison warden for the Texas Department of Corrections who has a private consulting practice, was retained by Barlow as an expert in prison conditions and future dangerousness. SA 2805-06.  Barlow sent him USP Beaumont records for Mr. Agofsky and Luther Plant but did not supply a social or medical history for Mr. Agofsky, mental health reports, inmate statements, or anything other than prison records.  SA 2806-07.  Pelz interviewed Mr. Agofsky and toured the scene of the Plant incident at USP Beaumont, but did not conduct any other interviews or tour the federal super-maximum facility at Florence, Colorado.  SA 2807, 2813.  He requested that Barlow provide him with Plant's state prison records and  Beaumont recreation rosters, staffing records, and guard protocols, but Barlow never obtained them.  SA 2806.

Finally, Mr. Barlow consulted Harvey Cox, a correctional consultant and former career

employee of the Federal Bureau of Prisons, to provide his opinion whether the BOP could safely hold Mr. Agofsky if he were not sentenced to death. SA 2814. Barlow sent Cox prison records, but no other materials, and Cox did not collect data or other information to prepare for his testimony. SA 2814.

The deposition testimony of Bennett and Roberts and the declarations of Gripon, Pelz, Pelz, and Cox confirm that, as the Amended § 2255 Motion alleges, the penalty phase investigation was unreasonably limited. By not conducting a reasonably complete investigation, trial counsel violated Guideline 10.7 of the ABA Guidelines, which provides that "Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.7, 31 Hofstra L. Rev. 913, 1015 (2003).

In addition, counsel's failure to investigate deprived Mr. Agofsky of the effective assistance of counsel. As set forth in the Amended § 2255 Motion, supplemented with the information in the ensuing sections, it is reasonably probable that, but for counsel's deficient investigation and presentation of the penalty phase, the jury would have imposed a non-death sentence. *See Rompilla v. Beard*, 545 U.S. 374 (2005).

**B.** **Counsel Failed To Conduct An Independent Investigation Of The Government's Case In Aggravation Or To Present Evidence Providing Context For The Aggravating Factors.**

**1.** **Introduction**

The Amended § 2255 Motion challenges trial counsel's failure to conduct any investigation of the prior convictions and disciplinary infractions that formed the basis of the government's statutory and non-statutory aggravating factors. Mr. Agofsky demonstrates that this deficiency was prejudicial by detailing extensive, readily available evidence that counsel could have used to rebut or explain the government's case for death. *See* Amended § 2255 Motion at 94 (citing *Rompilla v. Beard,* 545 U.S. 374 (2005)). Bennett's deposition testimony confirms, and the additional evidence described below further demonstrates, that counsel's failure to investigate the aggravating factors constituted ineffective assistance.

In his deposition, Mr. Bennett admitted that the attorneys did not ask him to investigate Mr. Agofsky's prior disciplinary infractions. SA 555. Although Mr. Agofsky had outlined for his trial counsel all of his disciplinary infractions and they were all contained in his central file, Bennett was not directed by counsel to investigate them. *Id*. Likewise, there was no evidence that Dr. Roberts was asked to investigate any of Mr. Agofsky's prior disciplinary infractions. SA 712-14. Bennett acknowledged that he and trial counsel believed that their case in mitigation could not outweigh the aggravation. SA 578. Nevertheless, Bennett testified that counsel did not ask him to investigate disciplinary infractions. They did not ask him to investigate the 1992 incident involving bodily fluids. SA 558. Counsel did not ask him to investigate an incident in Atlanta in which Mr. Agofsky had a fight with another inmate. SA 556. In addition, he did not investigate the incident at Lompoc. SA 557. Thus, the aggravating factors relied upon by the government went largely ignored by the defense.

### 2.    Noel State Bank Robbery

Beginning with ¶198 of his Amended §2255 Motion, Mr. Agofsky sets forth his claim that trial counsel's failure to undertake elementary investigation of, or challenge, Mr. Agofsky's previous conviction for the 1989 Noel State Bank robbery and murder of Daniel Short constituted deficient performance. *See Rompilla v. Beard,* 545 U.S. 374 (2005).[36]  Mr. Agofsky has consistently and unflaggingly maintained his innocence of the 1989 crimes and told his trial counsel in the Plant case that he wished to contest his guilt of those crimes.  Nevertheless, trial counsel appears to have assumed Mr. Agofsky was guilty of the prior crimes and, therefore, never investigated them, even to the extent of looking at ways in which the legal or scientific landscape had changed since the earlier cases were tried in the mid-1990's.  Had trial counsel conducted such an investigation, they could have effectively  challenged the reliability of the prior verdicts before the Plant jury.  Given that the convictions for Daniel Short's murder served as the basis for three aggravating factors in the Plant case, investigating and challenging the prior verdicts, especially on the basis of any new evidence that had become available since the time of the original trial, should have been a central piece of the defense preparation.[37]  Given that the fingerprint evidence used against Mr. Agofsky in the Short murder cases was the *only* physical evidence allegedly tying him to the scene of the

---

[36]  *See also Battenfield v. Gibson,* 236 F.3d 1215 (l0th Cir. 2001) (counsel ineffective for, among other deficiencies, failure to investigate prior conviction the prosecution planned to introduce in aggravation); *Summit v. Blackburn,* 795 F.2d 1237 (5th Cir. 1986) (counsel ineffective for failing to object to or argue lack of corroboration for aggravating factor).

[37] As Mr. Barlow has now made clear in his affidavit (SA 2336-37, 2339) and Mr. Agofsky confirms in his own (SA 2364-65), trial counsel never considered the possibility that Mr. Agofsky was innocent of these crimes.  Mr. Barlow was, in fact, angry at Mr. Agofsky for refusing to name the third participant in the face of Mr. Agofsky's insistence that he was never part of the criminal enterprise and did not know who *any* of the participants were.  SA 2337, 2339, 2365.

Short murder, it was incumbent upon defense counsel in the Plant case to conduct an independent examination of the print evidence and to consult with an expert in the field to determine its legitimacy.[38]  Trial counsel did neither.

Rather, trial counsel made no effort to investigate these prior crimes. Trial counsel did not ask Mr. Bennett to investigate the murder of Dan Short. SA 555. Mr. Bennett admitted that he "did not know a whole lot about" it. *Id.*  They did not instruct him to interview Ladell Farley, who testified for the government. SA 559. Mr. Bennett did not ask Joseph Agofsky about the bank robbery or murder, although he had been convicted of both crimes along with his brother. SA 559.

Although trial counsel have asserted in their affidavits that they had at least obtained the Oklahoma trial transcript, the evidence indicates otherwise. Mr. Bennett testified that he requested and obtained 27 boxes of records from the Oklahoma Indigent Defender Services. SA 558. While Mr. Bennett initially claimed that the transcript was in those boxes, he subsequently admitted that he did not know what was in the boxes because he never looked inside them. SA 558. Mr. Agofsky's letters to counsel reflect that he repeatedly asked counsel for the transcripts, e.g., SA 675, but Mr. Agofsky reports that counsel never told him that they had obtained the transcript. SA 2366.  And trial counsel did not produce the transcript to postconviction counsel.

Nor did trial counsel make any serious attempt to challenge these convictions during the

---

[38]  Postconviction counsel have employed the services of an experienced latent print examiner, Kenneth Eng, who has examined the same latent prints that FBI print examiner, Russell Davey, testified about at the Short trials. Mr. Eng disagrees with Agent Davey's unqualified assessment that the latent prints could be individualized to Mr. Agofsky. Mr. Eng's opinion is discussed in detail below and in his declaration, attached hereto as SA 3756. Postconviction counsel has also consulted with Simon Cole, an expert in the science of latent print analysis. Dr. Cole's explanation of the flaws that were uncovered in the science of latent print analysis between the time of the Short murder trials and the 2004 Plant trial is also discussed below and set out in detail in his declaration, attached hereto as SA 3786.

Plant trial.  Their only attempt to diffuse the impact this previous gruesome and premeditated crime would have on the jury at sentencing was to have the Government's witness acknowledge that the crime was not committed by Mr. Agofsky alone. Tr. Vol. 21, 45. This, of course, was a complete concession that Mr. Agofsky had participated in the commission of the crime.

In his Amended §2255 Motion, Mr. Agofsky has already set out a number of avenues trial counsel should have investigated and means counsel could have used to undermine with the Plant jury the reliability of the convictions for the 1989 crimes. Id. at 94-108.  Mr. Agofsky has also set out portions of closing arguments in the Plant case that show how strongly the government emphasized the prior convictions in the Short case as a basis for imposing death.  *Id.* at 107-08. Below, Mr. Agofsky supplements this section with this additional factual proffer:

Given that the convictions for Daniel Short's murder served as the basis for several aggravating factors in the Plant case and supported the Government's theme that Mr. Agofsky posed an ongoing danger even within a prison environment, defense counsel had a duty to investigate and present any new evidence that had become available since the time of the original trial that would cast doubt on the reliability of the verdict in the Daniel Short case.  By the time of the Plant trial in 2004, a substantial body of such evidence existed.  Specifically, by 2004, evidence existed that would have enabled trial counsel to mount a serious challenge to the fingerprint evidence introduced in the Daniel Short murder trials.

This was critical because the only physical evidence tying Mr. Agofsky to the scene of Daniel Short's murder were two pieces of duct tape on which  fingerprints were visible.  One piece of the tape, as noted in the Amended §2255 Motion, had been found by a local resident, washed up on shore of the lake in which Daniel Short's body surfaced.  The second piece of tape was attached

to the chair to which Mr. Short's body was taped.[39]

According to the 1997 trial testimony of Russell Davey, the examiner to whom the evidence was sent, almost immediately after these pieces of tape were received by the FBI, the visible prints were photographed and then chemicals were applied to the tape in an attempt to raise any underlying prints. The chemical application did not reveal any underlying prints and the chemical processing "took away the clarity" of the original visible prints. SA 3078, 3079. Thus, all that remained were photographic images of this critical evidence.

Agent Davey told the jury that he had then analyzed the photographic images of the prints (hereafter "latent prints") on both pieces of tape, compared them against Mr. Agofsky's inked prints and determined that the two prints on Q45, the piece of tape found on the lake shore, and the prints on Q1, the piece of tape attached to the chair, were Mr. Agofsky's prints. SA 3708, 3081, 3089, 3093-94. A second FBI agent, Robert Webb, testified that the torn edge from Q45 matched precisely the torn edge of Q1, the duct tape found on the chair into which Daniel Short was taped when he was killed. (See Amended §2255 Motion at 103-07 for a discussion of the fallacies of Agent Webb's testimony.) The testimony of both of these agents was given in categorical terms, admitting of nothing less than 100% certainty as to the validity of these matches. SA 3081, 3095. According to a report promulgated by the National Academy of Sciences at the behest of Congress, this was consistent with the position of the "friction ridge community [which] actively discourages its members from testifying in terms of a probability of a match; when a latent print examiner testifies that two impressions "match," they are communicating the notion that the prints could not possibly have come from two different individuals. SA 2875. See Nat'l Acad. of Sci., Strengthening

---

[39] The FBI gave these pieces of tape the identifiers Q1, referring to the piece of tape found on the chair, and Q45, referring to the piece of tape found on the lake shore.

Forensic Science in the United States: A Path Forward (Feb. 2009) (hereinafter "NAS Report"). at 5-11 [40] Agent Davey made clear that this is what he meant by his testimony.  SA 3031-32.

However, by the time of the Plant trial in 2004, substantial evidence casting doubt on the science of latent print analysis had come to the fore.   This evidence provided serious ammunition that defense counsel could have used to shake the jury's confidence in the reliability of Mr. Agofsky's convictions for the Short murder.[41]  SA 3795-802.

Specifically, the end goal of fingerprint analysis is to "individualize" a print or "exclude" a print.  That is, the effort is made to determine whether a latent print is sufficiently like a known inked print to be able to declare that the person who provided the inked print is the same person responsible for the latent print.  This is known as an "individualization" or a "match."  By contrast, the comparison of prints may result in a determination that the latent print is sufficiently different from a known inked print to enable the examiner to declare that the latent print does *not* come from the person who provided the inked print – *i.e.*, an exclusion.  If the comparison of characteristics of the latent print and the known inked print does not yield sufficient likeness or differences to individualize or exclude, the examiner will declare the results of the examination "inconclusive." SA 3759.

To establish a "match," a fingerprint examiner will look for similarities in location, type, and orientation of "ridge characteristics" of an unknown latent (*i.e.*, crime scene) fingerprint and a

---

[40]   While the NAS Report was published in 2009 and, therefore, not available to counsel at the time of the Plant trial, the information contained therein that is cited to in this section, is historical.  See Section VII, infra, for a discussion of the conclusions of the NAS Report and their implications for demonstrating Mr. Agofsky's innocence in the Short case.

[41]   Mr. Agofsky has already addressed the issue of the problems with duct tape matching in his Amended Motion.   See Amended §2255 Motion at 103-07.  This section will focus on the problems of the fingerprint analysis.

known inked print to determine whether the prints came from the same finger.  SA 3759.

In theory, an examiner is supposed to declare an exclusion if the examiner finds any point of genuine or unexplainable dissimilarity between two prints.[42]  Thus, it is critical that an examiner have a clear, undistorted image of a print because, even where points of similarity exist, points of dissimilarity that would require exclusion of a suspect may be obscured.  SA 3758-59.

Latent print terminology refers to three levels of detail that might be found in a print.  Level one detail refers to fingerprint pattern configurations: loops, whorls, and arches.  These are the gross patterns one sees when looking at a fingerprint.  SA 3759.

Level two details include general friction ridge paths and ridge characteristics.  Friction ridges rarely run evenly or in unbroken lines.  The ridges display a number of features known as minutiae.  The principal types of minutiae are: ridge endings, where a ridge ends abruptly; bifurcation, where a single ridge splits into two; lakes or enclosures, where a single ridge bifurcates and then reunites into a single ridge; an island, where a short piece of ridge has a determinate beginning and endpoint; a dot; a spur, where a short ridge branches off from a longer ridge at a point of bifurcation; and a crossover or bridge, where a short ridge joins two parallel ridges.  SA 3759-60.

Level three details include pores and other spots on the prints, the location of which may be shown to be in the same relative position to contours and other known features of a fingerprint. SA

---

[42]  The determination as to whether a point of dissimilarity is genuine or explainable falls upon the examiner who must rely upon his or her judgment, experience, and intuition in making this judgment. For example, fingerprints made by exerting more or less pressure may look different from one another but the examiner will not make an exclusion, even with the points of dissimilarity, if the examiner believes that they have been caused by a difference in pressure.  A different examiner could come to a different conclusion, given the same physical evidence.

3760. Use of level three details in individualizing prints is highly controversial.[43]

If an examiner decides that two prints have similar ridge characteristics in sufficient number, the examiner will declare the prints a match. SA 3760, 3789. In most jurisdictions in the United States, no standard exists as to how many of these similarities must be present, or of what quality these similarities must be, for an examiner to declare a match. SA 3795-96.

The comparison of ridge characteristics of two fingerprints is a subjective process. The decision as to whether two fingerprints contain sufficient similarities or dissimilarities is made intuitively, without reference to a uniform set of standards. Likewise, the determination of whether dissimilarities are genuine or explainable is subjective. SA 3789, 3794. Thus, the entire process of fingerprint analysis is subject to human error and to "context" effect - that is, the human tendency to confirm what one already has reason to believe is the case. SA 3801-02.

Nevertheless, despite the potential for human error inherent in the process and the real possibility that different examiners will reach different results, individualizations are by professional convention and under the guidelines promulgated by the so-called "Scientific Working Group on Friction Ridge Analysis, Study and Technology (SWGFAST) proclaimed in terms of absolute certainty. SA 3789 This, in fact, is how Agent Davey announced the individualization of the latent prints in the Short case to Mr. Agofsky.[44]

Indeed, until the late 1990's, the discretion inherent in latent print analysis was rarely

---

[43] A report by the Department of Justice Office of the Inspector General has noted, "the reliability of these very small details in latent prints is the subject of continuing debate within the fingerprint community." Glenn A. Fine, *A Review of the FBI's Handling of the Brandon Mayfield Case*, U.S. Department of Justice Office of the Inspector General (2006) at 109.

[44] For example, Davey testified with regard to the prints on Q45, "Both prints were made by one and the same person and could not have been made by any other." SA 3089.

questioned and the so-called science that underlay claims of individualization was never challenged. However, the period between the Short murder trials and the Plant trial in 2004 spelled a sea change during which the entire discipline of latent print analysis was undermined. SA 3795-802.

To wit, individualization of prints has been based on the assumption, never proven, that no two fingerprints are alike. Because of this common assumption, the evidence that an examiner has individualized or "matched" a print has traditionally been regarded in much the same way as DNA evidence is now regarded: it is accepted by courts and juries as irrefutable proof that the person from whom the known inked print was taken is indeed the person who left the unknown latent print. SA 3788-92.

However, in DNA testing, data exist on the frequency with which each allele (type of gene) examined during the testing shows up within a particular human population. Thus, the rarity of any given DNA profile may be estimated by multiplying the estimated rarity of each of the alleles within the sample tested. The resulting product, commonly referred to as the "random match probability," may be treated as a reasonably reliable estimate of the rarity of the DNA profile within the population at large. SA 3789.

The discipline of latent print individualization, however, lacks a process analogous to that which generates a match probability in DNA testing. Latent print examiners subjectively estimate the rarity of features found in a print, based upon their training and experience looking at prints. When an examiner's intuition tells him or her that the combination of ridge characteristics in the latent print match the features of a known print, taking into account both number and quality (*i.e.,* unusualness or rarity), the examiner will reach a conclusion of "individualization" or "match." The examiner will then report and testify that the person so identified is the only possible source of the latent print. SA 3789.

-98-

No underlying data exist to support any such claim. It is simply not known whether every finger has a fingerprint that is unique.[45] Even if, however, this "fact" were to be established, there is also no data available with which to estimate how many fingers contain friction ridge patterns that are very similar to the friction ridge patterns found on some other person's finger.

These concerns about the unreliability of the science of fingerprint analysis, almost unheard of at the time of Mr. Agofsky's trials in 1994 and 1997 for the murder of Daniel Short, suddenly exploded onto the scene in the years leading up to the Plant trial in June, 2004. SA 3795-802. In March 2000, the Department of Justice, under whose auspices the FBI operates, issued a solicitation for "basic research" to determine the scientific validity of individuality in friction ridge examination, noting that the "theoretical basis for ... individuality has had limited study and needs additional work to demonstrate the statistical basis for identifications. It is expected that proposals would address the relative importance of different minutiae to establish individuality, as well as the statistical significance of groups of minutiae." The Department of Justice also solicited validity testing for procedures for comparing friction ridge impressions that were both standardized and validated. The Solicitation stressed that the procedures had to be tested statistically in order to demonstrate that, by following the stated procedures, analysts would produce results with acceptable error rates. [46] Thus, four years before Mr. Agofsky's trial, the federal government itself announced that it had no scientific basis to support the forensic evidence that had convicted Mr. Agofsky of the Daniel Short murder. SA 3799.

---

[45] The long-accepted truism that no two snowflakes are identical was reported disproven in 1988, in the Bulletin of the American Meteorological Society. Knight, N.C., "No Two Alike?" 69 Bull. Am. Meteorological Soc. 496 (1988).

[46] This has not yet been accomplished. SA 3799.

By 2002, an article in the Southern California Law Review, criticized the lack of science underlying fingerprint analysis. The article talked about the DOJ solicitation and discussed, among other things, the challenges that had been brought in federal court beginning in 2000 to the scientific reliability of latent print testimony in cases across the country. *See* Epstein, Robert, "Fingerprints Meet *Daubert*: The Myth of Fingerprint 'Science' is Revealed." 75 Southern California Law Rev. 605, 606, 649-56 (2002).

By 2004, defense counsel had abundant sources of scholarly and scientific literature upon which to raise serious questions about the "proof" on which Mr. Agofsky was convicted for the murder of Daniel Short. This included: 2 David Faigman, et al., MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY §27-2.3.1 at 386 (2d ed. 2002). ("Woe to fingerprint practice were such [*Daubert* admissibility] criteria applied."); Michael Saks, *Merlin and Solomon: Lessons from the Law's Formative Encounters with Forensic Identification Science,* 49 HASTINGS L. J. 1069, 1106 (1998) ("By conventional scientific standards, any serious search for evidence of the validity of fingerprint identification is going to be disappointing. . . . A vote to admit fingerprints is a rejection of conventional science as the criterion for admission. A vote for science is a vote to exclude fingerprint expert opinions."); James E. Starrs, *Judicial Control Over Scientific Supermen: Fingerprint Experts and Others Who Exceed the Bounds,* 35 CRIM. L. BULL. 234 (1999) ("Instead of meaning incapable of error, fingerprint identifications are declared to be infallible on account of the uniqueness of fingerprints to each person . . ."); David A. Stoney, *Measurement of Fingerprint Individuality, in* ADVANCES IN FINGERPRINT TECHNOLOGY 327, 383 (H. C. Lee and R. E. Gaensslen eds., 2001) ("From a statistical viewpoint, the scientific foundation for fingerprint individuality is incredibly weak."); Jennifer L. Mnookin, *Fingerprint Evidence In An Age of DNA Profiling,* 67 BROOK. L. REV. 13

(2001) ("In the case of fingerprinting, the general rate of error is simply not known."); Simon A. Cole, SUSPECT IDENTITIES: A HISTORY OF FINGERPRINTING AND CRIMINAL IDENTIFICATION (2001); David L. Faigman, *Is Science Different for Lawyers?* 297 SCIENCE 339 (2002) (fingerprinting has "not been seriously tested"); Paul Giannelli, *Fingerprints Challenged!* 17 CRIM. JUST. 33, 35 (Spring 2002) ("In its interpretation of *Daubert, Plaza I* is a well-written opinion.  *Havvard* is not."); Robert Epstein, *Fingerprints Meet Daubert: The Myth of Fingerprint "Science" is Revealed,* 75 SO. CAL. L. REV. 605, 657 (2002) ("Having considered the various indicators of reliability set forth by the Supreme Court in *Daubert,* it is evident that at the present time, latent fingerprint identifications do not constitute reliable evidence."); Jessica M. Sombat, *Latent Justice: Daubert's Impact on the Evaluation of Fingerprint Identification Testimony,* 70 FORDHAM L. REV. 2819, 2825 (2002) ("the result Judge Pollak reached when he excluded expert testimony concerning fingerprints [in *Llera Plaza I*] was fair.")[47]; *Recent Case,* 115 HARV. L. REV. 2349, 2352 (2002) ("Fingerprint expert testimony does not survive application of the Daubert factors . . .");; Donald Kennedy, *Forensic Science: Oxymoron?* 302 SCIENCE 1625 (2003) (Fingerprinting's "reliability is unverified either by statistical models of fingerprint variation or by consistent data on error rates."); David H. Kaye, *The Nonscience of Fingerprinting: United States v. Llera Plaza,* 21 QLR 1073, 1087 (2003) ("As Llera-Plaza I so clearly reveals, this [the evidence advanced in support of the admissibility of latent fingerprint individualization] does not satisfy Daubert."); Jennifer L. Mnookin, *Fingerprints: Not a Gold Standard,* 20 ISSUES IN SCI. & TECH.

---

[47]  In 2002, a federal district court judge in the Eastern District of Pennsylvania issued a lengthy decision concluding that fingerprint analysis failed the test of *Daubert* and ruling that the government's expert could not testify that the fingerprints were a "match."  *United States v. Llera-Plaza*, 179 F. Supp. 2d 492 (E.D. Pa. 2002).  Following a motion for rehearing, however, the court issued a decision, giving the government expert permission to testify.

47 (2003) ("Judge Pollak's first opinion [restricting latent fingerprint individualization testimony] was the better one."); Tamara F. Lawson, *Can Fingerprints Lie? Re-weighing Fingerprint Evidence in Criminal Jury Trials,* 31 AM. J. CRIM. L. 1, 65 (2003) ("Currently fingerprint analysis is under attack because of the lack of study done on the accuracy of the examiners . . ."); Tara Marie La Morte, *Sleeping Gatekeepers: United States v. Llera Plaza and the Unreliability of Forensic Fingerprinting Evidence under Daubert,* 14 ALB. L.J. SCI. & TECH. 171, 173 (2003) (discussing "strong indications that the fingerprinting field should not survive a rigorous Daubert analysis."); Jane Campbell Moriarity, PSYCHOLOGICAL AND SCIENTIFIC EVIDENCE IN CRIMINAL TRIALS, §12:15 (2004) ("The assumption of the validity of fingerprinting rests upon law, rather than science."); Simon A. Cole, *Grandfathering Evidence: Fingerprint Admissibility Ruling from Jennings to Llera Plaza and Back Again,* 41 AM. CRIM. L. REV. 1189, 1215 (2004) ("It is clear that no studies exist that measure the accuracy of fingerprint examiners when they make conclusions of identification."); Nathan Benedict, *Fingerprints and the Daubert Standard for Admission of Scientific Evidence: Why Fingerprints Fail and a Proposed Remedy,* 46 ARIZ. L. REV. 519, 538 (2004) (". . . judges have generally relied on their instincts and the long history of judicial acceptance of fingerprint evidence to admit it without serious consideration of the science behind it."); Lyn Haber and Ralph Norman Haber, *Error Rates for Human Fingerprint Examiners, in* AUTOMATIC FINGERPRINT RECOGNITION SYSTEMS 339 (N. K. Ratha and R. Bolle eds., 2004) ("no data have been collected on how accurately latent print examiners match different images of the same finger.").[48]

---

[48] As noted in Claim VII., *infra*, the pace of publications exploring these concerns has not abated since 2004. See, e.g., Jane Campbell Moriarty, PSYCHOLOGICAL AND SCIENTIFIC EVIDENCE IN CRIMINAL TRIALS, §12:15 (2004) ("The assumption of the validity of fingerprinting rests upon law, rather than science."); Simon A. Cole, Grandfathering

Even if defense counsel had otherwise given no thought to investigating the reliability of the fingerprint evidence used to convict Mr. Agofsky of the murder of Daniel Short, the media frenzy of May 2004, involving the arrest and subsequent release of Brandon Mayfield, and the cloud left by these events on the so-called science of fingerprint analysis, could not have escaped counsel's attention. Jury selection in Mr. Agofsky's trial began on June 14, 2004. On May 6, 2004, Brandon Mayfield, a lawyer in Portland, Oregon, was arrested and jailed as a material witness in the deadly train bombings that killed 191 people in Madrid, Spain, in March 2004. The evidence that purportedly tied Mr. Mayfield to the scene of the crime was a fingerprint found on a plastic bag used by the terrorists. In media reports, U.S. officials insisted that the fingerprint, which had been

---

Evidence: Fingerprint Admissibility Ruling from Jennings to Llera Plaza and Back Again, 41 AM. CRIM. L. REV. 1189, 1215 (2004) ("It is clear that no studies exist that measure the accuracy of fingerprint examiners when they make conclusions of identification."); Nathan Benedict, Fingerprints and the Daubert Standard for Admission of Scientific Evidence: Why Fingerprints Fail and a Proposed Remedy, 46 ARIZ. L. REV. 519, 538 (2004) (". . . judges have generally relied on their instincts and the long history of judicial acceptance of fingerprint evidence to admit it without serious consideration of the science behind it."); Sandy L. Zabell, Fingerprint Evidence, 13 J. L. & POL'Y 143, 178 (2005) ("ACE-V is an acronym, not a methodology.") (Original emphasis); Katherine Schwinghammer, Fingerprint Identification: How "The Gold Standard Of Evidence" Could Be Worth Its Weight, 32 Am. J. Crim. L. 265, 266 (2005). ("The reliability of fingerprint identification has never been comprehensively tested."); Margaret A. Berger, What Has a Decade of Daubert Wrought?, 95 Am. J. Pub. Health S59, S64 (2005). ("Clearly . . . the courts are not applying Daubert stringently in the criminal context. The paramount example is fingerprint evidence that has never been validated.")

But the *coup de grace* came in February 2009, when the National Academy of Sciences, the preeminent scientific organization in the United States, published the report they had been commissioned by Congress to write after conducting a study of the forensic sciences. SA 2817 et seq. The NAS Report concludes that "with the exception of nuclear DNA analysis . . . no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source." SA 2837 (emphasis added). The NAS Report further recognizes that "there is a notable dearth of peer-reviewed published studies establishing the scientific bases and validity of many forensic methods," *id.* at 5-6, including latent print analysis. SA 2876.

analyzed by the FBI, was an "absolutely incontrovertible match." The other evidence against Mr. Mayfield at the time of his arrest, cited by law-enforcement officials, was: that Mr. Mayfield was a practicing Muslim; that he had represented one of the "Portland Seven," who had been accused of terrorist activities, in a child custody battle; and that his wife had contributed money to a Muslim charity that was under investigation for (perhaps) providing money for terrorist activities. Thus, the case against Mr. Mayfield rested, much as the case against Mr. Agofsky did, on the strength of a fingerprint match and little else. SA 3800-02, 3806, 3807.

Fortunately for Mr. Mayfield, Spanish law enforcement personnel expressed serious concerns over the quality of the fingerprint match, despite the FBI's confidence in it and its insistence that the match had been confirmed by another FBI fingerprint expert as well as a court-appointed expert. Only at the point at which the Spanish officials identified another man - an Algerian with demonstrable ties to terrorist organizations - did FBI examiners agree to travel to Spain, where they realized that the latent print on the plastic bag was a closer match to that of the Algerian suspect than it was to Mr. Mayfield's. SA 3644, 3800.

The mistake was attributed to two factors initially: first, there *had* been a significant number of points of similarity between the unknown latent print and Mr. Mayfield's print; second, the quality of the electronic copy of the print the FBI was using for comparison basis lacked the clarity of the print in its original form.[49] SA 3637, 3806. These two factors demonstrate at least three points

---

[49] Two additional factors in the misidentification, highly relevant to Mr. Agofsky's case, were cited in the report by the Department of Justice, Office of the Inspector General (hereafter, "OIG Report."). First, the FBI protocol did not call for double-blind testing. This increased the opportunity for a "confirmation" effect. In other words, each of the FBI examiners and the subsequent court-appointed examiner who compared the fingerprints was aware from the beginning that Mr. Mayfield was a suspect. The examiners also knew that other examiners had declared the fingerprints to be a match.

central to Mr. Agofsky's case.  First, two prints can be very similar and the match can still be wrong.  Second, the mere fact that other fingerprint examiners have confirmed the match does not confer infallibility on the match.  Third, a reproduction of a print may not be a precise copy of the original print.

Two weeks after his arrest on these charges, Mr. Mayfield was released.  On May 24, 2004, the FBI issued an apology, explaining that, as a result of this incident, the FBI's Latent Fingerprint Unit "will be reviewing its current practices and will give consideration to adopting new guidelines for all examiners receiving latent print images when the original evidence is not included."  SA 3800, 3806, 3807.

The so-called match in Mr. Mayfield's case was based on an electronic image.  The FBI did not have the physical evidence with the original fingerprint on it.  Once the FBI examiners flew to Spain and saw the original print pattern on the plastic bag on which it had been made, they agreed that it was not Mr. Mayfield's.

Mr. Agofsky's case presented almost an identical issue.  The FBI destroyed the original latent prints found on the duct tape while trying to find underlying prints, and had only a photographic image from which to work when conducting its analysis. Thus, the FBI examiners

---

Second, the examiners appeared to have engaged in "reasoning backwards" from the known inked print to the latent print.  In other words, instead of first identifying on the latent print points that could serve as usable comparison points, such a distinguishable level two details, the examiners found such points on the known inked prints and then looked for the same points on the latent prints.  The OIG Report found that in several instances, these characteristics "found" by the FBI examiners did not really exist but were merely suggested by indistinct markings on the latent prints.  See SA 3641.

As noted below, both of these issues have been cited by Mr. Agofsky's independent print examiner, Kenneth Eng, as problems in the FBI's handling of the latent print analysis in the Short murder investigation.

were not using the original latent prints in conducting their examination. Worse, neither the FBI nor an independent examiner will ever have access to the original latent prints, in contrast to the examiners in the Mayfield case.

News of Mr. Mayfield's arrest, subsequent release, the apology from the FBI, and the FBI's announcement that it was undertaking a review of the internal practices by which its Fingerprint Unit examined print images, was reported nationwide by every major news organization in every form of media, including United Press International, the Associated Press, Fox News, CNN, MSNBC, USA Today, and the New York Times. See, *e.g.*, SA 3806-3857. Defense counsel could not have failed to hear about these events.

The importance of this news story to Mr. Agofsky's case went even further. In Mr. Mayfield's case, as was also widely reported, three FBI examiners had "confirmed" that the latent print in question was Mayfield's, as had an independent court-appointed fingerprint examiner. See, *e.g.*, SA 3850-51. Thus, defense counsel in Mr. Agofsky's case had every reason to believe that the central piece of evidence in Mr. Agofsky's earlier case was available to substantial challenge, even if they had not previously been aware of the scholarly literature challenging fingerprint identification.

As noted earlier, Mr. Davey testified at Mr. Agofsky's Missouri and Oklahoma trials without qualification that the unknown latent prints found at the scene of the crime matched Mr. Agofsky's inked prints. As part of postconviction counsel's investigation into evidence in the Short murder case, Mr. Agofsky has now had an independent analysis conducted of the photographic image of the unknown latent prints and known inked prints that had previously been compared by the FBI fingerprint examiner, Russell Davey.

Kenneth Eng is a certified latent print examiner with more than 25 years' experience. Over

the course of his 22 years as Detective Investigator in the Latent Print Unit of the New York City Police Department, Mr. Eng has conducted over 800,000 inked and latent print comparisons. Mr. Eng has testified on numerous occasions and has lectured and trained members of the New York City Police Department and other law enforcement officials in the techniques and use of latent print analysis. SA 3753-55.

Mr. Eng disagrees with Agent Davey's assessment that the latent prints collected by the FBI in the Short case could be individualized to Mr. Agofsky. In Mr. Eng's judgment, which he holds to a reasonable degree of professional certainty, none of the latent prints on photographs of Q1 or Q45 could conclusively be individualized by comparison to the inked prints of Shannon Agofsky. Not only did he find an insufficient number of points of similarity in the prints, but he was unable to find some of the points of similarity identified and highlighted by Agent Davey when he testified at Mr. Agofsky's trials in 1993 and 1997. Mr. Eng believes Russell Davey's analysis of these prints was flawed. SA 3761.

In reaching this opinion, Mr. Eng notes two particularly important points. First, each of the images of the latent prints used by the FBI reflected partial, not full, prints. Even Agent Davey acknowledged that the prints on Q1 were of very small areas of fingertips and yielded relatively few points of similarity. SA 3093-94. The images of latent prints on photographs of Q45 were also of partial prints. SA 3761. In addition, large sectors of the prints on Q45 were smudged and otherwise obscured. SA 3761. It was, therefore, impossible to tell whether these areas contained unexplainable points of dissimilarity which might have excluded Mr. Agofsky. SA 3761.

Perhaps more important, Mr. Eng was unable to see in the latent prints all of the characteristics and details Agent Davey had highlighted on the inked prints. Mr. Eng explains that a problem that sometimes occurs when examiners are comparing prints is that they will identify

-107-

details in the known inked print first and then "find" those same details in the latent print because they are primed to see them.  Mr. Eng concludes that, whether or not this is what happened with Agent Davey in the Agofsky case, he himself is unable to find the points of similarity identified by Davey in the prints and cannot agree with Agent Davey's conclusion that the latent prints could be individualized to Mr. Agofsky.[50]  SA 3761.

These are critical points, particularly in light of the FBI's Mayfield debacle.  Defense counsel could have drawn any number of parallels between the FBI's handling of evidence in the Short case and its handling of evidence in the Mayfield case.  Defense counsel could have pointed to the fact that the FBI had misidentified Brandon Mayfield's print despite the fact that four trained examiners, three from the FBI, concluded that the latent print matched Mr. Mayfield's.  Defense counsel could also have raised the point that, in Brandon Mayfield's case, Spanish law enforcement personnel had maintained in its original condition the latent fingerprint that was found at the scene of the crime, that Spanish law enforcement personnel were able to demonstrate that the original latent contained far more detail than the electronic image used by the FBI, and that the existence of the original in turn enabled Spanish law enforcement to correct the FBI's mistake. From there, defense counsel could, therefore, have argued that, because the FBI destroyed the original latent prints from the scene of Daniel Short's murder, Mr. Agofsky might never be able to prove that the FBI made a mistake in its comparison but the likelihood was just as great that they had made a similar mistake based on the same flaws in the protocols employed.

---

[50]  As noted earlier, in the face of the FBI's embarrassment over misidentifying Brandon Mayfield as a terrorist bomber, the Office of the Inspector General undertook a major effort to determine how the FBI had gone so far astray.  The OIG cited this same problem of reasoning backwards from the known inked print to the latent as a factor in the FBI's misidentification of Brandon Mayfield, as well.  See SA 3624.

Counsel could also have established that Agent Davey misled the jury at the Short murder trials by testifying without qualification that the fingerprints on the tape were indisputably Mr. Agofsky's.  And, counsel could have introduced the expert testimony of someone like Kenneth Eng, who could have pointed to the specific flaws he or she had found in the identification and testimony given by Agent Farley.

In other words, a proper investigation into, and challenge of, the forensic evidence used against Mr. Agofsky in the Short case might well have  convinced one or more jurors at the Plant trial that the Government had failed legitimately to prove its case in the Short case beyond a reasonable doubt.

None of the reasons given by trial counsel in the Plant case for failing to investigate the evidence in the Short case are sufficient to defeat a claim of ineffective assistance of counsel.  In his affidavit, attorney Black asserts that he did not raise the issue at the Plant trial of Mr. Agofsky's claim of innocence of the murder of Daniel Short for two reasons.  First, he did not want to open the door for the Government to introduce all the evidence and "highly prejudicial facts" existing against Mr. Agofsky in the prior case.  Second, according to Black, Mr. Agofsky did not want to relitigate the prior conviction due to "family concerns and involvement."  SA 2326.  Attorney Barlow asserts that it would have been "'suicide by trial' to try to convince the jury that Agofsky was innocent of the prior capital murder case, especially when Agofsky chose not to discuss the facts of that case with us."  SA 2339.

Neither attorney's reasons for failing to investigate a potential challenge to the latent print evidence constitutes a genuine strategic decision. One simply cannot rule out a challenge to as fundamental a matter as aggravating circumstances unless one has first investigated and determined the bases on which such a challenge could be mounted. [put in case cites] The client's expressed

wish not to look into a prior conviction has been expressly rejected as a reason for failing to investigate.   The United States Supreme Court has found that the resistance or even obstreperousness of one's client does not provide such an excuse.  See, *e.g., Rompilla*, 545 U.S. 374. Thus, even if Mr. Agofsky had actually refused to discuss the Short case with counsel -- which he did not -- they would still have been professionally obligated to investigate it, given its centrality to the capital sentencing issues.

Moreover, even if Mr. Agofsky had not wanted to re-litigate this matter[51] *had no new evidence come to light*, counsel had no way whatsoever of knowing what Mr. Agofsky's reaction would have been, had they raised this new avenue of attack with him.

 Defense counsel's failure to investigate, which left them unable to mount this challenge, was prejudicial to Mr. Agofsky's case.  If the validity of the verdicts in the Short case had been undermined, there exists a reasonable probability that at least one juror in the instant case would have voted against death.  In its penalty phase eligibility determination, the jury had already determined that it did not believe Mr. Agofsky killed Luther Plant intentionally.  But the nature of the murder of Daniel Short as presented in testimony of FBI agent Ladell Farley at the penalty phase of trial left no apparent doubt about either Mr. Agofsky's guilt or the intentionality of the killing in that case.  Had defense counsel in the Plant trial given the jury any reason to believe that Mr. Agofsky might be innocent, as he had maintained unabatedly since his arrest for the murder in 1992, there is a reasonable probability that one or more jurors would have voted for life, rather than death.

---

[51]  Which Mr. Agofsky does not concede and, in fact, hotly contests. SA 2365.

### 4.      1992 Refusal to Clean Cell

In his Amended § 2255 Motion, Mr. Agofsky argues that counsel was ineffective for failing to investigate and present evidence about a disciplinary infraction received for failure to clean the wall of his cell in 1992. *See* Amended § 2255 Motion at 110.  The infraction was used by the government to support non-statutory aggravating factors to procure Mr. Agofsky's death sentence. A BOP officer, Officer Leonard Smith, told the jury that Mr. Agofsky's cell wall was saturated with bodily fluids and Mr. Agofsky refused to clean it when ordered to do so.  Tr. Vol. 21, 65-67.  In his deposition, Mr. Bennett admitted that the attorneys did not ask him to interview Officer Smith.  SA 561.

As discussed in the Amended § 2255 Motion, counsel were ineffective for failing to investigate the incident and present evidence that Mr. Agofsky, who was 21 years old and facing a capital trial for a crime that he did not commit, was depressed.  Mr. Agofsky was dealing with the harsh realities of solitary confinement and 23-hour lockdown.

Joseph Agofsky Jr., Mr. Agofsky's brother, could have helped to explain this to the jurors. Mr. Agofsky was transferred to Springfield Medical Center while he and Joe Jr. were being prosecuted for the Noel State Bank robbery.  During that time Joe's wife and the brothers' mother, Sheila, would visit Mr. Agofsky frequently and then report back to Joe.  Joe could have told the jurors about the conditions at Springfield. "They were keeping the light off all day. He could not read or write to anyone.  He just sat in his room in the dark.  He never knew what time of day it was or when the days change." SA 1944.  In addition, Joe Jr. could have testified that later his brother "told me that he began hallucinating during this time and once saw a snake come out of the drain in the middle of his room." SA 1944.  Bennett admitted in his deposition that he never asked Joseph Agofsky about the incident involving Mr. Agofsky's refusal to clean his fluids off the walls.  SA

558.

Sheila Agofsky saw her son as frequently as she could during this time period.  She could have told the attorneys that Mr. Agofsky's "incarceration was hard on him...In prison, he experienced a savage, threatening existence.  Every day he lived in fear of attacks, assaults, or even worse."  SA 1960.  Bennett did not ask Mr. Agofsky's mother about her son's adjustment to incarceration.  (*Id.*)  Nor did he ask her about the incident involving the bodily fluids.  SA 558.

The defense could also have interviewed and presented the testimony of Gene Sides, an older inmate who took young Shannon Agofsky under his wing.  SA 2313.  Sides could have confirmed Joe Agofsky's account of the disorienting effect of the conditions at Springfield, including the guards' manipulation of the lights.  He could have described how he counseled Mr. Agofsky not to follow the lead of the rebellious younger inmates who were "acting out" and encouraging him to do the same.  Sides convinced Mr. Agofsky to clean his cell wall and persuaded the guards to transfer the younger inmate to his own section of the prison.  After that, Mr. Agofsky "mellowed right out" and never had another problem at Springfield.  SA 2314.  Sides taught Mr. Agofsky the unwritten rules he needed to learn in order to survive a life sentence: not putting up with "rats" and child molesters, not celling with a member of another race, and standing up for himself.   SA 2314.

The failure of Mr. Agofsky's trial counsel to investigate and rebut this non-violent incident was deficient performance.  Reports of the incident were contained in Mr. Agofsky's BOP file, which was in counsel's possession.  Mr. Agofsky also described it in the outline he made for counsel of all of his prior disciplinary infractions.  SA 646.  Had counsel properly investigated the incident by reviewing the records in their possession and interviewing witnesses who knew about it, the jury could have seen the incident as a manifestation of Mr. Agofsky's inexperience and depression while he adjusted to prison, and not, as the Government argued, a hallmark of his defiance.

-112-

### 5.      1994 Lompoc Serving Line

The Amended § 2255 Motion argues that counsel was ineffective for failing to investigate a disciplinary infraction that arose when Mr. Agofsky, with two fellow inmates, walked off their job on the serving line in the dining hall after one of them was told he was serving too much meat.  The government introduced evidence of this infraction through the testimony of Officer Fred Wainer. Tr. Vol. 21, 51.  In his deposition, Mr. Bennett acknowledged that trial counsel never asked him to investigate the infraction or interview Officer Wainer.  SA 561.  Because counsel had not investigated and were poorly prepared, they were unable to cross-examine Wainer effectively to show that Mr. Agofsky was not the instigator and was not found guilty of the serious infraction of work stoppage.  For this reason and those in the Amended §2255 Motion, counsels' performance was prejudicially deficient.

### 6.      1998 Lompoc Incident

The Amended § 2255 Motion outlines counsel's deficiency in failing to adequately investigate and explain to the jury Mr. Agofsky's involvement in a so-called "riot" at Lompoc USP. *See* Amended § 2255 Motion at 114.  The motion presents the statement of Gerald Miller, one of the black inmates who was present during the fight.  Miller would have explained to the jury that the Lompoc "riot" was not a race riot, as the government asserted at trial, but a fight which began over a football game on the prison yard.  At the time of trial, Mr. Agofsky was under the impression that counsel were planning to call Miller.  SA 2372.  Near the time of trial, Mr. Agofsky wrote a letter to the defense in which he referred to Miller's name as being on the witness list.  SA 672. Nevertheless, at his deposition, Bennett admitted that he had never interviewed Miller.  SA 557.

Artie Dufur could also have undermined the government's evidence of the Lompoc incident, which was invoked as an aggravating circumstance.  SA 2031.  It was not a "race riot" as the

government had portrayed it, but arose from an argument over a call in a football game.  One team member disputed a call and violence erupted.  Mr. Agofsky was not involved in the game and did not instigate the violence.  He came to the assistance of the referee only after a bystander had been assaulted and the referee was confronted by an angry team member.  Mr. Agofsky was quickly outnumbered.  As it escalated, Mr. Agofsky was "fighting for his life" and "got beat up pretty bad." SA 2032.

As argued in the Amended § 2255 Motion, counsel's failure to present a proper explanation of the Lompoc incident was deficient performance.  Counsel was apprised of this disciplinary infraction by Mr. Agofsky himself.  In addition, they had in their possession Mr. Agofsky's BOP file, which contained the names and inmate numbers of all inmates on the prison yard at the time of the Lompoc incident.  Counsel's deficient performance prejudiced the defense.  For example, because counsel failed to conduct a reasonable investigation, they were unable to impeach the testimony of the government's witness, Officer Christopher Mattie, who testified that Mr. Agofsky began what he characterized as a "race riot."  Tr. Vol. 21, 73-79.

### 7.    1999 Edelen Assault

The Amended § 2255 Motion sets forth trial counsel's deficient performance in failing to investigate and present evidence to explain Mr. Agofsky's infraction for a fight at Atlanta USP with a black inmate, Kerry[52] Edelen, in 1999.  *See* Amended § 2255 Motion at 116.  The prosecution elicited the testimony of Officer Arthur Tobias that Mr. Agofsky said he did not like black people and that was why he attacked Edelen.  Tr. Vol. 21, 86.  Trial counsel never asked Mr. Bennett to interview Officer Tobias.  SA 561.  The prosecution argued in summation that one reason the jury

---

[52] Although the transcript spells Edelen's first name "Curry," he spells it "Kerry."

-114-

should sentence Mr. Agofsky to death was that he assaulted Edelen, a "man who he did not have a running feud with . . . cold cocked out of the blue. And you heard the statements that were made[.]" Tr. Vol. 24, 371. The defense could have addressed this infraction by presenting evidence through inmates – including Edelen himself – and/or experts to explain what happened.

If the defense team had conducted an independent investigation of the Edelen assault, they could have presented the testimony of Edelen himself and other inmates who could have explained that guards set up his fight with Mr. Agofsky and that neither of them had much choice about whether to engage the other. No one from Mr. Agofsky's defense, neither his investigator nor his trial lawyers, ever contacted Edelen. If he had been contacted before the 2004 trial or at any other time, he would have been willing to testify in Mr. Agofsky's behalf. SA 2053. In his deposition, Bennett admitted that the attorneys did not ask him to investigate Mr. Agofsky's prior disciplinary infractions. SA 555. Counsel did not ask Bennett to interview Kerry Edelen or Mark Allen, the two inmates present at the time of the incident. SA 556.

Edelen was housed in the Special Housing Unit ("SHU") at USP Atlanta in 1999. One day, without warning, guards came to his cell and told him to "cuff up" to move to another cell. When Edelen asked why, they said it didn't matter. They handcuffed him, collected his property, walked him upstairs, and stood him in front of a cell door. Shannon Agofsky and another white inmate were in the cell. Mr. Agofsky said, "I told you all, I don't want to be housed with a black inmate." Edelen looked into the cell and realized it had only two bunks, which meant that he would have to sleep on the floor. SA 2050.

Edelen knew at this point that the guards had orchestrated the move to incite trouble. They were moving him from a three-man cell to a two-man cell for no reason. The guards handcuffed Mr. Agofsky and the other white inmate and told them to back away from the door. Edelen, who is

-115-

black, felt unsafe being forced into a cell with two white inmates who were already there. He thought the situation might escalate. As guards were removing his handcuffs, Edelen noticed a number of correctional officers gathering around the cell window, trying to see what was going on in the cell. SA 2051.

As Edelen turned to pick up his property before finding a place on the floor, he noticed out of the corner of his eye that Mr. Agofsky was moving toward him. As Edelen turned, Mr. Agofsky grabbed him and they began tussling, falling to the floor and wrestling for seven or eight minutes. Edelen does not believe that Mr. Agofsky was actually trying to hurt him because Mr. Agofsky was not using much force. Edelen believes that he himself was using more force. Edelen never believed that his life was in danger. SA 2052.

During the fight, Edelen could hear the officers outside the cell saying, "move, let me see," and "let's wait a couple more minutes before we go in." The officers finally entered the cell, separated the inmates, and took Mr. Agofsky out, leaving the other white inmate and Edelen behind. A physician's assistant checked Edelen out, but he did not remember having any injuries. SA 2052. The physician's assistant prepared an inmate injury assessment and followup form stating that he or she treated Edelen's "superficial laceration and abrasion" with soap and water. SA 2492. Mr. Agofsky also had a superficial laceration, treated with "local asepsia and peroxide." SA 2493.

Edelen could have explained that mixing races in cells violated an unwritten code which applied to both inmates and correctional officers in all USPs. In Atlanta, however, officers would intentionally force races to mix in cells to provoke fights. Edelen believes that was why the officers put him into Mr. Agofsky's cell. Further, Edelen believes that Mr. Agofsky did not have a choice but to fight him. Any white inmate forced to house with a black inmate would have to do one of two things: (1) deal with the black inmate right away, or (2) deal with the other white inmates later. Mr.

-116-

Agofsky's own safety would have been at risk if he had not acted as he did.  SA 2053.

The defense could also have presented the testimony of Mark Allen, the other white inmate in the cell with Mr. Agofsky and Edelen during the fight.  Allen's name and BOP inmate number were contained in the BOP incident report about the incident at Atlanta.  SA 2491.  Counsel had this report in their possession.  In 1999, Allen was incarcerated in the SHU in Atlanta.  One day, the guards brought Mr. Agofsky to Allen's cell.  They were making racist remarks like, "You don't run anything here, white boy, this is Willie's World."  SA 2007.

Ten to fifteen minutes after Mr. Agofsky's arrival, they brought in a black inmate.  Mr. Agofsky told Allen to step out of the way once the black inmate came in, and so Allen stayed on his bunk and did not participate in the fight.  Once the guards removed the black inmate's handcuffs, he and Mr. Agofsky began fighting.  According to Allen, the two were equally matched, and fighting each other was unavoidable.  Allen could have explained that, under the unwritten convict code inside the BOP, it is absolutely mandatory for inmates of different races not to cell together.  Otherwise, they will face consequences from inmates of their own races.  SA 2007.

The fight turned into a wrestling match which the guards watched from outside the cell for two to three minutes, discussing what was happening.  Allen stood aside; it did not appear to him that either Edelen or Mr. Agofsky was getting hurt. Although their fight brought them both to the floor, neither of them used a weapon and Allen did not remember their exchanging any words.  Allen would have helped Mr. Agofsky if he was in imminent danger but it did not look like a serious fight to him.  SA 2007.

After the fight was over, the guards put Mr. Agofsky on a different floor and Allen remained in the cell.  Allen could have testified that he believed that the guards set up the fight  deliberately.  In his experience, it was common at USP Atlanta for guards to force races to mix, to provoke fights.

-117-

He saw it happen repeatedly and was himself a victim of the practice. Once he was forced into a fight with a black inmate and cut the other inmate because he feared for his life. SA 2007.

After this incident, Allen never saw Mr. Agofsky again. Although his lack of a prior or subsequent connection to Mr. Agofsky would have made him a disinterested witness, no one from Mr. Agofsky's defense, neither his trial lawyers nor his investigator, ever contacted him before the 2004 trial. If they had done so, he would have been willing to testify for the defense. SA 2008.

The defense could also have presented George Rivera, who would have testified that USP Atlanta was known for the guards' practice of placing inmates of different races, or inmates who were separatees because of previous conflicts, into the same cell. Sometimes they would put separatees onto the same range of cells and then open all the doors at once for recreation, which could give a group of inmates the opportunity to gang up on another vulnerable inmate. SA 2105.

The defense could have presented the testimony of Todd Gilbertson, whose declaration is included in the Amended § 2255 Motion. A521-22. One night, while Gilbertson was incarcerated at Atlanta USP, Mr. Agofsky was escorted into Gilbertson's cell by five guards. A521. Mr. Agofsky's "shirt was torn and he had blood on his face and neck." (*Id*). In addition, he "had fist marks, nick and lumps on his face, and scrapes on his legs...[and]...boot prints on his chest... and back." Mr. Agofsky explained to Gilbertson that he had been forced into a cell with a black inmate and that the two had an altercation.

Mr. Gilbertson could have told the jury about a similar incident that happened to him. He could have explained that in prison "politics dictate that an inmate is not supposed to live with an inmate of another race. If an inmate breaks the rule, he will face the consequences, which means that he will become a target of the other inmates." Gilbertson would have testified that in order to keep the peace in prison, all inmates must follow the rules. A521.

-118-

Additionally, Mr. Gilbertson could have helped explain to the jury the racially charged atmosphere at Atlanta USP. This racial animosity extends to the relationship between guards and inmates. Gilbertson saw the guards physically push inmates into cells with inmates of other races. He could have told the jury about one incident, in which the guards placed a small Mexican inmate, who they thought was a troublemaker, into the cell of a black prison rapist. Gilbertson could hear the smaller inmate screaming at night. A521. Another time, Gilbertson was asleep in his cell one night and awoke to five black guards standing over his bed. They strip searched him and searched his cell. After that, he would jam his lock shut every night so that the guards could not do that, or worse, again.

Mr. Bennett did not interview Mr. Gilbertson, nor did counsel ask him to do so. SA 556-57. Had counsel contacted Gilbertson, he would have told them everything he described in his declaration and would have been willing to testify at Mr. Agofksy's trial. A522.

Similarly, Russell Dinovo, whose declaration also appears in the Amended § 2255 Motion, shared a cell with Mr. Agofsky in Atlanta USP. A508. Dinovo could have testified about the racial tension at Atlanta USP as well. When Dinovo arrived at Atlanta USP, the guards attempted to force him into a cell with four or five black inmates. The cell contained only two or three beds. When Dinovo refused, the guards attacked him and then four pointed him in an isolated cell. A508.

Dinovo would also have described for the jury an incident in which Mr. Agofsky was attacked by other inmates in the prison. That incident occurred one night when officers popped the lock to Mr. Agofsky's cell, allowing inmates into the cell to jump on him while he was sleeping. Dinovo heard the incident occur and a few days later Mr. Agofsky asked Dinovo to move in with him. Dinovo observed injuries on Mr. Agofsky's chest and wrist from the fight and Mr. Agofsky reported that at least one of the inmates who attacked him had a knife. A509. Mr. Bennett did not

interview Dinovo and trial counsel did not ask him to do so. SA 556.

Additionally, the Amended § 2255 Motion describes the potential testimony of Roderic Russell, who was transferred to USP Atlanta at the same time as Mr. Agofsky and could have described the common practice there of forcing inmates of different races to cell together, and the testimony of other inmates who could have described the unwritten prison rules that constrained inmates to protest being placed with cellmates outside their own racial or ethnic groups. *See* Amended § 2255 Motion at 117. In his deposition, Bennett admitted that he did not speak with Russell, even though Mr. Agofsky's address book, which was in Mr. Bennett's possession, contained Russell's name and inmate number. SA 556.

The testimony of Edelen, Allen, Russell, Dinovo and others could have neutralized or at least ameliorated the aggravating weight of the fight with Edelen, by showing how and why it happened and demonstrating that it was not a random expression of personal racial animosity. Had counsel reviewed Mr. Agofsky's prison file he would have obtained the names and inmate numbers of Edelen and Allen and could have properly explained the incident to the jury. Counsel's failure to do so was deficient. *See Rompilla v. Beard,* 545 U.S. 374 (2005). There is a reasonable probability that this evidence, alone and in conjunction with other evidence described in this summary and in the Amended § 2255 Motion, could have led at least one juror to vote against a death sentence. This instance of trial counsel's deficient performance, alone and in combination with all of counsel's other deficient performance, accordingly prejudiced the defense.

### 8.    1999 and 2000 Possession of Weapons in Atlanta and Beaumont

As the Amended § 2255 Motion explains, trial counsel did nothing to rebut or explain Mr. Agofsky's 1999 and 2000 disciplinary infractions for possession of "shanks" or homemade weapons in Atlanta and Beaumont, except to ask the government witnesses to acknowledge that shanks were

commonly found in their institutions and that they had no evidence Mr. Agofsky had used the shanks to attack anyone. The Motion argues that trial counsel could have used evidence of the violent atmospheres at both penitentiaries to explain why Mr. Agofsky would feel a need to arm himself. *See* Amended § 2255 Motion at 119.

Officer Alford testified for the government that he found a weapon in Mr. Agofsky's cell. Tr. Vol. 21, 107. In his deposition, Mr. Bennett testified that he was not directed by trial counsel to interview Officer Alford. SA 561. In addition, Bennett testified that trial counsel did not ask him to interview inmate witnesses about prison culture or about their own experiences with violence in prison. SA 547, 554-55. Similarly, he did not interview inmates about the general level of violence at Beaumont, "because it was so well known." SA 554-55.

The additional evidence set forth in this Supplement that both Atlanta and Beaumont were extremely violent, dangerous places could also have helped to rebut and provide context for these infractions, which the prosecution used to support its statutory and non-statutory aggravating factors. *See* §§ I.D.2, I.E, and II.B.7, *supra*. Instead, the defense relied only on weak rhetorical questions, put to hostile witnesses, to counteract infractions that helped the prosecution to paint Mr. Agofsky as an armed predator. There is a reasonable probability that, but for counsel's deficient performance on this point, alone and in combination with the other deficient performance detailed in this Supplement and the Amended § 2255 Motion, the outcome of the penalty phase would have been different.

### 9.      2000 Michael Miele Incident

Mr. Agofsky's Amended § 2255 Motion sets forth evidence with which trial counsel could have undermined and explained the government's use of a 2000 assault by Mr. Agofsky of child molester Michael Miele. Specifically, the defense could have presented evidence stemming from

Mr. Bennett's interview of Miele, in which Miele told him that guards had set up the fight, and evidence from other inmates describing how guards sometimes deliberately placed sex offenders with other inmates, placing the inmates in the difficult position of being forced to take action against the sex offenders or risk trouble with their own groups. *See* Amended § 2255 Motion at 120. In his deposition, Mr. Bennett acknowledged that Miele characterized the fight as a "set up" by the guards and that Miele said that he "probably would help" Mr. Agofsky. SA 556. Bennett also stated that he relayed this information to Mr. Agofksy's attorneys. It was their decision, Bennett maintains, not to call Miele to testify. SA 556.

If the defense team had conducted an independent investigation of the Miele assault, they could also have presented the testimony of Miele himself.[53] Miele would have testified that he was in a fight with Mr. Agofsky while at Beaumont, but he would not have wanted the incident between himself and Mr. Agofsky to be used as a reason to put Mr. Agofsky to death. SA 2100-01.

William Massey, who was in the same recreation cage with Mr. Agofsky during the incident with Michael Miele, would also have been willing to testify for the defense. On July 17, 2000, Massey was in a recreation cage in the Special Housing Unit ("SHU") with Mr. Agofsky and two Islamic inmates. Massey and one of the Islamic inmates were "shot callers" and they were having a conversation to try to prevent a potential gang war from breaking out between the black and white inmates. As recreation time was nearing an end, the guards put two homosexual inmates into the

---

[53] At trial the prosecution introduced letters from Mr. Agofsky to family members describing the Miele incident and stating, for example, that "one whole side of his face was crushed flat," and that "he has permanent brain damage." Tr. Vol. 5, 36. The prosecution questioned Dr. Roberts about this letter and similar letters in his deposition. SA 850. However, the BOP medical report that described Miele's treatment after the incident states that he had only a laceration above the left eye and a possible concussion. SA 880-81; SA 1138. Dr. Roberts testified that he could have used this information in forming an opinion about whether the statements in the letters were exaggerated "braggadocio" to his cousin. SA 854, 880, 881.

recreation cage with them.   One of inmates (name unknown) was ill with HIV and other inmates would not go near him.   The other inmate placed in the cage was Miele.   The guards laughed as they put Miele into the cage.  As soon as Miele arrived at Beaumont the guards had made sure the inmates knew that he was a child molester.  Additionally, while in the SHU, Miele raped other inmates.  He was a predator and took advantage of weaker inmates.  SA 2093.

Massey could have explained that, because he himself was in discussions and preoccupied with the other "shot caller," Mr. Agofsky was put in a situation that required him to act to protect his own life.  Mr. Agofsky did not have a choice; he had to do something to Miele or he would have paid the price later.  SA 2093.  After the fight, the guards gave Mr. Agofsky and Massey extra food and extra phone time.  Massey describes these gestures as a "pat on the back" for the Miele incident. SA 2094.

No one from Mr. Agofsky's defense ever came to speak to Massey.  Mr. Agofsky repeatedly asked his team to interview him.  He gave Mr. Bennett Mr. Massey's address and telephone number. SA 668.  Correspondence between Mr. Agofsky and his team indicates that they claimed they could not find a correct telephone number for Mr. Massey.  SA 2508.  However, Mr. Massey is still at the same telephone number Mr. Agofsky provided to trial counsel.  Had trial counsel contacted Mr. Massey, he would have been willing to testify on Mr. Agofsky's behalf.  SA 2095.

Scott Lawson could also have provided important details surrounding the incident between Mr. Agofsky and Michael Miele.  SA 2085.  The guards hated Miele because he was a sex offender. Miele would "run around the cell block in his boxer shorts."  Miele's cellmate came to Lawson and said that Miele was getting naked and "getting sexual" with him in the cell.  Lawson and another inmate responded by starting a fight with Miele so that Miele would get put in the "hole" or SHU. That way Miele could not rape his cellmate any more. When Miele got out of the hole, another

inmate "checked" Miele back into the hole.  It was while Miele was in the hole the second time that the guards put him in a recreation cage with Mr. Agofsky.  The guards knew what they were doing by putting Miele, a known sex offender who was raping other men in prison, in the cage.  Mr. Agofsky had no choice but to fight him.  It was a "set-up" by the guards.  SA 2085.

Mr. Lawson was interviewed, but Mr. Bennett did not ask him about the Miele incident.  In fact, Mr. Lawson actually testified at Mr. Agofsky's trial.  However, counsel did not elicit any information about the Miele incident while Lawson was on the stand.  Lawson would have testified about it.   SA 2084.

Michael Fitzgerald could have corroborated Massey's testimony.  Fitzgerald knew of Miele because they were in prison together in Massachusetts.  Miele came to Fitzgerald one night and asked him to find him a cell.  Fitzgerald vouched for Miele and found him a cell to live in.  One day, Miele's cellmate approached Fitzgerald and told him that Miele was preying upon him sexually; Miele "was getting naked at night and getting a full erection and pressing up against him.  The implication was that Miele was raping his cellmate."  SA 2059.  Fitzgerald felt responsible for the rape because he had vouched for Miele.

When Fitzgerald ran into Miele next, he beat him up.  Both Miele and Fitzgerald went to the SHU.  While in the SHU, Miele molested yet another inmate.  Shortly after that, Miele was put into Mr. Agofsky's recreation cage.  Fitzgerald could have explained to the jury that "Miele was victimizing this other guy, and Shannon felt that he owed a duty to protect that other guy.  Miele was a big guy."  SA 2059.

Fitzgerald was subpoenaed to Beaumont before Mr. Agofsky's trial in 2004, but never called as a witness. No one from Mr. Agofsky's trial team ever interviewed Mr. Fitzgerald before he was subpoenaed.  SA 2066.  Mr. Bennett testified at his deposition that he did not know why the

attorneys had subpoenaed Mr. Fitzgerald.  Although an attorney and Bennett met with Fitzgerald briefly at the county jail before the trial, Bennett did not ask Fitzgerald about the Miele incident. SA 554.

Bruce Spring could have also offered testimony about the Miele incident.  Although Bennett interviewed Spring, he did not ask him about the incident with Miele.  SA 553.  Spring could have described the guards' practice of identifying the sex offenders to the other inmates.  SA 2308.  The guards hated the sex offenders just as much as the inmates did.  Spring could have also described the incident between Mr. Agofsky and Michael Miele.  It was a "set-up" by the guards.  Mr. Agofsky did not have a choice but to go after Miele.   If the guards put a known sex offender in a cage with an inmate who does not do anything, that inmate is putting himself in danger.  If he does not act in that situation, his "own people" will turn on him and assault him for not doing anything. SA 2308.

The testimony of Massey, Lawson, Fitzgerald, Spring, and Miele himself, alone or combined with the evidence contained in the Amended § 2255 Motion, would have rebutted the government's use of the Miele incident, by helping  to explain the isolated incident to the jury as one in which Mr. Agofsky was constrained by the inmate code and was actually protecting other inmates.  Instead, the defense did essentially nothing to prevent the government from using the Miele incident to argue, repeatedly, that Mr. Agofsky simply engaged in unprovoked attacks on inmates he did not like.  *See* Tr. Vol. 20, 274; Vol. 21, 25; Vol. 25, 339, 368-72.  There is a reasonable probability that counsel's deficient performance in connection with this infraction, alone and in combination with other deficiencies, prejudiced the defense.

**10.    Trial Counsel's Failure To Investigate Mr. Agofsky's Prior Convictions And Infractions, Cumulatively, Prejudiced His Defense.**

The Amended § 2255 Motion argues that counsel's failure to investigate and present evidence to rebut Mr. Agofsky's prior offenses and disciplinary infractions cumulatively prejudiced the defense. He maintains that their abdication of duty in this respect could have sealed his fate even before the defense case began. *See* Amended § 2255 Motion at 121.

The evidence set forth in the Motion and in this Supplement establishes a reasonable probability that the outcome would have been different. At the very least, if counsel had provided the results of an investigation of Mr. Agofsky's prior conviction and institutional infractions to their experts, the experts could have used the information to explain the incidents or provide context for them. Dr. Roberts, for example, testified that he could have used information from other inmates concerning the Lompoc "riot" because it corroborated Mr. Agofsky's account of how he did not instigate the event but became embroiled in it. SA 790. He could have used information from Kerry Edelen, the black inmate with whom Mr. Agofsky had a fight in USP Atlanta, because it confirmed Mr. Agofsky's account. SA 791-92. Inmate declarations describing the violent atmosphere at both USP Beaumont and USP Atlanta could have helped to explain why he might arm himself. SA 794. And inmate descriptions of the Michael Miele incident corroborated Mr. Agofsky's explanations of how it came about. SA 795.

Similarly, Terry Pelz states in his declarations that, if Barlow had provided him with materials similar to those provided by postconviction counsel, Pelz could have provided the jury with insight into Mr. Agofsky's institutional infractions. SA 2810. He could have explained that the Kerry Edelen incident was a "typical fight incited because the guards placed inmates of different races in the same cell," a situation in which the inmates would be expected to fight each other, to

-126-

protect themselves "in the long run." SA 2811. He could have provided context for the incident with sex offender Michael Miele:

> If an inmate is forced into a recreation cage with a sex offender and does nothing about it, it can give the appearance that an inmate chose to congregate with him. Giving the appearance of sympathizing with a sex offender can place an inmate in grave danger.

SA 2811. Pelz could have described the incident at Lompoc as a fight among a large group of people, a type of disturbance that is common in prisons, rather than a "riot," which "tends to invoke the idea of burning buildings and looting." SA 2811. Regarding Mr. Agofsky's first infraction, for refusing to clean his cell wall at the U.S. Medical Center at Springfield, Pelz could have explained that Mr. Agofsky was young, facing a life sentence and unschooled in surviving twenty-three-hour lockdown conditions. SA 2812.

Another expert whom Barlow retained, criminologist Elizabeth Pelz, could have testified that "an understanding of the correctional context is crucial to assessing the risk of prison violence," and that her lack of information in 2004 limited her ability to provide a meaningful assessment. SA 2799. For example, during her testimony, Barlow asked Dr. Pelz to comment about a letter from Mr. Agofsky to his cousin, Andy Jensen, in which Mr. Agofsky makes boastful remarks about the apparently serious injuries Miele had suffered. Pelz attempted to explain the letter by suggesting that inmates often exaggerate in letters in hopes of building a reputation, because they know that the authorities will read their mail. Tr. Vol. 22, 236-37. She states in her declaration that she has now reviewed a medical report indicating that Miele's injuries were relatively minor. SA 2803. She could have used the report to provide a concrete basis for her testimony, SA 2804, instead of forced speculation.

Although trial counsel presented four experts with excellent professional qualifications to

-127-

evaluate and explain inmate prison conduct, and although the government based its case for death

in large part on one aspect of Mr. Agofsky's prison conduct, his institutional infractions, counsel

left the experts in such ignorance about the facts that their expertise went to waste.  Furthermore,

counsel made no effort at all to investigate the previous capital murder conviction that placed Mr.

Agofsky in prison and formed the centerpiece of the government's penalty phase presentation.

There is a reasonable probability that, with reasonable investigation and presentation, the defense

could have ameliorated the aggravating side of the scale and the jury's weighing of the factors for

and against death would have come out the other way.  Trial counsel's deficient performance with

respect to Mr. Agofsky's prior convictions and infractions, alone and in combination with their other

deficient performance, prejudiced the defense.  *See Rompilla v. Beard*, 545 U.S. 374 (2005);

*Williams v. Taylor*, 529 U.S. 362 (2000).  This Court must accordingly order an evidentiary hearing

and grant relief on this ground.

C. **Counsel Completely Failed To Compile And Present A Social History Of Mr. Agofsky's Life Before His Incarceration.**

1. **Trial Counsel Neither Conducted A Social History Investigation Nor Delegated That Task To A Qualified Expert Or Any Other Person.**

As Mr. Agofsky describes in § II.C.1 of his Amended § 2255 Motion, trial counsel compiled almost no information about his family background, upbringing, his life before his incarceration, and his life during the eleven years of incarceration that proceeded the Luther Plant incident. *See* Amended § 2255 Motion at 122. Because his attorneys violated "well-defined" norms that require counsel to investigate all reasonably available mitigating evidence, he argues, their strategic decisions concerning their penalty phase presentation, based on "rudimentary knowledge" from "a narrow set of sources," were unreasonable and prejudicial. *See Wiggins*, 539 U.S. at 524-25; *see also Rompilla*, 545 U.S. 374; *Williams,* 529 U.S. 362.

The Courts of Appeals for this Circuit and others have repeatedly and recently held that the Supreme Court's "well-defined" norms required *habeas* relief in similar capital cases. *See Adams v. Quarterman*, 324 Fed. Appx. 340, 2009 WL 1069330 (5th Cir. April 22, 2009)*; Walbey v. Quarterman*, 309 Fed. Appx. 795, 2009 WL 113778 (5th Cir. Jan. 19, 2009); *see also Williams v. Allen*, 542 F.3d 1326, 1329-30 (11th Cir. 2008) (granting relief, although counsel presented the defendant's mother and consulted a mental health expert, because counsel's deficient investigation led to a misleading mitigation presentation that masked family dysfunction); *Gray v. Branker*, 529 F.3d 220, 225-26 (4th Cir. 2008) (granting relief, although counsel presented family testimony and was aware of psychiatrist's report, because adequate investigation would have uncovered many indicia of petitioner's mental health impairments). Applying United States Supreme Court precedent, these cases collectively hold that trial counsel in a capital case must make an "informed

decision" about mitigation strategy,[54] and must present "the details,"[55] "the full picture,"[56] the "entire,"[57] "cohesive,"[58] and "complete"[59] story, not a "scattered"[60] narrative that is "[in]accurate"[61] or "misleading,"[62] but "the strongest mitigation case possible."[63]

In *Walbey*, for example, trial counsel presented the petitioner's grandmother and two psychologists at trial but failed to speak to a number of potential witnesses who had first-hand knowledge of his troubled childhood, failed to correct the grandmother's misleading testimony painting a too-rosy picture of the petitioner's past, and failed to rehabilitate misleading cross-examination about whether the petitioner fit the criteria for antisocial personality disorder. 309 Fed. Appx. at 796-97. The Court of Appeals, citing case law "that firmly establishes a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history," held that counsel's investigation, and hence his performance, was deficient because it was "severely limited." *Id.* at 800-01. The court also found prejudice. It observed that "*Williams [v. Taylor]* . . . stands for the proposition that counsel can be prejudicially

---

[54] *Adams*, 324 Fed. Appx. at 349.

[55] *Walbey,* 309 Fed. Appx. at 803.

[56] *Gray,* 529 F.3d at 238.

[57] *Id.* at 237.

[58] *Id.* at 235.

[59] *Walbey* 309 Fed. Appx. at 802; *Williams*, 542 F.3d at 1340.

[60] *Gray*, 529 F.3d at 233 n.2.

[61] *Walbey* 309 Fed. Appx. at 802.

[62] *Williams,* 542 F.3d at 1340.

[63] *Id.* at 1340.

ineffective even if some of the available mitigation evidence is presented and even if there is psychiatric testimony." *Id.* at 802. The mitigating evidence introduced at trial was substantially incomplete and some of it was inaccurate; as the magistrate judge had observed, it was "scant, bereft in scope and detail." *Id.* at 803. Furthermore, the defendant's own mental health expert "did severe damage to Walbey's case" when counsel failed to rehabilitate him following damaging cross-examination about antisocial personality disorder. *Id.* at 803-04. Neither the brutality of the crime nor the possibility that some of the undiscovered mitigating evidence might have been unhelpful could ameliorate the prejudice created by counsel's deficiencies. *Id.* at 804-05. The court accordingly granted *habeas* relief. *Id.* at 806.

Similarly, in *Adams*, trial counsel and his investigator spoke with the petitioner's mother and stepfather and one of his siblings, but found that none of them was particularly informative or willing to help. The investigator testified that he did not make more active efforts to track down the petitioner's other family members or to investigate his social, medical, psychological, educational, abuse, and other histories because trial counsel did not ask him to do so. 342 Fed. Appx. at 347-49. Trial counsel opted not to present mitigating evidence and instead adopted a punishment phase strategy of portraying the co-defendant as the instigator and the petitioner as only an accomplice to the murder, and stressing the petitioner's cooperation with police. *Id.* at 343. On appeal from the district court's grant of penalty phase *habeas* relief, the state argued that the mitigation investigation could not be deficient because Adams had purportedly instructed his counsel not to contact his family. *Id.* at 347. The court, distinguishing *Schriro v. Landrigan*, 550 U.S. 465 (2007), rejected the claim because Adams, unlike Landrigan, never instructed his attorneys not to present any mitigating evidence. *Id.*

Even if Adams had instructed [trial counsel] not to contact family members and

-131-

> presumably not to present mitigating evidence derived directly from them, [trial counsel] was not relieved of conducting a mitigation investigation . . . . It is widely accepted that family members do not represent the only potential avenue of mitigating evidence. Thus, an instruction not to contact a defendant's family members does not equate with a blanket instruction not to investigate or present *any* mitigating evidence. . . . Neither are we satisfied that this is a case in which the defendant's family was unwilling or unable to help at the time of trial . . . . [T]hree uncooperative family members does not an unwilling family make.

*Adams*, 324 Fed. Appx. at 347-48 (citing *Rompilla*, 545 U.S. at 381, and *Wood v. Quarterman*, 491 F.3d 196, 203 n. 7 (5th Cir. 2007)). Indeed, the court expressed skepticism about Adams's true opposition to family involvement, noting that Adams had given his trial counsel his mother's phone number. 324 Fed. Appx. at 348. The court criticized the "skewed perspective" of counsel and his investigator, who attempted to excuse their deficient investigation efforts because Adams's other family members had not "come forward." *Id.*. And it held that counsel's deficient investigation made it "impossible" to make an "*informed decision*" concerning a penalty phase strategy. *Id.* at 349 (emphasis in original).

The court further held that the district court had properly considered affidavits from uncalled witnesses in assessing prejudice. *Id.* at 350. These affidavits established substantial, readily available mitigating evidence of Adams's childhood abuse, neglect and abandonment, which could have caused his numerous psychological problems. *Id.* at 351-52. The court rejected the State's claim that it should discount the proffered evidence because it was "double-edged." Even though the State might have impeached the affiants, if they had testified at trial, with evidence of Adams's prior bad acts, "we cannot conclude that the aggravating effect of this evidence would have outweighed the mitigating evidence in a reasonable jury's minds." *Id.* The court accordingly found that counsel's deficient performance prejudiced the defense and granted penalty phase *habeas* relief.

*Id.*[64]

Mr. Black and Mr. Barlow never conducted an independent social history investigation.  Mr. Bennett claimed that he prepared a "social history report," but admitted that this was only a memo, summarizing a single interview of Mr. Agofsky's mother, that he submitted to Barlow.  SA 546 (Bennett Depo. 26-27).  Dr. Roberts never received any such memo from either Barlow or Bennett, or from anyone else.  He interviewed Mr. Agofsky twice and spoke to his mother once by phone for about fifteen minutes, and never received any other information about Mr. Agofsky's background or life before he entered prison.  SA 715, 721.  Neither did Dr. Gripon, the psychiatrist whom Barlow retained but did not call as a witness, ever see such a memo or anything else resembling a social history report.  SA 2788-89.  Black and Barlow had many years of experience and the resources of the federal government at their disposal.  Their failure to assemble a reasonably complete picture of the available mitigating evidence, *before* crafting a penalty phase strategy, was deficient performance.  *See Adams,* 324 Fed. Appx. at 349.

In his Amended § 2255 Motion, Mr. Agofsky, setting forth mitigating evidence that was readily available in 2004, argues that his attorneys' deficiencies prejudiced the defense.  The ensuing sections describe in detail additional mitigating evidence that could have been presented.  An overview of that evidence appears in the attached reports of Marilyn Romanowski, L.C.S.W. (SA 1672, 1692), describing Mr. Agofsky's family background, upbringing, and mental health

---

[64] *See also Johnson v. Bagley*, 544 F.3d 592, 603 (6th Cir. 2008) (granting habeas relief for unreasonable mitigation investigation and observing, "Uncooperative defendants and family members, however, do not shield a mitigation investigation (even under AEDPA's deferential standards) if the attorneys unreasonably failed to utilize other available sources that would have undermined or contradicted information received."); *Marinez-Macias v. Collins, supra*, 810 F. Supp. at 819 (rejecting trial counsel's testimony that skepticism about "deprived childhood" mitigation excused failure to investigate background), *aff'd*, 979 F.2d 1067.

background.  Ms. Romanowski describes Mr. Agofsky's birth (a forceps delivery); a childhood marked by frequent moves, poverty, and periods in violent neighborhoods; chronic, severe beatings during his early school years; his father's death in an airplane accident when Mr. Agofsky was nine; his mother's subsequent depression, excessive drinking, and near-suicide; and Mr. Agofsky's ten years of martial arts training beginning at age nine.  Romanowski describes many head injuries and other potential neurological insults, describes episodes in which Mr. Agofsky suffered serious depressive symptoms, and provides clinically significant details about Mr. Agofsky's extended family.  SA 1684-93.

A reasonable social history investigation would also have yielded tangible and documentary evidence that the defense could have shared with experts and used at trial.  As discussed in the Amended § 2255 Motion, trial counsel failed to obtain important social history documents such as school, employment, and medical records, as well as family photographs.  *See* Amended § 2255 Motion at 129-33.  However, as Mr. Barlow testified, trail counsel did not ask him to obtain any documents from Mr. Agofsky's background.  SA 546.

Trial counsel could have compiled this information in 2004.  They could, and should, have complied with the ABA Guidelines by assigning or seeking funds for the appointment of a mitigation specialist.  *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guidelines 4.1.A.1, 10.4.C.2.a, 31 *Hofstra L. Rev*. 903, 952, 999-1000 (2003); *see also Adams*, 324 Fed. Appx. at 345 & n. 17 (indicating that ABA Guidelines in effect at time of petitioner's trial "embrac[ed] the prevailing norms of the time").  Even without complying with that ethical obligation, they could have directed their investigator, Jay Bennett, to conduct a reasonably comprehensive social history investigation or could have conducted the relevant investigation themselves.  *See Adams*, 324 Fed. Appx. at 349.  They could have asked Dr.

-134-

Gripon, Dr. Roberts or other mental health experts to conduct collateral interviews of the persons who appear in the Romanowski report. All of these family members and friends have stated that they would have been willing to speak to Mr. Agofsky's defense in 2004. The notes and testimony of Dr. Roberts establish that Mr. Agofsky agreed to and was even willing to facilitate interviews of his family and friends, including his mother.

If counsel had conducted an independent social history investigation, they could have used what they learned in a number of ways. They could have presented direct testimony from Mr. Agofsky's family, friends, and teachers. They could have presented the testimony of a mitigation specialist or investigator who had interviewed the witnesses and compiled the documents summarized in Mr. Agofsky's Amended § 2255 Motion and below. *See* 18 U.S.C. § 3593(c) (information admissible at penalty phase without regard to admissibility under rules of evidence). They could have provided the information to one or more experts, in the form of a report by the mitigation specialist, statements by the witnesses, or both. If Mr. Agofsky had objected to presenting the direct testimony of his mother or any other witness, multiple family members could have helped to persuade him to agree to the testimony. *See* Declarations of Joseph Agofsky (SA 1930), Peggy Black (SA 1970), Joy Johnson (SA 1992). Even if the effort did not succeed, counsel could have presented the same information through the family witnesses, the mitigation specialist, and/or mental health experts. *See Adams, supra*, 324 Fed. Appx. at 347-48 (distinguishing *Landrigan*, *supra*, and rejecting state's argument that petitioner's purported opposition to testimony by certain individuals excused counsel's failure to conduct comprehensive mitigation investigation); Declarations of Joseph Agofsky (SA 1947), Peggy Black (SA 1975), Joy Johnson (SA 1997-98).

At his deposition, Dr. Roberts testified that he could have made use of a comprehensive social history investigation and could have helped to prepare one. Mr. Agofsky knew that Roberts

-135-

would pass along anything they discussed to Barlow, and that Barlow might use the information at trial. SA 729. Mr. Agofsky told Roberts that it was all right to speak to his mother, aunts, cousins and friend. He gave Roberts his mother's phone number and never asked him not to talk to her. SA 730, 876, 913. When Roberts did call Sheila Agofsky, she never said that Mr. Agofsky objected to the interview. Roberts told Barlow that he thought Sheila would be a positive witness. SA 733. He also told Barlow that Mr. Agofsky had given him permission to talk to other relatives besides his mother, but Roberts did not recall receiving contact information from Barlow. SA 877. Roberts did not follow up because he did not know how to reach the other witnesses. SA 816. Dr. Gripon, similarly, states in his declaration that a social history report and statements from people who knew Mr. Agofsky would have been extremely valuable to him and would have enabled him to assist the defense in presenting a well-founded mitigation case. SA 2792.

Counsel could have used the readily available mitigating information to craft an informed penalty phase strategy instead of undertaking to make a plan in ignorance of the available evidence. *See Adams*, 324 Fed. Appx. at 349. With all of the available evidence at their disposal, they could have adopted a very different mitigation strategy that stressed the emotional and physical trauma Mr. Agofsky endured and its effects on his functioning and development. Even if not, however, the background evidence that counsel failed to uncover would not have contradicted, and could have supplemented and provided context for, counsel's own strategy of attempting to convince the jury that with proper management Mr. Agofsky would not be a threat to others within the BOP.

As developed further below, there is a reasonable probability that, had counsel conducted a reasonable penalty phase investigation and uncovered the evidence summarized in the Amended § 2255 Motion and below, the outcome of Mr. Agofsky's penalty phase would have been different and the jury would have spared his life.

**2.      The Defense Never Learned, and Never Made Sure That The Jury Learned, That Mr. Agofsky Is A Beloved Member Of A Family Marked By Tragedy.**

As the Amended § 2255 Motion describes, a reasonable investigation would have disclosed that Mr. Agofsky's family would have cooperated with the defense, and could have provided detailed information about his family background, his upbringing, the sudden death of his father and its impact on all of them, and the important role his martial arts training came to play in his life. *See* Amended § 2255 Motion at 124. Mr. Agofsky's mother and both his brothers would gladly have testified in his defense. In addition, each of his immediate family members could have provided a statement that his attorneys could have shared with experts. *See* Declaration of Sheila Agofsky, SA 1950; Declaration of Joseph Agofsky, Jr., SA 1930; Declaration of Trevan Billbe, SA 1966. A social history report or the testimony of its author could have supplemented their statements or their testimony on these subjects. *See* Declarations of Marilyn Romanowski, SA 1672, 1692.

Sheila Agofsky, Shannon's mother, could have testified about, or described in a statement, the circumstances of his birth. Sheila had a hard time carrying babies. She had to spend several months on bed rest before Shannon's older brother, Joe Jr., was born on July 23, 1966, and then had seven miscarriages before Shannon's birth on March 11, 1971. SA 1951, SA 1930. It was a difficult delivery and the doctors had to use forceps. SA 1951.

Sheila and Joe Jr. could have described the family's financial hardships. Sheila and her husband, Joe Sr., moved repeatedly in search of steady work. SA 1951-52. Often they were "wiped out, out of money." SA 1930. During Shannon's first nine years they lived in California, Missouri, Oklahoma, three places in Las Vegas, and again in Arkansas and Missouri. SA 1952, 1930, 1673. Shannon was a fearful child. One of his earliest memories is the yowling of the family cat as it was attacked and eaten by coyotes. Shannon, who was three years old at the time, was afraid to go

outdoors after this incident.  SA 1673.

Once the family wound up in a poor, violent neighborhood of Las Vegas where Shannon, as a first-grader, became a target for bullies who beat him up and threatened to rape him when he came home from school.  SA 1952,  SA 1931.  Sheila acknowledges that she and Joe Sr. did not do enough to protect him from the violence.  SA 1953.  As Joe Jr. remembers it, their father's attitude was that Shannon had to learn to protect himself and not worry their mother by complaining about what was happening to him.  SA 1932.

Shannon recalls being beaten every morning and frequently in the afternoons, and remembers dreading every day of school.  The bullies would spit on him, tear his clothes, throw him to the ground, jump on him, and punch him bloody.  He would beg them to stop but that only encouraged them further.  SA 1675.  When Shannon told his mother about the first assault, she called the school, but nothing was done.  And his father told him not to worry his mother.  He took Shannon to the backyard, taught him to throw a punch, and told him to protect himself.  But Shannon never could bring himself to fight back.  He absorbed the daily assaults and never told anyone about them again.  SA 1675.

Shannon also was exposed to significant neighborhood violence in Las Vegas.  He saw drug dealing, theft, guns and other weapons, gunfights, knife fights, and beatings.  SA1674.  It was noisy.  A bunch of bikers in the neighborhood would drink all day and get rowdy and fight, which was scary for Joe Jr. and even scarier for Shannon, who was younger and physically small.  SA 1931.  One time a near-riot broke out downstairs from where they lived and Shannon heard the apartment manager's wife screaming while men dragged her husband outside and stabbed him to death.  A drug dealer, who lived downstairs and had taken a liking to Sheila and her boys, planted himself in front of their apartment with a shotgun until the uproar subsided.  SA 1674, 1952.  Another time,

a neighbor knocked on the door while Shannon and Joe Jr. were alone in the apartment. Joe was frightened, and ran to the kitchen for a knife to protect them. Shannon was terrified. SA 1676, 1932. During the Las Vegas years, Shannon began to overreact to frightening events with hysterical crying and fear. SA1676. He remained a child who was easily terrified throughout his early school years. SA 1953, 1932. Another incident after the family moved back to Arkansas, involving a fugitive who kept the family hostage for several days at their home in the country, reinforced Shannon's perception of the world as a dangerous place. SA 1676, 1933, 1953.

The family could have described Joe Sr.'s death and its effect on Shannon. On March 9, 1980, they were living in Stella, Missouri and Joe Sr. was working on an oil rig. He was flying home to spend Shannon's ninth birthday with the family when he was killed in an airplane crash. SA 1953, 1933. Joe Jr. remembers that Shannon had survivor's guilt about the fact that his father had been killed coming home for his birthday. Years later, he confided to Joe and his wife Shayna that if it wasn't for his birthday their father would still be alive, and that Sheila sometimes blamed him for what happened. SA 1935, 1678.

The whole family naturally grieved, and Sheila was overwhelmed. She began drinking heavily, and found herself unable to cook or function. She was preoccupied by her own misery for quite a few years and a lot of times wouldn't respond to anything. SA 1934. She herself was afraid she would commit suicide. She would sit with a gun in her mouth, drink until she passed out, and wake up not recognizing herself in the morning. Sometimes Shannon would find her in this condition and have to drag her to bed. He attempted to cook his own meals and take care of his mother. Joe Jr. was old enough to get out the house, dealing with his grief by simply absenting himself, and often leaving Shannon alone to deal with her. SA 1954, 1935, 1678.

The family could have described their move to Noel, Missouri, after Joe Sr.'s death, to be

-139-

closer to Sheila's parents.  Because Sheila did not have the skills to support the family, she had to rely on non-perishable food donations from the Native American tribe to which she belonged.  She and the boys suffered severe financial hardship.  SA 1955, 1678.  In his new school, Shannon, who was still small for his age, again became the target of beatings by bullies.  SA 1955, 1937, 1679 .  He began having stomach aches and vomiting every morning and developed a phobia about being beat up.  SA 1955, 1937.  To "toughen him up," Sheila enrolled Shannon in a local martial arts school run by twin brothers, Gerald and Darryl Edmondson.  SA1955, 1937, 1979.  Shannon looked up to the Edmondsons and to Robert Duggan, a specialist who periodically visited the school to give seminars in the Korean martial art of Hwa Rang Do.  Shannon had a conversation with Duggan when he was still about nine, about Shannon's nearly paralyzing fear of fighting.  Duggan encouraged him by telling him that everyone has fears; courage involves not an absence of fear but facing fear.  He told Shannon that even death is not as important as dying with honor.  Shannon took the advice to heart and threw himself into the physical combat that terrified him so much.  SA 1679-1680.

After Shannon began martial arts classes, he found that he could defend himself against bullies and gained popularity in school. SA 1680.   He stayed with his martial arts school until he was eighteen, earning his black belt at a young age and becoming an instructor.  "It was like Shannon's religion."  SA 1937.  He taught classes of children who idolized him.  *Id.*; *see also*  SA 1956, 1682.  In high school, he was a good student who had no disciplinary infractions or juvenile record.  His teachers report that he was always polite, and he has no known history of rule breaking, aggression towards animals, deceitfulness, or property destruction.  SA 1682 (Romanowski report).

The family could have described Shannon's participation in "tuff man" mixed martial arts competitions on weekends.   The competitions were really free-for-alls.  SA 1659, 1939.  Shannon

often came home injured, with bloodshot eyes, broken toes, blood in his urine, bruises, and swellings. SA 1959. Even though Shannon had martial arts skills, he did not have the bulky build of most other participants in these contests and he got battered. At the time, he was 6'2" and only weighed about 160 pounds. SA 1959, 1939. He never wanted to admit to being afraid and would barely admit to being injured. SA 1959.

Sheila could also have provided background information about her family. Sheila's parents, Forrest and Emma Mae Webb Cousatte, were from Oklahoma and her father was a Quapaw Indian. The family had six children and moved around a lot, struggling to make ends meet. SA 1950. Sheila's father was a heavy drinker, often violent and suspicious, who once beat Sheila so badly that her high school reported him to the child welfare authorities. SA 1950. After Sheila and her sons moved to Noel following Joe Sr.'s death, Shannon spent a lot of time with his grandfather and was exposed to his heavy drinking, depressions, and rages. Shannon was put to work, but as hard as he tried it was never enough for his grandfather. Both grandparents favored Joe Jr., to the point that Shannon would ask his mother, "Why don't they like me?" SA 1955. Shannon was also exposed to violence, sexual abuse, and addiction that ran through Sheila's family. Her brother Bud was a convicted pedophile who kidnaped his daughters, Shannon's cousins Deborah and Nicole. There was domestic violence and substance abuse in the families of Sheila's sister Midge and her brothers Aaron and Sammy. SA 1960, 1686.

Both Sheila and Joe Jr. could have described Shannon's head injuries and similar incidents. Not only did he absorb many blows to the head and elsewhere during his formal martial arts work and the "tuff man" free-for-alls, but he had a 1989 motorcycle accident which mangled his helmet, and another time an adverse drug reaction sent his blood pressure skyrocketing and then plummeting, and nearly killed him. SA 1958, 1940-41.

Mr. Agofsky's youngest brother, Trevan Billbe, would have testified at trial, talked to members of the defense team, or signed a statement that the defense team could have shared with experts. He could have described his memories of the teenage Shannon joking with him and getting down on the floor to play with him when Trevan was still small. He could have described visiting his brothers when they were locked up in jail in Oklahoma and knowing that they were putting on a brave face for him. He could have described the family photos of himself and his brothers and the way they fueled his memories. He looks on Shannon as his hero. SA 1966.

Mr. Agofsky's trial counsel made no effort to work with his immediate family to develop an independent social history. Jay Bennett, as indicated, once interviewed Sheila before trial, but limited the discussion to general questions about where the family had lived and confirmation of their Native American heritage. He never asked her specifically to describe details about her son's life, traumatic events, head injuries or similar matters. He never asked her to provide a written statement or explained why his history, problems, or head injuries could be important. Nor did anyone from the defense ask Sheila to help develop evidence by helping to locate family members, signing releases, or providing documentary information. No one prepared her for Dr. Roberts's telephone interview or explained that it was important for her to volunteer information to him. SA 1962-1963.

Sheila would have testified for her son if she had been asked; in fact, "I would have crawled there to testify." SA 1963. She believed she could have persuaded him to permit it if he was opposed when the time for trial arrived, and if he remained opposed, his aunts and his brother could have testified and provided the details that she knew. SA 1963-64.

Mr. Bennett visited Joe Jr. in prison in 2004, but he never asked Joe about Shannon's background and upbringing or any problems Shannon had had. SA 1947. No one from Shannon's

defense ever asked Joe to provide or help develop evidence for the penalty phase, or to provide contact information for family members or sign releases. No one enlisted his help in persuading Shannon to allow his mother to testify or asked Joe to provide the same details in his mother's place. Joe would have testified in 2004 and would do so today. SA 1948.

No one from Mr. Agofsky's defense ever approached Trevan or interviewed him at all before the 2004 trial. SA 1968.

Mr. Agofsky's immediate family could have described for the jurors the tragedy that overshadowed his young life, and helped them to understand that the tragedy was superimposed on a series of traumas that already made him view the world as a dangerous place. Sheila and Joe could have explained why his martial arts study took on such importance for him and why he internalized its philosophy, carrying it with him to prison. Sheila, Joe, and Trevan could all have explained why they love Shannon and would be devastated to lose him. SA 1947, SA 1968. Trial counsel's failure to learn and use what Mr. Agofsky's nearest and dearest relatives could contribute to saving his life was deficient performance.[65] And the testimony and participation of Mr. Agofsky's loved ones could have tipped the balance against death by making it possible for the jury to appreciate him as a three-dimensional human being. There is a reasonable probability that, but for trial counsel's unreasonable failure to uncover and present this evidence, alone and in combination with the other evidence described in this Supplement and Mr. Agofsky's Amended § 2255 Motion, the jury would have spared him.

> **3.  The Defense Never Uncovered Or Presented Evidence That Mr. Agofsky Was Raised To Offer Refuge and Protection To Vulnerable Family And Friends.**

---

[65] *See Rompilla*, 545 U.S. 374 *; Williams*, 529 U.S. 362 *; Wiggins* No. 539 U.S. at 524-25*; Adams*, 324 Fed. App. 340*; Walbey*, 309 Fed. Appx. 795.

The Amended § 2255 Motion argues that trial counsel unreasonably failed to uncover and present evidence that Mr. Agofsky began from a young age to offer protection to vulnerable persons. *See* Amended § 2255 Motion at 134. Trial counsel could have offered additional evidence about the feelings that helped to fuel his protective behavior, and additional instances of the protective behavior itself.

In his teens, Shannon looked for causes. He experienced an overwhelming sense of responsibility and self-blame for events that he could not, but thought he should be able to, control. Once, as a result of a personal loss that he thought he should have prevented, he endured a period of extreme sadness, guilt, self-loathing, and lack of pleasure in his usual activities. He thought about suicide and became isolated, irritable, and vegetative. He even quit martial arts for a time. SA 1680-81.

During this period he would deliberately place himself in high-risk situations to assuage his need for self-punishment. He would have viewed killing himself as a "cop-out" or weakness, but being punished or even killed would have provided relief. SA 1681. Eventually, he emerged from his depression and resumed martial arts. However, he continued attempting to blunt his emotions and avoided showing anger, fear, or weakness. SA 1681.

Shannon volunteered at a women's shelter for a short period. One evening a domestic abuser came to the shelter trying to reach his victim, who was inside. Shannon went out to the parking lot and gave the batterer a beating. He was so upset that he does not remember going out to the parking lot. He has amnesia for the entire incident. SA 1682.

During his incarceration, Mr. Agofsky experienced another bout of depression after hearing a report that a female pen-pal to whom he had stopped writing had committed suicide. He felt severe guilt and responsibility for what had happened, disproportionate to his decision to stop

writing to her.  His correspondence relationship with a second female pen-pal then ended.  After these events, visitors noticed Mr. Agofsky's flat affect, sad mood, impoverished speech, and expressions of hopelessness.  He was not writing or working out and had lost pleasure in his usual activities.  He remained in this state for several months.  SA 1692-93.

Joe Jr., Shannon's brother, could have described many examples of his protective behavior: his visit to an aunt who was terrified about reports of a serial killer in the neighborhood, his concern for a friend who overdosed in high school, another who endured domestic abuse, and a third who was injured in a car accident; his concern for the sick inmates he cared for when incarcerated at the medical center in Springfield; and his protection of female inmates during a riot in the jail in Oklahoma.  SA 1829; 1950-51.

Mr. Agofsky emerged from the traumatic events of his childhood with a strong impulse to play a protecting role.  Because, as a result of their deficient investigation, trial counsel knew nothing about it, neither could the jury.  If the jury had learned about this side of Mr. Agofsky's personality, they could have given it independent mitigating weight, or it could have provided context for some of the prison behavior that the government urged in aggravation.  There is a reasonable probability that, but for trial counsel's unreasonable failure to uncover and present this evidence, alone and in combination with the other evidence described in this Supplement and Mr. Agofsky's Amended § 2255 Motion, the jury would have spared his life.

### 4.    The Defense Never Uncovered Or Presented Evidence That Mr. Agofsky Has The Support of Extended Family.

The Amended § 2255 Motion argues that trial counsel unreasonably failed to make any effort to contact or present the testimony of extended family members.  Many of them could have presented additional mitigating information and would gladly have done so.  Amended § 2255

Motion at 140.  Trial counsel had in their possession Mr. Agofsky's address book, which contained contact information for multiple family members, but counsel contacted none of them.  SA 559-60.

Peggy Black, Mr. Agofsky's maternal aunt, could have provided a statement, or testified, about many aspects of his background.  SA 1970.  She could have described Sheila's and Joe Sr.'s frequent moves, often to poor and dangerous places.  She could have described Shannon's sense of guilt over the fact that his father was killed coming home for his birthday.  She remembered Shannon as a child who was little for his age, fearful, and a target for bullies, until martial arts became a way of life for him.  As he reached his teenage years, Peggy recalled, Shannon always seemed to want to protect people – Peggy herself,  his immediate family, classmates with personal problems, and later weaker inmates in prison.  Peggy could have described, as well, Shannon's many injuries and the impact on him of the members of her family who struggled with alcoholism, addiction, and domestic abuse. SA 1970-77.

Joy Johnson, another maternal aunt, recalled visiting Sheila at the hospital after Shannon was born in a forceps delivery.  The baby had large lines across his face where the forceps had dug in, and his head was swollen, with one side bigger than the other.  SA 1998-99.  Sheila and Joe Sr. moved a lot and lived in some rough places. As he grew up, Shannon was small for his age and other children picked on him.  This was a problem until he eventually learned martial arts.  He was a fearful child, scared of the dark and scared that wolves would get him.  SA 2001, 1999.  Joy remembered that Joe Sr.'s jobs sometimes kept him away from home a lot and he and Sheila sometimes had conflicts because she would not let him discipline the children when he felt they needed it.  SA 1999.

Joy vividly remembered how devastated the whole family was when Joe Sr. was killed in an airplane crash on his way home from his job on an oil rig.  The fact that his father was coming

home for his birthday made it especially hard for Shannon. SA 2000. His mother's depression made it even harder. The whole family was worried about Sheila, who confided to Joy that she was suicidal, often falling asleep with a gun in her mouth. She stayed in bed a lot and Shannon had to be her care-giver. For years, she would not believe in Joe Sr.'s death, insisting that he could still be found somewhere. SA 2000.

At the same time, Shannon was enduring mistreatment from local boys. Sheila decided to enroll him in martial arts classes, insisting that it might do him good. At the beginning, Shannon said he did not like fighting and did not want to do martial arts, but Sheila insisted. Joy and her father had discussions about the fact that Shannon did not want to fight. It surprised Joy that he stayed with it for so many years, but she could see that the discipline helped him become a stronger person. SA 2001. He became a real expert in martial arts, trusted by his instructors to teach classes of younger kids and beginners. SA 2002. He also participated in tough man fighting contests where he endured many injuries, in the head and elsewhere. SA 2003. He had other injuries, including a motorcycle crash and two auto accidents in one day. SA 2003. He was also exposed to alcoholism, addiction, and different kinds of abuse in his family. *Id.* Sheila could be hard on Shannon herself. Joy remembers Sheila calling to tell her that she had punched Shannon in the mouth on two different days and "busted his lip" each time. SA 2001.

Joy and her husband were amused to notice that, as a teen, Shannon was still afraid of the dark when they asked him to help out checking the grounds at their drive-in theater. SA 1995. He was a kind young man who always "[took] up for the underdog," whether it was his aunt Peggy, afraid to be alone while her husband away, or other inmates in prison. SA 1996. He protected his mother after his father's death. Later, when he endured teasing at school because Sheila had become pregnant with Trevan, he never told Sheila, to spare her feelings. *Id.* Shannon was a great brother

-147-

to Trevan. SA 1996.

Another of Sheila Agofsky's sisters, Midge Malchupa, could have provided "many details about his life and background." SA 2537. Midge knew that Sheila had many miscarriages and a difficult time delivering Shannon, and that Sheila and Joe Sr. moved a lot and had trouble making ends meet. SA 2538. She was with Sheila when the news arrived of Joe Sr.'s death and could have described how devastated both Shannon and Sheila were. "I saw how he clutched himself and rocked back and forth." SA 2539. She could have described Sheila's severe depression after Joe's death, Shannon's beginning martial arts classes and entering "tuff man" fighting competitions. SA 2539-40. She could have described Sheila's family background, explaining that the family was very poor and their father would whip the children as discipline. SA 2537.

No one from Shannon's defense ever contacted Midge, although she has always been close to Shannon and Sheila. If she had been contacted in 2004, she would have given a statement to his lawyers, an investigator, a psychologist, or anyone else who would try to help Shannon. She would have told the defense team about other family members if they had asked her to do so. She would have been willing to testify on Shannon's behalf, share her information with the jury, and ask them not to sentence Shannon to death. SA 2540-41.

Peggy Black, Joy Johnson, and Midge Malchupa are Sheila Agofsky's sisters. They know most of the details that Sheila has provided about their nephew's upbringing, including the hardships he encountered, and other details about his family background. They could have provided that information by testifying on his behalf at trial, speaking to anyone working for his defense, providing written declarations, or helping to contact other family members. If Shannon had objected to having Sheila testify, they could have spoken to him to help persuade him to agree to it, and if he continued to resist, they could have provided that information for her in their own testimony.

-148-

No one from the defense ever asked them to do so. SA 1975, 1998, 2541. Trial counsel failed to contact any of them, despite the fact that the defense had contact information for both Peggy Black and Joy Johnson in Mr. Agofsky's address book and they both would have been willing to put counsel in contact with any other family members. SA 650, 657.

The defense also could have provided information from Mr. Agofsky's cousins. Rhonda Polvado is the daughter of Sharon Whatley, another of Sheila Agofsky's sisters. SA 2298. Rhonda knows the Agofsky family well. Sheila and Joe and their two boys lived with Rhonda's family in Oklahoma for a number of months when Shannon was four or five years old. SA 2298. Rhonda was older, closer to Joe Jr.'s age. She remembers that Shannon had an abnormal amount of fear of being hurt in some way. He was unusually gullible and would give his prized possessions to anyone. He wanted very badly to be liked. SA 2299-3000.

As Rhonda and Shannon grew up, she saw Shannon's family at gatherings at their grandparents' house. She could have confirmed and supplemented information from her aunts about Shannon's exposure, and her own, to family members who struggled with addictions and abuse. Their granddad was a heavy drinker who loved to make moonshine and homemade wine. He behaved in a controlling way to their grandmother, who never learned to drive, and was abusive to her. He beat Rhonda's mother and Shannon's mother when they were teenagers. Rhonda's father and her maternal uncles (also Shannon's maternal uncles) battled alcoholism, and Rhonda's brother and some of her Aunt Midge's children (Shannon's cousins) have struggled with drug dependency. Rhonda was always afraid of their uncle Buddy, Sheila's and Sharon's brother. He "gave the children the creeps;" when one of them cried it seemed to excite him. He molested his daughters and served time for sexual crimes. Rhonda's own brother, Tony Whatley, molested her when she was about eleven, and she later learned that molested their other brother, Kevin. Rhonda could have

-149-

testified that Shannon was exposed to the abuse and addictions in his family. He "lived it, and knows this history." SA 2300-01.

Rhonda, like her aunts, could have confirmed how devastated Shannon and his family were over Joe Sr.'s death. Shannon seemed "totally freaked out" at the time and scared for his mother. SA 2302. Sheila has told Rhonda how hard it was for her to focus after losing Joe Sr. She would go to sleep after drinking, only to wake up and realize that she had a loaded gun which she had placed in her mouth, considering suicide. Shannon would try to protect her from herself and try to take care of her. He physically had to get her to bed, afraid that she would kill herself. Sheila has told Rhonda that she feels very guilty about what Shannon went through, because he was so young at the time. SA 2302-03.

No one from Shannon's defense ever contacted Rhonda before his 2004 trial. She has maintained regular contact with Shannon and Joe since 1999. She and Shannon write to each other and speak by phone regularly. If she had been contacted, she would have provided information to the defense attorneys or investigator and would have testified if asked. She could have helped the defense team locate and work with other family members. Rhonda believes that Shannon would not have prevented his mother from testifying if he had understood that she had information the jury needed to hear and that she wanted to testify for him. Even if he had resisted letting Sheila testify, Shannon's trial counsel could have asked Rhonda or any other family member to persuade him to allow it. Rhonda feels certain she could have persuaded him, but even if no one had success at that, she could have testified herself to much of the same information Sheila could have provided. SA 2303-04.

Trial counsel also never contacted Deborah Cousatte, another first cousin of Mr. Agofsky's and the daughter of his Uncle Bud, Sheila's brother. SA 2295. Sheila and Bud lived near each other

for many years, and Shannon had a lot of contact with him and his family.   SA 2295.   When

Deborah was very small, her mother, Marilyn, informed on Bud on a company theft charge and he

was incarcerated.  As he neared release, Marilyn was so frightened that she was hospitalized with

a nervous breakdown.  Bud took revenge on Marilyn when he got out by kidnapping Deborah, age

three, and her brother Victor, age two, at knifepoint from their maternal grandmother and bringing

them to California.  Except for one short visit when she was five, Deborah never saw her mother

until she was eighteen.   SA 2295.

> Deborah has always been afraid of her father:

> While we were growing up, Buddy would hire "babysitters" who would become his
> sexual partners, along with other women who came and went.  He is a convicted
> pedophile and he sexually abused me during my childhood.  I can remember
> bleeding from my vagina as early as age five or six, and I can remember my father
> frequently hugging me with an erection.  He encouraged me to be "girly" and climb
> up into his lap, and because I learned to manipulate him I was not beaten.   But he
> severely beat my brother Victor, who grew up to be mentally ill, paranoid, and
> violent, and committed suicide, with a gun on Easter Sunday.

SA 2296.

Deborah was a teenager, living with Bud near Sheila and Joe Sr., when Shannon was born.

It was well known in the family that Sheila had trouble carrying babies.  Deborah was present for

one of the many miscarriages Sheila had before she finally managed to carry Shannon to term.

Sheila had a difficult labor and Shannon was delivered by forceps.  SA 2296.

Deborah could have confirmed that her grandfather Cousatte and two of his sons, Aaron and

Sammy, were all alcoholics. SA 2296.  She could also have reported on how devastated Sheila was

after Joe Sr.'s death.  Deborah returned to Noel after living out state and was taken aback by the

change in Sheila.  Deborah believed that there had been a rift between Joe and Sheila at the time of

Joe's death, and they never had a chance to make up.  When Deborah saw Sheila, Sheila had lost

her anchor and was broke, working in a factory.  The stress seemed to have brought out a tendency to depression in her, and some of what she said just did not make sense.  SA 2296-2297.

No one from Mr. Agofsky's the defense ever interviewed Deborah in preparation for the 2004 trial.  If she had been contacted, she would have talked to the defense team and would have been willing to testify for him.  SA 2297.

Mr. Agofsky argues in his Amended § 2255 Motion that his trial counsel were deficient in failing to contact his paternal relatives.  *See* Amended § 2255 Motion at 146.  His father's siblings could have provided additional information in the form of statements or testimony.  Leon Rondeau is the younger half-brother of Mr. Agofsky's father, Joe Sr.  SA 2000.  Leon and his wife visited Joe Sr. and Sheila several times a year when both couples were newly married and living in California. Joe's and Leon's mother did not like Sheila and would comment that she spoiled her boys.   Leon tended to agree that Sheila "gloated on" them.  SA 2001.  Joe Sr. and Sheila moved to Missouri to be near her parents when the boys were small.  Leon saw Joe Sr. only once more before he died, when Joe stopped in during a run to California driving a truck with Sheila's brother Bud.  SA 2002.

When Sheila first called Leon with the news of Joe's airplane accident, she was certain that Joe was still alive.  She clung to hope even after she received the final call saying that no one had survived.  SA 2002.  Leon believed that, while Joe loved Sheila, there had been some tension in the marriage at the time of his death and that this affected Sheila's sense of loss even more.  SA 2002. Leon, his older sister Theresa, and their mother attended Joe's funeral.  SA 2002.

A number of years later, when Shannon was around seventeen, Leon took a motorcycle ride to Missouri to visit Sheila and her boys for a week.  SA 2002.  He went caving and canoeing with Joe Jr. and Shannon.  He found both boys very respectful and was especially impressed with Shannon's way with Trevan, wrestling with him, teasing him, and tickling him.  SA 2002.  He was

-152-

also impressed when he attended Shannon's martial arts tournament:

> When we arrived, children from his club and their mothers came up to him and had great interaction. The kids were all excited and their mothers showed appreciation of Shannon's individual attention to each of them. I felt like I got to see Shannon's soft side and it was good. It was very obvious to me that Shannon was well liked and enjoyed the children. Shannon won first place in both forms and fighting that day. Shannon and I got to spend several hours alone together in his car while going to and from the tournament. I was impressed with him and his confidence in himself, his devotion to his family, and friends. I asked him if he had any plans to go to college. He told me that he wasn't going to go, that maybe later on he would consider it. When I was in the middle of my importance of school lecture, he stopped me and assured me that he was a good student and school was easy for him. He said he could be a doctor or lawyer if he wanted, but he wanted to pursue his martial arts, to study under the grand master and get his black belt. He wanted to fight professionally, to challenge the best. I took it as an obsession similar to that which drives Olympians who develop their talents and bodies to be the best. A dream I once had. I told him that while pursuing that goal he needed to make a living. He already had a plan which for a 17 year old is very impressive. His plan was to go into business as a distributor of various goods. He was going to contact manufacturers of various products and consolidate them into one catalog. He would be the middleman between them and the customer. Not a totally thought out plan but something he was considering.
>
>   Shannon was proud of the fact that he never did drugs or alcohol. He was a young man who honored integrity, honesty and bravery. He wanted to be a body guard, a protector. A career he pursued after high school.

SA 2002-2003.

Leon could have recounted his family's mental health history. He describes himself as a recovering alcoholic who has struggled with depression for most of his life and has received medication for anxiety attacks. He believes that his father was an alcoholic. His mother, Edna Boucher Agofsky Rondeau, was short-tempered, unpredictable, and physically violent to her children. She may have suffered from bipolar disorder. SA 2000-2001. Leon recalls her humiliating treatment of Joe, even when he returned home from the Army as a young man, and his anger because Joe never stood up to her or said anything bad about her. SA 2001.

Leon's older half-sister, Theresa Bryant, was Joe Sr.'s older full sister. SA 1978. Trial

counsel had contact information for Theresa in their possession. SA 651. She could have described Joe as a quiet, shy boy who would not stand up for himself. Their mother was prone to rages, beatings, and belittling treatment. SA 1978. Leon Sr., Theresa's stepfather, never protected the children from their mother, and apologized to Theresa for this when he was older. SA 1979. Their mother apologized to Theresa on her deathbed for her treatment of the children and told her that she loved them. SA 1979. Theresa could have provided additional details of family mental health history. Leon's sister Annette, Theresa's half-sister, suffers from depression that more than once has required hospitalization. SA 1980. Leon's and Annette's brother Henry, who was six weeks premature, died at a few weeks old with severe neurological problems. SA 1979.

No one from Mr. Agofsky's defense ever contacted Theresa or Leon in 2004. They both would have been willing to testify at his trial or to provide information to his defense. SA 1980, 2003.

Mr. Agofsky has many relatives who have known him all his life and who would gladly have worked with his defense team and testified on his behalf. They could have given detailed information about the hard times he endured as a child, described his family background, and explained the importance of martial arts in his life. They could have provided vivid anecdotes from Mr. Agofsky's past. If Mr. Agofsky had objected to his mother's testimony, they could have helped to persuade him to let her testify, or her nearest relatives could have taken the stand and spoken for her, and for him. There is a reasonable probability that, but for trial counsel's unreasonable failure to uncover and present the evidence Mr. Agofsky's extended family could have provided, alone and in combination with the other deficiencies described in this Supplement and Mr. Agofsky's Amended § 2255 Motion, the jury would have spared his life.

### 6.    The Defense Did Not Seek Out Local Friends And Teachers.

Mr. Agofsky challenges trial counsel's failure to seek out local friends and teachers who knew him during his school years. *See* Amended § 2255 Motion at 150. In addition to the other individuals discussed in the Amended § 2255 Motion, Jan Varner could have provided helpful information and testimony. SA 2005. Ms. Varner met Sheila Agofsky in martial arts class, a few years after Joe Sr.'s death, when Ms. Varner was seventeen or eighteen. Sheila took Jan under her wing and Jan visited almost every day. She remembered Shannon as the family clown. At that time, Sheila regularly went to the country club where she enjoyed drinking and throwing darts. Sheila could be short-fused and judgmental, and strict with her children. She once told Jan that she had hit Shannon's younger brother, Trevan, so hard that she knocked him out. Jan often saw Shannon's Uncle Bud at Sheila's home and remembered him as crude and sexualized in his conversations. *Id.*

No one from Mr. Agofsky's defense ever contacted Ms. Varner in 2004. She would have been, and remains, willing to speak to the defense and testify in Mr. Agofsky's behalf. SA 2005.

The defense also could have obtained helpful information and testimony from Brenda Bryson, whose son Ryan began taking Shannon's martial arts classes as a ten-year-old and continued for two to three years. SA 2535. Ms. Bryson could have described how the teenage Shannon interacted with the students:

> Shannon was so good with the kids, he never raised his voice and was incredibly patient with them. Before class they would talk, play and goof around, but when Shannon said it was time for class they all lined up immediately. They were there to learn and he tolerated no horseplay. When the classes were over the kids would run up and talk to him. Most guys that age would rather have been out with friends or talking to girls and not want to spend their time hanging around with kids. But Shannon would stay and talk to them. And they listened to him.

* * *

Shannon would get the kids ready for competitions. Then Shannon would always

-155-

be at the competition with them. They all did well in the competitions. After competitions Shannon would sit down with the kids and go through their moves with them and show them what they can do different next time. And Shannon was so proud. He referred to his students as "his kids."

SA 2535. Bryson could have described how Shannon gave Ryan extra lessons for free, and how Ryan, who did not have a father in his life, bonded with him. At competitions, Ryan would head straight for Shannon as soon as he arrived. Ryan was very proud when he advanced to a level at which Shannon began to shake his hand and bow to him. SA 2535, 2536. Ms. Bryson believes Ryan learned to protect his younger brother from Shannon. *Id*.

Bryson could also have described Shannon's self-discipline:

I have never seen Shannon be violent or aggressive. He does not start fights. He was very self disciplined. I have seen him provoked on multiple occasions and he always walked away. Guys would walk by the martial arts studio on the street and make rude remarks about martial arts directed at Shannon. It would have been so easy for Shannon to fight them for what they said. The kids would be offended and ask Shannon, "What are you going to do about it? You're a black belt go show them." But Shannon would tell them it wasn't worth making a big fuss over it and to let it go. I saw him walk away from several instances like that. Another time Ryan and I went to see Shannon in a kickboxing competition in Bartlesville. After Shannon's competition, some guys were mouthing off making rude remarks to him. Shannon could have reacted and gotten mad, but he didn't let it affect him. He just walked away.

SA 2535.

Ms. Bryson would have been willing to testify on Shannon's behalf in 2004. "I never understood why no one ever called us to testify on Shannon's behalf. I was waiting. I would have then and I still would today." SA 2536.

People who knew Mr. Agofsky before he entered prison, but who were not related to him, could have provided an otherwise missing dimension to the jury's understanding of his background. There is a reasonable probability that, but for trial counsel's unreasonable failure to uncover and present this evidence, alone and in combination with the other evidence described in this

-156-

Supplement and Mr. Agofsky's Amended § 2255 Motion, the jury would have spared his life.

**D.** **Counsel Failed To Investigate or Present Readily Available Prison Mitigation**

As the Amended § 2255 Motion recounts, the defense made virtually no effort to identify and elicit mitigating evidence from other inmates who had known Mr. Agofsky during the eleven years of incarceration that preceded the Plant incident. *See* Amended § 2255 Motion at 152. Other inmates could have described Mr. Agofsky as a person who was strong and independent enough to keep clear of gang membership, who was skillful at mediating and defusing conflicts between individuals and groups, and who earned the respect of inmates from all racial and ethnic backgrounds. The inmates who would have been willing to testify on his behalf are white, black, Hispanic, and Jewish. Instead, the jurors learned nothing about those eleven years of Mr. Agofsky's life except for a bare litany of disciplinary infractions introduced by the government in aggravation. The defense did not even provide any context about the prison culture in which those infractions occurred, except for a few pages of testimony by a sociologist from Houston who cited no data and had never met Mr. Agofsky. Tr. Vol. 22, 236.

The Amended § 2255 Motion describes the potential testimony of twelve inmates who could have provided information about Mr. Agofsky during his years in prison. In addition, the defense could have called several others to testify about Mr. Agofsky's positive actions and attitude in the prison environment.

Kerry Dixon, who knew Mr. Agofsky during his time in general population at USP Beaumont, had spent many years in both state and federal prisons and could have explained what life was like for inmates in the BOP. And he could have explained Mr. Agofsky's constructive influence in the general population. SA 2028. Jay Bennett interviewed Dixon at Beaumont in March 2004. Dixon gave him background about Mr. Agofsky and Plant, and passed along rumors he had heard in general population about the identities of possible government informants. The

-158-

defense did not call Dixon as a witness at trial.  SA 619-29, 2028-29.

Dixon met Mr. Agofsky when Mr. Agofsky arrived at Beaumont and they were housed in the same area. Dixon remembered Beaumont as a very dangerous place, where everybody had a "shank" or homemade weapon, or access to one if they needed it.  Most inmates belonged to gangs for protection against the inmate violence.  Mr. Agofsky, however, was not a member of any gang and did not need to be.  Because Mr. Agofsky was fair and calm and could communicate with all kinds of people, inmates would bring their problems to Mr. Agofsky and his friend Lug (Mike McLarty) for resolution. Mr. Agofsky could handle situations in ways that would minimize trouble. Mr. Agofsky was known for taking on problems from all inmate groups and finding non-violent ways to resolve them.  SA 629, 2028.

For example, one time an inmate was very frustrated about an incident and told Mr. Agofsky he was going to stab a particular person.  Mr. Agofsky successfully encouraged the other inmate not to do so, explaining that it would make the situation worse, not better.  Because Mr. Agofsky was so calm and reasonable, the inmate calmed down and took Mr. Agofsky's advice.   SA 2028.

Everyone respected Mr. Agofsky, from all groups, including whites, blacks, and Hispanics. He worked hard to help keep trouble from erupting, negotiating on behalf of white inmates with leaders of the black and Mexican inmates.  Likewise, leaders of those groups would approach Mr. Agofsky if they had a problem with one of the white inmates or even with a member of their own groups.  In this way, although Mr. Agofsky himself was not a member of any gang, he helped to keep peace.   SA 2028-29.

Because Dixon grew close to Mr. Agofsky, Mr. Agofsky would share his feelings with him. Mr. Agofsky often spoke about his mother and his brother, Joe, who was incarcerated in another prison.  Mr. Agofsky worried constantly about Joe's well-being, and said that he felt terrible about

-159-

the pain and trouble that his conviction and prison sentence had caused his family. Although some inmates took advantage of their families, Mr. Agofsky would never ask his mother for anything, not money or anything else, because he did not want to cause her any trouble. SA 2029.

Dixon considered Mr. Agofsky one of the finest men he had ever met, a man of integrity who was completely loyal to those he respected and cared about. Dixon was contacted briefly by someone from Mr. Agofsky's defense in 2004, and told the person he spoke to that he would be happy and even honored to testify at the capital trial. SA 2029. Mr. Bennett's interview memo does not indicate that he asked Dixon about Mr. Agofsky's character. SA 629. Dixon expected the defense to bring him to court, but never heard from them again. He would have been happy to testify if Mr. Agofsky's defense had asked him to do so. SA 2029.

Michael Fitzgerald was subpoenaed by the defense, but was not called to testify at trial. Mr. Fitzgerald could have told the jury, on the basis of his personal knowledge, that Mr. Agofsky "was not a bully. Shannon always went for the underdog." SA 2059. Fitzgerald came to prison as an older inmate with some health problems. Being older, vulnerable, and alone on the yard could have made him a target. Mr. Agofsky hung out with Fitzgerald every day for three years. During that time, Mr. Agofsky also helped Fitzgerald work out a cardiovascular exercise routine to help with his heart problems. SA 2059.

Fitzgerald would have told the jury that Mr. Agofsky "was respectful with people and people respected him. Because he had respect of so many people on the yard, Mr. Agofsky stopped a lot of beefs, and he helped a lot of people." *Id.* Fitzgerald would have testified that Mr. Agofsky diffused conflict on the yard, getting involved in situations that he could have walked away from. Fitzgerald would have explained that Mr. Agofsky did this because he "lived by a code, his rule for everybody was to act right, and if people acted right, then they were fine by Mr. Agofsky." SA

-160-

2059. Fitzgerald would have told the jury that in three years with Mr. Agofsky, he never saw him get mad or use his martial arts to intimidate people. SA 2060.

Fitzgerald was subpoenaed to Beaumont before trial, but never called as a witness. No one from Mr. Agofsky's trial team ever interviewed him before they subpoenaed him. SA 2057. Mr. Bennett testified that he did not know why the attorneys had subpoenaed Mr. Fitzgerald. SA 554.

Charles Glave, who was on the Beaumont USP recreation yard on January 5, 2001, was incarcerated with Mr. Agofsky at both Beaumont and Lompoc USP. He never knew Mr. Agofsky to "provoke any kind of problem or fight. He would give the shirt off his back." SA 2072.

Jeff Milton could also have described Mr. Agofsky's behavior during his time at USP Lompoc. At one time, Milton was in a cell on the second tier of the same cell block as Mr. Agofsky. In late 1997 or early 1998, Milton injected some black "tar" heroin he obtained from another inmate and passed out shortly afterwards because of a bad reaction to the drug. Mr. Agofsky watched over him for a day and a half to be sure he did not die as he drifted in and out of consciousness. Milton was told that when he first passed out, Mr. Agofsky used CPR to save his life. While he recovered, Mr. Agofsky would come to his cell each day as soon as the doors opened, bring him ice, and stay with him to be sure he was all right. SA 2108. Milton could have testified about the unwritten rules of behavior among inmates in the BOP. For example, if a white inmate is placed into a cell with a black inmate, and does not fight with the black inmate, the white inmate will have to face consequences from other white inmates. He will have to live with the consequences for the rest of his life. The white inmate has no choice but to fight the black inmate, no matter how he feels about the situation personally. SA 2036.

Frank Early, who was also on the recreation yard on the day of the Plant incident and knew Mr. Agofsky in Beaumont, characterized him as "one of the rare inmates who was independent

enough to stay out of a gang.  He was someone who was respected by all groups and was not a racist."  SA 2042.

The defense could have called Andres Campillo, another inmate from the recreation list, who knew Mr. Agofsky during his time at USP Beaumont.  Campillo could have described Mr. Agofsky's reputation.  He had a good reputation with his fellow inmates and was not someone who started trouble.  He was not involved with drugs and would mitigate problems and calm inmates down when trouble was brewing.  SA 2020, 2015.

The defense could have called Bruce Spring, who also knew Mr. Agofksy at USP Beaumont.  Spring and Mr. Agofksy were cellmates during the period when they were both on the compound (in general population).  Spring could have described Mr. Agofsky as well respected.   He was a "stand up guy" who spoke to everyone and kept peace.  Although Mr. Agofsky himself was not a gang member, he was able mediate conflicts among the gangs.  SA 628.

Mr. Bennett interviewed Spring at Beaumont in April or May of 2004 for about half an hour.  Spring gave him background information about Mr. Agofsky and Plant.  Bennett asked general questions about Spring's relationship with Mr. Agofsky and what life was like at Beaumont.  The investigator never asked any specific questions about the Plant incident, the Michael Miele incident, or other individuals who were in the recreation cage with Mr. Agofsky during the Plant incident.  Bennett  told Spring that Mr. Agofsky's trial lawyer would be in touch, but Spring never heard from any lawyers.  SA 2311.

Russell Dinovo, who knew Mr. Agofsky in Atlanta, would have testified that Mr. Agofsky was soft-spoken and calm, and was not aggressive.  Dinovo would have told the jury how Mr. Agofsky "quashed" problems in the prison.  SA 2025.  Todd Gilbertson, who celled with Mr. Agofsky in Atlanta, would have testified that Mr. Agofsky was good with words and a good story-

-162-

teller.  SA 2069.

Artie Dufur, who knew Mr. Agofsky in Lompoc, could have undermined the government's claims that he would be a future danger if he received a life sentence.  Dufur was already incarcerated when Mr. Agofsky came to prison.  Although there were plenty of opportunities for fights, Dufur never saw Mr. Agofsky harm anyone.  In fact, Mr. Agofsky was sought after to help diffuse disputes between warring factions and although not himself involved in any gangs was accepted by many diverse groups, including those predominately of other races and religions.  SA 2031.

Dufur could also have testified to the many positive aspects of Mr. Agofsky's prison adjustment at Lompoc. Although drugs were prevalent and easy to obtain, Mr. Agofsky never touched them but rather was involved in helping others to stay off drugs.  He also went out of his way to help young and otherwise vulnerable inmates.  He was active in a proposed program for inmates to donate bone marrow for children with Leukemia, and he collected money for charities, including an annual Christmas toy drive.  SA 2032.

Reginald Gilbert-Bey could have described Mr. Agofsky as an extremely respectful, well-mannered, polite, and intelligent person.  SA 2065.  Although they were not friends, Gilbert-Bey noticed his respectful way of acknowledging people, including himself, when he was around them. He also could have described Mr. Agofsky's kindness to Richard Ward, who had attempted suicide several times and received the nickname of "hangman."   White inmates were a small minority at Beaumont, perhaps as low as 10%, and because of their minority status and the extreme violence in the prison, many of them lost their equilibrium there.  Gilbert-Bey remembered Mr. Agofsky telling him that he was talking to Ward, trying to mentor him and encourage him to be strong.  SA 2066.

In addition, counsel could have elicited mitigating testimony from the few inmates whom they called as witnesses at the guilt-innocence phase of trial. The Amended § 2255 Motion describes mitigating evidence the defense could have elicited from Billy Santiago, who described Mr. Agofsky as a person who avoided problems and tried to stop fights. *See* Amended § 2255 Motion at 160. Scott Lawson also told the defense investigator important information that the defense never elicited but could have used at the penalty phase. Mr. Agofsky did not use drugs or alcohol or smoke cigarettes. He worked out every day on the yard along with a lot of inmates, including Lawson. Mr. Agofsky was a "stand up" individual who did not get into trouble on the yard. SA 2083.

Robert Ecker, the third inmate who testified at the guilt-innocence phase, also could have provided mitigating testimony about Mr. Agofsky at the penalty phase. Mr. Agofsky was never in a gang and could take care of himself. Ecker could have described a time when Mr. Agofsky helped him get out of a bad situation. Ecker was in trouble and owed someone money. Mr. Agofsky gave him a couple of books of stamps to resolve his debt and prevent him from getting hurt. SA 2046.

Mr. Agofsky's fellow inmates could have provided compelling mitigating evidence – which could have been interpreted by expert testimony – for the jurors to weigh against the government's case in aggravation. Instead, the defense proffered little but argument that the Bureau of Prisons had the means to isolate him from other inmates and guards. There is a reasonable probability that mitigating evidence from other inmates, alone and in conjunction with additional evidence described in this Supplement and in the Amended § 2255 Motion, could have led at least one juror to vote against a death sentence. This instance of trial counsel's deficient performance, alone and in combination with all of counsel's other deficient performance, accordingly prejudiced the defense.

-164-

**E.      Counsel Failed To Obtain And Present Appropriate Mental Health Evaluations.**

The Amended § 2255 Motion explains that trial counsel's performance was deficient because they retained two mental health experts (only one of whom testified) without providing them with the results of a reasonably comprehensive mitigation investigation and without directing them to conduct reasonably comprehensive evaluations. *See* Amended § 2255 Motion at 161. In effect, counsel left the experts to fish in the dark for Mr. Agofsky's history, conducting their evaluations in a short time with no idea of what information they might find or whether anyone or anything could corroborate or elucidate what they learned through their evaluative interviews.[66] Partly as a result, important mitigating information, such as Mr. Agofsky's history of head injuries, went undetected, while other information, such as his trauma history, received only glancing development. Finally, trial counsel never obtained necessary follow-up examinations required by Mr. Agofsky's history. *See Walbey*, 309 Fed. Appx. at 803-04; *Adams*, 324 Fed. Appx. at 351-52.

A reasonably complete mental health investigation and presentation would have developed the contributions of experts who could have established Mr. Agofsky's neuropsychological impairments, post-traumatic symptoms, and depression. They could have explained the effects of emotional and physical trauma that helped to shape Mr. Agofsky's personality, the role of the martial arts study that dominated his childhood and teen years, and his performance in the prisons where he spent his late adolescence and young adulthood. Expert testimony could have helped the jury understand Mr. Agofsky and his behavior in three-dimensional terms instead of leaving them to work with the government's flat caricature while deciding his fate.

In a case similar to Mr. Agofsky's, *Miller v. Dretke*, 420 F.3d 356 (5th Cir. 2005), the Court

---

[66] Indeed, Barlow was forced to give notice of potential expert testimony before any of his experts had even visited Mr. Agofsky. Criminal Docket, Doc. 70 (May 13, 2004).

of Appeals for this Circuit granted *habeas* relief because trial counsel, like Mr. Barlow and Mr. Black, failed to develop mental health evidence in mitigation of sentence. At the non-capital sentencing trial, counsel elicited testimony from Miller and her ex-husband concerning her traumatic brain injury, mental health treatment, and memory losses, but counsel made no effort to contact her treating experts because he expected that she would plead guilty in return for a probationary sentence. *Id.* at 358-59. All three experts could have provided evidence of the Miller's organic and emotional impairments. *Id.* at 359. The Court of Appeals faulted trial counsel for deciding not to call Miller's physicians as witnesses without first speaking to them. *Id.* at 362, 363-64. The evidence would have been highly relevant to punishment because it would have provided an explanation for Miller's behavior and for the memory problems that affected her trial testimony. *Id.* at 363. The Court found that counsel's conduct was objectively unreasonable, and, after re-weighing the evidence in aggravation against the totality of the available mitigating evidence, that there was a reasonable probability that the sentencing outcome would have been different but for counsel's errors. *Id.* at 364-66.[67]

In Mr. Agofsky's case, as in *Miller*, trial counsel failed to develop highly relevant mental health evidence that could have served as substantial mitigating evidence:

*Neuropsychological Assessment.* Dr. Michael Gelbort, a board-certified neuropsychologist, administered a series of neuropsychological tests to Mr. Agofsky. SA 1701-02. He found statistically and clinically significant differences between Mr. Agofsky's high and low test scores.

---

[67] *Accord Worthington v. Roper*, 619 F. Supp. 2d 661, 688-89 (E.D. Mo. 2009) ("[H]ad the trial judge heard testimony from properly prepared defense experts, there is a reasonable probability that petitioner would have received a different sentence."); *McNeill v. Branker*, *supra,* 601 F. Supp. 2d 694, 721 (E.D.N.C. 2009) (counsel ineffective for failing to investigate social history and develop mental health evidence).

Specifically, Mr. Agofsky's lowest score fell at the fifteenth percentile, meaning that Mr. Agofsky's score was lower than all but 15% of population on that test. His highest score, in contrast, fell at the 98th percentile, an 83 percentage-point difference. SA 1697-98.

Dr. Ruben Gur, a board-certified neuropsychologist and professor at the University of Pennsylvania School of Medicine, analyzed Dr. Gelbort's data and prepared a behavioral image, a map of the brain that delineates areas of high and low functioning with different colors. SA 1710-11. He concluded that the test results reflected:

> clinically significant brain damage to the right frontal and right temporal lobes of Mr. Agofsky's brain. The damage to the frontal lobe would affect Mr. Agofsky's impulse control, judgment, emotional lability, and consequential thinking. The damage to the temporal lobe would affect his facility in attribution of intent to others and his memory, especially his memory of faces and locations.

SA 1709. Dr. Gur explained the significance of the wide differences between Mr. Agofsky's high and low scores:

> His scores range from substantially above-average (in the top 99 percent of the population) in some areas of brain functioning to moderately impaired (in the bottom third of the population) in other areas of brain functioning. Specifically, compared to his strengths in reasoning ability and basic intellectual functioning, he has relative deficits in tests designed to assess impulsivity, attention, and working memory. Particularly when surprised or in response to unexpected stimuli, the clinically significant impairments in these areas prevent him from being able to take advantage of his reasoning and intellectual skills.

SA 1711. Dr. Gur found that the results of the testing were consistent with brain damage in the impaired areas, in the front and back of the right hemisphere of the brain, and that Mr. Agofsky's higher functioning in some areas did not undercut the evidence of brain damage in other areas. "Brain damage can happen to anyone regardless of how well he or she functions otherwise." SA 1712-13. The areas of impaired function were consistent with the injuries described in the Romanowski report, which should have prompted any competent neuropscyhological expert at the

time of trial to administer a neuropsychological test battery. SA 1712. Dr. Gur described how Mr.

Agofsky's brain damage could have affected his behavior on January 5, 2001:

> I have reviewed the description of the trial testimony in the briefs prepared for Mr. Agofsky's appeal to the Court of Appeals for the Fifth Circuit. A situation such as that described by the defense witnesses at trial, in which Mr. Agofsky was in a locked recreation cage in a violent prison and was attacked by another inmate, would be the kind of stressful situation in which his impairments could affect his impulsivity and his judgment. Even if, as described by the prosecution witnesses at trial, the other inmate did not physically attack Mr. Agofsky, it would have been consistent with his impairments if he had perceived the presence of a threat and reacted impulsively with unmodulated aggression. An exaggerated startle response when faced with what his brain perceives as a threat, followed by a decisive but reflexive physical reaction, is consistent with what one would expect from a person suffering from frontal and temporal lobe damage.

SA 1715-16. Dr. Gelbort reviewed Dr. Gur's report and found that it accurately reported his test

results and accurately described the areas of the brain implicated by the lowest and highest scores.

SA 1697. He concurred with Dr. Gur's conclusions:

> Dr. Gur and I concur in our views of Mr. Agofsky's relative deficits in the areas of impulsivity, attention, and working memory. His pattern of scores and his deficits are neuropsychologically significant and consistent with brain damage, as Dr. Gur describes. Mr. Agofsky's pattern of scores and his deficits are consistent with incidents involving head injuries and other potential neurological insults in his background. His history should have prompted inquiry by a mental health professional. . . . Further, having reviewed the statements of facts prepared by the two sides during Mr. Agofsky's direct appeal, I conclude that the brain damage evidenced by these particular deficits would have affected his behavior in the circumstances described at trial, a fight between inmates locked in a small recreation cage in a violent prison. In my opinion, his brain damage and neuropsychological deficits would have provided substantial mitigating evidence that could have been used at trial.

SA 1698-99.

*Trauma History and Its Effects.* Dr. Paula Lundberg-Love, a Professor of Psychology at the

University of Texas at Tyler and a diplomate of the American College of Forensic Examiners and

the American Psychotherapy Association, evaluated Mr. Agofsky and reviewed records, witness

statements, and the reports of other experts. SA 1816. She found his childhood and adolescence noteworthy for a series of traumatic incidents. SA 1817. In addition to the incidents noted by Drs. Gelbort and Gur, which had the potential to cause organic brain damage, Dr. Lundberg-Love described another series of incidents that could have caused chronic traumatic stress, affecting both the development of his brain and his emotional development. SA 1820.

- In his early grade-school years he was chronically a target for beatings by older children on the way to and from school.

- His father died in an airplane accident when he was nine years old.

- His mother thereafter suffered from severe depressive symptoms for an extended period and was emotionally unavailable to him.

- At age nine, he was enrolled in a martial arts school where he was placed in a class with adults, making it necessary for him to train and spar with persons much older and stronger than he was. He continued his studies in that school for ten years.

- As a teenager, in addition to his formal martial arts training, he enrolled in "tuff man" competitions where he sustained repeated injuries.

SA 1820. Having considered the impact of these episodes, Mr. Agofsky's martial arts training, and his years of incarceration beginning in late adolescence, Dr. Lundberg-Love concluded:

> In my professional opinion, based upon the extensive records that I reviewed for this case, as well as the results of my clinical interview of Mr. Agofsky, that the repeated physical victimization perpetrated on him during his childhood, coupled with other instances of childhood trauma such as the death of his father and the depression of his mother, led to the development of significant posttraumatic symptoms such as fear, anxiety, hypervigilance, and powerlessness. He came to view the world as a very dangerous place. Thus, when Mr. Agofsky was introduced to martial arts training, he finally found a coping skill to ameliorate some of his posttraumatic anxiety symptoms and his fear of the world. As he became adept at Hwa Rang Do and internalized its philosophy, Shannon incorporated dichotomous (right and wrong/black and white) thinking as well as a strong commitment to defend the weak and vulnerable. These factors played a significant role in Mr. Agofsky's childhood and adolescent development, and they were reinforced when he was exposed to the violence of the prison system. These same factors – especially hypervigilance and reliance on his martial arts training as a coping skill – would have come into play

when he perceived a sudden threat from another inmate in a locked recreation cage. That information, coupled with his organic brain impairment, the etiology of his "protector" behavior, the nature of the prison environment, and the affidavits of inmates that support the issues raised in this affidavit, could have been investigated by his previous counsel and the information could have been presented during the guilt-innocence and/or mitigation phases of his 2004 trial.

SA 1825-26.

*Personality Testing and Evaluation.* Dr. Erin Spiers, a clinical psychologist who works with Park Dietz & Associates of Newport Beach, California, evaluated Mr. Agofsky, administered personality tests, and reviewed records, witness statements, and the reports of other experts. SA1788. She identified several areas that could have been explored by a mental health expert in 2004: potential neuropsychological compromise, family psychiatric history, major traumatic life events, and institutional climate within the Bureau of Prisons. SA 1794-1800. Regarding Mr. Agofsky's trauma history, she concluded:

> An appreciation of an individual's psychosocial history is inherent to any comprehensive psychological evaluation and is part and parcel of a competent conceptualization. As outlined above, in Mr. Agofsky's case, his history includes myriad elements that can clearly adversely impact psychological development and, in his case, help to mold his rigid dichotomous world view. The cumulative effect of any/all of these incidents should have been considered, examined, addressed, and ruled in or out as part of any comprehensive psychological work-up and could have been presented as mitigating evidence at Mr. Agofsky's 2004 trial.

SA 1798. Regarding Mr. Agofsky's institutional adjustment, Dr. Spiers observed:

> Mr. Agofsky has spent almost half of his life behind bars. As such, it is apparent that his survival has been dependent, in part, upon his ability to adapt to prison culture and to negotiate the demands of his environment. The reality of prison life includes hypervigilance to one's surroundings, the ability to engage in self-protection, and the ability to assert oneself as necessary. Despite the pull toward racial segregation and gang affiliation, Mr. Agofsky appears to have been able to remain independent. This is likely due, in part, to his significant personal identification with the principles of Hwa Rang Do, the particular version of martial arts that Mr. Agofsky practices. Nevertheless, Mr. Agofsky's survival requires him to function within the reality of the context in which he lives. All of this information could have been presented in mitigation in Mr. Agofsky's capital trial in 2004. To disregard the very real impact

of institutional environment would be tantamount to disregarding an individual's environment in the free world (e.g., the important distinction of socioeconomic status, race, religion, etc.).

SA 1800.

Dr. Spiers administered the Minnesota Multiphasic Personality Inventory-2 and the Millon Clinical Multiaxial Inventory-III to Mr. Agofsky, and found that his test results did not reveal any objective evidence of major mental illness and his clinical profiles were within normal limits.  SA 1801.  He did not endorse any signs or symptoms of mental illness or personality disorder.  SA 1801.  The historical information Dr. Spiers had reviewed indicated that he had in the past met the DSM-IV-TR criterial for major depressive disorder.  SA 1802.  On the other hand, she concluded that he does not meet the DSM-IV-TR criteria for Antisocial Personality Disorder (ASPD) as there was no evidence of conduct disorder before age 15.  SA 1803.

> Given the crime(s) for which Mr. Agofsky has been convicted, one might simplistically think a diagnosis of ASPD was indicated.  However, even if one were to inappropriately look past the fact that Mr. Agofsky does not meet DSM-IV-TR criteria for ASPD, a critical analysis of Mr. Agofsky's presentation as a whole (e.g., the context/environment in which he lives, his interpersonal relationship history, his ability to remain focused and goal directed, responsibility, and his demonstrated capacity for empathy) reveals that a diagnosis of Antisocial Personality Disorder is not indicated.

SA 1803.

*Psychiatric Evaluation.*  Dr. Lawson Bernstein, a psychiatrist who is a diplomate of the National Board of Medical Examiners and the American Board of Psychiatry and Neurology, evaluated Mr. Agofsky and reviewed records, witness statements, and the reports of other experts. SA 1757.  He found that Dr. Gur's analysis and Dr. Spiers's history and conclusions as to Mr. Agofsky's brain damage and personality traits were consistent with his own findings. SA 1763.  On the basis of his own evaluation and the information he had reviewed, Dr. Bernstein concluded that

Mr. Agofsky suffers from a mood disorder not otherwise specified, with features of both adjustment

disorder with depressed mood and major depressive disorder.  SA 1763-64.  He further exhibits

symptoms associated with PTSD, including marked hypervigilance.  SA 1764.  Mr. Agofsky's

numerous head injuries could account for his "discrete mood disorder episodes."  SA 1764.  Dr.

Gelbort's neuropsychological tests revealed brain damage that, Dr. Bernstein found, was likely the

result of head trauma and was consistent with Mr. Agofsky's history.  The brain damage impaired

Mr. Agofsky's ability to perceive threat and modulate his responses to perceived threat.  SA 1764.

Dr. Bernstein could have provided opinion testimony concerning the issues before the jury.

Mr. Agofsky's conduct on January 5, 2001, was an acute stress reaction prompted by his

omnipresent hypervigilance and the perceived threats, and exaggerated by his brain organicity,

which rendered him substantially incapable of a measured, contemplative response.  SA 1765. His

mental disorders and brain damage could have supported statutory mitigating factors, in that his

hypervigilance, brain damage, and other factors significantly impaired his ability to assess and

modulate his responses to threats, and resulted in severe mental or emotional disturbance at the time

of the offense.  SA 1766.  Furthermore, Bernstein found, the evidence supported non-statutory

mitigation:

> Mr. Agofsky's young life was marked by loss, neglect, abandonment (through the
> death of his father and his mother's inability to maintain the role of a caring mother
> in the years that followed), and the nearly constant assaults and threat of assault by
> neighborhood bullies.   These affected Mr. Agofsky's ability to form normal
> interpersonal relations and often resulted in a distrust of the intentions of those
> around him.  The brain trauma likely resulting from years of unregulated or poorly
> regulated fighting events compounded Mr. Agofsky's ability to perceive threats,
> moderate his response, and recognize the consequences of his conduct without a
> substantial time for reflection.

SA 1766.

If trial counsel had conducted a reasonable mitigation investigation, and had provided the

information they collected to their own mental health experts, those experts would have reached conclusions similar to those summarized above, and could have so testified.

Dr. Edward Gripon, the psychiatrist whom Mr. Barlow consulted but did not call as a witness, interviewed Mr. Agofsky once at the Liberty Jail on June 4, 2004. Barlow asked Dr. Gripon to let him know if he thought Mr. Agofsky had any obvious mental illness. He did not ask Gripon to address future dangerousness or neuropsychological impairment, or to develop mitigating factors for the penalty phase. After the evaluation, Gripon spoke briefly to Barlow, who told him he would be in touch, but Gripon never heard from him again. SA 2789.[68]

Gripon did not find that Mr. Agofsky suffered from the kind of obvious and serious mental health condition that was the focus of Barlow's interest, but he learned enough from the prison records he received from Barlow, his evaluation, and the information Mr. Agofsky provided to develop some understanding of Mr. Agofsky's background and functioning. SA 2790. If he had testified, he could have helped the jury to understand why Mr. Agofsky reacted as he did and addressed the government's claims of future dangerousness. *Id.* He and Mr. Agofsky discussed Mr. Agofsky's background, his father's death, his study of martial arts, and his institutional infractions. Mr. Agofsky told Gripon that violence is a significant problem in maximum security settings in the federal prison system and explained how he had managed to survive. *Id.*

Dr. Gripon did not find that Mr. Agofsky was an especially dangerous inmate:

> . . . Mr. Barlow did not ask me to assess Mr. Agofsky's future dangerousness and I did not particularly focus on that aspect of my evaluation. I did not diagnose antisocial personality disorder; in fact, I did not have enough information for any

---

[68] *See McNeill v. Branker, supra*, 601 F. Supp. 2d at 719 (finding counsel ineffective, in part, because he "did not ask Dr. Bellard if he could offer evidence in support of any statutory or non-statutory mitigators and did not even discuss the topic of mitigating evidence with Dr. Bellard beyond whether he could diagnose petitioner with an identifiable mental disorder.").

diagnosis on Axis II of the Diagnostic and Statistical Manual, or DSM-IV-TR. . . . If asked, I could have testified that Mr. Agofsky was no more dangerous than any other prisoner who wanted to protect himself from violence.   He was not, in my judgment, an inherently dangerous person but was surviving in a dangerous environment.

SA 2791.

Gripon has reviewed the social history information in the Romanowski report and in the declarations of persons who knew Mr. Agofsky.  Information of that kind would have enabled him to form a more reliable assessment of Mr. Agofsky in 2004.  SA 2793.  In particular, if he had learned of Mr. Agofsky's history of head injuries and other potential insults at that time, he would have recommended that Barlow seek neuropsychological testing.  *Id.*  Gripon concurs with the conclusions of Drs. Gelbort and Gur that the test results are consistent with brain damage, and with their explanations of how Mr. Agofsky's deficits would affect his behavior and functioning.  *Id.*

Similarly, Gripon concurs with Dr. Lundberg-Love's assessment of the effects of chronic traumatic stress, and could have explained the emotional and organic effects of such stress in 2004 if he had been asked to do so.  SA 2793.  Similarly, the results of personality testing administered by Dr. Spiers were consistent with Gripon's own clinical understanding.  If similar testing had been performed in 2004, Gripon could have described and interpreted the test results to the jury.  SA 2793-94.

Gripon also concurs with Dr. Bernstein's "overview of the myriad ways in which a psychiatric assessment could have assisted the defense at both phases of Mr. Agofsky's trial."  SA 2794.  He could have testified, as Bernstein indicates in his report, that Mr. Agofsky's episodes of depression, along with his brain damage and post-traumatic symptoms, support  two statutory mitigating factors, impaired capacity and mental or emotional disturbance.  SA 2795.  He also endorses Bernstein's description of "how the physically and emotionally traumatic events of Mr.

-174-

Agofsky's life affected his functioning and should have mitigated his punishment," supporting the non-statutory "catchall" mitigating factor.  SA 2796.

Dr. Dan Roberts, the clinical psychologist who testified for the defense at Mr. Agofsky's 2004 trial, also testified at his deposition that he himself could have developed and presented much of the same evidence provided to him by postconviction counsel, or else could have made appropriate referrals, if trial counsel had asked him to do so.  He could have helped to develop or present neuropsychological evidence or personality testing if Barlow had requested it, and he could have reviewed information about the traumatic incidents in Mr. Agofsky's past and assessed their effects.  SA 759-60.  For example, he concurred with several experts who stated that the head injuries and other potential neurological insults included in the social history report of Marilyn Romanowski should have prompted a neuropsychological workup.  SA 761-64, 765.  He "probably" would have referred Mr. Agofsky if he had known of the incidents, and he would have recommended that Barlow consult a board-certified neuropsychologist rather than conducting the testing himself.  SA 764-65.  Other potentially significant information in the Romanowski report included the bullying Shannon encountered in Las Vegas, the fact that his mother blamed him for his father's death, his mother's depression, the further bullying in Noel, Missouri, and information about martial arts.  Roberts could have presented such information if he had known of it and the court had allowed him to testify about it.  SA 765-69.

Roberts had reviewed the reports of Dr. Gelbort and Dr. Gur.  He had no reason to doubt the accuracy of Dr. Gelbort's test results[69] and could have explained his report to counsel or the jury.

---

[69] Roberts mentioned additional "medical" scans such as "Cat [sic] scans and EEGs and CT scans and MRIs."  SA 828.  Drs. Gur and Gelbort have explained that those procedures have not replaced neuropsychological testing as a tool for diagnosis and treatment of brain injuries. Neuropsychological tests provide important information about the ways in which an individual is

SA 770-771.[70]  The pattern of low scores reflected on the tests was possibly consistent with Mr.

Agofsky's injuries, and the areas of "neuropsychological weakness" related to those low scores

could have affected his behavior.  SA 771, 827.  He might not have been attentive to what was going

on during the fight, might have mis-perceived something, and could have had delayed reactions to

what was happening.  SA 772-773.[71]  Roberts stressed that other factors, besides neuropsychological

factors, could have influenced Mr. Agofsky's behavior on the day of the fight: the violent

atmosphere in a maximum security prison, his history of martial arts training, and "his history of

being beaten up as a kid" would all have contributed to his hypervigilance and readiness "to protect

himself in a dangerous situation."  SA 774-75.

Dr. Roberts concurred with Dr. Bernstein's observation that Mr. Agofsky is hypervigilant

---

actually *functioning* and the regions of the brain associated with any impaired functions.  SA 2780-81, SA 2784.

[70]  Roberts expressed curiosity about the norms used to compare Mr. Agofsky's performance on one of the neuropsychological tests to the mean.  SA 773.  Drs. Gur and Gelbort have explained that Dr. Gur, relying on a procedure he developed and published in peer-reviewed journals, used the best norms available for each test included in the procedure, meaning those that used the largest sample sizes in the methodologically cleanest studies.  On the test about which Dr. Roberts testified, Dr. Gur used Heaton's norms.  The norms that Dr. Roberts questioned, developed by Halstead and Reitan, were not used.  SA 2779, 2784.

[71]  Roberts characterized Mr. Agofsky's score on one of the tests analyzed by both Gelbort and Gur as a "pretty normal score," but recognized the wide gap between the highest and lowest scores.  SA 773. Roberts has corrected a transcription error that misstated his testimony and understated how low that lowest score was.  SA 692.  Dr. Gur, who is joined in his opinion by Dr. Gelbort, has responded: "[Mr. Agofsky] had a consistent set of low scores that related to specific regions of his brain and were dramatically lower than his scores on tests related to other regions of his brain.  It was this overall pattern that led me to conclude that his scores are consistent with brain damage.  It is not 'normal' for someone who scores in the 98th percentile on a number of tests to score below the fourteenth percentile, as Mr. Agofsky did, on other tests."  SA 2780, 2784.  Furthermore, even standing alone, Mr. Agofsky's lowest score was more than one standard deviation below the mean, in a range that psychologists call clinically significant.  SA 2779-80, 2784.

and that during the Plant incident he was reacting in survival mode. While Roberts did not consider

Mr. Agofsky incapable of forming intent,

> Sometimes when people are in the middle of a conflict, an extreme conflict, they don't think. The simply act on instinct, adrenalin leads the way, and then drives the behavior, and then afterwards they sometimes don't even remember what just happened because it's sort of a , you know, hysterical dissociative state kicks in. If something like that happened, then he might not be capable of being aware of what he was doing or in control of what he was doing.
>
> Q: Okay. So if his statement said that it's possible that Mr. Agofsky, despite his actions, wasn't intending to kill Mr. Plant, then could you agree with that possibility? Is that what you're saying?
>
> A: Yes.

SA 863. Not having received any information that would indicate that Mr. Agofsky had a mood

disorder in 2001, Roberts could not join Bernstein's opinion that he suffers from a mood disorder

not otherwise specified. SA 7857. He concurred with Spiers respecting information that could have

been developed in 2004. SA 874. He could have himself administered the personality tests that

Spiers performed, and concurred with her conclusions. SA 871.[72] Roberts was not familiar with the

neurochemical effects of traumatic stress on the developing brain, and so could not comment on

Lundberg-Love's discussion of that subject, but concurred with her discussion of the effects of

emotionally traumatic events on Mr. Agofsky's development and his functioning in prison. Roberts,

who often deals with the emotional consequences of traumatic incidents in his private practice, could

---

[72]    At the deposition, Dr. Roberts was uncertain whether Dr. Spiers administered the full MMPI-2. SA 871. In fact, she did so. SA 2785. The prosecutor asked Roberts on cross-examination whether the test was "scored by a computer." SA 870-71. Spiers has responded that she based her conclusions on her independent interpretation of the test results and her clinical observations. The computer-generated interpretive report provided objective data related to the normative population on each scale. Spiers used the computer-generated interpretive report as a cross-check on her own conclusions. SA 2786.

have investigated and presented evidence of this type in 2004 if asked to do so.  SA 782-86.[73]

Trial counsel chose to consult two mental health experts, but gave them almost no information to work with.  As a result, they missed clinically significant brain damage and a significant trauma history, and were unprepared to provide a persuasive evaluation of Mr. Agofsky's functioning and development, or to suggest appropriate referrals.  Furthermore, trial counsel made no use at all of Dr. Gripon, a psychiatrist, and never elicited the background information that Dr. Roberts, a psychologist, could have provided.  There is a reasonable probability that, but for trial counsel's deficient investigation and presentation of mental health evidence, alone and in combination with counsel's other deficiencies, the jury would have imposed a life sentence instead of the death penalty.  The Court must accordingly order an evidentiary hearing and grant relief on this ground

### F.     Counsel Presented A Poorly Investigated And Prepared Case On Future Dangerousness.

The Amended § 2255 Motion explains that trial counsel's only argument in favor of a life sentence was that the Bureau of Prisons could prevent Mr. Agofsky from harming other inmates by isolating him in the future.  *See* Amended § 2255 Motion at 164.  Counsel advanced their theory through the testimony of two prison consultants, a criminologist, and a clinical psychologist, but all of them gave superficial testimony unsupported by details about Mr. Agofsky's background,

---

[73] On cross-examination at the deposition, the prosecution questioned Dr. Roberts extensively about statements in Mr. Afosky's letters concerning the Michael Miele incident and other topics.  SA 841-62.  These letters were provided to the defense by the government shortly before trial and were introduced at trial.  Tr. Vol.19, 287; Tr. Vol. 21, 129-40.  The fact that they contained statements that the government used against Mr. Agofsky both at trial and at the Roberts deposition, far from undermining the mitigating value of a reasonably prepared mental health presentation, only underscores  trial counsel's deficiency in failing to investigate and prepare to address evidence the government would almost certainly introduce.  *See Rompilla*, 545 U.S. at 385-90; *Adams*, 324 Fed. Appx. at 352.

information from persons who knew him, mental health assessments, or data and research about the institutional environment in which he served the eleven years of incarceration that preceded the Plant incident. *See Walbey*, 309 Fed. Appx. at 802.

All of this information would have been invaluable to the experts upon whom trial counsel relied for their future dangerousness and prison adjustment presentation. Dr. Craig Haney, a professor of psychology at the University of California at Santa Cruz, who holds both a Ph.D. degree and a J.D. degree, has engaged in extensive research on the psychological effects of living and working in institutional environments, including penal institutions, and the social and institutional histories of persons accused or convicted of violent crimes. Dr. Haney has testified and consulted extensively in capital cases. SA 1893. He explains the importance of an adequate investigation to underpin a defense case on prison adjustment and future dangerousness:

> To prepare a defense case on prison adjustment and/or future dangerousness, counsel must obtain as much information as possible, from as wide a set of sources as possible. In order to truly understand the defendant – the person who will enter and be expected to adjust to imprisonment – counsel must gather information from persons who knew the defendant during his childhood, adolescence, and adulthood, and during any previous periods of incarceration. Counsel must gather records, including school records, family records, medical and mental health records, and prior arrest, prosecution, and institutional records. Counsel must consult with appropriate mental health experts and seek to obtain any indicated neuropsychological or other relevant testing.
>
> Finally, counsel must seek to obtain in-depth information about certain specific institutional settings and contexts. This must include detailed information about the particular institutions and units in which the defendant was housed in the past, information about the individualized or special circumstances that may pertain to and help explain the defendant's prior adjustment and potentially shed light on any institutional infractions that may appear in his record. Counsel must also acquire as much information as possible about the institutions and circumstances in which the defendant is likely to be confined in the future (i.e., to which he will be expected to adjust). Reliance on institutional records alone is not sufficient to form an accurate and meaningful assessment of prison adjustment and future dangerousness.

SA 1894-95.

In addition to conducting a reasonably thorough mitigation investigation and a reasonably developed mental health assessment, and then presenting the results to the experts who were to testify about Mr. Agofsky's prison adjustment and future dangerousness, trial counsel could have sought and presented research and data to support their claims. As the Amended § 2255 Motion describes, counsel could have presented data showing that in 2001 USP Beaumont was among the most violent penitentiaries in the Bureau of Prisons. Dr. Mark Cunningham, a board-certified clinical and forensic psychologist, describes additional research that could have been presented. SA 1867-68. Research available in 2004 demonstrates that features of the prison environment – rather than features of individual inmates – more powerfully account for inmate violence and inmate defensive reactivity to anticipated or future violence. In social science terms, the research demonstrates that contextual factors matter more than importation factors in predicting future danger. SA 1867, 1878-79.

Dr. Elizabeth Pelz, the criminologist whose testimony Barlow offered at the penalty phase, agrees with Dr. Cunningham that an understanding of correctional context is crucial to assessing the risk of prison violence. SA 2801. Her ignorance of Mr. Agofsky's context and background hampered her ability to offer useful testimony at trial:

> Mr. Barlow wanted me to testify about whether I believed Mr. Agofsky would be able to adjust and live in an administrative segregation prison environment such as the one maintained in the control unit at the Administrative Maximum facility ("ADX") in Florence, Colorado. I told Mr. Barlow prior to trial that, based on the information provided, I could not comment on any type of psychological adjustment. I specifically told Mr. Barlow before trial not to press me on that issue. During my testimony, Mr. Barlow asked me whether I believed that Mr. Agofsky was the type of inmate who, when kept away from other inmates, such as in administrative segregation, he would be able to adequately cope in that environment. My response in front of the jury was that I did not know and that was an area that I should not comment upon because it was more of a psychological issue. I had no choice but to respond as I did, leaving the jury with no response from me about whether Mr. Agofsky could adjust to administrative segregation. I was really surprised when Mr.

> Barlow asked this since I had specifically told him before trial that I was unprepared to answer this question.

SA 2799-2800 (citations omitted).  In contrast, in other cases, Dr. Pelz has worked with defense attorneys who provided her with much more background information about the defendant and the case, including social history reports, psychological assessments of the defendants, and opportunities to interview the defendants and sometimes their family members.  SA 2802-03.  In those cases, armed with "a very rich and extensive background," she was able to provide an opinion on the details of the incident and the dangerousness of the defendant.  SA 2803.[74]

In Mr. Agofsky's case, if Dr. Pelz had received information similar to what she had received from postconviction counsel, she could have commented on many aspects of the case that would have been relevant to future danger and prison adjustment: the effects on individual inmates of a violent environment like the one at Beaumont; the practice of "checking in" and other unwritten prison rules; the role of gangs; the impact of the drug trade on prison violence; and the disfavored role of "snitches" in prison.  SA 2800-03.

Prison consultant Terry Pelz, if he had received materials similar to those provided by postconviction counsel, could have provided detailed testimony on Mr. Agofsky's past and future prison adjustment.  He concurs with Haney's and Cunningham's conclusions.  SA 2813.  If Barlow had arranged for Pelz to tour ADX, or asked him to educate himself about administrative segregation in the federal system and obtain statistics about violence there,  Pelz could have testified with more authority.  Instead, he found himself vulnerable to cross-examination about his unfamiliarity with

---

[74]  *See Worthington v. Roper, supra,* 619 F. Supp. 2d at 687-88 (psychiatric pharmacist, who normally worked with psychologist or psychiatrist but was only defense expert at original trial, "'overwhelmed' by the amount of relevant information that was available and not provided to him before he testified at the penalty hearing," and revised findings after reviewing records and reports of other mental health professionals).

the federal Bureau of Prisons.  SA 2812-13.

Pelz could have described his visit to Mr. Agofsky at the Liberty Jail, where it did not appear to Pelz that the authorities considered Mr. Agofsky especially dangerous:

> I was surprised by how lax the guards were with Mr. Agofsky.  The guards called him by his first name.  I also remember when the interview was over, the guards left Mr. Agofsky unattended in the security hallway outside the office/broom closet where the interview took place.  I also recall that he was not restrained other than handcuffs cuffed in the front.  I observed that Mr. Agofsky appeared to get along with the staff, and they certainly did not treat him like a maximum security inmate.  Jay Bennett told me that Mr. Agofsky got along with everyone there and had a good reputation.

SA 2807.

If Barlow had asked Pelz to give an opinion on the Luther Plant incident, he could have explained that an inmate in a recreation cage knows that he cannot expect the guards to help him but must protect himself if he is attacked.  An inmate in a violent institution like Beaumont, where many other inmates carry knives, must be on guard at all times.  SA 2808.  Pelz could have explained the inmate practice of "checking in," the role of "snitches," and the strength necessary for an inmate like Mr. Agofsky to remain a loner instead of seeking the protection of a gang.  SA 2809-10.  He could have testified that, as an Assistant Warden in the Texas prison system, he had known Luther Plant as a suspected drug mule and gang member.  SA 2809.  Additionally, Pelz could have provided context for Mr. Agofsky's institutional infractions.  He recalled telling Barlow that Mr. Agofsky's prison record was not remarkable, and that considering the amount of time he had been incarcerated, he had not received many infractions.  SA 2810-12.

Harvey Cox, a retired warden and administrator for the federal Bureau of Prisons who now maintains a private consulting practice, was retained by Barlow and testified that the BOP could house Mr. Agofsky securely in a facility like the "control unit" at ADX.  Tr. Vol. 22, 186.  The

government cross-examined him about the fact that he had been retired for eleven years and was unfamiliar with data or other information about assault rates in the control unit, and rebutted his testimony by presenting Michael Cooksey, a high-ranking BOP administrator who had helped advise the Bureau about the design of the control unit, and later sat on the panel that deliberated on those inmates' readiness for release to lower-security conditions.  Tr. Vol. 22, 194-202, 246-54.

Mr. Cox has reviewed materials he received from postconviction counsel, including the reports of Dr. Mark Cunningham.  SA 2815.  He would have found data on the almost non-existent assault rates at ADX, like those contained in the Cunningham report, very helpful to support his opinion that the BOP had the means to house inmates like Mr. Agofsky safely and to withstand cross-examination.  SA 2815-16.  Barlow did not provide Cox with or ask him to obtain such data.  In another case, at the request of counsel, Cox obtained data on assault rates at ADX.  He could have made a similar request for data for Mr. Agofsky's trial if Barlow had asked him to do so.  SA 2815.  Furthermore, if Barlow had asked, Cox could have obtained information like that detailed elsewhere in Cunningham's report, describing assault rates at USP Beaumont, to help demonstrate that it was one of the most violent institutions in the BOP at the time of the Plant incident.  SA 2815-16.

Dr. Roberts, who had only received prison records from Barlow (SA 719), agreed that the additional types of information that Haney described could all be helpful in preparing a case on prison adjustment.  SA 788-94.  Dr. Cunningham's conclusions about the importance of contextual factors in assessing the risk of prison violence, Roberts testified, "seem[ed] reasonable," and that research was available in 2004.  SA 786-787.

Trial counsel sent four experts out to do battle against the government's case for future dangerousness without arming them with information they needed to do the job.  They knew about the government's ammunition against Mr. Agofsky – his prison record and prior convictions –  but

they had no idea of the abundant evidence available for fighting back. As a result, the experts functioned more like sitting ducks than battleships. The prosecution conducted withering cross-examinations,[75] exposing the flimsy factual bases for their opinions (Tr. Vol. 22, 193-201 (Cox), 224-30 (Roberts), 242-43 (T. Pelz)), and argued that the defense evidence supported, rather than contradicted, Mr. Agofsky's future dangerousness. For example, the government's attorney began his opening summation:

> Ladies and gentlemen of the jury, there is a fire burning inside Shannon Agofsky. It's been burning and raging ever since the night that Dan Short was thrown off the Cow Skin Bridge in Oklahoma. Psychologists, his own psychologist called it antisocial disorder. Regular folks, you just call it that he's a killer.

Tr. Vol. 24, 332.[76] Later, he argued:

> Question No. 1: "Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant represents a continuing danger to the lives and safety of other persons?" That's the most important question that you will have and the easiest one that you should be able to answer. His own psychologist, at best, painted him as antisocial. At best his psychologist told you that he was antisocial. He said that he has an us versus them attitude. And he said this: the defendant in his mind feels justified in attacking people that he doesn't like."
>
>   Future danger? "Yes" and "Yes." . . . I would submit that just the one factor of future dangerousness outweighs any of those mitigating factors that you heard about.

Tr. Vol. 24, 338-39. The prosecutor reiterated the same theme in his rebuttal summation, arguing that "His own psychologist, at best, painted him as antisocial." Tr. Vol. 24, 339. He predicted that,

---

[75] In the case of Dr. Elizabeth Pelz, the prosecutors apparently concluded that defense counsel had done the job for them and conducted no cross-examination. Barlow elicited Pelz's testimony that she was unqualified to give an opinion about Mr. Agofsky's prison adjustment and that she had never met him. Tr. Vol. 22, 236, 237.

[76] As discussed in the next section, this argument mischaracterized Roberts's trial testimony. But Roberts had received no specific information about Mr. Agofsky's childhood and youth with which he could have counteracted the cross-examination at trial about conduct disorder, enabling the prosecutor to distort the testimony in summation.

if Mr. Agofsky did not receive a death sentence, he would spend a few years in the control unit and then "rotate out." Tr. Vol. 24, 367. Because counsel had failed to obtain statistics from the BOP about ADX at Florence, Colorado and other control units, they could not effectively cross-examine the government's witnesses and the defense trial experts were ill equipped to respond to questions from the government.

Counsel's failure to prepare a reasonably reliable rebuttal to the government's case for future dangerousness, and their presentation of expert testimony on prison adjustment without preparing their experts with the information they needed for well-founded opinions, was deficient performance that prejudiced the defense. There is a reasonable probability that, but for counsel's deficient performance in this respect, alone and in combination with their other deficiencies, the outcome of the penalty phase would have been different. It is reasonably probable that the jurors would have spared Mr. Agofsky's life if trial counsel had given them some reason to do so besides speculation about whether the Bureau of Prisons could guarantee that he would never get into another fight.

> **G.      Counsel Failed To Advocate For The Introduction Of Admissible Mitigating Evidence, To Object to Misleading Cross-Examination And Summation Arguments, Or To Object To The Submission Of Factually Unsupported Or Inadmissible Non-Statutory Aggravating Factors To The Jury.**

> **1.      Counsel Failed To Advocate Effectively For Clearly Admissible Mitigating Evidence That The Court Erroneously Excluded.**

Mr. Agofsky argues in the Amended § 2255 Motion that Mr. Barlow, who handled most of the defense evidentiary presentation at the penalty phase, unreasonably abandoned his effort to elicit the limited background information that Dr. Roberts had managed to unearth during his two interviews of Mr. Agofsky and brief phone call with his mother. Barlow simply gave up after the prosecution raised an unsound hearsay objection to Roberts's recounting of what Mr. Agofsky had told him. Tr. Vol. 22, 211-13; *see* Amended § 2255 Motion at 169.

As the Amended § 2255 Motion explains, Mr. Agofsky's hearsay statements to Dr. Roberts during his evaluation were admissible for three reasons: (1) hearsay is admissible at the penalty phase of a capital trial unless "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury," 18 U.S.C. § 2593(c); (2) hearsay is always admissible in federal sentencing proceedings, *see* F.R. Evid. 1101(d)(3);[77] and (3) even under Federal Rule of Evidence 703, which the court erroneously applied without any objection from Barlow, hearsay that forms the basis for an expert's opinion is admissible if the judge determines that its "probative value in assisting the jury to evaluate the expert's opinion substantially outweighs [its] prejudicial effect."  Furthermore, Mr. Agofsky contends, the admissibility of his proffered mitigating evidence was constitutionally guaranteed.[78]

Barlow's failure to argue the controlling statute and rules to the court was deficient performance.[79]  In addition, he was deficient in failing, at a minimum, to attempt to satisfy the requirements of Rule 703, which he could easily have done by asking Roberts appropriate questions. Roberts could have testified that it is customary in his field for professionals to interview patients whom they evaluate, and to use what they learn from those conversations in forming their opinions. Roberts could have explained to the court – and the jury – why the patient's own statements are

---

[77]  The prosecution made this very point at a pretrial hearing, opposing a hearsay objection by Mr. Black with a citation to Rule 1101, and arguing that hearsay is admissible at federal sentencing proceedings.  Tr. Vol. 5, 41-43.  Neither party adverted to this discussion when the prosecutor made his hearsay objection during the defense penalty phase presentation.

[78]  *See, e.g., Tennard v. Dretke*, 542 U.S. 274, 284 (2004); *Green v. Georgia*, 442 U.S. 95, 97 (1979); *Lockett v. Ohio*, 438 U.S. 586, 605  (1978); *Chambers v. Mississippi*, 410 U.S. 284, 502 (1973).

[79]  *See Lyons v. McCotter*, 770 F.2d 529 (5th Cir. 1985); *Sessions v. State*, 129 S.W.3d 242 (Tex. Ct. App. 2004).

important.  SA 743-44.  Roberts could thus have provided a basis for a Rule 703 argument by Barlow that the probative value of the information Roberts had gleaned directly from Mr. Agofsky, for purposes of evaluating Roberts's expert testimony, outweighed its non-existent prejudicial effect.

Dr. Roberts was prepared to testify, until the prosecutor objected and Barlow abandoned that line of testimony, about Mr. Agofsky's background, which he had discussed with Barlow.  SA 743, 748.  Based on his own interviews, Roberts could have presented evidence concerning Mr. Agofsky's capacity for empathy and urge to protect the vulnerable, both before and after his incarceration.  SA 743-46, 796.  He could have described highly goal-directed behavior in childhood, good grades in school,  absence of disciplinary problems, and ten years of work toward attending the executive security institute in Colorado.  SA 746, 796.  Although he never heard about the bullying and beating the young Shannon endured in the first grade, Roberts could have described some bullying he encountered during his later school years.  SA 747.  He could have described Mr. Agofsky's protectiveness toward women.  SA 746, 797.  He could have described his father's death and his mother's "distraught" state afterwards, and explained that martial arts were important to him, with his teachers serving as father figures.  SA 797.

Barlow's deficient failure to resist the government's unsound hearsay objection prejudiced the defense, by depriving Mr. Agofsky of the only evidence gathered by his defense team that even began to present him in a human light to the jury.  There is a reasonable probability that, but for this instance of deficient performance, alone and in combination with the other deficient performance discussed in this supplement and the Amended § 2255 Motion, the jury would have spared Mr. Agofsky's life.

> **2.**     **Counsel Failed To Object To Unfounded Cross-Examination About Mr. Agofsky's Non-Existent Antisocial Personality Disorder And Other Improper Questions.**

As the Amended § 2255 Motion explains, the prosecutor, after preventing Dr. Roberts from describing for the trial jury the information he had learned from Mr. Agofsky and his mother about his childhood, then conducted a misleading line of questions on cross-examination. *See* Amended § 2255 Motion at 177. First he secured Roberts's assent that Mr. Agofsky "fits the composition of adult antisocial *behavior*." Tr. Vol. 22, 224. Then he suggested that Mr. Agofsky would satisfy the criteria for antisocial personality *disorder* ("ASPD"), but for the fact that Roberts had no information about his behavior before eighteen.[80] He elicited Roberts's agreement that the only reason he could not find ASPD was that "you're not able to formulate activities or dispositive behavior prior to eighteen." Tr. Vol. 22, 224-25. Barlow neither objected nor attempted to rehabilitate Roberts following this line of questioning. *See Walbey*, 309 Fed. Appx. at 803-04 (counsel ineffective, in part, for failing to rehabilitate own expert following damaging cross-examination on antisocial personality disorder).[81]

Roberts could have explained on redirect examination that "adult antisocial behavior" is a V-code in the DSM-IV, the diagnostic and statistical manual of the American Psychiatric Association. A V-code in that manual provides "descriptive" information "that wouldn't technically be considered a significant illness in and of itself." SA 750. The "adult antisocial behavior" code applies to a person who has exhibited some antisocial or criminal behavior. The designation

---

[80] To conform with the recognized criteria for ASPD, the prosecutor should have asked about behavior before age fifteen. SA 751.

[81] Of course, if trial counsel had conducted an independent social history investigation and provided Roberts with its results, his damaging testimony on this topic could have been prevented altogether. *See Johnson v. Bagley, supra,* 544 F.3d at 605 ("This unhelpful testimony [concerning ASPD from the defense expert] could have been prevented if the attorneys had conducted a competent investigation and given Hawkins a more complete picture of Johnson's background[.]").

indicates nothing other than the fact of the past acts. *Id.*

Further, Roberts could have testified that Mr. Agofsky did not meet the criteria for ASPD, which is not a V-code but a personality disorder in the DSM-IV. At the time of his testimony in 2004, he had no evidence "at all" that Mr. Agofsky had suffered from conduct disorder before age 15, one of the criteria for ASPD. SA 751. He had no evidence that Shannon habitually lied, conned people, used aliases, was consistently irresponsible, or engaged in fire-setting or cruelty to animals or younger children, stealing from other children, or truancy. SA 752.[82] He could have explained that the DSM diagnoses are not meant to be predictive, but descriptive. To predict future behavior, one would need to know not only an individual's DSM diagnosis but also historical and demographic data and information about the environment. SA 752-23.[83]

There is a reasonable probability that this instance of counsel's deficient performance, alone and in conjunction with counsel's other deficiencies, prejudiced the defense because there is a

---

[82] Indeed, Roberts learned many facts from the postconviction investigation that affirmatively contradicted the criteria for conduct disorder. SA 796-97. As Dr. Spiers has explained, conduct disorder is a "gatekeeper" criterion for antisocial personality disorder. Its presence indicates that antisocial traits have persisted across several life stages and represent a longstanding characterological personality pattern. If the gatekeeper criterion is not satisfied, a diagnosis of ASPD cannot be made. The postconviction information Spiers reviewed reflected, "not just an absence of information about conduct disorder, but extensive information that contradicts conduct disorder." SA 2787.

[83] At the deposition, the prosecution cross-examined Roberts, improperly, about whether the government could have responded to a defense mental health presentation by attempting to prove that Mr. Agofsky met the criteria for a "psychopath" in the Hare Psychopathy Checklist. SA 836-40. Aside from the impropriety of asking Dr. Roberts to speculate about what the prosecution would have done in response to a different presentation in 2004, the prosecutor asked Dr. Roberts about only eight of the items on the checklist; Dr. Roberts did not agree that many of those eight items even applied to Mr. Agofsky. Furthermore, the fact that some undiscovered or unpresented mitigating evidence might have drawn a prosecution response does not undo counsel's ineffectiveness in failing to conduct a reasonable investigation and engage in reasonable advocacy. *See Adams,* 2009 WL 1069330 at *7; *Walbey*; 309 Fed. Appx. At 804-05; *see also Williams v. Taylor*,529 U.S. 362, 396 (2000) .

reasonable probability that the jury would otherwise have spared Mr. Agofsky's life.

### 3. Counsel Failed To Object To The Prosecutor's Inflammatory Summation Remarks Arguing That It Was the Jury's Patriotic Duty to Sentence Mr. Agofsky to Death.

The Amended § 2255 Motion argues that trial counsel were ineffective in failing to object

to the prosecutor's misleading summation remarks concerning the defense psychologist's diagnosis.

*See* Amended § 2255 Motion at 180.   In addition, the prosecutor committed misconduct and

deprived Mr. Agofsky of a fair penalty hearing when he argued that it was the jury's patriotic duty

to sentence Mr. Agofsky to death:

> And finally, Walter Lord, a great historian, wrote a great novel, "A Time to Stand." It was about our war of independence for the State of Texas -- and by the way, you might know that the constitution of the Republic of Texas begins with the same worded preamble of the constitution of the United States. And he wrote: "They came from all parts of the country.  As a group they had little in common, yet these Texans have everything, *for they were all Americans sharing together a fierce love of liberty and a deep belief that the time had come to take their stand to keep it.*"
>
> Well, sometimes the fight finds us when we are placed in positions of being responsible citizens and making decisions of other's conduct, **it's time for you to stand.** The decision is clear, there is only one option. The death penalty is the only fair option based upon this evidence, based upon the defendant's own conduct, time to hold him accountable. Thank you.

Tr. Vol. 24, 376-77 (emphasis added).

In *Viereck v. United States*, 318 U.S. 236 (1943), while remanding on different grounds, the

Supreme Court condemned statements by the prosecutor regarding jurors' patriotism as irrelevant

to any facts or issues in the case.  The remarks found prejudicial were as follows:

> In closing, let me remind you, ladies and gentlemen, that this is war. This is war, harsh, cruel, murderous war. There are those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps.

-190-

> This is war. It is a fight to the death. The American people are relying upon you ladies and gentlemen for their protection against this sort of crime, just as much as they are relying upon the protection of the men who man the guns in Bataan Peninsula, and everywhere else. They are relying upon you ladies and gentlemen for their protection. We are at war. You have a duty to perform here.
>
> As a representative of your Government I am calling upon every one of you to do your duty.

*Viereck*, 318 U.S. at 247 n. 3.

The court concluded that the purpose of the appeal to patriotism could have only been to arouse passion and prejudice, and admonished the prosecutor to refrain "from improper methods calculated to produce a wrongful conviction." *Id*. at 246 (quoting *Berger v. United States*, 295 U.S. 78). The remarks at issue here were every bit as inflammatory as those condemned in *Viereck*. Both made unabashed appeals to patriotism; both incited the jury with wartime references, and both exhorted the jury, as good "Americans," to find for the government.

Insofar as trial counsel failed to properly object to the comments by the prosecutor, they were ineffective. As demonstrated above, the remarks were highly inflammatory and injected the extrinsic concerns of patriotic duty into the life/death calculus. There is a reasonable probability that, but for the defense failure to object to this highly improper appeal, at least one juror would have voted for life and the outcome of the penalty phase would have been different. Thus, alone and in conjunction with the other instances of deficient performance set forth *supra* and *infra*, counsel's errors prejudiced the defense. U.S. Const. Amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000).

### 5. Counsel Failed To Seek A Unanimity Of Theory Charge As To The Non-Statutory Aggravating Circumstance, Future Danger.

The question of future dangerousness permeated the penalty phase and was the principal consideration for both parties in their respective presentations. Trial counsel eschewed virtually any

mitigation case and devoted the entire penalty hearing presentation to rebutting the non-statutory

circumstance – put forth based on multiple theories with distinct facts in support – that Mr. Agofsky

was a future danger and would likely kill again in prison.  Yet the court failed to charge, and counsel

failed to request, a unanimity of theory charge.  Mr. Agofsky's rights to due process, a unanimous

jury and the effective assistance of counsel were violated.

The government had three distinct theories in support of this aggravating circumstance, all

of which were contested, though ineffectively, by the defense.

- Mr. Agofsky had historically displayed a pattern of unprovoked assaults and thus it was likely this pattern would persist in the future (proved through specific instances of prior conduct).

- The Bureau of Prisons did not have the capacity to adequately restrain Mr. Agofsky and prevent future assaults (proved through various experts, both defense and prosecution).

- Mr. Agofsky displayed antisocial traits (proved through defense expert Dan Roberts).

The theory and proof of each was conceptually distinct and each theory of this aggravating

circumstance could be found individually even if a juror had rejected the alternative theories.  Yet

the court failed to instruct that the jury unanimously agree as to at least one of the three factual

predicates before it could find this circumstance.  The failure to so instruct violated Petitioner's

rights under the Sixth and Fourteenth Amendments.

In pursuit of the first theory, the past equals the future, the prosecutor invoked Petitioner's

prior record and disciplinary infractions.  Referencing these incidents, he elicited opinion evidence

from defense expert Dan Roberts that the "best prediction of future violence the evidence of violent

past." Tr. Vol. 22, 231-32.

The same circumstance was then proved a different way and with different facts – evidence

was elicited that despite increased security measures the federal prisons were incapable of

-192-

preventing future violence.  To prove this the prosecution relied on both its own and defense experts.  For example, it elicited from former prison warden – and defense expert – Harvey Cox that "super-max" lock-down conditions are not mandatory under BOP policy and that an inmate who shows good behavior is eligible to be removed from such restrictive conditions after five to six years.  Tr. Vol. 22, 198.

Government expert Michael Cooksey, a former  BOP administrator, testified that if the jury imposed a life sentence, Mr. Agofsky would initially be placed in "super-max" conditions but in as little as a "few" years "probably" would be able to come into contact with other prisoners in a less restrictive type of incarceration.  *Id*. at 253-83.  Cooksey also warned that even in "super-max" conditions, guards can be subject to assaults by inmates, and he cited statistical evidence to that effect.  *Id*. at 258.

The government's third factually distinct theory was that Mr. Agofsky suffered from a mental disorder that rendered him "antisocial."  From defense expert Dan Roberts, a psychologist, the prosecution elicited that Mr. Agofsky "fits the composition of adult antisocial behavior," and that the "essential feature of antisocial personality disorder is a pervasive pattern of disregard for and violation of the rights of others." *Id*.  at 224.

In closing the prosecutor argued the antisocial theory:

> Ladies and gentlemen of the jury, there is a fire burning inside Shannon Agofsky. It's been burning and raging ever since the night that Dan Short was thrown off the [Cowskin] Bridge in Oklahoma. Psychologists, his own psychologist called it antisocial disorder.  Regular folks, you just call it that he's a killer.

Tr. Vol. 24, 339.

***

> His own psychologist, at best, painted him as antisocial. At best his psychologist told you that he was antisocial. He said that he has an us versus them attitude.  And he

-193-

said this: the defendant in his mind feels justified in attacking people that he doesn't like.

Tr. Vol. 22, 339.

The Fifth Circuit has routinely insisted on unanimity as to each theory of conduct where the "beyond a reasonable doubt burden" applies.

> Like the "reasonable doubt" standard, which was found to be an indispensable element in all criminal trials in *In re Winship*, 1970, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, the unanimous jury requirement "impresses on the trier of fact the necessity of reaching a subjective state of certitude on the facts in issue." 397 U.S. at 364, 90 S.Ct. at 1072, 25 L.Ed.2d at 375. The unanimity rule thus requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged. Requiring the vote of twelve jurors to convict a defendant does little to insure that his right to a unanimous verdict is protected unless this prerequisite of jury consensus as to the defendant's course of action is also required.

*United States v. Gipson*, 553 F.2d 453, 457-58 (5th Cir. 1977); *United States v. Correa-Ventura*, 6 F.3d 1070, 1078 (5th Cir. 1993) ("We note that there are two levels of unanimity necessarily involved in this question: unanimity as to verdict and unanimity as to the critical facts necessary to support that verdict").

The *Gipson* court endorsed the concept of "distinct conceptual groupings." *Id*. at 478.  The complaint in *Gipson* was that the defendant could be found guilty if found to have committed any of six prohibited acts ("receiving, concealing, storing, bartering, selling, or disposing on a stolen vehicle moving in interstate commerce that the defendant knew to be stolen").  The Court found, "These six acts fall into two distinct conceptual groupings; the first consisting of receiving, concealing, and storing, and the second comprised of bartering, selling, and disposing." *Id.* at 458. The instruction in *Gipson* did not distinguish between the distinct groupings,  "Thus, under the instruction, the jury was permitted to convict Gipson even though there may have been significant disagreement among the jurors as to what he did. The instruction was therefore violative of Gipson's

-194-

right to a unanimous jury verdict." *Id*. at 458-59.

The reasoning of *Gipson* is completely analogous to the future dangerousness aggravating circumstance. The government urged conceptually distinct theories with conceptually distinct factual predicates. There was a very real risk that the jury disagreed as to any one theory, thus failing to reach unanimity, yet due to the lack of a "unanimity of theory" charge reported a "unanimous" finding.

Trial counsel was ineffective for failing to request this charge. Counsel did not present a case for mitigation; rather the sole theory of penalty phase defense was to refute the proof that the "defendant represents a continuing danger to the lives and safety of other persons." Tr. Vol. 22, 305; SA 2765. Because counsel put all their eggs in this one basket, it was critical that the government be held to its burden of proving its case beyond a reasonable doubt to all twelve of the jurors.

As demonstrated above, Mr. Agofsky was prejudiced. No other aggravating circumstance was contested by the defense team and no other mitigation case presented. The government, on this dispositive circumstance, took a scattershot approach, seeking a verdict premised on diverse theories and factual predicates all under the amorphous rubric of a "continuing danger to the lives and safety of other persons." This Court can have no confidence the jury was in agreement on this critical circumstance. Accordingly, trial counsel's deficient performance in failing to seek a "unanimity of theory charge" prejudiced the defense by creating a reasonable probability of a death sentence when the jury otherwise would have voted for life.

### H.    Counsel's Deficient Performance Prejudiced The Defense

As the Amended § 2255 Motion describes, the cumulative effect of Mr. Black's and Mr. Barlow's deficient investigation and presentation of the penalty phase prejudiced the defense. *See*

-195-

Amended § 2255 Motion at 184. If counsel had conducted a reasonable investigation and engaged in reasonable advocacy, the jurors could have learned about Mr. Agofsky's hard childhood and family background, the lifeline he found in the martial arts, the beatings he took, and the emotional and neuropsychological scars he carries. They could have learned how he carried his past with him to prison and how he learned to survive there. They could have learned the mitigating information detailed in the sections above, not only through Dr. Roberts, but also through the direct testimony of Mr. Agofsky's family, friends, and teachers, other inmates, and the social worker who prepared the social history report. Not only Dr. Roberts, but all the experts Mr. Barlow himeself consulted -

 Drs. Gripon and Pelz, Mr. Pelz, and Mr. Cox - could have interpreted the information for the jury and provided their expert opinions to assist the defense. Additional mitigating evidence, set forth above and in the Amended § 2255 Motion, could have been developed and presented, and counsel could have advocated effectively for Mr. Agofsky's life during the penalty phase. Instead, the jurors learned nothing about Mr. Agofsky from the defense except that he should be kept away from other inmates – and, by the end of the prosecution's rebuttal case, the jurors could not have felt confident that the BOP could even accomplish that. There is a reasonable probability that, but for all of counsel's deficient performance in the investigation and presentation of both phases of trial, set forth in the Amended § 2255 Motion and this Supplement, the jury would have imposed a life sentence. *See Williams*, 529 U.S. at 297-98; *Wiggins*, 539 U.S. at 535-36; *Strickland*, 466 U.S. 668. The Court must accordingly grant an evidentiary hearing and relief on this ground.

**III.    GROUND 12.3: APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE.**

**A.    Introduction**

Mr. Agofsky's appellate counsel, Brent E. Newton, filed a superficial brief containing only seven claims, three of which, he acknowledged, were foreclosed by Circuit precedent. As the Amended § 2255 Motion explains, Mr. Newton's half-hearted advocacy was deficient, both because he presented poorly developed claims and because he failed to present at least eight other, potentially meritorious claims. There is a reasonable probability that a vigorous defense on appeal would have secured a new trial of guilt or innocence, and/or penalty, because of multiple errors that include irrational jury findings that Mr. Agofsky both did, and did not, have the mental state necessary for conviction of capital murder; burden-shifting, confusing, and erroneous murder and manslaughter instructions; and prosecutorial comment on Mr. Agofsky's right to remain silent. *See* Amended § 2255 Motion at 187, 195. Counsel thus deprived Mr. Agofsky of his right to the effective assistance of counsel on appeal, in violation of his right to due process of law. U.S. Const. amend. V, VI; *see Smith v. Robbins,* 528 U.S. 259, 285-86 (2000) (Strickland v. Washington standard applies to claim of appellate ineffectiveness); *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000) (same).

**B.    Appellate Counsel's Role In The Case**

As the Court ordered on February 10, 2009 (Doc. 70), Mr. Newton prepared an affidavit responding to the allegations concerning his representation and sent it to counsel for the parties on March 4, 2009. SA 2349. He provides only a general "defense" of his briefing on direct appeal. SA 2357-58. He does not specifically discuss any claim he included in his brief, or explain why he failed to develop the claims in greater detail.

With respect to claims enumerated in the Amended § 2255 Motion that Newton could have included, but did not include, in Mr. Agofsky's direct appeal, Mr. Newton states that he has no independent recollection of identifying or considering any of them. He states, however, that he believes that "there was not any realistic possibility" that any of the claims would have succeeded under Fifth Circuit law and that he therefore "would not have identified them as worthy of inclusion in the opening brief." SA 2352.[84]

Assuming a prosecutorial role, Mr. Newton devotes the bulk of his affidavit to a legal argument that none of the claims that he failed to raise has any merit. SA 2352-57. However, as explained below and in the Amended § 2255 Motion, Mr. Agofsky could have obtained genuine appellate relief, on either claims that Mr. Newton did raise or claims he did not raise, if Newton had provided effective assistance.

## C.   Appellate Counsel Failed To Provide Reasonably Vigorous Representation.

### 1.   The Inconsistent Verdict Claim

As noted, a more diligent approach to briefing the claims Mr. Newton included in Mr. Agofsky's appeal could have affected the outcome. For example, he could have used Claim Three of his initial brief to convince the Court of Appeals that the tangled burden-of-proof and definitional errors in the murder and manslaughter instructions had so confused the jury that they caused irrational, unconstitutional, and remediably inconsistent guilt and sentencing verdicts. *See* Point I.I, *supra*. But Newton missed the instructional errors and thus had no specific arguments for making

---

[84]   *See Wiggins*, 539 U.S. at 526-27 (state courts unreasonable when they assumed counsel had strategy inconsistent with their actions at trial); *Kimmelman v. Morrison*, 477 U.S.365, 386-87 (1986) (under *Strickland*, courts cannot use hindsight to supply a strategy four counsel); *Griffin v. Warden*, 970 F.2d 1355, 1358 (4th Cir. 1992) ("courts should not conjure up tactical decisions an attorney could have made, but plainly did not") (citing *Strickland, Kimmelman*).

an exception to the ordinary rule that appellate courts will not grant relief for inconsistent verdicts. Nor did he provide a constitutional basis for such an exception.

In his initial brief, Newton argued that "The jury's special finding that the murder was not committed 'intentionally' contradicts the jury's earlier finding that the murder was committed in a 'willful,' 'deliberate,' 'malicious,' and 'premeditated' manner." A458 (Appendix to Amended § 2255 Motion). Citing *United States v. Powell*, 469 U.S. 57 (1984), and *United States v. Dotterweich*, 320 U.S. 277(1943), he acknowledged that inconsistent verdicts are not ordinarily subject to appellate review. A459. He sought to distinguish the *Powell* rule, however, arguing that the jury's guilt-innocence phase finding was not a verdict because, in the federal system, a "judgment of conviction" cannot be imposed before sentence and thus the conviction was not yet final. Therefore, he contended, *Powell's* rule against reviewing inconsistent verdicts did not apply. He cited only a single Third Circuit case, which concerned a different subject, in support of the argument. A460 (citing *Kapral v. United States*, 166 F.3d 565, 569 (3d Cir. 1999)). Second, Newton advanced a two-sentence argument that, even if the jury's second finding was an otherwise unreviewable inconsistent verdict, the "flagrant inconsistency" demonstrated that the death penalty had been arbitrarily imposed. He cited only 18 U.S.C. §3595(c)(1), which requires an appellate court to grant relief if a death sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor." He cited no constitutional or decisional authority and advanced no record-based explanation of how the inconsistent verdicts denoted juror arbitrariness. A461.

The Court of Appeals rejected the claim summarily, simply stating that it found "no merit" in his argument that his conviction or sentence on Count Two was "invalid" because the jury may have rendered inconsistent verdicts, and citing *Dunn v. United States*, 284 U.S. 390 (1932), and *Powell*. *See United States v. Agofsky*, 458 F.3d 369, 375 (5th Cir. 2006) (SA 2521).

-199-

The Court of Appeals did grant technical relief on a double jeopardy claim, raised by trial counsel before trial and presented by Newton on appeal. It vacated both capital convictions and remanded to the district court with directions to allow the government's election of one of the counts, and then to reconvict and resentence Mr. Agofsky to death on the remaining count. 458 F.3d at 375 (SA 2528). On remand, the government elected Count Two, premeditated federal murder (Criminal Docket No. 245). Mr. Agofsky appealed again (Criminal Docket No. 247). By this point, postconviction counsel had been appointed to investigate and prepare a potential motion for relief from judgment pursuant to 28 U.S.C. § 2255. Mr. Newton, however, again represented Mr. Agofsky on the resentencing appeal, raising, again, the claim that the jury's inconsistent findings on intent at the guilt-innocence and penalty phases required relief. SA 2674.

This time, Mr. Newton tried somewhat harder, but had to contend with the law-of-the- case doctrine. He argued that the court should apply the doctrine's exception for a prior decision that was clearly erroneous and would work manifest injustice. SA 2875-76 (citing *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002)). In support, he noted with apologies that he had found a Supreme Court decision that he had previously overlooked, and also argued that the panel entirely had failed to address his "compelling" argument that the inconsistent verdicts were reviewable for passion, prejudice, or arbitrariness under § 3595(c). SA 2676-77 (at 12). Further, he observed, law of the case would not bar the claim if he later sought *en banc* review on Mr. Agofsky's behalf. SA 2677.

On the merits, Newton explained, as he had in the initial appeal, why the verdicts were inconsistent. SA 2680-82. Then, in contrast to the initial appeal, he cited cases that, at least, addressed claims somewhat similar to the one he was making. He cited *Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385, 400 n.11 (1972), which stated in footnoted dicta that the remedy for an inconsistency between a general verdict and a finding in a special sentencing interrogatory

-200-

is a new trial. SA 2682. He cited two other cases that referred to *Pipefitters,* also in dicta. SA 2683 (citing *United States v. Lucarelli*, 490 F. Supp. 2d 295, 299-300 (D. Conn. 2007); *Blackwell v. Cities Service Oil Co.*, 532 F.2d 1006, 1008 (5th Cir. 1976)). However, he did not explain the reasons for the *Pipefitters* dictum, discuss how it applied in this case, or link it to any constitutional doctrines governing capital cases.

Turning to his argument that the court should exercise its § 3595(c) power to grant relief for juror passion, prejudice or arbitrariness, Newton cited *United States v. Johnson*, 223 F.3d 665, 676 (7th Cir. 2000). SA 2683-84. Johnson, like Mr. Agofsky, sought relief for inconsistent verdicts. The Court of Appeals for the Seventh Circuit rejected the claim, but stated that "if the inconsistencies were such as to indicate the verdict was a product of irrationality, it would have to be set aside under § 3595(c)." Mr. Newton noted a district court opinion that cited *Johnson* with approval. SA 2684. But, once again, he made no attempt to explain why, on this record, Mr. Agofsky's jury had behaved irrationally, or to make any claim of constitutional error.

The Court of Appeals again rejected the claim. *See United States v. Agofsky*, 516 F.3d 280 (5th Cir. 2008) (SA 2529). It noted that *Pipefitters* was not decided on the basis of the inconsistency between the general verdict and the special interrogatory, and that *Pipefitters* said nothing about *Dunn* or *Powell*. 516 F.3d at 284 (SA 2532-33). And it noted that *Johnson* had rejected the defendant's §3595(c) claim respecting inconsistent jury findings. *Id.* at 285 (SA 2533). Because the court found "nothing irrational about the jury's findings" in Mr. Agofsky's case, it found no "manifest injustice" in the prior panel's rejection of the inconsistent verdict claim. *Id.*

Newton's performance on this claim was deficient because he failed to present any authority at all in support of his two arguments in the initial direct appeal, provided the Court of Appeals with no case-specific explanation of why the juror's verdict resulted from arbitrariness, and provided no

-201-

constitutional basis for the claim. His reiteration of the same claim in the resentencing appeal was still too little and much too late. He had no convincing reason for not treating the court's first ruling as law of the case. The dicta from the Supreme Court in *Pipefitters* arose from a different context and were only dicta unrelated to any doctrine governing capital cases. His citation to *Johnson* was deficient because he did not explain why Mr. Agofsky should prevail on the inconsistent verdict claim while Johnson had lost.

Newton could, however, have briefed the claim in a manner that would have required relief. He could have begun by citing *Johnson* in the initial direct appeal and explaining the controlling distinctions between that case and Mr. Agofsky's. Johnson challenged his jury's inconsistent findings on mitigating factors that were equally applicable (or inapplicable) to each of the murder counts on which he faced the death sentence. 223 F.3d at 675. Judge Posner, writing for the Seventh Circuit panel, wrote that the inconsistencies were not "such as to indicate that the verdict was a product of irrationality." *Id.* at 676. He recognized that several jurors were likely "of two minds" about the existence of some mitigating factors, or disagreed among themselves. But the jurors were required to agree only about the verdict, not about every fact. And every juror, no matter what his or her mitigating findings, had agreed that the aggravating factors outweighed any mitigating factors found. *Id.* In other words, there was "no reason to suspect that any juror was in doubt about the bottom line . . . [and thus] no basis for thinking that he had voted irrationally." *Id.*

As Mr. Newton could have explained in his initial direct appeal brief, if he had uncovered *Johnson* in time to include it, or could at least have explained in his resentencing appeal brief, after he uncovered *Johnson*, Mr. Agofsky's case is very different. The inconsistent jury findings concern the mental element that made him death-eligible or -ineligible, not subsidiary mitigating factors. The circumstances provide *every* reason to suspect that the jurors were "in doubt about the bottom

-202-

line."   The burden-shifting, erroneous, and confusing murder and manslaughter instructions underscore that conclusion.  *See* Point I.I, *supra*, and § 4.c, *infra*.  Accordingly, the Court of Appeals could and should have found that the inconsistent verdicts of Mr. Agofsky's jury were irrational and arbitrary, and required relief under 28 U.S.C. § 3595(c).

Additionally, Newton could have placed his § 3595(c) argument on a constitutional basis. First, due process is violated when a verdict could have been based on alternative grounds, one of which was appropriate and another of which was improper, and it is impossible to tell which formed the basis for the verdict.  *Yates v. United States*, 354 U.S. 298, 312 (1957); *Stromberg v. California*, 283 U.S. 359, 367-68 (1931); *Bollenbach v. California*, 326 U.S. 607 (1946).  Moreover, in capital cases the fundamental requirement of heightened reliability is the keystone in making "the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Because there is "[a] qualitative difference between death and any other permissible form of punishment, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Zant v. Stephens*, 462 U.S. 862 884-85 (1983) (*quoting Woodson).* This requirement of heightened reliability functions as  "inherent restraint on the arbitrary and capricious infliction of the death sentence," *Zant*, 462 U.S. at 878 (citing *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980)).

There must be a discernable rational basis for findings that lead to a death sentence. "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1976).[85]    These considerations apply with equal force to guilt-innocence stage

---

[85]   *See also McCleskey v. Kemp*, 481 U.S. 279, 335 (1987) ("[W]e have demanded a uniquely high degree of rationality in imposing the death penalty."), 1570 (Brennan, J.,

error:

> To insure that the death penalty is indeed imposed on the basis of "reason rather than caprice or emotion," we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination.

*Beck v. Alabama*, 447 U.S. 625, 638 (1980) (footnote omitted).

Lower courts have applied these principles to the analysis of challenges to inconsistent jury findings at sentencing in capital cases. The dispositive factor, as in the non-constitutional claim rejected in *Johnson*, is whether the jurors reached rational conclusions about their ultimate life-or-death determination, despite any potentially inconsistent subsidiary findings. *See Wainwright v. Lockhart*, 80 F.3d 1226, 1231-32 (8th Cir. 1996) (no Eighth Amendment or due process violation because of inconsistent mitigating findings on factors equally applicable for both murders, because jury clearly decided aggravating factors outweighed mitigating) (cited in *Johnson*); *Williams v. Clarke*, 40 F.3d 1529, 1537-38 (8th Cir. 1994) (constitutional question is whether state court's reliance on inadequately narrowed aggravating factor was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation) (cited in *Wainwright*).

Newton could also have elaborated persuasively on his other argument, that the jury determinations on mental state at the guilt-innocence and penalty phases were two parts of one verdict and had to be consistent to be rational. In the initial appeal he only hinted at the argument by pointing out that a verdict is not final until sentence is imposed. A460. In the resentencing

---

dissenting)); *Caldwell v. Mississippi*, 472 U.S. 320, 329, n.2 (1985) ("[T]his Court has gone to extraordinary measures to insure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake," *quoting Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring)); *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980) (reason rather than caprice or emotion required); *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) ("reasoned determination" by a jury).

appeal he cited *Pipefitters*, SA 2682, but he could have gone further.

While the guilt-innocence verdict was a *general* verdict ("guilty" or "not guilty"), *see* guilt-innocence phase verdict form, SA 2753, the penalty phase verdict was a *special* verdict asking the jury if the "Government has established beyond a reasonable doubt that the defendant, Shannon Wayne Agofsky, intentionally killed the victim, Luther Plant." The jury answered that question "no." SA 2757. The *Powell* court was concerned with the potential windfall a defendant could receive based on inconsistent verdicts:

> Inconsistent verdicts therefore present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course.

*Powell*, 469 U.S. at 65. The concern in *Powell* does not obtain here as a reviewing court can determine "whose ox has been gored." One verdict was a general "guilty" predicated on an array of flawed instructions, whereas the second was a specific finding that the government failed to prove Mr. Agofsky " intentionally killed the victim, Luther Plant." This is not case such as *Powell* where the irrationality may have worked to the defendant's benefit; here, it did not. In each verdict, the jury selected the most severe option available to them, convicting Mr. Agofsky of two counts of capital murder in the first verdict and sentencing him to death on both counts in the second verdict. Mr. Agofsky was harmed by the irrationality of their inconsistent findings in a way that offended due process and the Eighth Amendment, but Newton failed to argue the crucial distinctions between *Powell* and Mr. Agofsky's case, with the result that the Court of Appeals relied on the ordinary *Powell* rule.

Newton raised neither of these constitutional arguments, and failed to identify how Mr. Agofsky was prejudiced, particularly how the likelihood of juror confusion rendered the verdicts

-205-

unreliable.  He failed to demonstrate persuasively that *Powell* and other Supreme Court precedent, and also *Johnson* and 28 U.S.C. § 3595(c), actually supported his claim.  In *Powell* the Supreme Court declined to grant relief "as a matter of course," leaving open an avenue for relief in circumstances such as those here, where the verdict was most certainly a product of jury irrationality and thus unconstitutional.  In *Johnson* the court recognized that inconsistent penalty phase findings that signaled jury indecision about "the bottom line" would require § 3595(c) relief.  Newton was deficient for failing to develop any of these constitutional and statutory arguments in either his initial brief or his attempt at a "do over" in the resentencing appeal.

### 2.      The Claim Concerning The Jury's Note

Mr. Newton raised a claim concerning a note the jurors sent during deliberations, asking if they would be polled individually if they rendered a life verdict.  Newton inferred that one or more jurors were considering a life sentence and were reluctant to vote for life.  He asserted that the jurors' communication denoted "arbitrariness," prohibited by both 28 U.S.C. § 3595(c)(1) and the Constitution, and contended, implicitly, that  the record sufficed to establish grounds for a new trial.  A456-57.  Mr. Newton does not say in his affidavit why he did not develop this claim (or any other claim) in more detail.

Mr. Newton's brief on direct appeal included no discussion of the rules that ordinarily require deference to a trial court's supervision of jury communications and deliberations, and ordinarily preclude impeachment of a jury's verdict.  He made no attempt to argue that the trial court should have conducted a hearing or that there was a reasonable possibility that extraneous prejudicial influences had been brought to bear on the jury.  *See United States v. Johnson,* 495 F.3d 951 (8th Cir. 2007) (applying standard in federal capital prosecution); *see also United States v. Webster,* 750 F.2d 307 (5th Cir. 1984) (no presumption of prejudice for juror misconduct intrinsic

-206-

to a juror, as opposed to misconduct related to external influence). Nor did he address Federal Rule of Evidence 606(b), or explain how the case fell into one of its exceptions. In order to make that case, he would have had to explain, again, how extraneous prejudicial information had been brought to the jurors' attention, or outside influence had been brought to bear upon them. *See United States v. Jackson*, 549 F.3d 963, 984 (5th Cir. 2008) (citing Fed. R. Evid. 606(b) and holding that it does not authorize admission of evidence that jurors misunderstood instructions).

Newton invoked the statutory and constitutional rules against arbitrariness in capital cases without arguing that the ordinary rules for review of jury deliberations did not apply to such claims and without, alternatively, establishing that Mr. Agofsky's case required relief under the ordinary rules. His failure to develop this claim was deficient.

### 3. The "Heinous and Cruel" Claim

The Amended § 2255 Motion describes Newton's failure to develop the claim that the evidence for the statutory aggravating factor that the murder was "heinous, cruel, and depraved" was legally insufficient *See* Amended § 2255 Motion at 192. In his brief, Newton cited *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), *overruled on other grounds*, *United States v. Martinez-Salazar*, 528 U.S. 304, 310 (2000), which addressed a different (instructional error) claim but provided a construction of this factor under the Federal Death Penalty Act. A463. The *Hall* court stated that the factor required a showing of torture (which required evidence of abuse while the victim was conscious) or serious physical abuse (which required more than the amount of injury necessary for death plus intention to inflict abuse apart from the killing). *Hall*, 152 F3d at 414-15. Newton applied this definition to the facts of Mr. Agofsky's case, arguing that (1) the jury had not found torture and in any event there was no evidence that Plant was conscious; (2) that the incident was too short to establish an intent to cause abuse apart from the killing, and (3) the "gruesomeness"

of the killing was not in itself enough to establish serious physical abuse.  A463-65.  He argued that the error was not harmless beyond a reasonable doubt because the jurors' note indicated that at least some of them were considering a life sentence.  A466.

The only authorities Newton cited in support of his arguments were *Hall* and *Godfrey v. Georgia*, 446 U.S. 420 (1980), which both concerned the need for narrowing construction to save this factor (and a similar Georgia factor) from unconstitutional vagueness, and *United States v. Jones*, 132 F.3d 232, 252 (5th Cir. 1998), which set forth the harmless error standard for review when the prosecution relies in part on unconstitutional non-statutory aggravating factors.  He did not cite any case that specifically supported his three arguments for finding the government's proof in sufficient.

For example, he did not cite any cases respecting Plant's possible unconsciousness during the assault.  Numerous state courts addressing comparable aggravating factors have concluded that conduct occurring after the victim has lost consciousness or has died may not be considered by the fact-finder in assessing the "heinousness" of a murder.[86]  Similarly, Mr. Newton made no effort to support his *Godfrey* argument – that the victim's injuries alone could not establish the factor – with more recent precedent.  Nor did Newton call the court's attention to any cases that addressed similar sufficiency claims.  Such authority was and is readily available.[87]

---

[86]   *See, e.g.,  Hayes v. State*, 845 P.2d 890, 892 (Okl. Cr. App. 1992)*; Rhodes v. State*, 547 So.2d 1201, 1205 (Fla. 1989); *Jackson v. State*, 451 So.2d 458, 463 (Fla. 1984); *Herzog v. State*, 439 So.2d 1372, 1380 (Fla. 1983); *State v. Hunt*, 371 N.W.2d 708, 721 (Neb. 1985), *overruled on other grounds*, 399 N.W.2d 706 (Neb. 1986); *State v. Hamlet*, 321 S.E.2d 837, 846 (N.C. 1984).

[87]   *See, e.g., State v. Schackart*, 947 P.2d 315, 326 (Az. 1997) (evidence did not support "gratuitous violence" necessary to establish "heinous" factor where majority of injuries associated with means of killing); *State v. Lee*, 944 P.2d 1204, 1219 (Az. 1997) (no showing of violence beyond that necessary to kill when killing effected with four gunshots and no showing

Newton's failure to conduct the research necessary to present this claim in a persuasive manner was deficient performance.

### 4.    The Claims Barred By Circuit Precedent

Mr. Newton raised two claims in his initial brief that, he acknowledged, were foreclosed by Circuit precedent, and indicated that he was only raising them to preserve Mr. Agofsky's rights to raise them as part of a petition for *en banc* review or a petition for *certiorari*. A471-75. A third claim had also been foreclosed by the time of the reply brief. A495. But Newton never sought *en banc* review in the initial appeal and did not include any of these claims in the resentencing appeal. His failure to seek *en banc* review, after raising these claims only for the purpose of preserving Mr. Agofsky's right to such review, was deficient performance.

### 5.    The Claims Not Raised

The Amended § 2255 Motion challenges Mr. Newton's failure to raise additional claims that would have required relief if he had identified, researched, and presented them to the Court of Appeals.

### a.    The Fifth Amendment Claim

In violation of Mr. Agofsky's Fifth Amendment right to silence and due process, the prosecution elicited evidence that Mr. Agofsky failed, following the incident, to tell the assigned correctional officer that he was acting in self-defense, and in closing asked the jury to infer guilt

---

of time between them or sequence); *State v. Richmond*, 886 P.2d 1329 (Az. 1994) (no "gratuitous violence" as required for "heinous" factor where no showing defendant knew victim was dead after first pass of car); *State v. Lloyd*, 552 S.E. 2d 596, 629-31 (N.C. 2001) (where four shots fired in quick succession, "we fail to see that this evidence suggests that defendant carried out this shooting in a fashion beyond that necessary to effectuate the victim's death," and evidence legally insufficient to submit "heinous, atrocious, and cruel" factor to jury); *Olsen v. State,* 67 P.3d 536, 581 (Wyo. 2003) (victims' mental anguish while waiting to be shot insufficient to establish intentional infliction of torture necessary to prove factor).

because Mr Agofsky "never" at any time asserted his self-defense claim.  Appellate counsel failed to raise these claims.  In his affidavit composed on behalf of the government, Mr. Newton claims that he routinely "winnows" weaker issues and then baldly asserts, "Unpreserved issues subject to the plain error standard generally tend to be weaker issues."  SA 2352.  Consequently, Mr. Newton raised *no claims* under the plain error exception.  Newton misapprehends the role of plain error, particularly in capital cases.  The plain error rule permits an appellate court to reach an otherwise unpreserved claim.  There is nothing inherently "weaker" about such claims and it was unreasonable for counsel to reject these claims out-of-hand simply because they fell under the rubric of "plain error."   Rather it was counsel's responsibility to review each claim on its merits, including unpreserved claims, and raise any claim that was meritorious.  As an objectively reasonable appellate attorney would have raised this issue for plain error review, and there is a reasonable probability the Fifth Circuit would have found plain error had the issue been raised, counsel was ineffective under *Strickland*.

Contrary to counsel's assertions that he declined to raise the claim because it was in the weaker "plain error" category, by his own admission the claim was not raised because he failed to perceive any error in the first instance.  As to the eliciting of Mr. Agofsky's failure to claim self-defense to Officer Matt, counsel failed to recognize any error at all, concluding that Mr. Agofsky's failure to "mention self-defense during those two conversations [with Matt]" was not a *Doyle* or *Miranda* violation.  SA 2354.  As to the prosecution's exploitation of Mr. Agofsky's silence, where at closing the prosecution urged rejection of self-defense because "[w]hat's most important is *never* did he claim self defense" Tr. Vol. 20, 397-98, counsel similarly failed to perceive any error ("I did not believe that the prosecutor's argument was really aimed at Mr. Agofsky's pretrial silence."  SA 2354).  Thus this is not a case where counsel recognized the error and made a strategic decision not

to pursue an otherwise meritorious claim; counsel failed to perceive that the claim had any merit. Even if counsel had consciously rejected the claim on some "lesser merit" theory, counsel was nevertheless ineffective for failing to recognize that relief was compelled by United States and Fifth Circuit precedent.  Moreover, any claim of strategic winnowing rings hollow as counsel raised *no guilt-phase claims at all* and counsel chose instead to pursue two sentencing claims in which he was compelled to concede relief was foreclosed by prior circuit precedent.  A449.  This decision was objectively unreasonable.

These claims meet the standard for relief under the plain error rule.  The prosecutor elicited testimony that Mr. Agofsky failed to assert self defense *at any time,* including the time immediately post-incident and continuing through the time of trial:

Q: Did he say anything about self-defense to you?

A: No, sir.

Q: Did he say anything about self-defense to you *at any time*?

A: No, sir.

Q: *From January 5, 2001, until today*?

A: No, sir.

Tr. Vol. 18, 61 (emphasis added).  Trial counsel made no objection to this line of questioning.  In closing, the prosecutor exploited Mr. Agofsky's silence and repeatedly argued that Mr. Agofsky "never" told the authorities that he acted in self-defense ("What's most important is *never* did he claim self defense .. "*Never* has self defense been raised." ... "The defendant ... *never* said anything about self defense. He has *never* said self defense." Tr. Vol. 20, 397-98, emphasis added).  The sole objection during summation was overruled and the jury was instructed only that Petitioner "does have a right not to testify and to remain silent, and the burden is always on the government."  Tr.

-211-

Vol. 20, 398.

As with the questioning of Matt, the prosecutor's persistent emphasis on "never" encompasses both pre- and post-arrest silence. When finally an objection came, it was overruled. The jury was never instructed to disregard the comments or that it could not consider post-arrest silence in determining whether the Commonwealth had met its burden of proving Agofsky did not act in self-defense. On the contrary, when the objection was overruled, the prosecutor continued to hammer the theme that self-defense should be rejected in light of Petitioner's silence "at any time." This is precisely the harm *Doyle* protects against. *Doyle v. Ohio*, 426 U.S. 610, 618-619, n.11 (1976) ("it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial").

No *Doyle* exception applies here. Mr. Agofsky did not testify in this case; thus his silence is not admissible to "impeach" him. The *Doyle* exception is limited to the narrow circumstance where a defendant's testimony at trial is inconsistent with events or statements at the time of arrest for which, in fairness to the government, reference to silence may be necessary. *Doyle v. Ohio*, 426 U.S. 610, 620 (1976) ("It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest"). Nor, for obvious reasons, does his silence properly impeach the witnesses who swore Plant was the initial aggressor. *See, e.g.*, *Hassine v. Zimmerman*, 160 F.3d 941, 949 (3d Cir. 1998) ("The *Doyle* footnote exception only permits the prosecution to use post-arrest silence to impeach the credibility of the defendant's version of what he did following arrest; the government cannot use the silence to impeach the exculpatory story itself or to draw

-212-

inferences suggesting the defendant's guilt"). Mr. Agofsky was advised of his right to remain silent and was entitled to rely on that representation.[88] Furthermore, the *Doyle* protections apply even in the absence of formal *Miranda* warnings. *See United States v. Moore*, 104 F.3d 377, 386-87 (D.C. Cir. 1997) ("Supreme Court's purpose in requiring the arresting authorities to advise a defendant of his right to silence and counsel in *Miranda* was to assure that those rights were properly safeguarded before any statements he made could be used against him, not his silence . . . to hold . . . that the failure to give those same warnings permits the state to use a defendant's silence against him turns a whole realm of constitutional protection on its head.").

The Fifth Circuit has made clear that *even if* some inquiry into a defendant's silence is allowed, it must be narrowly tailored to its permissible purposes and the jury so instructed. In *United States v. Rodriguez*, 260 F.3d 416, 421-22 (5th Cir. 2001), the prosecutor extensively cross-examined the defendant about his failure to tell authorities that his alleged theft was really a security test. In closing argument, the prosecutor emphasized the defendant's failure to come forward with the explanation sooner. The Fifth Circuit held that this violated *Doyle*. Although it was permissible to "clarify Rodriguez's direct testimony that possibly implied that he had given his exculpatory story to the postal inspectors during his initial interrogation," *id*. at 422, n.2, the prosecutor went too far in his closing argument:

> Consequently, in the present case, we conclude that the prosecutor, in his final comment during his closing argument, went beyond permissible impeachment and argued that the jury should infer Rodriguez's guilt directly from his post-arrest

---

[88]   At his initial appearance, the court told him, "The right to silence means that you're not required to make any statements. If you've already made statements, you're not required to make any additional statements. You're not required to even answer the Court's questions. If you elect to remain silent, no harm will come to you. Nobody will try to force you to speak. Nobody will automatically assume that you're guilty." Initial Appearance Transcript, September 25, 2003, at 3-4.

silence. The prosecutor argued that "the most important evidence in this case concerning Mr. Rodriguez's intent" was the contrast between his trial testimony and his failure to give his exculpatory story to the postal inspectors or supervisors: "On May 19, when the inspectors took him upstairs, he did not say ..., 'Hey, this is a security test.' ... And when management came in to talk to him about his job status, he did not say, not one time and not a peep, 'This is just a security test.' " Plainly, the prosecutor urged the jury to consider Rodriguez's silence as direct evidence of his guilt or knowing intent to fail to remit the deposit bags to the designated depository.

260 F.3d at 421-22.

The parallels to this case are strong. In *Rodriguez*, the defendant was asked:

Q: You never voiced your innocence to a single person after they picked you up on May 19, 1998, did you, sir?

A: No, sir.

260 F.3d at 420.

Here, Matt was asked:

Q: Did he say anything about self-defense to you at any time?

A: No, sir.

Q: From January 5, 2001, until today?

A: No, sir.

Tr. Vol. 18, 61.  In both cases the prosecutor argued the defendant's silence was the "most important" evidence of guilt in the case.  As in *Rodriguez*, even if the prosecutor was entitled to explore a supposed inconsistency between Mr. Agofsky's remarks to Matt and his claim of self defense,[89] he went too far in arguing that Mr. Agofsky's continuing silence up to the time of trial

---

[89]  Treating Mr. Agosky's alleged reference to an obscure black comedy, "Weekend at Bernie's" ("Bernie's") as a statement positing a defense to murder inconsistent with his trial defense (and thereby opening the door to exploit Mr. Agofsky's silence) borders on the ludicrous and was  invoked for the purpose of avoiding the rule in *Doyle*.  In Bernie's, the two protagonists had to pretend that the victim, their crooked boss, was still alive so as to avoid becoming victims

was evidence of his guilt.[90]

This unfair inference was "particularly egregious," and the error one that "seriously

_____

themselves of a hit man associated with his fraud. The prosecution set up a straw man by characterizing this supposed reference as a "defense" and then attempted to pigeonhole this comment into a *Doyle* exception. In *United States v. Laury*, 985 F.2d 1293, 1303 -1304 (5th Cir. 1993), the Fifth Circuit has rejected a similar attempt to circumvent *Doyle*:

> Although Laury made post-arrest statements to FBI agents, he did not discuss his whereabouts during the robbery. Therefore, nothing Laury told the FBI agents was inconsistent with his trial testimony that he was at a party on the date of the bank robbery. The prosecutor did not comment on what Laury told FBI agents, but on what he did not tell them. Jurors would naturally and necessarily view the prosecutor's line of questioning on cross-examination, as well as his statement in closing argument, as an attack on Laury's credibility. On cross-examination, the prosecutor suggests an implausible scenario-that Laury would prefer to languish in jail than tell the FBI about his alibi. The prosecutor meant to suggest that Laury's alibi was not disclosed prior to trial because it was not true, for the prosecutor's comments could not have served any other purpose. Therefore, the prosecutor's "manifest intent" was to comment on Laury's post-arrest silence with regard to his alibi. Only "[w]hen a defendant chooses to contradict his post-arrest statements to the police ... [does] it become[ ] proper for the prosecutor to challenge him with those [post-arrest] statements and with the fact that he withheld his alibi from them." *Lofton v. Wainwright*, 620 F.2d 74, 78 (5th Cir.1980). Because Laury's post-arrest and trial statements were not inconsistent, we view the prosecutor's comments as comments on Laury's post-arrest silence, and therefore in violation of *Doyle*.

*United States v. Laury*, 985 F.2d 1293, 1303 -1304 (5th Cir. 1993). Under *Laury*, the comment has to be truly inconsistent to permit impeachment. That was not shown here.

[90] Notably, in *Rodriguez*, a "curative" instruction similar to the one given here did not "cure" the error. There, after several improper references, the defense counsel finally objected that "it's a comment on his right not to say anything" and the court sustained the objection, instructing the jury to "disregard any suggestion that Rodriguez did not have a right to remain silent." 260 F.3d at 420. The Court found that despite this admonition, "The prosecutor ... continued to dwell upon Rodriguez's post- *Miranda* warning silence and, in effect, argued that the jury should infer that Rodriguez was guilty of willingly and knowingly failing to remit the deposit bags to the designated depository because he chose to remain silent ..." *Id.* Here the sole objection was overruled and as in *Rodriguez*, the prosecutor continued to argue Mr. Agofsky's guilt based on his silence.

affect[ed] the fairness, integrity or public reputation of judicial proceedings," *United States v. Garza*, 807 F.2d 394, 396 (5th Cir. 1986), and thus relief would have been compelled upon plain error review.

The Fifth Circuit has reviewed *Doyle* claims for plain error. *See United States v. Urbina*, No. 02-4046, 2003 WL 1923012, at *1 (5th Cir. April 3, 2003) (finding *Doyle* violation but denying relief "because the testimony was not significant in the context of the entire trial"). Here, in a clear and obvious *Doyle* violation, the prosecutor argued that the fact that Mr. Agofsky "never," from the time of the incident until trial (and encompassing the post-arrest period) asserted that self-defense was the "most important" factor they should consider in assessing whether to accept the defense. Tr. Vol. 20, 397. This was a close case with two witness testifying that Plant, a violent career criminal, was the initial aggressor. Weapons were easily introduced into the cages and the guards incapable of intervening. This "most important," and likely dispositive, factor was one the jury should never have heard, much less considered in its guilt deliberations. Mr. Newton was deficient for failing to identify and raise this claim.

### b.    The Morgan Claim

Point IV of the Amended § 2255 Motion challenges the trial court's decision to seat two jurors who were not "life-qualified" because their overriding pro-capital punishment views precluded them from considering mitigating evidence. *See* Amended § 2255 Motion at 196 (citing *Morgan v. Illinois*, 504 U.S. 719 (1992)). Mr. Newton responds that this claim "would not have struck me as worthy of inclusion in the brief under the plain error standard." SA 2355. He argues that the claim lacks merit because the appellate court had an obligation to give "substantial deference" to the trial court's implicit finding on bias, that the defense had the burden of proving

bias, and that trial counsel did not attempt to do so.[91]

Mr. Newton states the standard of review without giving any reason for concluding that Mr. Agofsky's *Morgan* claim could not meet that standard.  In fact, for both jurors, the choice of sentence turned upon evidence of guilt or of premeditation, necessarily making mitigating evidence irrelevant to them.  Both jurors sat on Mr. Agofsky's jury.  Accordingly, Mr. Newton could have satisfied the plain error standard by demonstrating that two jurors who sat on Mr. Agofsky's jury were not qualified to deliberate impartially on the appropriate sentence, and that the trial court's decision to seat them, lacking record support, was an abuse of discretion.  *See United States v. Nelson*, 347 F.3d 701, 710-11 (8th Cir. 2003).  "If even one such juror is empanelled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan*, 504 U.S. at 729.  Mr. Newton's failure to raise this claim was deficient performance.

> **c. The Claim Concerning the Burden-Shifting And Erroneous Murder Instructions.**

The trial court unconstitutionally failed to instruct the jury that the prosecution had the burden of disproving heat of passion in order to prove the malice required for a murder conviction. Indeed, the court charged the jury on heat of passion only in connection with manslaughter, and even then never told the jurors that Mr. Agofsky was entitled to the benefit of any reasonable doubt about whether he acted in the heat of passion – and hence an acquittal of murder and conviction of no more than manslaughter.  The court never explained that malice and heat of passion were, by definition, mutually exclusive.  In all these respects, the murder instructions plainly violated *Mullaney v. Wilbur*, 421 U.S. 684 (1975), then a twenty-nine-year-old precedent of the Supreme

---

[91]  The Amended § 2255 Motion also argues that trial counsel were ineffective in jury selection, in part because of their failure to challenge these jurors.  *See* Amended § 2255 Motion at 59.

Court. As the Amended § 2255 Motion describes, Mr. Newton was ineffective for not challenging the instruction on appeal. *See Sanders v. Cotton*, 398 F.3d 572 (7th Cir. 2005) (appellate counsel ineffective for failing to challenge, on direct appeal, failure to charge jury that state had burden of disproving "sudden heat").[92]

Mr. Newton responds that even if he had identified this point he would not have raised it. SA 2352, 2355-56. He maintains that it would have been unworthy of inclusion because (1) the instruction tracked the Fifth Circuit pattern jury instructions; (2) the claim was foreclosed by the panel opinion in *United States v. Molina-Uribe*, 853 F.2d 1193 (5th Cir. 1988), *overruled on other grounds*, *United States v. Bachynsky*, 934 F.3d 1439 (5th Cir. 1991), and (3) language in the panel opinion in *United States v. Browner*, 889 F.2d 549, 552 (5th Cir. 1989), indicating that "the malice element . . . implicitly forced prosecutors to disprove the existence of adequate provocation," was only dicta and, to the extent it contradicted *Molina-Uribe*, could not overrule another panel. SA 2356. Nevertheless, Newton acknowledges that, having represented Molina-Uribe in his § 2255 appeal, he was aware that similar instructions had been challenged on *Mullaney* grounds. *Id*.

None of Newton's reasons can justify bypassing a claim that an instruction central to the defense flatly contradicted well-settled Supreme Court precedent.

*First*, pattern instructions are only guides. *See United States v. Williams,* 20 F.3d 125, 132 (5th Cir. No. 1994) (while the Pattern Jury Instructions provide a useful guide for the district courts, they are not law); Fifth Circuit Pattern Jury Instructions, Introduction (2001), *available at* http://www.lb5.uscourts.gov/juryinstructions//crim2001.htm (last visited Aug. 30, 2009) (pattern charges "do not presume to be a legal treatise," but are rather "an aid to guide your instructing the

---

[92] Newton was also ineffective for failing to brief and argue additional deficiencies in the murder instructions delineated in Point I.I., *supra.*

jury on each individual case"). In this instance, the Circuit's pattern instructions give inaccurate guidance. Every other Circuit that provides a pattern instruction for murder and voluntary manslaughter directs the district judge to give an instruction complying with *Mullaney* in a heat of passion case. *See* Eighth Circuit, Model Criminal Jury Instructions (2009), Nos. 6.18.1111A ("If the defense of heat of passion is raised, the instruction should be modified to add "and not in the heat of passion as submitted in instruction ____."); Ninth Circuit Model Criminal Jury Instructions, No. 8.90, Murder - Second Degree, Comment (suggesting the following language once defendant raises heat of passion: "The defendant claims to have acted in sudden quarrel or in the heat of passion caused by adequate provocation, and therefore without malice aforethought. . . . In order to show that the defendant acted with malice aforethought, the government must prove the absence of heat of passion beyond a reasonable doubt."); Tenth Circuit, Criminal Pattern Jury Instructions (2005), No. 2.52, Use Note (citing *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985), and indicating that defendant who sufficiently raises  heat of passion defense entitled to instructions informing jury of theory of defense and  government's burden of proving absence of heat of passion in order to convict); Eleventh Circuit, Pattern Jury Instructions (Criminal Cases), 2003, No. 46.2, at 296-97, Annotations and Comments ("Once evidence is presented that the defendant's capacity for self-control was impaired by an extreme provocation, the burden is on the Government to prove beyond a reasonable doubt the absence of sudden quarrel or heat of passion before a conviction for murder can be sustained."). *Links to Out-of-Circuit Pattern Instructions available at* http://www.lb5.uscourts.gov/juryinstructions/ (last visited August 31, 2009).

*Second*, *Molina-Uribe* does not control Mr. Agofsky's case. As explained in Point I.I.2, *supra*, in Mr. Agofsky's case, in contrast to *Molina-Uribe,* the malice element was presumed, and the instruction was central – not irrelevant – to the defense presented at trial. Thus, in Mr.

-219-

Agofsky's case, the instruction violated not only his due process right to proof beyond a reasonable doubt of every element of the offense, but also his due process and compulsory process right to present a defense.    Furthermore, *Molina-Uribe* could not survive *Apprendi* or the Eighth Amendment standards that govern a capital case.   In any event, Mr. Newton pursued three other claims foreclosed by prior panel opinions, ostensibly to preserve them for possible *en banc* review that he then failed to seek.   Even if *Molina-Uribe* did control this case, Mr. Agofsky's instruction so obviously violated *Mullaney* that Mr. Newton, who admits that he represented Molina-Uribe and was aware of this issue, should have identified it in Mr. Agofsky's case, raised it, and sought *en banc* review.

*Third*, while the *Browner* language was dictum, it was dictum that simply restated what was obvious from *Mullaney* and the plain language of the statute defining manslaughter: "Manslaughter is the unlawful killing of a human being *without malice* . . . upon a sudden quarrel or heat of passion." 18 U.S.C. §1112 (emphasis added).   Courts have frequently repeated the same point made in *Browner*.  In *Lizama v. U.S. Parole Com'n*, 245 F.3d 503, 506-07 (5th Cir 2001), the Court of Appeals observed:

> Specifically, Lizama contends that he killed in a "heat of passion" induced by Hernandez's blow to the back of his head, which negates the existence of malice, an essential element of second degree murder. A defendant who kills in a heat of passion in response to adequate provocation is guilty only of voluntary manslaughter. *United States v. Browner,* 889 F.2d 549, 552 (5th Cir.1989).

*See also* Note, Fifth Circuit Pattern Jury Instructions (2001), No. 2.56, Murder Second Degree, *available at* http://www.lb5.uscourts.gov/juryinstructions//crim2001.htm (last visited Aug. 30, 2009) (endorsing *Lizama*'s "recent discussion of this statute").

In *Sanders v. Cotton, supra,* 398 F.3d 572, the Court of Appeals for the Seventh Circuit granted *habeas* relief for the ineffective assistance of appellate counsel.   Like Mr. Newton,

-220-

Sanders's appellate counsel did not raise a *Mullaney* claim challenging a murder/manslaughter instruction that, like the one in Mr. Agofsky's case, failed to place the burden of proving "sudden heat" on the prosecution. 398 F.3d at 577. As under federal law, Indiana law provides that "sudden heat" negates malice. *Id.* The Court of Appeals elaborated:

> Here, the jury instructions do not contain any statement that properly places the burden of proof on the State for showing the absence of sudden heat to gain a murder conviction. Rather, the only time the jury instructions mention the burden of proof for sudden heat is in the manslaughter instructions, where they erroneously require the State to prove the presence of sudden heat. . . . [T]he jury was never informed of each of the required elements of the government's proof for murder and attempted murder, and if the jury was not required to find Sanders guilty beyond a reasonable doubt on all the elements of murder and attempted murder, he did not receive the protections of federal due process. The Indiana appellate court's reliance on the manslaughter instructions' mitigation language to correct the erroneous instructions was unreasonable because advising the jury that sudden heat is a mitigating factor does nothing to inform it that the absence of sudden heat is an element of murder or attempted murder and that it is the prosecution that bears the burden of proof.

*Id.* at 582. The Court accordingly granted *habeas* relief. *Id.* at 585.

In Mr. Agofsky's case, the murder and manslaughter instructions unconstitutionally shifted the burden of proof in the same manner as in *Sanders*, and suffered from numerous other deficiencies enumerated in Point I.I, *supra.* Newton could have established that the erroneous instructions were highly prejudicial by pointing to the inconsistency between the jury's premeditation finding at the guilt-innocence phase and its finding of no intent at the penalty phase. For a jury struggling with uncertainty over the level of culpability necessary for conviction of the greater offense, a burden-shifting and otherwise erroneous instruction could have meant the difference between death-eligible murder and manslaughter. Mr. Newton's failure to present that argument to the Court of Appeals was deficient performance.

### d.    The Failure To Admonish Jurors To Consider Certain Testimony With Caution

The Amended § 2255 Motion argues that Mr. Newton was deficient for failing to challenge an instruction that the trial court told the jury concerned "immunity." The instruction admonished the jurors to view certain types of evidence with caution, including the testimony of witnesses with "an interest in the outcome of the case." Tr. Vol. 20, 349-50.  Richard Ward, the only eyewitness who testified for the government, acknowledged that he might receive some consideration for his testimony in the terms of his supervised release. Tr. Vo. 19, 232-33.  Yet the instruction was so misleadingly phrased that the jury could have had no idea it could apply to Ward, who had not received immunity for his testimony and did not appear by name in the instruction although he was the only witness to whom it applied.

Mr. Agofsky argues that Mr. Newton's failure to challenge the instruction as plain error was deficient performance. *See* Amended § 2255 Motion at 194.  Newton responds that he could not have satisfied the "prejudice" prong of the plain-error standard because the court gave the "immunity" instruction.  He ignores Mr. Agofsky's argument that the "immunity" instruction was useless because the jury could not tell that it applied to Ward.  He also ignores Ward's key role in the trial.  The government procured its only eyewitness's testimony at the last minute, over two years after the offense and shortly after he had been denied early release.  Although he denied receiving any explicit promises, he admitted that he testified with some hope of favorable treatment. Newton could have made a very persuasive argument that the court's failure to insure that the jury scrutinized his testimony with caution severely prejudiced the defense.

Mr. Newton makes an equally beside-the-point response to Mr. Agofsky's argument that he

-222-

should have challenged the instruction on Mr. Agofsky's statement to Officer Matt. The instruction directed the jurors to determine only the statement's voluntariness and not its accuracy. It told them to consider the evidence concerning the statement "with great care," but only in determining whether it "was knowingly and voluntarily made." Tr. Vol. 20, 352-53. The defense contended, not that this statement was involuntary, but that Officer Matt mis-remembered what Mr. Agofsky had said. Accordingly, the instruction failed to advise the jurors appropriately of their duties. *See Crane v. Kentucky*, 476 U.S. 683, 688 (1986) (holding that exclusion of testimony concerning circumstances of confession denies defendant opportunity to challenge credibility of testimony before jury).

Newton rejects this claim, asserting that he "could not have made a non-frivolous argument under the rigorous 'prejudice' prong of under the plain error standard, particularly in view of the . . . 'voluntariness' instructions[.]" SA 2356. His reliance on the voluntariness instruction as a reason for not challenging the voluntariness instruction, without addressing the court's failure to require the jurors to determine whether Officer Matt had reported the statement accurately, is circular and non-responsive. And he could have made a strong prejudice argument; the prosecution relied heavily on Matt's account of Mr. Agofsky's statement to support its argument for first-degree murder. Beginning on the first page of his summation, the prosecutor argued that "the heart of the matter" was Officer Matt's testimony and Mr. Agofsky's "own statements," urging the jurors to infer from Matt's version that "It means premeditation, premeditation." Tr. Vol. 20, 366-67. Newton's failure to raise this point was deficient.

### e.    The Erroneous Exclusion of Mitigating Evidence

As explained in Point II.G.1, *supra*, and the corresponding section of the Amended § 2255 Motion, trial counsel began to elicit a description of Mr. Agofsky's background from Dr. Dan Roberts, but stopped short when the trial court sustained the prosecutor's unsound hearsay objection.

*See* Amended § 2255 Motion at 169.  The governing statute, a rule of evidence, and the Constitution all require federal district courts to receive relevant hearsay evidence offered in mitigation at a penalty trial.  *See* 28 U.S.C. §3593(c); *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (citing *McKoy v. North Carolina*, 494 U.S. 433, 440-41 (1990)); *Green v. Georgia*, 442 U.S. 95, 97 (1979); Fed. R. Evid. 1101(d)(3).  The trial court's exclusion of the background information Dr. Roberts had gathered from Mr. Agofsky and his mother was plain error that Newton could and should have raised on direct appeal.

Newton now responds that he would not have identified the claim because the mitigating information identified comes from extra-record sources and thus was not part of the record on appeal.  SA 2357.  While Mr. Agofsky does offer extra-record evidence to support his related claim that trial counsel were ineffective for abandoning any effort to introduce background hearsay information that Dr. Roberts could have provided, *see* Amended § 2255 Motion at 170-74, the record on direct appeal already contained everything Newton would have needed to demonstrate plain error, using the four-part test of *United States v. Olano*, 507 U.S. 725, 732 (1993).  First and second, the court committed error that  was "plain"; the ruling contradicted the governing statute and evidence rule, and the Constitution.  *See Olano* 507 U.S. at 732.  Mr. Newton does not assert otherwise.

Third, the error affected Mr. Agofsky's substantial rights, *see id.* at 732 (citing F.R. Crim. P. 52(b)), because there was a reasonable probability that, but for the error, the result of the penalty phase would have been different.  A reasonable probability is less than "more likely than not," but is sufficient to undermine confidence in the outcome of trial.  *See United States v. Holmes*, 406 F.3d 337, 365 (5th Cir. 2005) (equating *Olano* "affects substantial rights" standard with *Strickland* "reasonable probability" standard, 466 U.S. at 694).  Mr. Newton knew from the record that Dr.

-224-

Roberts had interviewed Mr. Agofsky and his mother, and learned that Mr. Agofsky had lost his father as a child, that he had two brothers, and that he had grown up in Missouri. Tr. Vol. 22, 211-12. Not a single scrap of other evidence at the penalty phase gave the jury any reason to view Mr. Agofsky as a human being. Furthermore, as Newton was aware, the jurors were divided or conflicted about the presence or absence of intent to kill and thus about Mr. Agofsky's guilt of capital murder. Even the limited record facts at Newton's disposal thus establish at least a reasonable probability – that is, at least a probability less than more likely than not – that the outcome of the penalty phase would have been different if the jury had learned background information from Dr. Roberts. *See Skipper v. South Carolina*, 476 US 1, 8 (1986) (granting relief because Court "cannot be confident" that exclusion of mitigating evidence had "no effect" on penalty verdict, and "reasonably likely" that exclusion "may have affected" jury's decision); *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000) (erroneous exclusion of surrebuttal testimony by defense mental-health expert was not harmless beyond a reasonable doubt).

Finally, Newton could have argued convincingly that the Court of Appeals should exercise its discretion to grant relief because the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736. The erroneous exclusion of relevant mitigating evidence, especially mitigating evidence as conventional and crucial as a description of the defendant's family background, was a grave injustice. As the Court of Appeals has recently stated:

> The *Tennard* Court stated that, rather than a test for "constitutional relevance," the Court's ruling in *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), taught that juries must be permitted to give effect to any mitigating evidence that holds general relevance:
>
> > [T]he meaning of relevance is no different in the context of

> mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard--any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence--applies. Id. at 2570 (citations and internal quotations omitted).

*Tennard v. Dretke*, 442 F.3d 240, 254 (5th Cir. 2006) (citing *Tennard v. Dretke*, 542 U.S. 274 (2004)). The trial court's ruling deprived Mr. Agofsky of that constitutional right, enshrined in a long line of Supreme Court cases (*see, e.g., id.*, 542 U.S. at 285), as well as the controlling statute and evidence rule. Mr. Newton could easily have demonstrated plain error and his failure to challenge the trial court's obviously erroneous ruling was deficient performance.

> **f.     The Improper Cross-Examination and Argument On Antisocial Personality Disorder**

The Amended § 2255 Motion argues that Mr. Newton was deficient for failing to challenge the prosecutor's misleading cross-examination and summation argument on Mr. Agofsky's non-existent antisocial personality disorder ("ASPD"). *See* Amended § 2255 Motion at 194-95, *see also id.* at 177-79. Mr. Newton states that he would not have identified this claim because the prosecutor's misleading actions "did not impair the strategy of the defense," which, as Newton construes it, entailed admitting that Mr. Agofsky would present a future danger unless prison officials controlled him. Misconstruing the record, Newton concludes that:

> Furthermore, the defense expert himself agreed on cross-examination that Mr. Agofsky would qualify as having ASPD but for the fact that the expert was "not able to formulate activities or dispositive behavior prior to [age] eighteen." Regardless of whether this expert opinion was incorrect and regardless of whether the prosecutor's own expert offered a contrary opinion outside of the jury's presence, it was the opinion offered by the defense's own expert to the jury – and was part of the record that confronted me on direct appeal as appellate counsel.

Case 1:07-cv-00511-ALM   Document 105   Filed 09/09/09   Page 244 of 303 PageID #: 2306

SA 2357.

In fact, the prosecution never presented any expert testimony to counter Dr. Roberts. More important, Newton understates the impact of the prosecutor's misleading use of Dr. Roberts's responses. As trial counsel established at a hearing out of the jury's presence in connection with another witness, Mr. Agofsky does not suffer from ASPD and the "V-code" of adult antisocial behavior is not a mental disorder. Tr. Vol. 21, 164. It was misleading to question Dr. Roberts at length about a diagnosis that did not apply to Mr. Agofsky. While Mr. Newton does not believe that the ASPD label, a personality disorder diagnosis, damaged the defense, the prosecutor apparently anticipated that it would. He spent over half of his cross-examination attempting to make the ASPD label stick. Tr. Vol. 22, 224-28. And Mr. Newton does not even address the very beginning of the prosecutor's penalty phase summation, in which he leaped misleadingly from "adult antisocial behavior" to ASPD to name-calling: "[H]is own psychologist called it antisocial disorder. Regular folks, you just call it that he's a killer." Tr. Vo. 24, 332-33.

In a case in which Mr. Agofsky faced the death penalty for a fight in a dangerous prison, an inaccurate prosecutorial argument that Mr. Agofsky's own expert had rendered a "diagnosis" that he had a "disorder" that made him a "killer" was devastating and, ultimately, damning. Mr. Newton's failure to perceive the importance of the prosecutor's dishonest elaboration on a fictional diagnosis was deficient performance.

### 6. Conclusion

Mr. Newton sketched out only four claims that the Court of Appeals panel had the power to address, one of which, the double jeopardy claim, could relieve Mr. Agofsky of only one of his death sentences. As Mr. Agofsky could only die once, he needed a basis for relief on both capital

-227-

murder counts if his appeal was to do him any good. At least one of the claims Mr. Newton outlined in his brief, the inconsistent verdict claim, could have won him a new trial – if Mr. Newton had located authority whose analysis supported his argument and had explained to the Court of Appeals how the inconsistency arose from juror arbitrariness and thus required reversal. Newton failed to raise other winnable grounds for appeal, including the prosecutor's unconstitutional comments on Mr. Agofsky's right to remain silent, a burden-shifting instruction on the relationship between murder and manslaughter, and the trial court's erroneous exclusion of relevant mitigating evidence. He raised not a single claim that would have required a new trial of Mr. Agofsky's guilt or innocence.[93] In all these respects, Newton's performance was deficient. There is a reasonable probability that, but for Mr. Newton's failure to make a serious effort to secure relief for his client, the outcome of Mr. Agofsky's appeal would have been different. For all the reasons above and in the Amended § 2255 Motion, Mr. Agofsky received ineffective assistance of appellate counsel. U.S. Const. amend. V, VI. This Court must accordingly order an evidentiary hearing and grant relief on this ground.

---

[93] At the very least, Newton could and should have argued that the double jeopardy violation required a new trial, not only of the penalty phase, but of the guilt-innocence phase. Requiring the government to elect one count, after conviction for both, could not make Mr. Agofsky whole for the trial court's failure to require the election before trial. The multiplicitous counts permitted spillover prejudice from the "murder by a life-sentenced inmate" count (Count 1), which informed the jury of an otherwise inadmissible eleven-year-old offense and the resulting life sentence, on the "federal murder" count (Count 2). On the other hand, Count 2, which required premeditation, created its own spillover effect on Count 1, which did not. It was largely because the government had the burden of proving premeditation that the government sought to introduce the otherwise inadmissible, and highly inflammatory, Miele assault evidence at the guilt-innocence phase pursuant to Fed. R. Evid. 404(b). *See* Tr. Vol. 17, 36-37, 41 (prosecutor argues Miele assault relevant to showing of planning and intent). Newton was deficient for failing to point out on appeal that, if the district court had properly dismissed one count pretrial, trial counsel would not have been forced to fight the spillover prejudice battle on two fronts at once.

IV.     **GROUND 12.4: MORGAN-EXCLUDABLE JURORS WERE SEATED ON THE FINAL JURY.**

Mr. Agofsky's presentation in support of this point appears in the Amended § 2255 Motion at 196.

V.      **GROUND 12.5: THE GOVERNMENT WITHHELD FAVORABLE EVIDENCE THAT WAS MATERIAL TO GUILT OR INNOCENCE AND TO PUNISHMENT.**

As the Amended § 2255 Motion describes, the government withheld material evidence at trial, failing to disclose evidence that undermined the opinion testimony and credibility of government witnesses, evidence that could have implicated others or rebutted the government's proofs in the Noel State Bank case, and evidence that could have been used to mitigate punishment. *See* Amended § 2255 Motion at 198.  The government thus violated Mr. Agofsky's right to due process of law.  U.S. Const. amend. V; *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see Banks v. Dretke*, 540 U.S. 668 (2004).

The government also violated *Brady* by withholding crucial exculpatory evidence that would have undermined the testimony of prison-yard witness Richard Ward, the sole witness to claim that Mr. Agofsky was the initial aggressor in the January 5, 2001 cagefight. Undisclosed was an agreement with Ward for early release, and favorable treatment upon release, from prison in exchange for his testimony.  A further violation of *Giglio v. United States*, 405 U.S. 150, 153 (1972), occurred when the government stood silent in the face of denials by Ward that an agreement existed.

Ward had always claimed he did not see the incident, which even by the government's account only lasted about eleven seconds.  Over three years later, on February 9, 2004, Ward received news that his request for supervised release to a Community Corrections Center had been

-229-

denied, *see* SA 2378 *(Letter of February 9, 2004 from Mike Wright to Marilyn S. Taylor)*, despite an earlier favorable recommendation. *See* SA 2379-*2380 (Program Review Report, January 13, 2004).*[94] Ward soon changed his tune and pronounced for the first time that he did see the incident. *See* SA 2548 *(Ward FBI Interview of May 14, 2004)*. He coupled this belated revelation with a specific request for assistance from the FBI in gaining favorable treatment regarding his future release. *See* SA 2382 *(Ward FBI Interview of June 19, 2004)* ("Ward asked if he could have his supervised release commuted."). The government consistently denied making Ward any promises in exchange for his testimony ("Ward was told he that he would not be promised any reward for his testimony and that any reduction in sentence would be up to the prosecutors in his original sentencing case and the court that sentenced him"). *Id.*

It is now clear that the government failed to disclose the full extent of its agreement with Ward, an agreement which induced him to lie at trial.[95] Contrary to its assertions at trial, the government "promised [Ward] a new beginning thru (sic) a witness protection program," assured him he would be released "7 days after court" and that he " would not be subjected to supervised release" upon his discharge from prison. *See* SA 2131 *(Declaration of Richard Ward)* at 4. Government agents further advised Ward that he would have to "trust" them as they would not commit the agreement to writing ("They told me they would not put it on paper and I would have to trust them"). *Id.* Ward was instructed as well to conceal this agreement. "They told me this can not be disclosed because it would ruin the case. They told me that I have to get it across that this

---

[94]Ward filed a grievance noting his favorable recommendation. See Request to Staff Member of May 6, 2004. Reconsideration was denied on May 19, 2004. See Response to Request to Staff Member of May 19, 2004. SA 2546, 2547.

[95]Ward now admits he cannot say who was the initial aggressor. See SA 2128-2129.

is the right thing to do.  That was very important." *Id.*

In addition to these undisclosed promises, Ward was meticulously coached to give the testimony the government insisted on.

> They told me that I have to get it across that this is the right thing to do.  That was very important.

> During meetings with the prosecutor and another unknown investigator, I was told not to lie.  I was told that I knew [Plant] was viciously stomped on and that I saw the whole fight.  The investigator frequently got mad while he was scripting me.  They were almost playing good cop, bad cop.  They wanted me to minimize any contact with Shannon.  When I said I had greeted him, they said you mean you just nodded.  They would interrupt me with the information they wanted.  They did not want the jury to think Shannon and I were friends.

> ***

> They promised to give me a release 7 days after court.  After I testified I was never able to get in contact with them again.

*Id.* at 2131, 2134.

The undisclosed agreement and the government's failure to correct false testimony violated *Brady* and *Giglio*.  Even more egregious is the government's active solicitation of Ward's help in concealing the agreement.  While publically claiming no agreement, it secretly concealed the true arrangement – if Ward cooperated, he would be assisted in getting out, have his supervision period rescinded, and would get a "new beginning" in the witness protection program.

Due process and the defendant's right to confront the prosecution's witnesses are violated when a prosecutor affirmatively hides, and the witness fails to reveal, impeachment evidence. *Brady v. Maryland*, 373 U.S. 83 (1963); *Banks v. Dretke*, *supra*, 540 U.S. 668;  *Kyles v. Whitley*, 514 U.S.

419, 437 (1995).  Even tacit agreements are subject to disclosure under *Brady*.[96]  Due process was

violated when the government failed to disclose the true extent of its agreement with Ward.

A further due process violation occurred when the government failed to correct Ward's false

trial testimony:

> Q.    As far as being promised any rewards for your testimony, let's get that clear. What do you understand any agreements have been by the government for you coming today to testify?
>
> A.    No one has actually promised me anything.

Tr.  Vol 19, at 238.

"[D]eliberate deception of a court and jurors by the presentation of known false evidence is

incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153

(1972) (internal quotations omitted);  *Alcorta v. Texas*, 355 U.S. 28 (1957); *Napue v. Illinois*, 360

U.S. 264 (1959).

---

[96]   *See, e.g., United States v. Moore*, 283 Fed. Appx. 218, 218, 2008 WL 2477637, at *1 (5th Cir. 2008) (tacit agreements, if proven, violate *Brady*); *Douglas v. Workman*, 560 F.3d 1156, 1185 -1186 (10th Cir. 2009) ("A deal is a deal - explicit or tacit. There is no logic that supports distinguishing between the two."); *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) ("The existence of a less formal, unwritten or tacit agreement is also subject to *Brady*'s disclosure mandate"; relief denied as "[t]he fact that [the witness] desired favorable treatment in return for his testimony in Bell's case does not, standing alone, demonstrate the existence of an implied agreement"); *Wisehart v. Davis*, 408 F.3d 321, 323 (7th Cir. 2005) (recognizing that if there was a "tacit understanding that if [the witness'] testimony was helpful to the prosecution, the state would give him a break on some pending criminal charge" ... "Express or tacit, either way there would be an agreement, it would be usable for impeachment, and it would have to be disclosed to the defense."); *Reutter v. Solem*, 888 F.2d 578, 582 (8th Cir.1989) ("[t]he fact that there was no agreement ... is not determinative of whether the prosecution's actions constituted a *Brady* violation requiring reversal.... We hold that, viewed in the context of petitioner's trial, the fact of [the witness'] impending commutation hearing was material ... and that petitioner therefore is entitled to relief"); *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) ("[F]acts which imply an agreement ... bear on [the witness's] credibility and would have to be disclosed").

The suppressed evidence was material.  Ward's testimony was crucial to the case as he was the only trial witness to claim that Mr. Agofsky was the initial aggressor.  His credibility was already suspect and this additional information could well have been dispositive in the minds of the jurors.  Ward failed to come forward until three years after the incident and then unabashedly requested help with the term of his release in exchange for his testimony.  Ward was severely mentally ill, admitting to a history of blackouts, suicidal ideation, "hearing voices" and other hallucinations, and drug abuse in prison.  Tr. Vol 19, at 233-35.  Indeed, the ostensible reason[97] his release was denied was his mental illness:

> Ward was diagnosed with having an uncontrolled significant disorder. As a result, he was prescribe[d] anti-psychotic medications to aid him with his disorder. Inmate Ward has refused to utilize the medications since his arrival at this facility. Psychology staff has been counseling him due to his history of suicidal behavior.
>
> Based on this information, the Unit Team feels inmate Ward is a safety concern if placed in a Community Corrections Center due to his non-compliance with the Bureau of Prisons programs.

See SA 2378 *(Letter of February 9, 2004 from Mike Wright to Marilyn S. Taylor).*

Had the jury learned that, in addition to Ward's interest in tailoring his testimony to help the government and his severe mental illness, he was the beneficiary of an undisclosed deal, there is a reasonable probability that the outcome would have been different.  For these reasons and those in

---

[97]Upon information and belief, and subject to receipt of additional discovery, it is clear the prison delayed Mr. Ward's release not because he was a threat in the community but so that his "cooperation" in the Agofsky prosecution could be coerced by the threat of continued incarceration.  As of January 13, 2004, noting Ward's "good work performance" and "clear conduct," his Unit Team recommended  Ward for "CCC placement."  *See* SA 2379 *(Program Review Report, January 13, 2004.)* Yet three weeks later he was deemed a "safety concern" and his release denied.

the Amended § 2255 Motion, the Court should order an evidentiary hearing and grant Mr. Agofsky

relief on this ground.

**VI.    THE TRIAL COURT ERRED IN FAILING TO DISMISS THE INDICTMENT WITH PREJUDICE FOR PRE-ARREST DELAY AND VIOLATION OF PETITIONER'S CONSTITUTIONAL AND STATUTORY SPEEDY INDICTMENT RIGHTS, WHERE THERE DELAY WAS INTENTIONAL AND DESIGNED TO HAMPER THE DEFENSE AND MR. AGOFSKY WAS PREJUDICED. ALL PRIOR COUNSEL WERE INEFFECTIVE FOR FAILING TO ADEQUATELY RAISE, LITIGATE AND BRIEF THIS ISSUE.**

The incident occurred on January 5, 2001 yet Mr. Agofsky was not arrested until August 21, 2003, a delay of over two and one-half years. The delay was orchestrated by the government to ensure favorable witnesses would be dispersed throughout the penal system or released and thus impede any attempt to build a defense. Mr. Agofsky was prejudiced, notwithstanding counsels' meager attempt at investigation, rendering it difficult to secure witnesses and exposing them to claims of diminished memory and tailored testimony, and subject to impeachment for failing to come forward sooner. Prior counsel were ineffective for failing to raise this claim. Mr. Agofsky's rights to due process and effective assistance of counsel were violated.

Prearrest delay violates due process if it appears that the delay was unreasonable and that it was prejudicial to the defendant in the presentation of his case. *United States v. Lovasco*, 431 U.S. 783, 789-90 (1977); *United States v. Marion*, 404 U.S. 307, 324-26 (1971). To prevail on such a claim, a defendant must show prejudice and intent by the prosecution to gain a tactical advantage. *Marion*, 404 U.S. at 324; *Davis v. Quarterman*, No. 3:08-cv-00715-B, 2009 WL 2150865, at *7 (N.D. Tex. July 16, 2009).

By January 24, 2001, within weeks of the incident, the government had already announced not only its intention to prosecute but to seek the death penalty as well. See SA 2550(letter of January 24, 2001 from Special Agent in Charge Richard Mosquera to Warden Ernest Chandler). Yet another two and one-half years transpired before Mr. Agofsky was charged. The government

-235-

had no legitimate reason to delay prosecution in this case; rather it was designed to gain a tactical advantage and undermine any prospective defense. All the witnesses were available and it had within days announced its intention to prosecute. Rather, the bad faith delay was designed to impede the defense as the FBI knew virtually all of the eyewitnesses did not support the government's version of the events. By building in delay it knew these witnesses, if ultimately called by the defense, would be vulnerable to accusations their testimony was manipulated and subject to impeachment for failing to come forward initially. Indeed, this is exactly what happened; the only two eyewitnesses were both cross-examined about their failure to come forward sooner. *See* Tr. Vol 19, 311-12 (defense witness Robert Ecker impeached with failure to forward sooner); Tr. Vol 19, 322 (defense witness Billy Santiago impeached with failure to forward sooner). Production of witnesses was hampered as well. An additional witness who could testify Plant was the initial aggressor, Armondo Lopez, had been discharged by the time of trial and ultimately the defense failed to produce him. SA 550. Yet another witness, Mark Williams, had died in the interim and would have supported the defense version of events. *See* Declaration of Randy Seitzinger (SA 2117) (talking in Cage Three with Mark Williams when they observed Plant throw the first punch).

The government, which all along intended to prosecute Mr. Agofsky, delayed its case indefinitely until it was confident the witnesses were dispersed and the defense hampered in producing witnesses and with the knowledge that these witnesses, by time of trial, would be vulnerable to impeachment for failing to come forward sooner.

Counsel failed to raise this meritorious claim in a timely manner and thus his performance was deficient. As demonstrated above the delay was in bad faith and hampered the defense.

Prejudice has been amply shown.  Mr. Agofsky's rights to due process and effective assistance of

counsel under the Fifth and Sixth Amendments were violated.  A new trial must be granted.

**VII.    NEW EVIDENCE ESTABLISHES THAT PETITIONER WAS CONVICTED IN THE SHORT CASE AND SENTENCED TO DEATH IN THE PLANT CASE ON THE BASIS OF INACCURATE AND UNRELIABLE EXPERT SCIENTIFIC TESTIMONY, IN VIOLATION OF HIS DUE PROCESS AND EIGHTH AMENDMENT RIGHTS.**

**A.    The National Academy of Sciences Report**

On February 18, 2009, the National Academy of Sciences ("NAS" or the "Academy") issued a landmark report regarding the state of forensic science in this country.  *See* NAT'L ACAD. OF SCI., STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (Feb. 2009) (hereinafter "NAS Report"). SA 2817.  The NAS, which is the preeminent scientific organization in the United States, was commissioned by Congress to study the forensic sciences and to issue the instant report.   This Report concludes that "with the exception of nuclear DNA analysis . . . *no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source."* SA 2837 (NAS Report at S-5) (emphasis added.)  The NAS Report further recognizes that "there is a notable dearth of peer-reviewed published studies establishing the scientific bases and validity of many forensic methods," *Id.* at 5-6, including latent print analysis.  SA 2837-44.

Further, the NAS report "concludes that every effort must be made to limit the risk of having the reliability of certain forensic methodologies judicially certified before the techniques have been properly studied and their accuracy verified." *Id.* at 3-1.  This conclusion has direct implications for the verdicts rendered in the Short murder trials where the only physical evidence that tied Mr. Agofsky to the scene of the crime a fingerprint "match" found on a piece of duct tape found near the location at which Mr. Short's body surfaced in a lake.  Two FBI agents testified at trial.  One, Robert Webb, testified that the edge of this piece of duct tape matched precisely the edge of a piece

-238-

of duct tape attached to the chair in which Mr. Short was found.  The other, Russell Davey, an FBI latent print examiner, testified without qualification that the two fingerprints found on this duct tape could be individualized to Mr. Agofsky. This is the very type of testimony the NAS Report found to be unacceptable,  because of the lack of scientific studies to support such broad claims.

The NAS is plainly critical of forensic experts testifying to "absolute" identifications, like the testimony presented in this case.  "Claims of 'absolute' and 'positive' identification should be replaced by more modest claims about the meaning and significance of a purported 'match'." *Id.* at 5-12 (SA 2876).  "Imprecise or exaggerated expert testimony has sometimes contributed to the admission of erroneous or misleading evidence." *Id.* at S-3 (SA 2835).

The NAS also recognized that the law's greatest dilemma in its heavy reliance on forensic evidence concerns the question of whether – and to what extent – there even is *science* in any given "forensic science" discipline.  As the Report finds:

> Two very important questions should underlie the law's admission of  forensic evidence in criminal trials: (1) the extent to which a particular forensic discipline is founded on a reliable scientific methodology that gives it the capacity to accurately analyze evidence and report findings and (2) the extent to which practitioners in a particular forensic discipline rely on human interpretation that could be tainted by error, the threat of bias, or the absence of sound operational procedures and robust performance standards.  These questions are significant.  Unfortunately, these important questions do not always produce satisfactory answers in judicial decisions pertaining to the admissibility of forensic science evidence proffered in criminal trials.

*Id.* at S-7 (SA 2839).

The NAS emphasized the pressing need to insure the reliability of forensic testimony. "Law enforcement officials and the members of society they serve need to be assured that forensic techniques are *reliable*.  Therefore, we must limit the risk of having the reliability of certain forensic

science methodologies condoned by the courts before the techniques have been properly studied and their accuracy verified." *Id.* at 3-19-20. Nevertheless, the NAS notes judicial reluctance to subject forensic testimony to appropriate scrutiny. "[S]ome courts appear to be loath to insist on such research as a condition of admitting forensic science evidence in criminal cases, perhaps because to do so would likely 'demand more by way of validation than the disciplines can presently offer.'" *Id.*

This report seriously undermines the reliability of critically important fingerprint testimony presented by the Government at Mr. Agofsky's trial for the Daniel Short murder to establish Mr. Agofsky's participation in this crime. The conviction in the Short case was in turn was used in the Plant trial as the basis for three of the aggravators submitted to the jury during the penalty phase of trial.

The NAS Report has particular force because it was not developed at the request of the criminal defense bar, but in response to a request from Congress. The report reflects the generally accepted consensus of the scientific community. The NAS is a private, non-profit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare of the United States. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters.[98]

---

[98] *See* http://www.nasonline.org/site/PageServer?pagename=ABOUT_main_page. "Members and foreign associates of the Academy are elected in recognition of their distinguished and continuing achievements in original research; election to the Academy is considered one of the highest honors that can be accorded a scientist or engineer." *Id.* "The Academy membership is comprised of approximately 2,100 members and 380 foreign associates, of whom more than 200 have won Nobel Prizes." *Id.*

The NAS was signed into being by President Abraham Lincoln on March 3, 1863, at the height of the Civil War.  As mandated in its Act of Incorporation, the NAS has, since 1863, served to "investigate, examine, experiment, and report upon any subject of science or art" whenever called upon to do so by any department of the government. The Academy's service to government has become so essential that Congress and the White House have issued legislation and executive orders over the years that reaffirm its unique role.[99]

The NAS Report thus demonstrates, as discussed in detail below, that the expert scientific testimony relied upon by the Government in this case, is neither scientifically accurate nor reliable. Indeed, there is no scientifically reliable basis to support the scientific testimony used to link Mr. Agofsky to the murder of Daniel Short or the related robbery of the Noel State Bank.  Consequently, the jury's guilty verdicts in the Short case and death sentence in the Plant case are likewise unreliable.

B.    **The Due Process and Eighth Amendment Standards Governing Analysis of the New Evidence**

The NAS Report reveals that Mr. Agofsky's convictions and death sentence were based on unreliable evidence, in violation of due process and the Eighth Amendment.  "Reliability is ... a due process concern." *White v. Illinois*, 502 U.S. 346, 363-64 (1992).  Hence, the Due Process Clause requires that criminal convictions be reliable and trustworthy.  *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974); *Thompson v. City of Louisville*, 362 US 199, 204 (1960).  The use of exaggerated, inaccurate, or misleading testimony, such as that presented by the Government here, deprives a defendant of a fair trial if "the false testimony could . . . in any reasonable likelihood have

---

[99]    *Id.*

-241-

affected the judgment of the jury." *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *see also Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Giglio v. United States*, 405 U.S. 150 (1972).

The requirement of reliability stretches across our criminal justice system and is the backbone of much constitutional analysis. For example, due process precludes the admission of identification evidence if, under the totality of the circumstances, the identification process was impermissibly suggestive so as to give rise to a substantial risk of misidentification. *Stovall v. Denno*, 388 U.S. 293 (1967). Indeed, the linchpin for the admission of identification testimony is its reliability. *E.g., Manson v. Braithwaite*, 432 U.S. 98, 114 (1977); *Neil v. Biggers*, 409 U.S. 188 (1972). The due process inquiry applicable here is therefore whether the new evidence "could... in any reasonable likelihood have affected the judgment of the jury" in its determinations of guilt and in its sentence of death.

Similarly, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion); *see also Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980); *Mills v. Maryland*, 486 U.S. 367, 383-84 (1988). This need for heightened reliability requires "*accurate* sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die," *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (plurality opinion), and invalidates death sentences imposed as a result of the jury's consideration of materially inaccurate evidence. *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (Eighth Amendment does not permit a death sentence to be imposed by a jury that was allowed to consider materially inaccurate evidence); *Tuggle v. Netherland*, 516 U.S. 10, 14 (1995) (same). As discussed

-242-

below, the jury's death verdict here was based in significant part on materially inaccurate and unreliable pseudo-scientific evidence. As such, Mr. Agofsky's death sentence cannot stand.

## C.        The Unreliable Fingerprint Testimony

While fingerprint evidence has a long history of acceptance by state and federal courts as a legitimate forensic science, the NAS Report requires re-examination of that view. The NAS Report devotes considerable attention to deficiencies in forensic fingerprint practices. Virtually all of the general failings of forensic science are found in the area of friction ridge analysis – the method of fingerprint analysis used in Mr. Agofsky's case. The NAS Report findings on fingerprints (See SA 2871-78) include:

- The training of personnel to perform latent print identifications varies from agency to agency. Agencies may have a formalized training program, may use an informal mentoring process, or may send new examiners to a one- to two-week course. NAS Report at 5-8.

- The ACE-V methodology (Analysis, Comparison, Evaluation, and Verification) commonly used in latent print identification does not rest on a reliable factual foundation does not specify particular measurements or a standard test protocol and examiners must make subjective assessments throughout. *Id.* at 5-9.

- Outcome of a friction ridge analysis is not necessarily repeatable from examiner to examiner because of its subjectivity and further experienced examiners do not necessarily agree with even their own past conclusions when the examination is presented in a different context some time later. *Id.*

- The subjectivity is intrinsic to friction ridge analysis, as can be seen when comparing it with DNA analysis ... [T]he process does not allow one to stipulate specific measurements in advance, as is done for a DNA analysis. Moreover, a small stretching of distance between two fingerprint features, or a twisting of angles, can result from either a difference between the fingers that left the prints or from distortions from the impression process. For these reasons, population statistics for fingerprints have not been developed, and friction ridge analysis relies on subjective judgments by the examiner. Little research has been directed toward developing

-243-

population statistics, although more would be feasible. *Id.* at 5-10.

- The criteria for identification are much harder to define because they depend on an examiner's ability to discern patterns (possibly complex) among myriad features and on the examiner's experience judging the discriminatory value in those patterns. The clarity of the prints being compared is a major underlying factor. For 10-print fingerprint cards, which tend to have good clarity, even automated pattern-recognition software (which is not as capable as human examiners) is successful enough in retrieving matching sets from databases to enjoy widespread use. When dealing with a single latent print, however, the interpretation task becomes more challenging and relies more on the judgment of the examiner. *Id.*

- At present, fingerprint examiners typically testify in the language of absolute certainty. Both the conceptual foundations and the professional norms of latent fingerprinting prohibit experts from testifying to identification unless they believe themselves certain that they have made a correct match. Experts therefore make only what they term "positive" or "absolute" identifications—essentially making the claim that they have matched the latent print to the one and only person in the entire world whose fingertip could have produced it . . . Given the general lack of validity testing for fingerprinting; the relative dearth of difficult proficiency tests; the lack of statistically valid model of fingerprinting; and the lack of validated standards of declaring a match, such claims of absolute, certain confidence in identification are unjustified . . . *Id.* at 3-17, n.79.

- Although there is limited information about the accuracy and reliability of friction ridge analyses, claims that these analyses have zero error rates are not scientifically plausible. *Id.* at 5-12

- ACE-V provides a broadly stated framework for conducting friction ridge analyses. However, this framework is not specific enough to qualify as a validated method for this type of analysis. ACE-V does not guard against bias; is too broad to ensure repeatability and transparency; and does not guarantee that two analysts following it will obtain the same results. *Id.*.

- Error rate is a much more difficult challenge. Errors can occur with any judgment-based method, especially when the factors that lead to the ultimate judgment are not documented. Some in the latent print community argue that the method itself, if followed correctly (i.e., by well-trained examiners properly using the method), has a zero error rate. Clearly, this assertion is unrealistic, and, moreover, it does not lead to a process of method improvement. The method, and the performance of those who use it, are inextricably linked, and both involve multiple sources of error (e.g.,

errors in executing the process steps, as well as errors in human judgment). *Id.* at 5-13.

- Uniqueness and persistence are necessary conditions for friction ridge identification to be feasible, but those conditions do not imply that anyone can reliably discern whether or not two friction ridge impressions were made by the same person. Uniqueness does not guarantee that prints from two different people are always sufficiently different that they cannot be confused, or that two impressions made by the same finger will also be sufficiently similar to be discerned as coming from the same source. The impression left by a given finger will differ every time, because of inevitable variations in pressure, which change the degree of contact between each part of the ridge structure and the impression medium. None of these variabilities—of features across a population of fingers or of repeated impressions left by the same finger—has been characterized, quantified, or compared. *Id.*

At Mr. Agofsky's trials for the murder of Daniel Short, the government introduced testimony of FBI fingerprint analyst Russell Davey. Agent Davey testified that he processed, compared, and matched latent prints with prints from Mr. Agofsky. Agent Davey compared prints found on two pieces of duct tape, one of which was found on the chair into which Daniel Short had been taped before being drowned, the other of which was found on the shore of the lake in which Mr. Short's body surfaced a week after he had disappeared. Agent Davey testified that he had been able to match the latent fingerprints with the known inked prints of Mr. Agofsky, using a process whereby the ridges of the latent fingerprints are analyzed and then compared against known inked prints. This process of fingerprint identification is known as "friction ridge analysis."

The techniques used by Agent Davey to link Mr. Agofsky's fingerprints to the processed latent fingerprints were deficient and unreliable. Virtually all of the failings of forensic science in the area of friction ridge analysis identified in the NAS Report are present in this case. The findings were not and cannot be demonstrated to be reliable or based on valid science.

The admission of unreliable fingerprint evidence taints the integrity of the trial process and

-245-

denies a defendant a just and fair trial. *See Napue*, 360 U.S. at 271. The new evidence demonstrating the unreliability of Agent Davey's testimony is neither cumulative nor corroborative of evidence presented at trial. *See id.* Indeed, at trial, the defense presented no evidence undermining the scientific validity of the experts' fingerprint testimony. Further, the new evidence does not simply impeach Davey's testimony – it invalidates it.

Accordingly, there is a reasonable likelihood that this new evidence would have resulted in a different outcome in the penalty imposed in the Plant case. The fingerprint testimony given by Agent Davey provided a false scientific basis in the Short murder trials that eliminated doubt in the government's otherwise extraordinarily weak case against Mr. Agofsky. Without Davey's testimony, couched in unequivocal, categorical terms as it was, there is little chance the jury hearing the Short case would have convicted Mr. Agofsky of the robbery or murder for which he was being tried. The concerns raised by the NAS Report would certainly have caused the Plant jury to assess Mr. Agofsky's convictions of the Short murder in a very different light and to question whether the government had indeed proved Mr. Agofsky's guilt in those trials beyond a reasonable doubt. Because the Short conviction provided such a significant part of the case in aggravation for the government, undermining the reliability of the verdicts in those cases is likely to have resulted in one or more votes against the imposition of death in the Plant trial.

### D.    Conclusion

Given the new evidence undermining the reliability of the Government's expert evidence described above, an evidentiary hearing is necessary to determine the precise impact of the NAS Report's findings on the scientific evidence at issue. Petitioner requests that the Court hold an evidentiary hearing to address this matter.

-246-

## VIII.   MR. AGOFSKY IS INNOCENT OF CAPITAL MURDER.

Of the twenty-eight potential eyewitnesses on the Beaumont SHU recreation yard on the day of the fight between Shannon Agofsky and Luther Plant, the government could muster only one: Richard Ward, a mentally ill drug addict who initially told the FBI that he did not see what happened, and only turned on Mr. Agofsky over three years later, on the eve of Mr. Agofsky's trial, after prison officials abruptly dropped plans to release him to a halfway house and the FBI promised him unsupervised release to the witness protection program.  Ward has now recanted.  He states:

> I did not see the beginning of the fight between Shannon Agofsky and Luther Plant and do not know who started the fight.  When I first looked, I saw a blur and thought that Shannon had hit Luther Plant (Tootie) with the palm of his hand.  The FBI coached me that he must have hit Tootie with his elbow because Shannon had an indentation from Tootie's tooth near his elbow area.
>
> At the beginning of the fight my view was obscured by Shannon's back.  When I realized there was an incident I turned away from the fight . . . I knew I did not have much time left and I did not want anyone to think I could be involved in this incident.

SA 2128-29.

Nine witnesses state that Luther Plant started the fight and Shannon Agofsky acted only to defend himself.  *See* SA 2113 (Billy Santiago), SA 2040 (Robert Ecker), SA 2117 (Randy Seitzinger), SA 2079 (Melvin Hauser), SA 2062 (Reginald Gilbert-Bey), SA 2097 (Robert McKinn), SA 2071 (Charles Glave), SA 2014 (Andres Campillo), SA 2035 (Frank Early).  The only witness who has ever testified otherwise now admits that he did not see how the fight began. The evidence establishes a valid claim of self-defense and thus Mr. Agofsky's innocence of capital murder.  *See United States v. Branch*, 91 F.3d 699, 714 (5th Cir. 1996) (citing *United States v. Feola*, 420 U.S. 671 (1975)).  Mr. Agofsky is therefore entitled to postconviction relief on the ground that the

conviction and death sentence of an innocent man violates due process of law.  U.S. Const. amend. V; *Herrera v. Collins*, 506 U.S. 390 (1993); *see also House v. Bell*, 547 U.S. 518, 537 (2006)*; Schlup v. Delo*, 513 U.S. 298 (1995)*; Wolfe v. Johnson*, 565 F.3d 140, 163-66 (4th Cir. 2009) (remanding for hearing on actual innocence claim where sole witness who implicated the defendant and who had received benefits for his testimony, recanted).  This Court must accordingly order an evidentiary hearing and grant relief on this ground.

IX.    **TRIAL COUNSELS' AFFIDAVITS CONTAIN FACTUALLY INACCURATE AND NON-RESPONSIVE ALLEGATIONS, SPECIFICALLY NEGATED BY THE TESTIMONY AND STATEMENTS OF NUMEROUS PERSONS, INCLUDING MR. AGOFSKY.**

A.    **Introduction**

On February 9, 2009, this Court entered an Order (Doc. 70) directing trial counsel, G. Patrick Black and Douglas M. Barlow, to submit affidavits responding to the claims in Mr. Agofsky's Amended § 2255 Motion.  Both attorneys served the affidavits on Mr. Agofsky's current post-conviction counsel and on counsel for the government.  *See* Response and Affidavit of G. Patrick Black, Esq., March 13, 2009 (SA 2316); Affidavit of Douglas M. Barlow, Esq., March 13, 2009 (SA 2330).[100]

The affidavits contain factually inaccurate allegations.  In addition, they are vague and often non-responsive to Mr. Agofsky's very specific claims.  The Amended § 2255 Motion advances claims that Mr. Agofsky's trial attorneys were ineffective for:

•    failing to interview or present specific inmate witnesses who could have supported self-defense and heat of passion, either by providing eyewitness testimony that Luther Plant started the fight or by providing relevant background information about Luther Plant's reputation, the violent atmosphere at USP Beaumont, and prison culture;

•    failing to interview or present helpful testimony from specific, potential government witnesses;

•    failing to obtain or present specific expert testimony that could have supported the defense at the guilt-innocence phase;

•    failing to conduct an adequate voir dire in connection with specific jurors and overall;

_____

[100]  Mr. Agofsky responds to the affidavit of his appellate counsel, Brent E. Newton, Esq., in Point III.

-249-

- committing prejudicial errors in the presentation of the case at the guilt-innocence phase of trial;

- failing to conduct an independent investigation of the government's case in aggravation, including Mr. Agofsky's prior convictions and disciplinary infractions;

- failing to conduct a reasonable mitigation investigation by compiling and presenting a social history supported by reasonable efforts to interview specific family members, friends, and teachers;

- failing to investigate and present mitigating evidence readily available through specific inmates personally acquainted with Mr. Agofsky;

- failing to obtain and present appropriate mental health evaluations and presenting a poorly investigated and prepared case on future dangerousness; and

- committing prejudicial errors in the presentation of the defense case during the penalty phase.

As discussed in greater detail below, Mr. Black and Mr. Barlow respond to these claims either with general assertions that they did conduct an adequate investigation and did provide effective courtroom representation, or with more specific, usually false, assertions blaming Mr. Agofsky and his family for the deficiencies in counsels' conduct of the case. *But see Rompilla*, 545 U.S. at 381 (counsel had a duty to investigate despite family attitude); *Adams*, *supra*, 342 Fed. Appx. at 347-49 (same).

Mr. Agofsky has replied to his former attorneys' allegations in an affidavit denying and explaining, where explanation is necessary, his former attorneys' allegations. *See* Affidavit of Shannon Agofsky, August 6, 2009 SA 2359. Mr. Agofsky's responses are described in full below. Moreover, the witness statements and other evidence presented and summarized in Mr. Agofsky's

Amended § 2255 Motion and this Supplement – including the statements or deposition testimony of all five experts retained by trial counsel – contradict Mr. Black's and Mr. Barlow's defensive claims, support Mr. Agofsky's pleadings and affidavit, and demonstrate the ineffective assistance they provided in undertaking to defend his life.

### B.      Luther Plant Investigation

Mr. Black generally alleges that the defense team conducted a proper investigation:

> Trial counsel provided effective assistance of counsel to Mr. Shannon Agofsky at all times.  The case was properly and fully investigated.  Numerous witnesses were contacted and interviewed prior to trial.  Counsel's investigator traveled to several states and prison facilities to speak with many potential witnesses.  Trial counsel visited and inspected the crime scene at the United States Penitentiary and also arranged for their prison expert, Mr. Pelz, to tour the facility and location.

SA 2323.  He states that he subpoenaed six and called three inmate witnesses at the guilt-innocence phase, but the jury chose not to believe them.  SA 2323, 2326.  Further, he claims, some of the inmate witnesses whose statements appear in the appendix to the Amended § 2255 Motion did not provide the same information in 2004.  He gives only one example, that of Pete Carrion, whose statement is discussed in Point I.D of the Amended § 2255 Motion and this Supplement.  SA 2327.

Mr. Barlow also generally claims that the defense team performed a thorough investigation, stating that "Over the course of many months, we conducted interviews with Agofsky, as well as persons who knew him in prison, as well as out of prison."  SA 2335.  He states that Mr. Agofsky gave the defense the names of witnesses from the recreation yard and "our investigator attempted to locate and interview all of the persons who had relevant information at that time."  SA 2337.  He asserts that the defense team presented at trial "the only actual eyewitnesses we were able to locate and who were willing to testify as to who swung first and that Agofsky acted in self-defense."  SA

2340.

These allegations are denied, and are contradicted by the evidence set forth in Point I.  In his accompanying affidavit, Mr. Agofsky explains how surprised he was to learn that counsel had subpoenaed only six witnesses to his capital trial.  Mr. Agofsky believed, up until the time of his trial, that his attorneys had a list of approximately thirty witnesses whom they intended to subpoena in his defense.  SA 2372.  Correspondence from Mr. Black's file supports his belief.  In a letter dated February 8, 2004, Mr. Agofsky makes "comments on witness subpoenas," corrects the spelling of number 15 on the list, and asks for more information about number 19, whom Mr. Agofsky does not know.  SA 674.  In another letter, written near the beginning of trial, Mr. Agofsky refers to Gerald Miller, an African-American inmate present at the Lompoc incident who could have testified that it was fight on the yard, and not a riot.  SA 672.  As Mr. Agofsky explains in his affidavit, "my letter refers to Mr. Miller as 'the black guy on our list.'  I was referring to the list of approximately 30 inmates maintained by my defense team of witnesses.  It was my understanding up until trial that they intended to subpoena most if not all of these witnesses."  SA 2372.

Mr. Barlow makes few assertions that relate to specific witnesses.  He states that "other information we had obtained through investigation" indicated that the Luther Plant incident "was a preplanned 'hit' for which Agofsky had been compensated."  SA 2337.  Neither Bennett nor Black supports this assertion, and it is denied.  The record suggests that if Barlow acquired this idea, he did so, not from his own investigation, but from discovery provided by the government.  First, an FBI report supplied to the defense by the government, summarizing a statement by a cooperating witness, Jaycob Vidana, alleges that the fight was a planned "hit."  SA 2551-52.  Vidana did not testify at trial and has recanted.  He did not see who started the fight and believes it was mutual

combat. He is a schizophrenic who was using "a lot" of heroin in both 2001 and 2004. SA 2121-27. Another document supplied to the defense by the government, a report by a BOP Special Investigation Service agent, contains a statement by an inmate named James Stephens. SA 2553 Stephens did not testify for the government at trial either. Mr. Agofsky himself has always denied that the incident was a "hit": "I was not compensated for it. I was defending myself." SA 2369.

The Amended § 2255 Motion erroneously alleges (at 19) that trial counsel made no documented efforts to contact any government witnesses. In fact, Mr. Bennett made one documented, and unsuccessful, effort to visit Richard Ward. SA 623. He and Mr. Black now state that subsequent efforts were made to speak to Ward prior to trial. SA 554, 2327.

Black also states that Bennett contacted Officer Christopher Matt, who was on the recreation yard on the morning of January 5, 2001, but did not see the beginning of Mr. Agofsky's fight with Luther Plant. SA 2328. Although Bennett asserted in his deposition that he did in fact interview Officer Matt, he could not recall when he did so. In addition, he did not recall taking notes or memorializing the interview in any way. SA 561. No one from the defense team told Mr. Agofsky that they had interviewed Officer Matt. SA 2363. Mr. Agofsky wrote letters in which he suggested topics to cover with Officer Matt. SA 675, 2554-55. As Mr. Agofsky points out in his affidavit, "evidently from Mr. Black's cross-examination of him they never did ask him those things." SA 2363.

Both Black and Barlow claim that the defense contacted Robert Duggan, Mr. Agofsky's former teacher, who allegedly said that he had no personal recollection of Mr. Agofsky's attendance at his academy. They claim that Mr. Agofsky told them that he and Duggan had parted on "less than favorable terms." SA 2325, SA 2338. According to Black, the defense obtained course materials

-253-

and books used by the academy.  SA 2324-25.  The postconviction investigation and documentary evidence contradict these claims, which are denied.  When postconviction counsel contacted Duggan in late 2007, he remembered Mr. Agofsky and provided information about him.  A33-36.  The materials from Duggan's academy that trial counsel turned over to postconviction counsel bear the government's bates stamp numbers and were provided by the government in discovery.  SA 2429-59.  The materials received from Black do not include the "mini-manual" on unarmed defensive tactics that Mr. Agofsky asked counsel to obtain, in support of his justification defense.  SA 2367, SA 2460.

Contrary to trial counsels' assertions, Mr. Agofsky affirms that "I never told Mr. Barlow, Mr. Black, or Mr. Bennett that my time at Duggan's ESI school ended badly."  SA 2367.  Instead, as demonstrated in his letters to counsel, Mr. Agofsky made multiple suggestions for ways Duggan's testimony could be helpful to the defense.

> I suggested to Mr. Barlow that they look into a portion of Duggan's ESI curriculum that covered something called the tachy-psych effect (a phenomenon in response to a life threatening situation in which a person's ability to react and reason under pressure is degraded and distorted).  This, I thought, would be helpful in supporting our case in self-defense.  I also asked them to obtain Duggan's mini-manuals to support the defense.  I am not aware that they ever did so. (See, e.g., Bates 6692).[101]
>
> ....
>
> While the defense did get some of Duggan's materials from a website, they did not obtain the materials that I asked them to request from Duggan himself.  The "mini-manuals" that had been used for my ESI training, which discussed techniques for responding to lethal force and the tachy-psyche effect, would have supported my self-defense claim, but my attorneys did not request them. The materials used by the defense to cross examine Mr. Duggan were provided by the Government in conjunction with the case.

SA 2367-68.

---

[101]  *See* SA 2460.

Mr. Duggan himself maintains that no one from the defense team ever contacted him. A33, A36. Additionally, Mr. Agofsky "was never told that Mr. Bennett or any other member of my team spoke to Duggan." SA 2367-68. Duggan would not have said he did not remember Mr. Agofsky. Duggan had sent Mr. Agofsky's black belt certificate to his mother, Sheila Agofsky, only a few years previously. *Id*.

Thus, Mr. Black's and Mr. Barlow's few specific assertions concerning their investigation of the Luther Plant incident are denied. Furthermore, Mr. Agofsky has proffered the testimony of seven uncalled eyewitnesses and numerous background witnesses who would have testified that Luther Plant started the fight or offered other helpful information, and whose names and register numbers Black and Barlow received from the government. He has proffered other helpful information from Robert Duggan and Gerald Edmondson, and from trial experts Gripon, Elizabeth Pelz, and Terry Pelz. Neither Black, Barlow, nor Bennett has offered a convincing explanation for not interviewing and presenting them at trial.

### C.    Trial Counsel's Interactions With Mr. Agofsky.

Both Mr. Black and Mr. Barlow attempt to deflect attention from themselves to Mr. Agofsky, blaming him for meddling in their investigation. Their allegations that he interfered are false and distorted. Mr. Black states:

> On more than one occasion he became very upset that trial counsel had contacted potential fact witnesses or family members because he "had not given the OK" for trial counsel to contact them. He specifically instructed trial counsel to never contact any potential inmate fact witness unless he had communicated with the person first.

SA 2325. He claims that Mr. Agofsky "selected and approved" the six inmates the defense subpoenaed. Mr. Black chose to call three as witnesses, Ecker, Santiago, and Lawson, and rejected

-255-

the other three, Fitzgerald, Spring, and Rivera, on the basis of his "personal interview of them, trial tactics, evidentiary issues, and his assessment of their credibility." SA 2326. But the three rejected inmates were not present on the recreation yard at the time of the Plant incident and had no first-hand information to contribute regarding the fight itself, no matter what strategy the defense adopted or how Black viewed their credibility.

Similarly, Barlow states that "the actual eyewitnesses changed regularly according to Agofsky." He claims that, after evaluating the testimony of the three eyewitnesses who testified for the defense, the team decided that "calling other witnesses whose testimony we perceived to be weaker would have been counter-productive." SA 2340-41. Like Black, Barlow does not address the fact that the remaining three subpoenaed witnesses were not potential eyewitnesses at all.

Contrary to counsel's assertions, the list of potential eyewitnesses in the recreation cage of the Beaumont SHU on January 5, 2001 never changed. The government turned over that list to the defense team in early 2004. SA 2570-76. Before the defense received that discovery, Mr. Agofsky provided counsel with the names that he did have, so that they could begin their investigation while waiting for the government to turn over the official list. SA 2362. Mr. Agofsky explained how to obtain his address book, where he had written down the names of other prisoners who were on the yard that day three years earlier. SA 670, SA 2362. Mr. Agofsky did not know every inmate on the yard that day, nor did he have all of their names or inmate numbers. SA 2362. Once the government turned over the list, however, the defense had the name and inmate number of every single potential eyewitness. Mr. Agofksy also asked the defense team to obtain the recreation logs from the yard the day of the incident, which contained the names of all eyewitnesses. SA 2362. Trial counsel made no such request.

-256-

Mr. Agofsky was involved in his defense, and he did not want to die. SA 2377. His letters and affidavit show that he was attempting to cooperate with his trial attorneys. His suggestions of potential witnesses only changed when the theory of the case, as it was communicated to him by the defense, changed. SA 2363. For example, in his initial letters he suggested ways counsel could show that he was not a member of the Aryan Nation. Later, when the defense's theory of the case changed, he suggested how to counter allegations that he was a member of the Aryan Brotherhood. *Id*. Mr. Agofsky's suggestions were not, as counsel allege, "control" or "manipulation," but the efforts of a man zealously advocating for his own defense.

Mr. Barlow accuses Mr. Agofsky of persistent obstructive behavior:

> Agofsky was quite cordial and cooperative so long as we followed his dictates. We quickly learned that Agofsky intended to control the process exclusively directing our every move. We were not to file any motion or request except upon his instruction, and he became angry at any disobedience of his orders.

SA 2335-36. With respect to the investigation of the Luther Plant incident, Barlow falsely accuses Mr. Agofsky – who at the time was in pretrial detention in a private jail in Liberty Texas, while most of the potential witnesses were in BOP facilities all over the country – of "manipulating" witnesses:

> Agofsky instructed us not to speak with any witness without his prior approval or instruction, and told us that it would be necessary for him to speak with each witness individually before our attempts. He became angry when our investigator made attempts to contact some witnesses without his prior approval. If we failed to follow his instructions, he promised to sabotage our efforts on repeated occasions throughout our representation. During the course of our efforts to locate these fact witnesses, Agofsky instructed us to cease looking for further witnesses from the recreation cage because he had exhausted his list of potential witnesses through his contacts. . . . We gathered the distinct impression that Agofsky was manipulating witnesses along the way, and even during trial.

SA 2337-38.

Trial counsel's allegations that Mr. Agofsky tried to control their investigation and manipulate witnesses are denied. Mr. Agofsky did not tell counsel that he would need to talk with each witness. SA 2361. He did, however, ask that the team talk to him first before they interviewed prison witnesses. *Id*. He was concerned about gang issues in the prison. *Id*. In his affidavit, Mr. Agofsky discusses the reasons for his concern. First, Mr. Agofsky was concerned about asking gang members directly for help and then becoming indebted to them.

> Prison is a dangerous place, where I have to live, and I do not want to be indebted to gang members, from gangs such as the Aryan Brotherhood or the Dirty White Boys. If I placed myself under obligation to a gang member for saving my life I could have found myself pressured to reciprocate by doing gang business. After managing for so many years to keep free of gang obligations in violent prisons, I did not want my attorneys or their investigator inadvertently entangling me in a gang. I explained my reasoning to Mr. Bennett.

SA 2359-61. Indeed, Mr. Bennet himself admitted in his deposition testimony that this was a valid concern. SA 555.

Second, Mr. Agofsky was concerned because his defense team was spreading rumors among the prison population about the identity of the government informant.

> [W]e knew that one or more inmates were cooperating with the government. At the same time, I knew that several of the inmates who were on the recreation yard during the Plant incident, or who had other pertinent information, were affiliated with gangs. It would have been very dangerous to me, my brother, and family if one of these witnesses got the inaccurate impression that I and my defense team thought he was a snitch, or if my defense team even created the impression that he might be a snitch. I was worried that one of these witnesses could have retaliated against me. If they couldn't reach me, because I was incarcerated under high security, they could have reached my brother, who was in general population, or they could have gone after my family. I was gravely concerned about making sure my own defense did not get me, my brother, or my family murdered. This is why it was so critical that the defense team proceed with care. Jay Bennett carelessly told inmates that other prisoners were snitches and I did not trust him to handle this with the requisite caution.

SA 2360.

Mr. Agofsky's fears were warranted. Although Mr. Bennett denied in his deposition that he discussed who the snitches were with other inmates, SA 555, his letters demonstrate otherwise. In one letter, Mr. Bennett told Thomas Farrugia that Jaycob Vidana was the suspected informant. SA 645. Doing so potentially put Vidana in serious danger, especially since he was housed in the same prison with Mr. Farrugia. In another letter, Mr. Bennett "outed" Vidana to Armondo Lopez. SA 644. Mr. Bennett also told a number of prisoners that he believed Ben Masters was the informant, which was not true. As Mr. Agofsky discusses in his affidavit, "Mr. Masters is a known member of the Aryan Brotherhood. Thus, Mr. Bennett's indiscretion could have had dangerous consequences for both Mr. Masters and myself." SA 2360.

Third, at the time of the investigation, the government was pursuing several large capital RICO prosecutions of alleged members of the Aryan Brotherhood ("AB"). SA 2360-61. Accusing other inmates of being involved with the AB could have exposed them to federal prosecution. Mr. Agofsky explains in his affidavit:

> I was very concerned that my defense team might suggest to a potential witness that I was identifying him as an AB member when he was not actually a member or didn't want to be known as a member. Even asking inmates to self-identify as members of the AB could have opened them to capital RICO prosecution. This, too, could have gotten me, my brother, or my family murdered. So I wanted to be sure my defense team never said to an inmate "Shannon knows you're AB" or even said the name "AB" to any inmate unless the inmate brought up the subject himself. This is clear from my letters to Denise Callier and Jay Bennett, in which I repeatedly instruct them not to ever mention the term AB before an inmate did.

SA 2360-61; *see, e.g.*, SA 2507. Mr. Agofsky's recollection is well supported by the documentary evidence. In several letters turned over by trial counsel to postconviction counsel, Mr. Agofsky

urges Bennett to proceed with care inside the prison, especially with regard to the Aryan Brotherhood. For example, at one point in the case, the defense believed that inmate Ben Masters might be cooperating with the government and Bennett was planning a trip to USP Marion to interview other inmates about Masters. In a letter dated April 10 (SA 687), Mr. Agofsky asked Bennett to first visit Masters himself at ADX in Florence, Colorado, to try to find out if Masters was an informant, before talking to other inmates about Masters. Mr. Agofsky's reasons for doing so were self-preservation and protection of his family. "If Masters or associates of his had learned that we were spreading the word we thought he was a snitch, and it was not true, there could have been serious consequences. And, in fact, it turned out that Masters was not cooperating with the government and Mr. Bennett was operating under a false assumption." SA 2360.

Although he wanted his team to proceed with caution, Mr. Agofsky "did not attempt to control contacts with other witnesses." SA 2361. His correspondence with his team contains examples of his deference to them. In one letter, Mr. Agofsky mentions that he has learned that Bennett is going to see Charles Glave and wonders who he is. Later in the letter, after making detailed investigation suggestions, he interjects, "Please don't think I'm trying to tell yo how to do your job[.]" SA 2498-99. Similarly, Mr. Agofsky states that he "provided letters of introduction for Mr. Bennett to bring with him to some of the inmate witnesses, so that they would know that he was not with the prosecution and so that they would have something to show to other inmates to demonstrate that their visitor was not with the prosecution." SA 2361. The correspondence turned over to postconviction counsel by Mr. Black includes an example of such a letter, written to Thomas Farrugia. SA 2556. In addition, Mr. Agofsky gave to his counsel his full address book to aid in their investigation SA 2361, SA 648. Mr. Agofsky did not, as counsel allege, "insist on speaking

to witnesses before the defense contacted them."

As discussed above, Mr. Agofsky had many suggestions for the investigation of his case and communicated them to Bennett and his attorneys in writing and orally. Bennett has acknowledged and Mr. Agofsky has stated that he had legitimate concerns about his own safety and that of his family if Bennett failed to take care in contacting certain inmate witnesses. SA 555, 2359-61. Mr. Agofsky did not, however, obstruct the investigation. And, regardless of how he behaved, his trial team had a constitutional obligation to conduct a thorough investigation, particularly in a case in which the names and register numbers of the potential guilt-innocence eyewitnesses appeared on a list supplied by the government.

**D.     Trial Counsel's Inadequate Investigation Of Mr. Agofsky's Background**

**1. Mr. Agofsky's Prior Convictions and Infractions**

Neither Mr. Black nor Mr. Barlow claims that the defense made any effort to investigate Mr. Agofsky's prior disciplinary infractions, and Bennett has testified that they did not ask him to do so. SA 555. Regarding Mr. Agofsky's prior convictions, both attorneys claim generally that they did investigate them and also claim that Mr. Agofsky did not want them investigated in any event. Both allegations misstate the facts and are denied.

According to Mr. Black, Mr. Bennett drove to Oklahoma City to obtain 24 boxes of materials and transcripts, from the archives of the Oklahoma Indigent Defense System ("OIDS"), relating to Mr. Agofsky's prior trial for the Noel State Bank case. SA 2325-26. He says that he spoke to Mr. Agofsky's Oklahoma attorney, Deborah Maddox, more than once but would not have used her opinion that he is innocent, even if it were admissible, for fear of "opening the door" to all of the

evidence and prejudicial facts of that case. He claims that Mr. Agofsky told trial counsel he did not want to "relitigate" that offense because of "family concerns and involvement." SA 2326.

Mr. Barlow states that "it would have been 'suicide by trial' to try to convince the jury that Agofsky was innocent of the prior capital murder case, especially when Agofsky chose not to discuss the facts of that case with us." SA 2339. He claims that he "would have lost all credibility with the jury" in attempting to persuade them of his only mitigation theory, that "Agofsky did not need to die, because the BOP could securely house him forever." SA 2339. He does not point to any efforts he made to investigate the facts of Mr. Agofsky's prior convictions except to blame Mr. Agofsky, falsely, for not "cooperating." SA 2337. He states that Mr. Agofsky refused to reveal "pertinent information" concerning the specifics of his "prior significant offenses, such as the Dan Short capital murder."[102] SA 2337.

These allegations are denied. Neither Mr. Black nor Mr. Barlow ever asked Mr. Agofsky for details about the Noel State Bank case, such as information about the evidence or the witnesses. SA 2364-65. Contrary to Mr. Black's allegations, he never told counsel that his family was involved. Mr. Agofsky has always maintained, and continues to maintain, that he and his family are innocent of that crime. SA 2365.

Nor did he tell counsel that he did not want to litigate his own involvement in that case. SA 2365. Instead, Mr. Agofsky urged his trial counsel to investigate his prior conviction. He asked them repeatedly to obtain the Oklahoma transcript for that reason. In one letter to counsel, he explained that the transcript would be very useful in his attempt to prove his innocence. SA 677.

---

[102] Mr. Agofsky had only one other prior conviction, for two counts of interstate transportation of firearms.

Contrary to Mr. Black's affidavit, counsel told Mr. Agofsky that they did not obtain the Oklahoma transcripts. SA 2366, SA 675. Although Bennett stated in his deposition that he had picked up 24 boxes from OIDS, he admitted that he never looked inside the boxes. SA 558. The transcripts of Agent Farley's prior testimony that Mr. Black and Mr. Barlow had available for their trial preparation were turned over to them by the government, and not obtained by the defense. SA 2366.

Capital counsel have a fundamental obligation to investigate the government's case in aggravation. *See Rompilla*, 545 U.S. at 385-89 (investigating prior conviction the government has said it will use is "a sure bet"). Further, they must undertake a reasonable investigation *before* formulating strategy. *See, e.g., Martinez-Maeias, supra*, 810 F.Supp. at 819. As Point II.B, *supra*, demonstrates, an investigation could have cast doubt on Mr. Agofsky's guilt of the Noel State Bank case and could have uncovered numerous witnesses who could have denied, explained, or provided context for his disciplinary infractions. Black's and Barlow's affidavits only confirm their abdication of duty with respect to this aspect of the case.

### 2. Family and Childhood

*The alleged preparation of a social history.* Mr. Black alleges that "trial counsel" met with Mr. Agofsky "numerous times prior to trial" and that Bennett met with him "on nearly a weekly basis." SA 2324. He claims that the team investigated his social history:

> A complete social history and background was obtained by trial counsel. Information as to criminal history, personal and family history, physical condition, mental and emotional health, substance abuse, education and vocational skills, and employment records were obtained. Not only were previously written federal presentence reports obtained and carefully reviewed and discussed with Mr. Agofsky, but trial counsel's investigator drove to Noel, Missouri in March 2004, to personally interview Mr. Agofsky's mother. The investigator spent nearly 4 hours interviewing her in her home concerning the Petitioner's entire life and background.

Habeas counsel entirely omits this fact in their Petition.[103]

SA 2324.

Mr. Barlow also claims that the defense team conducted an investigation of Mr. Agofsky's

background:

> With the assistance of our investigator, we conducted a comprehensive investigation
> into his background to learn how he had been raised and what led him to his current
> predicament. We also learned a good deal about Agofsky himself. Armed with
> information about him, discovery from the government, and results of our
> investigation, we formulated a trial strategy that we felt best under the
> circumstances. . . . We learned that Agofsky was an intelligent person who
> graduated near the top of his high school class with a promising future but for his
> foray into a life of crime.

SA 2335-36. Neither Black nor Barlow confirms the testimony of Bennett that he prepared a written

social history report that he gave to Barlow, who (according to Bennett) may have lost it in the

hurricane that destroyed Barlow's files in this case. SA 559, 577. Dr. Roberts never saw or heard

about such a report or received any information that such a report might have contained. SA 721,

731, 768. Neither did Dr. Gripon ever receive such a report. SA 2788-89.

Trial counsels' account of their interactions with Mr. Agofsky contradict the documentary

evidence and Mr. Agofsky's recollection. His first meeting with anyone from his defense was at

his initial appearance, which (according to the docket) was held on September 25, 2003. After that,

months went by and no one from his defense contacted him at all. According to Mr. Agofsky:

> I first met Mr. Barlow at my arraignment in September 2003. He said he would
> come down and talk to me in the holding cell after the proceeding was over, but he
> never came down. I learned during the arraignment that my trial was scheduled for

---

[103] The Amended § 2255 Motion states that the investigator may have visited Mr. Agofsky's mother, but that the records received from trial counsel include no documentation of such a visit. *See* Amended § 2255 Motion at 92 n.20; 123 ¶ 257.

-264-

November 17, 2003.  No one from my defense team informed me when it was adjourned, on October 23, 2003,[104] until Mr. Bennett and Mr. Barlow came to see me in November.  Nor was I aware that they were seeking a continuance.  As October went on and I did not hear from my attorneys, I became increasingly worried that they would not be prepared for trial.

SA 2364.  Mr. Agofsky's recollection is supported by contemporaneous letters he wrote to his mother.  She gave them to Mr. Black, who has turned them over to postconviction counsel.  These letters show his increasing anxiety and trepidation as months passed and his capital trial approached, without any contact from his defense counsel.  SA 2557, 2562.  After November, Mr. Barlow came to visit his client only a handful of times.  SA 2364-65.  Mr. Black visited Mr. Agofsky one time, in December 2003, around Christmas, before he had received discovery in the case.  According to Mr. Agofsky, "This was the only time that Mr. Black spoke with me outside of the courtroom."  SA 2363.  Mr. Agofsky estimates that Mr. Bennett visited him approximately ten times, not weekly as asserted by counsel.  SA 2363.  Some of these visits were very brief "drop-ins," perhaps fifteen minutes long, occurring when Mr. Bennett would call him out of his cell while he was visiting other inmates in the jail. SA 2363.

Mr. Agofsky also never saw a social history report from his trial team.  SA 2367.  His recollection of the background investigation conducted by the defense at trial also differs greatly from trial counsel's.

> Virtually all the information my counsel compiled about me was obtained from the government. Though they never asked me to, I did write out my criminal history for them.  I never discussed my personal and family history with Mr. Black and only sketchily with Mr. Barlow.  Regarding my physical condition, I was asked by Mr. Barlow if I exercised and if I was sick.  There was no discussion of my emotions or feelings with counsel.  Regarding substance abuse, I told counsel I did not use drugs.

---

[104]   On October 23, 2003, the trial court granted a defense motion to continue the trial date to April 19, 2004.  Criminal Docket, Doc. 17.

Regarding my education and vocational history they just asked if I was a high school graduate. They did not discuss my time at ADX. They discussed my time at the Executive Security International only as part of an attempt to anticipate what Duggan would testify to. I don't think they asked me about prior employment although Dr. Roberts may have done so. They did not discuss my prior Pre-Sentence Investigation reports, and the copy of the Missouri Pre-Sentence Investigation report they gave me was an incorrect copy that did not reflect enhancements that were dropped by the sentencing court following my *pro se* argument.

SA 2367

In addition, counsel made no requests for background documents. Mr. Bennett admitted in his deposition that trial counsel did not ask him to obtain any documents from Mr. Agofsky's background. SA 546. Indeed, Mr. Agofsky recalls that the defense team did not even ask him to sign a release for records. SA 2369.

According to Mr. Barlow, the defense made strategic judgments not to present certain types of mitigating evidence (although in fact the defense had not investigated those types of evidence):

His current claim of organic brain damage was the type of unfounded claim that we felt would detract from the presentation of truthful evidence, and we prepared in that manner.

SA 2336. Further, "we did not believe that any of the mitigating evidence that existed would likely overcome the impact of violent acts including two capital murders by Agofsky." SA 2341. Barlow does not explain what type of mitigating evidence "existed" at the time he made this judgment, which is not surprising since he had not developed any except for what Dr. Roberts learned through his own interviews.

*Alleged negative information about Mr. Agofsky or his family.* Mr. Barlow, unlike Mr. Black or any other witness, falsely asserts that he learned negative information about Mr. Agofsky and his family. He claims that this information, along with irrelevant factors like Sheila Agofsky's personal

theories about the evidence in the Noel State Bank case, drove his penalty phase plans:

> We also learned that one or more of his family members had been suspects in the previous capital murder prosecution involving the death of the bank president Dan Short, which may have attributed [sic] to Agofsky's insistence that we not speak with his family.  We made arrangements to interview his mother to obtain background information and arranged for her presence at the trial.  Through information that we gained from contact with his mother, we learned that she believed that the Dan Short offense was a large "conspiracy" and that the body buried in Dan Short's grave was that of a black woman and not Dan Short.  I personally spoke with Ms. Agofsky and confirmed that such was the type of information that she intended to reveal had she participated in the trial of his case.  This type of information was representative of what we learned form Agofsky's background, and we contemplated offering mitigating evidence concerning the influence his family may have had on his introduction into a life of crime.  Agofsky himself implicated other family members and indicated his role in either participating in, or helping to conceal, criminal acts by other family members.

SA 2336.

Mr. Barlow did not tell Mr. Agofsky that he ever spoke with his mother.  Mr. Agofsky explains in his affidavit that "My mother's love for her sons combined with her adamant belief that we are innocent of this crime has led her to develop theories over the years to try and explain what happened."  SA 2366.

Mr. Barlow claims that the defense team decided against calling Mr. Agofsky as a witness because of "chilling factors," including boasting about his "violent capabilities" and an incident in which prison guards had to subdue him during an "act of resistance."  SA 2343.  Barlow falsely claims, with no support from Black, Bennett, or any other evidence, that Mr. Agofsky revealed to his trial attorneys that "he had in fact killed other individuals of which the government was unaware."  SA 2344.

Mr. Agofsky denies Barlow's allegation, and denies ever making such a statement to anyone

-267-

on his trial team.

> I never said such a thing to Mr. Black, Mr. Barlow, or Mr. Bennett or anyone else because it is false. I observe that there are no unsolved murders in the BOP. I never said, as Mr. Barlow states, that I killed anyone in prison on principle. The only person whose death I have caused was Luther Plant, and that happened because he jumped me, I reacted, and I was defending myself.

SA 2372. Mr. Agofsky also denies that he "boasted" about a violent incident. He explains that:

> The incident to which Mr. Barlow refers is one in which I refused to come out of a recreation cage because I had been skipped for recreation three prior consecutive times. Before the corrections officers were sent in to remove me, I explained directly into the video camera my reasons for refusing to leave the cell and that it was not out of anger or malice. I was not "bragging" about this incident. In fact, I only told Mr. Barlow about it because he brought the topic up. He said that Dr. Roberts was concerned the government might introduce evidence about an incident when guards were called to remove me from a recreation cage (not a cell). I told him about what had happened, because he asked, but also told him that I did not believe the subject would come up in court because the authorities did not charge me with an infraction for the incident and there was no paperwork on it. I urged him to obtain a copy of the videotape if he was concerned that the incident would be used against me at trial.

SA 2372.

*Mr. Agofsky's alleged resistance to defense contact with and testimony by his family.* Mr.

Black states that Mr. Agofsky resisted his mother's participation in the case:

> For a substantial period of time Mr. Agofsky was very specific that his mother was not to attend the trial or to testify in his behalf under any circumstances. We advised him we wanted her to testify. Mr. Agofsky finally agreed that his mother could attend the trial, but she was not to enter the courtroom at any time unless he gave his prior approval. Trial counsel made financial arrangements for Mrs. Agofsky to travel to Beaumont, Texas for the trial. She did not testify.

SA 2339.

Mr. Barlow makes a broader claim that Mr. Agofsky was generally opposed to background

mitigation, but Black, Bennett, and the record do not support him.  Further, Mr. Agofsky, Dr. Roberts, Dr. Gripon, other witnesses, and Barlow's own conduct during trial (when he made a too-easily abandoned effort to elicit background information from Dr. Roberts) all contradict his claim. Barlow states:

> Agofsky was adamant that we leave his family completely out of the process, despite our entreaties to him.  We explained the significance of mitigating information, and he was basically uninterested in presenting any mitigating evidence concerning his family or background whatsoever.

SA 2336.  Although Barlow actually began presenting background information through Dr. Roberts – until he was derailed by the prosecution's unsound hearsay objection – he now claims, falsely, that Mr. Agofsky's anticipated opposition to such evidence prevented him from presenting it:

> [W]e concluded that we could very easily lose control of the defensive theory because of the contingency that Agofsky would "act out" or disrupt the proceedings, as he threatened.  Agofsky had informed us in no uncertain terms that if we took any action, presented any evidence, or testimony, or raised any issue that displeased him, he was perfectly capable of "blowing up" in the middle of trial in order to disrupt the proceedings, and that he would do so.  He wanted no mitigating evidence from his past admitted.

SA 2341-42.

These accusations are denied, and are contradicted by documentary evidence.  Mr. Agofsky never objected to counsel's contacting his family members.  SA 2369.  He was aware that they had contacted two, his brother and his mother, and was not upset about either.  *Id.*  His asked his defense team to obtain his address book from ADX in Florence, Colorado, which contained contact information for several other family members.  SA 648.  The address book contained the addresses of his little brother Trevan, his maternal Aunt Peggy, his maternal Aunt Joy, and his paternal Aunt Terry.  SA 650, 651, 656, 664.  Dr. Roberts testified, and his contemporaneous notes reflect, that

Mr. Agofsky specifically told him that he could contact his mother and other family members. SA 730, 913. Counsel never suggested that any family members aside from his mother could or should testify. SA 2367-70.

Mr. Agofsky did not refuse to permit his mother to attend the trial. Initially, he was concerned with his mother's attendance at the guilt phase because his cousin was to testify. He did not want his mother to find out because it would cause a rift in the family. SA 2368-69. But he did not try to block her attendance at the penalty phase. In fact, correspondence from Mr. Agofsky to his trial counsel reflect that he asked them to help her with accommodations so that she could attend the trial. SA 2367-70, SA 681.

No one from Mr. Agofsky's defense team ever talked to him about factual or background testimony that his mother could have provided at trial.

> In my first discussion with Mr. Barlow regarding my mother, he asked me if my mom loved me and I said yes. Mr. Barlow said that then she's probably upset about your situation. I said yes again. Mr. Barlow then asked me if I thought she would cry if he put her on the stand. I told him that was not an option because I would not benefit from my mother's tears. He did not tell me of any factual information he would ask my mother to present. He did not suggest that she could testify about my life history and upbringing, or my head injuries or martial arts studies, or my father's death.

SA 2369. Mr. Agofsky's rejection of Barlow's initial suggestion was a refusal to permit counsel to put her on the stand just to cry. Had counsel discussed the background information that Mr. Agofsky's mother could have testified to, he would have consented to have her testify about mitigation in his penalty phase. He did not want his mother exploited. SA 2367-70.

### 3.   Prison Mitigation

As indicated, Barlow alleges that Mr. Agofsky "wanted no mitigating evidence from his past admitted." SA 2342. Mr. Barlow's allegation is false. It is unsupported by Mr. Black and Mr. Bennett and is contradicted by documentary evidence. In his correspondence with counsel, Mr. Agofsky directed counsel to specific witnesses from his eleven prior years of incarceration who could offer mitigating evidence as well as evidence to rebut aggravation. SA 2370-71; *see, e.g.,* SA 672-86. Mr. Agofsky wrote out questions that trial counsel could ask both inmates and guards about his own conduct in prison as well as prison culture evidence. *Id.*; *see also* SA 2566. He provided them with his address book, which contained a number of witnesses who could offer mitigating evidence about him in prison. SA 2371. Mr. Agofsky wrote out the details of every prior disciplinary infraction he had incurred in prison and suggested the names of witnesses who could have helped to provide defenses, explanations, and context to the prior acts alleged by the government. SA 646-47. He directed them to items in his BOP file that he thought would be helpful. Mr. Agofsky was very interested in counsel's presenting mitigating evidence from his prior incarceration and in rebutting aggravating circumstances.

### 4.   Consultations with Experts Concerning Mental Health Issues and Future Dangerousness.

The only defense Mr. Black makes in his affidavit of the trial team's mental health and future dangerousness presentation is to note that counsel called two Liberty Jail guards and four experts – prison consultants Cox and Terry Pelz, criminologist Elizabeth Pelz, and psychologist Dr. Dan Roberts – at the penalty phase, and argued that Mr. Agofsky's threat of future violence was low and the BOP had proper facilities to safely incarcerate him. SA 2323-24. He does not otherwise

respond to any specific allegations concerning the deficient mental health and future dangerousness investigation and presentation.

Mr. Barlow, who never investigated whether Mr. Agofsky had brain injuries or other neurological problems, nevertheless claims that "potential organic brain damage was the type of unfounded claim that we felt would detract from the presentation of truthful evidence[.]" SA 2336. He states that he hired "a renowned psychiatrist," but did not use him because he told Barlow that Mr. Agofsky's "penchant for violence was 'off the charts.'" SA 2345. Dr. Gripon is that psychiatrist. He contradicts Barlow's assertion, stating that Barlow never asked him to assess Mr. Agofsky's future dangerousness. SA 2789. Gripon did not diagnose Mr. Agofsky as suffering from antisocial personality disorder and could have testified, if asked, that the V-code "adult antisocial behavior" was a meaningless label when applied to a person in a prison setting. SA 2791. Gripon found Mr. Agofsky no more dangerous than any other prisoner who wanted to protect himself from violence. He was not a dangerous person but was surviving in a dangerous environment, and his prior convictions and infractions had to be assessed in context. When Gripon interviewed Mr. Agofsky at the Liberty Jail, the authorities clearly did not view him as especially dangerous, and his demeanor did not make Gripon apprehensive or uneasy. SA 2791-92. Mr. Barlow's allegation regarding Dr. Gripon is denied.

Barlow also presented the trial testimony of a clinical psychologist (Dr. Roberts), who, Barlow says in his affidavit, "prepared his evaluation based on the background information and investigation we had conducted." SA 2345. Roberts contradicted this claim at his deposition, testifying that he learned whatever he learned about Mr. Agofsky's background only from his own interviews with Mr. Agofsky and his own phone call to Mr. Agofsky's mother. Roberts denied

-272-

receiving a social history report or any other background information from counsel.  SA 721, 731.

Barlow's claim that he supplied background information to Dr. Roberts is denied.

Mr. Agofsky affirms that no one on his defense team ever conducted a full social history

investigation in his case.

> My trial defense team never told me that they had investigated my pre-prison
> background or described specific mitigating information from my pre-prison past
> that they could present on my behalf.  They never told me that they could present
> testimony about my childhood, the loss of my father, my martial arts training, my
> high school years, my academic record, or my head injuries.  They never told me that
> they could present testimony from my brothers, my aunts, my cousins, my uncles,
> or my teachers, and never described for me what factual information those witnesses
> (and/or my mother) could present or why that would be relevant to potential
> mitigating factors and to rebutting aggravating factors.  In particular, they never
> explained the importance of rebutting the government's "future dangerousness"
> aggravating factor and why my childhood and youth would be relevant to the
> rebuttal.  They never asked family members to speak to me about their willingness
> and eagerness to testify in my behalf.  And, although they gave me a warning that
> Dr. Roberts was going to visit me, they never told me what subjects he could cover
> in his testimony.

SA 2370.

In summary, as explained in Point II, *supra*, voluminous mitigating evidence was available,

from family members, teachers, friends, inmates, and experts.  Mr. Agofsky wanted to fight for a

life sentence and made repeated, documented efforts to suggest potential witnesses to his trial team.

He willingly provided family contact and family background information to Bennett and the mental

health experts.   Mr. Agofsky denies that he impeded trial counsel's investigation and explains

certain incidents that they have exaggerated into alleged obstruction.  And even if he had put up

some resistance to some avenues of mitigation investigation, that did not excuse counsel from

conducting one and presenting the most persuasive case for life reasonably available.  *See, e.g.,*

*Rompilla*, 545 U.S. at 381; *Wood*, 491 F.3d at 203 n.7; *Adams,* 2009 WL 1069330 at *5.  As the

-273-

attached declarations of witnesses, trial experts (Gripon, Roberts, E. Pelz, T. Pelz, and Cox), and postconviction experts (Gelbort, Gur, Spiers. Lundberg-Love, Bernstein, Cunningham, Haney, Cole, and Eng) all demonstrate, there were many ways to present the mitigating information summarized in this Supplement and the Amended § 2255 Motion.

### E.     Trial

#### 1.     Jury selection.

Mr. Black insists that he "conducted an effective voir dire and submitted an extensive questionnaire for all potential jurors to answer." SA 2323.  Mr. Barlow states that he and Black:

> carefully examined each juror with a view toward having an open mind concerning guilt or innocence, but just as importantly, being able to consider the death penalty only as a last resort.  We carefully utilized our peremptory strikes to obtain a jury that we believed would be amenable to our overall defense strategy, and committed no error in conducting the entire jury selection process.

SA 2340.  Neither Black nor Barlow comments on any decisions they made respecting specific jurors.  Their allegations that they conducted an effective voir dire are denied.

Mr. Agofsky recalls making a specific request to counsel about at least one potential juror during voir dire.  A seated juror expressed the belief that any situation in which a person was killed could not constitute legitimate self-defense.  SA 2371; Tr. Vol. 11, 97.  For that reason, Mr. Agofsky asked his attorneys to strike that juror.  In addition, Mr. Agofsky recalled that during voir dire Barlow was often not present.  SA 2371.

#### 2.     Counsel's Conduct of the Guilt-Innocence Phase of Trial.

According to Mr. Black, he was "fully and adequately prepared for trial."  SA 2323.  He states that he "conducted a thorough and effective cross-examination of Mr. Ward in an attempt to

-274-

neutralize and discredit his testimony," SA 2327, but does not respond to the specific allegations in the Amended § 2255 Motion (at 75-77) concerning Black's errors in Ward's cross-examination.

Mr. Barlow makes general assertions that the defense raised meritorious objections, protected the record, and presented a "well-reasoned and cogent" argument in summation. SA 2341. He does not respond to any specific allegations concerning the conduct of the trial. Black's and Barlow's non-specific allegations concerning their conduct of the defense are denied.

Mr. Agofsky was stunned when his counsel called only three inmate witnesses in the guilt-innocence phase of his trial. He "wanted counsel to interview and call many more than two eyewitnesses, and I believed that more than two favorable eyewitnesses were available. I also wanted counsel to present prison mitigating evidence through inmate witnesses, who could have included but should not have been limited to the three other subpoenaed witnesses (Fitzgerald, Spring, and Rivera). I believed that many more inmate mitigation witnesses were available and gave their names to my defense team." SA 2373.

### 3.    Counsel's Conduct of the Penalty Phase of Trial.

Mr. Barlow and Mr. Black defend their penalty phase presentation only with generalities. Barlow describes his efforts to develop his sole mitigation theme – that the BOP could control Mr. Agofsky and isolate him from other inmates, and that he would not pose a threat to guards – through voir dire, openings and summations, cross-examination of government witnesses, and presenting prison experts and jail guards at the penalty phase. SA 2344-45. He states that he would "not have conducted the investigation or trial in any substantially different manner," and that the outcome was the inevitable result of Mr. Agofsky's "past acts." SA 2347-48.

Barlow states that Mr. Agofsky shaved his head and refused to change from his prison

uniform into court clothes between the guilt-innocence and penalty phases. SA 2342. He claims that the team managed to "present mitigating factors," "without Agofsky realizing what was happening" and thus avoid "set[ting] him off in the courtroom." SA 2342.

In his affidavit, Mr. Agofsky denies Barlow's account and explains that Barlow confused two incidents that occurred during the trial.

> The defense team obtained a suit for me and Mr. Black told me that he had additional shirts for me to wear. During voir dire I wore the same shirt for 5 or 6 days in a row, telling Mr. Black each day that I needed a clean one. By the sixth day, the marshals who transported me to and from court were telling me that I smelled, and they were right. Finally, after the fifth or sixth day, as soon as I arrived at the courthouse around 6 a.m. before court, I told the marshals to tell my lawyers that I was not going to change into the dirty shirt again. Mr. Black came down to see me in the holding cell before court and I told him I was not wearing dirty clothes to court. He went to his car, or sent someone out to his car, and got me a clean shirt. I changed into the shirt and the suit and was ready on time to enter the courtroom. That is the only time I refused to change into court clothes during the trial and it was resolved before court began for the day.
>
> I did not threaten to shave my head. I simply did so the night after the jury found me guilty. I knew no mitigation investigation had been done and that my attorneys had little evidence to present at the penalty phase. I thought my situation was hopeless, so I shaved my head in protest.

SA 2373. Mr. Agofsky understood that the evidence the defense was presenting was intended to be mitigating, but believed it was ineffective and unpersuasive. "I was well behaved in court not, as Mr. Barlow alleges, because I was fooled about what my lawyers were doing, but because I did not want to disrupt the trial." SA 2373-74.

Still without support from Black or Bennett, Barlow claims that Mr. Agofsky "began to become uncontrollable" during the testimony of the former BOP warden (Cox). Barlow falsely states that Mr. Agofsky threatened to stop the proceedings with disruptive behavior, but the defense team "attempted to manage the situation" without attracting the attention of anyone else in the

-276-

courtroom.  SA 2346.

> Mr. Agofsky denies Barlow's allegations:
>
> I did not threaten to disrupt the trial.  I have never disrupted or threatened to disrupt
> any courtroom proceedings over the course of five trials in Missouri and Oklahoma,
> and never threatened to disrupt proceedings in this case.  Judge Heartfield cited my
> record of good conduct in the courtroom when he denied the government's motion
> to require me to wear a stun belt during trial.

SA 2373; *see also* Criminal Docket, Doc. 72.  Further, as he points out in his affidavit, the marshals

were sitting right next to him and would have immediately been alerted by any disruptive behavior

on his part.  SA 2375.

As described in Point II.G, Barlow abandoned his only effort to elicit any background

information about Mr. Agofsky, turning tail when confronted with an unsound hearsay objection

during Dr. Roberts's penalty phase testimony.  Neither Barlow nor Black objected to the

prosecution's unfounded cross-examination about Mr. Agofsky's non-existent antisocial personality

disorder or his misleading summation remarks about that diagnosis, and they otherwise failed to

advocate vigorously for Mr. Agofsky during the penalty phase.  Neither Barlow nor Black responds

specifically to these allegations.  Barlow attacks Mr. Agofsky instead, accusing him of actual and

threatened disruptive behavior, which Mr. Agofsky denies and Black and Bennett do not confirm.

Black says nothing at all about the penalty phase presentation except to list the witnesses who

testified for the defense.  SA 2323-24.

-277-

**F.      Trial Counsel's Interactions With Postconviction Counsel**

Both Mr. Black and Mr. Barlow attempt to defend their non-cooperation with Mr. Agofsky's

successor counsel, in contravention of their professional obligations,[105] by blaming successor

counsel.  According to Black:

> Trial counsel did cooperate with habeas counsel and advised them that he would
> meet with them if they would provide a written waiver of the attorney client privilege
> signed by Mr. Agofsky.  Habeas counsel refused to do so.  Instead they provided two
> documents signed by Mr. Agofsky.  The first document, dated April 12, 2007,
> authorized the release of documents and files by trial counsel to habeas counsel.  The
> second document, dated December 6, 2007, waived the attorney client privilege as
> to habeas counsel, not trial counsel.  (Petitioner's Appendix, A29.)  Specifically, it
> granted permission for Claudia Van Wyk and Jennifer Merrigan to speak with trial
> counsel.  The document did not waive Mr. Agofsky's attorney client privilege as to
> trial counsel.

SA 2320-21.  Similarly, Barlow alleges:

> The last purported "authorization" signed by Agofsky granted permission for his
> habeas counsel to speak with Mr. Black and myself, but did not authorize us to
> release any such information.  Again we related that oversight to habeas counsel, and
> learned that habeas counsel summarily canceled my scheduled interview.

SA 2334.  Black's and Barlow's descriptions of their interactions with postconviction counsel are

denied.

As Mr. Agofsky indicates in his affidavit, he intended to give full permission for a frank

discussion of his trial counsels' representation to them and to his current attorneys.  He signed an

authorization after discussing it with his postconviction counsel, who explained that its purpose was

---

[105]  *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in
Death Penalty Cases, Guideline 10.13, 31 Hofstra L. Rev. 903, 1074 (2003).

to permit his prior counsel to reveal otherwise privileged information to his current counsel in the course of an unrestricted discussion of trial counsel's representation. SA 2376. Black's and Barlow's insistence on a "waiver" was in any event unnecessary. Under the ABA Guideline for the Appointment and Performance of Counsel in Death Penalty Cases, his former counsel had an ethical obligation to offer their full cooperation to successor counsel. ABA Guideline 10.13(b), Duty to Facilitate the Work of Successor Counsel, expressly provides that prior counsel's duty includes "providing the client's files, as well as information regarding all aspects of the representation, to successor counsel." The Texas Bar has adopted this guideline verbatim.[106] In addition to the two written authorizations tendered to trial counsel, current counsel also provided trial counsel with a copy of the ABA guidelines governing their legal and ethical obligations. A19-32. Mr. Agofsky's former counsel had a continuing duty to protect his privileged communications, as did his current counsel, placing any discussions between them under the protection of the privilege as to other persons.[107] Thus nothing excused trial counsel's failure to cooperate.

Even if a waiver had been necessary, moreover, the language of Mr. Agofsky's notarized authorization would have sufficed: it authorized Van Wyk and Merrigan to meet with Black and

---

[106] The Texas State Bar Board of Directors adopted guidelines inspired by the ABA Guidelines in 2006. ABA Guideline 10.13 appears verbatim as Guideline 11.8, Duty to Facilitate the Work of Successor Counsel. These Guidelines "articulate the statewide standard of practice for all persons facing the death penalty in the State of Texas," and apply from the outset of the case through postconviction and clemency review. *See* State Bar of Texas, Guidelines and Standards for Capital Counsel (April 21, 2006), Guidelines 1.1, 11.8, *available at* http://www.uta.edu/pols/moore/indigent/txcapitalguidelines.pdf (last visited September 2, 2009).

[107] Because Mr. Agofsky had not yet filed his Amended § 2255 Motion, no implied waiver of the attorney-client privilege was yet in issue. After filing any privilege as to matters outside the scope of allegations of ineffective assistance of counsel remained in full force and effect.

-279-

Barlow and "discuss with them all matters arising from their representation of me," including but not limited to "any matters protected by the attorney-client privilege." A29. Finally, Black and Barlow never objected to the form of the December 6 authorization in 2007, but waited until this Court ordered them to submit affidavits to quibble about its wording. *See* A32 (letter from G. Patrick Black to Claudia Van Wyk, December 6, 2007, describing reasons for refusing to meet).

### G.    Conclusion

Mr. Agofsky describes his 2004 trial and the attorneys who represented him:

Mr. Black and Mr. Barlow both say that I was very involved in my investigation and it is true. I wanted to defend myself at the guilt-innocence phase of my trial and make the jury understand that the Luther Plant incident was a case of self-defense. I was very afraid that my attorneys were not investigating my case or preparing for trial thoroughly and were not developing favorable evidence. I tried to do everything I could to suggest avenues of investigation and to work with them. I also wanted my attorneys to conduct a thorough investigation of my prior offenses and infractions. I suggested many witnesses they could have interviewed and could have presented to explain and provide context for them.

I did not want to die in 2004 and I do not want to be executed now. I wanted my attorneys to conduct a thorough investigation to prepare for the penalty phase, make a persuasive penalty-phase presentation to the jury, and fight for my life. I suggested many mitigation witnesses to them. I spoke at length to Dr. Roberts and Dr. Gripon, both of whom I knew might testify for the defense at trial about anything I told them, about my family history and background. I would have answered additional questions from them or others to the best of my ability. I told the trial investigator, Jay Bennett, how to obtain my address book, which contained addresses for family members, friends, and potential inmate mitigation witnesses. I explicitly gave Dr. Roberts permission to talk to my mother and my aunts and I anticipated that he might testify in court about whatever they told him. I would have agreed if the defense had called members of my immediate and extended families, my teachers, my friends, and my fellow inmates as witnesses. While I would not have permitted Mr. Barlow to put my mother on the stand just to make her cry, I would have agreed to her testimony about factual information concerning my family background, my childhood and upbringing, the rough times I had, and how I surmounted them. I would have agreed to a presentation that traced my study of the martial arts from childhood to adulthood and explained how it influenced my life philosophy.

I have suffered through some rough times in my childhood and in my adult life as well. I am proud of how I have endured the rough times and navigated dangerous and difficult circumstances. I wish the sentencing jury could have heard my story.

SA 2376-77.

Mr. Agofsky was constitutionally entitled to attorneys who would thoroughly investigate the government's evidence and his defense. It should have been a straightforward task in a case where the government had only one eyewitness and supplied a list with the names and register numbers of 28 other inmates who were present during the fight between Mr. Agofsky and Luther Plant. Trial counsel's presentation of only two of these witnesses, in sketchy testimony that only outlined everything they could have said, fell far short of what they should have done. Seven other eyewitnesses could have said that Luther Plant initiated the fight, and many others could have helped to explain why Mr. Agofsky responded reasonably. There is a reasonable probability that, but for counsel's deficient investigation and other deficient performance, the jury would have accepted his justification defense and acquitted him, convicted of a lesser offense, or at least imposed a life sentence. U.S. Const. amend. VI; *Strickland v. Washington*, 384 U.S. 456 (1984); *Richards v. Quarterman*, 566 F.3d at 571.

Mr. Agofsky was also constitutionally entitled to attorneys who would make a serious effort to investigate his case in mitigation, *before* choosing a mitigation strategy. The available evidence was substantial and compelling. Defense counsel could have undermined the convictions and infractions that the government offered in aggravation at the penalty phase. The jurors could have heard that Mr. Agofsky's character was molded by trauma and tragedy that affected his world view and his brain. They could have learned that martial arts was his salvation and provided him with

-281-

a philosophy of life.  They could have seen how many family members, friends, and fellow inmates are willing to support him with their testimony or in other ways.  And they could have heard from experts who could have explained the impact of everything he has experienced on his development. There is a reasonable probability that, but for his attorneys' deficient investigation and other deficient performance, the sentencing jury would have spared his life.  U.S. Const. amend. VI; *Rompilla*, 545 U.S. 374.

For all these reasons, and those in Points I and II of Mr. Agofsky's Amended § 2255 Motion and this Supplement, this Court must order an evidentiary hearing and grant him a new trial on both guilt or innocence and penalty.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Agofsky prays that the Court:

1.      Permit the government to file an answer and allow Mr. Agofsky reasonable time to file a reply, as provided in the Court's order of July 16, 2009 (Doc. 98);

2.      Order discovery procedures as provided in the Court's order of February 10, 2009, setting a schedule for discovery (Doc. 71);

3.      Allow Mr. Agofsky reasonable time to file legal memoranda in response to defenses asserted and/or motions filed by the government, and to amend the motion, if warranted;

4.      Conduct an evidentiary hearing after the completion of discovery, as Mr. Agofsky will request by separate motion;

5.      Permit further amendment of the motion if the fact-development procedures so warrant;

6.      Allow reasonable time for filing a Memorandum of Law on the merits of grounds asserted in the motion and any amendments thereto, after discovery is complete and an evidentiary hearing is conducted;

7.      Vacate Mr. Agofsky's conviction and death sentence and order a new trial of the guilt-innocence and penalty phases; and

8.      Grant such additional relief as may be necessary and to which Mr. Agofsky may be entitled.


Respectfully submitted this 9th day of September, 2009


/s/
CLAUDIA VAN WYK
Federal Community Defender Office
For the Easter District of Pennsylvania
Capital Habeas Corpus Unit
The Curtis Center, Suite 545 W
Independence Square West
Philadelphia, PA 19106
(215) 928-0520 - phone
(215) 928-0526 - telefax
claudia_vanwyk@fd.org


/s/
JENNIFER MERRIGAN
MO Bar# 56733
305 E. 63rd Street
Kansas City, MO 64113
Telephone (816) 363-2795
Facsimile (816) 363-2799
Jmerrigan@pilc.net

## VERIFICATION

I, Claudia Van Wyk, swear and affirm as follows:

I am an attorney admitted to practice before the courts of the States of New Jersey, New York, and Pennsylvania.

Mr. Agofsky is confined at the United States Penitentiary at Terre Haute, Indiana. Because of the distance and difficulty involved in getting this motion to him for personal verification, he has authorized me, pursuant to Rule 2 of the Rules Governing § 2255 cases, to file the foregoing Supplement to his Motion to Vacate, Set Aside and Correct Conviction and Death Sentence, pursuant to 28 U.S.C. § 2255, on his behalf. I declare that the contents of the foregoing Motion are true and correct to the best of my information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

> /s/ Claudia Van Wyk
> _____
> CLAUDIA VAN WYK
> N.J. Bar #012401981
> N.Y. Bar #1706514
> PA. Bar #95310
> Federal Community Defender Office
> For the Easter District of Pennsylvania
> Capital Habeas Corpus Unit
> The Curtis Center, Suite 545 W
> Philadelphia, PA 19106
> (215) 928-0520 - phone
> (215) 928-0526 - telefax
> claudia_vanwyk@fd.org

September 09, 2009

-285-

## CERTIFICATE OF SERVICE

This will certify that, on today's date, this motion was served upon the United States by filing via CM/ECF.

/s/ _____

_____ Claudia Van Wyk

Dated: September 09, 2009

-286-