# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff** | ) | No. 1:07-cv-511 |
| | ) | |
| v | ) | **CAPITAL CASE** |
| | ) | |
| SHANNON WAYNE AGOFSKY, | ) | **FILED UNDER SEAL** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

## DEFENDANT'S COMPLETE MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO 28 U.S.C. § 2255

---

DAVID ZUCKERMAN
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Tel: 215.928.0520
Fax: 215.928.0826
david_zuckerman@fd.org

*Counsel for Petitioner*

CLAUDIA VAN WYK
Senior Staff, Capital Punishment Project
American Civil Liberties Union
201 W. Main Street, Suite 402
Durham, NC 27701
(919) 433-8533
cvanwyk@aclu.org

*Counsel for Petitioner*

Dated: June 17, 2022

# TABLE OF CONTENTS

PROCEDURAL BACKGROUND ................................................................ 1

PRELIMINARY STATEMENT ................................................................ 3

FACTUAL BACKGROUND COMMON TO ALL CLAIMS ................................ 7

    I.      GUILT PHASE ................................................................ 7

    II.     PENALTY PHASE ................................................................ 11

GROUNDS FOR RELIEF AND SUPPORTING FACTS ................................ 15

    I.      GROUND 12.1: TRIAL COUNSEL PROVIDED INEFFECTIVE
          ASSISTANCE AT THE GUILT PHASE ................................................................ 15

          A.    Introduction ................................................................ 15

          B.    Trial Counsel's Role In The Case ................................................................ 17

          C.    Trial Counsel Made Only One Documented, Unsuccessful Attempt
             To Interview One Government Witness And Otherwise Failed To
             Attempt To Neutralize Government Witness Testimony ........................ 25

          D.    Trial Counsel Failed To Investigate And Present Readily Available
             Evidence To Support The Justification And Heat Of Passion
             Defenses Upon Which They Relied At Trial ........................................ 36

             1.     Eyewitnesses ................................................................ 37

             2.     Background Witnesses ................................................................ 50

          E.    Trial Counsel Failed To Present Witnesses His Investigator Had
             Interviewed Who Were Willing To Testify And Who Could
             Provide Support For The Justification Or Heat Of Passion
             Defenses, And Failed To Elicit Other Helpful Information
             Available From Witnesses They Did Call. ........................................ 64

          F.    Counsel Failed To Obtain Or Present Expert Testimony On Prison
             Violence At The Guilt Phase, Despite Its Ready Availability And
             Relevance To Their Self-Defense and Heat of Passion Strategies. ......... 78

          G.    Counsel Was Deficient In Relying Primarily On Records Supplied
             By The Government, And Made Few Independent Efforts To
             Obtain Documentary Information ................................................ 86

          H.    Counsel Was Ineffective In Failing To Conduct An Adequate Voir
             Dire. ................................................................ 90

             1.     Counsel Failed to Conduct an Adequate Voir Dire as to
                 Publicity ................................................................ 91

             2.     Counsel Failed to Conduct an Adequate Voir Dire as to
                 Death Penalty Bias. ................................................................ 96

3.      Counsel Failed to Adequately Probe the Jurors' Views on the Death Penalty. ........................................................... 97

4.      Counsel Failed to Adequately Voir Dire Jurors About Bias Based on the Fact that Mr. Agofsky was Already in Prison. ...... 101

5.      Counsel Failed to Adequately Question Jurors About Bias Based on Mr. Agofsky's Prior Conviction. ............................. 103

6.      Conclusion ................................................................. 109

I.    Counsel Provided Ineffective Assistance During The Guilt Phase Portion Of Trial. ....................................................... 111

1.      Counsel's Examination Of Both Prosecution And Defense Witnesses, And His Arguments To The Jury, Demonstrated Lack Of Investigation, Unfamiliarity With Records And Information In His Possession, And Dangerous Self-Contradictions. .............................................................. 111

2.      Counsel Failed To Object To Erroneous Instructions................ 118

3.      Counsel Failed To Object To Burden-Shifting Murder and Manslaughter Instructions........................................... 124

4.      Counsel Failed To Object To The Erroneous Murder Instruction. ................................................................ 133

5.      Counsel Failed To Object To The Inconsistent And Confusing Malice Instructions................................................ 135

6.      Counsel Failed To Object To The Confusion Engendered By The Conflation Of "Federal Murder" And "Murder by Life Prisoner" Charges.............................................. 135

7.      Trial Counsel Failed To Seek An Instruction On The Lesser Included Offense Of Second-Degree Murder On Count 2. ....... 138

2.      Counsel Failed To Object To The Prosecutor's Violation Of Mr. Agofsky's Fifth Amendment Rights Or His Misleading Summation Remarks. ............................................ 141

3.      Counsel Failed To Cross-Examine Witnesses On Specific Instances Of Violent Conduct...................................... 149

4.      Counsel Was Ineffective For Failing To Seek Severance Of The "Murder By Life Sentenced Prisoner" Count From The Federal Murder Count To Prevent The Jury From Drawing Prejudicial Conclusions When Considering the Question of Petitioner's Guilt.................................................. 153

J.    Counsel Was Ineffective For Failing To Seek Severance Of The "Murder By Life Sentenced Prisoner" Count From The Federal Murder Count To Prevent The Jury From Drawing Prejudicial Conclusions When Considering the Question of Petitioner's Guilt. ..... 157

iii

K. The Cumulative Effect Of Trial Counsel's Guilt Phase Deficiencies Prejudiced The Defense At Both The Guilt Phase And The Penalty Phase. ................................................................... 161

II. GROUND 12.2: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE .................................................... 164

A. Introduction.................................................................................. 164

B. Counsel Failed To Conduct An Independent Investigation Of The Government's Case In Aggravation Or To Present Evidence Providing Context For The Aggravating Factors................................... 167

    1. Introduction................................................................... 167

    2. Noel State Bank Robbery.................................................. 168

    3. Federal Firearms Conviction............................................. 200

    4. 1992 Refusal To Clean Cell............................................... 202

    5. 1994 Lompoc Serving Line ............................................... 205

    6. 1998 Lompoc Incident ..................................................... 207

    7. 1999 Edelen Assault ....................................................... 210

    8. 1999 and 2000 Possession of Weapons in Atlanta and Beaumont ..................................................................... 219

    9. 2000 Michael Miele Assault ............................................. 221

    10. The Evidence Cumulatively Establishes Ineffective Assistance Of Counsel. ................................................... 226

C. Counsel Completely Failed To Compile Or Present A Social History Of Mr. Agofsky's Life Before His Incarceration...................... 229

    1. Trial Counsel Neither Conducted A Social History Investigation Nor Delegated That Task To A Qualified Expert Or Any Other Person....................................................... 229

    2. The Defense Never Learned, And Never Made Sure That The Jury Learned, That Mr. Agofsky Is A Beloved Member Of A Family Marked By Tragedy............................................. 246

    3. The Defense Never Uncovered Or Presented Evidence That Mr. Agofsky Was Raised To Offer Refuge And Protection To Vulnerable Family And Friends. ........................................ 262

    4. The Defense Never Uncovered Or Presented Evidence That Mr. Agofsky Has The Support Of Extended Family. ................ 270

    5. Trial Counsel Neither Investigated Nor Presented Evidence Of The Important Role Of Martial Arts In Mr. Agofsky's Life............................................................................... 286

iv

6.     The Defense Did Not Seek Out Local Friends And Teachers ................................................................................. 289

D.     Counsel Failed To Investigate Readily Available Prison Mitigation............................................................................. 293

E.     Counsel Failed To Obtain And Present Appropriate Mental Health Evaluations................................................................ 308

F.     Counsel Presented A Poorly Investigated And Prepared Case On Future Dangerousness....................................... 326

G.     Counsel Failed To Advocate For The Introduction Of Admissible Mitigating Evidence, To Object To Misleading Cross-Examination And Summation Arguments, Or To Object To The Submission of Factually Unsupported or Inadmissible Non-Statutory Aggravating Factors To The Jury. ...................................................... 337

1.     Counsel Failed To Advocate Effectively For Clearly Admissible Mitigating Evidence That The Court Erroneously Excluded. ................................................ 338

2.     Counsel Failed To Object To Unfounded Cross-Examination About Mr. Agofsky's Non-Existent Antisocial Personality Disorder And Other Improper Questions................ 347

3.     Trial Counsel Failed To Object To The Prosecutor's Misleading Summation Remarks About The Defense Psychologist's Diagnosis. ............................................. 352

4.     Counsel Failed To Seek The Dismissal Or Amendment Of Inadmissible Or Factually Unsupported Non-Statutory Aggravating Factors................................................. 355

5.     Counsel Failed To Seek A Unanimity Of Theory Charge As To The Non-Statutory Aggravating Circumstance, Future Danger. ............................................................. 357

H.     Counsel's Deficient Performance Prejudiced The Defense................... 361

III.     GROUND 12.3: APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE. ......................................................... 364

A.     Introduction.................................................................................. 364

B.     Appellate Counsel's Role In The Case .............................................. 365

C.     Appellate Counsel Failed To Provide Reasonably Vigorous Representation.............................................................................. 368

D.     Mr. Newton's Affidavit ................................................................... 372

1.     The Inconsistent Verdict Claim ............................................... 373

2.     The Claim Concerning The Jury's Note .................................... 381

3.     The "Heinous and Cruel" Claim............................................... 382

v

| | 4. | The Claims Barred By Circuit Precedent | 383 |
| | 5. | The Claims Not Raised | 384 |
| | 6. | Conclusion | 402 |
| IV. | | GROUND 12.4: MORGAN-EXCLUDABLE JURORS WERE SEATED ON THE FINAL JURY. | 404 |
| V. | | GROUND 12.5: THE GOVERNMENT WITHHELD FAVORABLE EVIDENCE THAT WAS MATERIAL TO GUILT OR INNOCENCE AND TO PUNISHMENT. | 406 |
| | | GROUND 12.6: THE TRIAL COURT ERRED IN FAILING TO DISMISS THE INDICTMENT WITH PREJUDICE FOR PRE-ARREST DELAY AND VIOLATION OF PETITIONER'S CONSTITUTIONAL AND STATUTORY SPEEDY INDICTMENT RIGHTS, WHERE THE DELAY WAS INTENTIONAL AND DESIGNED TO HAMPER THE DEFENSE AND MR. AGOFSKY WAS PREJUDICED. | 416 |
| VI. | | GROUND 12.7: NEW EVIDENCE ESTABLISHES THAT PETITIONER WAS CONVICTED IN THE SHORT CASE AND SENTENCED TO DEATH IN THE PLANT CASE ON THE BASIS OF INACCURATE AND UNRELIABLE EXPERT SCIENTIFIC TESTIMONY, IN VIOLATION OF HIS DUE PROCESS AND EIGHTH AMENDMENT RIGHTS. | 418 |
| | A. | The National Academy Of Sciences Report | 418 |
| | B. | The Due Process And Eighth Amendment Standards Governing Analysis Of The New Evidence | 421 |
| | C. | The Unreliable Fingerprint Testimony | 422 |
| | D. | Conclusion | 427 |
| VII. | | GROUND 12.8: MR. AGOFSKY IS INNOCENT OF CAPITAL MURDER. | 428 |
| VIII. | | GROUND 12.9: TRIAL COUNSEL'S AFFIDAVITS CONTAIN FACTUALLY INACCURATE AND NON-RESPONSIVE ALLEGATIONS, SPECIFICALLY NEGATED BY THE TESTIMONY AND STATEMENTS OF NUMEROUS PERSONS, INCLUDING MR. AGOFSKY. | 430 |
| | A. | Introduction | 430 |
| | B. | Luther Plant Investigation | 432 |
| | C. | Trial Counsel's Interactions With Mr. Agofsky. | 436 |
| | D. | Trial Counsel's Inadequate Investigation Of Mr. Agofsky's Background | 442 |
| | | 1. Mr. Agofsky's Prior Convictions And Infractions | 442 |
| | | 2. Family And Childhood | 444 |

3. Prison Mitigation ........................................................... 451

4. Consultations With Experts Concerning Mental Health
Issues And Future Dangerousness. ............................................ 452

E. Trial ................................................................................................. 454

1. Jury Selection. ................................................................ 454

2. Counsel's Conduct At The Guilt-Innocence Phase Of Trial. .... 455

3. Counsel's Conduct At The Penalty Phase Of Trial. .................. 456

F. Trial Counsel's Interactions With Postconviction Counsel .................. 458

G. Conclusion ....................................................................................... 460

IX. GROUND 12.10: MR. AGOFSKY'S PRIOR CONVICTION UNDER 18
U.S.C. § 924(C), WHICH SERVED AS AN AGGRAVATING FACTOR
IN SUPPORT OF A DEATH SENTENCE, IS INVALID BECAUSE THE
UNDERLYING BANK ROBBERY IS NOT A "CRIME OF
VIOLENCE." ........................................................................................ 462

A. Introduction ..................................................................................... 462

B. Procedural History ........................................................................... 464

C. The Residual Clause Is Void for Vagueness ........................................ 466

D. Section 2113(a) Bank Robbery Cannot Serve As A Predicate
Offense For A § 924(c) Conviction Under The Force Clause. .............. 467

1. Under *Borden*, The Predicate Offense Must Require A
*Mens Rea* Of More Than Recklessness. .................................. 467

2. The Categorical Approach Applies Because § 2113(a) Is
Indivisible. ..................................................................... 469

3. Bank Robbery By Intimidation Cannot Serve As A
Predicate § 924(c) Conviction Under *Borden.* .......................... 471

4. Section 2113(a) Fails To Qualify As A "Crime of
Violence" On Additional Grounds ............................................ 473

E. Sections 2113(d) And (e) Do Not Qualify As Crimes Of Violence
Under The Force Clause. .................................................................... 475

1. Because § 2113(a) Is Not A Crime Of Violence, The
Sentence Enhancements Under §§ 2113(d) And (e) Cannot
Qualify As Crimes Of Violence. ............................................... 475

2. Neither § 2113(d) Nor § 2113(e) Requires The Requisite
*Mens Rea* To Qualify As A Crime Of Violence. ........................ 476

F. Mr. Agofsky Is Entitled to a New Penalty Phase ................................. 479

1. The Legal Standard .............................................................. 479

2.     The Use Of Mr. Agofsky's § 924(c) Convictions In Aggravation Was Constitutional Error, Was Not Harmless, And "Unbundled" The Sentencing Package. ............................ 481

G.     Conclusion ...................................................................... 482

FORM QUESTIONS 13-18 ....................................................................... 484

PRAYER FOR RELIEF ........................................................................... 486

## PROCEDURAL BACKGROUND[1]

1.     The defendant, Shannon Wayne Agofsky, was convicted of two counts of murder for the death of Luther Plant, in the United States District Court for the Eastern District of Texas under Indictment No. 1:03-cr-173.

2.     Defendant was convicted on July 8, 2004, and sentenced on July 16, 2004.

3.     Defendant was sentenced to death on both counts.

4.     The indictment, filed August 21, 2003, charged defendant with Murder by a Federal Inmate, 18 U.S.C. §§ 1118, 1111 (Count 1), and Premeditated First-Degree Murder, 18 U.S.C. § 1111 (Count 2), for the death of Luther Plant on January 5, 2001. The indictment alleged three statutory aggravating factors: a murder by a prisoner serving a life term (18 U.S.C. § 3592(c)(1)); a previous conviction for a federal offense involving death of another for which life imprisonment was authorized (18 U.S.C. § 3592(c)(3)); and an offense committed in an especially heinous, cruel, or depraved manner (18 U.S.C. § 3592(c)(6)). A superseding indictment was filed on February 19, 2004, charging the same offenses and aggravating factors, and adding statutory aggravating factor 18 U.S.C. § 3592(c)(2), a previous conviction of a federal offense involving a firearm.

5.     Defendant pled not guilty.

6.     Defendant was tried by a jury.

7.     Defendant did not testify.

8.     Defendant appealed his conviction and death sentence.

9.     Defendant appealed to the Court of Appeals for the Fifth Circuit under Docket No. 04-41219. The appeal raised the following grounds, all of which, except for the double jeopardy claim, were rejected:

    a.     The district court erred by refusing to require the prosecution to elect between count one or count two of the superseding indictment.

    b.     Mr. Agofsky's death sentence was imposed under the influence of an arbitrary factor as reflected by the jury's note asking whether jurors would be individually polled if they imposed a life sentence.

    c.     Mr. Agofsky's conviction under, and death sentence for, count two of the indictment are invalid in view of the jury's special finding that he did not commit the murder "intentionally."

---

[1] This section tracks Questions 1-11 of Administrative Office Form 243.

d.       There is insufficient evidence to support the jury's finding that the murder was committed in an "especially heinous, cruel, or depraved manner."

e.       The district court erred by submitting both the second and third statutory aggravating factors when each arose from the same past criminal transaction.

f.       The district court erred by submitting non-statutory aggravating factors to the jury when those factors had not been charged in the superseding indictment.

g.       The Federal Death Penalty Act is unconstitutional.

On July 28, 2006, defendant's convictions were vacated to prevent double jeopardy and the case was remanded to the district court with instructions to impose, at the government's election, a guilty verdict and death sentence for either Count 1 or Count 2. *United States v. Agofsky,* 458 F.3d 369 (5th Cir. 2006). Defendant filed a petition for certiorari under Docket No. 06-7253 in the United States Supreme Court, which denied the petition on January 22, 2007. *See Agofsky v. United States,* 549 U.S. 1182, 127 S.Ct. 1149 (2007). Defendant sought review of the question whether appellate arbitrariness review in a federal death penalty case under 18 U.S.C. § 3595(c) is plenary or subject to the plain error standard.

On March 30, 2007, on remand from the Fifth Circuit, the district court (Hon. Thad Heartfield, Chief Judge) reconvicted and resentenced Mr. Agofsky to death, pursuant to the Fifth Circuit's mandate, on Count 2. The government elected to dismiss Count 1. Defendant appealed the resentencing to the Fifth Circuit under Docket No. 07-40330, arguing that Mr. Aogfsky's conviction under, and death sentence for, Count Two of the superseding indictment are invalid in view of the jury's finding that he did not commit the murder "intentionally." The Fifth Circuit denied that appeal on January 31, 2008. *United States v. Agofsky*, 516 F.3d 280 (5th Cir. 2008). The Supreme Court denied certiorari on October 6, 2008. *Agofsky v. United States*, 555 U.S. 837, 129 S. Ct. 64, 172 L. Ed. 2d 61 (2008).

10.       Other than the above-listed direct appeals and this motion, Mr. Agofsky has not filed any other motions, petitions, or applications, concerning his conviction for the murder of Luther Plant.

11.       Not applicable.

## **PRELIMINARY STATEMENT**

1.        In 2001, inmates Shannon Agofsky and Luther Plant had a fight in a recreation cage at the United States Penitentiary in Beaumont, Texas. Plant later died of his injuries. Twenty-eight other inmates were in the recreation yard during the fight, and the government provided a list of their names and register numbers to the defense in 2004, when Mr. Agofsky was tried, convicted, and sentenced to death for Plant's murder. Although nine inmates could have testified that Plant was the initial aggressor and Mr. Agofsky acted in self-defense, the jury heard from only two, because trial counsel conducted an unreasonably limited investigation and did not locate or call the others. The government's case rested on the word of a single inmate, Richard Ward, who testified in exchange for promises that the government never disclosed to the defense. Ward has now recanted.

2.        At the penalty phase, again because of counsel's deficient investigation and other deficient performance, the jury never learned about evidence that the fingerprint "match" that supported the prior conviction introduced as an aggravating factor was inconclusive. They never heard testimony that could have rebutted or explained prison disciplinary infractions, also introduced in aggravation of punishment. Nor did the jury learn anything about extensive mitigating evidence, including a history of trauma and neuropsychological impairment, available from Mr. Agofsky's family, friends, teachers, other inmates, and experts. Many family members and others who knew Mr. Agofsky were willing, even eager, to describe him to the jury as a compassionate survivor who extended protection to the weak and defenseless. Experts could have provided a comprehensive explanation of his development and functioning. Nevertheless, all the jury heard from the defense in mitigation was that the Bureau of Prisons—maybe—could keep him away from other inmates. The defense "strategy" did not work and the jury sentenced Mr. Agofsky to death.

3.      Mr. Agofsky was represented by attorneys who failed at every step to conduct a vigorous defense. In preparing for the guilt-innocence phase, his attorneys failed to locate, prepare, or present numerous eyewitnesses who saw the deceased, Luther Plant, attack Mr. Agofsky, and thus could have established that Mr. Agofsky was defending himself. Other witnesses could have provided detailed descriptions of the circumstances surrounding the incident, and evidence of Plant's violent reputation and the violent conditions at the prison where the attack occurred. If trial counsel had obtained and presented all this evidence, and otherwise provided effective assistance at all points of the trial, there is a reasonable probability that counsel's own strategy would have succeeded and the jury would have found Mr. Agofsky not guilty.

4.      Trial counsel personally conducted no mitigation investigation to prepare for the penalty phase, and never delegated that task to anyone. The only person who learned anything about Mr. Agofsky's background was a psychologist who got his information almost entirely from Mr. Agofsky. As a result, no one ever compiled a social history of Mr. Agofsky's life before age eighteen, or made any effort to determine whether anyone who knew him during his eleven subsequent years in federal custody could provide mitigating information. A reasonably thorough mitigation investigation, coupled with otherwise reasonably effective advocacy, would have enabled the jurors to recognize the value of the life placed in their hands. Instead, trial counsel left them with nothing to consider but the unadorned and unexplained record of two convictions and seven disciplinary infractions presented by the prosecution, plus the evidence, some of it presented by Mr. Agofsky's own defense, that effectively portrayed him as a danger to those around him.

5.      Mr. Agofsky's appellate counsel, too, was ineffective, raising only seven superficially presented claims, three of them foreclosed by binding circuit precedent. More fundamentally, the Court of Appeals ruled on Mr. Agofsky's direct appeal without considering

4

any briefing or argument—because appellate counsel presented none—concerning the prosecutor's comments on Mr. Agofsky's failure to offer an exculpatory account of the incident until the time of trial, the burden-shifting instructions on the difference between murder and manslaughter, the erroneous exclusion of clearly admissible mitigating evidence at the penalty phase, and other meritorious claims. Because appellate counsel failed to raise on direct appeal prejudicial constitutional errors that had a substantial and injurious effect on the outcome of trial, and raised only a few claims in an ineffective manner, his prejudicially deficient performance was constitutionally ineffective. U.S. Const. Amend. VI.

6.      Other errors contributed to the unfairness of Mr. Agofsky's conviction and sentence. At least two jurors could not say they would consider anything less than a death sentence, and thus were not "life-qualified" to form part of an impartial jury at a capital trial. By seating these jurors, the district court violated Mr. Agofsky's rights to an impartial jury and due process of law. U.S. Const. Amend. V, VI. The government also skewed the outcomes of both phases of trial by concealing exculpatory evidence, including the statements of Mr. Agofsky's first martial arts teacher, whom the prosecution subpoenaed but then decided not to call as a witness once he made clear that his opinion favored Mr. Agofsky's claim of self-defense. The government thus violated Mr. Agofsky's right to due process of law. U.S. Const. Amend. V. In addition, one of the crimes used as an aggravator at Mr. Agofsky's trial was not a crime of violence and, as a result, should not have been considered by the jury.

7.      This motion argues that Mr. Agofsky's trial attorneys provided ineffective assistance at the guilt-innocence and penalty phases of his trial because of their limited investigation and other deficient performance. It also argues that (among other things) his jury was not life-qualified, that appellate counsel provided ineffective assistance, that the government

withheld exculpatory information from the defense, that he was deprived of a speedy trial, that one of the crimes cited as an aggravating circumstance was not a crime of violence, that newly-discovered evidence requires a new penalty trial, and that he is innocent of capital murder. Trial counsel's unreasonable failure to uncover and present the evidence that a reasonable investigation of the guilt-innocence and penalty phases would have disclosed, and other deficient performance, prejudiced the defense and deprived Mr. Agofsky of the effective assistance of counsel at both phases of his trial. U.S. Const. Amend. VI. For all these reasons and those below, Mr. Agofsky moves to vacate his conviction and sentence pursuant to 28 U.S.C. §2255.[2]

---

[2] On April 21, 2022, this Court granted Mr. Agofsky's motion to amend, ECF No. 189, and ordered Mr. Agofsky to file a "complete amended motion." ECF No. 190. This Complete Motion includes the content of Defendant's Amended Motion for Relief from Judgment, filed on October 6, 2008, ECF No. 51 (the "Amended Motion" or the "Amended § 2255 Motion"); the Supplement to Defendant's Amended Motion for Relief from Judgment, filed on September 7, 2009, ECF No. 105 (the "Supplement" or the "Supplement to the Amended Motion"); and the Amendment to Shannon Agofsky's Motion to Vacate, lodged with the court on February 18, 2022, ECF No. 189-1 (the "Borden Amendment"), 190. *See also* ECF No. 172, 173 (Petitioner's earlier motion to add a claim under *Johnson v. United States*, 576 U.S. 591 (2015) was granted, and the content of the Johnson Amendment has been incorporated into the Borden Amendment). The four claims appearing at the end of the Supplement to the Amended Motion, *see* ECF No. 105 at Points VI, VII, VIII & IX, now appear as Grounds 12.6, 12.7, 12.8, and 12.9, respectively. The Borden Amendment now appears as Ground 12.10. All grounds are numbered to track Administrative Office Form Number 243. Fonts, margins, page and paragraph numbering, spacing, headings, titles and honorifics, and other styles have all been universalized. Internal citations have been updated; hyperlinks have been updated where possible. Other light edits appear in the text, mostly where necessary to integrate material or correct assertions that were originally made in the Amended Motion and subsequently corrected via the Supplement. It is filed under seal because it refers to information that remains under seal. *See* ECF Nos. 28, 36; *see also* 99-2, 103.

Disputes regarding the content of this Motion, as well as the Court's ability to consider facts contained in various other documents when deciding whether to grant relief under 18 U.S.C § 2255, *see* ECF Nos. 112, 113, 115, 117-21, 124, 133, 135-36, 141, 144, 146-47, 159, 160, 161, 165, and disputes regarding additional documents necessary to rebut factual allegations raised in the Government's response to Mr. Agofsky's Amended Motion, *see* ECF Nos. 133, 135, 142-144, 146-47, remain before the Court.

## FACTUAL BACKGROUND COMMON TO ALL CLAIMS

**I. GUILT PHASE**

8. Mr. Agofsky stood trial and was convicted in 2004 of the beating death of Luther Plant in the recreation cages of the Segregated Housing Unit at the United States Penitentiary ("USP") in Beaumont. The only witnesses to the beginning of the incident were other inmates. One of these, Richard Ward, testified for the government that Mr. Agofsky attacked Plant without provocation, knocked him down, and stomped on his head and neck. Two other inmates, Robert Ecker and Billy Santiago, testified for the defense that Plant swung at Mr. Agofsky first. The only Bureau of Prisons ("BOP") employee who testified that he observed part of the fight, Christopher Matt, did not see it begin and thus could not assist the jury in resolving the credibility contest between the government and defense inmate witnesses.

9. According to Officer Matt, the fight broke out on January 5, 2001, as he was supervising the six recreation cages in the Segregated Housing Unit ("SHU"). Tr. Vol 18, 36-37.[3] Mr. Agofsky and Plant were both at recreation in Cage 3 along with three other inmates. Matt had overseen the inmates' entry into the first five cages and was standing in front of Cage 6 when he heard a thumping and grunting sound. Tr. Vol 18, 40. He hurried down the row of cages until he

---

[3] "Dkt." refers to docket entries in the underlying capital federal proceedings. *See* Indictment, *United States v. Agofsky,* Case No. 1:03-cr-173 (E.D. Tex. Aug. 21, 2003). "ECF No." refers to docket entries in the above-captioned § 2255 proceedings. "Tr." refers to the trial transcripts. "A" refers to the Appendix to the Amended § 2255 Motion, filed October 6, 2008. *See* ECF Nos. 51–56. "SA" refers to the Appendix to the Supplement to the Amended § 2255 Motion. *See* ECF Nos. 104; 106. Petitioner has not compiled the various other appendices filed concurrently with many of the above-mentioned pleadings, nor other information (e.g., documents, affidavits, etc.) that has already been admitted into the record as a result of other motions. *See, e.g.*, ECF No. 65, 66, 69, 70, 91, 92, 161, 165 (admitting into the record ECF Nos. 161-1, 161-2, 161-3, 161-4, 161-5). All such documents are incorporated herein by reference. In the event that further developments (e.g., the resolution of the outstanding disputes mentioned *supra*, n.2) necessitate such relief, Mr. Agofsky reserves the right to seek additional leave to amend, consolidate, or supplement the filings compiled herein.

reached the front of Cage 4, and from that point was able to see into Cage 3. He testified that he saw Mr. Agofsky stomping with his foot coming straight down on another inmate who was on the ground. Tr. Vol. 18, 45-46. Matt grabbed a video camera and called for assistance, but by the time he turned the camera on the incident was over. Tr. Vol. 18, 47. It took Matt about nine seconds to move down the line of cages, and he estimated that from the time he heard the first thump until the time the incident stopped, about ten or eleven seconds had elapsed overall. Tr. Vol. 18, 45, 88-89. Mr. Agofsky offered no resistance and complied with orders, from the officers who responded, to submit to restraints. A search of his person uncovered no weapons. Tr. Vol. 18, 50, 75-76. Officer Dale Elkins recovered a plastic knife from the person of Billy Santiago, who was in the next recreation cage. Tr. Vol. 19, 181.

10.     Plant, who was still moving two minutes after the fight ended (Tr. Vol. 18, 74), was treated at the prison medical unit and later transported to Mid-Jefferson Medical Center, where he died at about 12:30, two hours after the attack. Tr. Vol. 18, 98, 106, 169. The cause of death was a crushed neck and aspirated blood resulting from blunt force trauma. Tr. Vol. 19, 153.

11.     Matt and another officer described several subsequent statements by Mr. Agofsky. According to Officer Arthur Hill, Mr. Agofsky asked him, immediately after the incident, whether he was going to be "four pointed' (strapped down to his bunk) and whether he was going to be fed. Tr. Vol. 18, 124-26. Officer Matt testified that a few days after Plant's death, Mr. Agofsky told him that he would use the Bernie Conspiracy defense, referring to a movie in which "two guys pretty much carry around a dead guy all weekend to make people believe that he's alive."[4] Matt said that Mr. Agofsky told him that Plant was already dead when he was brought out to the recreation yard. Tr. Vol. 18, 60. In the following weeks, during recreation, Mr. Agofsky asked

---

[4] Matt was apparently referring to the movie "Weekend at Bernie's."

Matt if the Plant incident had caused him trouble with his superiors. Tr. Vol. 18, 62. According to Matt, Mr. Agofsky elaborated that Matt did not see the first blows because Mr. Agofsky waited for him to get to the end. In Matt's mind, this meant that Mr. Agofsky waited for him to get to the end of the recreation yard before beginning an assault on Plant. Tr. Vol. 18, 62. He said that Mr. Agofsky told him that if Matt had been standing right there (in front of Cage 3), the assault still would have happened. Tr. Vol. 18, 63.

12.     Matt acknowledged that he did not see who threw the first punch or hear any conversation between Mr. Agofsky and Plant. Tr. Vol. 18, 71. Mr. Agofsky ceased the attack without Matt's ordering him to do so, and had not asked to cell with Plant. They had shared the same recreation cage numerous times without problems. Tr. Vol. 18, 73, 77. Matt also acknowledged that there had been another inmate stabbing in the SHU recreation cages a short time before January 5. Tr. Vol. 18, 79.

13.     Inmate Richard Ward, one of Plant's cellmates, testified for the government that Mr. Agofsky and Plant were talking, with no argument or shouting or raised voices, when Mr. Agofsky struck Plant without warning. Tr. Vol. 19, 214-15. He hit Plant in the mouth with his elbow, knocking Plant to the ground, and then stomped on his neck with his tennis shoe "repeatedly." Tr. Vol. 19, 217. Ward testified that he saw eleven stomps. Tr. Vol. 19, 217.

14.     Ward had two federal felony convictions for bank robbery and a number of state court convictions for robberies and thefts. At the time of his testimony, he had tested positive for heroin or morphine ten times while in federal custody. Tr. Vol. 19, 220, 224. He had attempted suicide four times. Tr. Vol. 19, 228. He acknowledged that, although he refused to speak to the FBI immediately after the incident, he agreed to cooperate shortly after his transfer to a halfway house was denied in May 2004. Tr. Vol. 19, 229. He denied that he had received a "time cut" in

return for his testimony, but acknowledged meeting twice with agents in the two months before trial. Tr. Vol. 19, 229-32.

15. The government called Mr. Agofsky's former martial arts teacher, Robert Duggan, who described the curriculum at the school he had founded, Executive Security Institute, in Aspen, Colorado. The prosecution asked Duggan to describe some of the "lethal techniques" taught at his school, and secured his agreement that the students were taught that they were lethal. Tr. Vol. 19, 188-99. On redirect examination, he offered the opinion that a scenario posed by the prosecutor, in which a martial arts expert stomps on an unarmed person lying face up on concrete, offering no resistance, involves the unnecessary use of force. Tr. Vol. 19, 210-11. No one ever questioned him about his opinion under the defense witnesses' account.

16. Pursuant to Fed. R. Evid. 404(b), the government called Corrections Officer Marcus Bevil, who testified that on July 17, 2000, six months before the Plant incident, Mr. Agofsky attacked another inmate named Michael Miele without warning, knocking him down, attacking him with his feet, and causing him serious injury. Tr. Vol. 19, 258-65. The government introduced letters from Mr. Agofsky to a relative, indicating his hostility to Miele as a "scumbag." Tr. Vol. 19, 287-88.

17. Three inmates testified briefly for the defense. Scott Lawson, another of Plant's cellmates, testified that he heard Plant make threats toward Mr. Agofsky in early January 2001, and that Plant, who did not ordinarily work out, stopped smoking, and appeared to be trying to get into shape around that time. Tr. Vol. 19, 297-300. Robert Ecker, a third cellmate of Plant's, was in the same recreation cage where he died and heard Plant call out to Mr. Agofsky, telling him, "Shannon, I want to holler at you." Tr. Vol. 19, 307. Plant swung at Mr. Agofsky, who knocked Plant down and "it was on." Tr. Vol. 19, 308. Ecker had no doubt that Plant swung first. He testified

that, when this happened, Ward was holding a shouted conversation with an inmate named Self a few cages away, and was not paying attention to the inmates in his own cage. Tr. Vol. 19, 309. Billy Santiago, an inmate in the cage next to Cage 3, also heard Plant call out, "Shannon, come over here. I need to holler at you." Tr. Vol. 19, 317. He, too, saw Plant swing at Mr. Agofsky and the fight begin. Tr. Vol. 17, 318-19. Santiago was caught with a knife, which he was carrying for his personal protection, after the incident was over. Tr. Vol. 17, 319-20.

18. The defense argued that Mr. Agofsky lacked intent, acted in self-defense, and acted in the heat of passion on a sudden quarrel. Tr. Vol. 20, 378. But the prosecution contended that Mr. Agofsky killed Plant intentionally and with premeditation and deliberation. Tr. Vol. 20, 366. Mr. Agofsky was convicted of both counts of the indictment as charged: Murder by a Federal Inmate, 18 U.S.C. §§ 1118, 1111 (Count 1), and Premeditated First-Degree Murder, 18 U.S.C. § 1111 (Count 2). Tr. Vol. 20, 403.

## II.     PENALTY PHASE

19. At the penalty phase, the government re-offered all of the guilt phase evidence and introduced new evidence of Mr. Agofsky's prior convictions and disciplinary infractions. The defense called two jail guards who had met Mr. Agofsky in the months immediately before trial and four experts who had reviewed his BOP central file and offered opinions that addressed his future dangerousness, but presented no other evidence.

20. The government called FBI Agent Ladell Farley to testify that Mr. Agofsky was convicted in federal court, in 1992, for the 1989 robbery of the Noel State Bank and the murder of the bank president, whose body was later found duct-taped to a weighted chair in Grand Lake, Oklahoma, 22 miles away. After the federal conviction, he was prosecuted and convicted for the same offense in Oklahoma state court in 1997. Tr. Vol. 21, 31. He was also convicted, in federal court, of interstate transportation of firearms in 1990. Tr. Vol. 21, 42.

11

21. The government introduced evidence concerning a number of disciplinary infractions incurred while Mr. Agofsky was in federal custody: (1) his refusal to clean bodily fluids off his cell wall in 1992 (Tr. Vol. 21, 64-65); (2) his involvement in an incident in which three inmates walked off the food serving line at USP Lompoc in 1994 (Tr. Vol. 21, 55-60); (3) his involvement in a 1998 brawl in Lompoc, in which over one hundred black inmates battled with under two dozen white inmates, including Mr. Agofsky, after a fight broke out over a football game (Tr. Vol. 21, 73-83); (4) his fight with an inmate named Curry Edelen at USP Atlanta in 1999 (Tr. Vol. 21, 89-90); (5) his possession of handmade knives in USP Alabama in 1999 and USP Beaumont in 2000 (Tr. Vol. 21, 111-12, 117-18); and (6) his involvement in an assault on an inmate named Michael Miele in 2000 at USP Beaumont (Tr. Vol. 21, 129, 141, Vol. 22, 185).

22. The defense called only two witnesses who knew Mr. Agofsky. Their testimony consumed only six pages of the transcript. Ula Ann Chapman, a guard at the Liberty County Jail during Mr. Agofsky's pretrial detention there, testified that she had never had any problems with him in the jail, that he obeyed all the rules, was respectful, complied with instructions, and never threatened her. Tr. Vol. 22, 203-06. Latisa Winters, another guard at the same jail, testified that she had had contact with Mr. Agofsky "on a few occasions." He had never caused any behavioral problems but had obeyed all orders and instructions. Tr. Vol. 22, 206-08. Trial counsel allowed an unsound hearsay objection to derail his only effort, through his psychologist, to present evidence of Mr. Agofsky's pre-incarceration background. Tr. Vol. 22, 211-12.

23. The defense called four experts: Harvey Cox and Terry Pelz, prison consultants who had reviewed Mr. Agofsky's central file and testified that the Bureau of Prisons could prevent Mr. Agofsky from harming other inmates; Elizabeth Pelz (Terry Pelz's wife), a criminology professor who described the importance of status and respect in the inmate culture; and Dr. Daniel

12

Roberts, a clinical psychologist who had met with Mr. Agofsky twice, called his mother once, and interviewed several of the Liberty Jail Guards. Tr. Vol. 22, 186, 208, 232, 238. Cox and Terry Pelz had never met Mr. Agofsky. The prosecution secured Roberts's testimony on cross-examination that Mr. Agofsky "fit" the pattern of "adult antisocial behavior" in the Diagnostic and Statistical Manual of the American Psychological Association. Tr. Vol. 22, 226. In rebuttal, the prosecution called Michael Cooksey, a recently retired BOP administrator who had helped to design the federal government's most secure facility, and who testified that with good behavior there, Mr. Agofsky could have access to other inmates within a relatively short time. Tr. Vol. 22, 246.

24. In summation, the defense argued that the jurors should spare Mr. Agofsky's life because his threat of future violence was low and the BOP had the facilities to control him. Tr. Vol 23, 342, 354. The government argued that the jurors should find that Mr. Agofsky had the requisite mental state to be death-eligible and that four statutory aggravating factors applied: (1) he was a prisoner serving a life term; (2) he had a previous conviction for a federal offense with a firearm; (3) he had a previous conviction for a federal offense for which a life sentence was authorized; and (4) the killing was heinous and cruel. Tr. Vol. 23, 334-38. Additionally, it argued that the jurors should find four non-statutory aggravating factors, (1) he represented a continuing danger; (2) he had a significant history of disciplinary violations; (3) he lacked remorse; and (4) he had a prior conviction for transportation of stolen property. Tr. Vol. 23, 238-340.

25. The jurors, after deliberating for an afternoon and part of the next morning, found that Mr. Agofsky had not intentionally caused Plant's death but that he had intentionally caused his serious bodily injury, resulting in his death. Tr. Vol 23, 386-87. They found each of the statutory and non-statutory aggravating factors and unanimously rejected most of the defense's

13

proffered mitigating factors. Tr. Vol. 23, 387-93. They concluded, unanimously, that Mr. Agofsky should be sentenced to death. Tr. Vol. 23, 394.

## GROUNDS FOR RELIEF AND SUPPORTING FACTS

I.    **GROUND 12.1: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE.**

A.    **Introduction**

26.    Mr. Agofsky stood trial for the death of Plant, which occurred while they were locked in a recreation cage. His defense was self-defense and heat of passion, and was supported by two other inmates who said Plant initiated the fight that resulted in his own death. The prosecution's only countervailing evidence on the key question of who struck the first blow was the testimony of one inmate who received a promise of sentencing consideration in return for his testimony.

27.    Although, with adequate investigation and preparation and vigorous advocacy, Mr. Agofsky's defense had, at the very least, a reasonable probability of success, he did not receive the effective representation to which he was constitutionally entitled. His attorneys went to trial with their investigation only partially complete, and thus never presented readily available evidence that Plant initiated the fight, and other evidence explaining why any inmate in Mr. Agofsky's position would reasonably have believed he needed to respond with lethal force to survive the attack. They made no attempt to interview the government's prospective witnesses before they took the stand and thus failed to discover that some of them could offer extremely helpful testimony. And they failed to object to a burden-shifting jury instruction and otherwise to engage in reasonably effective advocacy. In all these respects, counsel's investigation, preparation, and presentation of their case constituted deficient performance. Because there is a reasonable probability that a case prepared and presented in conformity with reasonable professional standards would have prevailed at the guilt phase or would at least have prevented a death sentence at the penalty phase, Mr. Agofsky received unconstitutionally ineffective assistance during the

15

guilt phase of his capital trial. Defense counsel's failures, individually and in combination, denied him his rights under the Sixth Amendment to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984); *Virgil v. Dretke,* 446 F.3d 598, 612-14 (5th Cir. 2006). Accordingly, this Court should reverse Mr. Agofsky's convictions and sentence of death.

28.     In *Strickland*, the Supreme Court established a two-prong test for evaluating ineffective assistance claims under the Sixth Amendment to the United States Constitution. First, counsel's performance must fall "below an objective standard of reasonableness;" this happens when, in light of all the circumstances of the case, counsel's "acts or omissions were outside the range of professionally competent assistance." *Id.* at 680, 690. Second, counsel's deficient performance must prejudice the defense, by creating a "reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Id.* at 693-94; *accord Tenny v. Dretke*, 416 F.3d 404, 406-07 (5th Cir. 2005).

29.     To assess the *Strickland* prejudice caused by counsel's deficiencies, a reviewing court must consider counsel's errors "collectively, not item-by-item." *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (applying identical prejudice standard for withholding of exculpatory evidence); *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985) (prejudice standard for withholding of exculpatory evidence same as for ineffective assistance of counsel); *Soffar v. Dretke*, 368 F.3d 441, 478-79 (5th Cir. 2004) (assessing effect of multiple attorney errors cumulatively under *Strickland* prejudice standard), *amended* 391 F.3d 705 (5th Cir. 2006).

**B.** **Trial Counsel's Role In The Case**

30.    Mr. Agofsky was indicted for the murder of Plant on August 21, 2003, and the Court appointed the Federal Public Defender to represent him on September 25, 2003.[5] The Federal Public Defender for the Eastern District of Texas, G. Patrick Black, undertook the position of lead counsel, and, on September 26, the Court granted Black's motion to appoint second counsel, accepting his recommendation that it appoint Douglas M. Barlow. Dkt. 10. Magistrate Judge Earl Hines entered a discovery order on September 25. Dkt. 7.

31.    Although Barlow and Black knew within weeks of their appointment, if not sooner, that this was a potential capital case, and their client in any event faced premeditated murder charges, they did little investigation or preparation until after they learned in late January 2004 that the Department of Justice had authorized capital prosecution.

32.    Mr. Agofsky was transferred to a local jail in Liberty, Texas, in September 2003, but counsel and their investigator met with him only infrequently. Black met with Mr. Agofsky there once before trial, in late 2003 or early 2004. Black had received discovery from the government but had not yet reviewed it, and the Department of Justice was about to convene a meeting with the parties before deciding whether to authorize capital prosecution. Barlow visited Mr. Agofsky two or three times. Jay Bennett, an investigator who worked for Black at the Federal Defender and was assigned to this case, visited four or five times.

33.    On October 14, 2003, the Assistant United States Attorney who served as lead counsel in this case, John B. Stevens, wrote to Black and Barlow to inform them that, on October

---

[5] One or more additional grand jury presentations, earlier in 2001, did not result in an indictment. *See Convicted killer suspected in slaying of inmate,* Tulsa World, January 12, 2001, *available at* https://tulsaworld.com/archives/convicted-killer-suspected-in-slaying-of-inmate/article_480f893b-446f-541f-9d3f-6c02e4ac07c7.html.

17

20, the Department of Justice's Capital Case Unit would hold a telephone conference with the parties. Mr. Stevens also advised counsel that he was prepared to discuss discovery and "had the information ready to present to you at your convenience." A1. The Department of Justice made its decision to authorize capital prosecution on January 21, 2004, and Black received the notice on January 26. A2-7.

34.     Black requested and received most of the evidence he collected in this case from the government. Between February 6, 2004, and the beginning of jury selection on June 14, 2004, he requested and obtained several thousand pages of records. The defense sent for the central file of the victim, Luther Plant, independently, on June 15, 2004, the eve of trial.

35.     The documented efforts of Jay Bennett focused on the guilt phase of trial and took place during the first half of 2004. He interviewed, or attempted to interview, nineteen potential witnesses, all of whom were inmates and many of whose names appeared on a list of eyewitnesses provided by the government. He also wrote to several other inmates asking if they would consent to interviews (A8-12) and obtained Mr. Agofsky's address book from the Bureau of Prisons ("BOP"). A13. Bennett arranged a tour of USP Beaumont for the defense prison expert, Terry Pelz, and himself on May 27. A14. Nevertheless, as explained in detail below, Bennett left many necessary and elementary investigation tasks undone.

36.     On April 14, the government advised the defense that it would not attempt to prove that the killing was a "drug hit" or "Aryan brotherhood hit." A15.

37.     Mr. Agofsky actively participated in his own defense but, as discussed at length below, many of the leads he provided were ignored. He gave Bennett names of witnesses to the incident, witnesses who knew Plant and Michael Miele, and witnesses who were familiar with prison conditions. He gave Bennett his recollection of what he said to Officer Christopher Matt

18

and described the context in which he said it. Further, he referred Bennett to potential witnesses who could describe prison mitigation and address the disciplinary infractions the government had proffered in aggravation, and recommended witnesses who could testify to his good relations with all racial groups in the prison.

38.     Between the time of indictment on August 2, 2003, and the beginning of jury selection on June 14, 2004 (Dkt. 109), the defense filed a number of routine pleadings (Dkt. 4, 11, 12, 13, 19, 21, 32, 40, 43), and litigated several less routine matters. Counsel filed a motion to suppress Mr. Agofsky's oral and written statements (April 26, Dkt. 41, 42), and responded to the prosecution's motion for safety precautions. April 20, Dkt. 35. The defense moved *in limine* to exclude extraneous acts and to invoke the witness rule (Dkt 82, 83), and submitted proposed jury instructions for the guilt-innocence phase and penalty phase (Docketed June 3 and 4, 2004). Counsel represented Mr. Agofsky at a hearing on the motion for safety precautions on April 29 (Dkt. 56), and the motion to suppress oral and written statements on May 30. Dkt. 80. Counsel submitted a proposed jury questionnaire with a supporting motion on May 24, 2004. Dkt. 73, 74.

39.     The trial began with jury selection on June 14 and ended with the jury's decision to impose the death sentence on July 16, 2004. Dkt 109, 177, 178. The court held a hearing on a defense motion for a new trial—based on the disclosure that the prosecution had improperly obtained the defense witness list—and denied it on August 19 and 27, 2004. Dkt. 191, 196.

40.     On February 23, 2007, following Mr. Agofsky's appeal, the Honorable Thad Heartfield appointed counsel to investigate, prepare, and file a motion to vacate sentence pursuant to 28 U.S.C. § 2255. Dkt 233, 235. Postconviction counsel contacted Black and Barlow and asked for copies of their files. Black turned over 2,907 pages of Bates-stamped material (chiefly consisting of Mr. Agofsky's BOP central file and medical records) that he had received from the

19

government, 723 additional pages of government-supplied material (chiefly consisting of the BOP files of Plant, the deceased, and Richard Ward, the government's only eyewitness), and 1,158 pages of transcripts of the testimony of FBI Agent Ladell Farley at proceedings relating to the Noel State Bank robbery. The defense-created material that Black supplied consisted of 220 pages of correspondence, 22 pages of witness interviews conducted by defense investigator Bennett, and approximately 310 pages of miscellaneous matter, consisting of BOP program materials, an ALR annotation, newspaper articles, and Mr. Agofsky's address book. Black advised postconviction counsel on June 15, 2007, that he had turned over his complete file. A17-18. On June 15, 2007, Barlow advised postconviction counsel that none of the expert witnesses he had retained had prepared reports and that he believed that his file had been destroyed in a hurricane. A19.

41.    Neither Black nor Barlow gave postconviction counsel any information, documentary or otherwise, that related to Mr. Agofsky's life before his incarceration at age eighteen.

42.    In late November and early December 2007, postconviction counsel made plans—and obtained the Court's approval to expend funds—to travel to Texas to interview Black, Barlow, defense investigator Bennett, and a secretary in Black's office, Denise Caillier, who had performed a supporting role in the investigation. Although Black initially told counsel that he would make himself available during the week of the projected visit, A24, he later changed his mind. On December 4, Black sent counsel a letter stating that he would not consent to the interview because (1) counsel had not obtained a waiver of the attorney-client privilege from Mr. Agofsky and (2) Black anticipated that Mr. Agofsky would win his pending Fifth Circuit appeal and the projected

20

§ 2255 motion would be moot.[6] A25-26. Two days later, after postconviction counsel had faxed him Mr. Agofsky's notarized waiver of the attorney-client privilege (limited to communications between trial counsel and postconviction counsel about his case) and a copy of the ABA guideline requiring capital counsel to facilitate the work of successor counsel (A27-31), Black reiterated his refusal to consent to the interview. This time he cited only his optimism that Mr. Agofsky would win his appeal. He further advised counsel that Bennett and Caillier had refused to be interviewed as well. A32. Also on December 6, Barlow, who had received his own copies of Mr. Agofsky's limited waiver and the ABA guideline, advised postconviction counsel through his secretary that he would refuse to be interviewed.

43. The depositions of Jay Bennett and Dr. Dan Roberts, as well as declarations obtained from the trial experts, Drs. Edward Gripon and Elizabeth Pelz, Terry Pelz, and Harvey Cox, support Mr. Agofsky's claims that counsel took an unreasonably limited role in preparing, investigating, and presenting Mr. Agofsky's case. Bennett's deposition confirms the picture of a chaotic defense marked by little attorney involvement.[7] Bennett testified that he is the only investigator in his office and is involved in investigating the office's entire caseload of approximately 200 cases. SA 542. Bennett does not independently investigate; he receives his assignments on a case from the attorneys. SA 543.

---

[6] On October 9, 2007, Judge Heartfield granted postconviction counsel's motion to file Mr. Agofsky's projected § 2255 motion, and then stay and hold the proceedings in abeyance pending his new appeal to the Fifth Circuit. Docket No. 1:07-cv-511-TH, Doc. #24.

[7] Furthermore, Dr. Roberts and the other experts consulted by trial counsel—Dr. Elizabeth Pelz, Terry Pelz, Harvey Cox, and Dr. Edward Gripon—have all confirmed that their interaction with counsel was sparse and that counsel did not seek their advice concerning potentially helpful opinions they could have offered at both phases of trial. SA 725 (Roberts), SA 2798-99, 2810 (E. Pelz), SA 2807-8 (T. Pelz), SA 2815 (Cox), SA 2789 (Gripon).

44. Bennett confirmed Mr. Agofsky's claims that the defense team was delayed in its investigation. He did not meet with Mr. Agofsky until November 2003, despite the fact that Mr. Agofsky was indicted in August. SA 547, 638. The majority of witnesses he interviewed were not seen until 2004.

45. In Mr. Agofsky's case, Bennett testified that he largely maintained the following protocol. He was responsible for interviewing witnesses for the defense. After a witness interview, he typed up a summary of his notes and delivered that to the attorneys. SA 544. Of the six inmates who were subpoenaed in Mr. Agofsky's case, Bennett recalled interviewing five. He recalled no contact with the sixth, Michael Fitzgerald, and did not know why the attorneys had subpoenaed inmate Fitzgerald. SA 554. The attorneys did not give Bennett topics for witness interviews and they did not ask him to talk to witnesses about prison culture, or violence in the prisons. SA 547, 555.

46. Bennett testified that he did not obtain any documents in Mr. Agofsky's case. He further reported that trial counsel did not instruct him to investigate Plant's criminal history or background. SA 558. Although Plant had multiple state convictions prior to his federal incarceration, trial counsel did not ask Bennett to investigate any of those. Bennett acknowledged that the defense team had only documents from Plant's central federal BOP file. *Id.* Trial counsel likewise did not ask Bennett to obtain any documents from Mr. Agofsky's background. SA 27. Bennett recalled that the only documents obtained by the team in relation to Mr. Agofsky were from his BOP file. *Id.*

47. Initially, the defense team did not have the government's list of inmates in the recreation yard at the time of the altercation between Mr. Agofsky and Plant. SA 547. For over half of the investigation, the defense team was in fact relying upon Mr. Agofsky's recollection of

22

who the inmates on the yard that day were. Mr. Agofsky told his team how to obtain his address book from the Administrative Maximum Facility "ADX" Florence, Colorado, where his property remained after he was transferred to the Liberty County Jail to await trial. SA 556. In it, Mr. Agofsky had contact information for family members, friends, and other potential mitigation witnesses. In addition, after the incident with Plant three years earlier, Mr. Agofsky had written down the names and register numbers of inmates who were on the yard on the day of the fight and had witnessed the fight. SA 566. Bennett obtained the address book and kept a copy for himself. SA 580.

48.     The defense team finally received the BOP list of potential eyewitnesses from the government in March 2004.[8] Bennett acknowledged in his deposition that every witness on the recreation list was a potential eyewitness. SA 581. He admitted that the only way to determine whether or not they actually witnessed the fight would be to interview them. SA 547. Yet Bennett only interviewed six of the twenty-eight inmates on the list.

49.     Bennett simply did not follow through on many investigative tasks. For example, he wrote letters to several of the remaining twenty-two potential eyewitnesses, but made no further effort to contact them if they did not write him back. Bennett wrote a letter to Robert McKinn because he identified McKinn as a potential eyewitness. SA 581, 691. When McKinn did not write him back, Bennett made no further effort. *Id.* McKinn states now, and would have stated then, that he witnessed Plant start the fight with Mr. Agofsky and that no one from Mr. Agofsky's trial team ever contacted him. SA 2097. Had Bennett followed up with McKinn, he could have testified on Mr. Agofsky's behalf. The same is true for Charles Glave and Andres Campillo. Bennett wrote

---

[8] Discovery turned over by the government to lead counsel, Mr. Black, indicates that the government had that list at least one year before, in June 2003. SA 2573.

one letter to each of them and failed to follow up with them when they did not respond. SA 2056, 2543. Both Glave and Campillo witnessed Plant start the fight and would have been willing to testify on Mr. Agofsky's behalf. SA 2071, 2014.

50.     In addition, Bennett testified that he believed that, because he visited Beaumont, his "presence was known" among the inmates and any inmates who wanted to speak to him about the case would simply have contacted him. SA 570. Although Bennett admitted that most of the potential eyewitnesses were no longer housed at Beaumont at the time of his visits, he believed that word would travel through the prison grapevine to other prisons. SA 582.

51.     Bennett and trial counsel speculated about who the government's informants were and developed changing theories. At one point, they believed that Jaycob Vidana was the government informant. Yet Bennett did not make an attempt to interview Vidana. Instead, as Bennett testified, when he learned that someone was a "snitch," he would ask other inmate witnesses about that person. SA 547; *see also* SA 644, 645.[9] Ben Masters was the one exception to this. According to Bennett, "I didn't want to put that word out like that because he's in -- in the Aryan -- Aryan Brotherhood and you just don't go -- I wasn't going to go talk -- for Shannon's safety I wasn't going to go start spreading rumors that he's a -- a snitch 'cause he might not be-." SA 555.

52.     Bennett testified that Mr. Agofsky was responsible for the shifting suspicions about who the informant was. However, Bennett's letters reflect that the government's discovery suggested who the informant might have been. SA 644. Letters from Mr. Agofksy to Bennett indicate that trial counsel did not turn over discovery to him until mid- April, only a few months

---

[9] As discussed *infra*, this practice could have placed Mr. Agofsky in danger by suggesting that Mr. Agofsky was accusing various inmates of cooperating with the government, before the defense had any clear evidence that it was so.

24

before the case was to go to trial. SA 687. Once Mr. Agofsky was able to review the discovery, he was able to have actual input into who might be testifying against him. *Id*. Before then, he was only relying upon his memory of an event which had occurred over three years before in trying to help his attorneys.

53.     Trial counsel's investigation was incomplete and their trial preparation was inadequate. As a result, the record and the available evidence demonstrate counsel's repeated failures to present evidence that would have supported or harmonized with their own strategy and numerous other failures of reasonable advocacy. All these instances of deficient performance prejudiced the defense. U.S. Const. Amend. VI.

### C.     Trial Counsel Made Only One Documented, Unsuccessful Attempt To Interview One Government Witness And Otherwise Failed To Attempt To Neutralize Government Witness Testimony

54.     Trial counsel made one documented effort to contact any of the witness who testified for the government. SA 623.[10] Trial counsel thus were unprepared to confront damaging evidence that they could have neutralized or ameliorated if they had done so. *See, e.g., Catalan v. Cockrell*, 315 F.3d 491 (5th Cir. 2002) (failure to impeach victim on cross-examination with inconsistent statement was deficient performance); *White v. Godinez*, 301 F.3d 796 (7th Cir. 2002) (failure to interview or call defendant's accomplice was ineffective assistance); *Chambers v. Armontrout*, 907 F.2d 825 (8th Cir. 1990) (failure in self-defense case to interview only witness who said defendant struck victim was deficient performance); *Higgins v. Renicio*, 362 F. Supp. 2d 904 (E.D. Mich. 2005) (failure to prepare for cross-examination of key government witness was deficient performance).

---

[10] Bennett and Black have since stated that subsequent efforts were made to speak to Ward prior to trial. *See* SA 554, 2327.

55.    For example, the government called Robert Duggan, an expert in the Korean martial art of Hwa Rang Do who ran the Executive Security Institute ("ESI"), an academy for executive protection experts and other security specialists that Mr. Agofsky attended, fulfilling a childhood dream, immediately after he graduated from high school. Duggan testified that Mr. Agofsky attended his academy in 1989 and described the curriculum. The program taught various lethal techniques, including "stomping kicks to the neck and head," but also taught students to be aware that "these are lethal techniques." Tr. Vol. 19, 188-99. The prosecutor asked Duggan the following:

> Q: And in the techniques of this martial art, would you agree that several of those techniques end with stomping kicks to the neck and head?
>
> A: There are several techniques illustrated in the book [written by Duggan] and in the system that include kicking, stomping, yes.
>
> Q: And do they direct the student to apply those to the head region, the neck region?
>
> A: Yes.
>
> * * *
>
> Q: So in this martial arts field, in the training that is taught, then they are taught how to deliver lethal blows?
>
> A: Yes, they are.
>
> Q: And they are also taught to understand that these are lethal blows?
>
> A: Correct.

Tr. Vol. 19, 198-200.

56.    On cross-examination, Duggan testified that Hwa Rang Do was a lifestyle that required discipline and restraint. He explained that his students were taught to be non-emotional in stressful situations, to make threat assessments by looking at facial expressions and interpreting

body gestures, and to use force as a last resort. Tr. Vol. 19, 201-09. Duggan's school records contained no indication that Mr. Agofsky had any disciplinary problems while he was there. Tr. Vol. 19, 209.

57.     On redirect examination, the prosecution elicited Duggan's opinion on the use of force in this case:

> Q:     If someone is lying face up on concrete, and a trained martial arts expert in this trained field is stomping repeatedly on a defenseless human being who is not putting up any, any defense whatsoever, and that person is stomped to death to the point where his throat is crushed and he drowns in his own blood, can you imagine that force being employed necessary to be used as self-defense?
>
> A:     No.

Tr. Vol. 19, 210-11.

58.     Neither Bennett, the defense investigator, nor trial counsel, Black and Barlow, ever contacted Duggan before trial or requested copies of training materials. He saw them in the hallway at the courthouse during the trial but they did not acknowledge him. A33. If they had interviewed him, he could have offered testimony that would have supported, and not contradicted, the justification or heat of passion defense.[11]

59.     At the time of his testimony, Duggan did not know key facts about the other evidence introduced at trial, or about additional evidence the defense could have presented. If he had known those facts, his testimony would have been different. For example, Duggan did not know that two inmates had testified that they saw Plant swing first, or that a corrections officer had testified that the incident lasted only eleven seconds. He was not aware that Plant was a drug

---

[11] As explained *infra,* Duggan could also have offered mitigating information that the defense could have presented at the penalty phase.

user who was possibly going through withdrawal, or that Plant's cellmate had testified that he made threats against Mr. Agofsky, or that Plant carried knives because of his drug debts. He was unaware of the history and atmosphere of violence at USP Beaumont or that Mr. Agofsky was locked in a cage with four other inmates, each of whom could have been involved in the assault. Duggan could have testified that all of this information was critical to an assessment of whether the use of force was necessary. A34.

60. Although Black asked Duggan cross-examination questions about observational skills taught at ESI in a course called Behavioral Cues, he did not ask follow-up questions that would have supported the defense. He asked no questions about the likely effect of the violent environment at Beaumont on Mr. Agofsky's assessment of the need to use force, or the fact that Mr. Agofsky was locked in a cage with four other inmates, including one (Plant) known to carry a knife, on his reaction to behavioral cues. A34-35.

61. Duggan could have described the firearm theory taught at ESI and applied it to the situation of an unarmed person locked in a cage with an attacker who might have been armed. The firearm theory teaches that, once an attacker escalates a situation to the point where the defender needs to pull a gun, the defender should fire until the attacker is fully incapacitated. Duggan could have stated that the same principle would apply to an unarmed person locked in a cage in a life-threatening situation. According to the principles taught at ESI, once the attacker escalates the encounter to a life-threatening level, the defender should use lethal force to render the attacker incapable of doing further harm. A35.

62. Duggan also could have testified about knife defenses as they are taught at ESI. This testimony could have been helpful if, as explained below, the defense had elicited evidence that Plant was known to carry knives and that knives were very prevalent at USP Beaumont.

28

Duggan could have explained that there are few reliable methods to disarm someone with a knife. He could have testified that, if a person knows or believes an attacker is carrying a knife, it becomes a life or death situation and the defender would be forced to use lethal force. A35.

63.     Duggan could also have described the Tachy Psyche Effect, a phenomenon taught in the ESI curriculum. In a life-threatening situation, adrenaline affects a person's judgment, and creates tunnel vision and selective hearing. A35-36.

64.     Duggan could have testified that this common response to a life-threatening situation could explain Mr. Agofsky's reactions during and after the fight. According to a guard, the fight lasted approximately eleven seconds. During that time, according to the defense witnesses, Mr. Agofsky saw Plant swing at him and reacted. Mr. Agofsky knocked Plant down, and then incapacitated him with his foot. At that point, Mr. Agofsky did not know if anyone else in the cage was acting in concert with Plant or whether they were armed. Further, Duggan could have stated that the immediacy of Mr. Agofsky's reaction under these circumstances demonstrated primal and not predatory behavior. A primal attack is instantaneous, while a predatory attack is cognitive or planned. A36.

65.     Duggan could have testified that students at ESI are taught how to stay calm and centered under stress, even after the fact. The curriculum emphasizes calming the mind and body under stress, and teaches students to be professional and non-emotional during stressful situations. This could also have helped explain why Mr. Agofsky was calm immediately after the fight. A36.

66.     Duggan could have described his own experience with incarceration as a draft resister in 1962, when he was housed at the Los Angeles County Jail for three months. In that overcrowded facility, inmates had access to toothbrushes, razor blades, forks, and spoons, all easily used as, or converted into, weapons. Duggan watched other inmates making weapons and was cut

29

twice with such weapons during his three months in the jail. He could have testified that, if Mr. Agofsky suspected that Plant was carrying an edge weapon and he attacked Mr. Agofsky, any use of force by Mr. Agofsky to defend himself was reasonable. And deadly force was comprehensible. A35.

67.     The facts that were unknown to Duggan at the time of trial would have altered his testimony. If he had known those facts, he would have testified that, given the testimony about the setting and Plant's reputation, Mr. Agofsky acted comprehensibly and even justifiably. A36.

68.     The defense could also have addressed Duggan's direct testimony, and the prosecution's case generally, by presenting testimony from Gerald Edmondson, one of Mr. Agofsky's early martial arts teachers, about self-defense in the discipline of Hwa Rang Do. Edmondson was subpoenaed but never called as a witness by the prosecution. Edmondson could have explained that the sequence of events between Mr. Agofsky and Mr. Plant suggest defensive intent instead of lethal intent. "Long techniques," which employ the feet, are generally used in Hwa Rang Do to keep opponents at a distance and enable an individual to cover the most ground in the fastest way. Kicks are designed to maintain distance from an attacker. "Intermediate techniques" use the hands, and "close techniques" are akin to wrestling. Close techniques are considered the most lethal. In every manual, stomping is a "follow-up" technique. It is not the main focus of lessons but is taught mainly for use in self-defense. With multiple opponents, the philosophy is to engage one person at a time and disconnect or immobilize each one. If an individual cannot see all the opponents, then speed becomes vital, and it becomes even more critical if one thinks the opponent might have a weapon. Edmondson could have testified that he did not believe there would have been any room for error on the recreation yard. Because the attack took place in a prison, "there had to be some reality to how [Mr. Agofsky] reacted." If Mr. Agofsky

was attacked, no matter what the level of that attack, he could not afford to wait and see what someone was going to do. Mr. Agofsky was at a skill level that would allow him to defend himself in prison, and Edmondson was confident that he would protect both himself and others. A513-14.

69.     Trial counsel's failure to interview either Duggan or Edmondson, who were not only prospective government witnesses but also Mr. Agofsky's former teachers, violated prevailing professional norms. The prosecution relied heavily on Duggan's expertise and conclusions in seeking Mr. Agofsky's conviction and death sentence. Tr. Vol. 20, 371; Tr. Vol. 18, 28. Tr. Vol. 24, 334-35. If the jury had learned that Duggan believed that Mr. Agofsky acted comprehensibly and even justifiably under the circumstances described by the defense witnesses, and had learned from both Duggan and Edmondson about the defensive techniques they had taught Mr. Agofsky, the outcome of trial could have been very different.

70.     Assertions by Mr. Agofsky's trial counsel about their contact with Duggan are contradicted by documentary evidence. Black and Barlow allege that Mr. Agofsky had told them that his relationship with Duggan ended on less than favorable terms, which made them believe that Duggan would not provide any helpful information. SA 2324 (Black), SA 2338 (Barlow). However, letters from Mr. Agofsky written to his trial counsel and turned over by Black to postconviction counsel indicate otherwise. In one letter, he specifically tells counsel that he "believes that [Duggan's] testimony can be made very beneficial to us." SA 642. In another letter, Mr. Agofsky writes, "[A]ll I can think of that the pros. may want him for is to say that Hwa Rang Do incorporates restraint/control techniques, which I could have used instead of killing. If that's not it, I cannot guess." SA 685. These letters show that Mr. Agofsky expected that Duggan would give favorable testimony and that he communicated that fact to his defense team. Trial counsel's assertions that Mr. Agofsky discouraged them from speaking with Mr. Duggan are simply untrue.

71. Black and Bennett allege that the defense team actually spoke with Duggan and that he "informed the investigator that he had no personal recollection of Mr. Agofsky attending his academy and that during the entire time he may have only taught one or two classes to Mr. Agofsky." SA 2324. Bennett testified that he had planned an interview with Duggan but was derailed because of a snowstorm. Instead, Bennett states that he had a brief telephone conversation with Duggan, in which Duggan told him that he did not recall many details about Mr. Agofsky. SA 560. Bennett does not recall taking any notes during the interview and none have been produced to current counsel. SA 561.

72. Mr. Agofsky and Duggan contradict these assertions as well. In his accompanying affidavit, Mr. Agofsky maintains that neither his lawyers nor Bennett ever told him that they had contacted Duggan. SA 2368. Likewise, Duggan recalls that no one from Mr. Agofsky's defense ever spoke with him about Mr. Agofsky. A33, A36. As discussed elsewhere in this Motion, the defense's failure to effectively interview Duggan meant that the jury did not hear accurate information that would have been helpful to Mr. Agofsky, and in fact heard testimony that actually harmed Mr. Agofsky. *See infra* at 22-28.

73. Had trial counsel spoken with Duggan, they would have learned that the government misled Duggan about the prosecution's theory of the case, telling Duggan that Mr. Agofsky was a hired hit man. Had trial counsel informed Duggan of the true circumstances of the case: that Plant struck first, that he and Mr. Agofsky were locked in a 30-foot cage with three other inmates, and that inmates at Beaumont were regularly armed, Duggan's testimony would have been drastically different. Instead of testifying that Mr. Agofsky used excessive force, he would have testified that the amount of force was reasonably necessary for survival. A34-36.

74.     To excuse his failure to conduct or arrange for a proper interview with Duggan, Black, in his affidavit, claims that "Mr. Agofsky left martial arts school on 'bad terms' and trial counsel was concerned that due to such Duggan and the other instructors might testify adversely to Mr. Agofsky's interest at trial." SA 2325. If believed, those circumstances would have made it even more important that the team interview Duggan. Counsel knew that the government intended to call Duggan as a witness. Their failure to conduct an adequate interview and investigation of Mr. Duggan in order to at least neutralize his testimony was deficient.

75.     A reasonably thorough defense investigation would also have yielded prior inconsistent statements from and impeaching background information about the government's only eyewitness, Richard Ward.[12] Scott Lawson, who testified for the defense at trial, shared a cell with Ward and defense witness Robert Ecker. Lawson could have testified to conversations he had with Ward and Ecker after the fight. Lawson was in the cell when Ward and Ecker returned from recreation on the day of the incident. When they came back to the cell, both Ward and Ecker told Lawson that Plant had started a fight with Mr. Agofsky. Ward said that Plant had slapped Mr. Agofsky, who then knocked Plant down and kicked him. Ward and Lawson shared their surprise that Plant would do this. Ward said to Lawson more than once, "I cannot believe that Tootie [(Plant)] swung on Shannon [(Mr. Agofsky)]" and was laughing in surprise that Plant had attacked Mr. Agofsky. Plant was alive when Ward and Ecker left the yard so no one knew at that time that

---

[12] As explained in Ground 12.5, *infra*, the government withheld *Brady* information concerning Ward. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Although Ward now states that he did not see how the fight between Plant and Mr. Agofsky started, government agents convinced him to testify that Mr. Agofsky initiated it, by promising Ward a "clean start" in the form of release to Texas, admittance to the witness protection program, and suspension of his supervised release. They instructed him not to mention those promises when he testified, and coached him repeatedly. And as explained *supra*, n.10, Bennett did make a single, unsuccessful attempt to contact Ward before trial. A reasonably thorough investigation would have followed up with Ward to ensure that the valuable information he had to provide was presented at trial.

33

Plant had died. Lawson told the defense investigator this information, yet Lawson was not questioned about it by the defense on the witness stand. SA 2082.

76.     Robert Ecker, also called by the defense at trial, could have testified about a conversation he had with Ward after the fight. Ecker could have explained that he and Ward were surprised and in total shock when Plant swung at Mr. Agofsky. He and Ward went back to the cell and talked about how they could not believe that Plant had turned on or swung at Mr. Agofsky, and how Plant "must have been crazy." SA 2041.

77.     The defense could also have obtained evidence that would have helped explain why Ward would lie. This would have been important because, as Ward testified, he had only "a couple of months left" before his release. Tr. Vol. 19, 232. Thus it appeared that he would have little to gain by testifying, and the prosecution argued in summation that Ward "has not been guaranteed any benefits for his testimony and that is absolutely true." Tr. Vol. 20, 373.[13] George Rivera could have testified that Ward, like Plant himself, was a drug courier who carried drugs and held both knives and drugs for Rivera. Indeed, a few months after the Plant incident, Ward was caught with seven knives in his cell. SA 2111. Ward owed a lot of money to inmates in general population and did not want to leave the SHU to face his creditors. SA 2105. Ward was transferred to another facility immediately after he agreed to testify for the government. SA 2542. All of this information could have explained why cooperation would have been attractive and beneficial to Ward even though he was so close to release.

---

[13] As explained above, trial counsel also failed to make use of the most substantial piece of impeachment material he did have, a report that Ward received a clear promise of a "Rule 35" time cut. And Ground 12.5 describes the government's failure to disclose even more substantial impeachment evidence (given the limited impeachment value of the time cut because of Ward's already imminent release), in the form of promises the government had made to Ward that he would be placed in the witness protection program and would not have to report for supervised release once he was out of prison.

78.     Robert Ecker could have also testified about Ward's reputation to help undermine his credibility. Ecker told Mr. Agofsky's attorneys before trial that Ward was a severe drug addict and a "sick guy." Ward would talk really fast and "go off", then later he would be calm. SA 2046. Black and/or Barlow told Ecker that they were going to ask him about Ward's character, drug use, and mental illness, but they never did. SA 2048.

79.     If the jury had heard from several witnesses that the government's only eyewitness had previously stated that Plant attacked Mr. Agofsky, and that he had something more substantial to gain by testifying than a few weeks off his sentence—namely, a way to escape his debts in Beaumont—the information could have been fatal to the government's case.[14] If, in addition, the jury had known that Edmondson and Duggan would have supported the defense, if anyone had informed them of the evidence presented by the defense witnesses, the government's case would have been undermined still further. There is a reasonable probability that, but for trial counsel's unreasonable failure to undertake basic investigation of the government's case, the outcome would have been different and the jury would have found Mr. Agofsky not guilty or imposed a non-death sentence. *See Catalan v. Cockrell*, 315 F.3d 491 (5th Cir. 2002) (failure to impeach prosecution witness was deficient performance); *Martinez-Macias v. Collins*, 810 F. Supp. 782, 808-13 (W.D. Tex. 1991) (counsel's failure to investigate or present evidence contesting government witnesses was ineffective), *aff'd on opinion below*, 979 F.2d 1067 (5th Cir. 1992). Thus, alone and in conjunction with other deficient performance described in this summary and Mr. Agofsky's amended petition, this instance of trial counsel's deficient performance prejudiced the defense.

---

[14] If the jury had also learned about the promises of witness protection and no supervised release, which the government failed to disclose, and which provided a more convincing explanation for Ward's decision to cooperate than his insistence that he just wanted to square his debt to society by doing the right thing, the likelihood of acquittal would have increased dramatically. *See* Ground 12.5.

There is a reasonable probability that, but for counsel's deficient performance, alone and in conjunction with the other instances of deficient performance summarized *infra*, the outcome of the guilt and penalty phases would have been different. U.S. Const. Amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984).

**D. Trial Counsel Failed To Investigate And Present Readily Available Evidence To Support The Justification And Heat Of Passion Defenses Upon Which They Relied At Trial**

80.     The defense investigator, Jay Bennett, interviewed only seven of the twenty-eight eyewitnesses to the Plant incident, whose names and register numbers were provided to the defense by the government. A37. He attempted to interview two others.[15] The defense presented two eyewitnesses who testified, briefly (totaling only twelve pages of direct testimony for the two witnesses), that Plant initiated the attack, and a third inmate witness who gave three pages of background testimony. But the defense offered no explanation why Plant would do such a thing, and they failed to present additional evidence, from those witnesses and others, some of whom Bennett had interviewed and two of whom the defense had subpoenaed for trial. The additional evidence that Black and Barlow failed to obtain would have corroborated the defense witnesses' account of the event or provided further support by describing Plant's violent reputation and the situation at USP Beaumont, or both. *See Smith v. Dretke*, 417 F.3d 438 (5th Cir. 2005) (counsel ineffective in murder case for failing adequately to prepare and present evidence of self-defense); *Tenny v. Dretke*, 416 F.3d 404 (5th Cir. 2005) (same); *see also Beltran v. Cockrell,* 294 F.3d 730 (5th Cir. 2002) (counsel ineffective for failure to investigate and impeach eyewitness testimony); *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001) (failure to call three witnesses who would have

---

[15] As explained *infra,* Bennett interviewed twelve other inmate witnesses who were not eyewitnesses.

36

supported defense was deficient); *Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994) (failure to interview eyewitnesses was deficient performance, despite counsel's vigorous cross-examination of those witnesses); *United States v. Gray*, 878 F.2d 702 (3d Cir. 1989) (failure to locate potential witnesses or interview witnesses suggested by defendant, all of whom would have supported self-defense, was deficient performance); *Sullivan v. Fairman*, 819 F.2d 1382 (7th Cir. 1987) (failure to locate and call several "occurrence witnesses" was deficient performance).

### 1.    Eyewitnesses

81.    The defense failed to interview numerous inmates who were present on the yard, some of whom actually saw the beginning of the fight, and failed to obtain important details from the inmates they did interview.

82.    For example, because the defense team never interviewed inmate Randy Seitzinger, they were unable to present his testimony. Seitzinger was on the recreation yard, two cages down from Cage 3 and talking to another inmate in Cage 3 named Ears (Mark Williams, since deceased), on the morning of January 5, 2001, the day Plant was killed. There was a cage between them but nothing blocking his line of sight when he noticed Plant yelling at Mr. Agofsky and using abusive language, walking back and forth as if he was upset about something. Seitzinger saw Plant punching Mr. Agofsky and Mr. Agofsky trying to block the punches. He heard Plant's head hit the ground with a loud crack, looked down, and saw Plant lying on the ground. Surprised, he exchanged glances with Ears, and then looked toward the responding officers arriving on the recreation yard. Because the yard then became chaotic, he did not observe what happened next between Mr. Agofsky and Plant. Mr. Agofsky did not initiate the attack, and from Seitzinger's perspective his actions looked more like a block than a blow, following which Plant lost his footing and fell. The incident happened very quickly. A534.

83. Seitzinger could have described Plant as a person who was constantly "going off," always drunk, always owing people money. He had been making threatening statements about Mr. Agofsky and "running his mouth off." Plant made knives, and sold them for $50 each. He was known to carry them. Once Seitzinger ran into Plant in the hall on his way somewhere, but when Plant realized that he would have to pass through a metal detector, he turned around and went back. Seitzinger concluded that Plant was carrying a knife and had to avoid setting off the metal detector. A534-35.

84. Seitzinger could have testified that Mr. Agofsky had to defend himself from Plant's attack. First, Plant could have had a knife. "A big guy isn't very big if the little guy has a knife." Second, an inmate who fails to defend himself in prison will find himself labeled as a target. If someone steals from an inmate he cannot say "oh it's cool, I'll buy another one." Next, all his possessions will be taken, "including yourself." Seitzinger could have told the jurors , "[Mr. Agofsky] was put into a predicament, like anyone in prison could be. It could happen at any moment. The jury needs to realize that predicament." A535.

85. Plant was aggressive and a bully, constantly pressuring people. Given his relatively small size, his aggressiveness suggested to Seitzinger that he must be armed. Seitzinger avoided him at all costs. A535.

86. Plant frequently ran drugs back and forth into the prison and between the general population and SHU. Seitzinger frequently saw him on the yard, drunk, stumbling, and slurring. He either worked, or had friends who worked, for maintenance, providing him access to paint to sniff and chemicals for making wine. Seitzinger also believed that Plant had other friends who worked for construction, providing him the materials to make knives. A535.

87. Seitzinger could also have described the violent conditions at USP Beaumont. Because Beaumont was a "disciplinary joint," a prison to which inmates were transferred for disciplinary reasons, it was "wild," and the SHU was even wilder. Infractions, and knives, were so common that officers did not always pursue them; Seitzinger once was caught with a knife in his cell and the charges were dismissed. As he argued to the hearing officer, there were so many knives that an inmate could have a knife in his cell and not even know it. One reason, as Seitzinger could have explained to the jury, is that the facility was still relatively new and inmates could find metal braces from the chain link fences, and angle irons, literally lying around or buried in the dirt. Drinking was prevalent; inmates made moonshine that was so strong that it tasted like vinegar and could easily catch fire. Officers would not send inmates to disciplinary segregation for drinking, but just make them stay in their cells if they found them drunk. Plant made moonshine and sold it. A535.

88. Because Beaumont was understaffed, not only infractions and knives, but also violent incidents, were common during the time that Seitzinger was there. A535.

89. Inmate Pete Carrion was another readily available witness. Although defense investigator Bennett did interview Carrion, the defense either never obtained, or failed to use, important information that he could have provided. Bennett learned from Carrion that he was in Cage 1, two cages away from Mr. Agofsky and Plant, playing handball, and that he did not see the onset of the fight because "people in Rec. cage #2 blocked their view." Bennett's interview lasted about fifteen minutes, and the defense did not call Carrion as a witness at trial.

90. The handball cage where Carrion was confined was larger than the other cages because it was used as a handball court, and had a round drain in the middle.[16] Carrion and another

---

[16] Several other inmates who were in the SHU at USP Beaumont also recalled this drain.

inmate had finished one handball game and were into the second when they heard a loud thump. He saw Plant lying on the ground and Mr. Agofsky kicking him in the torso area, perhaps twice. Carrion then noticed a homemade knife lying on the ground at his feet, under the fence between his cage and Cage 2. The knife was in a homemade sheath and made of plastic. Because he did not want to be charged with possessing it, Carrion immediately picked it up and threw it down the drain in Cage 1. No one in his cage or Cage 2 said anything about the knife. A504.

91.    Carrion believed the knife belonged to Plant because it did not appear to belong to inmates in the next cage and because Plant was known to carry one. Because Plant had "burned" so many other inmates, he had to carry a weapon. Carrion had seen him with a weapon. He knew that the weapon could not belong to Mr. Agofsky because if so it would have been used against Plant. He believed that Mr. Agofsky had caught Plant pulling out his weapon and reacted, causing it to fly across Cage 2 and under the fence between that cage and Cage 1. A504.

92.    Carrion could have testified that, had Plant pulled a knife on Mr. Agofsky, Mr. Agofsky would have had to react. Otherwise, he would have been looked upon as "someone who gives breaks," a reputation that would invite other inmates to stab him in the back. A504.

93.    Carrion could also have described Plant's reputation and behavior. Plant was always in debt, and was known to bring drugs into the prison, and from the general population into the SHU, for sale to other inmates. He saw Plant smuggle drugs by receiving them from someone in the visiting room and hiding them in his anal cavity. A505.

94.    Carrion could have described USP Beaumont as a violent place where many inmates carried knives. He saw two stabbings in his first week there. There was so much violence and the SHU was so overcrowded that inmates could test positive for drugs over and over and not be sent there. Carrion also knew the officers to "set up" inmates by forcing them to enter cages or

40

cells with inmates they were not supposed to be housed with. For example, Carrion became involved in a fight and was charged with assault after being placed in a recreation cage with inmates from a hostile gang. A505-06.

95. Although the defense did interview and call inmate Billy Santiago, who was in the recreation cage next to the one where Mr. Agofsky and Plant were confined on January 5, 2001, the defense never elicited important details from him and thus could not present them at trial. Santiago testified briefly that he was doing pushups before the fight began and that Plant was walking back and forth. He heard Plant call out to Mr. Agofsky, and then saw Plant swing first. Santiago had entered the cage with a homemade knife (or "shank") which he had brought for his personal protection. He did not use it, and the authorities discovered it later. Tr. Vol. 19, 316-19.

96. Bennett interviewed Santiago at USP Marion before the trial, but it was a short visit. He asked Santiago what happened and was gone in half an hour. Black came to the county lockup with Bennett before trial to interview Santiago and the other inmates the defense had subpoenaed, and Santiago also saw him very briefly in the holding cell in the courthouse before his testimony. Santiago had no contact with Barlow.

97. Santiago could have offered additional helpful information about the incident, Plant's personality and reputation, the prevalence of violence at Beaumont, and the inmate practice of "check-in moves" to avoid violence.[17]

98. Santiago could have testified that, when the inmates in the recreation cages in the Segregated Housing Unit (or "SHU") went outdoors for recreation, the cages were filled one at a time. Inmates were subjected to a pat-down, not a full-blown search, before going out to the cages.

---

[17] Bennett did not obtain the information summarized in this section, Ground 12.1(D)(1), ¶¶ 81 to 97. Also, when Santiago testified, Black did not elicit some of the limited favorable information that Santiago had given to Bennett.

On January 5, 2001, Santiago had a knife that was not discovered on his way out to the recreation cages. He generally carried a knife for his own protection because Beaumont was so dangerous. He was carrying the knife that day for his own protection. A531.

99.    Santiago was in Cage 4, next to Cage 3, where Mr. Agofsky was. At one point he and Mr. Agofsky talked through the chain-link fence separating the two cages while, in Cage 3, Plant and someone else were walking back and forth. After that, Santiago did pushups. Santiago could have testified that, if Mr. Agofsky had expected trouble, he could have asked Santiago for the knife and Santiago would have given it to him. But Mr. Agofsky did not ask him for the knife. Nor did Santiago see any indication of trouble between Plant and Mr. Agofsky before the fight happened. A531.

100.    Santiago could have testified that he heard Plant call Mr. Agofsky over, and was alerted because he was "nosy." He thought that maybe Plant was going to give Mr. Agofsky some cigarettes and maybe Santiago would get one. He saw Plant take a swing at Mr. Agofsky and Mr. Agofsky knock Plant down. The fight was over quickly and Officer Matt also arrived quickly. A531.

101.    Santiago could have provided testimony about Plant's reputation. Plant ("Tootie") was a drug user and someone who would do a lot of talking and arguing and conning. For example, he might undertake to obtain some commodity for another inmate and then not turn over what he promised. He could convince the other inmate that a mishap had prevented him from keeping his promise, and would promise to make it up on another occasion. And then the next time he would cheat the other inmate again. Plant also tended to talk big, perhaps because he was often high, and, as Santiago remembered him, would do anything to protect himself. A532.

102. According to Santiago, Plant got away with a certain amount of this behavior because he was a "home boy" from east Texas. Other inmates from Texas frequently interceded for him and shielded him from some of the consequences of his behavior. Santiago could have testified that Plant's attitude played into what happened in the recreation cage. Although Plant initiated the attack, he could have expected that Mr. Agofsky would use restraint in response, because in the past his actions had often been met with restraint. A532.

103. Santiago could also have explained the practice of "check-ins," a concept that could have been helpful to the jury because, as described below, a number of witnesses could have testified that Plant owed money "on the compound" (in general population) and had reason to fear being released from SHU. "Check-in moves" were common in Beaumont and other institutions where Santiago had served time. An inmate might owe money in general population, usually for drugs. To get away from the inmates he owed, he would "do something stupid." The inmate might deliberately use drugs that would show up in urinalysis, or get caught with a knife, or do something more serious. Santiago knew of instances in which an inmate who needed to check in would gratuitously attack another innocent inmate. Usually the prison authorities would discipline the aggressor by moving him, especially if the other inmate was respected. Mr. Agofsky was respected among the inmates at Beaumont as a person who avoided problems and tried to stop fights. A532.

104. Santiago could have described Beaumont as a very violent place where inmates had to protect themselves because of frequent assaults and murders. If one inmate attacked another, the defender could not underestimate the attacker on the basis of size. A small inmate could, and frequently did, carry a large knife. A531.

105. With reasonably thorough preparation, Santiago also could have responded to damaging cross-examination in which the government questioned his failure to give a statement

43

to the FBI before trial. Tr. Vol. 19, 322-23, 327. Santiago could have explained the reasons for his refusal to do so. The FBI attempted to interview inmate witnesses very shortly after the incident, maybe the same day or the next. When Santiago was called for his interview, he would not even let the escorting officer close the door behind him. He told the FBI agent his name and register number and said he did not want to talk to him, and asked to be escorted back to his cell. This was because he did not want other inmates to think he was an informer or "rat." A532.

106.    Later, while Santiago and five other inmates were housed in the local jail after the defense subpoenaed them for Mr. Agofsky's trial, agents from the FBI came to talk to them. Once the inmates learned from the jail officers that the persons asking to interview them were not defense lawyers, they all refused. Again, the reason Santiago refused to talk to the FBI was that he did not want to jeopardize his safety in the prison population by creating the impression that he was an informer. A532.

107.    The defense could also have presented testimony from inmate Lonnie Griffin, who was on the recreation yard on the day of the incident but was never interviewed by the defense. Griffin did not see the fight between Mr. Agofsky and Plant begin, but could have provided useful information about recreation procedure at the SHU in Beaumont. The recreation officer would walk around the SHU each morning asking each inmate if he wanted to go to recreation, and then develop a list from the responses. Next he would determine whom he could cage with whom and develop a recreation roster. However, the officers did not always follow the roster. Many inmates would not go to recreation in the SHU because they could not be certain who might appear in the cage with them; officers sometimes placed inmates who were not supposed to be together in the same cage. A523.

108. Griffin could have testified that many inmates carried a weapon in the SHU and many carried their weapons into the recreation area, because Beaumont was such a violent place at the time. Because at that time officers did not strip search the inmates before recreation, an inmate could easily have smuggled a plastic knife into the recreation cage.

109. If trial counsel had taken the elementary step of thoroughly investigating the inmates on the recreation yard on the day of Plant's death, they would not have been forced to rest their entire defense on 12 laconic pages of testimony by Santiago and Ecker. If, instead, they had provided a well-supported and detailed account of what happened from more than two witnesses, it is reasonably probable that the outcome would have been different.

110. An additional six eyewitnesses could have provided further testimony that Mr. Agofsky was defending himself, bringing the tally of directly supportive eyewitnesses whom counsel did not present at trial to seven. Melvin Hauser, who was in the cage next to Mr. Agofsky's cage during the fight with Plant, saw Plant swing first. Hauser could have been particularly persuasive to a jury because he was an impartial observer. Before January 5, 2001, he knew who Mr. Agofsky was, but they were not friends and he never had any dealings with him. Hauser is African-American and would have also been able to testify that he never had any problems with Mr. Agofsky. Hauser also knew who Plant was, but had only seen him in the Special Housing Unit (administrative segregation or "SHU"). They were not friends. SA 2085.

111. Hauser recalls the details of January 5, 2001 very clearly. That morning, Hauser was in the recreation yard in the SHU. He was in Cage #2, in the cage next to Cage #3, which held Mr. Agofsky and Plant. At that time, inmates were generally placed in each recreation cage in order. Inmates were brought out one by one, first to Cage #1 until it was full, then Cage #2, then Cage #3, and so on. Cage #6 would be filled last. SA 2085.

45

112.     Hauser was getting exercise that morning by walking back and forth across Cage #2, and happened to be walking in the direction of Mr. Agofsky's cage when the incident happened. Mr. Agofsky and Plant were also walking and would pass each other as they walked back and forth across Cage #3. The inmates in Cage #1 were playing handball. The inmates in the first few cages had been on the recreation yard for a while before the incident occurred. The inmates in Cage #1 might have had enough time to finish one handball game and start the next game. SA 2085.

113.     Hauser saw that Mr. Agofsky and Plant were having some words as they walked back and forth, but did not hear what they were saying and did not know if the conversation was positive or negative. He was not paying close attention because he had no idea that something was about to happen. Suddenly, Hauser saw Plant try to make a move on Mr. Agofsky by swinging at him. He could not tell if Plant actually landed a blow or just attempted to hit Mr. Agofsky but had no doubt that Plant swung at Mr. Agofsky first. Then Mr. Agofsky knocked Plant to the ground and kicked him. The whole thing was over quickly. It could have been over in eleven seconds. Hauser did not notice any officers in the yard when this happened, but was not paying close attention to their location. It took a long time for the officers to get into the cage to help Plant. Hauser could hear that Plant was gurgling because he had blood in his throat, and shouted for the officers to turn him on his side. The officers just told the rest of the inmates to get back even though there really was nowhere to get back to. One of Plant's legs was twitching in the air and the officers kept telling him to put his leg down. SA 2079.

114.     Even though Hauser was not friends with Mr. Agofsky, he shouted at him, after the incident, to have someone talk to him, since he had seen what had happened and did not want anyone telling lies about it. The authorities came to the SHU within a day or two after the incident

46

trying to take statements, but Hauser would not talk to them because he did not want other inmates to consider him a "snitch." SA 2080. No one from Mr. Agofsky's defense ever came to speak to Hauser after the incident. Bennett testified that he did not interview Hauser, but would have done so had the attorneys requested it. SA 581. Hauser would have been willing to testify on Mr. Agofsky's behalf. SA 2080.

115.    Trial counsel could also have presented the testimony of Reginald Gilbert-Bey, who was in the same cage as Hauser, Cage #2, next to Mr. Agofsky's and Plant's cage, Cage #3, on January 5, 2001. Gilbert-Bey was working out and noticed that Plant was getting loud and aggressive with Mr. Agofsky. Plant suddenly charged at Mr. Agofsky, who put up his arm to defend himself, knocked Plant down, and kicked him. SA 2065. Gilbert-Bey could have explained why he never gave a statement to the FBI. Immediately after the incident, the FBI came to talk to him along with three other inmates. They met the FBI in a group and declined to give a statement. Gilbert-Bey declined, along with the others, because he is not a government informant and did not want other inmates to think he was an informant. SA 2072.

116.    No one from Mr. Agofsky's defense ever talked to Gilbert-Bey about the Plant incident or any other subject before the 2004 trial. Bennett testified that he would have interviewed Gilbert-Bey, had the attorneys asked him to do so. SA 581. If asked, Gilbert-Bey would have been willing to testify on Mr. Agofsky's behalf. SA 2064.

117.    Robert McKinn was three cages down from the cage where Mr. Agofsky and Plant were fighting and witnessed the incident. McKinn, like Hauser and Gilbert-Bey, was not a friend of either Mr. Agofsky or Plant. McKinn could have testified that as he was walking back and forth in his recreation cage he heard people talking and looked over at the cage Mr. Agofsky and Plant were in. At that point McKinn saw Plant swing at Mr. Agofsky. Plant lunged at Mr. Agofsky with

47

a "roundhouse punch." McKinn believed that Plant had something in his hand, possibly a "fist pack" or a knife. McKinn thought the "roundhouse" nature of the punch was odd, but thought that maybe Plant was trying to get more leverage and make the hit more powerful. If called to testify, McKinn could have explained that Mr. Agofsky defended himself and the only thing you can do in a recreation cage if someone "pops" you is to "pop" them back. SA 2097-98. McKinn did not see any guards on the yard at that time and did not think any guards were around at the time of the incident. McKinn thought it was possible that the guards were aware of the incident and let it happen, as guards have been known to stage things. SA 2097.

118.     McKinn could also have explained to the jury why he never gave a statement to the FBI. After the fight, the FBI came to talk to him. McKinn was in the shower and said that he did not want to speak to them. McKinn and others were told that they had to talk to the FBI and if they did not come out of the shower then officers would come in and get them. McKinn told the FBI that he did not know anything because if you speak to the FBI for too long you will be deemed a snitch. McKinn did not want to get hurt and did not want any problems or anyone thinking he was a snitch. SA 2098.

119.     McKinn's name and inmate number were listed in Mr. Agofsky's address book, in the possession of the defense team. SA 670. In addition, Mr. Agofsky made references to McKinn in his correspondence with the team. SA 685. Although Bennett wrote McKinn a letter, SA 691, when McKinn did not respond, no one from Mr. Agofsky's defense ever followed up with him. SA 581.

120.     Charles Glave was also on the recreation yard that day; in Cage #5, just two cages away from Mr. Agofsky. Glave heard Plant "running his mouth on the day of the fight. When I looked Tooty was swinging at Shannon. His arms were flailing." SA 2073. Glave could have

48

explained to the jury that he did not talk to the FBI after the fight because "It is an unwritten rule. No man talks to the cops, either way. Never. You don't want to spend too much time there or others will think you are a snitch." SA 2074.

121.    No one from Mr. Agofsky's defense ever spoke with Glave. SA 2071. One letter from Mr. Agofsky to Bennett, which was turned over by trial counsel to habeas counsel, indicates that. Bennett had written to Glave, whom Mr. Agofsky did not know, in Victorville. SA 2498. Bennett did not follow up with Glave. SA 551. Bennett testified that he would have passed along the information from Glave—that he saw Plant swing first—to the attorneys, had he interviewed Glave. SA 551. Glave would have been willing to testify at Mr. Agofsky's trial, had counsel ever asked. SA 2071.

122.    Andres Campillo was also on the yard, and witnessed the beginning of the incident between Mr. Agofsky and Plant. Campillo heard Plant say something nasty to Mr. Agofsky and then saw Plant strike Mr. Agofsky first. SA 2014. After the incident, Campillo was taken into a room by the FBI who tried to pressure him to say things that would be bad for Mr. Agofsky. The FBI threatened Campillo and told him he would "get a case" if he did not speak with them. Campillo had to refuse to speak several times before they would allow him to leave. Campillo told the FBI to talk to his lawyer and they finally left him alone. SA 2014.

123.    On April 13, 2004, Bennett wrote to Mr. Agofsky that he would be going to ADX in Florence to interview Campillo. SA 2501. Mr. Agofsky responded, urging Bennett to just ask the "standard stuff" with Campillo—"did he see Tootie swing on me, how long it lasted, etc." Bennett never went to see Mr. Campillo, however. SA 551.

124.    Frank Early was on the recreation yard on January 5, 2001, in a recreation cage adjacent to Mr. Agofsky's. Early could have testified that he witnessed Plant getting "loud and

49

aggressive...and too close to" Mr. Agofsky before the incident. SA 2036. He then heard a scuffle but did not stare because that is against proper prison etiquette. When he looked up again, Plant was on the ground. "It's definitely not true that Shannon just walked up to Tootie and hit him for no reason." SA 2037. Early could have also helped explain to the jury why the inmates did not talk to the FBI. "I know and any inmate knows, that if he's seen with the FBI too long then he will be in trouble because people will think he's snitching." SA 2037.

125.    Early was interviewed by Bennett but was not subpoenaed. According to Bennett's interview with Early, Early stated that he witnessed the fight but would not go into detail. SA 634. According to Bennett, Early did not want to get involved in Mr. Agofsky's business. SA 571. Early stated in 2008, however, that Bennett simply did not ask him these questions. SA 2038.

126.    If, in addition to the superficial trial testimony elicited at trial from Santiago and Ecker, the jurors had heard from seven other eyewitnesses that Plant started the fight, Mr. Agofsky's acquittal would not have been just a reasonable probability but a virtual certainty. At the very least, there is a reasonable probability that a jury that had heard this evidence would have convicted Mr. Agofsky of a lesser offense or would not have sentenced Mr. Agofsky to death. The government's only eyewitness was Richard Ward, a drug user and courier with drug debts to other inmates, who originally told the FBI that he did not see the attack and told other inmates that Plant had started the fight. Thus, alone and in conjunction with other deficient performance described herein, their failures constituted prejudicially deficient performance. U.S. Const. Amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984).

### 2.    Background Witnesses

127.    The defense failed to obtain information about Plant's reputation and behavior, violence at USP Beaumont, and similar information that would have helped to establish the justification or heat of passion defenses, from other witnesses, some of whom were interviewed

by the defense. *See Towns v. Smith*, 395 F.3d 251 (6th Cir. 2005) (counsel ineffective for failure to investigate witness who exonerated defendant); *Soffar v. Dretke*, 368 F.3d 441, *amended* 391 F.3d 703 (5th Cir. 2004) (counsel ineffective for failing to interview surviving victim); *Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003) (counsel ineffective for failing to interview and present favorable eyewitness); *United States ex rel. Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003) (counsel ineffective for failing to investigate and interview exculpatory eyewitnesses).

128.    For example, the defense could have called Brian Berry, an inmate who was an orderly on the SHU in 2000 and 2001. He could have provided testimony that would have explained Mr. Agofsky's statements shortly after the Plant incident to Officer Hill, who testified that Mr. Agofsky asked him, immediately after the incident, whether he was going to be "four pointed" (strapped down to his bunk) and "when we were going to feed him." Tr. Vol. 18, 124-26. The government argued that these statements demonstrated callous unconcern about Plant's welfare. Tr. Vol. 20, 369. Berry could have explained the statements, and also could have testified about the violent atmosphere at USP Beaumont.

129.    Before the Plant incident, Mr. Agofsky was housed in one of the lower ranges on the SHU, which had four ranges of cells on two levels. Berry worked on one of the upper ranges. Inmate orderlies cleaned the ranges and handed out cleaning supplies to the inmates, who cleaned their own cells. The orderlies also cleaned other parts of the SHU. Officers, not orderlies, delivered meals from a food cart. A502.

130.    When the Plant incident began, officers ordered Berry and two other orderlies to remain in a room inside the SHU while the available officers went out to the yard. They remained there until Plant had been brought out on a "sled," and Mr. Agofsky had been placed in one of the "four-point rooms." These cells, located in a back corner of the SHU, each contained only a

51

concrete bed with four loops in the four corners for chaining an inmate at wrists and ankles. They had no toilets.[18] A502.

131.    When Berry was free to move about the SHU again, he went to the four-point room where Mr. Agofsky was confined and asked him if he was all right. Mr. Agofsky was not four-pointed, but he had been stripped to his underwear, with a belly chain, handcuffs, a black box over the handcuffs, shackles on his feet, and a chain between the black box and the shackles. Mr. Agofsky told Berry that he felt a little nauseated. He urged him, "Brian, don't let them forget to feed me back here." Berry interpreted this to mean that Mr. Agofsky was afraid he would be punished by being left back in an isolated corner with nothing to eat and no sanitation for an extended time. A502.

132.    After this, Mr. Agofsky was moved to a cell on Berry's range and left there naked and still chained in the same manner Berry had seen him chained in the four-point cell, for two weeks. Chaining him that way meant that Mr. Agofsky could shuffle around, but his hands were locked in front of him and he could not keep himself clean. Berry did not see his cell opened during that time. The food cart skipped Mr. Agofsky's door at least once every two days. The food portions at USP Beaumont were generally modest and "even missing one meal would count." Berry managed to bend up an aluminum flange at the bottom of Mr. Agofsky's door to expose a small crack under the door, and slip a few candy bars through the crack to him. A502.

133.    Berry could have described the severity of the violence at USP Beaumont. When he arrived at Beaumont in 1999, there was an average of one stabbing a day and one killing a month. An inmate would have to take someone with him for protection when he showered. And

---

[18] The four-point rooms at the Beaumont SHU had glass walls because they were also used as "dry cells," where inmates suspected of swallowing narcotics were housed until the narcotics, if any, had an opportunity to pass through their systems. The glass walls facilitated observation.

an inmate needed to keep his cell door open in order to hear if an assault was occurring in the hall or the next cell, and avoid walking into the middle of it inadvertently. Sometimes as Berry walked from one part of the institution to another, he would encounter someone simply lying on the ground bleeding to death. It was dangerous to assist the injured person because one never knew why the person had been attacked or whether assisting him would be interpreted as an unwelcome intervention into an ongoing situation. One usually had to just step over the person and move on. A503.

134. Berry would also have testified that knives were common. "You had to have a knife." In contrast to other institutions, if the officers at Beaumont caught an inmate with a knife, they would write up charges, but would not send the inmate to the SHU for detention while the charges were pending. The SHU would have had no room. "The whole compound would have to go." A503.

135. Berry would also have told the jury about "check-in moves" like assaulting or cursing a guard to get off the compound (general population). The inmate would get a beating but could be placed in the SHU or transferred out of the institution. And Beaumont was so violent that it took more extreme action to get transferred from there than from other institutions. Everywhere else that Berry has been confined, an inmate would be transferred for stabbing someone. Not necessarily so at Beaumont, because it was too common. An inmate could stab someone and still go back to the compound. Similarly, in other prisons where Berry has served time, if a racial or gang-type fight breaks out on the yard, the authorities will lock down the whole institution for a number of days or weeks, until they have conferred with inmate leaders to be sure tensions have cooled and there will be no retaliation. Not at Beaumont. If there was a big brawl on the yard they would close the compound, clean up, and then reopen it. A503.

136.    Berry would have been willing to testify on behalf of the defense if asked. A503.

137.    Inmate Gerald Miller could also have described the practice of "checking in." He was at Beaumont during the time that Mr. Agofsky was there, and served time in the SHU, although he was not on the recreation yard on the day of Plant's death. Miller could have testified that inmates commonly check in to get into the SHU or to keep from going back out if they are afraid to be on the compound. It is considered more honorable to get into the SHU by receiving a disciplinary infraction than by asking the authorities for protection. Inmates avoid creating the impression that they are afraid to be on the compound. A friend of Miller's was in the SHU in Beaumont with Miller and other friends in 2003. They all expected transfers to other institutions. But while Miller was in court in 2003, his friend was released instead to general population in Beaumont. Although none of his associates were on the compound and the friend knew other inmates there had grievances against him, he could not refuse to go out there. If he had done so, he would have been labeled and targeted. He was killed an hour after his return to general population. No one was ever prosecuted.

138.    In Miller's experience, inmates will often prefer to do something like attack someone to avoid going back on the compound and meeting the same fate as his friend. People who are that desperate could easily attack someone larger for that reason. It was well-known that Plant owed money to many people on the compound because he was a drug user, and he therefore had good reason to be concerned about being released from the SHU.

139.    The defense could also have interviewed and presented testimony from Jeffrey Milton. Bennett knew that he was a potential witness but did not interview him, although Milton wrote two or three letters to the defense team. Milton was incarcerated with Plant at USP Lompoc (before Plant's time in Beaumont) and said he had a reputation for carrying a knife and preying on

54

weaker inmates. Milton, who looked very young at the time, recalled that Plant would follow him around the yard and on one occasion aggressively pursued him. Milton would have been willing to testify for the defense if asked.

140. Inmate Ralph Cutchins, who knew Plant at USP Lompoc, said that Plant would lose all fear and inhibitions when he was drunk or high. Plant made aggressive advances on Cutchins, who outweighed Plant by 80 pounds, in a movie theater in Lompoc. Plant was drunk, high, loud, and belligerent before and during the movie. A507.

141. Cutchins often saw Plant on the recreation yard at Lompoc and saw him with knives. More than once, he witnessed Plant befriending other young inmates, after which he would encourage them to get drunk and/or high, and rape them. When the young inmates sought protection in the SHU the next day, Plant would keep their personal belongings. On another occasion, he saw Plant assault another inmate in the recreation cage in Lompoc. A507.

142. Inmate Russell Dinovo, who knew Plant when he was the orderly at the SHU in Lompoc, remembered him as rude, cocky, and disrespectful. A509.

143. Mike Fitzgerald, another inmate who was at USP Beaumont at the same time as Mr. Agofsky, could have described what a dangerous place it was. Although Bennett never interviewed Fitzgerald individually, he was subpoenaed to Beaumont before trial, and talked to Bennett and Black there, but was never called as a witness.

144. Fitzgerald could have testified that, in prison, inmates cannot expect guards to protect them in case of violence. If an inmate gets into a fight with a cellmate, the guards will not come in and intervene. If the inmate gets into a fight on the yard, he needs to make sure the other inmate "goes down" because the guards will not come to the rescue. The guards are following BOP policy. They will not rush in on a fight until backup officers arrive, don protective gear, and

start the video camera. Because that can take as much as 20 minutes, an inmate embroiled in a fight must make sure the other combatant goes down and does not get back up because otherwise he will find himself taken down. If Plant had gotten Mr. Agofsky down, Fitzgerald believed, then lawyers would now be representing Plant for the homicide of Mr. Agofsky. A518.

145. Fitzgerald could have explained that he was very aware of prison violence because, coming into Beaumont at 55 years old, he knew that he could be a target and must be careful. A518.

146. He could have described the rules of self-protection for inmates in Beaumont. "I wanted to explain our rules on the inside so that the jury would understand what was going on." If somebody comes into an inmate's cell and takes a 25-cent soap dish, the victim of the theft must be sure to go and get it back even though a soap dish is easily replaced. Otherwise, the next time it could be the theft of a radio and the time after that a physical attack. In such an environment, a knife is like car insurance. A car owner has insurance, but does not want to get into a wreck. An inmate carries a knife for protection, but does not want to have to use it. A518.

147. Fitzgerald could have testified that many federal inmates have mental illnesses. One cannot know what to expect from them and must be prepared. He could also have described Beaumont's "Thunderdome" atmosphere. Frequently, inmates and guards would "just watch" as other inmates fought in the cages. He saw many stabbings. In the three years that he was in Beaumont, he saw at least three or four people get killed. Fist fights were uncommon in Beaumont. Everyone had a knife. A518.

148. Fitzgerald told Bennett and Black about violence at Beaumont and his view of a knife as "car insurance," but they did not call him as a witness. Fitzgerald wanted to testify for Mr. Agofsky and wanted to explain that the rules in the cage required him to defend himself in a way

that ensured that Plant would not be able to get back up and stab or kill him. Fitzgerald thought that the jury might have found his testimony persuasive because he has no tattoos and is not in a gang. A517-18.

149. The defense could have obtained further helpful information about violence in prison from Joe Agofsky, Shannon Agofsky's brother. Joe could have testified that prison violence is common. He has seen an inmate stabbed 45 times, and both inmates and guards have been murdered at institutions where he has been incarcerated. Once a murder or assault happens, the authorities put the institution on lockdown status and both inmates and guards become more tense and heated than before. Inmates can go for years accumulating anger and frustration, and it can "run its course" in one second.

150. Joe could have testified that, if an inmate is attacked, he has no time to think about anything but survival. He has no choice. He cannot fend off an attacker and wait for help but must defend himself. An inmate also has to consider his reputation and the prevalence of diseases like hepatitis C. If he runs instead of defending himself from an attack, other inmates will "run over" him. No matter who attacks him, an inmate must defend himself or else he will have "a miserable life and a painful death" or "wind up a sex slave."

151. Bennett interviewed Joe Agofsky once, but did not ask him questions with a view to testifying. He updated him on Shannon's case and asked Joe what he thought the government's witness, Ward, would say. Joe told Bennett that Ward had said he had declined Bennett's visit because he did not know he was with the defense.

152. The defense could also have called inmate Roderic Russell, who could have testified that Plant had a reputation for making threats and using drugs. He could have testified that a number of stabbings took place in the recreation cages and the SHU while he was at USP

Beaumont. The metal bed frames in the SHU had holes in them because inmates had pried off pieces of metal to make knives. A530.

153. Melvin Hauser could also have testified that Beaumont was a very violent institution. People called it "gladiator school" because there were so many fights. There were a lot of knives around. It was a new prison and it was easy to find metal in the dirt on the compound left over from construction. Hauser saw a lot of violence with his own eyes, including a white inmate's stabbing in the chest and a black inmate's murder by another black inmate over a gambling dispute. SA 2080. Hauser could have described an example of the dangerous way Beaumont was run. Even though the prison was so violent, seven inmates in wheelchairs were part of the general population and not in a unit by themselves. Hauser thought that those inmates were vulnerable and that their presence in general population was an invitation for trouble. In his experience, other, less dangerous institutions have housed handicapped inmates separately. At Beaumont, he himself looked out for one of the inmates who was in a wheelchair, to protect him. SA 2080.

154. Hauser could also have explained the practice of "checking in." Attacking Mr. Agofsky could have been Plant's way of trying to get himself out of the institution. Hauser had seen inmates do similar things many times to get off the compound and into a SHU, or out of an institution altogether. He could have testified that an inmate who uses drugs is usually in debt because drugs are much more expensive in prison than on the street and inmates cannot support a habit without a really good source of income. Inmates will often try to escape debts, or other inmates who are hostile to them for other reasons, by "checking in." They can "check in" either by asking the authorities for protection in the SHU or by committing an infraction that will get them placed in the SHU or transferred to another prison. It is considered more honorable to commit

an infraction than to ask for protection, especially since an inmate who asks for protection comes under suspicion of being an informer. SA 2080.

155. Reginald Gilbert-Bey could also have described both the atmosphere at Beaumont and Plant's reputation. In 2001, Beaumont was an extremely violent place, the most violent institution Gilbert-Bey had been in. Inmates commonly called it the "Thunderdome" or "Terrordome." Guards used to allow and encourage fighting and could not control the inmates. Things got so bad that some inmates filed administrative grievances about the lax security. If an inmate slept in his cell in the daytime, he had to lock the door. In fact, to avoid trouble, Gilbert-Bey's religious group required its members to lock their cell doors if they slept in the daytime, or pay a penalty. Knives were easily available at Beaumont and stabbings were common. Gilbert-Bey witnessed many stabbings, including one in the very same recreation cage shortly before the Plant incident. Gilbert-Bey could have testified that Mr. Agofsky would have had good reason to assume that Plant had a weapon. Anyone at Beaumont would assume that if someone smaller attacked him, the other inmate must be armed. SA 2065.

156. Plant had a drug habit, and had acquired heavy debts and many enemies. Gilbert-Bey knew that Plant had been caught transporting drugs into the institution and now owed money both to the owners of those drugs and to other people for previous debts, whom he had been planning to pay with the percentage he expected for his transportation services. He was afraid of retaliation and had good reason to want to get out of the institution. He could have attacked Mr. Agofsky deliberately to incur an infraction that would lead to his transfer. SA 2065.

157. The defense could have called Robert McKinn to describe the violence at Beaumont. According to McKinn, everyone at Beaumont carried a knife. McKinn always carried a knife to protect himself. It was easy to make knives and there were many ways to do it. The

59

inmates would pull pieces of metal off the bottom of the doors or they would find pieces of metal in the yard. Another way to make knives was from the food trays. Inmates would break the food trays until they got to the aluminum and then they would use the two edges of the tray and tie them together a string. SA 2097.

158. Similarly, Charles Glave would have testified that Beaumont was a "dangerous facility" where guards treat inmates "like animals. There is no empathy at all. They hate their jobs and hate us....We're like dogs in a kennel." SA 2071. In Beaumont, the guards would frequently put a third cellmate in a two-man cell, forcing one inmate to sleep on the floor. Because Beaumont was a "lock- down" facility, inmates spent twenty-three hours a day in their cells. SA 2072. The third inmate had to "keep all his stuff in his mattress and roll it up under the bottom bunk or sit on it." This increased tension in the prison and frustrations with the guards and prison administration. Glave had witnessed stabbings at Beaumont and witnessed a murder on the yard there over a book of stamps. SA 2072. Glave was incarcerated with Plant at Beaumont and at USP Lompoc and described him as someone who "was doing everything you shouldn't do in prison." SA 2073. Plant made and sold knives on the prison yard. "He owed money and had enemies." *Id.* Glave knew that Plant owed money on the yard because he would buy drugs on credit. Plant would then do something to get into trouble, so that he could get more time to pay off his debts. Glave saw this happen with Plant at Lompoc. According to Glave, Plant "has a 'track record' for this." SA 2073.

159. The defense could have asked Andres Campillo, who knew Mr. Agofsky during his time at USP Beaumont, to describe the environment there. Beaumont was a very violent place. Fights were not one-on-one, they were three or four people against one. SA 2014. During his time at Beaumont, Campillo witnessed fifteen to twenty stabbings and was aware of three or four deaths. In another incident, he was jumped and his teeth were kicked out, even though it turned out he was

60

not the intended target. He could have also described an incident were the prison chaplain was attacked with a weapon. No one was safe in Beaumont. SA 2014.

160. The defense could have interviewed and presented testimony from Jeff Milton, who was incarcerated at USP Lompoc during 1996-99, when both Plant and Mr. Agofsky were there. Although Mr. Agofsky suggested that the defense interview Milton, and Bennett at one time planned to do so, Bennett never spoke to him. SA 558, 2543-44, 2545. Milton could have testified that Plant was known as a predator who carried a knife and preyed on weaker inmates if he thought he could get away with it. Plant would follow Milton around the yard at Lompoc and hang out wherever he was. Milton had no tattoos and looked very young at that time, and believed that Plant was following him because he appeared to be vulnerable. He avoided Plant because he knew his reputation. One day Plant, accompanied by two other inmates, came up to Milton near the bathroom on the yard at Lompoc. Plant said aggressively, "You're with me now." Milton asked him what he was talking about and they had a heated argument. Milton believed that if he had not defended himself, Plant and his companions would have preyed on him. SA 2102.

161. Milton wrote two or three letters to Mr. Agofsky's attorneys in 2004, but no one ever contacted or visited him. He would have been willing to testify if he had been asked. SA 2103.

162. The defense could also have called William Massey, who knew Mr. Agofsky during his time in the SHU at USP Beaumont. Massey could have described the atmosphere at Beaumont, and could have testified that it was a very dangerous prison commonly known as "Gladiator School" and "Bloody Beaumont." During Massey's stay there, the institution was locked down three times because of inmate murders. SA 2090. Massey and Mr. Agofsky were cellmates for two years in the SHU and Massey could have explained that the reason they both worked out every

day was because there was nothing else to do and because inmates had to protect themselves on the "Gladiator Compound." SA 2090.

163. Massey could have also described the behavior of the guards at Beaumont. The guards would intentionally put inmates in cells with other inmates who they knew would assault them. On one occasion a guard came to Massey's cell saying he wanted to put another inmate in Massey's cell with him. The guard said that this inmate was causing problems and indicated that he wanted Massey to take care of the inmate. Massey told the guard not to put the inmate in his cell. The guard said "you should handle this, we have taken care of you." Massey again told the guard no. At that point Massey was taken out of his cell by guards and taken to recreation. SA 2091. When Massey returned to his cell the problem inmate was there. Massey told the inmate he needed to get out of his cell. The inmate banged on the cell door and told the guards he wanted out. The guards left the inmate in the cell with Massey. The inmate was an informant. Informants are the worst people to be associated with in prison, and the guards knew that. Since this type of individual was placed in Massey's cell, he had to handle the situation or there would be repercussions for him later. Massey could have explained that there are unwritten rules in prison—you stay with your own people, you do not mix races and you do not associate with informants. SA 2091.

164. No one from Mr. Agofsky's defense ever came to speak to Massey. Mr. Agofsky repeatedly asked his attorneys and Bennett to interview Massey. He gave Bennett Massey's address and telephone number. SA 668. Correspondence between Mr. Agofsky and his defense indicates that they could not find a correct telephone number for Massey. SA 2509, 2500, 2543-45. However, Massey is still at the same telephone number in Mr. Agofsky's address book. SA

648. Had trial counsel contacted Massey, he would have been willing to testify on Mr. Agofsky's behalf.

165.    Trial counsel based their entire defense on twelve pages of eyewitness testimony by Santiago and Ecker and a few more pages of background testimony by Lawson, Plant's cellmate. The jury had no context in which to assess the credibility of the defense evidence that Plant attacked first or the reasonableness of Mr. Agofsky's response. There is a reasonable probability that if the jurors had learned the background information a reasonable investigation would have uncovered—concerning Plant's reputation, prison culture, and the violent atmosphere at USP Beaumont—that they would have found Mr. Agofsky not guilty, convicted him on a lesser offense, or imposed a non-death sentence. Thus, alone and in conjunction with other deficient performance described elsewhere in this Motion, this instance of trial counsel's deficient performance prejudiced the defense.

166.    If trial counsel had conducted a reasonable investigation, they could have presented, not just the brief, bare account they elicited from Lawson, Ecker, and Santiago, but a detailed account from multiple sources of the events in the recreation yard, Plant's reputation, and the violent conditions at USP Beaumont. Trial counsel's failure to obtain this helpful information—because neither they nor their investigator interviewed certain witnesses and because the investigator failed to elicit sufficient information from the witnesses he did interview—was deficient performance. There is a reasonable probability that a fully developed justification and/or heat of passion defense would have prevailed, and that but for counsel's deficient performance, alone and in conjunction with the other instances of deficient performance summarized *supra* and *infra*, the outcome of the guilt and penalty phases would have been different. U.S. Const. Amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984).

**E.** **Trial Counsel Failed To Present Witnesses His Investigator Had Interviewed Who Were Willing To Testify And Who Could Provide Support For The Justification Or Heat Of Passion Defenses, And Failed To Elicit Other Helpful Information Available From Witnesses They Did Call.**

167. Although Bennett interviewed only seven of the twenty-eight eyewitnesses and a handful of other witnesses, his interviews did yield limited information that could have supported the justification or heat of passion defenses. Trial counsel, however, failed to make full use of even the limited information Bennett gathered. *See Williams v. Washington*, 59 F.3d 673 (7th Cir. 1995) (counsel ineffective for failure to present evidence of victim's character); *Martinez-Macias v. Collins*, 979 F.2d 1067 (5th Cir. 1992) (counsel ineffective for failing to call disinterested alibi witness of whom he was aware).

168. For example, Billy Santiago could have offered further helpful information, which he had given to Bennett, but which Black did not elicit when Santiago testified. For example, he had provided Bennett an explanation for Plant's conduct. He told Bennett that Plant, an unpredictable drug addict, was "checking himself in on the cool," meaning that he was "checking in" to the SHU by deliberately taking action that would increase the time he would stay in the unit or cause authorities to transfer him. Santiago explained that Plant owed money "on the yard" (in general population) for drugs and did not want to leave segregated housing to face his debts. Plant chose to attack another white person because attacking a black or Mexican inmate would cause interracial "repercussions." A532.

169. Santiago also told Bennett that he was willing to testify for Mr. Agofsky even though Santiago was caught with a shank in the aftermath of the Plant incident, and received a disciplinary transfer to USP Marion partly as a result of that infraction. A533.

170. Trial counsel could have supplied further support for Santiago's testimony about the "check-in" practice by calling Ronnie Wiggins, another inmate whom Bennett interviewed.

64

Wiggins told Bennett that he had "beat up a guy" to get himself placed in the SHU in order to see an uncle he had not seen in years, because it was the only way he could talk to him.

171. Inmate Scott Lawson, whom Black called to the stand for three pages of direct testimony, could have provided further information, which he had given to Bennett but did not provide to the jury because Black did not elicit it, about why Plant attacked Mr. Agofsky. At trial, Lawson testified, without elaboration, that during the first week in January 2001 he was Plant's cellmate and heard Plant making threats against Mr. Agofsky. After the second or third time, Lawson told Plant he did not want to hear about it. Tr. Vol. 19, 298-99. Although Plant did not ordinarily work out, Lawson noticed in late December and early January that Plant stopped smoking and began working out every day. Tr. Vol. 19, 300.

172. Lawson could have testified to further details he had given to Bennett. He told Bennett that on January 2 or 3, 2001, Plant began complaining about Mr. Agofsky, "moaning" that Mr. Agofsky and another inmate were telling him to pay his drug debts. Plant told Lawson that he was going to settle this with Mr. Agofsky, but Lawson told Plant that he was on his own and that he should not expect Lawson to back him up. Lawson was not in the recreation cages when Plant was killed, but Black did not elicit that fact. Therefore nothing prevented the jurors from speculating that Lawson was silent about what happened in the cages because he knew something harmful to the defense.

173. Another inmate and cellmate of Plant's, Robert Ecker, testified at trial but had given more detailed information to Bennett. Ecker testified that he was in the same recreation cage as Mr. Agofsky, Plant, and Ward on January 5, 2001. Immediately before the fight, Plant was leaning against the back wall, talking to another inmate in the next cage, and Mr. Agofsky was walking back and forth. Plant called out to Mr. Agofsky, "Shannon, I want to holler at you," and then "just

charged" at Mr. Agofsky and "swung first" with his right hand. Ward was standing next to him with his back to Plant and Mr. Agofsky at the time Plant initiated the attack. Ward was occupied "yelling back and forth" to Thomas Self, an inmate several cages away. Tr. Vol. 19, 305-10.

174. Ecker could have provided further information about Plant that he had given to Bennett. Immediately before the fight, Ecker shared a cell with Plant, Ward, and Lawson. Plant was a heroin user and "dope fiend" who dealt with blacks and whites and was not afraid of a fight. Because corrections authorities knew about Plant's drug use, he was on their "hot list" and inmates did not want to be around him because the officers were always watching him. Immediately before his death, Plant was behaving strangely and may have been suffering from withdrawal.

175. Ecker could have testified that Mr. Agofsky got along with Plant but was not friends with him because Mr. Agofsky did not do drugs. No problems led up to the fight, and all the inmates entered the recreation cages on January 5 with "no problems between anyone." Plant's attack on Mr. Agofsky was a surprise to Ecker, who thought Plant should have known better.

176. Bennett interviewed inmate Armondo Lopez twice, on January 9 and February 6, 2004, at Three Rivers Federal Correctional Institution (where Plant was formerly incarcerated). He knew that Lopez's release was imminent, and obtained his home address and phone number and his wife's name. Although Bennett made personal service of a subpoena on Lopez at the second interview on February 6, four months before trial, Lopez handed the subpoena back and told Bennett to mail it to his home. Bennett speculated that Lopez did not want other inmates to see it, and mailed the subpoena to the address where, Lopez told him, his wife lived. On April 26, 2004, Bennett wrote to Lopez at his putative address in San Diego, "trusting" that Lopez's wife had received the subpoena that Bennett had served on Lopez at Three Rivers, and that Lopez's wife would forward Bennett's letter if Lopez was still in a halfway house. Bennett told Lopez that

his testimony was important and asked him to write back. On June 16, Bennett wrote by facsimile transmission to the chief investigator at the Federal Defender Office in San Diego explaining that he had not heard from Lopez and asking the chief investigator, "if you have time," to stop by the address Lopez had given him, or send another investigator, to attempt to speak to him. The documents received from trial counsel contain no indication of any further effort to locate Lopez or effect personal service of the subpoena that Bennett had begun to serve and then withdrawn.

177.    Lopez told Bennett, and could have testified, that he was in one of the recreation cages on January 5. He saw Plant take a swing at Mr. Agofsky, saw Mr. Agofsky respond by "forearm[ing]" Plant, and then Lopez turned away. He told Bennett that Plant was "always strung out" on heroin and cocaine and was acting strangely for a couple of weeks before his death, perhaps because he had not had a "fix."

178.    The defense could have called Terryonto McGrier, who was in the recreation cage next to the one where Mr. Agofsky and Plant were on January 5. Before the fight, Plant complained to McGrier that he had been "set up with drugs" by the staff. After that conversation, McGrier saw Plant make an aggressive move toward Mr. Agofsky out of the corner of his eye and the fight began. Plant and Mr. Agofsky did not seem to be angry at each other before it happened.

179.    McGrier could have provided information about the dangerous environment at Beaumont. He himself was confined in the SHU because he had been caught with a knife in his cell. He told Bennett that when he was first transferred to Beaumont, the Special Investigation Service personnel who met his bus told the members of his group that they had better get knives to defend themselves.

67

180.    The defense could have called Thomas Farrugia, an inmate who knew Mr. Agofsky at Beaumont but had no direct contact with him for a month before Plant's death. Mr. Agofsky suggested that the defense interview Farrugia, and Farrugia wrote to Black offering to testify.

181.    Bennett interviewed Farrugia on March 5, 2004, and thus Black knew that he could have testified that Plant was a heroin addict who was "aggressive and paranoid," and was always known to carry a weapon because he was always in drug debt. Plant would sit with his back to the wall in the dining hall, and tended to think people were out to get him. Farrugia thought of Plant as a person to watch because he might "sneak up behind you." Farrugia told Bennett, as he had told Black by mail, that he was willing to testify. A516.

182.    The defense could have obtained similar testimony from Kerry Daniel Dixon, who spoke to Bennett on March 5, 2004. Dixon, like Farrugia and others, told Bennett that Plant was a "dope fiend" who used heroin and was always in drug debt.

183.    Interview memos from Bennett reflect that he interviewed a total of seventeen witnesses. At his deposition, Bennett stated that he prepared witness summaries for each of the prisoners he interviewed, and that he had not interviewed anyone else. SA 551. There are seventeen summaries; seven of these pertain to eyewitnesses. SA 615-37.

184.    The defense subpoenaed only six witnesses, and put only three on the stand. Billy Santiago and Robert Ecker were both eyewitnesses who testified. Scott Lawson also testified. The defense subpoenaed but decided not to call George Rivera, Michael Fitzgerald, and Bruce Spring, none of whom were on the recreation yard at the time of the Plant incident. Black and Barlow decided whom to subpoena solely on the basis of the brief memos by Bennett summarizing inmate interviews. SA 615-37. Bennett testified that the determination of whom to call was made by the

attorneys, although he did provide input or suggestions. SA 553, 554, 556-57. Bennett did not know why some inmates were subpoenaed, but not called to testify. *Id.*

185.    Bennett acknowledged that Beaumont was well known as a "very dangerous" place. SA 550. However, he admitted that he did not ask any of the inmates he interviewed about specific experiences of violence in prison, other than the fight between Mr. Agofsky and Plant. SA 554. According to Bennett, he was not directed to ask inmates about prison culture evidence. SA 547. Nor did Black or Barlow direct Bennett to investigate Plant's criminal history. SA 558.

186.    Although the defense did interview and call inmate Robert Ecker, who (as described above) was in the same recreation cage as Mr. Agofsky and Plant on January 5, 2001, the defense failed to elicit important details from him. Ecker testified that on the day of the incident, Plant was leaning on the wall facing Cage #4 talking to an unidentified inmate. Mr. Agofsky was walking back and forth with inmate Williams. Ecker heard Plant say to Mr. Agofsky, "Shannon, I want to holler at you." Ecker testified that Mr. Agofsky turned towards Plant, and as Plant was walking towards Mr. Agofsky, Plant just "charged." Ecker then testified that Plant swung or threw the first blow at Mr. Agofsky. Then Mr. Agofsky hit Plant and Plant went down. Ecker also testified that Richard Ward had his back turned when the fight happened and therefore Ward did not see the fight. Tr. Vol. 19, 306-07.

187.    If prepared by the defense team, Ecker could have responded to the government's cross-examination about his failure to provide a statement to the FBI before trial. Ecker could have explained that the reason that he did not want to speak to the FBI because he did not want to look like a "snitch." Ecker could have explained that in Atlanta, the FBI or guards had once separated him from the other inmates and made him look like a snitch. This could have had Ecker killed. SA 2042.

69

188. Ecker could also have provided important information about Plant's reputation. Plant was a severe drug addict. Both Ward and Plant were using about three hundred dollars' worth of drugs each day. Plant was a "mule" who kept the flow of marijuana, heroin and knives coming into the institution. Ecker could have explained that Plant may have been trying to "check in" by hurting or hitting Mr. Agofsky and that Plant may have been suicidal. Plant owed a lot of money, and "checking in" would have offered a way to escape his debts. Ecker could have also described how Plant started working out sometime before the fight with Mr. Agofsky. Plant would wrap his legs up on the toilet and do sit-ups and push-ups. Ecker could also have told the jury that Plant was in withdrawal at the time and was sick. The defense team told Ecker that they were going to ask him about Plant's character and drug use, but they never did. SA 2042, 2044-45 2047.

189. In addition, Ecker could have described Beaumont as a violent institution where several stabbings occurred each day. Ecker could have described a horrible stabbing that he witnessed on the yard where an inmate was stabbed in the back. After the stabbing, the guards fired a warning shot, which means the inmates have to get down or they will be shot. An inmate lost a finger when the guards then fired shots into the yard. Ecker could have described the effects of being housed in a violent prison like Beaumont. Ecker describes himself as nervous and "waiting to be stabbed," and never being able to get over the fear of being in a place like Beaumont. SA 2042.

190. Although Scott Lawson was interviewed and called to testify by the defense, trial counsel failed to elicit important details from him. In addition to testifying that he heard Plant make threats towards Mr. Agofsky in the days leading up to the fight, Lawson could have explained further to the jury that Plant said "he was growing sick of Shannon and he was going to jump on him." Lawson did not tell Mr. Agofsky about the threats Plant was making because Lawson did

not take Plant seriously at the time. Additionally, Lawson could have explained why Plant was acting like this and making these threats. Plant was in trouble in the prison and he wanted to get transferred to another institution. Plant was a junkie, he used heroin, and he owed money all over the yard to all kinds of people. Mr. Agofsky had nothing to do with Plant's problems but Plant knew that he could get away from those people if he started a fight with Mr. Agofsky. Plant was using Mr. Agofsky to get himself out of trouble. Lawson was Plant's cellmate at the time and could have explained that every time they went to recreation Mr. Agofsky's cell went also. Plant knew that he would be in a recreation cage with Mr. Agofsky. Plant knew that if he attacked Mr. Agofsky, the prison would list Plant as a separatee from Mr. Agofsky and they would transfer Plant to a different institution. Lawson could have explained that Plant would most likely have been transferred because Mr. Agofsky was friends with everyone on the yard. SA 2082.

191. Lawson could also have explained the practice of "checking in" to the jury. Lawson explains that it is pretty frequent in United States Penitentiaries for one inmate to start an altercation with another inmate in order to "check-in" to the hole (SHU) or to get transferred out of that penitentiary entirely. If an inmate was trying to get separated from someone, they would often cause an altercation in front of a corrections officer. SA 2082.

192. Lawson could have explained to the jury that in prison inmates must take threats seriously or it could cost them their lives. Inmates have to deal with threats right on the spot or it will be a much bigger problem involving more people. If Mr. Agofsky had not defended himself, he would have had to watch his back for the rest of his time at Beaumont. Plant was known for carrying knives and Mr. Agofsky would not have known whether or not Plant had a knife that day in the cage. SA 2084.

71

193. Lawson could have described the environment at Beaumont. When Lawson arrived at Beaumont in 2000, the institution was known as "Bloody Beaumont." It was a dangerous and violent prison with drugs and knives everywhere. Inmates witnessed stabbings and killings and eventually become desensitized. Lawson saw three or four stabbings at Beaumont and was almost stabbed himself by four inmates with knives. Another time an inmate ran up behind Lawson with a lead pipe. Lawson could have explained that inmates had to stay alert and watch their surroundings as there was violence every day. The inmates had to learn how to read people so they would know if people were coming after them. If an inmate was in a fight he had to watch to make sure another inmate did not come up behind and stab him. SA 2084.

194. Lawson could have described the behavior of the guards at Beaumont. The guards would cause fights by identifying the sex offenders to the other inmates. The staff hated the sex offenders just as much as the inmates did. The people in charge of the shops and trades had access to the computer database covering all of the inmates and their charges. This is how they would identify who the sex offenders were. Guards would also tell inmates who the snitches were. The guards would purposely put snitches and sex offenders in recreation cages with inmates to start fights between them. This was common in most of the penitentiaries SA 2084.

195. Lawson could have provided other information about Ward's reputation. Ward was a heroin addict, was "really strung," and had tried to kill himself at least two or three times. Ward was placed in the "suicide cells" numerous times. SA 2083.

196. Lawson could have also provided valuable information about Plant's reputation. Lawson could have described Plant as a heroin addict and was always high on the yard and frequently out of control. Plant jeopardized his family by having them bring drugs to him in the visiting room of the prison. He had to move drugs through them to pay off his habit, and everyone

72

knew about this. Lawson could have explained that Plant was a liar and told a lot of stories that were untrue. Because of his lies Plant was not trustworthy. Lawson could have explained that in prison you get credit on your word, but Plant could not get any more credit because he was a liar. Plant had trouble with inmates on the yard because of his debt. Lawson told the defense investigator this information, yet defense counsel failed to elicit it from Lawson when he testified. SA 2083.

197. The defense investigator failed to conduct a meaningful interview of Lawson. Bennett took a few notes and told Lawson that he would testify. Lawson did not speak to anyone from Mr. Agofsky's defense team again until he was transported to Texas for the trial. Defense counsel Black spoke to Lawson and the other inmate witnesses in a group setting for about ten to fifteen minutes. Black never spoke to Lawson individually, never asked him any questions, and never prepared him for the what the prosecution would ask him. Black spoke to the inmates very generally about what he was going to ask them, but never went into any detail. Black told them to keep their answers short with a "yes" or "no" answer. The defense team provided two blue suit coats for the six inmates to share. When Lawson took the stand he did not know what questions defense counsel was going to ask him. It was the first time he had ever testified and he was nervous. He testified for a couple of minutes but did not have an opportunity to explain any of the things that he told the investigator about Plant, Ward, or Mr. Agofsky. SA 2084.

198. George Rivera was not called as a defense witness, although the defense did subpoena him. Before the trial in 2004, Rivera received a visit in Coleman, Florida, from the defense investigator, who discussed the violence at USP Beaumont and background information about both Plant and Mr. Agofsky. Rivera was subpoenaed and transported to Beaumont. Although one of Mr. Agofsky's trial lawyers met with Rivera a couple of days before the trial and asked him

about Ward's background, and the other lawyer spoke to Rivera briefly on the day he was to testify, the defense never called him to the stand. SA 2106.

199.     Rivera could have described both USP Beaumont and Plant. From 1999 to 2001, Rivera was an inmate at Beaumont and knew Mr. Agofsky, Plant, and Richard Ward, but was not in the SHU on January 5, 2001. Beaumont was a very violent institution. Rivera used to shower wearing boots and a knife on a rope around his neck, for protection in case someone attacked him. Also, it was common for the guards to set up cockfights by putting inmates together who shouldn't be together. Drugs were easy to get and there were more drug charges than at any prison Rivera had known. SA 2105.

200.     Rivera could have described Plant, whose nickname was Tootie, as a "dope fiend" who transported drugs from the visiting room into the prison. Plant's parents used to visit him often. They were old and his mother used a walker. Plant would use the visits to receive drugs from his outside contacts. Eventually, Plant was caught bringing drugs in after a visit and was placed in the SHU. He then owed money both to the people for whom he was carrying the drugs and to other inmates whom he had planned to pay after receiving his percentage for delivering them. Rivera remembered that Plant was desperate to get out of Beaumont because he was afraid of getting out of the SHU and having to face trouble in general population. He wanted either to stay in the SHU or get himself transferred out of Beaumont. Rivera had seen similar incidents before. SA 2105. Rivera's testimony would have provided critical additional detail in support of Mr. Agofsky's defenses.

201.     Bruce Spring was also subpoenaed but did not testify. Spring knew Mr. Agofksy during his time at USP Beaumont. Spring and Mr. Agofksy were cellmates during the time period

74

when they were both on the compound in general population at Beaumont. He could have described the environment at Beaumont and Plant, whose nickname was "Tootie." SA 2307.

202. Like the other inmates available to testify, Spring describes Beaumont as an extremely violent and dangerous prison where almost everyone carried a knife for protection. Inmates had to be on guard twenty-four hours a day and often referred to the prison as "Bloody Beaumont." Spring worked out every day to keep himself in shape in order to defend himself. Spring witnessed three stabbings a week and inmates were murdered all the time at Beaumont. Spring could have described how the guards facilitated fights and killings between inmates. For example, the guards would intentionally put gang members together on the yard who were supposed to be separated. SA 2307.

203. Spring also could have testified that Plant was a drug addict and owed money all over the yard in drug debts. Spring knew that Mr. Agofsky and Plant were around each other daily. Mr. Agofsky would walk the track with Plant and another inmate named Mike McLarty for exercise. Additionally, Mr. Agofsky helped Plant out many times, paying off his drug debts to prevent other inmates from going after him. Mr. Agofsky did not like Plant's drug use, but he did not have any problems with him, and even looked out for him. SA 2309.

204. Spring remembered that Mr. Agofsky was caught with a knife and was placed in the SHU. While Mr. Agofsky was in the SHU there was no one to look out for Plant and his increasing drug use and drug debts on the yard. There was hostility brewing on the yard towards Plant from other inmates. A couple of weeks later Plant was placed in the SHU also. At this point Plant owed so much money on the yard that everyone knew that he could not go back. Plant knew that if he attacked Mr. Agofksy he would get transferred to another institution and not have to go back to the yard to face his debts. Spring would have testified that Mr. Agofsky was serving a life

sentence and everyone knew, including Plant, that Mr. Agofksy would not get transferred out of Beaumont over a fight. SA 2309.

205. Bennett's summary of his interview with Spring is twelve lines long. SA 628 . It is the only information the attorneys received about Spring before making the decision to subpoena him. SA 554. None of the information above was contained in that memorandum. According to Bennett, he and trial counsel met with Spring at the county jail before trial for approximately 30 minutes, at the same time they met with the other five inmates subpoenaed by the defense. SA 553. Spring stated that counsel came to see him at the county jail and asked him "what can you tell me?" SA 2312. Spring estimates that Mr. Agofsky's counsel spent approximately two minutes with him. *Id*. Spring was brought to the courthouse but did not testify. SA 2311.

206. Frank Early was interviewed by Bennett but was not subpoenaed. Early was present on the recreation yard that day. Early had a knife on him that day, because "all the inmates knew that if they were going to survive they couldn't survive passively. They had to protect themselves." He could have explained to the jury that "Because of the atmosphere at Beaumont, Shannon did what he had to do to stay alive. In the circumstances, Mr. Agofsky had to assume Tootie could be armed. It didn't matter who was taller. A knife is an equalizer." SA 2038.

207. Early could have told the jury about the extreme level of violence at Beaumont. Early characterized Beaumont as "the most violent USP I have ever been in, the most violent in the BOP. It was a killing field." Early would have testified that "fights and stabbings and killings were common. Early himself had seen "fifty to sixty stabbings and four killings with my own eyes in two years." SA 2035. In addition, Early found the level of corruption at Beaumont to be unprecedented. SA 2038. It was common for Beaumont officers to stage fights and put bets on

76

them. Frequently, officers would place inmates in cells that should not have been placed together. In addition, officers would "watch fights occur without interceding." SA 2038.

208.    Although Bennett spoke with Early, he did not elicit the foregoing information. Early stated that Bennett did not tell Early that he was interested in the level of violence at Beaumont. "If Bennett had asked about these subjects, I would have told him about them. I would have been willing to testify in Shannon's behalf and I am willing now." SA 2038.

209.    Bennett interviewed Kerry Dixon, but the defense did not subpoena him for trial either. Dixon would have been willing to tell Mr. Agofsky's jury about the dangerous environment at Beaumont. He would have testified that, "Everybody had a shank, or access to on if they needed it." SA 2028. The high level of violence at Beaumont has also led to the prevalence of gangs. Dixon believes that inmates "belonged to gangs in order to have other to back them up and protect them against the horrific inmate violence." SA 2028.

210.    Although Bennett interviewed Dixon, his summary does not reflect any information about the level of violence at Beaumont. SA 629. Dixon was in Beaumont at the time of the interview and Bennett noted in his memo that he might interview him again. However, he never did and the attorneys decided not to subpoena him for trial. SA 554.

211.    These witnesses could have provided the jury with background information about Beaumont and Plant to help them understand why Mr. Agofsky reasonably believed that his life was in danger when Plant lunged toward him in the recreation cage. Although these witnesses were contacted by the defense team, they were not adequately questioned about Plant or prison violence. According to Bennett, Black and Barlow did not direct him to question witnesses about prison culture evidence or their experience of violence in prison. SA 547, 555. Thus, jury was deprived of this important information in making a determination of whether Mr. Agofsky was

acting in self-defense and if he should be sentenced to die. Counsel's deficient performance prejudiced Mr. Agofsky. Mr. Agofsky was sentenced to death for his participation in an unarmed fight after being attacked by another inmate while locked in a cage with him. Evidence or information which helped the jury to understand why Mr. Agofsky would reasonably fear for his life could have led the jury to acquit or convict him of a lesser offense, or could have led at least one juror to vote for life.

212. Trial counsel not only conducted an inadequate investigation but also failed to make use of much of the evidence in their possession that would have supported their own strategy, presenting instead the unpersuasively superficial testimony of only three witnesses who did not provide a complete description of the events or provide any reasons for Plant's attack. Counsel's failure to present limited but helpful information that their investigator obtained, in support of the justification or heat of passion defenses that they presented to the jury, was deficient performance. There is a reasonable probability that, but for counsel's deficient performance, alone and in conjunction with the other instances of deficient performance described elsewhere in this Motion, the outcome of the guilt and penalty phases would have been different. U.S. Const. Amend. VI; *Strickland v. Washington,* 466 U.S. 668 (1984).

### F. Counsel Failed To Obtain Or Present Expert Testimony On Prison Violence At The Guilt Phase, Despite Its Ready Availability And Relevance To Their Self-Defense and Heat of Passion Strategies.

213. A key element of the justification defense was the reasonableness of Mr. Agofsky's perception of danger when Plant attacked him. *See Smith v. Dretke*, 417 F.3d 438, 441-42 (5th Cir. 2005) (evidence of victim's violent character admissible to show both reasonableness of defendant's perception of danger and likelihood victim was first aggressor); *United States v. Burks*, 470 F.2d 432 (D.C. Cir. 1972) (same). As set forth above, *see* Ground 12.1(E), counsel unreasonably failed to elicit the firsthand testimony of numerous inmate witnesses who could have

testified that USP Beaumont was a very dangerous place, where, to stay alive, an inmate needed to assume that any attacker was trying to kill him.

214.    Counsel also failed, unreasonably, to present expert testimony that could have corroborated and provided context for the inmate accounts. *See, e.g., Miller v. Dretke*, 420 F.3d 356 (5th Cir. 2005) (counsel ineffective for failure to call treating physician at sentencing); *Soffar*, 368 F.3d at 476 (counsel ineffective for failure to investigate and present expert ballistics evidence supporting defense); *Harris v. Cotton*, 365 F.3d 552 (7th Cir. 2004) (counsel ineffective for failure to obtain toxicology report in self-defense case). Even if the jury rejected the justification defense, such evidence could have supported the heat of passion defense as well, and could have had an effect on the jurors' penalty phase deliberations.

215.    Criminologists also could have offered evidence to assist the jury in assessing the reasonableness of Mr. Agofsky's perception of danger. Such experts could have described empirical studies of prison inmate populations, and provided statistical data on inmate misconduct within the Federal Bureau of Prisons, including data on assaults at specific institutions. *See, e.g.,* A40-43, 52-53, 54 (Declaration of Mark Cunningham).

216.    Two experts the defense called at the penalty phase—criminologist Elizabeth Pelz and prison consultant Terry Pelz—have since provided declarations detailing the helpful testimony they could have given at the guilt-innocence phase of trial. *See* SA 2798 (Declaration of Dr. Mary Elizabeth Pelz); SA 2805 (Declaration of Charles Terry Pelz).

217.    Dr. Elizabeth Pelz, a criminologist and the Dean of the of the College of Public Service at the University of Houston, received no information from Barlow except for institutional records and case discovery material. SA 2798. She was unable to visit Mr. Agofsky because arrangements were initiated too close to the onset of trial. *Id.* She has now reviewed materials

79

provided by postconviction counsel, which includes family, teacher, and inmate declarations, a social history report, and expert reports. SA 2798-99.

218. If she had received similar information from trial counsel, she could have supported the justification defense by testifying about features of inmate societies such as the practice of "checking in," the unwritten rule that inmates cannot use minimal force to protect themselves, the need for vigilance and the role that Mr. Agofsky's own hypervigilance could have played; the tendency of drug users in prisons to accrue large debts; and the unwritten prison rule against cooperating with the government or appearing to be a "snitch," SA 2799, 2800-02.

219. Terry Pelz, a prison consultant who spent over twenty years as a corrections officer and warden, had little communication with Barlow and never spoke to Black. SA 2805. Like Dr. Pelz, he received only BOP records and case discovery materials from Barlow, who never gave him other records Pelz requested. SA 2806. Mr. Pelz has now reviewed the same postconviction materials as Dr. Pelz. *Id*. He, too, could have provided support for the justification defense if he had received similar information before trial and had been called to testify during the guilt phase:

> Mr. Barlow did not ask me to give an opinion on the incident involving Luther Plant and Mr. Agofsky. However, if asked, I could have testified about common inmate behavior in these types of situations. I went to USP Beaumont and looked at the recreation cage where the incident occurred. I could have also explained that inmates know that if they are attacked in a recreation cage, they cannot expect the guards to come in and help them, but they must do the best they can to protect themselves from inmates who carry weapons. Additionally, the many inmate statements I have reviewed depict the USP Beaumont as an extremely violent place where many inmates routinely carried shanks (homemade knives) for protection. There were stabbings on a regular basis and many of the inmates report witnessing murders. Any inmate locked in a cage in a violent institution like the USP Beaumont would be on guard at all times and hypervigilant.

SA 2808.

220. Additionally, trial counsel could have presented mental health testimony at the guilt-innocence phase that would have supported their own strategy. The evidence would have aided the jury in determining whether Mr. Agofsky acted reasonably during the altercation with Plant and whether he possessed the requisite intent to kill. Numerous factors in Mr. Agofsky's background and resulting mental health impairments were crucial to understanding Mr. Agofsky's conduct. SA 1757 (Declaration of Dr. Lawson F. Bernstein). SA 2788 (Declaration of Dr. Edward Gripon). Trial counsel were ineffective for failing to develop this evidence and present it to the jury at the guilt phase.

221. Based on his examination, testing conducted on Mr. Agofsky, and other records and declarations, Dr. Bernstein concluded:

> Shannon Agofsky suffers from what would be described a "Mood Disorder Not Otherwise Specified" with features of both Adjustment Disorder with Depressed Mood and Major Depressive Disorder. He is obviously at risk for future depressive episodes based on this propensity. Although Mr. Agofsky does not meet the technical criteria for PTSD, he exhibits symptoms associated with the disorder, including marked hypervigilance. Hypervigilance is an enhanced state of sensory sensitivity accompanied by an exaggerated intensity of behaviors whose purpose is to detect threats and often resulting in extreme response to perceived threats of harm. Hypervigilance is also accompanied by a state of increased anxiety which can cause exhaustion. Other symptoms include: abnormally increased arousal, a high responsiveness to stimuli and a constant scanning of the environment for threats. Hypervigilance in such a context may be accompanied by perseverance, tunnel vision, loss of auditory function, and amnesia.
>
> Significantly, Mr. Agofsky has a history of multiple head injuries, which is likely another etiology for his discrete mood disorder episodes. This is consistent with testing done by Dr. Michael Gelbort and findings of Dr. Ruben Gur. Drs. Gelbort and Gur found organic brain damage specifically in the frontal lobe region which is associated with impulse control.
>
> The psychological and neuropsychological tests administered by Dr. Gelbort are standardized, reliable and accurate. These tests have for many years been widely administered by psychologists and

81

neuropsychologists to assess questions regarding brain damage. The results of neuropsychological testing from qualified practitioners such as Dr. Gelbort, including whether the testing demonstrates the existence of organic brain damage, are routinely relied upon by psychiatrists and other medical doctors. See, e.g., Kaplan & Sadock, Comprehensive Textbook of Psychiatry (6th ed.), pp. 343-44, 860-87; Yudofsky & Hales, The American Psychiatric Press Textbook of Neuropsychiatry (3rd ed.), pp. 181-204; Lezak, Neuropsychological Assessment (3rd ed.), pp. 333-806; Berg, Franzen & Wedding, Screening for Brain Impairment (2nd ed.), p. 174 ("Comprehensive neuropsychological assessments ... have been shown for several years to be effective in differentiating brain-damaged from psychiatric and normal patients.")

The brain damage is likely a result of head trauma and is consistent with reported concussions and the history of staged boxing and martial arts contests. This damage impaired Mr. Agofsky's ability to perceive threat, and to modulate his response in the face of a perceived threat. The symptomatology I observed and as are reflected in the records is consistent with these findings. Kaplan and Sadock's Comprehensive Textbook of Psychiatry (8th ed.), pp. 392-98, explains that the "clinical presentation" of organic disorders includes "associated" symptoms such as anxiety features (including apprehensive expectation and hypervigilance); affective features and mood problems (including depressed or irritable mood and its cognitive and vegetative concomitant features); features usually associated with personality disorders; emotional features (including impaired impulse control and judgment), and cognitive impairment features (including disturbance of attention and orientation).

SA 1763-65.

222.    Had counsel fully investigated the case and obtained expert assistance, the jury could have been greatly assisted in it guilt-phase deliberations. Dr. Bernstein further explained:

A person suffering from the mood disorder, hypervigilance, and brain damage which Mr. Agofsky suffered on January 5, 2001 would have great difficulty perceiving the true extent of the threat posed by Luther Plant, and controlling or moderating his response in the short time frame described in the record.

Shannon Agofsky's conduct on January 5, 2001 was due to an acute stress reaction, prompted by his omnipresent "hypervigilance" and the perceived threats, and exaggerated as a result of his brain organicity which rendered him substantially incapable of a

measured, contemplative response. His reaction on that date is properly characterized as a sheer survival response.

Assuming Mr. Agofsky's response was triggered by the perceived aggression on the part of Mr. Plant, it is my opinion that Mr. Agofsky could not have formed the specific intent to kill and was not capable of a premeditation in the short time frame described. The record shows the jury struggled with the question of intent. Had this information been made available at the time of trial, a mental health expert could have explained to the jury that the brain damage reported affected Mr. Agofsky's ability to recognize and assess threats. Further, frontal lobe damage has a direct, immediate and substantial impact on the capacity to form intent. This limitation is proportional to the perceived seriousness of the threat and the reaction time-frame. This conclusion is supported by the history of hypervigilance, that the decedent was known to be a violent drug user and the short duration of the incident as reported by the correctional officer on the scene.

SA 1765-66.

223. Dr. Edward Gripon, a psychiatrist from Beaumont, Texas, whom Barlow retained but did not call as an expert at trial, has reviewed the declarations of Dr. Bernstein and other experts, the social history report of Marilyn Romanowski, and family, teacher, and inmate declarations. SA 2792. He concurs with Dr. Bernstein's conclusions and states that he himself could have provided similar testimony in support of the justification defense at the guilt-innocence phase. SA 2794-96.

224. Evidence that could assist the jury in determining whether Mr. Agofsky acted lawfully, or in a state of mind inconsistent with first degree murder, was admissible. The Federal Rules of Evidence are clear:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

83

Fed. R. Evid. 702.

225.   Federal courts have consistently recognized the value of such expert testimony to assist the jury in judging the reasonableness of a defendant's actions, and have permitted such testimony in cases similar to Mr. Agofsky's.[19] The evidence was also probative of whether Mr. Agofsky had the specific intent to kill.[20] Similarly, it could have assisted the trier of fact in assessing whether Mr. Agofsky acted under heat of passion, which would have negated malice. *See Beardslee v. United States*, 387 F.2d 280, 293 (8th Cir. 1967) (expert opinion presented that the defendant acted out of heat of passion).

226.   Trial counsel failed to reasonably investigate, develop and present the evidence of Mr. Agofsky's background and its resulting psychological effects through lay and expert witnesses. Had trial counsel obtained the available background data, they would have been able to present testimony about Mr. Agofsky's cognitive deficits and mental health issues. This evidence would have assisted the jury in determining whether Mr. Agofsky acted completely lawfully, or alternatively whether he possessed the specific intent to kill at the time of the offense or acted under heat of passion.

---

[19] *See, e.g., United States v. Whitetail,* 956 F.2d 857, 859 (8th Cir. 1992) (in murder prosecution for killing live-in boyfriend, defendant presented two experts who testified with regard to battered-woman syndrome); *United States v. July*, No.1992 WL 57428, *1 (9th Cir. 1992) (in prosecution for murder of her husband defendant presented psychologist "to assist the trier of fact in judging the reasonableness of her response to the actions of her husband"); *United States v. Gordon*, 812 F.2d 965 (5th Cir. 1987) (evidence of "Battered Women's Syndrome, dependent personality disorder, depression, and alcohol abuse" presented to challenge voluntariness of confession); *United States v. Grant*, No. 2008 WL 2485610, *1 (D. Neb. 2008) (battered spouse syndrome).

[20] *United States v. Pohlot*, 827 F.2d 889, 897 (3d Cir. 1987) (diminished capacity); *United States v. Fazzini,* 871 F.2d 635, 641 (7th Cir.1989) (diminished capacity); *United States v. Twine*, 853 F.2d 676, 678 (9th Cir. 1988) (diminished capacity); *United States v. Bartlett*, 856 F.2d 1071, 1077 (8th Cir.1988) (diminished capacity); *United States v. Erskine,* 588 F.2d 721, 722-23 (9th Cir.1978) (diminished capacity).

227. Trial counsel's failure to consider or to reasonably investigate the available evidence that could have been provided by a criminologist, prison consultant, and/or a psychiatrist constitutes deficient performance, and counsel's deficiency prejudiced the defense at the guilt-innocence phase of trial. The jury was charged that Mr. Agofsky could reasonably use force "likely to cause death or great bodily harm is justified only if *[he] reasonably believe[d]* that such force is necessary to protect himself from what *he reasonably believe[d]* to be a substantial risk of death or great bodily harm." Tr. Vol. 20, 351. A full expert exposition of prison culture, Mr. Agofsky's life experiences and mental impairments, and the interrelationship of the two, was critical to understanding why Mr. Agofsky acted reasonably.

228. The jurors would have learned the influence of prison culture and prison conditions on Mr. Agofsky's behavior. They would have learned how the confluence of a mood disorder, hypervigilance, and brain damage would have impacted Mr. Agofsky's perceptions of the threat posed by Plant and his ability to moderate his response. They would have learned that the brain damage reported—governing impulse control—affected Mr. Agofsky's ability to recognize and assess threats. They would have learned that these deficits are relevant to whether Mr. Agofsky had formed the specific intent to kill.

229. Counsel's failure to obtain and present to the jury any evidence to support the reasonableness of Mr. Agofsky's perception of danger, through their own penalty phase expert, a different expert, or inmate witnesses, or through all three means, was deficient performance. A key element of the justification defense thus went to the jury with little or no evidentiary support.

230. The jurors struggled with the question of intent, as evidenced by their penalty-phase finding that Mr. Agofsky lacked intent to kill. SA 2755. They rendered their verdict without the benefit of full background history or knowledge of Mr. Agofsky's prison environment, his

impairments, or any expert elucidation of why these factors were relevant to his guilt or innocence. Counsel's deficient performance in this respect prejudiced the defense both alone and in combination with the other instances of deficient performance set forth herein. There is a reasonable probability that, but for counsel's deficient performance, alone and in conjunction with the other instances of deficient performance summarized herein, the outcome of the guilt and penalty phases would have been different. U.S. Const. Amend. VI; *Strickland v. Washington,* 466 U.S. 668 (1984).

> **G.** **Counsel Was Deficient In Relying Primarily On Records Supplied By The Government, And Made Few Independent Efforts To Obtain Documentary Information.**

231. The correspondence supplied by trial counsel demonstrates that, while they received several thousand pages of material from the government, they obtained very little documentary information independently. Their unreasonable failure to obtain and use documentary evidence that could have supported their own defense was deficient performance. *See Rompilla v. Beard,* 545 U.S. 374 (2005); *Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003) (counsel ineffective, in part, for relying only on State's discovery); *Bloom v. Calderon*, 132 F.3d 1267 (9th Cir. 1997) (counsel ineffective, in part, for failure to obtain records and testing that psychiatrist indicated were needed).

232. In a letter to AUSA Stevens on February 6, 2004, Black stated that he had previously received discovery from the government pursuant to the Magistrate Judge's order, but now, having received notice of the Department of Justice decision to authorize capital prosecution, was seeking "additional and supplemental discovery." A68-73.

233. On January 28, 2004, Black also wrote to Chris Synsvoll at ADX Florence to request Mr. Agofsky's central Bureau of Prisons ("BOP") file and his medical, mental health, psychological, and psychiatric records. A74. On February 20, he wrote to Mr. Agofsky's prior

counsel on his Missouri and Oklahoma prosecutions, Deborah Maddox and Waco Carter, requesting copies of any psychological, medical, or mental health examinations conducted in their cases. A75, 76. The documents supplied to postconviction counsel contain no indication that such evaluations were ever received.

234.     Synsvoll wrote to Stevens on March 1, enclosing Mr. Agofsky's complete central file and medical records, in response to Black's request. A77-78.

235.     Stevens turned over additional records between March 1, 2004, and the beginning of trial on July 6, 2004, as follows:

- On March 9, Stevens sent Black and Barlow a list of names and BOP numbers of all 28 inmates on the recreation yard at the time of the homicide. A79-81.

- On April 13 and 14, Stevens provided a summary of the projected expert testimony of Michael Cooksey and his CV. A82, 83.

- On April 16, Stevens supplied discovery and summaries of the projected testimony of three BOP medical personnel who treated Plant. A84-93.

- Also on April 16, Stevens provided the results of DNA testing matching Plant's profile with that of blood recovered from Mr. Agofsky's shoe. A94-95.

- Stevens turned over letters Mr. Agofsky had sent to Robin Graves, Andrew Jensen, and Robert Billbe on April 16, June 1, and June 4. A96.

236.     In June, the defense obtained Plant's central file through an open records request and secured certified copies of his judgments. A97, 103.

237.     Except for requesting Oklahoma and Missouri defense counsels' records concerning Mr. Agofsky's prior convictions and obtaining Plant's central file and certified judgments, the defense made no independent efforts to obtain additional documents not supplied by the government. For example, the file supplied by trial counsel contains no indication that counsel ever sought Mr. Agofsky's local arrest records, records of any medical treatment he received outside the prison setting, or data concerning violence by inmates at Beaumont.

87

238.    Nor did counsel seek or obtain statistics from the BOP or from their prison consultants documenting the high level of violence and drug activity at USP Beaumont. *See* ¶ 215–19, *supra* (describing data on level of serious assaults at USP Beaumont).

239.    In his deposition, Bennett confirmed this allegation. Although Bennett is "sometimes" responsible for requesting documents in a case, he only does so when the attorneys so instruct. SA 543. Bennett testified that he requested "no records" in Mr. Agofsky's case. SA 546. Bennett further testified that he did not obtain any further documents regarding Plant's criminal history. SA 547. He stated that he believed that the attorneys already had all of that information in Plant's federal central BOP file. *Id*. He was not responsible for obtaining the BOP file. *Id*.

240.    Despite their affidavits to the contrary, counsel did not obtain any documents from Mr. Agofsky's former teacher, Robert Duggan. Mr. Agofsky asked his defense to obtain several documents from Mr. Duggan, including "mini-manuals" that had been used for his training at ESI, which discussed techniques for responding to lethal force and the tachy-psyche effect. SA 642-43; *see also* SA 2367. However, counsel failed to request these manuals. Black asserts in his affidavit that the defense did in fact obtain course materials and books from Duggan, which were used to cross-examine him. SA 2325. However, all materials used by the defense to cross-examine Duggan, which were turned over to current counsel, bore the government's Bates numbers and appear to have been provided by the government. Indeed, Bennett admitted in his deposition that he had never requested any documents from Mr. Duggan and that counsel did not ask him to do so. SA 560.

241.    As explained elsewhere in this Motion, counsel could have used these materials in their cross-examination of Duggan to help explain to the jury why the force displayed by Mr.

88

Agofsky was reasonable in defending his own life. *See infra* at 25-29. Even though the defense knew that Duggan was going to testify, SA 579, counsel made no effort to obtain such materials in order to prepare for his cross-examination, despite their client's repeated requests that they do so. Mr. Agofsky explicitly warned his trial team that the government might try to use the texts against them at trial and explained how the documents themselves would not support the government's theory.

> As I stated before, I believe that pros. focus on the martial arts will be on 'control techniques to say I had options other than to kill Plant. They may introduce the 'mini-manuals' Duggan wrote on cants and goosenecks, which are part of the ESI course syllabus, emphasis on non-lethal control. All of those things are addressed in the 2 firearms 'mini manuals' used at ESI, you may want to obtain copies. They are not meant for possible multiple opponent situations, not meant for life threatening situations, etc.

SA 642.

242. The trial court's docket does not reflect any efforts by trial counsel to obtain, through discovery or other motions, information the government had failed to turn over voluntarily. This could have included:

- Information about promises made to the government's only eyewitness, Richard Ward, that were not reflected in the material the government did turn over;

- Transcripts from the multiple Grand Juries convened in Mr. Agofsky's case;

- Records indicating payment for testifying and non-testifying government witnesses.

243. As stated above, trial counsel's deficient performance prejudiced the defense. Had counsel conducted an independent investigation into the case, obtaining documents outside of discovery handed over by the government, cross-examination of both Ward and Duggan would have been radically different. Documents about Ward's deal with the government would have further undermined his already questionable testimony. Documents from Duggan's training school

89

could have transformed Duggan's testimony and actually supported the defense theory that Mr. Agofsky used force which he reasonably believed was necessary to defend his life. There is a reasonable probability that but for counsel's deficiencies in this respect, alone and in combination with the other deficient performance described elsewhere in this Motion, Mr. Agofsky would have been acquitted or convicted of a lesser offense, or the jury would not have sentenced him to death.

244. Counsel's failure to conduct a reasonably independent investigation of relevant records was deficient performance. There is a reasonable probability that, but for counsel's deficient performance, alone and in conjunction with the deficient performance described elsewhere in this Motion, the outcome of the guilt and penalty phases would have been different. U.S. Const. Amend VI; *Strickland v. Washington,* 466 U.S. 668 (1984).

### H.      Counsel Was Ineffective In Failing To Conduct An Adequate Voir Dire.

245. Mr. Agofsky was denied the right to an adequate voir dire. The constitutional right to an impartial jury includes the right to an adequate voir dire. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "Our criminal justice system rests firmly on the proposition that before a person's liberty can be deprived, guilt must be found, beyond a reasonable doubt, by an impartial decision maker." *Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006). Only through an adequate voir dire may the trial court reliably exclude those panelists who are biased or otherwise unable to decide the case on the evidence alone. *Morgan*, 504 U.S. at 729-30. It is axiomatic that "an adequate voir dire is part of the constitutional guarantee of a fair and impartial jury." *Rosales-Lopez v. United States*, 451 U.S. 182 (1981). Generalized "follow the law" questions will not satisfy this constitutional guarantee because they do not adequately detect juror bias. *Morgan*, 504 U.S. at 734-36. In Mr. Agofsky's case, all that trial counsel asked of the jury were generalized "follow the law" questions.

246. Voir dire in Mr. Agofsky's case took place over a one-week period. On June 14, 2004, the Court convened the venire panel to complete juror questionnaires in court. The

90

questionnaire consisted mainly of questions calling for "yes or no" or multiple choice answers. On the same day, the court conducted general voir dire for hardships. On June 17, individual voir dire began and continued for six days, until June 24. The government and the defense each submitted their peremptory challenges to the deputy clerk of the court, who then empaneled the jury. On June 29, the court announced the final jury.[21]

247. Trial counsels' overall performance during voir dire was deficient. They repeatedly failed to adequately question jurors in order to determine the existence of bias in three areas: publicity, his incarceration, and his prior conviction. This prejudiced Mr. Agofsky because (1) It appears that biased jurors were in fact seated on his final jury; and (2) trial counsel frequently made uninformed decisions about whom to seat on the jury and whether to exercise peremptory challenges.

### 1. Counsel Failed to Conduct an Adequate Voir Dire as to Publicity

248. It is well-established that intense pretrial publicity and media attention to a case may so encumber and undermine the fairness of a criminal proceeding that the defendant's Due Process rights may be violated. *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966). Publicity may also unconstitutionally impair the ability to select a "fair and impartial" jury required by the Sixth Amendment. *Irvin v. Dowd*, 366 U.S. 717, 729 (1961). It is crucial that voir dire adequately explore the opinions held by jurors. If an issue of bias surfaces before trial, it is the trial court's responsibility to conduct an adequate inquiry. *Oswald v. Bertand*, 374 F.3d 475, 484 (7th Cir. 2004), *see also United States v. Barber*, 80 F.3d 964, 968 (4th Cir. 1996) (an inquiry is required

---

[21] The final jurors: #1 (Lichtfield), #23 (Portie), #32 (Bennet), #36 (Martines), #45 (Relford), #49 (Lene), #51 (Poulard), #58 (Baty), #60 (Church), #65 (Hansen), #41 (Liles), #77 (Reynolds). The jurors' names are being provided to lessen confusion because the record numbers and strike list numbers are inconsistent. These are the strike list numbers.

during voir dire to eliminate prejudice that threatens the fairness of the process or result). The greater the probability of bias, "the more searching the inquiry needed to make reasonably sure that an unbiased jury is impaneled." *Oswald*, 374 F.3d at 480.

249.     The jury questionnaire distributed to the venire before Mr. Agofsky's trial sought to determine whether venire members had been exposed to publicity. Defense counsel did not follow up in court with specific questions. By failing to follow up, counsel did not account for media coverage airing during the lapse in time between the distribution of questionnaires and the individual voir dire. Even if a member of the venire responded that he had not been exposed to publicity at the time he responded to the questionnaire, counsel should have followed up in individual voir dire to ensure that the venire member still had not been exposed. This is especially so, since two articles about Mr. Agofsky were published in the Beaumont Enterprise during individual voir dire and after the questionnaire was completed.[22]

250.     Mr. Agofsky's voir dire took place amidst negative publicity which detailed both the current charges and Mr. Agofsky's prior conviction for murder and kidnapping. "Convicted killer expected to die in prison, one way or another" was the opening line of an article published on the morning that Mr. Agofsky's individual jury selection began, after the jury questionnaires had been completed. The Beaumont Enterprise, June 17, 2004, "Lifer Now Faces Death Penalty Case." (A98-99). The article continued:

> Serving life without parole in Beaumont federal prison, Agofsky has
> been accused of threatening inmates, stomping a prisoner's head
> until he was unconscious, keeping homemade knives in his cell,
> participating in a riot, and killing a man with his bare hands,

---

[22] Question 29 on page 5 of the questionnaire asked "what news source do you regularly read?" Four jurors specifically wrote "Beaumont Enterprise." (See Questionnaires of jurors #1 (Lichtfield), #36 (Martines), #41 (Liles), and #65 (Hansen)). Three other jurors stated that they read the local newspaper, although they did not specifically name the "Beaumont Enterprise." (See Questionnaires of Jurors #23 (Portie), #51 (Poulard), #77 (Reynolds))

according to court documents. He's a master of Hwa Rang Do, a Korean martial arts form.

*Id*.

251.    The article also detailed Mr. Agofsky's prior conviction:

> Agofsky abducted Dan Short from his home in Arkansas, took him across state lines to the bank in Noel, Mo., then crossed into Oklahoma with his victim bound in duct tape. Agofsky tied Short to a weighted chair and dropped him into a lake while he was still alive.

*Id*.

252.    Four days later, in the midst of voir dire, The Beaumont Enterprise published another article, detailing the current charges against Mr. Agofsky as well as his prior convictions. "A Life or Death Matter," June 21, 2004. A100-102. The article focused on Mr. Agofsky's upcoming trial and emphasized the difficult decision of the prosecutor to seek the death penalty, quoting the Jefferson County prosecutor about the time and resources that go into that decision:

> Jefferson County District Attorney Tom Maness makes the ultimate decision on whether to seek the death penalty, but he confers with trial attorneys, considers the defendant's background and whether a jury here would assess the death penalty.
>
> "It takes up a lot of court resources and time to try a death penalty case, so we need to make sure we aren't wasting time," Maness said. "We also weigh what we think a jury's going to do."

*Id*.

253.    The comments of this local prosecutor bolstered the government's decision to seek the death penalty, and the defense should have sought to discover which jurors had read it and whether or not it biased them. At least one seated juror, Juror #1, openly admitted in court and on the questionnaire that he believed that "prosecutors wouldn't seek the death penalty unless they thought it was warranted." Tr. Vol. 9, 37. Juror #1 expressed exactly the sentiment expressed in this Beaumont Enterprise article.

93

254.     In addition to newspaper publicity, there were national television programs featuring Mr. Agofsky and his prior conviction. *Unsolved Mysteries* aired, and continues to air, a feature called "Over the Edge," and *Forensic Files'* Episode 190, entitled "Stick 'Em Up," continues to air as well. Both programs focused on Mr. Agofksy's prior conviction, in great detail. *See* http://www.forensicfiles.com/episodes.htm. Another program, an *FBI Files* episode called "Blood          Brothers,"          aired          on          A&E.          *See*          http://www.tv.com/the-fbi-files/blood_brothers/episode/283044/summary.html. At least one television newscast aired during voir dire, according to the venire member who saw it. (Tr. Vol. 10, 92).

255.     Despite this and other media publicity, the defense failed to adequately inquire into the publicity exposure and resulting bias. Only nine (9) total venire members were asked questions about exposure to publicity in voir dire, including only two (2) of the final seated twelve (12) jurors. None of the alternates were asked publicity questions during voir dire.[23]

256.     Three of the nine admitted to having been exposed to publicity. Seated Juror #1 stated in voir dire that she had in fact been exposed to publicity, though she had answered "no" to the same question on her questionnaire. Two of the venire members who were actually questioned about publicity in court admitted to having been exposed to publicity that morning and the night before, after the time that the questionnaires were completed. Venire Member #20 (Wilson), had read an article that very morning, in which he learned that Mr. Agofsky studied martial arts. Tr. Vol. 9, 189. Venire member #27 (Naumann), admitted that he had heard about the crimes for which

---

[23] Of the final twelve jurors and four alternates, only two seated jurors were asked publicity questions. They were: Juror #1 (Lichtfield) (Vol. 9, 35) and Juror #45 (Relford) Tr. Vol. 11, 101. Juror #1 (Lichtfield) had in fact been exposed to media reports. The other seven unseated venire members who were asked about publicity were: #6 (Butch), #15 (Atkins), #17 (Melonson), #19 (Coleman), #20 (Wilson), #27 (Naumann), and #71 (Spreyer). Venire members #20 and #27 had in fact been exposed to publicity.

Mr. Agofsky and Plant had been previously convicted on the news the night before. Tr. Vol. 10, 92 The responses of these three (3) jurors should have put the defense and Court on notice to ask each juror about publicity in the individual jury selection.

257.    It appears that the defense arbitrarily chose which jurors to question about publicity. In total, seven potential jurors answered "yes" or "maybe" on their questionnaire to having been exposed to pre-trial publicity. (See Venire Members #20, 35, 43, 71, 81, 89, 91). Of those seven, only two were asked follow up questions about publicity in voir dire. (See Venire members #20, Tr. Vol. 9, 190, and 71, Tr. Vol. 12, 195).

258.    The notion that voir dire covering areas of publicity is constitutionally required finds firm support in *Irvin v. Dowd*, 366 U.S. 717 (1961). In *Irvin*, as in the present case, news of the defendant's prior convictions was widely circulated in the media. *Id.* For this and other reasons, the Supreme Court observed "[i]t cannot be gainsaid that the force of this continued adverse publicity caused a sustained excitement and fostered a strong prejudice among the people of Gibson County." *Id.* at 726. This law was firmly established at the time of Mr. Agofsky's trial. Trial counsel should have known to conduct meaningful voir dire on this issue of pretrial publicity.

259.    Mr. Agofsky had a right to a verdict and sentence "induced only by evidence and argument in open court and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907). The examination of his jury does not pass constitutional muster because it did not ensure that his jurors were free from outside influence. In Mr. Agofsky's case the majority of jurors were not even asked if they had been exposed to publicity, let alone whether they held bias from such exposure.

260.    Based on the foregoing principles of law, this Court should hold that trial counsel failed to adequately inquire into the pervasive publicity to which the jurors were exposed. Only

nine of the 100 members of the venire, including only two of the final seated jurors and none of the alternates, were even asked if they had been exposed to publicity. The examinations of these jurors regarding publicity and their opinions was inadequate to determine whether or not they held biases against Mr. Agofsky due to publicity, let alone whether they could truly set those aside. Due to the pervasiveness of publicity surrounding Mr. Agofsky and his trial, it is reasonable to expect that at least one of his jurors was in fact exposed to publicity and had formed a bias against Mr. Agofsky. Had defense counsel adequately questioned Mr. Agofsky's capital jury, they could have uncovered such bias. A reasonable probability exists that the outcome of Mr. Agofsky's trial would have been different, had his counsel adequately questioned the jury with regard to publicity. *See Strickland v. Washington*, 466 U.S. 668 (1984).

> 2.        Counsel Failed to Conduct an Adequate Voir Dire as to Death Penalty Bias.

261.    It is critical in capital voir dire that there be a meaningful and thoughtful probing of the prospective juror's attitudes and beliefs concerning the death penalty; "general fairness" or "can you follow the law" questions are plainly insufficient to accomplish this. *Morgan v. Illinois*, 504 U.S. 719, 736 (1992) ("[a]s to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed.")

> Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. . ."Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able to impartially follow the court's instructions and evaluate the evidence cannot be fulfilled."

*Id*. at 729-730 (internal citations omitted) (citing *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)).

262. Counsels' questioning of jurors' penalty-based bias was fatally flawed in three distinct respects. First, jurors' general views on the death penalty were not sufficiently probed, leaving counsel all but ignorant of almost every juror's views. Second, counsel failed to follow up on jurors who expressed an inability or unwillingness to impose a life sentence because Mr. Agofsky was already incarcerated. Third, and relatedly, the defense failed to probe into juror bias based on Mr. Agofsky's prior conviction.

3. Counsel Failed to Adequately Probe the Jurors' Views on the Death Penalty.

263. The majority of the death penalty questions in Mr. Agofsky's capital jury questionnaire consisted of "yes or no" or multiple choice questions. In several instances, jurors gave inconsistent or even contradictory answers on their questionnaires, and were never asked to clarify in voir dire. Several of the potential jurors did nothing more than complete the perfunctory questionnaire, and answer the perfunctory and leading questions "correctly." Seated Juror #36 (Martines), for example, answered "no" in his questionnaire to the question of whether the juror would "automatically vote for the death penalty, regardless of the facts and mitigating evidence" and "no" to the question of whether the juror would "automatically vote for a sentence of life imprisonment without the possibility of release, regardless of the facts and the evidence." Tr. Vol. 11, 32. When asked on his questionnaire what types of cases he thought were appropriate for the death penalty, #36 answered, "I don't know. The law would need to be explained." *Id*. at 33. In response, the government instructed #36 that "this case" is appropriate for the death penalty. *Id*. The defense made no follow-up whatsoever to this question.

264. Such voir dire was wholly inadequate to detect those jurors not willing or able to give *meaningful* consideration to a sentence less than death for first degree murder. A juror might

97

honestly answer "no" when asked whether he or she would *automatically* impose death, even if the juror might not meaningfully consider a life sentence.

265.     Seated Juror #1 (Lichtfield), Seated Juror #23 (Portie) and Seated Juror #58 (Baty) illustrate the point. Juror #1 wrote in her questionnaire that "prosecutors wouldn't seek the death penalty unless they thought it was warranted." Tr. Vol. 9, 37. After a series of "yes or no" leading questions, defense counsel asked, "If the prosecution sought the death penalty, could you say no, it's not warranted?" Juror #1 responded, "It depends upon the outcome." *Id*. Though her answer was ambiguous and confusing, there was no effort made by the defense to follow up. Juror #23 stated that he believed that the death penalty is warranted where the government has proven premeditation. Tr. Vol. 10, 67. He appeared to believe that situations where the death penalty is not warranted are situations such as self-defense and impulse. *Id.* Juror #58 also expressed the belief that the defendant deserves the death penalty if he is proven guilty. "If there is enough evidence to convict them of their crime and there's enough evidence to convict that they did it (*sic*), then I do believe that they would need to receive it." Tr. Vol. 12, 45. Juror #58 further indicated on his questionnaire that he believed that the imposition of the death penalty hinged upon the government's proving intent.[24]

> Q:     In what kinds of cases do you believe that the death penalty is appropriate?
>
> A:     Where there is strong evidence proving it is intentional.

---

[24] Juror #58's responses are otherwise very ambiguous and confusing. On his questionnaire, he wrote "the death penalty is there for people who need it." Tr. Vol. 12, 45. When asked by the defense if he would automatically impose the death penalty if the government proved premeditation, #58 responded: "Well, not necessarily, it depends on, you know, the other cases, too. You know they might say, you know, and show enough evidence, well, then, you might come back and show that, you know, that it evens out." *Id*. Defense counsel did not follow up on this answer.

*Id.* Again, defense counsel failed to follow up.

266.    Seated Juror #1, Seated Juror #23 and Seated Juror #58 revealed a belief that any first degree murderer should be given death if proven guilty beyond a reasonable doubt. Seated Jurors #23 and #58 indicated that they were unable or unwilling to consider mitigating evidence, since death-worthiness apparently depended only on the certainty of the defendant's guilt. Their answers make plain that counsel should have probed the issue further. Counsel's failure to detect death-certain jurors made his trial fundamentally unfair. Questions which are not aimed at uncovering bias, such as general fairness or follow-the-law questions, are ineffective at uncovering actual juror bias. *See Morgan*, 504 U.S. 735-36 & n.9 ("That certain prospective jurors maintain such inconsistent beliefs -- that they can follow the law, but that they will always vote to impose death for conviction of a capital offense -- has been demonstrated, even in this case.").

267.    These sentiments were echoed throughout the jury selection. The defense failed to explore the beliefs of multiple venire members who appeared to favor the death penalty for all persons convicted of first degree murder.[25] Venire member #10 (Boyett) stated that it is important

---

[25] Mr. Agofsky is not arguing that his constitutional rights were violated because he was forced to waste peremptory strikes on automatic death jurors. Rather, it was the inadequate voir dire of the entire jury panel, including seated jurors, alternates, and jurors peremptorily struck, that violated Mr. Agofsky's rights. This case is inapposite to *Ross v. Oklahoma*, 487 U.S. 81 (1988) and *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), where defendants claimed a constitutional violation *only* because they were forced to use peremptory strikes on partial jurors. The defendants in *Ross* and *Martinez-Salazar* never suggested that any of the twelve final jurors who sat were partial. *Id.* Mr. Agofsky, on the other hand, asserts that his attorneys were ineffective for failing to conduct and advocate for adequate questions to detect and follow up on possible juror bias, and that this deficiency not only required the defense to use peremptory challenges on jurors it might have challenged for cause if counsel had developed the record, and not only required the defense to exercise its peremptory challenges without adequate information, but actually resulted in the seating of jurors who were not life-qualified. *See United States v. Sanchez-Hernandez*, 507 F.3d 826 (5th Cir. 2007) (noting exception to rule of *Martinez-Salazar* where partial juror sat); *see also* Ground 12.4, *infra* (raising free-standing *Morgan* claim).

to have the death penalty because "if somebody is killed, I think they should die, but let it be reasonable doubt for that to go through." Tr. Vol. 9, 98. Venire member #22 (LeBouf) indicated that he is an automatic death penalty juror three times on his questionnaire: (1) "If a person is convicted of a capital crime and the death penalty is requested, I will always vote to impose it, regardless of the facts and the laws in this case." (2) "I am strongly in favor of the death penalty and will always vote to impose it, regardless of the facts and the law in the case." (3) He answered "yes," that he would automatically vote for death if he found the defendant guilty. Tr. Vol. 10, 56. When asked follow up questions by the government, venire member #22 gave contradictory answers. For example, when asked if he could make a fair determination of penalty, venire member #22 stated, "whatever would be appropriate, either one. Whatever the jury would vote on." Tr. Vol. 10, 56. When asked "Even though a person would be convicted of a capital crime, would you have an open mind whether he should receive the death penalty or life, or just because they were guilty give them the death penalty?", venire member #22 answered, "The first, I could go either one." *Id.* The defense made absolutely no effort to follow up. Venire member #25 (Fitzpatrick) told the court that he strongly favored the death penalty and would have a hard time voting against it, but would "try" to be fair and would "try to weigh aggravating and mitigating factors." Tr. Vol. 10, 74. Defense counsel again failed to follow up. Venire member #27 (Naumann) stated that he would "probably vote for the death penalty if someone killed someone else maliciously." Tr. Vol. 10, 92. Likewise, venire member #63 (Licatino) stated that he believed that the death penalty is appropriate when someone takes a life, as long as it is not self-defense. Tr. Vol. 12, 93-95. Follow up by defense was confusing and elicited no meaningful response.

> Defense: Are you telling me that even if you believe a person committed murder in a premeditated manner or with malice aforethought, you would not always give that person death?
>
> #63: No.

100

*Id.* at 103-104. Defense counsel offered no follow up questions and did not ask the juror for clarification.

268.    Venire member #69 also expressed the belief that if a defendant is proven guilty, he deserves the death penalty. Tr. Vol. 12, 166. Though she said that she would listen to the evidence, she repeatedly emphasized that she would do so only to make sure that the defendant was guilty. *Id*. at 170, 172. Venire member #76 also indicated that he believed that the imposition of the death penalty is a sufficiency of the evidence problem, believing it to be appropriate "where there is enough evidence." Tr. Vol. 13, 138.

269.    The above examples indicate that trial counsel failed to follow up on clear indications that jurors would automatically vote for the death penalty if they found Mr. Agofsky guilty of premeditated murder and thus were not "life-qualified." Mr. Agofsky was prejudiced in that such jurors were actually seated on his jury. Since imposition of death required a unanimous jury, having even one unqualified juror prejudiced Mr. Agofsky. *See Ross*, 487 U.S. at 85. Because of defense counsel's failure to adequately voir dire the jury, he had at least two, #s 23 and 58. *See also infra* Ground 12.4. Had counsel adequately questioned jurors on their feelings about the death penalty, there is a reasonable probability that the result of his trial would have been different. *See Strickland*, 466 U.S. 668.

4.    <u>Counsel Failed to Adequately Voir Dire Jurors About Bias Based on the Fact that Mr. Agofsky was Already in Prison.</u>

270.    Defense counsel also failed to address juror bias against those incarcerated. None of the seated jurors were asked about opinions or biases against incarcerated persons, including whether or not a prisoner had the right to a fair trial. Jurors were asked only one question about incarceration, whether or not they believed an inmate had the right to defend himself. This was so, even though several venire members and one alternate outwardly expressed bias against Mr.

101

Agofsky because of his incarceration. In addition, the court mandated removal of one venire member for holding such a bias. The responses of these jurors should have served to put the defense on notice that this type of bias existed. However, the defense failed to question seated jurors about such bias.

271.    Alternate #87 (Bowman) wrote in her questionnaire that prison works because it "gets scum off the streets." Vol. 14, 33. She wrote, "I don't feel sorry for anyone that keeps making the same mistakes, I figure you get what you deserve…You do the crime, you do the time." *Id*. This was a clear indication of bias, which the defense made no effort to follow up on.

272.    Several venire members who were peremptorily struck by the defense made similar representations to the Court. Their responses are indicative of the bias amongst the potential jurors against Mr. Agofsky because he was incarcerated, and should have served as notice of the existence of such sentiments. Venire member #15 (Atkins) told the Court that, "I feel when someone has committed a crime and really no longer contributes anything to our country or our society but just takes from it, to me I think that's grounds right there for the death penalty." Tr. Vol. 9, 157. In response, the defense asked, "does that include everyone in prison? Do some people in prison contribute to society?" *Id*. Venire member #15 answered, "Some do." The defense made no effort to follow up. *Id*. Venire member #48 (Dodson) had a son who was a corrections officer at Stiles, a maximum security prison just five miles down the road from the Beaumont complex where this incident occurred. Tr. Vol. 11, 128. Venire member #48 expressed the belief that "People that kill people get—stay their life in prison and the government has to feed them for the rest of their life." *Id.* Venire member #69 expressed bias against incarcerated persons several times. Tr. Vol. 12, 168-178. First, she told the Court that she would have a difficult time being fair and weighing the evidence because "he was already doing a life sentence, then he goes and murders

102

someone." *Id*. at 168. When asked what she meant by this statement, she responded that Plant "did not asked to be murdered. This person was innocent at the time." *Id*. Finally, she stated that she believes that it is a waste of tax dollars if a murderer is in prison for life, while our troops are sleeping in tents and rain, freezing weather and they feel like they're in prison. *Id*. As these examples illustrate, venire members repeatedly expressed bias toward Mr. Agofsky because he was in prison. The defense did little to probe into their feelings and did not object to the above named jurors.

273. Finally, the Court expressly took note of the potential for bias against prisoners to cause partiality in Mr. Agofsky's trial. Dismissing one venire member (Spencer) the Court stated, "He has a bias about people serving a life term…There is so much that he would bring into that sentencing hearing that is weighted with bias that the court, again, concludes that your motion to strike must be granted." Despite the court's recognition that venire members' bias against the incarcerated warranted removal, defense did not move to strike any of the above mentioned jurors other than Spencer.

274. Bias against Mr. Agofsky for being in prison was pervasive. Having dismissed one venire member (Spencer) for such bias, the court and the defense were well aware of this potential ground for partiality. Yet, the defense still failed to question jurors about Mr. Agofsky's incarceration. Mr. Agofsky had a constitutional right to be judged on his current charge, not his incarceration. Had counsel been able to unmask such bias, there is a reasonable probability that the result would have been different. *See Strickland*, 466 U.S. 668.

5. <u>Counsel Failed to Adequately Question Jurors About Bias Based on Mr. Agofsky's Prior Conviction.</u>

275. The Court prohibited counsel from asking questions about Mr. Agofsky's prior conviction. Tr. Vol. 13, 63. Though the jurors were potentially aware of the prior conviction, they

were not questioned about it. As discussed above, in ¶¶ 250–60, it is unknown how many jurors knew about Mr. Agofsky's prior conviction. Counsel thus never determined whether any jurors would automatically vote for death on the basis of the prior conviction. Whether or not the Constitution requires case-specific questions on death qualification as a general matter, *see United States v. McVeigh*, 153 F.3d 1166, 1207-08 (10th Cir. 1998), it at least forbids the seating of jurors unable to follow the law impartially in the case before them. In death penalty cases, the sentencer is required to "consider" mitigating evidence *and* to be able to "give effect" to it. *See Penry v. Johnson*, 532 U.S. 782, 796 (2001) ("the key under *Penry I* is that the jury be able to 'consider and *give effect to* [a defendant's mitigating] evidence in imposing sentence.'") (emphasis added). For it is only when the jury is given a "vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision," *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (*Penry I)*, that we can be sure that the jury "has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence." *Id.* at 319 (quoting *Woodson v. North Carolina,* 428 U.S. 280, 304, 305 (1976)).

276.    A juror already committed to a death sentence in the case at hand, before hearing any mitigating evidence whatsoever, could neither meaningfully "consider" nor "give effect" to mitigating evidence, and could not fashion an individualized sentence. Such biases must be probed or will inevitably go undetected. Yet Mr. Agofsky's counsel did not attempt to discover whether jurors were already committed to a death sentence based on his prior conviction.

277.    Mr. Agofsky's prior conviction received much media attention on its own. He was prosecuted in both state and federal court, and his trials spanned almost a decade. His federal trial was in 1992, and his state trial in 1997; both were heavily covered in the media. Both *Unsolved Mysteries* and *Forensic Files* featured programs about Mr. Agofsky and the Noel State Bank

robbery, which have continued to run to this day. In addition, media accounts of the Beaumont trial discussed Mr. Agofsky's prior conviction in detail. (A98-99, A100-102). The prior conviction was a focus of the government's case at the penalty phase. The defense had a duty to question jurors as to whether or not Mr. Agofsky's prior conviction precluded them from considering life.

278. As discussed above, many venire members expressed opinions based on the fact that Mr. Agofsky was in prison. However, the defense did not follow up or probe further to determine whether the reason for that incarceration would cause them to be impartial. *See supra* Ground 12.1(H)(4). Venire member #4 (Heacker) was one such juror. Though venire member #4 was removed for cause, the response of defense counsel to his clearly expressed bias is indicative of their response to bias of other venire members. Instead of attempting to discover whether or not #4 could actually consider a life sentence in Mr. Agofsky's case, the Court, the government, and defense counsel advised venire member #4 simply to not think about Mr. Agofsky's prior conviction. Venire member #4 repeatedly stated that if Mr. Agofsky's prior conviction was for murder, he would vote for the death penalty. "One of my factors for the death penalty would be a repeat offender. I don't know Mr. Agofsky's prior conviction, but if it was murder, I would be prone to the death penalty." Tr. Vol. 13, 47. "If he's found guilty, I would automatically vote for the death penalty, keeping in mind his prior convictions." *Id*. at 49. After the juror had repeatedly made this statement, the Court intervened.

> Venire member #4: If I knew that he was in prison for a life sentence for—
>
> Government: Not for.
>
> Court: Forget the "for." Just think about the life sentence at this stage.

*Id*. at 55.

279.  When jurors themselves advance reasons for possible bias -- based upon uncontested facts of the case at hand -- it is unthinkable that a court would forbid further inquiry. *See State v. Jackson*, 836 N.E.2d 1173, 1190-92 (Ohio 2005) ("Counsel were merely attempting to discover whether prospective jurors could fairly consider imposition of a life sentence in a case involving a three-year-old murder victim. While it is improper for counsel to seek a commitment from prospective jurors on whether they would find specific evidence mitigating...counsel should be permitted to present uncontested facts to the venire directed at revealing prospective jurors' biases.") *Turner v. Murray*, 476 U.S. 28, 36-37 (1986) (defendant entitled to ask about racial bias in cross-racial murder case).

280.  The voir dire of venire member #4 is troubling for another reason as well. Instead of recognizing this potential for bias and thus questioning other jurors in order to determine the existence of such bias, the Court then prohibited counsel from asking any questions based upon Mr. Agofsky's prior conviction. "I see no need…to get into why a person is in prison. You didn't, but it did happen. But I see no reason for anyone to generate that question. Do you agree with that?" *Id*. at 66. Defense counsel did not object, but instead stated that they agreed with the Court. *Id*.

281.  Asking questions about Mr. Agofsky's prior conviction would not have been tantamount to attempting to "stake out" any jurors. "True 'stake out' questions 'ask a juror to speculate or precommit to how that juror might vote based on any particular facts.'" *United States v. Johnson*, 366 F. Supp. 2d 822, 841 (N.D. Iowa 2005), quoting *United States v. McVeigh*, 153 F.3d 1166, 1207-08 (10th Cir. 1998)). In contrast, without asking "stake-out" questions, counsel needed to ascertain whether jurors could realistically *consider* a life sentence if the government's basic allegations were proven, not whether the jurors would tend to *vote* for a particular sentence

under particular facts. "It is difficult . . . to see how a question that asks about a juror's ability to consider both life and death sentences 'stakes-out' or 'pre-commits' a juror to vote one way or the other." *Johnson*, 366 F. Supp. 2d at 843; *accord United States v. Fell*, 372 F. Supp. 2d 766, 771 (D. Vt. 2005) ("There is a crucial difference between questions that seek to discover how a juror might vote and those that ask whether a juror will be able to fairly consider potential aggravating and mitigating evidence.").

282. In *McVeigh*, 153 F.3d at 1207-08, the Tenth Circuit held that *Morgan* does not require case-specific questions. The court also held that such questions are improper where they seek "to determine what prospective jurors thought of the death penalty in regards to this particular case." *McVeigh*, 153 F.3d at 1207-08. However, because *Morgan*'s "entire premise" is that "highly general questions may not be adequate to detect specific forms of juror bias," its holding suggests that, "in appropriate circumstances, the parties should be allowed to ask more specific questions to investigate potential bias." *United States v. Fell*, 372 F. Supp. 2d 766, 769 (D. Vt. 2005). *McVeigh*, then, does not preclude all case related questions, but only those aimed at asking jurors to commit to a sentence.

283. Under *Morgan*, jurors must be able to consider and give effect to mitigating evidence. *Morgan*'s holding is rooted in a long line of Supreme Court cases requiring that jurors consider and be permitted to give effect to mitigating factors relating to the individual defendant before assessing the ultimate punishment. *See, e.g., Morgan*, 504 U.S. at 736 (explaining that the dissenting opinion rejects "the line of cases tracing from *Woodson* and *Lockett*, developing the nature and role of mitigating evidence in the trial of capital offenses). In *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976), the Supreme Court first held that imposition of a mandatory death sentence without consideration of the character and record of the individual defendant is

107

inconsistent with the fundamental respect for humanity that underlies the Eighth Amendment. The Court reaffirmed and extended this principle in *Sumner v. Shuman*, 483 U.S. 66, 78 (1987), by invalidating a mandatory death sentence imposed on a Nevada inmate (who had been serving a life term without parole) for killing a prison guard on the ground that the sentencing scheme failed to give individualized consideration to the defendant's mitigating circumstances. The Court's holdings in *Woodson* and *Shuman* (that the Constitution does not permit mandatory death sentencing in theory) require voir dire sufficient to discern whether a given juror can consider mitigating circumstances despite a defendant's prior conviction, even one for which the defendant is serving a life sentence.

284. The failure of counsel to ask jurors about bias against Mr. Agofsky due to his prior conviction was deficient and prejudicial. Mr. Agofsky's prior conviction was used in the penalty portion of his trial to underpin two statutory aggravators (that he was a prisoner serving a life term and that he had a previous conviction for a federal offense for which a life sentence was authorized) and also as the basis for the non-statutory aggravating factor of "continuing danger." Tr. Vol. 21, 14, 15; Tr. Vol. 23, 334-40. FBI Agent Ladell Farley was the first witness in the penalty phase, and gave detailed testimony of his investigation into the Noel Bank Robbery and murder of Dan Short. Vol. 21, 31. The prosecutor relied upon the conviction in his penalty phase opening and referred to it extensively in his penalty phase closing. "There is a fire burning in Shannon Agofsky since the day Dan Short was thrown off the bridge. His own psychologists called it antisocial disorder. Regular folks, you just call it that he's a killer." Tr. Vol. 24, 332. "You know that he's 18 because you heard Ladell Farley, the retired FBI agent who investigated the execution of Dan Short." Tr. Vol. 24, 333. "The next step in putting out the fire is the statutory aggravators… you heard that he was convicted of armed robbery and the murder of Dan Short and received a life

sentence." Tr. Vol. 24, 336. "Look at the senselessness of the killing, he had no reason to kill Dan Short." Tr. Vol. 24, 336. "The tragic death of Dan Short, for which the defendant received life imprisonment….Can you imagine in a more terrible way? Tied to a chair, thrown off a bridge, weighted down and drowned." Tr. Vol. 24, 339. Each juror found each of the three separate aggravators based upon Mr. Agofsky's prior conviction. Jurors who were predisposed to sentence a person to death because he was incarcerated, especially for a prior murder, would certainly be impacted by this argument. Trial counsel's failure to question jurors on their ability to consider a life sentence in light of Mr. Agofsky's prior conviction was deficient and prejudicial. There is a reasonable probability, had trial counsel questioned jurors about their ability to give meaningful consideration to a life sentence in light of Mr. Agofksy's prior conviction, that the result of Mr. Agofsky's trial would have been different. *See Strickland*, 466 U.S. 368.

### 6. Conclusion

285. In failing to adequately question jurors on bias based on pre-trial publicity, Mr. Agofsky's incarceration, and his prior conviction, counsel for Mr. Agofsky were constitutionally

ineffective.[26] Counsel failed to ensure that all of Mr. Agofsky's jurors were genuinely impartial as to sentence and genuinely able to consider Mr. Agofsky's life circumstances and the circumstances of the alleged offense. Publicity during Mr. Agofsky's voir dire was extensive. Two articles ran during the individual voir dire in the Beaumont Enterprise, the publication regularly read by a majority of the jurors. Yet, defense counsel neglected to question most of the jurors about their exposure to publicity. In addition, many venire members expressed clear bias against Mr. Agofsky because he was imprisoned under a term of life. Yet, defense counsel failed to question any of the seated jurors about potential bias against Mr. Agofsky because of his incarceration. Finally, trial counsel refused to question jurors about Mr. Agofsky's prior conviction, the basis for three separate aggravating circumstances, and extremely prejudicial argument and testimony. In each of these respects, trial counsel was deficient, and Mr. Agofsky was prejudiced. Had Mr. Agofsky been permitted to adequately voir dire the jury, there is a reasonable probability that the outcome

---

[26] Overall, it appeared that counsel was not paying attention in voir dire. For example, venire member #12 (Standberry) was herself a corrections officer, working at the Texas DOC in a male maximum security facility in the Stiles Unit, only five miles down from the USP Beaumont. (Tr. Vol. 9, 120). She was a senior officer, and ran the unit. When asked if she could still be fair, even with this experience, she vacillated, stating "I think I could, I think I would be able to." *Id*. at 121. She indicated that she has seen violence in prison, but that she did not believe it to be justified, "most of the time we don't usually know the background." *Id*. 127. The protestations by this venire member that she could be fair should have been met with extreme skepticism considering her current employment as a corrections officer. Instead, defense counsel appeared to ignore them. Several jurors throughout voir dire expressed incorrect legal understandings of self-defense. These jurors should have been of special concern to counsel, since self-defense was the defense theory at trial. Not only did the defense fail to object to these jurors, they all were seated on the final jury. In addition, the defense failed to correct their erroneous understandings of self-defense law. Seated juror #45 (Relford) made it clear that he did not believe someone could kill another person in self-defense, "it wouldn't go that far." (Tr. Vol. 11, 97). Seated juror #60 (Church) wrote on her questionnaire that a prisoner has the right to defend himself "to a certain degree." Tr. Vol. 12, 71. When asked follow up questions by the defense, she stated that she was confused. The defense did not follow up properly or properly use voir dire to educate her as to the law.

of his trial would be different. Thus, Mr. Agofsky has shown prejudice under *Strickland v. Washington*. 466 U.S. 668.

286.    However, in this case, it is not necessary to show prejudice. Because the deficient performance of counsel resulted in the seating of at one least biased juror, the due process right to an impartial and disinterested tribunal is violated and reversal is automatic. *See Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995) (evidence that "the judge had a fixed predisposition to sentence this particular defendant to death if he were convicted" warrants relief); *see also Johnson v. United States*, 117 S.Ct. 1544, 1550 (1997); *Arizona v. Fulminante*, 499 U.S. 279, 309-310 (1991); *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring) (juror bias, whether presumed or proven, requires automatic reversal); *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980); *Leonard v. United States*, 378 U.S. 544 (1964) (per curiam) (reversal due to "implied bias" of jurors at second trial who had been in the courtroom during the announcement of the guilty verdict at his first trial). When trial counsel's deficient performance results in structural error, prejudice under *Strickland* is presumed. *McGurk v. Stenberg*, 163 F.3d 470, 473 (8th Cir. 1998); *Miller v. Dormire*, 310 F.3d 600, 603-04 (8th Cir. 2002); *Miller v. Webb*, 385 F.3d 666, 676 (6th Cir. 2004); *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001); *Bell v. Jarvis*, 236 F.3d 149, 165, 180 (4th Cir. 2000) (en banc).

I.    **Counsel Provided Ineffective Assistance During The Guilt Phase Portion Of Trial.**

1.    Counsel's Examination Of Both Prosecution And Defense Witnesses, And His Arguments To The Jury, Demonstrated Lack Of Investigation, Unfamiliarity With Records And Information In His Possession, And Dangerous Self-Contradictions.

287.    During the guilt phase, Black (who played the role of lead counsel during that phase) repeatedly made arguments, and examined or cross-examined witnesses, in a manner that demonstrated his lack of investigation, his unfamiliarity with his own file, and his failure to plan

111

his courtroom presentations or adopt a consistent theory of the case. He gave an opening statement that omitted what would become his primary defense by the time he gave his summation; failed to impeach the only eyewitness who testified for the government with evidence that he received a promise of sentencing consideration for his cooperation; made a summation argument that indirectly bolstered that witness's testimony; and made other summation arguments that the government properly attacked in rebuttal as completely unsupported by the evidence. Counsel's unprepared and uninformed presentation of his case constituted prejudicially deficient performance that deprived Mr. Agofsky of the effective assistance of counsel. *See, e.g., Henry v. Poole*, 409 F.3d 48 (2d Cir. 2005) (counsel ineffective for arguing alibi for wrong day); *Higgins v. Renicio*, 362 F. Supp. 2d 904 (E.D. Mich. 2005) (counsel ineffective for failure to prepare for cross-examination of key prosecution witness).

288.     Counsel's opening statement to the jury said nothing about what would ultimately be his primary theory, that Mr. Agofsky acted in self-defense. Instead, he told the jurors that he agreed with the government that "from a legal standpoint your focus should be on the premeditation and the malice aforethought and the deliberate issue." Tr. Vol. 18, 31.

289.     Counsel also made opening and summation arguments that, because they had no support in the evidence, indirectly bolstered the testimony of the government's only eyewitness, Richard Ward. And he inexplicably failed to impeach Ward with documentary evidence, supplied by the government, that he was promised a substantial benefit for testifying. Black argued in his opening statement that the jurors should pay attention to the benefits a government inmate witness might receive for testifying:

> If a federal inmate testifies against Mr. Agofsky, I would suggest to
> you that you should ask yourself several things: why is that inmate
> testifying? What benefit is he obtaining as a result of his testimony

112

in this courtroom? What promises have been made to that inmate to have him appear and testify against Mr. Agofsky.

Tr. Vol. 18, 31-32.

290. When the time came to cross-examine Ward, Black failed to use impeachment evidence that he had received from the government. Ward initially refused to speak to the FBI when agents attempted to interview him on January 5, 2001. A104. In May 2004, however, eight days after he learned that he had been rejected for halfway house status, Ward agreed to be interviewed by the FBI. On May 14, he agreed to cooperate in return for support for a time cut under Fed. R. Crim. P. 35, and the Assistant United States Attorney involved in the case agreed. A105-106. Ward told Agent Bolin that Mr. Agofsky, not Plant, was the initial aggressor, and repeated the allegation at a follow-up interview on June 19. A107-110. At the June 19 interview, however, the only discussion of consideration for Ward's testimony was his request to have his supervised release commuted. At that time, he was told that any reduction in his sentence would be up to the prosecutor and the court in his own case.

291. Inexplicably, while Black sought to elicit Ward's admission on cross-examination that he was testifying in hope of receiving a benefit, he did not confront Ward with the report by Bolin indicating the initial promise of a Rule 35 reduction, in return for which he had made his initial statement incriminating Mr. Agofsky. Black brought out the fact that Ward met with Agent Bolin on May 14th, and that this was only eight days after Ward learned of his rejection by the halfway house. Tr. Vol. 19, 229-30. And he brought out the fact that Ward had requested commutation of his supervised release at the June 19 interview. Tr. Vol. 19, 231-33. But he did not cross-examine him about the specific promise on May 14. Ward was therefore able to testify that "no one has actually promised me anything" on redirect examination. Tr. Vol. 19, 238.

113

292.    After the close of the evidence, but before summations, the prosecutor advised the court that Ward's denial that he had received any benefit was misleading because, while Ward had received no guarantees, he had been told that his cooperation would be made known to his prosecuting attorney. Tr. Vol. 20, 239-40. The government offered to make Ward available to the defense for an interview, but, even though Ward had refused to speak to the defense before trial, Black declined the offer, preferring to deal with the issue on summation. *Id.* Nevertheless, Black's summation comments on Ward turned a lost opportunity into an indirect bolstering of Ward's testimony. He argued—without factual support because he had failed to impeach Ward—that Ward was "here to get a time cut," and had not cooperated with the FBI until he did receive an offer of a time cut. Tr. Vol. 20, 385. Because Black inaccurately summarized the testimony, which indicated that Ward had *not* received any promises and was close to release, his arguments only bolstered Ward's credibility. Tr. Vol. 20, 214, 239.

293.    Ward was the only prosecution eyewitness and the only witness who claimed that Mr. Agofsky attacked Plant. A careful review of the reports on each of his FBI interviews was an elementary and necessary trial preparation task, but Black did not cross-examine Ward about the specific promise of leniency that a careful review of the May 14 report would have disclosed. Trial counsel's failure to elicit evidence that Ward had a concrete expectation, not just a hope, of favorable treatment in return for his testimony, coupled with his prejudicially misleading statements in opening and summation, was unprofessional and constituted deficient performance. *See, e.g., Catalan v. Cockrell,* 315 F.3d 491 (5th Cir. 2002) (counsel deficient for failure to impeach victim with prior inconsistent statement); *Medina v. Deguglielmo*, 373 F. Supp. 2d 526 (E.D. Pa. 2005) (counsel deficient for failure to challenge competence of key witness), *rev'd on*

114

*other grounds,* 461 F.3d 417 (3d Cir. 2006); *Harris v. Senkowski*, 298 F. Supp. 2d 320 (E.D.N.Y. 2004) (counsel ineffective for failure to impeach robbery victim with prior inconsistent statement).

294.    Counsel made similar errors in cross-examining Corrections Officer Christopher Matt, apparently on the basis of a misinterpretation of information received from his client. Black elicited Matt's agreement that Mr. Agofsky might have said to him, "I waited for you to get down *there*" (reinforcing a damaging impression created on direct examination, of a premeditated attack in which Agofsky waited for Matt to walk to the other end of the recreation yard), instead of asking Matt whether Mr. Agofsky might have made a non-incriminating statement, that the incident was over and "I was waiting for you to get down *here*" (i.e., for Matt to arrive back at the cage where the fight happened) by the time Matt arrived. Tr. Vol. 18, 84. The non-incriminating version had been reported to Black by his client, but Black did not elicit that version. Instead, Black argued in summation, but with no evidentiary support because he had failed to ask the right question:

> Now, Mr. Agofsky, I will submit to you, made a statement to Officer Matt. And the statement that he really said was "I waited for you to get down here." He didn't say "there," he said "here." And if you use your common sense and you look at what the evidence shows because that version is supported by the evidence. . . . Because Mr. Agofsky is not going to stop defending himself until that officer got back down to that recreational cage. And why is that? Because the recreational area in [sic] thunder dome or gladiator school as they call it, you don't stop a fight until those officers return back down to that area.

Tr. Vol. 20, 384.

295.    There was absolutely no evidence that Mr. Agofsky told Matt that he had to continue fighting Plant until Matt arrived to protect him, and, as noted, Black had asked Matt the wrong question in cross-examination. Thus, by making the argument, Black turned a non-incriminating statement by his client that he had not succeeded in placing into evidence—that Mr. Agofsky had ceased the attack and offered no resistance to Matt by the time he arrived—into a

115

claim so unsupported by the evidence that could only have damaged the defense in the jury's eyes. Indeed, the government opened its rebuttal summation by arguing, "One thing Mr. Black can't do. He can put a spin on the evidence, but he can't change what it is . . . Reasonable doubt is not a doubt that is manufactured by the defense, it is what is there naturally." Tr. Vol. 20, 394-95.

296.     Black also made no attempt to neutralize damaging testimony by Walter Moss, a physician's assistant who helped to treat Plant in the medical department at the prison. Moss testified that Mr. Plant was unresponsive and "clinically dead" while he was still under the care of Moss and his colleagues. Tr. Vol. 18, 101. Moss testified that they had to "assist his breathing the full time he was there," and that they were merely "going through the motions" of treating him. Tr. Vol. 18, 102-04. Although Black had received a copy of Moss's report from the government and the prosecutor used it in Moss's direct examination (Tr. Vol. 18, 103), Black did not use the report to demonstrate that Moss's account was exaggerated. The report (G-16, A111) was jointly prepared by Moss and nurse Ross and, while they found that Plant's injuries were severe, they did not document his condition as hopeless. Upon arrival, Plant had no respiration or pulse and required CPR, but once his airway was cleared and a breathing bag applied he began "spontaneous respirations." Thereafter, according to the report, an airway was maintained until paramedics arrived and inserted a breathing tube. The report does not mention clinical death.

297.     Furthermore, Black failed to ask Moss about, or introduce, the report prepared by a paramedic at Mid-Jefferson Hospital at 11:30 AM, after Plant had been taken from the prison. A112. The report indicates (in two places) that at that time Plant was alert, and describes him as "oriented times three." Although the government had supplied this report to the defense, Black did not ask Moss if the information that Plant was alert and oriented at 11:30 caused him to reconsider his opinion that Plant was already clinically dead.

298.    Black's cross-examination of Corrections Officer Dale Elkins created an unsupported and damaging misimpression about the presence of a weapon in the recreation cage adjacent to the one where Plant and Mr. Agofsky were confined. Inmate Billy Santiago had told the defense investigator that "someone said" that the "shank" (or homemade knife) recovered from Santiago (who was in the next cage from Plant) had belonged to Plant. Apparently on the basis of the rumor Santiago had reported, Black elicited Officer Elkins's agreement on cross-examination that it was possible for inmates to pass objects from one recreation cage to another. Tr. Vol. 19, 183-84. However, when Black called Santiago to the witness stand, Santiago contradicted the suggestion Black had raised in his examination of Elkins. Santiago testified that the shank was his and he entered the cage with it. Tr. Vol. 19, 319. *See* ¶ 98, *supra.* Thus, the shank that Black had suggested was passed from the cage where Plant and Agofsky were confined remained unaccounted for. Black's series of questions must have raised a suspicion in the jurors' minds that a shank passed to another cage could have belonged to Mr. Agofsky.[27]

299.    Black's unfamiliarity with the evidence and apparent lack of planning for his examinations of witnesses resulted in repeated failures of advocacy throughout the trial. He did not introduce his principal theory of defense until summation, and then undermined his own credibility by arguing without record support (because he had failed to elicit the facts through records the government had given him) that the government's only eyewitness expected a time cut. He undermined his credibility still further by asking Officer Matt the wrong question on cross-examination and then misrepresenting his answer in summation, and otherwise failed to examine witnesses effectively. These missteps alone could have caused the jury to reject a defense

---

[27] In his summation, the prosecutor noted his own bewilderment about what Black was attempting to establish with this line of questioning. Tr. Vol. 20, 372.

117

supported by three witnesses, in favor of a government theory supported by only one. There is a reasonable probability that, but for counsel's deficient performance, alone and in conjunction with the other instances of deficient performance summarized herein, the outcome of the guilt and penalty phases would have been different. U.S. Const. Amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984).

### 2. Counsel Failed To Object To Erroneous Instructions.

300. On June 3, 2004, trial counsel submitted proposed jury instructions to the Court. A113-138. They did not include any instruction that appropriately required the government to disprove the presence of "heat of passion" in order to secure a murder conviction, or a request to charge the jurors that they should consider both the testimony of Richard Ward and Mr. Agofsky's alleged oral statements with caution. Later, during trial, the Court gave both counsel a copy of its proposed instructions, and held a charge conference after the parties had rested. Tr. Vol. 20, 335. Counsel objected that Counts 1 and 2 were multiplicitous and that submitting both of them to the jury violated Mr. Agofsky's double jeopardy rights, and objected to the omission of the territorial element in Count 1, but otherwise made no substantive objections. Tr. Vol. 20, 335-37. Counsel's failure to object to the erroneous instructions set forth below was deficient performance. *See Reagan v. Norris,* 365 F.3d 616 (8th Cir. 2004) (counsel ineffective for failure to object to instructions); *Gray v. Lynn*, 6 F.3d 265 (5th Cir. 1993) (counsel ineffective for failure to object to erroneous jury instruction on elements of attempted murder); *United States v. Stracener*, 959 F.3d 31 (5th Cir. 1992) (counsel ineffective for failure to object to erroneous instruction on aiding and abetting); *Hall v. State*, 161 S.W.3d 142 (Tex. Ct. App. 2005) (counsel ineffective for failure to object to erroneous instructions).

301. For example, counsel did not object to the court's burden-shifting instructions on the relationship between the greater offense of murder and the lesser-included offense of voluntary

manslaughter. The court gave the following instructions on how the jury was to deliberate on the greater offense of capital murder (Count 2):[28]

> The law permits the jury to determine whether the government has proven the guilt of a defendant for any other offense which is, by its very nature, necessarily included in the crime of murder that is charged in Count 2 of the indictment.
>
> If the jury should unanimously find that the government has proven each of the elements – each of the essential elements of the offense of murder that is charged in Count 2 of the indictment beyond a reasonable doubt, the foreperson should write "guilty" in the space provided and the jury's consideration of that count is concluded.
>
> If the jury should determine unanimously that the government has not proven each element of the offense of murder that is charged in Count 2 of the indictment beyond a reasonable doubt, the foreperson should write "not guilty" in the space provided and the jury show [sic] then consider the guilt or innocence of defendant, Shannon Wayne Agofsky, for the other offense of voluntary manslaughter which is necessarily included in the offense of murder charged in Count 2 of the indictment.
>
> If, after reasonable efforts have been unsuccessful, the jury is unable to reach a verdict as to whether or not the government has proven each element of the offense charged in Count 2 of the indictment, the jury should then consider whether defendant, Shannon Wayne Agofsky, is guilty or not guilty of the crime of voluntary manslaughter which is necessarily included in the offense of murder charged in Count 2 of the indictment.
>
> Of course, if the government has not proved beyond a reasonable doubt that the defendant committed voluntary manslaughter, your verdict must be not guilty of all charges as to Count 2.

Tr. Vol. 20, 361-62.

302. The Court went on to instruct on the lesser-included offense of voluntary manslaughter.

> Title 18, United States Code, Section 1112, makes it a crime for anyone to unlawfully kill another human being, *without malice.*

---

[28] The court gave substantially the same instruction on Count 1. Tr. Vol. 20, 357.

> For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> First, that the defendant unlawfully killed Luther Plant;
>
> Second, that the defendant did so *without malice,* that is, upon a sudden quarrel or heat of passion;[29]
>
> Third: That the killing took place within the territorial jurisdiction of the United States; and
>
> Fourth: That the defendant did not act in self-defense.
>
> The term "heat of passion" means a passion of fear or rage in which the defendant loses his normal self-control as a result of circumstances which would provoke such a passion in an ordinary person, but which did not justify the use of deadly force.

Tr. Vol. 20, 363 (emphasis added).

303.    Because the "heat of passion" that reduces murder to manslaughter, by definition, negates the "malice" that is a necessary element of murder, this series of instructions was erroneously burden-shifting. An instruction that correctly allocated the burden of proof would not have required the jurors to find an absence of malice to convict Mr. Agofsky of voluntary manslaughter but would have required the government to prove the absence of "heat of passion" to convict him of murder. Instead, the Court advised the jurors that they should convict of the lesser offense only if affirmatively convinced that Mr. Agofsky had acted without malice, *i.e.*, in the heat of passion, depriving him of the benefit of the entire range of uncertainty the jurors might have between a firm conviction that he acted with malice beyond a reasonable doubt (and was thus guilty of murder) and a firm conviction that he acted in the heat of passion.

304.    These instructions misstated the law and may have misled the jurors. The burden is on the prosecution to "*disprove* the existence of adequate provocation when the evidence suggests

---

[29] Defendant's proposed instructions also contained this sentence. A121.

that it may be present." *United States v. Browner*, 889 F.2d 549, 552 (5th Cir. 1989) (citing *United States v. Comosona*, 848 F.2d 1110 (10th Cir. 1988); *United States v. Lincoln*, 630 F.2d 1313 (8th Cir. 1980); *United States v. Lopez*, 575 F.2d 681 (9th Cir. 1978); *United States v. Reagan*, 453 F.2d 165 (6th Cir. 1971)) (noting that as a consequence convictions for voluntary manslaughter as lesser included offenses on indictments for murder are not uncommon). *See also United States v. Quintero*, 21 F.3d 885, 890 (9th Cir. 1994) ("[T]he burden is on the Government to prove beyond a reasonable doubt the absence of a sudden quarrel or heat of passion before a conviction for murder can be sustained." (citing *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975)). The jury instructions fell far short of this requirement, however, instead improperly presuming an element of the crime and implicitly imposing a burden on the defendant to disprove the element. If the jurors had a reasonable doubt on the question whether Mr. Agofsky acted with malice or with passion, he was entitled to acquittal of the greater offense and the appropriate verdict was voluntary manslaughter. The instructions deprived Mr. Agofsky of the benefit of such a reasonable doubt, and should have prompted trial counsel's objection.

305.    Counsel made no objection to the Court's failure to instruct the jury on how to assess the testimony of Richard Ward. As noted in ¶ 292, the defense made one unsuccessful pretrial effort to interview Ward, the only witness to testify that Mr. Agofsky initiated an attack on Plant. Ward testified without objection that he received no consideration for his testimony. As set forth in ¶ 290, *supra,* the defense made no attempt to impeach Ward with a report demonstrating that he was in fact promised consideration with the prosecutor's approval. And defense counsel exacerbated the initial blunder by failing even to insure that the Court instructed the jurors to view Ward's testimony with caution.

306.    The Court gave the following instruction without objection:

Immunity

> The testimony of one who provides evidence against a defendant for personal advantage or vindication must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. You, the jury, must decide whether the witness' testimony has been affected by any of those circumstances, or by the witness' interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received or may receive. You should keep in mind that such testimony is always to be received with caution and weighed with great care. You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

Tr. Vol. 20, 349-50.

307. As Black and Barlow knew, the only witness who had any expectation of consideration for his testimony was Richard Ward. But the jury could not possibly have understood that it applied to him and that they should view his testimony with caution. First, they had heard no evidence that Ward or anyone else had received "immunity." Furthermore, thanks to counsel's failure to impeach Ward, they had no idea that Ward had received any promise of consideration at all. Therefore, as they weighed Ward's testimony they could not have realized that this cautionary instruction applied to him. Trial counsel were deficient in failing to insure that the court gave the instruction in a way that made its application to Ward clear, by mentioning him by name, and/or omitting the reference to "immunity," and/or advising them that he had received a promise of consideration for his testimony.

308. The Fifth Circuit made clear in *United States v. Villafranca,* 260 F.3d 374 (5th Cir. 2001), that a line of cases requires the trial judge to give careful and specific instructions regarding the credibility of a witness who has been or expects to be compensated for his testimony. *Id.* at 378 n. 16 (quoting *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315-16 (5th Cir. 1987); *United States v. Dukes*, 139 F.3d 469, 476 (5th Cir. 1998); *United States v. Kaufman*, 858 F.2d

122

994, 1005 (5th Cir. 1988); *United States v. Goff*, 847 F.2d 149, 161 (5th Cir. 1988); *United States v. Rizk*, 833 F.2d 523, 525 (5th Cir. 1987)). A general instruction tracking the pattern instruction for testimony of an accomplice, informer, or in exchange for immunity does not meet this requirement and may invite reversal. *Villafranca*, 260 F.3d at 380.

309. Counsel also offered no objection to instructions that failed to make clear the jurors' duties in assessing the alleged oral statements of Mr. Agofsky. The Court, without objection, gave the following instruction on the voluntariness of statements, which did not instruct the jurors to consider, not only whether the statement was voluntary, but whether it was accurately reported:

> In determining whether any statement claimed to have been made by a defendant outside of court and after an alleged crime has been committed was knowingly and voluntarily made, you should consider the evidence concerning such a statement with caution and great care, and should give such weight to the statement as you feel it deserves under all the circumstances.
>
> You may consider in that regard such factors as the age, sex, training, education, occupation, and physical and mental condition of the defendant, and all the other circumstances in evidence surrounding the making of the statement.

Tr. Vol. 20, 352-53.

310. Defense counsel's failure to object to this instruction was prejudicially deficient performance because it failed to focus the jurors' attention on the accuracy—as opposed to the voluntariness—of statements made orally and not recorded until months after the incident. Tr. Vol. 18, 63. It is the province of the jury to address the reliability and credibility of statements made by witnesses and defendants. *See Crane v. Kentucky*, 476 U.S. 683, 688 (1986) (holding that exclusion of testimony concerning circumstances of confession held admissible denies the defendant an opportunity to challenge the credibility of the testimony before a jury) (citing *Jackson v. Denno*, 378 U.S. 368 (1964), and *Lego v. Twomey*, 404 U.S. 477 (1972)); *United States v. Miliet*, 804 F.2d 853, 858-59 (5th Cir. 1986) (applying *Crane*, 476 U.S. 683).

123

311. Counsel's failure to ensure that the jurors focused on the key question concerning the oral statement—whether Matt had accurately reported it—and their failure to ensure the jurors understood that the "immunity" instruction applied to Ward, was deficient performance. *See Freeman v. Class*, 95 F.3d 639 (8th Cir. 1996) (counsel ineffective for failure to request cautionary instruction on accomplice testimony).

312. Counsel's failure to object to any of these erroneous instructions was deficient performance. Even if the defense had never presented any of the evidence it could have offered, as detailed in the sections above, ensuring that the court gave proper jury instructions could have changed the outcome. The defense called two witnesses who contradicted the government's only eyewitness, Richard Ward. If the jurors had known that they must view both Ward's testimony and Matt's account of Mr. Agofsky's oral statements with suspicion, and if the Court had instructed them to give Mr. Agofsky the benefit of any doubts they had about whether he acted with malice, they might have acquitted Mr. Agofsky outright or convicted him of only voluntary manslaughter. There is a reasonable probability that, but for counsel's deficient performance, alone and in conjunction with the other instances of deficient performance summarized herein, the outcome of the guilt and penalty phases would have been different. U.S. Const. Amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984).

### 3. Counsel Failed To Object To Burden-Shifting Murder and Manslaughter Instructions.

313. Trial counsel failed to object to instructions that obscured the mirror relationship between "malice" murder and "heat of passion" manslaughter, and failed to instruct the jury that

the government must disprove heat of passion before it could obtain a conviction of murder.[30] In addition, the "progression" charge—instructing the jury to resolve the murder charge before considering its manslaughter instructions—precluded the jury from even considering whether the heat of passion evidence negated malice. Both aspects of the instructions unconstitutionally shifted or lightened the government's burden. *In re Winship*, 397 U.S. 358 (1970); *Mullaney v. Wilbur*, 421 U.S. 684 (1975). Trial counsel was ineffective for failing to object.[31]

*i.      The Dueling "Malice" Instructions.*

314.    The court gave two malice instructions, one applicable for murder only and the second applicable only if the jury failed to convict on murder and turned to voluntary manslaughter. The Court mentioned the mutually exclusive relationship between malice and heat of passion only in the manslaughter instruction, where it mis-allocated the burden of proof, and said nothing at all about heat of passion in the murder instruction. This was error. The "murder" malice instruction was as follows:

> To kill "with malice aforethought" means to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life. To find malice aforethought, you need not be convinced that the defendant hated the person killed or felt ill will toward the victim at that time.

---

[30] On each of the murder counts, the court correctly listed as the final element "that the defendant did not act in self-defense," Tr. Vol. 20, 360, 356, but it did not instruct the jury to make the same finding respecting heat of passion.

[31] *Strickland v. Washington*, 466 U.S. 668 (1984); *Reagan v. Norris*, 365 F.3d 616 (8th Cir. 2004) (counsel ineffective for failure to object to instructions); *Gray v. Lynn*, 6 F.3d 265 (5th Cir. 1993) (counsel ineffective for failure to object to erroneous jury instruction on elements of attempted murder); *United States v. Stracener*, 959 F.3d 31 (5th Cir. 1992) (counsel ineffective for failure to object to erroneous instruction on aiding and abetting); *Hall v. State*, 161 S.W.3d 142 (Tex. Crim. App. 2005) (counsel ineffective for failure to object to erroneous instructions).

> In determining whether the killing was with malice aforethought, you may consider the use of a weapon or instrument in the manner in which the death was caused.

Tr. Vol. 20, 360.

315. Conspicuously absent from this charge was any consideration of "heat of passion," which under statute circuit law negates malice, or any indication that the government had the burden of proving that the killing *was not* a result of "heat of passion." The court then gave the following instructions on how the jury was to deliberate on the greater offense of capital murder (Count 2):[32]

> If, after reasonable efforts have been unsuccessful, the jury is unable to reach a verdict as to whether or not the government has proven each element of the offense charged in Count 2 of the indictment, the jury should then consider whether defendant, Shannon Wayne Agofsky, is guilty or not guilty of the crime of voluntary manslaughter which is necessarily included in the offense of murder charged in Count 2 of the indictment.
>
> Of course, if the government has not proved beyond a reasonable doubt that the defendant committed voluntary manslaughter, your verdict must be not guilty of all charges as to Count 2.

Tr. Vol. 20, 362.

316. The Court went on to instruct on the lesser-included offense of voluntary manslaughter, instructions the jury was only to consider in the event it failed to convict of murder:

> Title 18, United States Code, Section 1112, makes it a crime for anyone to unlawfully kill another human being, without malice.
>
> For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> First: That the defendant unlawfully killed Luther Plant;

---

[32] The court gave substantially the same instruction on Count 1. Tr. Vol. 20, 357.

126

> Second: *That the defendant did so without malice, that is, upon a sudden quarrel or heat of passion;*[33]
>
> Third: That the killing took place within the territorial jurisdiction of the United States; and
>
> Fourth: That the defendant did not act in self-defense.
>
> The term "heat of passion" means a passion of fear or rage in which the defendant loses his normal self-control as a result of circumstances which would provoke such a passion in an ordinary person, but which did not justify the use of deadly force.

Tr. Vol. 20, 363 (emphasis added).

317. This charge—already erroneous because it confined the consideration of absence of malice only to the manslaughter deliberations—also failed to allocate the burden of proving that Mr. Agofsky *did not* act under heat of passion to the government. These instructions therefore misstated the law and misled the jurors. Voluntary manslaughter is, by definition, a homicide committed without malice. 18 U.S.C. § 1112(a) ("Manslaughter is the unlawful killing of a human being **without malice** . . . upon a sudden quarrel or heat of passion.") (emphasis added). Provocation, i.e., sudden quarrel or heat of passion—of which there was considerable evidence here—negates malice. Accordingly, the prosecution bears the burden of "*disprov[ing]* the existence of adequate provocation when the evidence suggests that it may be present." *United States v. Browner*, 889 F.2d 549, 552 (5th Cir. 1989) (citing *United States v. Comosona*, 848 F.2d 1110 (10th Cir. 1988).[34]

---

[33] Defendant's proposed instructions also contained this sentence. A121.

[34] *See also United States v. Lincoln*, 630 F.2d 1313 (8th Cir. 1980); *United States v. Lopez*, 575 F.2d 681 (9th Cir. 1978); *United States v. Reagan*, 453 F.2d 165 (6th Cir. 1971)) (noting that as a consequence convictions for voluntary manslaughter as lesser included offenses on indictments for murder are not uncommon); *see also United States v. Quintero*, 21 F.3d 885, 890 (9th Cir. 1994) ("[T]he burden is on the Government to prove beyond a reasonable doubt the absence of a sudden quarrel or heat of passion before a conviction for murder can be sustained." (citing *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975)).

318.     The jury instructions fell far short of this requirement, instead improperly telling the jury that the prosecution must affirmatively prove the sudden quarrel or heat of passion. The instruction thus presumed an element of the crime—the absence of heat of passion and provocation—and implicitly imposed a burden on the defendant to disprove the element. If the jurors had a reasonable doubt on the question whether the government had proven malice and disproven heat of passion, Mr. Agofsky was entitled to acquittal of the greater offense and the appropriate verdict was voluntary manslaughter. The instructions deprived Mr. Agofsky of the benefit of such a reasonable doubt, and should have prompted trial counsel's objection.

319.     The Fifth Circuit's opinion in *United States v. Molina-Uribe*, 853 F.2d 1193, 1203-04 (5th Cir. 1988), *overruled on other grounds*, *United States v. Bachynsky,* 934 F.2d 1349 (5th Cir. 1991), does not control this case. In *Molina-Uribe*, the defendant complained that the jury should have been instructed that the government had the burden of disproving heat of passion, relying on the Supreme Court precedent of *Mullaney*, 421 U.S. 684 (finding unconstitutional Maine instruction presuming malice unless heat of passion proved by defendant by the preponderance of the evidence). The court declined to follow *Mullaney,* noting a key distinction; in *Mullaney* malice was implied, whereas under the instructions in *Molina-Uribe* it was not. *Molina-Uribe*, 853 F.2d at 1204 (no requirement to "prove the absence of heat of passion ... when the element of malice is neither presumed nor required to be disproved by the defendant"). Thus in the absence of implied malice, there was no unfair burden-shift to the defense to negate a required element. In Mr. Agofsky's case, however, in the language of the jury instruction and on these facts, malice *was implied*. As to first degree murder, the jury was charged on to the elements the government had to prove:

First: That the defendant unlawfully killed Luther Plant;

128

Second: That the defendant killed Luther Plant with malice aforethought;

Third: That the killing was willful[], deliberate, malicious and premeditated;

Fourth: That the killing took place within the special territorial jurisdiction of the United States; and

Fifth: That the defendant did not act in self-defense.

Tr. Vol. 20, 360.

320.    The court then defined malice in relevant part as follows: "To kill 'with malice aforethought' means to kill another person *deliberately and intentionally. . .*" *Id*. Under this tautological instruction, malice was not only presumed, it was compelled by the jury's finding that the murder was "willful", "deliberate," and "premeditated", also necessary elements under the court's instruction. This compelled finding is no different than the presumption instruction in *Mullaney*. The relegating of any consideration of heat of passion to the voluntary manslaughter deliberations could only have been taken by the jury to mean that malice was otherwise presumed as to their murder deliberations in light of their concurrent finding of premeditation (as it was explicitly instructed). Thus, under the instructions as given in this case, *Mullaney*, not *Molina-Uribe*, controlled.

321.    Also, the burden-of-proof charge in *Molina-Uribe*, unlike the charge in this case, did not affect the defendant's right to present a defense. The defense in *Molina-Uribe* was that someone else was the killer, 853 F.2d at 1200 ("Molina's defense ... was that it was not he who shot Ramos, but rather that Ramos was the victim of a conspiracy and assassination by fellow DEA agents"), and thus the failure to give the burden of proof charge did not undermine Molina-Uribe's right to present a defense. In contrast, in this case, the defense was that Plant was the initial aggressor, and accurate instructions were crucial to the success of that defense. The instructions here left the jury with no way to meaningfully apply the defense evidence to its deliberations. It

129

has long been established that, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal citations omitted) (*quoting California v. Trombetta*, 467 U.S. 479, 485 (1984).[35] It is equally well-established that a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor. *Mathews v. United States*, 485 U.S. 58, 63 (1988).[36] The instructions here gave the jury no guidance on how the defense evidence could apply to its deliberations on malice. Counsel had an obligation to seek an instruction that not only imposed on the government the burden of disproving heat of passion but that also required that the jury view the government's proof of malice in light of the evidence *offered by the defense*, and if—as a result of that evidence—the jury had reasonable doubt as to malice or any other element, it must acquit.

322. It is also clear that *Molina-Uribe's* 1988 holding did not survive the Supreme Court's pronouncements in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002). In *Ring*, the Supreme Court, citing *Apprendi*, made clear in no uncertain terms that, "If a State makes an increase in a defendant's authorized punishment contingent on the finding

---

[35] *See also Holmes v. South Carolina*, 547 U.S. 319, 324-25 (2006) (affirming this principle); *see In re Oliver*, 333 U.S. 257, 273 (1948); *Washington v. Texas*, 388 U.S. 14, 22-23 (1967); *Chambers v. Mississippi*, 410 U.S. 284 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations").

[36] *See also Stevenson v. United States*, 162 U.S. 313 (1896); *United States v. Harrelson*, 754 F.2d 1153, 1173 (5th Cir. 1985) (where "instruction concerned an important point in the trial, failure to give it seriously impaired [defendant's] ability effectively to present a given defense"); *Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002) ("[T]he right to present a defense would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense;" citations omitted).

of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Id*. at 602. Under *Apprendi* and *Ring* there can be no "presumption" exception to the government's burden. If it is a fact that must be proved, however characterized, it must be found by a jury beyond a reasonable doubt. Under the Circuit's law, malice means the absence of "sudden quarrel or heat of passion" and to comport with *Apprendi* and *Ring* any instructions must apprise the jury of the full extent of the government's burden.

323.    Finally, the Eighth Amendment requires that the jury be charged as to the heat of passion burden, also taking this case out of the purview of *Molina-Uribe* (which was non-capital). The Eighth Amendment's requirements of heightened "reliability in the determination that death is the appropriate punishment in a specific case," *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976), mandates that in capital cases instructions scrupulously adhere to the burdens inuring to the government. In *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980), the Supreme Court made clear that these heightened protections extend to the guilt phase of capital trials, in that case holding that the federal Due Process Clause requires lesser included offense instructions in all capital trials so as to ensure the jury does not default to a charge greater than warranted under the facts. The same concerns apply here.

### ii.    The "Progression" Instructions.

324.    The "progression" instructions exacerbated the harm caused by the burden-of-proof instructions, preventing the jurors from *even considering* whether the heat of passion negated the necessary malice unless they had already acquitted, or found themselves unable to agree, on murder.

325.    As to malice the jury was instructed:

> To kill "with malice aforethought" means to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life. To find malice aforethought, you need not

131

> be convinced that the defendant hated the person killed or felt ill will toward the victim at that time.
>
> In determining whether the killing was with malice aforethought, you may consider the use of a weapon or instrument in the manner in which the death was caused.

Tr. Vol. 20, 360.

326. This portion of the charge was silent as to how the jury should view claims that Mr. Agofsky acted in the face of provocation, "sudden quarrel" or "heat of passion." Rather the jury was specifically instructed to consider provocation only in their manslaughter deliberations, which—following the court's instruction—they never reached. Tr. Vol. 20, 362 (jury to consider heat of passion, sudden quarrel, and other elements of manslaughter only if it failed to convict of murder).

327. Under the court's explicit instruction, the jury was not to consider the "elements" of manslaughter if it returned a guilty verdict on murder. Only if the jury had acquitted or failed to reach a verdict was it permitted to consider the "elements" of manslaughter, including heat of passion. The only reasonable interpretation of this charge, in contrast to the self-defense charge, was that "sudden quarrel" and "heat of passion" evidence was relevant only in the context of whether Mr. Agofsky committed manslaughter, a question it was to reach only in the event it failed to convict him of first degree murder. Indeed, the jurors were explicitly so charged. Instead, as explained above, the court should have instructed the jury to consider the heat of passion evidence, not after it failed to convict on the murder count, but during its deliberations on first degree murder. And it should have instructed the jurors that they must find there was no heat of passion in order to convict of murder.

328. As demonstrated elsewhere in this Motion, trial counsel's performance was deficient for failing to object to erroneous instructions, instructions which absolved the

government of its burden of proving each element beyond a reasonable doubt and prevented the jurors from reaching a verdict of manslaughter if they had reasonable doubts about malice.

329. Mr. Agofsky was prejudiced. The defense was self-defense and heat of passion. The defense presented evidence that Plant, a violent "career offender," was the initial aggressor, and engaged in an unprovoked attack of Mr. Agofsky. The jury, had it been charged correctly, could have concluded that, although he may have acted unlawfully, he did so without malice, and returned a verdict of manslaughter. At the least, a correctly instructed jury could have entertained a reasonable doubt on the question of malice, and accordingly delivered a manslaughter verdict. Such a conclusion is also supported by the jury's finding in the penalty phase that the killing was not intentional, demonstrating, at a minimum, confusion as to the government's burden. There is a reasonable probability that, but for counsel's failure to object to—and thus prevent—the unconstitutional instruction, the jury could have acquitted Mr. Agofsky outright, convicted him only of manslaughter, or imposed a sentence less than death. At the very least, there is a reasonable probability that he would have obtained appellate relief for preserved error. For these reasons and others identified in this Motion, counsel's deficient performance prejudiced the defense and deprived Mr. Agofsky of the effective assistance of counsel.

4. Counsel Failed To Object To The Erroneous Murder Instruction.

330. Trial counsel failed to object to other erroneous and confusing aspects of the murder instructions. Collectively, the instructions resulted in inconsistent jury verdicts regarding intent at the guilt-innocence phase (where the jury found Mr. Agofsky guilty of one count that required premeditation) and the penalty phase (where they found that he acted without intent to kill). The court gave the following instruction as to first degree murder:

> Title 18, United States Code, Section 1111, makes it a crime for anyone to murder another human being with malice aforethought.

133

> Every murder perpetrated willfully, deliberately, maliciously, *or* with premeditation is murder in the first degree.

Tr. Vol. 20, 359 (emphasis added).

331.     This instruction is erroneous. The court instructed the jury in the disjunctive, permitting it to find first degree murder if it *any* of the four options it delineated—willful, deliberate, malicious, or with premeditation—obtained. Thus, if the jury, under this instruction, found only malice (but not willfulness, deliberation, or premeditation) it was permitted to return a verdict of first degree murder. The result is that the government was absolved of its burden to prove all of the elements of first degree murder beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970).[37]

332.     That the court elsewhere stated the elements correctly, Tr. Vol. 20, 359, does not obviate the error. There was no objection to the erroneous instruction. Nor did the court disclaim the earlier erroneous instruction as incorrect or misleading. At best the jury was left with two competing and inconsistent instructions on what it must find before it convicted of first degree murder. This created "perfect storm" conditions for an irrational and unreliable result. Even assuming that the jurors accurately recollected the court's instruction during deliberations, they still could have reached a first degree murder verdict based solely on a finding that the killing, though not intentional, was with malice ("callous and wanton disregard for human life"). Not only did the erroneous instruction render this result likely, the sentencing verdict demonstrates that this is almost certainly what happened: the jury found at sentencing that the killing was not intentional.

---

[37] *See also Cage v. Louisiana*, 498 U.S. 39 (1990); *Osborne v. Ohio*, 495 U. S. 103, 122-23 (1990); *Carella v. California*, 491 U.S. 263, 265 (1989); *Francis v. Franklin*, 471 U.S. 307, 313 (1985); *Sandstrom v. Montana*, 442 U. S. 510 (1979).

### 5. Counsel Failed To Object To The Inconsistent And Confusing Malice Instructions

333. As developed at length in Ground 12.1(I)(3)(i) and (ii), the court gave two different malice definitions, one expressly applicable only to murder and the second expressly applicable only if the jury failed to convict on murder and had turned to voluntary manslaughter. The instructions were inconsistent and confusing. Although the law is clear that the jury could not convict of murder if the government failed to prove Mr. Agofsky did not act pursuant to heat of passion, it was told otherwise. The court instructed the jurors to rely on a definition that *excluded* consideration of the heat of passion in its murder deliberations, permitting the jury to find malice if it found the defendant acted "with callous and wanton disregard for human life." Tr. Vol. 20, 360. Moreover, the jury was not instructed that the government had to disprove heat of passion before it could find malice. *Id.* Rather, by its express instructions, "heat of passion" was a consideration only in the event it had failed to convict of murder. That the erroneous, confusing malice instruction resulted in an irrational and unreliable verdict is likewise borne out by the jury's later rejection at sentencing of the government case for intentional murder. It had the option of finding malice on a "reckless" standard without consideration of provocation from the victim or having to hold the government to its burden. Confusion reigned and the verdict at sentencing—finding the killing was not intentional—proves it.

### 6. Counsel Failed To Object To The Confusion Engendered By The Conflation Of "Federal Murder" And "Murder by Life Prisoner" Charges

334. Trial counsel sought pretrial to have one of the two murder counts dismissed for violation of double jeopardy. The Court of Appeals later held that the motion was wrongfully denied. *United States v. Agofsky*, 458 F.3d 369 (5th Cir. 2006) (SA 2521), yet denied any relief beyond vacating the extraneous charge. Not addressed by trial counsel during the charge

conference or after the court instructed the jury, however, was the that wrongful introduction into the jury's deliberations of the additional charge—and the instructions it was given—likely resulted in confusion as to what standard to apply.

335.    As to Count One (Murder by Life Prisoner) the jury was charged that it could convict if the jury found an unlawful killing with malice. The sole salient distinction between Count One, Murder by Life Prisoner, and Count Two, Federal Murder (as the Circuit later found), was the life sentence element. *Id.* at 371. In defining the two charges, the Court cross-referenced the definitions, ineluctably leading the jury to conflate the two counts. As to Count One the jury was instructed that "United States Code, 1118 makes it a crime for anyone, while confined in a federal correctional institution under a sentence for a term of life imprisonment to commit the murder of another human being. Murder means a *first degree or a second* degree murder as defined in Title 18, United States Code, Section 1111." Tr. Vol. 20, 355. While cross-referencing Section 1111, the jury was only instructed as to the definition of *second degree* murder. Tr. Vol. 20, 355-56. When it reached Count Two the court did the opposite. It began noting, "Title 18, United States Code, Section 1111, makes it a crime for anyone to murder another human being with malice aforethought," a definition that would apply to both counts. It then proceeded to charge the charge the jury only as to first degree murder and omitted the lesser included offense of second degree murder. Tr. Vol. 20, 359-62.

336.    Thus, because of the erroneous inclusion of the extraneous charge: The jury was given Section 1118 charge (Count One) that cross-referenced Section 1111 (Count Two). It was then informed that, "Section 1111, makes it a crime for anyone to murder another human being with malice aforethought," echoing the § 1118 charge. Once the court cross-referenced these

136

identical statutes (save for the life sentenced element), the jury was bound to conflate the two instructions (indeed required to).

337.    Compounding the confusion was the court's failure to charge on the respective greater and lesser-included murder offenses. Although first and second degree murder applied to both charges—and indeed was the basis of the Circuit's jeopardy ruling—the § 1118 charge only included second degree murder and the § 1111 only included first degree murder. Rather it was instructed that *Count One was controlled by the definitions found in Count Two*.

338.    Finally, the verdict sheet failed ensure that the jury understood its instruction. As to each count it was only given the option of "guilty" or "not guilty" of murder, with reference to the degree of murder it had decided upon. Again, the inclusion of the extraneous count (because of the trial court's denial of the double jeopardy motion), the cross-referencing of the definitions, and the Court's ineffectual attempt to distinguish these otherwise identical counts was a prescription for jury confusion. It is clear it conflated the definitions—as the court had done—and likely reached unanimity at best only as to second degree murder and again this conclusion is supported by the jury's later unanimous rejection of intentional murder at the penalty phase.

339.    Trial counsel was ineffective for failing to object to any of the erroneous instructions.[38] The instructions were erroneous in a way that would benefit only the government. There is and could be no reason to fail to object to these erroneous instructions. Mr. Agofsky was prejudiced. The erroneous instructions resulted in a diminution of the government's burden of

---

[38] *Strickland v. Washington*, 466 U.S. 668 (1984); *Reagan v. Norris*, 365 F.3d 616 (8th Cir. 2004) (counsel ineffective for failure to object to instructions); *Gray v. Lynn*, 6 F.3d 265 (5th Cir. 1993) (counsel ineffective for failure to object to erroneous jury instruction on elements of attempted murder); *United States v. Stracener*, 959 F.3d 31 (5th Cir. 1992) (counsel ineffective for failure to object to erroneous instruction on aiding and abetting); *Hall v. State*, 161 S.W.3d 142 (Tex. Ct. App. 2005) (counsel ineffective for failure to object to erroneous instructions).

proof, absolved it of proving each and every element beyond a reasonable doubt, and rendered the verdict wholly unreliable.

> ### 7. Trial Counsel Failed To Seek An Instruction On The Lesser Included Offense Of Second-Degree Murder On Count 2.

340. The court also erred by failing to instruct the jury on the lesser-included offense of second-degree murder as to Count 2 (Federal Murder), and counsel was ineffective for failing to request the charge and object to its omission.

341. Circuit law establishes when a defendant is entitled to a charge on a lesser included offense:

> a defendant is entitled to a lesser-included offense instruction when some of the elements of the crime charged constitute a lesser crime, there is an evidentiary basis for a finding of guilt on the lesser offense, and "the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense." *Sansone v. United States*, 380 U.S. 343, 350, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965). "[T]wo independent prerequisites" must be met before a defendant is entitled to an instruction on a lesser-included offense: "(1) the elements of the lesser offense must be a subset of the elements of the charged offense; and (2) the evidence at trial must be such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater". [*United States v. Browner* , 889 F2d 549, 550-51 (5th Cir. 1989)]; *United States v. Deisch*, 20 F.3d 139, 142 (5th Cir.1994).

*United States v. Harrison*, 55 F.3d 163, 166-167 (5th Cir. 1995).[39]

---

[39] *See also Keeble v. United States*, 412 U.S. 205, 208 (1973)) ("[I]t is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater"); *United States v. Neiss*, 684 F.2d 570, 571 (8th Cir. 1982) (lesser-included offense instruction should be given if "there is some evidence which would justify conviction of the lesser offense; [and] the proof on the element or elements differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense.").

342. There is no question that second degree murder is a lesser offense of first degree murder. 18 U.S.C. § 1111(a) defines murder in relevant part as:

> a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; ... is murder in the first degree.
>
> Any other murder is murder in the second degree.

18 U.S.C. § 1111(a).

343. Thus, by definition, all of the elements of second degree murder, unlawful killing of a human being with malice aforethought, are found in first degree murder. *See, e.g., United States v. Chagra*, 638 F. Supp. 1389, 1400 (W.D. Tex. 1986) ("A defendant on trial for first degree murder is automatically on trial for second degree murder because it is a 'lesser included offense' of first degree murder."). Similarly, there is no question that the facts would rationally support a finding of second degree murder. The jury could well have found that although malice was present, the government failed to prove the element of premeditation. There was evidence that the conflict was a situational one; Mr. Agofsky and the decedent were placed together in the recreation cage just prior to the incident and without advance knowledge of the identity of the cage-mates, there was no evidence of prior animus between the parties, and least at least two witnesses testified Plant was the initial aggressor. The confrontation had all the hallmarks of a prison-yard fight, without the time for cool reflection that typifies a premeditated killing. *United States v. Shaw*, 701 F.2d 367, 393 (5th Cir. 1983) ("Perhaps the best that can be said of deliberation is that it requires a 'cool mind' that is capable of reflection, and of premeditation that it requires that the one with the 'cool mind' did, in fact, reflect , at least for a short period of time before his act of killing."). Similarly, the jury could have found an unlawful killing in the sudden heat of passion but without adequate provocation. Thus the jury could rationally have returned a verdict of second degree murder which

139

fell between first degree murder and manslaughter in culpability. Indeed, the Court agreed that the jury must be charged as to manslaughter, an even lesser offense.

344. Mr. Agofsky easily meets the *Strickland* standard for counsel's ineffectiveness. As demonstrated above, Mr. Agofsky was entitled to have the jury charged as to the lesser included offense of second degree murder, yet counsel failed to seek the instruction or object to the court's erroneous instruction. Counsel's performance was deficient.

345. Further, Mr. Agofsky was prejudiced by counsel's inaction. A conviction for second degree murder would have precluded the possibility of a death verdict under 18 U.S.C.A. § 1111, the remaining count for which Mr. Agofsky stands convicted, and Mr. Agofsky was already serving a life sentence. As discussed above, in light of the provocation and other evidence arguing against premeditation, there is more than a reasonable probability that the outcome would have been different had the jury been correctly charged. Additionally, at the penalty phase, the jury unanimously found that the killing was not intentional, a finding which, if made at the guilt-innocence stage, would have precluded a first degree conviction. This is an additional indication that this was a close case in the minds of the jury.[40]

346. The court's murder instructions shifted the burden of proof on heat of passion from the government—which should have been required to disprove it in order to obtain a first-degree murder conviction—and improperly prevented the jurors from even considering heat of passion unless they had already acquitted Mr. Agofsky of murder. The court erroneously submitted the four mental states required for first-degree murder (willfully, deliberately, with malice, and with

---

[40] While the Fifth Circuit found no due process violation in these inconsistent verdicts, *United States v. Agofsky* 458 F.3d 369, 375 (5th Cir. 2006), the fact of the inconsistency can inform this court in assessing the probability that had the jury been correctly charged a different result may have obtained. *See also* Ground 12.3, *infra* (appellate counsel's inadequate briefing of inconsistent verdict claim was ineffective).

premeditation) alternatively instead of conjunctively. The court failed to submit the lesser-included offense of second degree murder; it gave inconsistent and confusing malice instructions; and it conflated the two forms of first-degree murder the jury was considering. Trial counsel's failure to object to any of these instructions was deficient performance. The juror's evident confusion, manifested when they found premeditation at the guilt-innocence phase following these erroneous instructions but found no intent to kill at the penalty phase after clear instructions, demonstrates that counsel's deficient performance prejudiced the defense. There is a reasonable probability that, but for counsel's deficient failure to prevent these instructions or at least preserve claims for appeal by making appropriate objections, Mr. Agofsky would have been acquitted of first-degree murder, would not have received the death sentence, or would have received appellate relief.

2.     <u>Counsel Failed To Object To The Prosecutor's Violation Of Mr. Agofsky's Fifth Amendment Rights Or His Misleading Summation Remarks.</u>

347.     Without objection, the prosecutor elicited inadmissible testimony concerning Mr. Agofsky's failure to make an exculpatory statement to prison officials. Additionally, he made misleading summation remarks about the nature of Richard Ward's expectation of leniency from the government. Despite the importance of Ward to the government's case, trial counsel made no objection to these remarks either. *See Girts v. Yanal,* 501 F.3d 743 (6th Cir. 2007) (counsel ineffective for failure to object to summation misconduct); *Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996) (counsel ineffective for failing to object to prosecutor's improper comments concerning defendant's post-arrest silence).

348.     In his direct examination of his first witness, Christopher Matt, the prosecutor asked him to recount oral statements that Mr. Agofsky had allegedly made after the Plant incident. Then he elicited Matt's testimony that Mr. Agofsky failed to make an exculpatory statement:

> Q: Did he say anything about self-defense to you?

141

A: No, sir.

Q: Did he say anything about self-defense to you at any time?

A: No, sir.

Q: From January 5, 2001, until today?

A: No, sir.

Tr. Vol. 18, 61.

349. Trial counsel made no objection to this line of questions, which were plainly improper. U.S. Const. Amend. V; *see Chapman v. United States*, 547 F.2d 1240, 1249 (5th Cir. 1977) ("When the prosecution uses defendant's post-arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous" where the prosecutor's use strikes at the "'jugular' of the defendant's story.") (citing *United States v. Harp*, 536 F.2d 601, 603 (5th Cir. 1976)); *see also United States v. Moreno*, 185 F.3d 465, 474-75 (5th Cir. 1999) (observing that even a sustained objection to government's reference to defendant's silence and a curative instruction do not automatically mean no constitutional violation occurred and still requires assessment of impact of testimony on jury's verdict).

350. In discussing Richard Ward, the prosecutor personally vouched for his credibility, without objection from the defense:

> Now, there's one thing I do want to clear up so that there's not a doubt about it for you. The witness testified that he has not been guaranteed any benefits for his testimony. *And that is absolutely true.* In the instructions, there is an instruction about such testimony. And when you weigh the testimony of a witness, you must decide whether the witness' testimony has been affected by benefits that he has received or may receive.
>
> Now, in all fairness here, he could get a sentence reduction; *but there is no agreement that that is going to be accomplished. There is no*

142

*guarantee that would be done.* It would be up to the judge who sentenced him, based upon a motion being filed by the prosecutor who prosecuted him, based upon information that I would provide to that prosecutor.

Tr. Vol. 20, 372-73. This argument was, at best, extremely disingenuous. As the prosecutor presumably knew—although the jury did not, because Black had failed to cross-examine Ward about the relevant report—the discovery provided to defense counsel included a report stating that Ward had agreed on May 14, 2004, to cooperate with the government in return for support for a time cut under Fed. R. Crim. P. 35, and that the (unnamed) Assistant United States Attorney involved in the case agreed. A105-106. It would have been improper for the prosecutor to function as an unsworn witness by asserting as fact, without support in the evidence, that there was "no agreement" with Ward, even if that had been true. In fact, to assert that it was "absolutely true" that Ward had no agreement, without mentioning that the prosecution in Mr. Agofsky's case had agreed, not just to provide "information" to Ward's prosecutor, but to recommend a time cut for him, was extremely misleading.

351. The prosecutor also committed misconduct and violated due process at the guilt-innocence phase by urging the jury to convict Mr. Agofsky, not because it had met its burden of proving each element beyond a reasonable doubt, but because if it failed to convict, "the inmates [would be] running the penitentiary." Tr. Vol. 20, 400. He also injected his personal opinion in Mr. Agofsky's guilt and sought to inflame the passions of the jury by claiming that Mr. Agofsky beat Plant "unmercifully" and characterizing Mr. Agofsky as "cold blood[ed]" and "ruthless[]." Counsel was ineffective for failing to object.

352. The prosecutor made the following argument in urging the jury to convict:

> You must find him guilty. That's what the evidence cries out for. Guilty of Count 1 and 2, that's what the evidence shows, that's what the instructions show, and that's what is just. *Otherwise, the inmates are running the penitentiary.* Their defense, the inmates would have influenced you in this decision. Don't let them do that. *We are in control, people like Christopher Matt and his credibility.*

143

Tr. Vol. 20, 400 (emphasis added).

353.    This argument was improper. It functioned to inflame the passions of the jurors by raising the specter of a complete loss of control of our penal institutions, and by implication the endangerment of correctional officers and the public, if they failed to convict. The fear-mongering was explicit; if the jurors failed to convict, then "[w]e" are no longer in control of the prisons. The argument also tied the fears of rampaging inmates to whether the jurors accepted the credibility of Officer Matt, which was also improper, as this placed the responsibility of future incidents on the jury if it dared to question Matt's credibility rather than assess his testimony as it would that of any other witness.

354.    Due process is violated when a prosecutor's summation relies not on the evidence, but burdens the jury with societal ills extrinsic to the case. As one court has stated:

> A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.

*United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984).[41]

---

[41] *See also United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992) ("We conclude that by urging the jury to act as a 'bulwark against ... putting this poison on the streets,' the prosecutor in this case appealed to the jurors to be the conscience of the community in an improper and inflammatory manner"); *United States v. Solivan*, 937 F.2d 1146, 1155 (6th Cir. 1991) (improper to urge jurors to convict in order to send message to "other drug dealers"); *United States v. Barlin*, 686 F.2d 81, 93 (2d Cir.1982) (prosecutor improperly appealed to the jury's passion and emotion by characterizing its job as "the one occasion on which you have a duty to do something about the drug traffic in our community"); *United States v. Love*, 534 F.2d 87, 89 (6th Cir. 1976) (finding misconduct where prosecutor injected specter of organized crime and the Mafia); *Dunn v. United States*, 307 F.2d 883, 885-886 (5th Cir. 1962) (reversible error where prosecutor maintained the case was the most flagrant he had ever tried and remarked that all politicians take kickbacks).

355.     The misconduct could not be more plain. The prosecutor urged, "You must find him guilty . . . Otherwise, the inmates are running the penitentiary." This is a direct appeal the jury to carry a burden with which they were neither charged nor had a right to assume. Its duty was to assess the facts as they pertained to Mr. Agofsky, not to send a message to other inmates, or protect correctional officers or the public generally.

356.     The prosecutor's characterization of Mr. Agofsky as cold-blooded, ruthless, and merciless was also unnecessary hyperbole designed to inflame the jury. These are not words that are descriptive of facts alone, but rather clothed in the prosecutor's personal opinion of guilt. *United States v. Shaw*, 701 F.2d 367, 391-392 (5th Cir. 1983) (reference to defendant as cold-blooded "improper;" isolated instance of misconduct cured by immediate admonition by judge, and where evidence of premeditation "not close").

357.     The prosecutor also committed misconduct at the guilt-innocence phase by urging the jury to reject the defense arguments and accept the government's because defense counsel's job was only representing Mr. Agofsky "the best way he can" whereas the prosecutor represented the "United States of America." In closing, the prosecutor stated, "I don't expect Mr. Black to agree with me at all. He's not representing the United States of America. He's defending the defendant the best way he can." Tr. Vol. 20, 394. The import was clear; defense counsel was just going through the motions, saddled with the burden of representing a "defendant" (thus Black's summation should be summarily rejected) whereas the prosecutor's remarks enjoyed the imprimatur of the "United States" (and thus should be accepted on those grounds). A prosecutor

may not denigrate the role of defense counsel as grounds to reject the defense case.[42] Nor is it proper ask the jury to accept the government's case simply because the prosecutor purports to represent the "United States of America."[43]

358.    The prosecutor further committed misconduct by injecting his personal opinion as to the credibility of government witness Officer Christopher Matt. In arguing Matt's credibility, the prosecutor stated:

> It all boils down, really, to the strength you give to Christopher Matt and a person who *we trust, we put in harm's way, we represent[,] the Justice Department[,] there as a corrections officer*.

Tr. Vol. 20, 399 (emphasis added).

359.    The Eleventh Circuit has articulated a standard for assessing when a prosecutor crosses the line from zealous advocacy into the realm of personal vouching:

> First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the "witness" veracity. Secondly, a prosecutor may implicitly vouch for the "witness" veracity by indicating that information not presented to the jury supports the testimony.

*United States v. Knowles*, 66 F.3d 1146, 1161 (11th Cir. 1995). The Fifth Circuit has endorsed this formulation. *Jackson v. Johnson*, 194 F.3d 641, 653 (5th Cir. 1999) ("According to this suggested inquiry [*Knowles*], a prosecutor improperly vouches for a witness by making explicit assurances of the 'witness' veracity or by alluding implicitly to information not presented").

---

[42] *United States v. Young*, 470 U.S. 1, 9 (1985) (improper for an attorney to make "unfounded and inflammatory attacks" on opposing counsel); *United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990) (reversing conviction where prosecutor *inter alia* stated that "while some people ... go out and investigate drug dealers and prosecute drug dealers and try to see them brought to justice, there are others who defend them, try to get them off[.]").

[43] *See United States v. Smith*, 962 F.2d 923, 933 (9th Cir. 1992) (error for prosecutor to reinforce opinion of government's witness's credibility "with repeated comments aimed at establishing his own veracity and credibility as a representative of the government").

360. Here, the prosecutor made "explicit assurances" of Matt's credibility. He repeatedly claimed that Matt should be believed because "we" trust him, "we" put him in harm's way, and "we" represent him.[44] The prosecutor was unambiguously invoking the prestige of the government, including, explicitly, the "Justice Department['s]" endorsement of Matt, in urging the jury to accept Matt's version of events as opposed to the word of "inmates" seeking to wrest "control" of the institution. The invocation of the Matt's relationship with the Justice Department violates the alternative prong of *Knowles* as well, as it implies that Matt is an officer in good standing and one whose record would give no cause to doubt his word, all extra-record considerations.

361. The Fifth Circuit has not hesitated to condemn the practice of vouching for the credibility of witnesses:

> [T]he prosecutor made extremely improper remarks of two varieties, both of which have often been discussed by this Court. First, the prosecutor sought personally to bolster the credibility of its key witnesses, Juarez and Gonzales, by reference to matters which were outside the record in the case. For instance, he inserted repeatedly his opinion of their motives. Of Gonzales, for example, the prosecutor insisted, "He wants to make this a better place. He wants to improve things. He wants to make that a prettier picture on the wall than it is right now." At another point, the prosecutor asserted that Juarez and Gonzales "get up here and say that's the man. If it wasn't the man, they wouldn't have any reason to say it, ladies and gentlemen." On rebuttal he took up this cudgel again, asserting of both Gonzales and Juarez, "I think their motives are pure as the driven snow. Their motives are to get out and make this world a better place to live in." Aside from personally vouching for his witnesses' motives and general integrity, the prosecutor attempted to bolster their credibility by maintaining that they had taken on the responsibility for doing an "unpleasant job" and that they were

---

[44] There is no question that when the prosecutor used the pronoun "we," he was referring to the "United States." *See* e.g., Tr. Vol. 20, 394 (using "we" and "United States" interchangeably while urging the jury to reject the defense counsel's arguments as his duty is only to the defendant).

> "professional" and "dedicated" men, doing a good job and the "right
> thing."

*United States v. Garza*, 608 F.2d 659, 664 (5th Cir. 1979). The Court went on to bemoan the

frequency of due process violations noting that the "court has all too often had to make such a

determination." *Id*.

362.     The remarks here were no less damaging than the "extremely improper remarks"

uttered in *Garza*. As in *Garza*, the prosecutor vouched for the witness, describing him as someone

"we trust" and "we represent." The remark, "We are in control, people like Christopher Matt and

his credibility," was an unabashed endorsement of Matt's credibility by posing him as a dedicated

stalwart against those inmates who would seek take control of the institution. And as in *Garza* the

prosecutor's remarks comprised "textbook examples of what a closing argument should not be."

*Id*., 608 F.2d at 664 n.3.

363.     Counsel had no reasonable strategic or tactical reason for failing to object to these

improper comments. A timely objection—and at a minimum a request for a curative instruction—

would have ameliorated the prejudice inherent in the prosecutor's vouching for his witness's

credibility, expression of personal belief in Mr. Agofsky's guilt, the denigration of defense counsel

while trumpeting the prestige that inures to representatives of the "United States of America," and

the placing of responsibility for any future prison strife on the jury. As developed at length

elsewhere, prejudice was manifest. The evidence of premeditation and malice was razor thin at

best, the confrontation was situational and brief, and there was evidence that Plant, a violent career

criminal, was the initial aggressor. Had trial counsel objected and the prosecutor played fair, there

is a reasonable probability that the jury would have acquitted Mr. Agofsky, convicted him of a

lesser offense, or imposed a sentence less than death, or that he would have received appellate

relief for preserved error.

364.     Mr. Agofsky's defense hinged on one question, whether Plant initiated the attack. Yet trial counsel permitted the prosecutor to undermine Mr. Agofsky's case unfairly by suggesting that he had an obligation to preview his defense with the prison authorities, and by stating, falsely, that the only eyewitness who contradicted that defense received no promises for his testimony. Without objection from the defense, the jurors likely accepted the prosecutor's view of Mr. Agofsky's silence and Ward's credibility. Trial counsel's failure to object to the prosecutor's questions and remarks, which were plainly unconstitutional or highly misleading, was deficient performance. There is a reasonable probability that, but for counsel deficient performance, alone and in conjunction with the other instances of deficient performance summarized herein, the outcome of the guilt and penalty phases would have been different. U.S. Const. Amend. V, VI; *Strickland v. Washington*, 466 U.S. 668 (1984).

### 3.     Counsel Failed To Cross-Examine Witnesses On Specific Instances Of Violent Conduct

365.     Not only was counsel ineffective for failing to investigate and put before the jury evidence of Plant's violent reputation, *see* Ground 12.1(D)(2) & (E), counsel failed to object to evidence of Plant's "peaceful" character. Further, once the government's witness put forth evidence of Plant's character, counsel was also ineffective for failing to cross-examine him about specific instances of violent conduct, including Plant's convictions for three robberies, arson, firearms possession and drug dealing. Fed. R. Evid. 404, 405.

366.     Evidence Rule 404(a) provides that character evidence generally "is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Fed. R. Evid. 404(a). However, an exception exists for "[e]vidence of a pertinent trait of character of the victim of the crime offered by an accused." Fed. R. Evid. 404(a)(2). As addressed above, Plant's violent character was relevant to prove he was the initial aggressor.

367.    Rule 405 specifies the methods by which character may be proved. Subsection (a) provides that "proof may be made by testimony as to reputation or by testimony in the form of an opinion" and that, "[o]n cross-examination, inquiry is allowable into relevant specific instances of conduct." Fed. R. Evid. 405(a).

368.    The government elicited opinion evidence from Officer Christopher Matt about Plant's character for violence, portraying him, falsely, as non-violent.

> Q.    OK, now, you said you saw both the defendant and Luther Plant on a daily basis?
>
> A.    Yes, sir.
>
> Q.    You dealt with them and associated with them just daily and personal face-to-face contact on a daily basis?
>
> A.    Yes, sir.
>
> Q.    Okay. Did people pick on the defendant?
>
> A.    No, sir, I've never seen anybody pick on him.
>
> Q.    Did Luther Plant pick on the defendant?
>
> A.    I've never seen it.
>
> Q.    *Was Luther Plant the kind of people person who would pick a fight with the defendant?*
>
> A.    I've never seen him pick -- engage in any kind of fights or pick fights.
>
> ***
>
> Q.    And the -- are you aware of any, any reason that Luther Plant's drug usage would have been the cause of the initiation of this fight?
>
> A.    No, sir.
>
> Q.    In fact what you know is he never put up any fight at all?
>
> A.    *I've never seen him fight, sir.*

Tr. Vol. 18, 66 (emphasis added).

150

369.    The government presented Matt as competent to speak to Plant's reputation within the prison community. The government elicited that Matt knew Plant, saw him frequently, observed his interactions and associated with him on a daily basis, that he was not the "kind of person" who engages in violence and had a reputation for "not fighting." This was unquestionably reputation and opinion evidence of Plant's peaceful character, sufficient to warrant a response.[45]

370.    Counsel's performance was deficient because they did nothing to counteract Officer Matt's opinion testimony. Under Rule 405(a), inquiry into the basis of the opinion, including specific acts of violence, was permitted. However, not only did counsel fail to put before the jury evidence of Plant's violent reputation, they failed to impeach the government's claim that Plant possessed a peaceful, non-violent character.[46]

371.    Mr. Agofsky was prejudiced by counsel's inaction. As the record stands, the jury could well have rejected the self-defense claim based on this unimpeached reputation and opinion evidence. Since there was conflicting testimony as to whether Plant was the initial aggressor,

---

[45] *See, e.g., United States v. Matthews*, 440 F.3d 818, 825 (6th Cir. 2006) (impeachment as to specific acts permissible where witness testified defendant was a "good person" and that she had "never known him to do anything to get in trouble ... or do any illegal activities"; "no error in the district court treating [witness] as a character witness under Rule 405 of the Federal Rules of Evidence"); *United States v. Green*, 305 F.3d 422, 431 (6th Cir. 2002) (treating witness testimony that defendant was a "law-abiding citizen" as character evidence, thus opening the door to whether witnesses "were aware of an alleged seizure of $18,000 from Green at the Atlanta airport in 1979"); *United States v. Lewis*, 929 F.2d 702, 1991 WL 43903, *8 (table; text in Westlaw) (6th Cir. 1991) (by stating that he was "a law abiding citizen," defendant "opened the door" to questions relating to his past criminal conduct; that he did not intend to place his good character at issue deemed "irrelevant"); *United States v. Strong*, 17 M.J. 263, 266-67 (C.M.A. 1984) (in finding cross-examination on specific act permissible, court ruled the proponent "must accept responsibility not only for the specific evidence it offers ..., but also for the reasonable inferences which must be drawn from it").

[46] At a motion in limine before trial, the court barred reference to Plant's prior record. Tr. Vol. 18, 3-4. Counsel failed to recognize that Rule 405 permitted exploration of these facts on cross-examination once the government put forth evidence of good character. Tr. Vol. 18, 68.

evidence of Plant's otherwise peaceful character could well have been dispositive in the minds of the jury.

372. In fact, Plant had a long history of violence, weapons possession and drug dealing, evidence the jury did not hear at the guilt-innocence stage of trial:

- On March 4, 1981, Plant and a co-conspirator entered Buckley's Grocery Store in Orange, Texas, and robbed the clerk while brandishing a .22 caliber pistol. They removed approximately $100 from the cash register and fled the scene. Plant was convicted of Robbery.

- On December 30, 1981, Plant, along with a co-conspirator, entered Marie's Beauty Salon in Orange, Texas and robbed an elderly female cashier at the point of a .22 caliber pistol. The two stole $100 and fled the scene. Plant was convicted of Aggravated Robbery.

- On January 5, 1982, Plant and a codefendant entered Sam Paradise Real Estate in Vidor, Texas, and robbed an employee of $60 at the point of a .22 caliber pistol and fled the scene. Plant was convicted of Aggravated Robbery.

- On December 23, 1989, Plant and a co-conspirator burglarized the Texas Longhorn Club in Orange County, Texas. They stole four money bags from one safe and tried to gain entry to another safe with a blowtorch. That having failed, they ultimately hacksawed off the hinges and stole an additional three money bags. The two decided they did not want to leave any evidence and both spread papers and files over the floor. These were ignited with a cigarette lighter. The proprietor reported that over $500,000 was taken. Also stolen was an Iver Johnson .32 caliber revolver. This gun was found in Plant's possession upon his February 28, 1990 arrest. Plant was convicted of Arson of a Building Used in Interstate Commerce and Felon in Possession of a Firearm. The Probation Department classified this conviction as violent and Plant as a career offender.

- On February 28, 1990, Plant sold 25 capsules of Phenterrnine to an undercover officer working for the special drug enforcement unit of Orange County, Texas. Plant was convicted of Delivery of a Controlled Substance.

*See* Presentence Report, Luther Kenneth Plant. SA 2513-14.

373. Contrary to the government's claims about the "kind of person" Plant was, in fact he was a violent, gun-toting drug dealer and "career offender," evidence the jury should have heard. *See United States v. West*, 58 F.3d 133, 141 (5th Cir. 1995) (cross-examination of a witness offering character evidence can include questions regarding relevant, specific instances of

152

conduct). Furthermore, as set forth in Ground 12.1(D)(2), *supra*, if trial counsel had conducted a reasonable investigation, they could have countered Officer Matt's reputation testimony with testimony from inmates with first-hand knowledge about him. Trial counsel did not direct their investigator to investigate Plant's criminal history or background. SA 558. In addition, although Black alleges in his affidavit that the defense investigator spoke with Matt, Bennett could not recall when or where he spoke with Matt and had no notes or memo of the interview, though he acknowledged that he "should have" taken notes or written a memo had he actually interviewed him. SA 561.

374. Once the government had opened the door by eliciting Matt's testimony portraying Plant as having a peaceful character and reputation, counsel was ineffective for failing to impeach Matt by putting Plant's prior acts of violence before the jury. There is a reasonable probability that, if counsel had objected, Mr. Agofsky would have been acquitted or convicted of a lesser offense, that he would not have been sentenced to death, or that he would have received appellate relief.

4. Counsel Was Ineffective For Failing To Seek Severance Of The "Murder By Life Sentenced Prisoner" Count From The Federal Murder Count To Prevent The Jury From Drawing Prejudicial Conclusions When Considering the Question of Petitioner's Guilt.

375. Counsel sought before trial to have one of the two murder counts dismissed for violation of double jeopardy. As the Court of Appeals later held, that motion was wrongfully denied. *United States v. Agofsky*, 458 F.3d 369 (5th Cir. 2006) (SA 2521). Nevertheless, counsel unreasonably failed to take any further steps that would have prevented the jury from hearing the highly prejudicial evidence that Mr. Agofsky was serving a life sentence at the time of the incident. Rather, counsel stipulated that Mr. Agofsky was a life-sentenced prisoner and acquiesced to the jury's being so advised. Tr. Vol. 18, 33. Counsel could have sought severance of the "murder by

life prisoner" count to avoid this prejudice. *See* Fed. R. Crim. P. 14 (a) ("**Relief.** If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."). Counsel's failure to seek this readily available and routinely applied remedy constituted deficient performance.

376. In the context of felon-in-possession counts, the Fifth Circuit has made clear the risk of prejudice where the jury hears evidence of a prior record:

> We have long recognized the obvious dangers inherent in trying a felon-in-possession count together with other charges, as it acts as a conduit through which the government may introduce otherwise inadmissible evidence of the defendant's prior convictions, thereby potentially tainting the reliability of the verdict rendered by the jury on the other counts. For this reason, "'evidence of a prior conviction has long been the subject of careful scrutiny and use at trial' because of the danger that the jury might convict, not based on the evidence, but because it feels that the defendant is a 'bad person.'" Although the potential for prejudice resulting from introduction of prior crimes evidence in connection with a felon-in-possession charge may be lessened by limiting instructions, a proper inquiry into the propriety of trying the felon count together with the other charges requires examining not only the efficacy of the limiting measures taken by the trial court, but also the strength of the evidence of the defendant's guilt. In certain cases, the translucency of the government's ill motive for adding the felon-in-possession count is also a factor in determining whether severance was warranted.

*United States v. McCarter*, 316 F.3d 536, 538-539 (5th Cir. 2002) (footnotes omitted). McCarter was charged with drug offenses and felon-in-possession of ammunition charges. The court, finding that the evidence was not so strong as to render the error harmless, and characterizing the motives of the government in belatedly adding the felon-in-possession charge as "dubious," reversed the conviction.

377. As in *McCarter*, here severance of the federal murder charge from the "murder by life prisoner" count would have eliminated any risk of a tainted verdict. Other than the one-

sentence stipulation, the evidence was identical for both counts. Had the jury returned a guilty verdict for murder, the second stage could then have commenced with the only remaining issue whether Mr. Agofsky was in fact a life-sentenced prisoner. This would ensure the jury's verdict was based solely on the facts and not on any extrinsic, and highly prejudicial, evidence. At the same time the process would entail a minimal burden on the court and parties.[47]

378. Nor was the "limiting" instruction sufficient to ameliorate the taint. The instruction in its entirety was as follows:

> **Caution – Consider Only Crimes Charged:** You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or offense not alleged in the indictment. Nor are you concerned with the guilt of any other person or persons not on trial as a defendant in this case.

379. Tr. Vol. 18, 353. The court did not specifically reference the life sentence evidence, why it was admissible, or how it should be received. The obvious observation that the "defendant is not on trial" for other acts even falls short as an admonition not to consider the evidence for any

---

[47] *See United States v. Busic*, 587 F.2d 577, 585 (3d Cir.1978), *rev'd on other grounds*, 446 U.S. 398 (1980) (where defendant charged with drug offenses and with being a felon in possession of a firearm, failure to sever harmless as evidence otherwise independently admissible; however, severance should be granted "[i]f it is determined that the convictions would not be admissible on the other counts-that were these counts to be tried alone the jury would not hear this evidence-then severance should be granted"); *United States v. Joshua*, 976 F.2d 844, 847 (3d Cir. 1992), *abrogated on other grounds*, *Stinson v. United States*, 508 U.S. 36 (1993) (approving of bifurcated approach where the jury, having reached a verdict on other counts, would then proceed to consider the counts requiring proof of prior convictions); *United States v. Vastola*, 670 F. Supp. 1244, 1263 (D.N.J. 1987) (approving bifurcated two-stage procedure where counts involving proof of prior record deferred "to avoid the possibility of prejudice resulting from admission of such evidence").

other reason than as proof of an element of one of the two counts, and in no way was sufficient to overcome the prejudice of the jury's hearing of the prior conviction and resulting life sentence.[48]

380.    Mr. Agofsky was prejudiced. While Mr. Agofsky did not contest that he killed Plant, the evidence of murder was weak, resting on the word of one inmate. Two witnesses said Plant was the initial aggressor and provoked Mr. Agofsky. There was evidence that knives were readily introduced into the recreation cages and that the correctional officers were not in a position to render immediate aid in the event of an attack. Thus, the potentially inflammatory evidence that Mr. Agofsky was serving a life sentence—which was irrelevant to the justification and heat of passion defenses on which he sought acquittal or a lesser conviction—could have tipped the balance against him. There is a reasonable probability that, had counsel sought and obtained a severance, Mr. Agofsky would have been acquitted of capital murder.

381.    Nor is this a case where a stipulation ameliorated the prejudice. *See Old Chief v. United States*, 519 U.S. 172, 174 (1997) (abuse of discretion found where trial court refused defendant's offer to stipulate as to defendant's prior felony conviction). The stipulation was that Mr. Agofsky was sentenced to *life imprisonment*. This telegraphed to the jury Mr. Agofsky had

---

[48] *See United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994) ("presumption that a jury will adhere to a limiting instruction evaporates where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense") (internal citations and quotations omitted); *United States v. Daniels*, 770 F.2d 1111, 1118 (D.C. Cir. 1985) ("We are not nearly so sanguine concerning the efficacy of jury instructions in curing the prejudice caused by the introduction of other crimes evidence. To tell a jury to ignore the defendant's prior convictions in determining whether he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities. In such cases, it becomes particularly unrealistic to expect effective execution of the "mental gymnastic" required by limiting instructions and "the naive assumption that prejudicial effects can be overcome by instructions to jury" becomes more clearly than ever "unmitigated fiction") (internal citations and quotations omitted); *Government of the Virgin Islands v. Toto*, 529 F.2d 278, 283 (3d Cir.1976) (once the jury hears evidence of prior crimes, "it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence. A drop of ink cannot be removed from a glass of milk").

likely been convicted of a prior murder. Thus the jury knew both the duration of the sentence and the likely crime for which he had been previously convicted. This was far more prejudicial than the felony evidence which compelled a reversal in *McCarter*. Trial counsel's failure to seek a severance was prejudicially deficient performance because there is a reasonable probability that Mr. Agofsky otherwise would have been acquitted or convicted of a lesser offense, that he would have received a non-death sentence, or that he would have received appellate relief for preserved error.

> **J.**      <u>**Counsel Was Ineffective For Failing To Seek Severance Of The "Murder By Life Sentenced Prisoner" Count From The Federal Murder Count To Prevent The Jury From Drawing Prejudicial Conclusions When Considering the Question of Petitioner's Guilt.**</u>

382.     Counsel sought before trial to have one of the two murder counts dismissed for violation of double jeopardy. As the Court of Appeals later held, that motion was wrongfully denied. *United States v. Agofsky*, 458 F.3d 369 (5th Cir. 2006) (SA 2521). Nevertheless, counsel unreasonably failed to take any further steps that would have prevented the jury from hearing the highly prejudicial evidence that Mr. Agofsky was serving a life sentence at the time of the incident. Rather, counsel stipulated that Mr. Agofsky was a life-sentenced prisoner and acquiesced to the jury's being so advised. Tr. Vol. 18, 33. Counsel could have sought severance of the "murder by life prisoner" count to avoid this prejudice. *See* Fed. R. Crim. P. 14 (a) ("**Relief.** If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."). Counsel's failure to seek this readily available and routinely applied remedy constituted deficient performance.

383.     In the context of felon-in-possession counts, the Fifth Circuit has made clear the risk of prejudice where the jury hears evidence of a prior record:

> We have long recognized the obvious dangers inherent in trying a felon-in-possession count together with other charges, as it acts as a conduit through which the government may introduce otherwise inadmissible evidence of the defendant's prior convictions, thereby potentially tainting the reliability of the verdict rendered by the jury on the other counts. For this reason, "'evidence of a prior conviction has long been the subject of careful scrutiny and use at trial' because of the danger that the jury might convict, not based on the evidence, but because it feels that the defendant is a 'bad person.'" Although the potential for prejudice resulting from introduction of prior crimes evidence in connection with a felon-in-possession charge may be lessened by limiting instructions, a proper inquiry into the propriety of trying the felon count together with the other charges requires examining not only the efficacy of the limiting measures taken by the trial court, but also the strength of the evidence of the defendant's guilt. In certain cases, the translucency of the government's ill motive for adding the felon-in-possession count is also a factor in determining whether severance was warranted.

*United States v. McCarter*, 316 F.3d 536, 538-539 (5th Cir. 2002) (footnotes omitted). McCarter was charged with drug offenses and felon-in-possession of ammunition charges. The court, finding that the evidence was not so strong as to render the error harmless, and characterizing the motives of the government in belatedly adding the felon-in-possession charge as "dubious," reversed the conviction.

384. As in *McCarter*, here severance of the federal murder charge from the "murder by life prisoner" count would have eliminated any risk of a tainted verdict. Other than the one-sentence stipulation, the evidence was identical for both counts. Had the jury returned a guilty verdict for murder, the second stage could then have commenced with the only remaining issue whether Mr. Agofsky was in fact a life-sentenced prisoner. This would ensure the jury's verdict

was based solely on the facts and not on any extrinsic, and highly prejudicial, evidence. At the same time the process would entail a minimal burden on the court and parties.[49]

385. Nor was the "limiting" instruction sufficient to ameliorate the taint. The instruction in its entirety was as follows:

> **Caution – Consider Only Crimes Charged:** You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or offense not alleged in the indictment. Nor are you concerned with the guilt of any other person or persons not on trial as a defendant in this case.

Tr. Vol. 18, 353. The court did not specifically reference the life sentence evidence, why it was admissible, or how it should be received. The obvious observation that the "defendant is not on trial" for other acts even falls short as an admonition not to consider the evidence for any other

---

[49] *See United States v. Busic*, 587 F.2d 577, 585 (3d Cir.1978), *rev'd on other grounds*, 446 U.S. 398 (1980) (where defendant charged with drug offenses and with being a felon in possession of a firearm, failure to sever harmless as evidence otherwise independently admissible; however, severance should be granted "[i]f it is determined that the convictions would not be admissible on the other counts-that were these counts to be tried alone the jury would not hear this evidence-then severance should be granted"); *United States v. Joshua*, 976 F.2d 844, 847 (3d Cir. 1992), *abrogated on other grounds*, *Stinson v. United States*, 508 U.S. 36 (1993) (approving of bifurcated approach where the jury, having reached a verdict on other counts, would then proceed to consider the counts requiring proof of prior convictions); *United States v. Vastola*, 670 F. Supp. 1244, 1263 (D.N.J. 1987) (approving bifurcated two-stage procedure where counts involving proof of prior record deferred "to avoid the possibility of prejudice resulting from admission of such evidence").

reason than as proof of an element of one of the two counts, and in no way was sufficient to overcome the prejudice of the jury's hearing of the prior conviction and resulting life sentence.[50]

386.    Mr. Agofsky was prejudiced. While Mr. Agofsky did not contest that he killed Plant, the evidence of murder was weak, resting on the word of one inmate. Two witnesses said Plant was the initial aggressor and provoked Mr. Agofsky. There was evidence that knives were readily introduced into the recreation cages and that the correctional officers were not in a position to render immediate aid in the event of an attack. Thus, the potentially inflammatory evidence that Mr. Agofsky was serving a life sentence—which was irrelevant to the justification and heat of passion defenses on which he sought acquittal or a lesser conviction—could have tipped the balance against him. There is a reasonable probability that, had counsel sought and obtained a severance, Mr. Agofsky would have been acquitted of capital murder.

387.    Nor is this a case where a stipulation ameliorated the prejudice. *See Old Chief v. United States*, 519 U.S. 172, 174 (1997) (abuse of discretion found where trial court refused defendant's offer to stipulate as to defendant's prior felony conviction). The stipulation was that Mr. Agofsky was sentenced to *life imprisonment*. This telegraphed to the jury Mr. Agofsky had

---

[50] *See United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994) ("presumption that a jury will adhere to a limiting instruction evaporates where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense") (internal citations and quotations omitted); *United States v. Daniels*, 770 F.2d 1111, 1118 (D.C. Cir. 1985) ("We are not nearly so sanguine concerning the efficacy of jury instructions in curing the prejudice caused by the introduction of other crimes evidence. To tell a jury to ignore the defendant's prior convictions in determining whether he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities. In such cases, it becomes particularly unrealistic to expect effective execution of the "mental gymnastic" required by limiting instructions and "the naive assumption that prejudicial effects can be overcome by instructions to jury" becomes more clearly than ever "unmitigated fiction"") (internal citations and quotations omitted); *Government of the Virgin Islands v. Toto*, 529 F.2d 278, 283 (3d Cir.1976) (once the jury hears evidence of prior crimes, "it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence. A drop of ink cannot be removed from a glass of milk").

likely been convicted of a prior murder. Thus the jury knew both the duration of the sentence and the likely crime for which he had been previously convicted. This was far more prejudicial than the felony evidence which compelled a reversal in *McCarter*. Trial counsel's failure to seek a severance was prejudicially deficient performance because there is a reasonable probability that Mr. Agofsky otherwise would have been acquitted or convicted of a lesser offense, that he would have received a non-death sentence, or that he would have received appellate relief for preserved error.

**K.**    **The Cumulative Effect Of Trial Counsel's Guilt Phase Deficiencies Prejudiced The Defense At Both The Guilt Phase And The Penalty Phase.**

388.    When the time arrived for Black's summation, he had very little evidentiary foundation for the arguments he made to the jury. He argued that the jurors should believe that the killing was a "sudden quarrel" and not premeditated, for only three reasons: according to Officer Matt, Mr. Agofsky stopped the attack voluntarily, he did not resume it despite the opportunity, and he had not asked to be placed in the same cage with Plant. Tr. Vol. 20, 381-83. Then, as set forth above, Black argued a version of Mr. Agofsky's alleged oral statement that was unsupported by the evidence (because Black had failed to elicit it), a fact that the prosecutor promptly pointed out in his rebuttal summation. Tr. Vol. 20, 383-84, 394-95. Then he argued that Ward was unworthy of belief, again without support in the evidence (and again, because Black had failed to elicit it) because Ward was "here to get a time cut." Tr. Vol. 20, 385-86. Next he argued that the jurors should evaluate whether Mr. Agofsky acted in self-defense by viewing the situation through his eyes. Tr. Vol. 20, 286-87. But the only supporting evidence at Black's disposal was the limited evidence he had elicited from Lawson, Ecker, and Santiago, plus an acknowledgment by Matt that there had been prior acts of violence in those recreation cages. Tr. Vol. 20, 387-89. The balance of Black's summation urged the jurors to discount the evidence of the Miele assault and the letter to

161

Andrew Jensen. The reasons he offered were that Mr. Agofsky was never charged with a crime for the Miele incident, Miele did not testify for the government, and the "scumbags" referred to in the Jensen letter did not refer to Plant. Tr. Vol. 20, 390-92.

389.    There is a reasonable probability that if trial counsel (1) had obtained and presented all of the available evidence that Plant was the initial aggressor, (2) had presented all of the evidence that Plant was the initial aggressor that his investigator did obtain but the defense never used; (3) had obtained and presented additional evidence that explained Plant's motives for the attack and the reasons that any inmate in Mr. Agofsky's position would have anticipated lethal violence once Plant attacked him; (4) had obtained and presented supporting expert testimony and data about the violent atmosphere at USP Beaumont; (5) had insured the selection of a qualified jury; (6) had made appropriate objections and conducted appropriate cross-examinations; (7) had objected to the court's burden-shifting instructions and other instructional errors; and (8) had objected to the prosecutor's misleading summation remarks, both the guilt phase and penalty phase outcomes would have been different. Both individually and cumulatively, the instances of deficient performance set forth above prejudiced the defense at the guilt phase and the penalty phase. Mr. Agofsky's conviction and sentence must therefore be reversed and a new trial on both guilt and penalty ordered. U.S. Const. Amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984).

390.    The Court of Appeals granted relief because of such cumulative deficiencies in *Richards v. Quarterman*, 566 F.3d 553, 568-71 (5th Cir. 2009), where it found deficient performance in counsel's failure to interview important witnesses before trial, present favorable evidence, object to inadmissible hearsay, or request a lesser included offense instruction. Observing that "we need not engage in a lengthy discussion of the prejudice prong," the court held that the cumulative effect of counsel's deficiencies prejudiced the defense. *Id.* at 571-72; *see also*

162

*Martinez-Macias v. Collins*, 810 F.Supp. 782, 805, 813 (W.D. Tex. 1991) (adopting Magistrate Judge's conclusion that trial counsel's failure to investigate and present alibi testimony was ineffective) *aff'd* 919 F.2d 1067 (5th Cir. 1992).

391.    As in *Richards*, the cumulative effect of counsel's deficient performance in Mr. Agofsky's case prejudiced the defense. If counsel had located and presented all of the testimony available from all nine of the witnesses who could have testified that Plant started the fight, along with the background information available from one witness after another concerning Plant and the violent atmosphere at USP Beaumont, and testimony from prison and mental health experts, and if counsel had engaged in appropriate advocacy in jury selection and during the testimony, summations, and jury instructions, there is a reasonable probability that the trial would have ended differently. There is a reasonable probability that, with effective representation, Mr. Agofsky would have been acquitted outright, or convicted of non-capital murder, or received a sentence of less than death, or would have obtained appellate relief for preserved error. For all these reasons and others described elsewhere in this Motion, Mr. Agofsky received ineffective assistance of counsel at the guilt-innocence portion of his trial. U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984). This Court must accordingly order an evidentiary hearing and grant relief on this ground.

## II.     GROUND 12.2: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE

### A.     Introduction

392.     Trial counsel made almost no preparation for the penalty phase. No one from the defense made any attempt to compile a social history or, except for token interviews with jail guards who had met Mr. Agofsky shortly before trial, to learn whether there was any mitigating evidence stemming from his eleven years of incarceration before the Plant incident. No one from the defense team met with Mr. Agofsky's family or anyone who had known him as a child, and the only family interview was one phone call with Mr. Agofsky's mother, Sheila Agofsky.[51] Nor did the defense make any effort to investigate the context of any of the disciplinary infractions that were offered as the basis for statutory and non-statutory aggravating factors. And, although counsel obtained portions of the records of the federal and state prosecutions for the Noel State Bank robbery the federal firearms conviction, counsel conducted no independent investigation and made little use of the records in their possession.

393.     Douglas Barlow was primarily responsible for the penalty phase preparation. About six weeks before trial, he filed five *ex parte* motions, docketed April 30, 2004, for the appointment of mental health experts, prison experts, a criminologist, an investigator, and a federal corrections consultant. Dkt. 49-53. He did not ask for funds for a mitigation specialist or for authorization for any other consultant to compile a social history. The Court granted the motions (Dkt. 59-63).[52]

---

[51] The defense investigator may have visited Mr. Agofsky's mother on one occasion to retrieve a personal item, but the documents received from trial counsel do not include any record of such a visit.

[52] The motions and orders were released to postconviction counsel but are otherwise still under seal.

The experts prepared no reports. Barlow never spoke to Mr. Agofsky's mother or any other member of his family.[53]

394. As a result, the jurors heard a penalty phase presentation in which *both* prosecution and defense focused on one underlying issue, his future dangerousness and the ability or inability of the Bureau of Prisons to control him. The lack of defense investigation into any other avenue of mitigation left counsel with little alternative. The penalty phase took four days, and consisted chiefly of the government's presentation of evidence on seven disciplinary infractions Mr. Agofsky had incurred during his incarceration, and his two prior convictions. The defense presented six pages of testimony by two jail guards and the testimony of two corrections consultants, a clinical psychologist, and a criminologist, who painted Mr. Agofsky as an uncontrollably violent person who must be kept in solitary confinement for life, if allowed to live. As a result of counsel's deficient performance in these and other respects, the jury decided that he should not be allowed to live. The jurors unanimously rejected most of the defense's proffered mitigating factors (Tr. Vol. 23, 387-93) and, because the defense had conducted almost no mitigation investigation, never had any opportunity to consider an array of very different mitigating evidence.

395. There was voluminous, readily available mitigating evidence that counsel could have presented. Mr. Agofsky also proffers in this Court a social history report by a licensed clinical

---

[53] Barlow several times dealt with other business during proceedings in Mr. Agofsky's case. *See United States v. Pevehouse*, 1:04-cr-00093, E.D. Texas (Barlow enters appearance on 7/06/04, the same date as defendant's arraignment; information entered on 06/29/04), *United States v. Chandler*, 1:04-cr-00097 (Barlow enters appearance on 07/01/04, the same date as waiver of indictment and sealed plea agreement entered; information filed on 6/29/04); *United States v. Estrada,* 1:03-cr-00067 (Barlow attends sentencing hearing on 6/29/04).

social worker and declarations by fourteen family members, friends, and teachers.[54] These witnesses describe repeated head injuries in Mr. Agofsky's childhood and youth, and emotionally and physically traumatic events that affected his functioning and perception of the world. They explain the importance of his martial arts training in his development from childhood to manhood. Mr. Agofsky presents mitigating evidence from mental health experts who have determined that he suffers from organic brain damage resulting in executive functioning deficits, and from post-traumatic symptoms. He presents evidence, which trial counsel could have developed, that casts doubt on his guilt of the prior convictions that served as aggravating factors, and presents the statements of multiple inmates who could have provided context or rebuttal for the seven disciplinary infractions that the government also introduced in aggravation. He presents other statements from fellow inmates who could have described Mr. Agofsky as a person who managed to keep clear of gangs in prison and played a mediating and protective role.

396. Finally, Mr. Agofsky presents evidence from other participants in the 2004 trial investigation and preparation. The deposition testimony of Jay Bennett and Dr. Dan Roberts confirms the irresponsibly limited nature of the defense penalty phase preparation and the value of the mitigating evidence that counsel could have developed and presented. All four of the other experts retained by trial counsel—Dr. Edward Gripon (a psychiatrist), Dr. Elizabeth Pelz (a criminologist), and Terry Pelz and Harvey Cox (prison consultants)—have reviewed the postconviction mitigating information summarized below, and have stated that it would have been

---

[54] Joe Agofsky, Jr. (SA 1930), Sheila Agofsky (SA 1950), Trevan Billbe (SA 1966), Peggy Black (SA 1970), Terry Bryant (SA 1978), Robert Duggan (SA 1982), Gerald Edmondson (SA 1987), Joy Johnson (SA 1992), Leon Rondeau (SA 2000), Jan Varner (SA 2005), Deborah Cousatte (SA 2295), Rhonda Polvado (SA 2298), Brenda Bryson (SA 2535), Midge Malchupa (SA 2537).

helpful to them in 2004. They all could have developed and presented similar mental health and prison adjustment evidence.

397. Because there is a reasonable probability that if counsel's investigation, preparation, and presentation of the defense case (at both the guilt-innocence phase and the penalty phase) had conformed to prevailing professional norms the outcome would have been different, their failure to investigate and present a case for life deprived Mr. Agofsky of the effective assistance of counsel. U.S. Const. Amend. VI; *Wiggins v. Smith,* 539 U.S. 510 (2003).

**B.** **Counsel Failed To Conduct An Independent Investigation Of The Government's Case In Aggravation Or To Present Evidence Providing Context For The Aggravating Factors.**

1. Introduction

398. The government alleged as aggravating factors, and presented evidence of, Mr. Agofsky's two prior convictions. It also offered evidence of seven disciplinary infractions in support of other non-statutory aggravating factors.[55] Trial counsel failed to undertake elementary investigation of these aggravating factors, or to present evidence that would rebut them or provide context for them. Their failure to do so was deficient performance. *See Rompilla v. Beard*, 545 U.S. 374 (2005); *Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001) (counsel ineffective for, among other deficiencies, failure to investigate prior conviction the prosecution planned to

---

[55] The government alleged four statutory aggravating factors: (1) Mr. Agofsky was a prisoner serving a life term; (2) he had a previous conviction for a federal offense with a firearm; (3) he had a previous conviction for a federal offense for which a life sentence was authorized; and (4) the killing was heinous and cruel. Tr. Vol. 21, 14-15. It alleged four non-statutory aggravating factors: (1) he represented a continuing danger to the lives and safety of other persons; (2) he had a significant history of disciplinary violations, including threatening other inmates, being involved in a riot, and being found in possession of weapons; (3) he lacked remorse; and (4) he had a prior conviction for transportation of stolen property. Tr. Vol. 21, 15.

introduce in aggravation); *Summit v. Blackburn*, 795 F.2d 1237 (5th Cir. 1986) (counsel ineffective for failing to object or argue lack of corroboration for aggravating factor).

399. Bennett's deposition testimony confirms, and the additional evidence described below further demonstrates, that counsel's failure to investigate the aggravating factors constituted ineffective assistance. In his deposition, Bennett admitted that the attorneys did not ask him to investigate Mr. Agofsky's prior disciplinary infractions. SA 555. Although Mr. Agofsky had outlined for his trial counsel all of his disciplinary infractions and they were all contained in his central file, Bennett was not directed by counsel to investigate them. *Id*. Likewise, there was no evidence that Dr. Roberts was asked to investigate any of Mr. Agofsky's prior disciplinary infractions. SA 712-14. Bennett acknowledged that he and trial counsel believed that their case in mitigation could not outweigh the aggravation. SA 578. Nevertheless, Bennett testified that counsel did not ask him to investigate disciplinary infractions. They did not ask him to investigate the 1992 incident involving bodily fluids. SA 558. Counsel did not ask him to investigate an incident in Atlanta in which Mr. Agofsky had a fight with another inmate. SA 556. In addition, he did not investigate the incident at Lompoc. SA 557. Thus, the aggravating factors relied upon by the government went largely ignored by the defense

2. Noel State Bank Robbery

400. The government used Mr. Agofsky's conviction for the murder of Dan Short and the Noel State Bank robbery as a statutory aggravator in the case against him. The prosecution introduced the conviction into evidence (Tr. Vol. 21, 30), presented the testimony of the FBI agent who investigated the case, Ladell Farley, and focused on the conviction in penalty-phase closing arguments. (Tr. Vol. 24, 332, 333, 336, 339). Although Mr. Agofsky had been convicted of these crimes in both state and federal court, the evidence against him was tenuous at best. In mounting the case against Mr. Agofsky, Farley relied heavily upon compensated government informants and

physical evidence that had been analyzed and presented by an FBI agent who has since been discredited. Mr. Agofsky's trial attorney from Oklahoma believes steadfastly that he is innocent of this crime. Yet, trial federal capital trial counsel in this case failed to investigate and present compelling evidence that could have undermined this key aggravating factor.

401. Farley was the government's first witness at the penalty phase of Mr. Agofsky's capital trial. (Tr. Vol. 21, 31). Farley offered detailed testimony about his investigation into the robbery of the Noel State Bank and the killing of Dan Short, bank president, including a graphic description of the body of Dan Short after it had been pulled from the river. (Tr. Vol. 21, 31). On cross examination, Black elicited Farley's testimony that there was substantial evidence that Mr. Agofksy did not act alone in this crime. *Id*. at 46. However, the defense failed to elicit substantial evidence that Mr. Agofksy was not involved at all in the commission of this crime.

i. <em>Information Trial Counsel had in their Possession</em>

402. Black had over 1,000 pages of previous testimony from Farley in both the state and federal trials. He could have used this testimony to undermine confidence in the previous convictions. A reasonably competent attorney would have done so, and Mr. Agofsky was prejudiced due to this deficiency.

403. Contained in the 1,000 pages of Farley's prior testimony was extensive information about other suspects and theories developed in the case. Approximately one-third of the pages trial counsel turned over to postconviction counsel are excerpts from the proceedings before three federal grand juries, two of which were unsuccessful, convened in attempts to indict Mr. Agofsky for the murder robbery. The other 700 pages are from the state and federal trials, preliminary hearings, and depositions. Information contained in these transcripts could have, and should have, been used to cross-examine Farley.

169

404. Counsel should have elicited testimony from Farley about the unreliable informants used in his prosecutions. Initially, Mr. Agofsky was not a suspect in the Noel State Bank robbery. He emerged as a suspect only after Farley received an anonymous call. (A165, *Trial Testimony of Ladell Farley*) The caller was never identified and never testified at the trial. *Id*. Thereafter, a number of informants emerged.

- Jailhouse informants came out of the woodwork to testify that Mr. Agofsky had confessed to them. None of these jailhouse informants ever took polygraph examinations. A214 (*Oklahoma Deposition of Ladell Farley*). Many were given rewards. A179, 216 (*Oklahoma Deposition of Ladell Farley; see also id.* at 46). Many of them said that he confessed to being a famous hit man, but this was never corroborated. A186 (*Oklahoma Deposition of Ladell Farley*). As part of the whirlwind of rumor surrounding the crime, Farley received unsubstantiated and farfetched tips that Mr. Agofsky was a Satan worshiper and that there was a satanic element to the crime. A189-190 (*Oklahoma Deposition of Ladell Farley*).

- Gant Sanders was an initial suspect and informant in the FBI case and was instrumental to Farley's mission to obtain an indictment against Mr. Agofsky. However, Farley acknowledged that he told Sanders that Sanders himself was a suspect because his palm print was found at the bank. A217-18. Sanders later stated that he was being paid for his information against Mr. Agofsky, and that the FBI had set up his business for 6-10 months and paid his rent. A186-188 (*Oklahoma Deposition of Ladell Farley*). Farley admitted paying Sanders in order to "keep him out of trouble," get him a house, and a telephone. A222 (*Oklahoma Deposition of Ladell Farley*).

- In addition, Sanders confessed to, and had given information about, many other robberies, which remain unsolved. Sanders confessed to sixteen robberies and was never charged at the state level. A217-21 (*Oklahoma Deposition of Ladell Farley*). He was charged at the federal level, and given probation. *Id*.

- Sanders' father, Frank Sanders, had connections to the Noel Bank and a record of bank robberies. Frank Sanders remodeled the Noel State Bank in 1975. A177 (*Federal Grand Jury Testimony of Ladell Farley*). Frank Sanders was later convicted in relation to bank robberies. A177 (*Federal Grand Jury Testimony of Ladell Farley*). His associate would kidnap the banker, force him to open the safe, and then release him; a similar modus operandi to the one employed in the Noel State Bank robbery and murder of Dan Short. *Id*. According to some FBI agents, Gant Sanders is not a believable character. A188-189 (*Oklahoma Deposition of Ladell Farley*). At one point, Farley considered Gant Sanders a suspect. A188-189 (*Oklahoma Deposition of Ladell Farley*).

170

405.    In addition to Sanders, there were a number of other viable suspects about whom trial counsel should have elicited testimony from Farley.

- Oliver Cromwell Hardy and his step-son C.W. McMann committed a crime similar to the Noel State Bank robbery, in that they kidnapped a pawn broker from Missouri and took him to his pawn shop and forced him to open a safe. A202a-209 (*Oklahoma Deposition of Ladell Farley*). They also robbed an individual in Oklahoma and duct-taped him into his car. *Id*. Farley received information from Ron Brody that C.W. McMann said he was going to rob the Noel State Bank. *Id*. The men owed $30,000 in drug debts, which disappeared after the crime; a friend of theirs drove a truck matching the one supposedly used in the crime. *Id*. Farley never administered polygraphs to these persons. A214 (*Oklahoma Deposition of Ladell Farley*). Hardy had a van fitting the description of the one used in the Noel State Bank robbery, but Farley never inspected it. A212a (*Oklahoma Deposition of Ladell Farley*). Hardy was addicted to methamphetamine.

- Dan Short's wife, Joyce Short, was also a suspect. She twice failed a polygraph exam, had left Short one and a half years before his death, and gained at least a $200,000 inheritance by his death. A191-193 (*Oklahoma Deposition of Ladell Farley*).

- The Noel State Bank was having major federal compliance problems, and was under investigation by federal and state regulators. The investigation of the bank had started when the previous president killed himself, after holding the position for only 6-8 months. A199a (*Oklahoma Deposition of Ladell Farley)*. Farley never spoke with the federal or state regulators. A200 (*Oklahoma Deposition of Ladell Farley*). There were 2 audits of the bank, and one account had reportedly been allowed to go $400,000 delinquent. A192-95 (*Oklahoma Deposition of Ladell Farley*). There was $100,000 cash left in the bank, but a substantial amount was taken in coins. A196-199 (*Oklahoma Deposition of Ladell Farley*). Some suggested that this was because coins were easy to launder, because they cannot be traced. *Id*. Farley also received reports that Dan Short was having problems with alcohol. A200 (*Oklahoma Deposition of Ladell Farely*).

- Don O'Brian, the bank owner, was investigated as a suspect. A223 (*Oklahoma Deposition of Ladell Farley*). O'Brian had plead guilty in 1982 to a misdemeanor charge involving check kiting at the bank. *Id*. There was evidence that O'Brian was upset with Dan Short, the bank president, because of the audit by the federal government triggered by the bank's compliance problems. A224. Farley testified that O'Brian was never actually cleared as a suspect. However, Farley never even talked to O'Brian. *Id*. O'Brian's son had been accused of murder one year before. A224 (*Oklahoma Deposition of Ladell Farley*).

- Bruce Moore and Jerome Bargo were fugitives who had both been convicted of murder in the past. A180 (*Oklahoma Deposition of Ladell Farley*). Farley sent their fingerprints to Russell Davey, the FBI's fingerprint examiner, but the prints were

171

not of sufficient quality for Davey to make a print comparison. Farley did not attempt to obtain another set of prints from them. *Id*. Jerome Vargo had killed a police officer in Arkansas. A167a-167c (*Federal Grand Jury Testimony of Ladell Farley*). The men were named by an informant, who said that he had information on $2 bills that, Farley testified, were taken in the robbery. *Id*.

- Mike and Steve Place were truck drivers who were questioned. A181 (*Oklahoma Deposition of Ladell Farley*). Clayton Don Amos gave Farley information about their involvement in the crime, but later recanted, blaming the statement on an LSD trip. A209a-209b, A210 (*Oklahoma Deposition of Ladell Farley*). Amos said that Mike Place had approached him and his cousin Matt Amos and showed him a picture of Dan Short and the Noel State Bank and a hand-drawn map of Dan Short's residence. A169 (*Federal Grand Jury Testimony of Ladell Farley*). Later they asked Clayton Amos to use his pick-up truck**.** A171a (*Federal Grand Jury Testimony of Ladell Farley*). On the night of the murder, Clayton Amos met them in a parking lot. *Id*. Mike Place pulled up in a blue pick-up truck, sitting between Mike Place and another man was a person whom Clayton Amos identified as Dan Short. A171a (*Federal Grand Jury Testimony of Ladell Farley*). The man had his wrists bound with duct tape, and someone was holding a gun to the back of his head. A171a (*Federal Grand Jury Testimony of Ladell Farley*). After Dan Short was killed, Mike Place and Matt Amos were convicted of murder in Oklahoma. A169-70 (*Federal Grand Jury Testimony of Ladell Farley*). Farley never could verify the whereabouts of Steve Place at the time of the crime. *Id*.

- Farley made a fingerprint request for Richard Romaine Wright. A182 (*Oklahoma Deposition of Ladell Farley*). Wright was another suspect with a lengthy criminal record, including prior bank robbery convictions. A211-12 (*Oklahoma Deposition of Ladell Farley*). According to the owner of the chain hoist on the chair in which the victim was found, Romaine would have had access to it. Farley discovered that Romaine was in Noel during the crime. *Id*.

- Angie Stites gave Farley the names of Michael North and Rick Rushing, and told him that she overheard them at the Holiday Hotel planning the Bank robbery and homicide of Dan Short.

406. As of May 29, 1990, the FBI had a list of 51 suspects for whom print comparisons had been requested. A161 (*OK trial testimony of Davey*). They were unable to compare prints with any of these suspects, and did not eliminate any of them. A163 (*OK trial testimony of Davey*).[56]

---

[56] In addition, the day before the Noel State Bank robbery and homicide of Dan Short, another body was found in the Oklahoma Grand Lake, the lake where Short was found. A201-02 (*Oklahoma Deposition of Ladell Farley*). Farley did not believe that it was connected to Short's murder. *Id*. The homicide remains unsolved. *Id*.

407. Farley surmised in his testimony in front of the grand jury that Mr. Agofsky's motive was "money, excitement and intrigue." A225 (*Oklahoma Deposition of Ladell Farley*). However, Mr. Agofsky had $130,000 in a bank account from his father's death that he would inherit at the age of 21. *Id*. Joseph Agofsky, having turned 21, had already inherited this money.

408. All of the information above was gleaned by postconviction counsel from records that trial attorney Patrick Black had in his possession. Trial counsel had a duty to obtain and review that information in order to effectively cross-examine Farley and undermine the aggravating factor. See ABA Guidelines on the Appointment and Performance of Defense Counsel in Death Penalty Cases, Commentary to Introduction and Objectives, 31 Hofstra L. Rev. 913, 926-27 (2003) ("If the defendant has any prior criminal history, the prosecution can be expected to attempt to offer it in support of a death sentence. Defense counsel accordingly must comprehensively investigate— together with the defense investigator, a mitigation specialist, and other members of the defense team—the defendant's behavior and the circumstances of the conviction.") *See also Rompilla v. Beard*, 545 U.S. 374 (2005). In *Rompilla*, the Supreme Court made it very clear that a trial attorney defending a capital case has an unambiguous duty to investigate the penalty phase of a capital case, including the aggravating evidence and circumstances tendered by the prosecution. In that case the Court held that "counsel fell short here because they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce Rompilla's prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case." *Rompilla*, 545 U.S. at 389. Likewise, in Mr. Agofsky's case, trial counsel were aware that the government intended to elicit the damaging testimony of Ladell Farley. They were further aware that the prosecution intended to argue three

173

separate aggravating factors[57] based upon this conviction and the testimony of Farley. Yet they did nothing to impeach Farley or the judgment.

> ii.  *New Information that Trial Counsel Could have Obtained in 2004*

409.  In addition to reviewing the transcript from Mr. Agofsky's previous trials, trial counsel could have spoken to Debbie Maddox, counsel for Mr. Agofsky at his Oklahoma trial. Jay Bennett, investigator in Mr. Agofsky's case, contacted Ms. Maddox in order to obtain the prior testimony of Farley. A501 (*Declaration of Debbie Maddox*). Ms. Maddox informed Bennett that she firmly believed that Mr. Agofsky was innocent of this crime, and offered to discuss the evidence introduced in the prior prosecutions with trial counsel. *Id*. She also offered to testify on Mr. Agofsky's behalf in the penalty phase of his Beaumont trial. "I told Mr. Bennett that I believed my testimony would have been admissible under the Supreme Court cases, *Skipper v. South Carolina* and *Eddings v. Oklahoma*." *Id*. No one from Mr. Agofsky's trial defense team ever discussed the case with her. *Id*.

410.  Had they contacted her, she would have aided counsel in impeaching Farley and the prior conviction by directing their attention to relevant impeachment material. In addition, she could have led counsel to Frederick Whitehurst, a former FBI agent who left the bureau after twelve years of employment and testified for the defense at Mr. Agofsky's Oklahoma trial. A499-500 (*Declaration of Frederic Whitehurst*). Mr. Whitehurst could have discredited much of the physical evidence in the Noel State Bank case, partly on the basis of information that was newly available in 2004.

---

[57] The Noel Bank case was the basis for two statutory factors—prisoner serving life term and prior conviction for which life sentence authorized—and was a substantial ground for the nonstatutory "continuing danger" factor. Tr. Vol. 21, 14, 15; Tr. Vol. 23, 334-40.

411.    The physical evidence against Mr. Agofsky consisted of two sets of fingerprints, but Whitehurst could have demonstrated that their reliability, too, is debatable. They come from two pieces of duct tape which were each submerged in a river for over a week. The first was found free-floating in the water, and was "matched" by FBI tape expert Robert Webb to the chair where the victim was found by using debatable duct tape analysis. The second was found actually attached to the chair in which Dan Short was found.

412.    Mr. Whitehurst testified at Mr. Agofsky's Oklahoma trial about the unreliable nature of duct tape comparison and matching. In its case against Mr. Agofsky, the government had relied upon fingerprints found on a piece of duct tape which was found by a passerby, Rowdy Foreman, floating in the Grand Lake River. A183-184 (*Oklahoma Deposition of Ladell Farley*).[58] This piece was not connected to the chair, but Farley's theory was that it once had been. To pursue that theory, he asked Robert Webb to examine the tape. At the time, Webb was a tape expert at the FBI, and he claimed that he had conclusively "matched" the piece of tape found in the river with the one connected to the chair. Farley used this evidence in the grand jury to support an indictment, telling the grand jurors that the "two ends are positive as a fingerprint. There's no other piece of tape that could be torn from another piece of tape that would match this end here." A175a (*Federal Grand Jury Testimony of Ladell Farley*). Webb testified at Mr. Agofsky's Missouri trial, the first trial, that he had "characterize(d) the tape for color, texture, type, physical characteristics and chemical composition of the component parts." A146-147 *(Webb testimony)*. In addition, he

---

[58] The discovery of this piece of duct tape is interesting in and of itself. Mr. Foreman found several pieces of evidence in the case on the river bank, on several different occasions. See A173, 174, 175 (*Federal Grand Jury Testimony of Ladell Farley*). The chain of custody was also far from reliable. There is some speculation that his wife actually took this piece of duct tape to work with her at Simmons Industries, where her supervisor called the FBI to come and pick up the piece of evidence. This duct tape would prove to be fundamental in the prosecution of Mr. Agofsky.

testified that he had performed an "end match" or "fracture match," and conclusively established the tape as having been connected. A152 (*Webb Testimony*).

413.    Mr. Whitehurst testified at Mr. Agofsky's Oklahoma trial, the second trial, that duct tape could not be "reverse engineered." A499-500 (*Declaration of Frederic Whitehurst*). In other words, a scientist cannot analyze the chemical components of duct tape in order to prove that two pieces were a match or were from the same roll. *Id*. Also, Mr. Whitehurst testified that end matching cannot be performed on duct tape because it is a pliable material. A499-500 (*Declaration of Frederick Whitehurst*). Duct tape is porous, meaning that when it is ripped or torn the molecules do not retain the shape of the rip or tear. *Id*. In contrast, when a non-pliable material, like a pencil or metal, is broken or fractured, the pieces will retain their fractured shape. This is not the case for a porous material such as duct tape.

414.    The FBI has recently published a study attempting to validate duct tape matching. (Bradley, Keagy, Lowe, Rickenbach, Wright & LeBeau, *A Validation Study For Duct Tape End Matches*, Forensic Science Communications, Vol. 9, No. 3 (July2007)http://www.fbi.gov/hq/lab/fsc/backissu/july2007/research/2007_07_research01.htm.) The results of this study are not promising for validation, as the study compares 3 pieces of duct tape and cites several instances where the tape was incorrectly matched. It is the first attempt by the FBI to validate duct tape matching. No validation had been completed at the time of Mr. Agofsky's trial. *Id*.; *see also* A500 (*Declaration of Frederic Whitehurst*).

415.    At the Oklahoma trial, Mr. Whitehurst would not testify negatively about Webb, or his methods, standards, and practices in the field. A499. At that time, he considered Webb a colleague and would not slander him. *Id*. In fact, on the stand he was asked to do just that by David Autrey, attorney for Joseph Agofsky, and he refused. *Id*. This changed, and by 2004, the time of

176

Mr. Agofsky's Beaumont trial, Mr. Whitehurst would have been willing to testify that he had serious doubts that he had about Webb's credibility and integrity. A499-500. Over the past decade, it has become clear to Mr. Whitehurst that Mr. Webb falsified evidence and presented false testimony in several cases. In the case of Walter Leroy Moody, in Alabama, Webb had supposedly conclusively matched several materials in evidence—tape, sealant, and paint—to materials found at the defendant's home. He found that they came from the same batches or manufacturers, thus linking the defendant to the crime. The FBI in that case determined that Webb had in fact "overstated" his determinations. However, they did not find that he gave false evidence, because he did not testify. (See Report of the USDOJ, http://www.usdoj.gov/oig/special/9704a/03amnewv.htm) Again, in the case of Ralph Plotner, in Oklahoma, it emerged that Webb had falsely testified that he had conclusively matched a smudge on a watch band to a specific batch of paint. A499-500. As Whitehurst later learned, Mr. Webb perjured himself and falsified evidence. *Id.* These cases, and others, worked to seriously undermine Mr. Whitehurst's confidence in Webb. Mr. Whitehurst did not testify to that in 1997, but would have testified to that in 2004. *Id.*

416. The circumstances surrounding the second set of fingerprints in Mr. Agofsky's case also bring their reliability into question. Initially, the prints on the piece of tape found free-floating did not match Mr. Agofsky. Ten months later, after Webb had handled this evidence extensively, the FBI announced that it was able to make a seven-point match to Mr. Agofsky with a method known as the "rubber roll."

417. For one, Webb's association with this evidence severely undermines its credibility. In addition, the reliability of a seven-point match is debatable. Though currently no specific number of points is required for a fingerprint match in the United States, twelve points has long

177

been a generally accepted rule. (http://www.latent-prints.com/images/Historical%20development%20and%20evaluation%20of%20the%2012%20point%20rule.pdf). Other countries have more definite rules: Britain has long required 16 points in order to match a fingerprint, France requires a 17-point match. *Id*. The FBI Fingerprint expert, Russell Davey, testified, in order to bolster the low number of point matches, that he had compared pores and ridges and they were similar. However, the science of ridgeology is also quite debatable. "The repeatability of the finite detail that is utilized in the comparison process has never been subjected to a definitive study to demonstrate that what is visible is actually a true third level detail or an anomaly...Ridgeology hasn't been scientifically proven to be repeatable, and its application is not standardized." Dusty Clark, What's The Point (Dec. 1999), http://www.latent-prints.com/id_criteria_jdc.htm/. Comparison of pores, or poreoscopy, is also a controversial technique which has not been validated and is questioned for many of the same reasons. *Id*. Finally, the rubber roll is a method by which prints of fingertips are taken with latex, and then transferred to a flat material. In doing so, the ridge and pore characteristics change. This further undermines the evidence of Mr. Agofksy's conviction.

418. Evidence of Robert Webb's unsavory and unreliable practices seriously undermine confidence in Mr. Agofsky's prior convictions. His false testimony had long since been unearthed by the time of Mr. Agofsky's 2004 trial. Frederick Whitehurst would have readily spoken with trial counsel, had they only contacted him (*Dec.*). Counsel were deficient for failing to investigate and uncover this information. It would have been critical to impeaching Farley and discrediting the government's aggravating factors. Trial counsel's failure to make any attempt to undermine the conviction was deficient performance. *See Rompilla*, 545 U.S. 374.

### iii. Bennett's Deposition Testimony

419.    Mr. Agofsky has consistently and unflaggingly maintained his innocence of the 1989 crimes and told his trial counsel in the Plant case that he wished to contest his guilt of those crimes. Nevertheless, trial counsel appears to have assumed Mr. Agofsky was guilty, and would be found guilty, of the prior crimes and, therefore, never investigated them, even to the extent of looking at ways in which the legal or scientific landscape had changed since the earlier cases were tried in the mid-1990's. Had trial counsel conducted such an investigation, they could have effectively challenged the reliability of the prior verdicts before the Plant jury. Given that the convictions for Daniel Short's murder served as the basis for three aggravating factors in the Plant case, investigating and challenging the prior verdicts, especially on the basis of any new evidence that had become available since the time of the original trial, should have been a central piece of the defense preparation.[59] Given that the fingerprint evidence used against Mr. Agofsky in the Short murder cases was the *only* physical evidence allegedly tying him to the scene of the Short murder, it was incumbent upon defense counsel in the Plant case to conduct an independent

---

[59] As Barlow has now made clear in his affidavit (SA 2336-37, 2339) and Mr. Agofsky confirms in his own (SA 2364-65), trial counsel never considered the possibility that Mr. Agofsky was innocent of these crimes. Barlow was, in fact, angry at Mr. Agofsky for refusing to name the third participant in the face of Mr. Agofsky's insistence that he was never part of the criminal enterprise and did not know who *any* of the participants were. SA 2337, 2339, 2365.

examination of the print evidence and to consult with an expert in the field to determine its legitimacy.[60] Trial counsel did neither.

420. Rather, trial counsel made no effort to investigate these prior crimes. Trial counsel did not ask Bennett to investigate the murder of Dan Short. SA 555. Bennett admitted that he "did not know a whole lot about" it. *Id*. They did not instruct him to interview Ladell Farley, who testified for the government. SA 559. Bennett did not ask Joseph Agofsky about the bank robbery or murder, although he had been convicted of both crimes along with his brother. SA 559.

421. Although trial counsel have asserted in their affidavits that they had at least obtained the Oklahoma trial transcript, the evidence indicates otherwise. Bennett testified that he requested and obtained 27 boxes of records from the Oklahoma Indigent Defender Services. SA 558. While Bennett initially claimed that the transcript was in those boxes, he subsequently admitted that he did not know what was in the boxes because he never looked inside them. SA 558. Mr. Agofsky's letters to counsel reflect that he repeatedly asked counsel for the transcripts, e.g., SA 675, but Mr. Agofsky reports that counsel never told him that they had obtained the transcript. SA 2366. And trial counsel did not produce the transcript to postconviction counsel.

422. Nor did trial counsel make any serious attempt to challenge these convictions during the Plant trial. Their only attempt to diffuse the impact this previous gruesome and premeditated crime would have on the jury at sentencing was to have the Government's witness

---

[60] Postconviction counsel have employed the services of an experienced latent print examiner, Kenneth Eng, who has examined the same latent prints that FBI print examiner, Russell Davey, testified about at the Short trials. Mr. Eng disagrees with Agent Davey's unqualified assessment that the latent prints could be individualized to Mr. Agofsky. Mr. Eng's opinion is discussed in detail below and in his declaration, attached hereto as SA 3756. Postconviction counsel has also consulted with Simon Cole, an expert in the science of latent print analysis. Dr. Cole's explanation of the flaws that were uncovered in the science of latent print analysis between the time of the Short murder trials and the 2004 Plant trial is also discussed below and set out in detail in his declaration, attached hereto as SA 3786.

acknowledge that the crime was not committed by Mr. Agofsky alone. Tr. Vol. 21, 45. This, of course, was a complete concession that Mr. Agofsky had participated in the commission of the crime.

### iv. Other Avenues Available to Defense Counsel

423. Given that the convictions for Daniel Short's murder served as the basis for several aggravating factors in the Plant case and supported the Government's theme that Mr. Agofsky posed an ongoing danger even within a prison environment, defense counsel had a duty to investigate and present any new evidence that had become available since the time of the original trial that would cast doubt on the reliability of the verdict in the Daniel Short case. By the time of the Plant trial in 2004, a substantial body of such evidence existed. Specifically, by 2004, evidence existed that would have enabled trial counsel to mount a serious challenge to the fingerprint evidence introduced in the Daniel Short murder trials.

424. This was critical because the only physical evidence tying Mr. Agofsky to the scene of Daniel Short's murder were two pieces of duct tape on which fingerprints were visible. One piece of the tape, as noted elsewhere herein, had been found by a local resident, washed up on shore of the lake in which Daniel Short's body surfaced. The second piece of tape was attached to the chair to which Mr. Short's body was taped.[61]

425. According to the 1997 trial testimony of Russell Davey, the examiner to whom the evidence was sent, almost immediately after these pieces of tape were received by the FBI, the visible prints were photographed and then chemicals were applied to the tape in an attempt to raise any underlying prints. The chemical application did not reveal any underlying prints and the

---

[61] The FBI gave these pieces of tape the identifiers Q1, referring to the piece of tape found on the chair, and Q45, referring to the piece of tape found on the lake shore.

chemical processing "took away the clarity" of the original visible prints. SA 3078, 3079. Thus, all that remained were photographic images of this critical evidence.

426. Agent Davey told the jury that he had then analyzed the photographic images of the prints (hereafter "latent prints") on both pieces of tape, compared them against Mr. Agofsky's inked prints and determined that the two prints on Q45, the piece of tape found on the lake shore, and the prints on Q1, the piece of tape attached to the chair, were Mr. Agofsky's prints. SA 3708, 3081, 3089, 3093-94. A second FBI agent, Robert Webb, testified that the torn edge from Q45 matched precisely the torn edge of Q1, the duct tape found on the chair into which Daniel Short was taped when he was killed. (*See infra* at 168-72 for a discussion of the fallacies of Agent Webb's testimony.) The testimony of both of these agents was given in categorical terms, admitting of nothing less than 100% certainty as to the validity of these matches. SA 3081, 3095. According to a report promulgated by the National Academy of Sciences at the behest of Congress, this was consistent with the position of the "friction ridge community [which] actively discourages its members from testifying in terms of a probability of a match; when a latent print examiner testifies that two impressions "match," they are communicating the notion that the prints could not possibly have come from two different individuals. SA 2875. See Nat'l Acad. of Sci., Strengthening Forensic Science in the United States: A Path Forward (Feb. 2009) (hereinafter "NAS Report"). at 5-11.[62] Agent Davey made clear that this is what he meant by his testimony. SA 3031-32.

---

[62] While the NAS Report was published in 2009 and, therefore, not available to counsel at the time of the Plant trial, the information contained therein that is cited to in this section, is historical. See Section VII, *infra,* for a discussion of the conclusions of the NAS Report and their implications for demonstrating Mr. Agofsky's innocence in the Short case.

427.    However, by the time of the Plant trial in 2004, substantial evidence casting doubt on the science of latent print analysis had come to the fore. This evidence provided serious ammunition that defense counsel could have used to shake the jury's confidence in the reliability of Mr. Agofsky's convictions for the Short murder.[63] SA 3795-802.

428.    Specifically, the end goal of fingerprint analysis is to "individualize" a print or "exclude" a print. That is, the effort is made to determine whether a latent print is sufficiently like a known inked print to be able to declare that the person who provided the inked print is the same person responsible for the latent print. This is known as an "individualization" or a "match." By contrast, the comparison of prints may result in a determination that the latent print is sufficiently different from a known inked print to enable the examiner to declare that the latent print does *not* come from the person who provided the inked print—*i.e.*, an exclusion. If the comparison of characteristics of the latent print and the known inked print does not yield sufficient likeness or differences to individualize or exclude, the examiner will declare the results of the examination "inconclusive." SA 3759.

429.    To establish a "match," a fingerprint examiner will look for similarities in location, type, and orientation of "ridge characteristics" of an unknown latent (*i.e.*, crime scene) fingerprint and a known inked print to determine whether the prints came from the same finger. SA 3759.

---

[63] Mr. Agofsky has already addressed the issue of the problems with duct tape matching. *See infra* Ground 12.2(B)(2). This section will focus on the problems of the fingerprint analysis.

430. In theory, an examiner is supposed to declare an exclusion if the examiner finds any point of genuine or unexplainable dissimilarity between two prints.[64] Thus, it is critical that an examiner have a clear, undistorted image of a print because, even where points of similarity exist, points of dissimilarity that would require exclusion of a suspect may be obscured. SA 3758-59.

431. Latent print terminology refers to three levels of detail that might be found in a print. Level one detail refers to fingerprint pattern configurations: loops, whorls, and arches. These are the gross patterns one sees when looking at a fingerprint. SA 3759.

432. Level two details include general friction ridge paths and ridge characteristics. Friction ridges rarely run evenly or in unbroken lines. The ridges display a number of features known as minutiae. The principal types of minutiae are: ridge endings, where a ridge ends abruptly; bifurcation, where a single ridge splits into two; lakes or enclosures, where a single ridge bifurcates and then reunites into a single ridge; an island, where a short piece of ridge has a determinate beginning and endpoint; a dot; a spur, where a short ridge branches off from a longer ridge at a point of bifurcation; and a crossover or bridge, where a short ridge joins two parallel ridges. SA 3759-60.

---

[64] The determination as to whether a point of dissimilarity is genuine or explainable falls upon the examiner who must rely upon his or her judgment, experience, and intuition in making this judgment. For example, fingerprints made by exerting more or less pressure may look different from one another but the examiner will not make an exclusion, even with the points of dissimilarity, if the examiner believes that they have been caused by a difference in pressure. A different examiner could come to a different conclusion, given the same physical evidence.

433. Level three details include pores and other spots on the prints, the location of which may be shown to be in the same relative position to contours and other known features of a fingerprint. SA 3760. Use of level three details in individualizing prints is highly controversial.[65]

434. If an examiner decides that two prints have similar ridge characteristics in sufficient number, the examiner will declare the prints a match. SA 3760, 3789. In most jurisdictions in the United States, no standard exists as to how many of these similarities must be present, or of what quality these similarities must be, for an examiner to declare a match. SA 3795-96.

435. The comparison of ridge characteristics of two fingerprints is a subjective process. The decision as to whether two fingerprints contain sufficient similarities or dissimilarities is made intuitively, without reference to a uniform set of standards. Likewise, the determination of whether dissimilarities are genuine or explainable is subjective. SA 3789, 3794. Thus, the entire process of fingerprint analysis is subject to human error and to "context" effect—that is, the human tendency to confirm what one already has reason to believe is the case. SA 3801-02.

436. Nevertheless, despite the potential for human error inherent in the process and the real possibility that different examiners will reach different results, individualizations are by professional convention and under the guidelines promulgated by the so-called "Scientific Working Group on Friction Ridge Analysis, Study and Technology (SWGFAST) proclaimed in terms of absolute certainty. SA 3789 This, in fact, is how Agent Davey announced the individualization of the latent prints in the Short case to Mr. Agofsky.[66]

---

[65] A report by the Department of Justice Office of the Inspector General has noted, "the reliability of these very small details in latent prints is the subject of continuing debate within the fingerprint community." Glenn A. Fine, *A Review of the FBI's Handling of the Brandon Mayfield Case*, U.S. Department of Justice Office of the Inspector General (2006) at 109.

[66] For example, Davey testified with regard to the prints on Q45, "Both prints were made by one and the same person and could not have been made by any other." SA 3089.

185

437.   Indeed, until the late 1990's, the discretion inherent in latent print analysis was rarely questioned and the so-called science that underlay claims of individualization was never challenged. However, the period between the Short murder trials and the Plant trial in 2004 spelled a sea change during which the entire discipline of latent print analysis was undermined. SA 3795-802.

438.   To wit, individualization of prints has been based on the assumption, never proven, that no two fingerprints are alike. Because of this common assumption, the evidence that an examiner has individualized or "matched" a print has traditionally been regarded in much the same way as DNA evidence is now regarded: it is accepted by courts and juries as irrefutable proof that the person from whom the known inked print was taken is indeed the person who left the unknown latent print. SA 3788-92.

439.   However, in DNA testing, data exist on the frequency with which each allele (type of gene) examined during the testing shows up within a particular human population. Thus, the rarity of any given DNA profile may be estimated by multiplying the estimated rarity of each of the alleles within the sample tested. The resulting product, commonly referred to as the "random match probability," may be treated as a reasonably reliable estimate of the rarity of the DNA profile within the population at large. SA 3789.

440.   The discipline of latent print individualization, however, lacks a process analogous to that which generates a match probability in DNA testing. Latent print examiners subjectively estimate the rarity of features found in a print, based upon their training and experience looking at prints. When an examiner's intuition tells him or her that the combination of ridge characteristics in the latent print match the features of a known print, taking into account both number and quality (*i.e.,* unusualness or rarity), the examiner will reach a conclusion of "individualization" or

186

"match." The examiner will then report and testify that the person so identified is the only possible source of the latent print. SA 3789.

441. No underlying data exist to support any such claim. It is simply not known whether every finger has a fingerprint that is unique.[67] Even if, however, this "fact" were to be established, there is also no data available with which to estimate how many fingers contain friction ridge patterns that are very similar to the friction ridge patterns found on some other person's finger.

442. These concerns about the unreliability of the science of fingerprint analysis, almost unheard of at the time of Mr. Agofsky's trials in 1994 and 1997 for the murder of Daniel Short, suddenly exploded onto the scene in the years leading up to the Plant trial in June, 2004. SA 3795-802. In March 2000, the Department of Justice, under whose auspices the FBI operates, issued a solicitation for "basic research" to determine the scientific validity of individuality in friction ridge examination, noting that the "theoretical basis for ... individuality has had limited study and needs additional work to demonstrate the statistical basis for identifications. It is expected that proposals would address the relative importance of different minutiae to establish individuality, as well as the statistical significance of groups of minutiae." The Department of Justice also solicited validity testing for procedures for comparing friction ridge impressions that were both standardized and validated. The Solicitation stressed that the procedures had to be tested statistically in order to demonstrate that, by following the stated procedures, analysts would produce results with acceptable error rates.[68] Thus, four years before Mr. Agofsky's trial, the federal government itself

---

[67] The long-accepted truism that no two snowflakes are identical was reported disproven in 1988, in the Bulletin of the American Meteorological Society. Knight, N.C., "No Two Alike?" 69 Bull. Am. Meteorological Soc. 496 (1988).

[68] This has not yet been accomplished. SA 3799.

announced that it had no scientific basis to support the forensic evidence that had convicted Mr. Agofsky of the Daniel Short murder. SA 3799.

443. By 2002, an article in the Southern California Law Review, criticized the lack of science underlying fingerprint analysis. The article talked about the DOJ solicitation and discussed, among other things, the challenges that had been brought in federal court beginning in 2000 to the scientific reliability of latent print testimony in cases across the country. *See* Epstein, Robert, "Fingerprints Meet *Daubert*: The Myth of Fingerprint 'Science' is Revealed," 75 Southern California Law Rev. 605, 606, 649-56 (2002).

444. By 2004, defense counsel had abundant sources of scholarly and scientific literature upon which to raise serious questions about the "proof" on which Mr. Agofsky was convicted for the murder of Daniel Short. This included: 2 David Faigman, et al., MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY §27-2.3.1 at 386 (2d ed. 2002). ("Woe to fingerprint practice were such [*Daubert* admissibility] criteria applied."); Michael Saks, *Merlin and Solomon: Lessons from the Law's Formative Encounters with Forensic Identification Science,* 49 HASTINGS L. J. 1069, 1106 (1998) ("By conventional scientific standards, any serious search for evidence of the validity of fingerprint identification is going to be disappointing. . . . A vote to admit fingerprints is a rejection of conventional science as the criterion for admission. A vote for science is a vote to exclude fingerprint expert opinions."); James E. Starrs, *Judicial Control Over Scientific Supermen: Fingerprint Experts and Others Who Exceed the Bounds,* 35 CRIM. L. BULL. 234 (1999) ("Instead of meaning incapable of error, fingerprint identifications are declared to be infallible on account of the uniqueness of fingerprints to each person . . ."); David A. Stoney, *Measurement of Fingerprint Individuality, in* ADVANCES IN FINGERPRINT TECHNOLOGY 327, 383 (H. C. Lee and R. E. Gaensslen eds., 2001) ("From a

statistical viewpoint, the scientific foundation for fingerprint individuality is incredibly weak.”); Jennifer L. Mnookin, *Fingerprint Evidence In An Age of DNA Profiling,* 67 BROOK. L. REV. 13 (2001) (“In the case of fingerprinting, the general rate of error is simply not known.”); Simon A. Cole, SUSPECT IDENTITIES: A HISTORY OF FINGERPRINTING AND CRIMINAL IDENTIFICATION (2001); David L. Faigman, *Is Science Different for Lawyers?* 297 SCIENCE 339 (2002) (fingerprinting has “not been seriously tested”); Paul Giannelli, *Fingerprints Challenged!* 17 CRIM. JUST. 33, 35 (Spring 2002) (“In its interpretation of *Daubert, Plaza I* is a well-written opinion. *Havvard* is not.”); Robert Epstein, *Fingerprints Meet Daubert: The Myth of Fingerprint “Science” is Revealed,* 75 SO. CAL. L. REV. 605, 657 (2002) (“Having considered the various indicators of reliability set forth by the Supreme Court in *Daubert,* it is evident that at the present time, latent fingerprint identifications do not constitute reliable evidence.”); Jessica M. Sombat, *Latent Justice: Daubert’s Impact on the Evaluation of Fingerprint Identification Testimony,* 70 FORDHAM L. REV. 2819, 2825 (2002) (“the result Judge Pollak reached when he excluded expert testimony concerning fingerprints [in *Llera Plaza I*] was fair.”)[69]; *Recent Case,* 115 HARV. L. REV. 2349, 2352 (2002) (“Fingerprint expert testimony does not survive application of the Daubert factors . . .”);; Donald Kennedy, *Forensic Science: Oxymoron?* 302 SCIENCE 1625 (2003) (Fingerprinting’s “reliability is unverified either by statistical models of fingerprint variation or by consistent data on error rates.”); David H. Kaye, *The Nonscience of Fingerprinting: United States v. Llera Plaza,* 21 QLR 1073, 1087 (2003) (“As Llera-Plaza I so clearly reveals, this [the evidence advanced in support of the admissibility of latent fingerprint

---

[69] In 2002, a federal district court judge in the Eastern District of Pennsylvania issued a lengthy decision concluding that fingerprint analysis failed the test of *Daubert* and ruling that the government’s expert could not testify that the fingerprints were a “match.” *United States v. Llera-Plaza*, 179 F. Supp. 2d 492 (E.D. Pa. 2002). Following a motion for rehearing, however, the court issued a decision, giving the government expert permission to testify.

individualization] does not satisfy Daubert."); Jennifer L. Mnookin, *Fingerprints: Not a Gold Standard,* 20 ISSUES IN SCI. & TECH. 47 (2003) ("Judge Pollak's first opinion [restricting latent fingerprint individualization testimony] was the better one."); Tamara F. Lawson, *Can Fingerprints Lie? Re-weighing Fingerprint Evidence in Criminal Jury Trials,* 31 AM. J. CRIM. L. 1, 65 (2003) ("Currently fingerprint analysis is under attack because of the lack of study done on the accuracy of the examiners . . ."); Tara Marie La Morte, *Sleeping Gatekeepers: United States v. Llera Plaza and the Unreliability of Forensic Fingerprinting Evidence under Daubert,* 14 ALB. L.J. SCI. & TECH. 171, 173 (2003) (discussing "strong indications that the fingerprinting field should not survive a rigorous Daubert analysis."); Jane Campbell Moriarity, PSYCHOLOGICAL AND SCIENTIFIC EVIDENCE IN CRIMINAL TRIALS, §12:15 (2004) ("The assumption of the validity of fingerprinting rests upon law, rather than science."); Simon A. Cole, *Grandfathering Evidence: Fingerprint Admissibility Ruling from Jennings to Llera Plaza and Back Again,* 41 AM. CRIM. L. REV. 1189, 1215 (2004) ("It is clear that no studies exist that measure the accuracy of fingerprint examiners when they make conclusions of identification."); Nathan Benedict, *Fingerprints and the Daubert Standard for Admission of Scientific Evidence: Why Fingerprints Fail and a Proposed Remedy,* 46 ARIZ. L. REV. 519, 538 (2004) (". . . judges have generally relied on their instincts and the long history of judicial acceptance of fingerprint evidence to admit it without serious consideration of the science behind it."); Lyn Haber and Ralph Norman Haber, *Error Rates for Human Fingerprint Examiners, in* AUTOMATIC FINGERPRINT

RECOGNITION SYSTEMS 339 (N. K. Ratha and R. Bolle eds., 2004) ("no data have been collected on how accurately latent print examiners match different images of the same finger.").[70]

445.     Even if defense counsel had otherwise given no thought to investigating the reliability of the fingerprint evidence used to convict Mr. Agofsky of the murder of Daniel Short, the media frenzy of May 2004, involving the arrest and subsequent release of Brandon Mayfield, and the cloud left by these events on the so-called science of fingerprint analysis, could not have escaped counsel's attention. Jury selection in Mr. Agofsky's trial began on June 14, 2004. On May

---

[70] As noted in Claim VII., *infra*, the pace of publications exploring these concerns has not abated since 2004. See, e.g., Jane Campbell Moriarty, PSYCHOLOGICAL AND SCIENTIFIC EVIDENCE IN CRIMINAL TRIALS, §12:15 (2004) ("The assumption of the validity of fingerprinting rests upon law, rather than science."); Simon A. Cole, Grandfathering Evidence: Fingerprint Admissibility Ruling from Jennings to Llera Plaza and Back Again, 41 AM. CRIM. L. REV. 1189, 1215 (2004) ("It is clear that no studies exist that measure the accuracy of fingerprint examiners when they make conclusions of identification."); Nathan Benedict, Fingerprints and the Daubert Standard for Admission of Scientific Evidence: Why Fingerprints Fail and a Proposed Remedy, 46 ARIZ. L. REV. 519, 538 (2004) (". . . judges have generally relied on their instincts and the long history of judicial acceptance of fingerprint evidence to admit it without serious consideration of the science behind it."); Sandy L. Zabell, Fingerprint Evidence, 13 J. L. & POL'Y 143, 178 (2005) ("ACE-V is an acronym, not a methodology.") (Original emphasis); Katherine Schwinghammer, Fingerprint Identification: How "The Gold Standard Of Evidence" Could Be Worth Its Weight, 32 Am. J. Crim. L. 265, 266 (2005). ("The reliability of fingerprint identification has never been comprehensively tested."); Margaret A. Berger, What Has a Decade of Daubert Wrought?, 95 Am. J. Pub. Health S59, S64 (2005). ("Clearly . . . the courts are not applying Daubert stringently in the criminal context. The paramount example is fingerprint evidence that has never been validated.")

But the *coup de grace* came in February 2009, when the National Academy of Sciences, the preeminent scientific organization in the United States, published the report they had been commissioned by Congress to write after conducting a study of the forensic sciences. SA 2817 et seq. The NAS Report concludes that "with the exception of nuclear DNA analysis . . . no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source." SA 2837 (emphasis added). The NAS Report further recognizes that "there is a notable dearth of peer-reviewed published studies establishing the scientific bases and validity of many forensic methods," *id.* at 5-6, including latent print analysis. SA 2876.

6, 2004, Brandon Mayfield, a lawyer in Portland, Oregon, was arrested and jailed as a material witness in the deadly train bombings that killed 191 people in Madrid, Spain, in March 2004. The evidence that purportedly tied Mr. Mayfield to the scene of the crime was a fingerprint found on a plastic bag used by the terrorists. In media reports, U.S. officials insisted that the fingerprint, which had been analyzed by the FBI, was an "absolutely incontrovertible match." The other evidence against Mr. Mayfield at the time of his arrest, cited by law-enforcement officials, was: that Mr. Mayfield was a practicing Muslim; that he had represented one of the "Portland Seven," who had been accused of terrorist activities, in a child custody battle; and that his wife had contributed money to a Muslim charity that was under investigation for (perhaps) providing money for terrorist activities. Thus, the case against Mr. Mayfield rested, much as the case against Mr. Agofsky did, on the strength of a fingerprint match and little else. SA 3800-02, 3806, 3807.

446.    Fortunately for Mr. Mayfield, Spanish law enforcement personnel expressed serious concerns over the quality of the fingerprint match, despite the FBI's confidence in it and its insistence that the match had been confirmed by another FBI fingerprint expert as well as a court-appointed expert. Only at the point at which the Spanish officials identified another man—an Algerian with demonstrable ties to terrorist organizations—did FBI examiners agree to travel to Spain, where they realized that the latent print on the plastic bag was a closer match to that of the Algerian suspect than it was to Mr. Mayfield's. SA 3644, 3800.

447.    The mistake was attributed to two factors initially: first, there *had* been a significant number of points of similarity between the unknown latent print and Mr. Mayfield's print; second, the quality of the electronic copy of the print the FBI was using for comparison basis lacked the

192

clarity of the print in its original form.[71] SA 3637, 3806. These two factors demonstrate at least three points central to Mr. Agofsky's case. First, two prints can be very similar and the match can still be wrong. Second, the mere fact that other fingerprint examiners have confirmed the match does not confer infallibility on the match. Third, a reproduction of a print may not be a precise copy of the original print.

448. Two weeks after his arrest on these charges, Mr. Mayfield was released. On May 24, 2004, the FBI issued an apology, explaining that, as a result of this incident, the FBI's Latent Fingerprint Unit "will be reviewing its current practices and will give consideration to adopting new guidelines for all examiners receiving latent print images when the original evidence is not included." SA 3800, 3806, 3807.

449. The so-called match in Mr. Mayfield's case was based on an electronic image. The FBI did not have the physical evidence with the original fingerprint on it. Once the FBI examiners

---

[71] Two additional factors in the misidentification, highly relevant to Mr. Agofsky's case, were cited in the report by the Department of Justice, Office of the Inspector General (hereafter, "OIG Report."). First, the FBI protocol did not call for double-blind testing. This increased the opportunity for a "confirmation" effect. In other words, each of the FBI examiners and the subsequent court-appointed examiner who compared the fingerprints was aware from the beginning that Mr. Mayfield was a suspect. The examiners also knew that other examiners had declared the fingerprints to be a match.

Second, the examiners appeared to have engaged in "reasoning backwards" from the known inked print to the latent print. In other words, instead of first identifying on the latent print points that could serve as usable comparison points, such a distinguishable level two details, the examiners found such points on the known inked prints and then looked for the same points on the latent prints. The OIG Report found that in several instances, these characteristics "found" by the FBI examiners did not really exist but were merely suggested by indistinct markings on the latent prints. *See* SA 3641.

As noted below, both of these issues have been cited by Mr. Agofsky's independent print examiner, Kenneth Eng, as problems in the FBI's handling of the latent print analysis in the Short murder investigation.

flew to Spain and saw the original print pattern on the plastic bag on which it had been made, they agreed that it was not Mr. Mayfield's.

450. Mr. Agofsky's case presented almost an identical issue. The FBI destroyed the original latent prints found on the duct tape while trying to find underlying prints, and had only a photographic image from which to work when conducting its analysis. Thus, the FBI examiners were not using the original latent prints in conducting their examination. Worse, neither the FBI nor an independent examiner will ever have access to the original latent prints, in contrast to the examiners in the Mayfield case.

451. News of Mr. Mayfield's arrest, subsequent release, the apology from the FBI, and the FBI's announcement that it was undertaking a review of the internal practices by which its Fingerprint Unit examined print images, was reported nationwide by every major news organization in every form of media, including United Press International, the Associated Press, Fox News, CNN, MSNBC, USA Today, and the New York Times. See, *e.g.*, SA 3806-3857. Defense counsel could not have failed to hear about these events.

452. The importance of this news story to Mr. Agofsky's case went even further. In Mr. Mayfield's case, as was also widely reported, three FBI examiners had "confirmed" that the latent print in question was Mayfield's, as had an independent court-appointed fingerprint examiner. See, *e.g.*, SA 3850-51. Thus, defense counsel in Mr. Agofsky's case had every reason to believe that the central piece of evidence in Mr. Agofsky's earlier case was available to substantial challenge, even if they had not previously been aware of the scholarly literature challenging fingerprint identification.

453. As noted earlier, Mr. Davey testified at Mr. Agofsky's Missouri and Oklahoma trials without qualification that the unknown latent prints found at the scene of the crime matched

Mr. Agofsky's inked prints. As part of postconviction counsel's investigation into evidence in the Short murder case, Mr. Agofsky has now had an independent analysis conducted of the photographic image of the unknown latent prints and known inked prints that had previously been compared by the FBI fingerprint examiner, Russell Davey.

454. Kenneth Eng is a certified latent print examiner with more than 25 years' experience. Over the course of his 22 years as Detective Investigator in the Latent Print Unit of the New York City Police Department, Mr. Eng has conducted over 800,000 inked and latent print comparisons. Mr. Eng has testified on numerous occasions and has lectured and trained members of the New York City Police Department and other law enforcement officials in the techniques and use of latent print analysis. SA 3753-55.

455. Mr. Eng disagrees with Agent Davey's assessment that the latent prints collected by the FBI in the Short case could be individualized to Mr. Agofsky. In Mr. Eng's judgment, which he holds to a reasonable degree of professional certainty, none of the latent prints on photographs of Q1 or Q45 could conclusively be individualized by comparison to the inked prints of Mr. Agofsky. Not only did he find an insufficient number of points of similarity in the prints, but he was unable to find some of the points of similarity identified and highlighted by Agent Davey when he testified at Mr. Agofsky's trials in 1993 and 1997. Mr. Eng believes Russell Davey's analysis of these prints was flawed. SA 3761.

456. In reaching this opinion, Mr. Eng notes two particularly important points. First, each of the images of the latent prints used by the FBI reflected partial, not full, prints. Even Agent Davey acknowledged that the prints on Q1 were of very small areas of fingertips and yielded relatively few points of similarity. SA 3093-94. The images of latent prints on photographs of Q45 were also of partial prints. SA 3761. In addition, large sectors of the prints on Q45 were smudged

and otherwise obscured. SA 3761. It was, therefore, impossible to tell whether these areas contained unexplainable points of dissimilarity which might have excluded Mr. Agofsky. SA 3761.

457.  Perhaps more important, Mr. Eng was unable to see in the latent prints all of the characteristics and details Agent Davey had highlighted on the inked prints. Mr. Eng explains that a problem that sometimes occurs when examiners are comparing prints is that they will identify details in the known inked print first and then "find" those same details in the latent print because they are primed to see them. Mr. Eng concludes that, whether or not this is what happened with Agent Davey in the Agofsky case, he himself is unable to find the points of similarity identified by Davey in the prints and cannot agree with Agent Davey's conclusion that the latent prints could be individualized to Mr. Agofsky.[72] SA 3761.

458.  These are critical points, particularly in light of the FBI's Mayfield debacle. Defense counsel could have drawn any number of parallels between the FBI's handling of evidence in the Short case and its handling of evidence in the Mayfield case. Defense counsel could have pointed to the fact that the FBI had misidentified Brandon Mayfield's print despite the fact that four trained examiners, three from the FBI, concluded that the latent print matched Mr. Mayfield's. Defense counsel could also have raised the point that, in Brandon Mayfield's case, Spanish law enforcement personnel had maintained in its original condition the latent fingerprint that was found at the scene of the crime, that Spanish law enforcement personnel were able to demonstrate that the original latent contained far more detail than the electronic image used by the FBI, and that the existence of the original in turn enabled Spanish law enforcement to correct the FBI's mistake.

---

[72] As noted earlier, in the face of the FBI's embarrassment over misidentifying Brandon Mayfield as a terrorist bomber, the Office of the Inspector General undertook a major effort to determine how the FBI had gone so far astray. The OIG cited this same problem of reasoning backwards from the known inked print to the latent as a factor in the FBI's misidentification of Brandon Mayfield, as well. *See* SA 3624.

From there, defense counsel could, therefore, have argued that, because the FBI destroyed the original latent prints from the scene of Daniel Short's murder, Mr. Agofsky might never be able to prove that the FBI made a mistake in its comparison but the likelihood was just as great that they had made a similar mistake based on the same flaws in the protocols employed.

459. Counsel could also have established that Agent Davey misled the jury at the Short murder trials by testifying without qualification that the fingerprints on the tape were indisputably Mr. Agofsky's. And, counsel could have introduced the expert testimony of someone like Kenneth Eng, who could have pointed to the specific flaws he or she had found in the identification and testimony given by Agent Farley.

460. In other words, a proper investigation into, and challenge of, the forensic evidence used against Mr. Agofsky in the Short case might well have convinced one or more jurors at the Plant trial that the Government had failed legitimately to prove its case in the Short case beyond a reasonable doubt.

461. None of the reasons given by trial counsel in the Plant case for failing to investigate the evidence in the Short case are sufficient to defeat a claim of ineffective assistance of counsel. In his affidavit, attorney Black asserts that he did not raise the issue at the Plant trial of Mr. Agofsky's claim of innocence of the murder of Daniel Short for two reasons. First, he did not want to open the door for the Government to introduce all the evidence and "highly prejudicial facts" existing against Mr. Agofsky in the prior case. Second, according to Black, Mr. Agofsky did not want to relitigate the prior conviction due to "family concerns and involvement." SA 2326. Attorney Barlow asserts that it would have been "'suicide by trial' to try to convince the jury that Agofsky was innocent of the prior capital murder case, especially when Agofsky chose not to discuss the facts of that case with us." SA 2339.

462.    Neither attorney's reasons for failing to investigate a potential challenge to the latent print evidence constitutes a genuine strategic decision. One simply cannot rule out a challenge to as fundamental a matter as aggravating circumstances unless one has first investigated and determined the bases on which such a challenge could be mounted. The client's expressed wish not to look into a prior conviction has been expressly rejected as a reason for failing to investigate. The United States Supreme Court has found that the resistance or even obstreperousness of one's client does not provide such an excuse. See, *e.g., Rompilla*, 545 U.S. 374. Thus, even if Mr. Agofsky had actually refused to discuss the Short case with counsel -- which he did not -- they would still have been professionally obligated to investigate it, given its centrality to the capital sentencing issues.

463.    Moreover, even if Mr. Agofsky had not wanted to re-litigate this matter[73] *had no new evidence come to light*, counsel had no way whatsoever of knowing what Mr. Agofsky's reaction would have been, had they raised this new avenue of attack with him.

464.    Defense counsel's failure to investigate, which left them unable to mount this challenge, was prejudicial to Mr. Agofsky's case. If the validity of the verdicts in the Short case had been undermined, there exists a reasonable probability that at least one juror in the instant case would have voted against death. In its penalty phase eligibility determination, the jury had already determined that it did not believe Mr. Agofsky killed Plant intentionally. But the nature of the murder of Daniel Short as presented in testimony of FBI agent Ladell Farley at the penalty phase of trial left no apparent doubt about either Mr. Agofsky's guilt or the intentionality of the killing in that case. Had defense counsel in the Plant trial given the jury any reason to believe that Mr. Agofsky might be innocent, as he had maintained unabatedly since his arrest for the murder in

---

[73] Which Mr. Agofsky does not concede and, in fact, hotly contests. SA 2365.

198

1992, there is a reasonable probability that one or more jurors would have voted for life, rather than death.

*v.    Conclusion*

465.    Mr. Agofsky was prejudiced by trial counsel's failure to investigate the shaky circumstances of his prior conviction and to use them to impeach the government's case in aggravation. The government relied heavily on the Noel State Bank robbery and murder of Dan Short in its case in aggravation against Mr. Agofsky. They introduced it as the basis for two statutory aggravators: 1) that Mr. Agofsky was serving a life sentence in prison and 2) that he had a previous conviction for a federal offense for which a life sentence was authorized. Tr. Vol. 21, 14-15. They also argued it extensively as the basis for the non-statutory aggravator that he was a future danger. *Id*. at 15. In their closing penalty-phase argument, the prosecution repeatedly emphasized the conviction. "There is a fire burning in Shannon Agofsky since the day Dan Short was thrown off the bridge. His own psychologists called in antisocial disorder. Regular folks, you just call it that he's a killer." (Tr. Vol. 24, 332). "You know that he's 18 because you heard Ladell Farley, the retired FBI agent who investigated the execution of Dan Short." (Tr. Vol. 24, 333). "The next step in putting out the fire is the statutory aggravators… you heard that he was convicted of armed robbery and the murder of Dan Short and received a life sentence." (Tr. Vol. 24, 336). "Look at the senselessness of the killing, he had no reason to kill Dan Short." (Tr. Vol. 24, 336). "The tragic death of Dan Short, for which the defendant received life imprisonment….Can you imagine in a more terrible way? Tied to a chair, thrown off a bridge, weighted down and drown." (Tr. Vol. 24, 369). That he received life in "the horrible commission of the death of that first victim should cry out shame on you, premeditated murder again." (Tr. Vol. 24, 370). "November 23, 1992, convicted in the western district of Missouri and sentenced to life imprisonment for the armed bank robbery resulting in the killing of the bank president." (Tr. Vol. 24, 371).

466.     The testimony and argument was pervasive and, with no effort by trial counsel to rebut, it was persuasive. Each juror found each of the three separate aggravators based upon Mr. Agofsky's prior conviction. Trial counsel was deficient in failing to use even the information that they had in their possession to impeach Farley and rebut the aggravator and in failing to investigate and present additional evidence available in 2004. There is a reasonable probability that had trial counsel created doubt about these significant aggravators, the outcome of Mr. Agofsky's trial would have been different. *Strickland*, 466 U.S. 368.

### 3.     Federal Firearms Conviction

467.     FBI Agent Farley also testified about his involvement in an investigation that resulted in of Mr. Agofsky's conviction for the interstate transport of stolen firearms. The prosecution alleged the conviction as a non-statutory aggravating factor and introduced the judgment into evidence. (Tr. Vol. 21, 42). Farley testified that information developed during the investigation of the Noel State Bank robbery suggested that Mr. Agofsky had stolen and transported stolen firearms, along with others. *Id*. at 44. On cross-examination, Farley testified that the firearms convictions occurred first, in 1991, and that they involved two residential burglaries following which the firearms were taken across state lines and sold. *Id.* at 45.

468.     Information about these burglaries came from Gant Sanders. Sanders confessed to and gave information about these and many other robberies, which were never solved. Sanders was never prosecuted by the state, but received federal probation for his cooperation against Mr. Agofsky. As set forth in ¶ 404, *supra*, Sanders acknowledged that he received substantial consideration for his cooperation.

469.     One count in the conviction is based upon the burglary of the home of Buddy Cousatte, Mr. Agofksy's uncle. Buddy Cousatte reported his house burglarized and guns stolen. Had counsel spoken to family members, counsel would have learned that they believed the

insurance company determined that a burglary had not occurred, and that it instead was insurance fraud. Had counsel spoken to Mr. Agofsky's family members they would also have learned that Buddy Cousatte is a convicted felon, with a history of making false insurance reports.

470. Trial counsel were deficient for failing to question Farley about Sanders' credibility problems and the issue of the insurance investigation. The conviction was both introduced into evidence and elicited through Farley's testimony. It served as the basis for two aggravating factors: one statutory aggravator that Mr. Agofsky had a previous conviction for a federal offense, and one non-statutory aggravator that he had a prior conviction for the interstate transportation of stolen property. (Tr. Vol. 21, 14-15). The government referred repeatedly to this in their penalty phase opening and closing arguments. (Tr. Vol. 21, 336-337, 334, 371). The jury found these aggravators unanimously. There is a reasonable probability that had counsel impeached Farley with the above information, the outcome of Mr. Agofsky's trial would have been different. *Strickland*, 466 U.S. 368.

471. Altogether Ladell Farley accounted for the majority of the evidence in support of half of the aggravating factors presented to the jury. His testimony was the only testimony in support of three statutory aggravators: that Mr. Agofsky was a prisoner serving a life term; that he had a previous conviction for a federal offense involving a life sentence; and that he had a federal offense with a firearm. It was the only testimony in support of one of the non-statutory aggravators: that he had a prior conviction for transportation of firearms. In addition, Farley's testimony offered major support for the non-statutory aggravator of future dangerousness. All five of these factors were found unanimously. As stated above, the government emphasized those aggravators throughout its penalty phase closing. (Tr. Vol. 24, 332, 333, 336, 337, 339, 369, 370, 371).

> We have shown you eight reasons that you can take with you to
> decide that the death penalty, just those, each of those can carry the

201

> day. I submit that one of them, the tragic death of Dan Short. Can you imagine in a more terrible way? Tied to a chair, thrown off a bridge. He received life imprisonment for that. And now you have found him guilty for premeditated murder and the defense says life imprisonment is what he should receive. He's already punished. In fact, he has life imprisonment plus 60 months because of the firearms conviction, and their argument is that its reasonable for life imprisonment again.

*Id.* at 369.

472. The failure of defense counsel to adequately impeach Farley was extremely prejudicial to Mr. Agofsky. Had they done so, there is a reasonable probability that the outcome of his trial would have been different. *Strickland*, 466 U.S. 368.

### 4. 1992 Refusal To Clean Cell

473. One of the disciplinary infractions the government offered in support of the non-statutory aggravating factors was Mr. Agofsky's refusal to clean the wall of his cell in the USP Medical Center in Springfield, Missouri, in 1992. At the time, Mr. Agofsky was incarcerated in the Segregated Housing unit ("SHU") without a cellmate. Tr. Vol. 21, 64-65. An officer noticed that the wall was saturated with bodily fluids, and Mr. Agofsky refused to clean it when ordered to do so. Tr. Vol. 21, 65-67.

474. A reasonable investigation would have disclosed, and the defense could have presented evidence to the jury, that Mr. Agofsky was sent to Springfield because of his ongoing Noel State Bank trial there. He was twenty-one years old and placed in a single cell in the SHU. His only previous experience with incarceration had been in the comparatively unrestricted conditions at the USP Medical Center in Rochester, Minnesota, where he was a member of the "work cadre," an able-bodied inmate assigned to a prison for mentally and physically ill inmates to help keep the institution running. At that time, Mr. Agofsky was serving his sentence for interstate transport of firearms and was not under maximum security status. His transfer to the

SHU at Springfield was his first experience with lockdown conditions. Also, the first trial for the Noel State Bank robbery was approaching and Mr. Agofsky was trying to convince his brother, who was married with a baby on the way, to testify against him in return for leniency, but his brother was refusing to do so.[74] Mr. Agofsky seldom left his cell and grew depressed and, on occasion, oppositional.

475.    The infraction was used by the government to support non-statutory aggravating factors to procure Mr. Agofsky's death sentence. A BOP officer, Officer Leonard Smith, told the jury that Mr. Agofsky's cell wall was saturated with bodily fluids and Mr. Agofsky refused to clean it when ordered to do so. Tr. Vol. 21, 65-67. In his deposition, Bennett admitted that the attorneys did not ask him to interview Officer Smith. SA 561.

476.    As discussed elsewhere in this motion, counsel were ineffective for failing to investigate the incident and present evidence that Mr. Agofsky, who was 21 years old and facing a capital trial for a crime that he did not commit, was depressed. Mr. Agofsky was dealing with the harsh realities of solitary confinement and 23-hour lockdown.

477.    Joseph Agofsky Jr., Mr. Agofsky's brother, could have helped to explain this to the jurors. Mr. Agofsky was transferred to Springfield Medical Center while he and Joe Jr. were being prosecuted for the Noel State Bank robbery. During that time Joe's wife and the brothers' mother, Sheila, would visit Mr. Agofsky frequently and then report back to Joe. Joe could have told the jurors about the conditions at Springfield. "They were keeping the light off all day. He could not read or write to anyone. He just sat in his room in the dark. He never knew what time of day it was or when the days change." SA 1944. In addition, Joe Jr. could have testified that later his brother

---

[74] Joe would never testify against Shannon, and the two brothers celled together amicably in Oklahoma for an extended period.

"told me that he began hallucinating during this time and once saw a snake come out of the drain in the middle of his room." SA 1944. Bennett admitted in his deposition that he never asked Joseph Agofsky about the incident involving Mr. Agofsky's refusal to clean his fluids off the walls. SA 558.

478.    Sheila Agofsky saw her son as frequently as she could during this time period. She could have told the attorneys that Mr. Agofsky's "incarceration was hard on him...In prison, he experienced a savage, threatening existence. Every day he lived in fear of attacks, assaults, or even worse." SA 1960. Bennett did not ask Mr. Agofsky's mother about her son's adjustment to incarceration. (*Id.*) Nor did he ask her about the incident involving the bodily fluids. SA 558.

479.    The defense could also have interviewed and presented the testimony of Gene Sides, an older inmate who took young Mr. Agofsky under his wing. SA 2313. Sides could have confirmed Joe Agofsky's account of the disorienting effect of the conditions at Springfield, including the guards' manipulation of the lights. He could have described how he counseled Mr. Agofsky not to follow the lead of the rebellious younger inmates who were "acting out" and encouraging him to do the same. Sides convinced Mr. Agofsky to clean his cell wall and persuaded the guards to transfer the younger inmate to his own section of the prison. After that, Mr. Agofsky "mellowed right out" and never had another problem at Springfield. SA 2314. Sides taught Mr. Agofsky the unwritten rules he needed to learn in order to survive a life sentence: not putting up with "rats" and child molesters, not celling with a member of another race, and standing up for himself. SA 2314.

480.    The failure of Mr. Agofsky's trial counsel to investigate and rebut this non-violent incident was deficient performance. Reports of the incident were contained in Mr. Agofsky's BOP file, which was in counsel's possession. Mr. Agofsky also described it in the outline he made for

counsel of all of his prior disciplinary infractions. SA 646. Had counsel properly investigated the incident by reviewing the records in their possession and interviewing witnesses who knew about it, the jury could have seen the incident as a manifestation of Mr. Agofsky's inexperience and depression while he adjusted to prison, and not, as the Government argued, a hallmark of his defiance.

481. A reasonably complete investigation could easily have disclosed the context of and reasons for Mr. Agofsky's infraction. If the jurors had understood that Mr. Agofsky's inexperience with the rigors of solitary confinement under maximum security, his youth, his depression, and the tensions of his approaching trial all contributed to his unsanitary behavior and intransigence when ordered to clean up after himself, that information could have mitigated whatever weight they gave to this evidence. The defense's failure to investigate and present evidence that could have helped the jurors to understand this infraction was prejudicially deficient performance.

5.       1994 Lompoc Serving Line

482. The government introduced evidence that, while Mr. Agofsky was incarcerated at USP Lompoc in 1994, he was assigned with two other inmates to serve on the food line. One of them argued that three ounces of meat was not enough, but they were ordered to serve the portions they were directed to serve. Later, when the three inmates were reproved because one of them had defiantly served more meat than directed, all three, including Mr. Agofsky, took off their hats and gloves and left the serving line. All three received disciplinary charges. Tr. Vol. 21, 55-60.

483. Because trial counsel conducted no independent investigation of the government's penalty phase case, the defense team never talked to the inmate who served the meat, Roderic Russell. Russell would have testified that he was serving roast beef to the inmates, while Mr. Agofsky might have been serving bread. Russell had words with the food service foreman, walked off the food service line, and encouraged Mr. Agofsky and the other inmate on the serving line to

205

walk off as well. Russell would have testified that, if Mr. Agofsky had not followed suit, it would have reflected negatively on him; he did not have much choice about whether to walk off. A527.

484. Trial counsel never asked the BOP employee who testified about this incident, Fred Wainer, whether one of the other inmates, and not Mr. Agofsky, raised the issue of the amount of meat and initiated the work stoppage. Nor did he ask either Wainer or Elizabeth Pelz, his prison culture expert, or either of his prison consultants, about the importance of solidarity among inmates if one inmate refuses to perform an assigned task in a protest. And he did not introduce documentary evidence demonstrating that Mr. Agofsky was found not guilty of the most serious charges arising from the incident, suggesting that the authorities did not consider him the instigator. The disciplinary hearing officer ultimately found insufficient evidence that Mr. Agofsky had participated in a work stoppage or refused to work, and sustained only the lesser charge of disobeying an order, imposing a sanction of 30 days' commissary restriction. A226, 228.

485. The government introduced evidence of this infraction through the testimony of Officer Fred Wainer. Tr. Vol. 21, 51. In his deposition, Bennett acknowledged that trial counsel never asked him to investigate the infraction or interview Officer Wainer. SA 561. Because counsel had not investigated and were poorly prepared, they were unable to cross-examine Wainer effectively to show that Mr. Agofsky was not the instigator and was not found guilty of the serious infraction of work stoppage.

486. The defense team's failure to investigate the circumstances surrounding this infraction, or to present any prison culture evidence—through their three prison experts or other witnesses—explaining why such an incident can occur, was prejudicially deficient performance. An understanding of the reasons for the infraction, and the fact that another inmate was primarily responsible, could have lessened the weight the jurors gave to it.

6.    1998 Lompoc Incident

487.    The prosecution alleged, in support of a non-statutory aggravating factor, Mr. Agofsky's involvement in a large disturbance on the exercise yard in general population at USP Lompoc in 1998. It presented the testimony of Christopher Mattie, a guard posted at an observation tower overlooking the yard on the day of the incident. Mattie testified that a flag football game between two housing units had just ended when he observed Mr. Agofsky and three other inmates arguing with a black inmate. This continued for three or four seconds until "it just erupted' into indiscriminate fighting between white and black inmates. The white inmates were "pretty much buried" because they were outnumbered. Mattie testified that he saw Mr. Agofsky in the middle of the fight punching and swinging and kicking "and whatever he could." Not only Mr. Agofsky, but "everybody was swinging." Mattie was preparing to fire warning shots when the fight died down, about 15-20 seconds after it began. Tr. Vol. 21, 73-79. On cross-examination, Mattie said he would dispute a report by another officer who said someone other than Mr. Agofsky had thrown the first punch, but also acknowledged he could not say who had thrown the first punch himself. Tr. Vol. 21, 80, 83.

488.    The defense could have presented readily-available testimony contradicting the notion that Mr. Agofsky helped instigate the incident. Roderic Russell was with Mr. Agofsky when the incident began. They were playing handball and working out in the yard at the same time as other inmates were playing a football game. They were waiting next to the football field before returning to their units when an argument broke out between a white inmate and black coaches, and the tension erupted into a physical brawl which simply engulfed him, Mr. Agofsky, and other inmates in the area. The white inmates were outnumbered and Russell was hit in the head with a "pooper scooper." Following the incident, Russell and Mr. Agofsky celled together in disciplinary

207

segregation. Although Mr. Agofsky had been injured himself, he was more concerned that Russell might have suffered a concussion, and would not let him sleep. A528-29.

489. The defense could have presented Gerald Miller, who was also at Lompoc at that time and was in the recreation compound when it began. The trouble started over a call by a referee for a football game. Miller, a black inmate, is positive Mr. Agofsky was not an instigator and was not the referee. Mr. Agofsky was not in the game. Miller himself, who was also not in the game, was seen by the corrections officers in the middle of the fighting, received an incident report, and was given time in disciplinary segregation. He has firsthand knowledge about what happened. Mr. Agofsky did not start the incident and Miller did not even see him fighting.

490. Once the fighting started, the incident became racially tinged, and bystanders on both sides got drawn into it purely because of their races, but the fight was not originally over race. While Miller is not certain of the numbers, the white inmates were badly outnumbered. Whites were in "a defensive posture" and "fighting for life really." The intervention of the guards essentially saved the whites who were there. Government records that listed the names and races of all those charged could have substantiated Miller's recollection of the racial imbalance on the exercise yard that day; one report identified 56 black inmates and only 15 white inmates as involved in the incident, while a second identified 37 whites, 287 blacks, and 46 others. A242-43.

491. In addition, trial counsel could have used or introduced documentary evidence to demonstrate that the government had selected the only potential witness, after an incident that involved over one hundred inmates, who had anything negative to say about Mr. Agofsky. Mr. Agofsky's disciplinary hearing report, received from the government, showed that no other corrections officers except Mattie identified Mr. Agofsky as even remotely involved in the initiation of the event. The report indicates that Officer Magana observed another inmate throw

208

the first punch and, as Mattie testified, he did not see who did. Nor did other accounts by other officers implicate Mr. Agofsky in initiating the event. Trial counsel cross-examined Mattie about what Magana reported, but did nothing to substantiate the basis for his questions. A229-233, 234, 235, 236, 237, 238-239.

492.     The disciplinary hearing officer who adjudicated Mr. Agofsky's disciplinary charges for this incident sustained a rioting charge, but the governing regulations only required a determination that the findings were supported by "some evidence" and that, if the evidence conflicted, the finding was supported by the "more credible evidence." The hearing officer had no other evidence of Mr. Agofsky's specific involvement in the outbreak of violence except Mattie's account and the fact that Mr. Agofsky—like every other white inmate who was on the yard at the time of the brawl—was found to be injured when it subsided. A232, A238-39. A number of inmates, including Mr. Agofsky, were transferred to USP Atlanta after the incident. A241. But the defense could have established, through the reports provided by the government, that this did not mean the authorities had found that Mr. Agofsky was an instigator.

493.     Trial counsel's failure to investigate or present evidence to address the extent of Mr. Agofsky's involvement in the incident, which could have established the questionable factual basis of the government's proofs, was deficient performance. There is a reasonable probability that, armed with such evidence, counsel could have argued successfully that Mattie's testimony had limited probative value outweighed by its potential for prejudice, confusion, and misleading the jury, and that the Court would have excluded it. *See* 18 U.S.C. § 3593 (c) (information "may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury"). Even if that argument was unsuccessful, the defense

could, at a minimum, have provided context that could have affected the weight the jury gave to the evidence.

494.     Miller would have explained to the jury that the Lompoc "riot" was not a race riot, as the government asserted at trial, but a fight which began over a football game on the prison yard. At the time of trial, Mr. Agofsky was under the impression that counsel were planning to call Miller. SA 2372. Near the time of trial, Mr. Agofsky wrote a letter to the defense in which he referred to Miller's name as being on the witness list. SA 672. Nevertheless, at his deposition, Bennett admitted that he had never interviewed Miller. SA 557.

495.     Artie Dufur could also have undermined the government's evidence of the Lompoc incident, which was invoked as an aggravating circumstance. SA 2031. It was not a "race riot" as the government had portrayed it, but arose from an argument over a call in a football game. One team member disputed a call and violence erupted. Mr. Agofsky was not involved in the game and did not instigate the violence. He came to the assistance of the referee only after a bystander had been assaulted and the referee was confronted by an angry team member. Mr. Agofsky was quickly outnumbered. As it escalated, Mr. Agofsky was "fighting for his life" and "got beat up pretty bad." SA 2032.

496.     Counsel's failure to rebut or address the government's evidence of this incident was prejudicially deficient performance.

### 7.     1999 Edelen Assault

497.     The government presented evidence that, the day after Mr. Agofsky arrived in Atlanta following his transfer from Lompoc, officers placed him, over his objection, in a cell with a black inmate, Curry Edelen. The two inmates fought, and Mr. Agofsky received a disciplinary infraction. Tr. Vol. 21, 84-89. The defense could have addressed this infraction by presenting evidence through inmates or experts to explain what happened. Instead, Black, apparently because

210

he had not carefully read the reports he had received from the government attempted to establish (erroneously) that the reason for the fight was that Edelen had attacked Mr. Agofsky at Lompoc, and was immediately proven wrong by the next government witness.

498.    On cross-examination of the officer who testified about the incident for the prosecution, Black showed the witness an Atlanta report recommending that Mr. Agofsky and Mr. Edelen be separated, and asked if the witness knew that the BOP had recommended the separation because Edelen had assaulted Mr. Agofsky at Lompoc. Tr. Vol. 21, 89-90; A244-249. Black apparently failed to notice that the report was prepared a month after the fight between Mr. Agofsky and Edelen and the separation recommendation was a result, not the cause, of that fight. The report did not state that Edelen had been at Lompoc. A244, A249.

499.    The government promptly responded by calling as its next witness a records custodian who testified that Edelen had never been incarcerated at Lompoc. Tr. Vol. 21, 100. Black could have obtained a record of Edelen's places of incarceration before trial to avoid this embarrassing rebuttal. Furthermore, as indicated in ¶¶ 486-90, *supra*, the government had given him lists of the inmates involved in the Lompoc incident and of the inmates who received disciplinary transfers from Lompoc to Atlanta. Edelen's name does not appear on either list. A248, A242-43. Black's protest on the record (Tr. Vol. 21, 98) that he had a list indicating that Edelen was at Lompoc, was unsupported.

500.    If, instead, the defense team had conducted an independent investigation of the Edelen assault, they could have presented the testimony of Roderic Russell, who, like Mr. Agofsky, was transferred from USP Lompoc to USP Atlanta, a predominantly black prison, following the riot (A244), and found himself already stereotyped as a racist by the Atlanta administration. Guards tried more than once to cell him with black inmates, and when he resisted,

211

confined him to the SHU. Russell learned that guards had physically forced a black inmate, who was also objecting, and Mr. Agofsky into the same cell. He could have testified that, once that had happened, prison "politics" required the two of them to fight. A529.

501. Other inmates could have described the racially charged atmosphere at USP Atlanta, and could have confirmed that inmates entering that prison from Lompoc after the riot arrived with a strike against them. Among others, Randy Seitzinger could have described his own experience entering Atlanta, where most of the inmates and staff were black. Sometimes the guards would taunt him, saying, "We've got a tough white guy coming in," and "Come here white boy." A536.

502. The defense could also have presented prison culture evidence available from experts or additional inmates, who could have explained the racially charged atmosphere in federal prisons in general, and the fear and tension that commonly arises between inmates of different races who are unknown to each other and forced to cell together. Such evidence could have further explained the reasons for the fight between Mr. Agofsky and Edelen.

503. For example, Jeffrey Milton, a white inmate, could have explained that, in prison, Mr. Agofsky had no choice but to fight Edelen. When officers place a white inmate in a cell with a black inmate, if they do not fight, an inmate will have to live with the consequences a reputation as someone unable to defend himself—for the rest of his life. Milton could have testified that Mr. Agofsky had no choice but to fight with Edelen once they were placed in the cell together. Gerald Miller, a black inmate, could have presented similar testimony, and could have testified that USP Atlanta had a reputation for placing newly arrived inmates of different races together to provoke fights.

504. Other inmates of both races could also have described the "unwritten rules" or "inmate politics" that require inmates—to avoid dangerous damage to their own reputations—to protest and even attack cellmates who are informants, child molesters, members of other racial or ethnic blocks, or members of hostile gangs. Inmates who break those rules can face consequences, usually from members of their own groups. Inmates and/or experts could also have explained that guards are also aware of these rules and sometimes deliberately force inmates together in violation of the rules, to provoke trouble and start "cockfights." Awareness of the unwritten rules could have helped the jurors understand the reasons for the fight between Mr. Agofsky and Edelen.

505. Counsel's clumsy and unprepared effort to address the Edelen assault exclusively through cross-examination only made him look like a dishonest advocate, while the government's evidence made his client look like a racist. Reasonable investigation would have provided an explanation for the harsh prison realities that surrounded the incident and could have affected the weight the jurors gave to this infraction. Counsel's unfamiliarity with the records in his possession, his failure to conduct any independent investigation of Edelen, and his failure to investigate mitigating evidence from other inmates were prejudicially deficient performance.

506. The prosecution elicited the testimony of Officer Arthur Tobias that Mr. Agofsky said he did not like black people and that was why he attacked Edelen. Tr. Vol. 21, 86. Trial counsel never asked Bennett to interview Officer Tobias. SA 561. The prosecution argued in summation that one reason the jury should sentence Mr. Agofsky to death was that he assaulted Edelen, a "man who he did not have a running feud with . . . cold cocked out of the blue. And you heard the statements that were made[.]" Tr. Vol. 24, 371. The defense could have addressed this infraction by presenting evidence through inmates—including Edelen himself—and/or experts to explain what happened.

507.     If the defense team had conducted an independent investigation of the Edelen assault, they could have presented the testimony of Edelen himself and other inmates who could have explained that guards set up his fight with Mr. Agofsky and that neither of them had much choice about whether to engage the other. No one from Mr. Agofsky's defense, neither his investigator nor his trial lawyers, ever contacted Edelen. If he had been contacted before the 2004 trial or at any other time, he would have been willing to testify in Mr. Agofsky's behalf. SA 2053. In his deposition, Bennett admitted that the attorneys did not ask him to investigate Mr. Agofsky's prior disciplinary infractions. SA 555. Counsel did not ask Bennett to interview Kerry Edelen or Mark Allen, the two inmates present at the time of the incident. SA 556.

508.     Edelen was housed in the Special Housing Unit ("SHU") at USP Atlanta in 1999. One day, without warning, guards came to his cell and told him to "cuff up" to move to another cell. When Edelen asked why, they said it didn't matter. They handcuffed him, collected his property, walked him upstairs, and stood him in front of a cell door. Mr. Agofsky and another white inmate were in the cell. Mr. Agofsky said, "I told you all, I don't want to be housed with a black inmate." Edelen looked into the cell and realized it had only two bunks, which meant that he would have to sleep on the floor. SA 2050.

509.     Edelen knew at this point that the guards had orchestrated the move to incite trouble. They were moving him from a three-man cell to a two-man cell for no reason. The guards handcuffed Mr. Agofsky and the other white inmate and told them to back away from the door. Edelen, who is black, felt unsafe being forced into a cell with two white inmates who were already there. He thought the situation might escalate. As guards were removing his handcuffs, Edelen noticed a number of correctional officers gathering around the cell window, trying to see what was going on in the cell. SA 2051.

214

510. As Edelen turned to pick up his property before finding a place on the floor, he noticed out of the corner of his eye that Mr. Agofsky was moving toward him. As Edelen turned, Mr. Agofsky grabbed him and they began tussling, falling to the floor and wrestling for seven or eight minutes. Edelen does not believe that Mr. Agofsky was actually trying to hurt him because Mr. Agofsky was not using much force. Edelen believes that he himself was using more force. Edelen never believed that his life was in danger. SA 2052.

511. During the fight, Edelen could hear the officers outside the cell saying, "move, let me see," and "let's wait a couple more minutes before we go in." The officers finally entered the cell, separated the inmates, and took Mr. Agofsky out, leaving the other white inmate and Edelen behind. A physician's assistant checked Edelen out, but he did not remember having any injuries. SA 2052. The physician's assistant prepared an inmate injury assessment and follow-up form stating that he or she treated Edelen's "superficial laceration and abrasion" with soap and water. SA 2492. Mr. Agofsky also had a superficial laceration, treated with "local asepsia and peroxide." SA 2493.

512. Edelen could have explained that mixing races in cells violated an unwritten code which applied to both inmates and correctional officers in all USPs. In Atlanta, however, officers would intentionally force races to mix in cells to provoke fights. Edelen believes that was why the officers put him into Mr. Agofsky's cell. Further, Edelen believes that Mr. Agofsky did not have a choice but to fight him. Any white inmate forced to house with a black inmate would have to do one of two things: (1) deal with the black inmate right away, or (2) deal with the other white inmates later. Mr. Agofsky's own safety would have been at risk if he had not acted as he did. SA 2053.

215

513. The defense could also have presented the testimony of Mark Allen, the other white inmate in the cell with Mr. Agofsky and Edelen during the fight. Allen's name and BOP inmate number were contained in the BOP incident report about the incident at Atlanta. SA 2491. Counsel had this report in their possession. In 1999, Allen was incarcerated in the SHU in Atlanta. One day, the guards brought Mr. Agofsky to Allen's cell. They were making racist remarks like, "You don't run anything here, white boy, this is Willie's World." SA 2007.

514. Ten to fifteen minutes after Mr. Agofsky's arrival, they brought in a black inmate. Mr. Agofsky told Allen to step out of the way once the black inmate came in, and so Allen stayed on his bunk and did not participate in the fight. Once the guards removed the black inmate's handcuffs, he and Mr. Agofsky began fighting. According to Allen, the two were equally matched, and fighting each other was unavoidable. Allen could have explained that, under the unwritten convict code inside the BOP, it is absolutely mandatory for inmates of different races not to cell together. Otherwise, they will face consequences from inmates of their own races. SA 2007.

515. The fight turned into a wrestling match which the guards watched from outside the cell for two to three minutes, discussing what was happening. Allen stood aside; it did not appear to him that either Edelen or Mr. Agofsky was getting hurt. Although their fight brought them both to the floor, neither of them used a weapon and Allen did not remember their exchanging any words. Allen would have helped Mr. Agofsky if he was in imminent danger but it did not look like a serious fight to him. SA 2007.

516. After the fight was over, the guards put Mr. Agofsky on a different floor and Allen remained in the cell. Allen could have testified that he believed that the guards set up the fight deliberately. In his experience, it was common at USP Atlanta for guards to force races to mix, to provoke fights. He saw it happen repeatedly and was himself a victim of the practice. Once he was

216

forced into a fight with a black inmate and cut the other inmate because he feared for his life. SA 2007.

517. After this incident, Allen never saw Mr. Agofsky again. Although his lack of a prior or subsequent connection to Mr. Agofsky would have made him a disinterested witness, no one from Mr. Agofsky's defense, neither his trial lawyers nor his investigator, ever contacted him before the 2004 trial. If they had done so, he would have been willing to testify for the defense. SA 2008.

518. The defense could also have presented George Rivera, who would have testified that USP Atlanta was known for the guards' practice of placing inmates of different races, or inmates who were separatees because of previous conflicts, into the same cell. Sometimes they would put separatees onto the same range of cells and then open all the doors at once for recreation, which could give a group of inmates the opportunity to gang up on another vulnerable inmate. SA 2105.

519. The defense could have presented the testimony of Todd Gilbertson. *See* A521-22. One night, while Gilbertson was incarcerated at USP Atlanta, Mr. Agofsky was escorted into Gilbertson's cell by five guards. A521. Mr. Agofsky's "shirt was torn and he had blood on his face and neck." (*Id*). In addition, he "had fist marks, nick and lumps on his face, and scrapes on his legs...[and]...boot prints on his chest... and back." Mr. Agofsky explained to Gilbertson that he had been forced into a cell with a black inmate and that the two had an altercation.

520. Mr. Gilbertson could have told the jury about a similar incident that happened to him. He could have explained that in prison "politics dictate that an inmate is not supposed to live with an inmate of another race. If an inmate breaks the rule, he will face the consequences, which

means that he will become a target of the other inmates." Gilbertson would have testified that in order to keep the peace in prison, all inmates must follow the rules. A521.

521. Additionally, Mr. Gilbertson could have helped explain to the jury the racially charged atmosphere at USP Atlanta. This racial animosity extends to the relationship between guards and inmates. Gilbertson saw the guards physically push inmates into cells with inmates of other races. He could have told the jury about one incident, in which the guards placed a small Mexican inmate, who they thought was a troublemaker, into the cell of a black prison rapist. Gilbertson could hear the smaller inmate screaming at night. A521. Another time, Gilbertson was asleep in his cell one night and awoke to five black guards standing over his bed. They strip searched him and searched his cell. After that, he would jam his lock shut every night so that the guards could not do that, or worse, again.

522. Bennett did not interview Mr. Gilbertson, nor did counsel ask him to do so. SA 556-57. Had counsel contacted Gilbertson, he would have told them everything he described in his declaration and would have been willing to testify at Mr. Agofksy's trial. A522.

523. Similarly, Russell Dinovo, shared a cell with Mr. Agofsky in USP Atlanta. A508. Dinovo could have testified about the racial tension at USP Atlanta as well. When Dinovo arrived at USP Atlanta, the guards attempted to force him into a cell with four or five black inmates. The cell contained only two or three beds. When Dinovo refused, the guards attacked him and then four pointed him in an isolated cell. A508.

524. Dinovo would also have described for the jury an incident in which Mr. Agofsky was attacked by other inmates in the prison. That incident occurred one night when officers popped the lock to Mr. Agofsky's cell, allowing inmates into the cell to jump on him while he was sleeping. Dinovo heard the incident occur and a few days later Mr. Agofsky asked Dinovo to move in with

218

him. Dinovo observed injuries on Mr. Agofsky's chest and wrist from the fight and Mr. Agofsky reported that at least one of the inmates who attacked him had a knife. A509. Bennett did not interview Dinovo and trial counsel did not ask him to do so. SA 556.

525.     Additionally, in his deposition, Bennett admitted that he did not speak with Russell, even though Mr. Agofsky's address book, which was in Bennett's possession, contained Russell's name and inmate number. SA 556.

526.     The testimony of Edelen, Allen, Russell, Dinovo and others could have neutralized or at least ameliorated the aggravating weight of the fight with Edelen, by showing how and why it happened and demonstrating that it was not a random expression of personal racial animosity. Had counsel reviewed Mr. Agofsky's prison file he would have obtained the names and inmate numbers of Edelen and Allen and could have properly explained the incident to the jury. Counsel's failure to do so was deficient. *See Rompilla v. Beard,* 545 U.S. 374 (2005). There is a reasonable probability that this evidence, alone and in conjunction with other evidence described in this summary and motion, could have led at least one juror to vote against a death sentence. This instance of trial counsel's deficient performance, alone and in combination with all of counsel's other deficient performance, accordingly prejudiced the defense.

### 8.     1999 and 2000 Possession of Weapons in Atlanta and Beaumont

527.     The government presented evidence that Mr. Agofsky received disciplinary infractions for the possession of handmade knives ("shanks") in 1999 at USP Atlanta and 2000 at USP Beaumont. Tr. Vol. 21, 107-119. The only defense response was to elicit the acknowledgment of each of the government witnesses to these events that shanks were not uncommon in the BOP and that there was no evidence that Mr. Agofsky had used a shank to attack anyone. Tr. Vol. 21, 111-12, 117-18.

528. As detailed in ¶¶ 80 to 166, *supra*, and ¶¶ 748 to 799, *infra*, the defense could have presented readily available evidence from inmates about how dangerous those prisons were and how many inmates were commonly armed in those institutions. For example, the defense could have presented Roderic Russell's testimony about what he termed Mr. Agofsky's "introduction to life inside the United States Penitentiaries" early in Mr. Agofsky's time at USP Lompoc. Mr. Agofsky came to Russell one day at Lompoc with an ice pick sticking out of his side. Russell removed the pick and helped him dress the wound. A527.

529. Evidence that provided a defensive reason for the possession of shanks could have affected the weight the jurors gave to these infractions in support of a non-statutory aggravating factor

530. In addition, the defense could have obtained statistical evidence and expert testimony to support inmate testimony about the high level of violence in various BOP facilities. A44, 52-53.

531. Officer Alford testified for the government that he found a weapon in Mr. Agofsky's cell. Tr. Vol. 21, 107. In his deposition, Bennett testified that he was not directed by trial counsel to interview Officer Alford. SA 561. In addition, Bennett testified that trial counsel did not ask him to interview inmate witnesses about prison culture or about their own experiences with violence in prison. SA 547, 554-55. Similarly, he did not interview inmates about the general level of violence at Beaumont, "because it was so well known." SA 554-55.

532. The evidence set forth that both Atlanta and Beaumont were extremely violent, dangerous places could also have helped to rebut and provide context for these infractions, which the prosecution used to support its statutory and non-statutory aggravating factors. *See* Ground 12.1(D)(2), (E), and Ground 12.2(B)(7), *supra*. Instead, the defense relied only on weak rhetorical

questions, put to hostile witnesses, to counteract infractions that helped the prosecution to paint Mr. Agofsky as an armed predator. There is a reasonable probability that, but for counsel's deficient performance on this point, alone and in combination with the other deficient performance detailed herein, the outcome of the penalty phase would have been different.. Trial counsel's failure to uncover and present such evidence was deficient performance.

### 9.    2000 Michael Miele Assault

533.    The government introduced evidence at the guilt phase, pursuant to Fed. R. Evid. 404(b), that in July 2000, Mr. Agofsky assaulted another inmate, Michael Miele, with his feet. The government also offered this assault in support of a non-statutory aggravating factor. Tr. Vol. 21, 25. At the penalty phase, it introduced a letter Mr. Agofsky had written to his cousin, Andrew Jensen, describing the incident, saying that he "could not pass up the opportunity to beat a child molester-snitch," who now would not be "messing with any more kids." Tr. Vol. 129, 131. The defense addressed this infraction by cross-examining the officer who read the Jensen letter for about a page, and introducing a letter from Mr. Agofsky to another friend, Robin Graves, indicating that the reason for Mr. Agofsky's hostility was that Miele had sexually assaulted another inmate who was wheelchair-bound. Tr. Vol. 21, 129, 141, Vol. 22, 185.

534.    The defense investigator, Bennett, had interviewed Miele before trial. Miele told Bennett that corrections officers in the SHU who knew that he and Mr. Agofsky had had words the day before had "set up" the fight. This information would have radically altered the predatory picture the government presented of the Miele incident, but the defense did not introduce it through live testimony or in any other form. The information, from the mouth of Miele himself, that corrections officers deliberately placed Mr. Agofsky in a cage with Miele to provoke a fight between them could have affected the weight the jurors assigned to this infraction.

535. The defense could also have provided context for the infraction with testimony from other inmates who could have told the jury that authorities sometimes placed inmates who did not belong together in the same cell to provoke fights, and that prison politics required inmates to protest being placed with sex offenders. *See* Ground 12.2(B)(7). An inmate deliberately placed with a sex offender would feel compelled to take action or face recriminations from his own group for not doing so.

536. Counsel's inadequate investigation and presentation of their case enabled the government to paint a picture of Mr. Agofsky as a person who sought out victims in a predatory manner. An explanation of the surrounding circumstances could have ameliorated the weight the jurors gave to this evidence. Counsel's failure to investigate or present information from Miele and others about the background and onset of the fight was deficient performance.

537. The defense could have presented evidence stemming from Bennett's interview of Miele, in which Miele told him that guards had set up the fight, and evidence from other inmates describing how guards sometimes deliberately placed sex offenders with other inmates, placing the inmates in the difficult position of being forced to take action against the sex offenders or risk trouble with their own groups. In his deposition, Bennett acknowledged that Miele characterized the fight as a "set up" by the guards and that Miele said that he "probably would help" Mr. Agofsky. SA 556. Bennett also stated that he relayed this information to Mr. Agofksy's attorneys. It was their decision, Bennett maintains, not to call Miele to testify. SA 556.

538.    If the defense team had conducted an independent investigation of the Miele assault, they could also have presented the testimony of Miele himself.[75] Miele would have testified that he was in a fight with Mr. Agofsky while at Beaumont, but he would not have wanted the incident between himself and Mr. Agofsky to be used as a reason to put Mr. Agofsky to death. SA 2100-01.

539.    William Massey, who was in the same recreation cage with Mr. Agofsky during the incident with Michael Miele, would also have been willing to testify for the defense. On July 17, 2000, Massey was in a recreation cage in the Special Housing Unit ("SHU") with Mr. Agofsky and two Islamic inmates. Massey and one of the Islamic inmates were "shot callers" and they were having a conversation to try to prevent a potential gang war from breaking out between the black and white inmates. As recreation time was nearing an end, the guards put two homosexual inmates into the recreation cage with them. One of inmates (name unknown) was ill with HIV and other inmates would not go near him. The other inmate placed in the cage was Miele. The guards laughed as they put Miele into the cage. As soon as Miele arrived at Beaumont the guards had made sure the inmates knew that he was a child molester. Additionally, while in the SHU, Miele raped other inmates. He was a predator and took advantage of weaker inmates. SA 2093.

540.    Massey could have explained that, because he himself was in discussions and preoccupied with the other "shot caller," Mr. Agofsky was put in a situation that required him to

---

[75] At trial the prosecution introduced letters from Mr. Agofsky to family members describing the Miele incident and stating, for example, that "one whole side of his face was crushed flat," and that "he has permanent brain damage." Tr. Vol. 5, 36. The prosecution questioned Dr. Roberts about this letter and similar letters in his deposition. SA 850. However, the BOP medical report that described Miele's treatment after the incident states that he had only a laceration above the left eye and a possible concussion. SA 880-81; SA 1138. Dr. Roberts testified that he could have used this information in forming an opinion about whether the statements in the letters were exaggerated "braggadocio" to his cousin. SA 854, 880, 881.

act to protect his own life. Mr. Agofsky did not have a choice; he had to do something to Miele or he would have paid the price later. SA 2093. After the fight, the guards gave Mr. Agofsky and Massey extra food and extra phone time. Massey describes these gestures as a "pat on the back" for the Miele incident. SA 2094.

541.    No one from Mr. Agofsky's defense ever came to speak to Massey. Mr. Agofsky repeatedly asked his team to interview him. He gave Bennett Mr. Massey's address and telephone number. SA 668. Correspondence between Mr. Agofsky and his team indicates that they claimed they could not find a correct telephone number for Mr. Massey. SA 2508. However, Mr. Massey is still at the same telephone number Mr. Agofsky provided to trial counsel. Had trial counsel contacted Mr. Massey, he would have been willing to testify on Mr. Agofsky's behalf. SA 2095.

542.    Scott Lawson could also have provided important details surrounding the incident between Mr. Agofsky and Michael Miele. SA 2085. The guards hated Miele because he was a sex offender. Miele would "run around the cell block in his boxer shorts." Miele's cellmate came to Lawson and said that Miele was getting naked and "getting sexual" with him in the cell. Lawson and another inmate responded by starting a fight with Miele so that Miele would get put in the "hole" or SHU. That way Miele could not rape his cellmate any more. When Miele got out of the hole, another inmate "checked" Miele back into the hole. It was while Miele was in the hole the second time that the guards put him in a recreation cage with Mr. Agofsky. The guards knew what they were doing by putting Miele, a known sex offender who was raping other men in prison, in the cage. Mr. Agofsky had no choice but to fight him. It was a "set-up" by the guards. SA 2085.

543.    Mr. Lawson was interviewed, but Bennett did not ask him about the Miele incident. In fact, Mr. Lawson actually testified at Mr. Agofsky's trial. However, counsel did not elicit any

224

information about the Miele incident while Lawson was on the stand. Lawson would have testified about it. SA 2084.

544. Michael Fitzgerald could have corroborated Massey's testimony. Fitzgerald knew of Miele because they were in prison together in Massachusetts. Miele came to Fitzgerald one night and asked him to find him a cell. Fitzgerald vouched for Miele and found him a cell to live in. One day, Miele's cellmate approached Fitzgerald and told him that Miele was preying upon him sexually; Miele "was getting naked at night and getting a full erection and pressing up against him. The implication was that Miele was raping his cellmate." SA 2059. Fitzgerald felt responsible for the rape because he had vouched for Miele.

545. When Fitzgerald ran into Miele next, he beat him up. Both Miele and Fitzgerald went to the SHU. While in the SHU, Miele molested yet another inmate. Shortly after that, Miele was put into Mr. Agofsky's recreation cage. Fitzgerald could have explained to the jury that "Miele was victimizing this other guy, and Shannon felt that he owed a duty to protect that other guy. Miele was a big guy." SA 2059.

546. Fitzgerald was subpoenaed to Beaumont before Mr. Agofsky's trial in 2004, but never called as a witness. No one from Mr. Agofsky's trial team ever interviewed Mr. Fitzgerald before he was subpoenaed. SA 2066. Bennett testified at his deposition that he did not know why the attorneys had subpoenaed Mr. Fitzgerald. Although an attorney and Bennett met with Fitzgerald briefly at the county jail before the trial, Bennett did not ask Fitzgerald about the Miele incident. SA 554.

547. Bruce Spring could have also offered testimony about the Miele incident. Although Bennett interviewed Spring, he did not ask him about the incident with Miele. SA 553. Spring could have described the guards' practice of identifying the sex offenders to the other inmates. SA

225

2308. The guards hated the sex offenders just as much as the inmates did. Spring could have also described the incident between Mr. Agofsky and Michael Miele. It was a "set-up" by the guards. Mr. Agofsky did not have a choice but to go after Miele. If the guards put a known sex offender in a cage with an inmate who does not do anything, that inmate is putting himself in danger. If he does not act in that situation, his "own people" will turn on him and assault him for not doing anything. SA 2308.

548.     The testimony of Massey, Lawson, Fitzgerald, Spring, and Miele himself, alone or combined with the evidence described elsewhere in this Motion, would have rebutted the government's use of the Miele incident, by helping to explain the isolated incident to the jury as one in which Mr. Agofsky was constrained by the inmate code and was actually protecting other inmates. Instead, the defense did essentially nothing to prevent the government from using the Miele incident to argue, repeatedly, that Mr. Agofsky simply engaged in unprovoked attacks on inmates he did not like. *See* Tr. Vol. 20, 274; Vol. 21, 25; Vol. 25, 339, 368-72. There is a reasonable probability that counsel's deficient performance in connection with this infraction, alone and in combination with other deficiencies, prejudiced the defense.

> 10.     The Evidence Cumulatively Establishes Ineffective Assistance Of Counsel.

549.     Cumulatively, trial counsel's failure to undertake reasonable investigation of evidence that could rebut or ameliorate the aggravating factors proffered by the prosecution, and counsel's failure to make reasonably effective use of available evidence for that purpose, was deficient performance. Counsel's nearly complete abdication of the duty of advocacy during the government's case at the penalty phase could have sealed their client's fate even before the defense case began. There is a reasonable probability that, but for counsel's deficiency, alone and in conjunction with the deficient performance herein, the outcome of the penalty phase would have

226

been different. U.S. Const. Amend. VI; *Strickland v. Washington,* 466 U.S. 668 (1984); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Williams v. Taylor*, 529 U.S. 362 (2000).

550.    The evidence set forth in the Motion and in this Supplement establishes a reasonable probability that the outcome would have been different. At the very least, if counsel had provided the results of an investigation of Mr. Agofsky's prior conviction and institutional infractions to their experts, the experts could have used the information to explain the incidents or provide context for them. Dr. Roberts, for example, testified that he could have used information from other inmates concerning the Lompoc "riot" because it corroborated Mr. Agofsky's account of how he did not instigate the event but became embroiled in it. SA 790. He could have used information from Kerry Edelen, the black inmate with whom Mr. Agofsky had a fight in USP Atlanta, because it confirmed Mr. Agofsky's account. SA 791-92. Inmate declarations describing the violent atmosphere at both USP Beaumont and USP Atlanta could have helped to explain why he might arm himself. SA 794. And inmate descriptions of the Michael Miele incident corroborated Mr. Agofsky's explanations of how it came about. SA 795.

551.    Similarly, Terry Pelz states in his declarations that, if Barlow had provided him with materials similar to those provided by postconviction counsel, Pelz could have provided the jury with insight into Mr. Agofsky's institutional infractions. SA 2810. He could have explained that the Kerry Edelen incident was a "typical fight incited because the guards placed inmates of different races in the same cell," a situation in which the inmates would be expected to fight each other, to protect themselves "in the long run." SA 2811. He could have provided context for the incident with sex offender Michael Miele:

> If an inmate is forced into a recreation cage with a sex offender and does nothing about it, it can give the appearance that an inmate chose to congregate with him. Giving the appearance of sympathizing with a sex offender can place an inmate in grave danger.

SA 2811.

552.   Pelz could have described the incident at Lompoc as a fight among a large group of people, a type of disturbance that is common in prisons, rather than a "riot," which "tends to invoke the idea of burning buildings and looting." SA 2811. Regarding Mr. Agofsky's first infraction, for refusing to clean his cell wall at the U.S. Medical Center at Springfield, Pelz could have explained that Mr. Agofsky was young, facing a life sentence and unschooled in surviving twenty-three-hour lockdown conditions. SA 2812.

553.   Another expert whom Barlow retained, criminologist Elizabeth Pelz, could have testified that "an understanding of the correctional context is crucial to assessing the risk of prison violence," and that her lack of information in 2004 limited her ability to provide a meaningful assessment. SA 2799. For example, during her testimony, Barlow asked Dr. Pelz to comment about a letter from Mr. Agofsky to his cousin, Andy Jensen, in which Mr. Agofsky makes boastful remarks about the apparently serious injuries Miele had suffered. Pelz attempted to explain the letter by suggesting that inmates often exaggerate in letters in hopes of building a reputation, because they know that the authorities will read their mail. Tr. Vol. 22, 236-37. She states in her declaration that she has now reviewed a medical report indicating that Miele's injuries were relatively minor. SA 2803. She could have used the report to provide a concrete basis for her testimony, SA 2804, instead of forced speculation.

554.   Although trial counsel presented four experts with excellent professional qualifications to evaluate and explain inmate prison conduct, and although the government based its case for death in large part on one aspect of Mr. Agofsky's prison conduct, his institutional infractions, counsel left the experts in such ignorance about the facts that their expertise went to waste. Furthermore, counsel made no effort at all to investigate the previous capital murder

228

conviction that placed Mr. Agofsky in prison and formed the centerpiece of the government's penalty phase presentation. There is a reasonable probability that, with reasonable investigation and presentation, the defense could have ameliorated the aggravating side of the scale and the jury's weighing of the factors for and against death would have come out the other way. Trial counsel's deficient performance with respect to Mr. Agofsky's prior convictions and infractions, alone and in combination with their other deficient performance, prejudiced the defense. *See Rompilla v. Beard*, 545 U.S. 374 (2005); *Williams v. Taylor*, 529 U.S. 362 (2000). This Court must accordingly order an evidentiary hearing and grant relief on this ground.

C. **Counsel Completely Failed To Compile Or Present A Social History Of Mr. Agofsky's Life Before His Incarceration.**

1. Trial Counsel Neither Conducted A Social History Investigation Nor Delegated That Task To A Qualified Expert Or Any Other Person.

555. The Supreme Court has explicitly recognized that "well-defined norms" require counsel in a capital case to investigate "all reasonably available mitigating evidence," a process that entails the investigation and compilation of the defendant's social history. Strategic decisions made on the basis of "rudimentary knowledge of [a defendant's] history from a narrow set of sources" are unreasonable. *See Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003). Mr. Agofsky's trial counsel violated those prevailing professional norms. They made almost no effort to learn anything about his history from birth until age eighteen and no effort at all to compile mitigating evidence from his years of incarceration from age eighteen until the time of trial. As a result, they made strategic decisions in ignorance of the available evidence and presented a mitigation case limited strictly to the question of future dangerousness. Their presentation on that issue was so superficial that it only reinforced the government's case.

556. Black and Barlow were appointed in September 2003, but did not seek the appointment of experts until the following spring. Barlow filed five *ex parte* motions that were

229

docketed on April 30, 2004, for the appointment of mental health experts, prison experts, a criminologist, an investigator, and a federal corrections consultant. Dkt. 49-53. Although the request for the investigator referred to "issues regarding the issues of guilt or innocence as well as the suitability of a life sentence" (Dkt. 52, p. 2), Barlow did not ask for funds for a mitigation specialist or for authorization for anyone to compile a social history. Nor did he make such a request at an *ex parte* hearing conducted on April 29. Instead, he argued that "these people" (the experts whose appointment he had sought), "together," "make up the mitigation specialists." Dkt. 224, at 2.[76]

557.     Jay Bennett, the investigator who assisted Black's and Barlow's trial preparation, interviewed only one member of Mr. Agofsky's family, his brother Joseph, who was Mr. Agofsky's codefendant on the Noel State Bank case. The focus of that interview was the status of Mr. Agofsky's charges for the Plant murder, and Bennett did not ask Joseph Agofsky about his brother's background. Trial counsel's file contains no indication of any inquiry into Mr. Agofsky's background before his incarceration by any member of the defense team. Only Dr. Dan Roberts, a clinical psychologist whom Barlow retained, made a single phone call to Mr. Agofsky's mother, interviewed Mr. Agofsky himself about his background, and spoke to several jail guards. A251-81.

558.     As indicated, the deposition testimony of Jay Bennett, the staff investigator assigned by the Federal Defender to Mr. Agofsky's case, confirms the superficial nature of the penalty phase investigation. Trial counsel failed to hire a mitigation specialist, and Bennett did not and does not qualify as such a specialist. He admitted that he does not have specialized training in

---

[76] The *ex parte* motions, orders, and hearing were released to postconviction counsel but are still otherwise still under seal.

mitigation investigation. Indeed, Bennett has never attended a training on investigating mitigation in capital cases. SA 542. Although he now attends investigation conferences which may include an occasional session about death penalty defense, Bennett acknowledged that at the time of Mr. Agofsky's trial he had not attended such a conference. SA 543.

559.    Trial counsel did not ask Bennett to conduct a mitigation investigation or interviews, as required by the ABA Guidelines. SA 545-47. They did not ask Bennett to obtain any records from Mr. Agofsky's background. SA 546. They did not ask him to interview Mr. Agofsky's family members, even though he had names and addresses for several of them in his possession. Had counsel asked, Bennett testified, he would have interviewed the family. SA 582. Trial counsel did not give their investigator direction on topics to cover with witnesses. For example, counsel did not ask him to interview the prison inmate witnesses about prison culture. SA 547. Accordingly, while he interviewed some inmates in connection with the investigation for the guilt-innocence phase, Bennett did not ask them about their own personal experiences with violence in the prison. SA 554-55.

560.    Although Bennett reported that he compiled a "social history" in Mr. Agofsky's case, the document he described would not qualify as the kind of social history contemplated by the ABA guidelines. He testified that when he prepares a social history report, he relies solely upon verbal information from the client and the client's parent(s). SA 544. In compiling the report in this case, he spoke only with Mr. Agofsky and Mr. Agofsky's mother. SA 546. He did not investigate Mr. Agofsky's educational history or speak with anyone who knew Mr. Agofsky prior to or during his eleven years of incarceration. *Id*. Bennett testified that he delivered the "social history" report to Barlow and did not retain a copy of it. Current counsel have never seen it. Bennett suggested that it may have been lost in a hurricane that destroyed Barlow's records. SA 577. No

231

such report appeared among the Bennett interview memos supplied to postconviction counsel by Black.

561.    Like Bennett, Dr. Dan Roberts confirmed that Mr. Agofsky's defense team did not conduct an independent mitigation investigation. Roberts, who testified for the defense at trial, testified at a court-authorized deposition on July 2, 2009. SA 696. He maintains a private practice in clinical psychology in Round Rock, Texas, providing counseling, evaluations, and testing to adults and children. He performs personality, intellectual, achievement, and neuropsychological testing, but is not board-certified in neuropsychology. SA 704.

562.    Douglas Barlow retained Dr. Roberts in May 2004 and sent him materials to review on May 13, 2004. SA 714. Barlow sent Dr. Roberts about 700 pages from Mr. Agofsky's Bureau of Prisons ("BOP") central file, including information about his prior arrests and disciplinary infractions. SA 708, 728, SA 965-1671. Barlow said that he was interested in mitigation issues and "prediction of danger, of violence in prison." SA 714. Dr. Roberts interviewed Mr. Agofsky on May 21 and June 19, 2004, for about three hours each time. He spent about an hour on June 19 conducting collateral interviews of several guards at the Liberty Jail where Mr. Agofsky was being held in pretrial detention, and interviewed Mr. Agofsky's mother by telephone for about an hour on July 6, a week before he testified. SA 730. He billed for two 15-minute consultations with Barlow in June and one half-hour consultation in July. SA 715-16. Except for time spent reviewing the records Barlow had sent him, he did no other work on the case. SA 717. Barlow was Roberts's main contact on the defense team. He may have met Black and Bennett but did not recall any substantive interactions with them. SA 717-18.

563.    Barlow did not ask Dr. Roberts to investigate whether there might be any head injuries in Mr. Agofsky's past, nor whether there were any other neurological insults or issues.

232

Roberts did not recall Barlow's asking him to conduct any tests. Barlow did not ask him to make referrals for any tests or to review any records except the BOP prison records. SA 718, 719, 735. When Roberts interviewed Mr. Agofsky, he asked him about past injuries in general, but never asked him about head injuries. SA 735, 736. Among the BOP records Roberts had received from Barlow were five medical reports indicating that, during his years of incarceration, Mr. Agofsky had repeatedly answered "yes" when medical personnel asked him about head injuries, and that the personnel had several times recorded further details. SA 737-40. Roberts had reviewed these records but did not remember the notations about head injuries. If Barlow had told Roberts that he was interested in potential head injuries, he would have called the notations to Barlow's attention, but he did not focus on them because he no had information about head injuries. SA 741, 823, 824. Mr. Agofsky was cooperative but did not volunteer some of the information uncovered in the post-conviction social history investigation. SA 809-12.

564. Roberts was not asked to review a social history report or compile one himself. Although Roberts has sometimes conducted collateral interviews in other cases, Barlow did not ask him to conduct interviews of family members or others, except for the single telephone interview of Sheila Agofsky. If asked, he could have conducted collateral interviews if the witnesses had been brought to Beaumont while he was there, or he could have interviewed them by telephone or traveled to their homes. SA 720. Dr. Roberts was doubtful that he would have had time to compile a social history report similar to the report he received from postconviction counsel in the two months he was working on Mr. Agofsky's case in 2004. SA 720.

565. Barlow never asked Roberts to review witness statements from family members or friends; whatever Roberts learned about Mr. Agofsky's pre-prison life he learned from Mr. Agofsky or his mother. SA 721. The only information about Mr. Agofsky's pre-prison life Roberts

received from the lawyers concerned Mr. Agofsky's prior convictions. SA 721. Roberts never received a report by Bennett describing Mr. Agofsky's pre-prison life, and never received any information describing statements by Sheila Agofsky, prepared by Bennett or anyone else. He only knew what he learned by talking to her himself. SA 721, 731. Mr. Agofsky's lawyers did not set up any family interviews or ask Roberts to interview any family members besides Sheila. He did not interview, and they did not give him any statements or information from, other family members, friends, or teachers. Roberts did not travel to Noel, Missouri, Mr. Agofsky's home town, and did not interview Sheila Agofsky when she came to Beaumont. SA 758. Barlow never asked Roberts to review statements by inmates who knew Mr. Agofsky personally, or to interview guards who had known him before his incarceration at the Liberty Jail. SA 721.

566.    In a phone conversation on June 24, 2004, after the trial was under way and about three weeks before Roberts testified, Barlow asked Roberts whether Mr. Agofsky had "any mental condition bearing on trial." SA 723, 906. Roberts told Barlow that "from a psychological standpoint, he appeared to be normal, and I didn't see any pathology." SA 723. Roberts did not learn from Barlow about any kind of trauma in Mr. Agofsky's past, "except maybe the airplane crash" that had killed his father. SA 724. Although Mr. Agofsky told Roberts that he was protecting himself in the Plant incident, Roberts and Barlow did not discuss whether Roberts might be able to provide an opinion that could support the defense at the first phase of the trial. SA 724-25, 734. No one told Roberts to keep alert for disclosures about bullying, Sheila Agofsky's depression, or other similar emotionally traumatic events. SA 741-42. He was not asked to review reports or test results from other experts, or to prepare a report himself. SA 722.

567.    Barlow told Roberts that future dangerousness would be a penalty phase issue, but did not ask Roberts to conduct any personality testing, to review any statements from inmates who

knew Mr. Agofsky, or to gather literature or statistics that might be relevant to a future dangerousness assessment. SA 725-26. According to Roberts, Barlow decided not to contest future dangerousness generally. Rather, he wished to show that Mr. Agofsky could be safely held in prison by keeping him away from other inmates. SA 805-06, 808.

568.    Barlow did ask Roberts to "discuss his behavior in custody." SA 754. To investigate this, Roberts spent an hour interviewing several guards at the Liberty Jail, where Mr. Agofsky was in pretrial detention. SA 715, 753. Officers Cook, Beeson, and Hendrix agreed that Mr. Agofsky was a model prisoner. Officer Marshall told him that the maximum security unit, for violent inmates, was across the street from where Mr. Agofsky was housed, and that he had a "great sense of humor" and was protective toward females. Officer Chapman[77] said that he was respectful and did not cause problems. Officer Petty described an incident when Mr. Agofsky's cell door popped open accidentally and he did not try to escape, but just waved and told the guards. She was not afraid of him. Roberts got no negative information from the guards; they all gave Mr. Agofsky a good report. SA 753-57.

569.    Barlow retained four other experts, but none of them conducted anything remotely resembling a mitigation investigation. Dr. Edward Gripon, a psychiatrist, evaluated Mr. Agofsky at Barlow's request on June 4, 2004, ten days before jury selection began. SA 2789. Barlow sent Gripon prison records but did not give him any materials relating to Mr. Agofsky's pre-prison life. Gripon never saw any statement from Mr. Agofsky's mother or any report prepared by Jay Bennett. Barlow did not ask him to interview anyone but Mr. Agofsky, and he did not do so. SA 2788-89. Barlow asked Gripon to inform him whether Mr. Agofsky had any substantial mental illness, but

---

[77] Officer Chapman was the only one of the guards Roberts interviewed who testified at trial. Tr. Vol. 22, 181.

did not ask the doctor to assess Mr. Agofsky's future dangerousness or whether he had any head injuries or neuropsychological impairment. SA 2789.

570. Barlow retained Dr. Elizabeth Pelz, a criminologist at the University of Houston, to testify as an expert in prison societies. SA 2796. Barlow gave Dr. Pelz prison records and the case discovery, but she did not receive any social history or mental health reports. Dr. Pelz was unable to schedule a meeting with Mr. Agofsky because she had been consulted too close to the beginning of trial, and testified only from her general academic knowledge. SA 2796-97. In other cases, Pelz has made a regular practice of interviewing the defendant and has sometimes had the opportunity to interview family members. She did not have that opportunity in Mr. Agofsky's case. SA 2802-03.

571. Terry Pelz, a former prison warden for the Texas Department of Corrections who has a private consulting practice, was retained by Barlow as an expert in prison conditions and future dangerousness. SA 2805-06. Barlow sent him USP Beaumont records for Mr. Agofsky and Plant but did not supply a social or medical history for Mr. Agofsky, mental health reports, inmate statements, or anything other than prison records. SA 2806-07. Pelz interviewed Mr. Agofsky and toured the scene of the Plant incident at USP Beaumont, but did not conduct any other interviews or tour the federal super-maximum facility at Florence, Colorado. SA 2807, 2813. He requested that Barlow provide him with Plant's state prison records and Beaumont recreation rosters, staffing records, and guard protocols, but Barlow never obtained them. SA 2806.

572. Finally, Barlow consulted Harvey Cox, a correctional consultant and former career employee of the Federal Bureau of Prisons, to provide his opinion whether the BOP could safely hold Mr. Agofsky if he were not sentenced to death. SA 2814. Barlow sent Cox prison records,

236

but no other materials, and Cox did not collect data or other information to prepare for his testimony. SA 2814.

573.    The deposition testimony of Bennett and Roberts and the declarations of Gripon, Pelz, Pelz, and Cox confirm that, as alleged herein, the penalty phase investigation was unreasonably limited. By not conducting a reasonably complete investigation, trial counsel violated Guideline 10.7 of the ABA Guidelines, which provides that "Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.7, 31 Hofstra L. Rev. 913, 1015 (2003).

574.    In addition, counsel's failure to investigate deprived Mr. Agofsky of the effective assistance of counsel. As set forth elsewhere in this Motion, and supplemented with the information in the ensuing sections, it is reasonably probable that, but for counsel's deficient investigation and presentation of the penalty phase, the jury would have imposed a non-death sentence. *See Rompilla v. Beard*, 545 U.S. 374 (2005).

575.    Because Barlow and the other members of the defense team made no effort to compile a social history, they never learned about abundant mitigating evidence. They could have described Mr. Agofsky's childhood, the devastating loss of his father in an airplane accident when he was nine years old, his mother's and older brother's subsequent struggles to provide for the family, the vulnerable family members and friends who found a haven in the Agofsky home, the importance of Mr. Agofsky's devotion to the martial arts discipline of Hwa Rang Do, and his years of work toward the goal of entering the executive security or law enforcement fields. At a minimum, while the members of the defense team were interviewing inmates in preparation for the guilt phase, they could have collected ample evidence that Mr. Agofsky had often played the

role of protector and peace-maker during his eleven years of incarceration. Trial counsel's failure to take these minimally necessary investigatory steps was blatantly deficient, and highly prejudicial, performance. *See Morales v. Mitchell*, 507 F.3d 916 (6th Cir. 2007) (counsel ineffective for numerous deficiencies, including failure to interview defendant's family, friends, and others who knew him); *Dobbs v. Turpin*, 142 F.3d 1383 (11th Cir. 1998) (counsel ineffective for failure to investigate and present mitigating evidence; counsel spoke to a few witnesses, including defendant's mother, but overall investigation was deficient).

576.    Because Mr. Agofsky's attorneys violated "well-defined" norms that require counsel to investigate all reasonably available mitigating evidence, their strategic decisions concerning their penalty phase presentation, based on "rudimentary knowledge" from "a narrow set of sources," were unreasonable and prejudicial. *See Wiggins*, 539 U.S. at 524-25; *see also Rompilla*, 545 U.S. 374; *Williams,* 529 U.S. 362.

577.    The Courts of Appeals for this Circuit and others have repeatedly and recently held that the Supreme Court's "well-defined" norms required *habeas* relief in similar capital cases. *See Adams v. Quarterman*, 324 Fed. Appx. 340, 2009 WL 1069330 (5th Cir. April 22, 2009)*; Walbey v. Quarterman*, 309 Fed. Appx. 795, 2009 WL 113778 (5th Cir. Jan. 19, 2009); *see also Williams v. Allen*, 542 F.3d 1326, 1329-30 (11th Cir. 2008) (granting relief, although counsel presented the defendant's mother and consulted a mental health expert, because counsel's deficient investigation led to a misleading mitigation presentation that masked family dysfunction); *Gray v. Branker*, 529 F.3d 220, 225-26 (4th Cir. 2008) (granting relief, although counsel presented family testimony and was aware of psychiatrist's report, because adequate investigation would have uncovered many indicia of petitioner's mental health impairments). Applying United States Supreme Court precedent, these cases collectively hold that trial counsel in a capital case must make an "informed

decision" about mitigation strategy,[78] and must present "the details,"[79] "the full picture,"[80] the "entire,"[81] "cohesive,"[82] and "complete"[83] story, not a "scattered"[84] narrative that is "[in]accurate"[85] or "misleading,"[86] but "the strongest mitigation case possible."[87]

578.    In *Walbey*, for example, trial counsel presented the petitioner's grandmother and two psychologists at trial but failed to speak to a number of potential witnesses who had first-hand knowledge of his troubled childhood, failed to correct the grandmother's misleading testimony painting a too-rosy picture of the petitioner's past, and failed to rehabilitate misleading cross-examination about whether the petitioner fit the criteria for antisocial personality disorder. 309 Fed. Appx. at 796-97. The Court of Appeals, citing case law "that firmly establishes a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history," held that counsel's investigation, and hence his performance, was deficient because it was "severely limited." *Id.* at 800-01. The court also found prejudice. It observed that "*Williams [v. Taylor]* . . . stands for the proposition that counsel can be

---

[78] *Adams*, 324 Fed. Appx. at 349.

[79] *Walbey,* 309 Fed. Appx. at 803.

[80] *Gray,* 529 F.3d at 238.

[81] *Id.* at 237.

[82] *Id.* at 235.

[83] *Walbey* 309 Fed. Appx. at 802; *Williams*, 542 F.3d at 1340.

[84] *Gray*, 529 F.3d at 233 n.2.

[85] *Walbey* 309 Fed. Appx. at 802.

[86] *Williams,* 542 F.3d at 1340.

[87] *Id.* at 1340.

prejudicially ineffective even if some of the available mitigation evidence is presented and even if there is psychiatric testimony." *Id.* at 802. The mitigating evidence introduced at trial was substantially incomplete and some of it was inaccurate; as the magistrate judge had observed, it was "scant, bereft in scope and detail." *Id.* at 803. Furthermore, the defendant's own mental health expert "did severe damage to Walbey's case" when counsel failed to rehabilitate him following damaging cross-examination about antisocial personality disorder. *Id.* at 803-04. Neither the brutality of the crime nor the possibility that some of the undiscovered mitigating evidence might have been unhelpful could ameliorate the prejudice created by counsel's deficiencies. *Id.* at 804-05. The court accordingly granted *habeas* relief. *Id.* at 806.

579.    Similarly, in *Adams*, trial counsel and his investigator spoke with the petitioner's mother and stepfather and one of his siblings, but found that none of them was particularly informative or willing to help. The investigator testified that he did not make more active efforts to track down the petitioner's other family members or to investigate his social, medical, psychological, educational, abuse, and other histories because trial counsel did not ask him to do so. 342 Fed. Appx. at 347-49. Trial counsel opted not to present mitigating evidence and instead adopted a punishment phase strategy of portraying the co-defendant as the instigator and the petitioner as only an accomplice to the murder, and stressing the petitioner's cooperation with police. *Id.* at 343. On appeal from the district court's grant of penalty phase *habeas* relief, the state argued that the mitigation investigation could not be deficient because Adams had purportedly instructed his counsel not to contact his family. *Id.* at 347. The court, distinguishing *Schriro v. Landrigan*, 550 U.S. 465 (2007), rejected the claim because Adams, unlike Landrigan, never instructed his attorneys not to present any mitigating evidence. *Id.*

> Even if Adams had instructed [trial counsel] not to contact family
> members and presumably not to present mitigating evidence derived

240

> directly from them, [trial counsel] was not relieved of conducting a mitigation investigation . . . . It is widely accepted that family members do not represent the only potential avenue of mitigating evidence. Thus, an instruction not to contact a defendant's family members does not equate with a blanket instruction not to investigate or present *any* mitigating evidence. . . . Neither are we satisfied that this is a case in which the defendant's family was unwilling or unable to help at the time of trial . . . . [T]hree uncooperative family members does not an unwilling family make.

*Adams*, 324 Fed. Appx. at 347-48 (citing *Rompilla*, 545 U.S. at 381, and *Wood v. Quarterman*, 491 F.3d 196, 203 n. 7 (5th Cir. 2007)). Indeed, the court expressed skepticism about Adams's true opposition to family involvement, noting that Adams had given his trial counsel his mother's phone number. 324 Fed. Appx. at 348. The court criticized the "skewed perspective" of counsel and his investigator, who attempted to excuse their deficient investigation efforts because Adams's other family members had not "come forward." *Id*. And it held that counsel's deficient investigation made it "impossible" to make an "*informed decision*" concerning a penalty phase strategy. *Id.* at 349 (emphasis in original).

580. The court further held that the district court had properly considered affidavits from uncalled witnesses in assessing prejudice. *Id.* at 350. These affidavits established substantial, readily available mitigating evidence of Adams's childhood abuse, neglect and abandonment, which could have caused his numerous psychological problems. *Id.* at 351-52. The court rejected the State's claim that it should discount the proffered evidence because it was "double-edged." Even though the State might have impeached the affiants, if they had testified at trial, with evidence of Adams's prior bad acts, "we cannot conclude that the aggravating effect of this evidence would have outweighed the mitigating evidence in a reasonable jury's minds." *Id.* The court accordingly

241

found that counsel's deficient performance prejudiced the defense and granted penalty phase *habeas* relief. *Id.*[88]

581.    Black and Barlow never conducted an independent social history investigation. Bennett claimed that he prepared a "social history report," but admitted that this was only a memo, summarizing a single interview of Mr. Agofsky's mother, that he submitted to Barlow. SA 546 (Bennett Depo. 26-27). Dr. Roberts never received any such memo from either Barlow or Bennett, or from anyone else. He interviewed Mr. Agofsky twice and spoke to his mother once by phone for about fifteen minutes, and never received any other information about Mr. Agofsky's background or life before he entered prison. SA 715, 721. Neither did Dr. Gripon, the psychiatrist whom Barlow retained but did not call as a witness, ever see such a memo or anything else resembling a social history report. SA 2788-89. Black and Barlow had many years of experience and the resources of the federal government at their disposal. Their failure to assemble a reasonably complete picture of the available mitigating evidence, *before* crafting a penalty phase strategy, was deficient performance. *See Adams,* 324 Fed. Appx. at 349.

582.    Additional evidence appears in the attached reports of Marilyn Romanowski, L.C.S.W. (SA 1672, 1692), describing Mr. Agofsky's family background, upbringing, and mental health background. Ms. Romanowski describes Mr. Agofsky's birth (a forceps delivery); a childhood marked by frequent moves, poverty, and periods in violent neighborhoods; chronic, severe beatings during his early school years; his father's death in an airplane accident when Mr.

---

[88] *See also Johnson v. Bagley*, 544 F.3d 592, 603 (6th Cir. 2008) (granting habeas relief for unreasonable mitigation investigation and observing, "Uncooperative defendants and family members, however, do not shield a mitigation investigation (even under AEDPA's deferential standards) if the attorneys unreasonably failed to utilize other available sources that would have undermined or contradicted information received."); *Marinez-Macias v. Collins, supra*, 810 F. Supp. at 819 (rejecting trial counsel's testimony that skepticism about "deprived childhood" mitigation excused failure to investigate background), *aff'd*, 979 F.2d 1067.

Agofsky was nine; his mother's subsequent depression, excessive drinking, and near-suicide; and Mr. Agofsky's ten years of martial arts training beginning at age nine. Romanowski describes many head injuries and other potential neurological insults, describes episodes in which Mr. Agofsky suffered serious depressive symptoms, and provides clinically significant details about Mr. Agofsky's extended family. SA 1684-93.

583. A reasonable social history investigation would also have yielded tangible and documentary evidence that the defense could have shared with experts and used at trial. As discussed above, trial counsel failed to obtain important social history documents such as school, employment, and medical records, as well as family photographs. *See infra* at 244-48. However, as Barlow testified, trail counsel did not ask him to obtain any documents from Mr. Agofsky's background. SA 546.

584. Trial counsel could have compiled this information in 2004. They could, and should, have complied with the ABA Guidelines by assigning or seeking funds for the appointment of a mitigation specialist. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guidelines 4.1.A.1, 10.4.C.2.a, 31 *Hofstra L. Rev.* 903, 952, 999-1000 (2003); *see also Adams*, 324 Fed. Appx. at 345 & n. 17 (indicating that ABA Guidelines in effect at time of petitioner's trial "embrac[ed] the prevailing norms of the time"). Even without complying with that ethical obligation, they could have directed their investigator, Jay Bennett, to conduct a reasonably comprehensive social history investigation or could have conducted the relevant investigation themselves. *See Adams*, 324 Fed. Appx. at 349. They could have asked Dr. Gripon, Dr. Roberts or other mental health experts to conduct collateral interviews of the persons who appear in the Romanowski report. All of these family members and friends have stated that they would have been willing to speak to Mr. Agofsky's defense in 2004. The notes and testimony

of Dr. Roberts establish that Mr. Agofsky agreed to and was even willing to facilitate interviews of his family and friends, including his mother.

585.    If counsel had conducted an independent social history investigation, they could have used what they learned in a number of ways. They could have presented direct testimony from Mr. Agofsky's family, friends, and teachers. They could have presented the testimony of a mitigation specialist or investigator who had interviewed the witnesses and compiled the documents summarized below. *See* 18 U.S.C. § 3593(c) (information admissible at penalty phase without regard to admissibility under rules of evidence). They could have provided the information to one or more experts, in the form of a report by the mitigation specialist, statements by the witnesses, or both. If Mr. Agofsky had objected to presenting the direct testimony of his mother or any other witness, multiple family members could have helped to persuade him to agree to the testimony. *See* Declarations of Joseph Agofsky (SA 1930), Peggy Black (SA 1970), Joy Johnson (SA 1992). Even if the effort did not succeed, counsel could have presented the same information through the family witnesses, the mitigation specialist, and/or mental health experts. *See Adams, supra*, 324 Fed. Appx. at 347-48 (distinguishing *Landrigan*, *supra*, and rejecting state's argument that petitioner's purported opposition to testimony by certain individuals excused counsel's failure to conduct comprehensive mitigation investigation); Declarations of Joseph Agofsky (SA 1947), Peggy Black (SA 1975), Joy Johnson (SA 1997-98).

586.    At his deposition, Dr. Roberts testified that he could have made use of a comprehensive social history investigation and could have helped to prepare one. Mr. Agofsky knew that Roberts would pass along anything they discussed to Barlow, and that Barlow might use the information at trial. SA 729. Mr. Agofsky told Roberts that it was all right to speak to his mother, aunts, cousins and friend. He gave Roberts his mother's phone number and never asked

him not to talk to her. SA 730, 876, 913. When Roberts did call Sheila Agofsky, she never said that Mr. Agofsky objected to the interview. Roberts told Barlow that he thought Sheila would be a positive witness. SA 733. He also told Barlow that Mr. Agofsky had given him permission to talk to other relatives besides his mother, but Roberts did not recall receiving contact information from Barlow. SA 877. Roberts did not follow up because he did not know how to reach the other witnesses. SA 816. Dr. Gripon, similarly, states in his declaration that a social history report and statements from people who knew Mr. Agofsky would have been extremely valuable to him and would have enabled him to assist the defense in presenting a well-founded mitigation case. SA 2792.

587.     Counsel could have used the readily available mitigating information to craft an informed penalty phase strategy instead of undertaking to make a plan in ignorance of the available evidence. *See Adams*, 324 Fed. Appx. at 349. With all of the available evidence at their disposal, they could have adopted a very different mitigation strategy that stressed the emotional and physical trauma Mr. Agofsky endured and its effects on his functioning and development. Even if not, however, the background evidence that counsel failed to uncover would not have contradicted, and could have supplemented and provided context for, counsel's own strategy of attempting to convince the jury that with proper management Mr. Agofsky would not be a threat to others within the BOP.

588.     As developed further below, there is a reasonable probability that, had counsel conducted a reasonable penalty phase investigation and uncovered the evidence summarized elsewhere in this Motion, the outcome of Mr. Agofsky's penalty phase would have been different and the jury would have spared his life.

2. The Defense Never Learned, And Never Made Sure That The Jury Learned, That Mr. Agofsky Is A Beloved Member Of A Family Marked By Tragedy.

589. A reasonable investigation would have disclosed that Mr. Agofsky's immediate family would have cooperated gladly with the defense, would have provided detailed information about him and his background, and would have testified if asked. It also would have disclosed numerous extended family members who would have offered helpful information and were willing to testify.

590. As explained in the following paragraphs, Sheila Agofsky, Mr. Agofsky's mother, could have described his birth and early years, his father's death, and her years as a single mother to Shannon, his older brother Joe, and his much younger brother Trevan. She could have described his martial arts training and his high school years.

591. As explained in the following paragraphs, the defense could also have presented the testimony of Joseph Agofsky, Jr. ("Joe Jr."), Shannon's brother. Because he was older than Shannon, he could have provided more detailed memories of their early years and of their father, a more mature description of the devastating impact of their father's death on the family, and recollections of Shannon as a teenager.

592. As explained in the following paragraphs, Sheila's third son, Trevan, who was only five when Shannon and Joe Jr. were convicted in the Noel State Bank case, could also have testified for the defense.

593. Sheila and her deceased husband both have living siblings and other relatives who knew Mr. Agofsky as a child and teenager. As demonstrated in the following paragraphs, many of these extended family members, and others, would have been willing to testify in Mr. Agofsky's behalf.

246

594.    Through Mr. Agofsky's immediate family, the defense could have uncovered and presented detailed evidence about his upbringing. Sheila and Joseph Agofsky, Sr. ("Joe Sr."), Shannon's father, were married for seventeen years, until Joe was killed in a plane crash in 1980 on his way from his job on an oil rig owned by a subsidiary of Halliburton Co.

595.    Shannon, the Agofskys' second son, was born in Fairfield, California, in 1971. Joe Sr. was an involved father who spent a lot of time with his two boys. He took them to the park, fishing, or to the movies. The family took a walk together every evening. Joe Jr., who is old enough to remember those years, recalls that his dad built the boys a play house, let them help spray their vines for spiders, gave them rabbits in cages, and took care of the family truck, making sure the oil was changed and it was washed, waxed, and painted. Sometimes they took family bicycle outings, with Joe and Sheila taking turns on the bicycle that held the child seat carrying Shannon.

596.    If the defense team had conducted a reasonable mitigation investigation, Bennett, Black, or Barlow could have obtained family photos from Sheila Agofsky. Family members could have identified the photos and described the memories they preserved.

597.    Thus, they could have identified photos of Joe Sr. with his two sons, and of Joe Jr. and Shannon as small boys in California. A282 (Joe and Shannon with their dad on Joe Jr.'s seventh birthday); A283 (the boys playing on the floor with their dad, Shannon about a year old); A284 (the boys with their dad in California, playing with a soapbox derby car they made together); A285 (Joe Sr. riding a bicycle with Shannon in a child seat behind him); A286 (Joe Sr. lying in the shade with the boys leaning on him); A287 (the boys at their grandparents' house in California); A288, 289 (the boys at their home in California).

598.    Before Shannon started school, his parents moved the family to Anderson and Seneca, Missouri, and Woodward, Oklahoma, where his father held a variety of jobs. He also

247

provided them with a sense of security. For example, in Woodward, when "nutty Larry" next door frightened Shannon and Joe off his property, Joe Sr. defended his sons in a vigorous argument. Larry's children, who played with Joe Jr., had a dirt bike track on railroad property next to Larry's home, which Larry considered his private property and kept blocked off with a cow gate. One day Larry, brandishing a pipe wrench, chased Joe Jr. off the property, with Joe gunning his dirt bike as fast as it would go to get away. That night when Joe Sr. got home and heard about this incident, he went down the lane to Larry's. The boys followed although they had been told to stay home, and saw Joe Sr. jump the cattle fence and yell at Larry, telling him, "where's your pipe wrench?" and warning him never to bother his kids again.

599.    Later, the family moved to Henderson, Nevada near Las Vegas, where Joe Sr. worked for a glass company. The defense could have presented family memories from those years. Joe Sr. taught Shannon how to make simple items like mirrored flower pots, a skill Shannon used as a teenager when he needed gifts for girlfriends. In 1976, Joe Sr. won 26 bicentennial silver dollars at a casino and gave 13 to each of his sons. Shannon still had the dollars, and a wallet of his father's, when he entered federal prison, but during one of his mother's moves they were lost. Sometimes Joe. Sr. would take Joe. Jr. out to the desert to ride his dirt bike. While the big brother was racing through the open country on his bike, Joe Sr. would help the little brother, Shannon, turn over rocks and look for scorpions.

600.    Shannon entered kindergarten in Nevada in 1977, but the following summer the family moved back East. They lived temporarily, for a summer, in Bella Vista, Arkansas, and then moved to Stella, Missouri, where Shannon attended Triway Elementary School for first, second, and part of third grade. Joe Sr. worked for a propane company and a bread company, and later drove a tractor-trailer truck. On the bread truck job he was driving fourteen hours a day.

248

Subsequently, Joe Sr. got a job on an oil rig owned by Halliburton Co., a subsidiary of the company where Sheila's brother-in-law Joe Black worked. For his stints on the oil rig, Joe Agofsky would drive to Woodward, Oklahoma, leave his car at the home of Sheila's sister Sharon, and fly out to the rig. The job was a compromise; Joe Sr. would be gone, on the rig, for three weeks to a month, but then he would come home.

601.   The family's life changed tragically on March 9, 1980, when Joe Sr. was killed in an airplane crash on his way home from the job. A290. Joe Jr. remembers that his dad was coming home for Shannon's ninth birthday. A call came from Oklahoma saying that everyone on the plane had been killed, followed by a second call holding out hope of survivors, and then a third confirming that everyone aboard was dead.

602.   Sheila was so devastated that she could barely speak for two years. Family members described her condition as a nervous breakdown and said that for a time she could hardly get out of bed. As Joe Jr. recalled it, Sheila was "shell shocked" for about two years, functioning erratically and speaking very little. For a time, she drank heavily with a woman friend who was a drinker, but in the end cut off that friendship as a way to cut back her drinking.

603.   After Joe's death, Sheila moved with her boys to Noel, Missouri, to be closer to her parents. Joe Jr. tried to do things that Joe Sr. had done for them. He went to school part-time and worked eight hours a day, becoming a skilled mechanic. And he made sure his father's Ford pickup truck stayed washed, waxed, and painted. Shannon was too young to take on such responsibilities, but his reaction to the grieving of the adults around him was to develop protective instincts towards all of them.

604.   Family members could have identified photos of Shannon at around the time of his father's death: A291 (Shannon on his Grandpa Cousatte's cub tractor); A292 (school photo); A293

249

(early to mid-1980s). The defense could also have presented family photos of Shannon playing with animals during this period: A294 **(**Shannon with puppies**)**; A295 **(**Shannon with family cat resting around his neck**)**.

605.    After the family moved to Noel, Shannon (and Joe Jr.) had to switch schools in the middle of the school year. Sheila signed Shannon up for martial arts classes because local boys were beating him up on the way home from school, and because she thought he needed a male influence. Joe Jr. witnessed one of the beating incidents, arriving a bit too late to protect his brother, who at that time was smaller than other boys in his grade. Initially Sheila, Joe, and Shannon all took classes, but Shannon was the only one who persevered. He attended that school and worked there as an instructor for about ten years, and earned his black belt. He looked up to the owners, who were twin brothers named Gerald and Darryl Edmondson, as father figures.

606.    Early in Shannon's time at the martial arts school, a specialist in the Korean martial art of Hwa Rang Do visited to give a seminar. Robert Duggan was one of the first Americans to earn a black belt and was still the highest-ranked American in this discipline, and was widely admired. The occasions when he came to give seminars were big events. At the time of this first seminar, he had just founded a school in Aspen, Colorado, to train executive bodyguards and other security professionals. Nine-year-old Shannon wanted to attend the school. Duggan told him that if he could earn his black belt, his high school diploma, and CPR and EMT certificates, he could enroll when he turned eighteen.

607.    Shannon worked hard for the Edmondson twins until he graduated high school. He worked as an assistant instructor from age 14, opening the doors, teaching a children's class, and working out later with the adults. Sometimes he would teach an adult class. Throughout this time he wanted to be a bodyguard, and attending Duggan's ESI school remained his goal for years.

608. Shannon was a good student in high school and a member of the speech and debate team. He graduated in the top 20% of his class with a B-plus average. A296-299, 300-301, 302-303, 304-305. One summer, when he was about 14, he and a friend worked at a canoeing lodge in Ginger Blue, Missouri, performing maintenance tasks and moving the canoes upriver for the guests' convenience. One day after a storm, Shannon jumped into the river to save a drowning dog and nearly drowned himself.

609. Joe Jr. and Shannon became closer as Shannon grew older. They made pacts with one another never to "go for the same girl" or to do things that destroy families, like drinking and doing drugs.

610. Joe Jr. bought a house nearby when he turned 21, using money from the trust fund set up after his father's death. The cemetery where Joe Sr. was buried lay between Joe Jr.'s house and his mother's. One night, after returning from work, Joe noticed car lights coming from the graveyard, recognized Shannon's car, and realized that his brother was still visiting their father's grave all these years later.

611. Shannon skipped his high school graduation ceremony to set off for Aspen and enroll in Duggan's ESI academy. He completed the residential part of the course, having already completed all but one of the home study components before he arrived.[89] When Shannon completed the course, however, he could not immediately seek a job in the security field because he was still too young to carry a weapon, and he returned home. He planned to work at other jobs for a while and then get into the executive security job market when he was old enough.

---

[89] Duggan later testified that Shannon was a good student and that he thought well of him while he was there. Tr. Vol. 19, 197-98. As explained in ¶¶ 55 to 69, *supra,* and 726, *infra*, the defense could have, but failed to, elicit extensive helpful information from Duggan.

612. After Shannon's return from Aspen in August 1989, Darryl Edmondson opened another branch of the martial arts school in Arkansas. Shannon ran that school for the brothers until March 1990, when he left in pursuit of another opportunity to further his martial arts training. Master Henry Lee of the Hwa Rang Do international headquarters came to Arkansas to give a seminar and invited Shannon to train at his school in Los Angeles. Shannon traveled to California expecting to stay a short time, but was invited to stay on as a resident black belt. In return for training with Master Lee, Shannon lived at the studio and worked for him at a variety of tasks. He stayed for about six months.

613. Shannon left Los Angeles because he had realized he was under suspicion for the federal gun and bank robbery charges for which he was later convicted. He returned home to face them, and was arrested in December 1990.

614. Trevan Billbe, Shannon's younger half-brother, could have described his memories of his older brother Shannon playing with him when he was small. He spent long hours at the courthouse during Shannon's trial and remembers playing with a ball in the hallway. He now has trouble disentangling his memories of what his brothers were like from family photos he has seen and stories he has heard. He corresponds with Shannon and admires him.

615. The defense could have presented family photos of Shannon spending time with Trevan: A306 (playing in Trevan's room); A307 (washing Shannon's car); A308 (giving Trevan a ride on the lawn mower-tractor); A309 (playing with toy jeep the family gave Trevan for Christmas); A310 (clowning with Trevan for the camera); A311 (giving Trevan a ride on his leg while doing pull-ups from a tree limb); A312 (letting Trevan sit on Shannon's motorcycle); A313 (playing with Trevan's toy trains).

616. Family members could also have identified photos taken during Sheila's and Trevan's visit to Shannon and Joe Jr. at the Delaware County Jail during their Oklahoma trial. Joe and Shannon tried for Trevan's sake to keep the atmosphere cheerful, clowning with him by holding him upside down by the legs, A314, and letting him sit on Shannon's shoulders. A315. They posed for a group photo with their mother as well. A316.

617. Mr. Agofsky's immediate family could have identified photos that showed them sharing holidays, special events, and meals: A317 (Shannon, dressed for eighth grade graduation or a school event, with Joe Jr.); A318, 319 (Shannon with scrapes and bruises following a motorcycle accident); A320 (Shannon with Sheila at Christmas 1990); A321 (family table scene from late 1989); A322, 323 (Shannon and Joe Jr. at Christmas 1989 or 1990); A324 (Shannon in one of the fancy dress shirts he liked); A325 (Shannon in 1988 or 1989).

618. By obtaining information from Mr. Agofsky's immediate family, the defense could also have collected and presented evidence of a number of medical emergencies and injuries that Mr. Agofsky suffered during his childhood and adolescence, and during his incarceration, all of which had potentially significant mitigating implications:

- Sheila Agofsky had a difficult labor and Shannon was delivered with forceps. Sheila's sister Joy, who was living in California and was 14 or 15 at the time, remembered the forceps marks on the baby's face and his mis-shapen and swollen head.

- During the summer of 1977, while the family was living in Bella Vista, Arkansas, Shannon disturbed a nest of bumble bees and was badly stung, and later fell ill with Rocky Mountain tick fever.

- At around age 12, he and his mother were in a car accident on a snowy day. Later, after Shannon's grandfather arrived to drive him home, he also crashed his car in the snow. Shannon was treated at Freeman Neosho Hospital, where medical personnel picked glass from his face.

- At about age 16, Shannon developed a severe case of poison ivy. The local general practitioner, Dr. Galvin, gave him two medications that should not have been combined, causing his heart to stop. To restart the heart, Galvin administered a high

dose of adrenaline, and then packed Shannon in ice to get his heart rate back down. Shannon missed some school. The following weekend, he blacked out while driving home from a martial arts examination and crashed his car. Many small veins in his eyes and face had ruptured.

- In Shannon's junior or senior year of high school, he hit his head on the floor after a throw in martial arts class. Mr. Rowe, his debate coach, noticed that one of his pupils was dilated, and his mother brought him to a local opthalmologist for treatment.

- In 1989, Shannon had a motorcycle accident on Highway 43 near Seneca, Missouri. He ran into a barbed wire fence and also crushed his helmet. The barbed wire took the shirt from his back and the gold chain from his neck but did not seriously injure him. He was treated at Gravette Medical Center.

- In addition to his regular martial arts classes during high school, Shannon entered amateur kick-boxing bouts on weekends in Missouri and neighboring states, and also in California, from approximately 1987-90.

619. The defense could also have learned about instances of severe neurological dysfunction among Mr. Agofsky's close relatives. His uncle Bud, Sheila's other brother, according to his own and his family's reports, has a seizure disorder. Both of Bud's daughters have had babies with neurological damage, one of whom died very young and the other of whom requires constant care. On his father's side, his father's younger half-brother died at 6 weeks old of neurological problems, weighing only a few pounds, and his father's siblings believe that their mother, Mr. Agofsky's paternal grandmother, had an undiagnosed genetic mental illness. Another of his father's siblings has been treated for chronic depression. This information would have been very useful to a reasonably thorough mental health evaluation.[90]

---

[90] The defense did not arrange for any expert to conduct neuropsychological testing, a neurological or medical examination, or any form of neuroimaging. *See* Ground 12.2(E), *infra*. This Court has denied Mr. Agofsky's motion for funds to retain a mental health expert. In his supporting declaration, the expert stated that Mr. Agofsky's history of possible neurological insults and the family history of neurological disorders require further evaluation by qualified professionals. Doc. #33 (12/17/07).

620. Sheila Agofsky never spoke to either Black or Barlow before Shannon's trial. Black's secretary arranged for Sheila to attend part of the trial. She received one phone call, lasting about fifteen minutes, from a member of the defense team who asked about Shannon's childhood.[91] During the trial, Sheila had one five-minute conversation with Black, but never met Barlow. Joe Jr. received one visit from Jay Bennett, but Bennett did not ask him questions about his brother's family or background, or ask if he would be a witness. Joe Jr. would have been willing to testify if he had been asked to do so. The defense never contacted Trevan Agofsky.

621. Mr. Agofsky's mother and both his brothers would gladly have testified in his defense. In addition, each of his immediate family members could have provided a statement that his attorneys could have shared with experts. *See* Declaration of Sheila Agofsky, SA 1950; Declaration of Joseph Agofsky, Jr., SA 1930; Declaration of Trevan Billbe, SA 1966. A social history report or the testimony of its author could have supplemented their statements or their testimony on these subjects. *See* Declarations of Marilyn Romanowski, SA 1672, 1692.

622. Sheila Agofsky, Shannon's mother, could have testified about, or described in a statement, the circumstances of his birth. Sheila had a hard time carrying babies. She had to spend several months on bed rest before Shannon's older brother, Joe Jr., was born on July 23, 1966, and then had seven miscarriages before Shannon's birth on March 11, 1971. SA 1951, SA 1930. It was a difficult delivery and the doctors had to use forceps. SA 1951.

623. Sheila and Joe Jr. could have described the family's financial hardships. Sheila and her husband, Joe Sr., moved repeatedly in search of steady work. SA 1951-52. Often they were "wiped out, out of money." SA 1930. During Shannon's first nine years they lived in California,

---

[91] As set forth in ¶ 802, *infra,* a defense psychologist, Dr. Dan Roberts, could have testified that he conducted one telephone interview of Sheila Agofsky.

Missouri, Oklahoma, three places in Las Vegas, and again in Arkansas and Missouri. SA 1952, 1930, 1673. Shannon was a fearful child. One of his earliest memories is the yowling of the family cat as it was attacked and eaten by coyotes. Shannon, who was three years old at the time, was afraid to go outdoors after this incident. SA 1673.

624. Once the family wound up in a poor, violent neighborhood of Las Vegas where Shannon, as a first-grader, became a target for bullies who beat him up and threatened to rape him when he came home from school. SA 1952, SA 1931. Sheila acknowledges that she and Joe Sr. did not do enough to protect him from the violence. SA 1953. As Joe Jr. remembers it, their father's attitude was that Shannon had to learn to protect himself and not worry their mother by complaining about what was happening to him. SA 1932.

625. Shannon recalls being beaten every morning and frequently in the afternoons, and remembers dreading every day of school. The bullies would spit on him, tear his clothes, throw him to the ground, jump on him, and punch him bloody. He would beg them to stop but that only encouraged them further. SA 1675. When Shannon told his mother about the first assault, she called the school, but nothing was done. And his father told him not to worry his mother. He took Shannon to the backyard, taught him to throw a punch, and told him to protect himself. But Shannon never could bring himself to fight back. He absorbed the daily assaults and never told anyone about them again. SA 1675.

626. Shannon also was exposed to significant neighborhood violence in Las Vegas. He saw drug dealing, theft, guns and other weapons, gunfights, knife fights, and beatings. SA1674. It was noisy. A bunch of bikers in the neighborhood would drink all day and get rowdy and fight, which was scary for Joe Jr. and even scarier for Shannon, who was younger and physically small. SA 1931. One time a near-riot broke out downstairs from where they lived and Shannon heard the

apartment manager's wife screaming while men dragged her husband outside and stabbed him to death. A drug dealer, who lived downstairs and had taken a liking to Sheila and her boys, planted himself in front of their apartment with a shotgun until the uproar subsided. SA 1674, 1952. Another time, a neighbor knocked on the door while Shannon and Joe Jr. were alone in the apartment. Joe was frightened, and ran to the kitchen for a knife to protect them. Shannon was terrified. SA 1676, 1932. During the Las Vegas years, Shannon began to overreact to frightening events with hysterical crying and fear. SA1676. He remained a child who was easily terrified throughout his early school years. SA 1953, 1932. Another incident after the family moved back to Arkansas, involving a fugitive who kept the family hostage for several days at their home in the country, reinforced Shannon's perception of the world as a dangerous place. SA 1676, 1933, 1953.

627. The family could have described Joe Sr.'s death and its effect on Shannon. On March 9, 1980, they were living in Stella, Missouri and Joe Sr. was working on an oil rig. He was flying home to spend Shannon's ninth birthday with the family when he was killed in an airplane crash. SA 1953, 1933. Joe Jr. remembers that Shannon had survivor's guilt about the fact that his father had been killed coming home for his birthday. Years later, he confided to Joe and his wife Shayna that if it wasn't for his birthday their father would still be alive, and that Sheila sometimes blamed him for what happened. SA 1935, 1678.

628. The whole family naturally grieved, and Sheila was overwhelmed. She began drinking heavily, and found herself unable to cook or function. She was preoccupied by her own misery for quite a few years and a lot of times wouldn't respond to anything. SA 1934. She herself was afraid she would commit suicide. She would sit with a gun in her mouth, drink until she passed out, and wake up not recognizing herself in the morning. Sometimes Shannon would find her in this condition and have to drag her to bed. He attempted to cook his own meals and take care of

his mother. Joe Jr. was old enough to get out the house, dealing with his grief by simply absenting himself, and often leaving Shannon alone to deal with her. SA 1954, 1935, 1678.

629. The family could have described their move to Noel, Missouri, after Joe Sr.'s death, to be closer to Sheila's parents. Because Sheila did not have the skills to support the family, she had to rely on non-perishable food donations from the Native American tribe to which she belonged. She and the boys suffered severe financial hardship. SA 1955, 1678. In his new school, Shannon, who was still small for his age, again became the target of beatings by bullies. SA 1955, 1937, 1679 . He began having stomach aches and vomiting every morning and developed a phobia about being beat up. SA 1955, 1937. To "toughen him up," Sheila enrolled Shannon in a local martial arts school run by twin brothers, Gerald and Darryl Edmondson. SA 1955, 1937, 1979. Shannon looked up to the Edmondsons and to Robert Duggan, a specialist who periodically visited the school to give seminars in the Korean martial art of Hwa Rang Do. Shannon had a conversation with Duggan when he was still about nine, about Shannon's nearly paralyzing fear of fighting. Duggan encouraged him by telling him that everyone has fears; courage involves not an absence of fear but facing fear. He told Shannon that even death is not as important as dying with honor. Shannon took the advice to heart and threw himself into the physical combat that terrified him so much. SA 1679-1680.

630. After Shannon began martial arts classes, he found that he could defend himself against bullies and gained popularity in school. SA 1680. He stayed with his martial arts school until he was eighteen, earning his black belt at a young age and becoming an instructor. "It was like Shannon's religion." SA 1937. He taught classes of children who idolized him. *Id.*; *see also* SA 1956, 1682. In high school, he was a good student who had no disciplinary infractions or juvenile record. His teachers report that he was always polite, and he has no known history of rule

breaking, aggression towards animals, deceitfulness, or property destruction. SA 1682 (Romanowski report).

631. The family could have described Shannon's participation in "tuff man" mixed martial arts competitions on weekends. The competitions were really free-for-alls. SA 1659, 1939. Shannon often came home injured, with bloodshot eyes, broken toes, blood in his urine, bruises, and swellings. SA 1959. Even though Shannon had martial arts skills, he did not have the bulky build of most other participants in these contests and he got battered. At the time, he was 6'2" and only weighed about 160 pounds. SA 1959, 1939. He never wanted to admit to being afraid and would barely admit to being injured. SA 1959.

632. Sheila could also have provided background information about her family. Sheila's parents, Forrest and Emma Mae Webb Cousatte, were from Oklahoma and her father was a Quapaw Indian. The family had six children and moved around a lot, struggling to make ends meet. SA 1950. Sheila's father was a heavy drinker, often violent and suspicious, who once beat Sheila so badly that her high school reported him to the child welfare authorities. SA 1950. After Sheila and her sons moved to Noel following Joe Sr.'s death, Shannon spent a lot of time with his grandfather and was exposed to his heavy drinking, depressions, and rages. Shannon was put to work, but as hard as he tried it was never enough for his grandfather. Both grandparents favored Joe Jr., to the point that Shannon would ask his mother, "Why don't they like me?" SA 1955. Shannon was also exposed to violence, sexual abuse, and addiction that ran through Sheila's family. Her brother Bud was a convicted pedophile who kidnaped his daughters, Shannon's cousins Deborah and Nicole. There was domestic violence and substance abuse in the families of Sheila's sister Midge and her brothers Aaron and Sammy. SA 1960, 1686.

633.    Both Sheila and Joe Jr. could have described Shannon's head injuries and similar incidents. Not only did he absorb many blows to the head and elsewhere during his formal martial arts work and the "tuff man" free-for-alls, but he had a 1989 motorcycle accident which mangled his helmet, and another time an adverse drug reaction sent his blood pressure skyrocketing and then plummeting, and nearly killed him. SA 1958, 1940-41.

634.    Mr. Agofsky's youngest brother, Trevan Billbe, would have testified at trial, talked to members of the defense team, or signed a statement that the defense team could have shared with experts. He could have described his memories of the teenage Shannon joking with him and getting down on the floor to play with him when Trevan was still small. He could have described visiting his brothers when they were locked up in jail in Oklahoma and knowing that they were putting on a brave face for him. He could have described the family photos of himself and his brothers and the way they fueled his memories. He looks on Shannon as his hero. SA 1966.

635.    Mr. Agofsky's trial counsel made no effort to work with his immediate family to develop an independent social history. Jay Bennett, as indicated, once interviewed Sheila before trial, but limited the discussion to general questions about where the family had lived and confirmation of their Native American heritage. He never asked her specifically to describe details about her son's life, traumatic events, head injuries or similar matters. He never asked her to provide a written statement or explained why his history, problems, or head injuries could be important. Nor did anyone from the defense ask Sheila to help develop evidence by helping to locate family members, signing releases, or providing documentary information. No one prepared her for Dr. Roberts's telephone interview or explained that it was important for her to volunteer information to him. SA 1962-1963.

636.     Sheila would have testified for her son if she had been asked; in fact, "I would have crawled there to testify." SA 1963. She believed she could have persuaded him to permit it if he was opposed when the time for trial arrived, and if he remained opposed, his aunts and his brother could have testified and provided the details that she knew. SA 1963-64.

637.     Bennett visited Joe Jr. in prison in 2004, but he never asked Joe about Shannon's background and upbringing or any problems Shannon had had. SA 1947. No one from Shannon's defense ever asked Joe to provide or help develop evidence for the penalty phase, or to provide contact information for family members or sign releases. No one enlisted his help in persuading Shannon to allow his mother to testify or asked Joe to provide the same details in his mother's place. Joe would have testified in 2004 and would do so today. SA 1948.

638.     No one from Mr. Agofsky's defense ever approached Trevan or interviewed him at all before the 2004 trial. SA 1968.

639.     Mr. Agofsky's immediate family could have described for the jurors the tragedy that overshadowed his young life, and helped them to understand that the tragedy was superimposed on a series of traumas that already made him view the world as a dangerous place. Sheila and Joe could have explained why his martial arts study took on such importance for him and why he internalized its philosophy, carrying it with him to prison. Sheila, Joe, and Trevan could all have explained why they love Shannon and would be devastated to lose him. SA 1947, SA 1968. Trial counsel's failure to learn and use what Mr. Agofsky's nearest and dearest relatives could contribute to saving his life was deficient performance.[92] And the testimony and participation of Mr. Agofsky's loved ones could have tipped the balance against death by making

---

[92] *See Rompilla*, 545 U.S. 374 ; *Williams*, 529 U.S. 362 ; *Wiggins* No. 539 U.S. at 524-25; *Adams*, 324 Fed. App. 340; *Walbey*, 309 Fed. Appx. 795.

it possible for the jury to appreciate him as a three-dimensional human being. There is a reasonable probability that, but for trial counsel's unreasonable failure to uncover and present this evidence, alone and in combination with the other evidence described herein, the jury would have spared him.

640. The defense team's failure to take the preliminary step of interviewing Mr. Agofsky's immediate family and beginning to compile a basic social history made it impossible for them to establish his identity for the jury. The jury had no idea that there are people who care for him deeply and no notion of the circumstances that shaped his development. Trial counsel's failure to undertake this fundamental task was deficient performance and a clear violation of prevailing professional norms. There is a reasonable probability that, but for this deficiency, alone and in conjunction with the deficient performance described elsewhere in this motion, the outcome of the penalty phase would have been different. U.S. Const. Amend. VI; *Strickland v. Washington,* 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000).

3. The Defense Never Uncovered Or Presented Evidence That Mr. Agofsky Was Raised To Offer Refuge And Protection To Vulnerable Family And Friends.

641. If trial counsel had conducted a reasonable mitigation investigation, they could have learned that a number of Mr. Agofsky's relatives and friends were abused as children or as women living with violent partners. And they could have learned that, more than once, the Agofsky family provided support and refuge for relatives and friends who needed it. This family tradition, which Mr. Agofsky imbibed and carried on, could have served as mitigating evidence and could have provided context for incidents later in his life.

642. For example, Nyki Phillips (born Nicole Cousatte) is the daughter of Sheila's brother, Bud Cousatte, and Darlene Phillips. When Nyki was four years old, Darlene ran away from Bud with Bud's and Sheila's brother, Sammy. About two years later, Bud kidnapped Nyki

262

from the kindergarten playground and brought her back to his home in Missouri, where he intercepted her mother's cards and letters and told her that her mother no longer loved her. Bud kept her until she ran away at sixteen.

643. Bud, who was a convicted sex offender, behaved violently toward Nyki and did not protect her from other violent family members, including his wife, his mother, and his son (Nyki's older half-brother). Bud was explosive and violent, and was verbally abusive, frequently calling Nyki stupid and ugly, and comparing her unfavorably with her older half-sister Debbie (who no longer lived with them during the years Bud kept Nyki in his home). He did not protect Nyki from his mother, Nyki's grandmother, who frequently switched her on the legs and sometimes drew blood. And Bud once sat and watched while her older half-brother, Victor, knocked her chair over and beat her up.

644. Sheila's house was a refuge to Nyki throughout her childhood and adolescence. When she was small, she once stayed with the Agofskys in Las Vegas. She remembered Joe Sr. fondly and especially remembered Sheila curled up on a recliner under his arm. He allowed Nyki to lie under his other arm and fall asleep with one hand on his beard.

645. After Bud had brought Nyki to Noel, her older half-sister Debbie visited them there. Worried about leaving Nyki alone with their father, Debbie asked Sheila to keep an eye on her little sister. After that, Sheila, who by this time lived in Noel herself, frequently invited Nyki to stay with her. As a teenager, Nyki moved into Sheila's home.

646. During their high school years, Nyki and Shannon spent a lot of time together. She frequently worked out with him and he taught her karate moves above her skill level. They went rappelling at a local rock quarry and attended dances together. At school, he protected her from a boy who was picking on her.

647.     When Nyki was in her mid-teens, Sheila found medication in Nyki's bottom drawer where Trevan, who was still a small child, could have discovered it. She and Sheila argued and Nyki got her own apartment in Arkansas, supporting herself as a waitress. Shannon would come to see her at least once a week, take her out to eat, and give her money. He would take her driving, playing music and telling her enthusiastically about the songs he liked.

648.     Nyki recalled that Shannon frequently brought home stray animals, especially cats, and that he, like the rest of the family, loved their old German shepherd, Boy. They were all devastated when Boy died.

649.     Nyki saw her biological mother only twice during her childhood, but as a teenager would sometimes telephone her secretly from a pay phone. At sixteen, she left Missouri and headed to her mother's home in Arizona. She and Shannon lost contact for a while, and she had already left Missouri when he was arrested and convicted. Later, however, Shannon began writing to her from prison and was supportive and comforting through a difficult pregnancy during which she developed gestational diabetes, and gave the birth to a son who developed severe neurological problems.

650.     Nyki and other family members could have identified photos that documented her inclusion in the Agofsky family during her teenage years: A326 (Nyki in the mid-1980s); A327 (Shannon with Nyki).

651.     No one from the defense ever contacted Nyki. She would have told the defense that Shannon was a great support in her life who encouraged, helped, and cared for her. She would have said that he went out of his way, repeatedly, for her. She would have testified in his behalf, but was never asked.

652.    Nyki's older half sister, Debbie Cousatte, also remembered the Agofsky home, at an earlier time, as a place of refuge. Before Nyki was born, Debbie and her younger brother Victor were also kidnapped by their father, Sheila's brother Bud Cousatte. Their mother had reported Bud for a crime and, when his release from prison was imminent, had what was described as a "nervous breakdown" and was hospitalized. Debbie's and Victor's grandmother took care of the children, who were three and two years old. The grandmother later admitted to Debbie that Bud came to her door and took them from her at knifepoint. They grew up in their father's custody and the family, afraid of Bud, would not tell their mother where they were. Finally, years later, someone told their mother what area they were living in, and she called every high school in that area and asked for Debbie Cousatte until she found her daughter.

653.    During her childhood, Debbie often spent summers with Joe Sr. and Sheila Agofsky in California, as frequently as her father would permit. Debbie was a young teenager when Shannon was born and Sheila was a stay-home mom. Sheila had trouble carrying babies and had several miscarriages. Joe Sr. worked a route job, and was an "excellent dad," who was a "stabilizing and caring" influence in the family. He "worshipped those boys" and "taught them right from wrong." Debbie remembered Joe Jr. and Shannon as "good boys." Little Shannon was a "handful, the kind that makes you laugh." Debbie's summertime visits continued through high school.

654.    Debbie's father had seizures and possibly other mental disorders. His household was always chaotic and he "always had a lot of Hells Angels around." He would report fraudulent thefts of guns or other property and commit other insurance frauds. When Debbie was grown and had made her own life, she was still afraid of her father and tried to keep her whereabouts secret

265

from him. When he showed up in her town unannounced, she secured an order forbidding anyone but herself to pick up her children from school.

655. As an adult, Debbie sometimes visited Noel for three-week periods. By this time, Nyki was a small child living in Bud's home. Debbie's own experience with her father caused her great concern about Nyki, who did not know Debbie well. Remembering her childhood summers with the Agofskys, she asked Sheila to look out for the little girl and divulged some information about her own experience with Bud.

656. Joe Jr.'s wife, Shayna, had a sister, Yalanda Tuttle. The defense could have gathered information from her about Shannon as a young man.

657. Yalanda got to know the family through Shayna and dated Shannon for a time. Yalanda had just moved to Noel after a divorce from a violent husband and found that Shannon was his opposite. He never belittled her, loved to tease her, and was fun to dance with. He protected her from her ex-husband, who sometimes came around to torment her mentally. When Shannon warned the husband to stay away, he did. Yalanda remembered that Shannon wanted to protect the President, and that she told him he could achieve his goal.

658. Sheila was very welcoming to both Yalanda and Shayna, and Yalanda admired the way both older brothers treated their little brother Trevan. She also recalled Sheila's kindness to her sister Shayna after Joe Jr. was arrested. Sheila helped Shayna care for her son little Joe ("LJ"). For a while, Shayna lived with Sheila, but eventually had to leave town because the family became a "household name" as a result of Joe Jr.'s and Shannon's convictions. Shayna tried to "hang in there" for Joe Jr. for a number of years, but in time moved on.

659. Jan Varner met Sheila Agofsky through karate class when Jan was seventeen or eighteen years old, and began to visit Sheila's home every day because her own home life was not

266

good. At that time both Sheila and Joe Jr. were taking karate classes. Shortly after Jan got to know the family, Shannon graduated eighth grade. She remembered Shannon as a boy who was smart, funny, and "always on" for his mother. He could make all of them laugh so hard they had trouble catching a breath. While there was a lot of laughter at the Agofsky house, Sheila could also be very strict. Sheila tended to see moral issues in black and white terms, and could be short-fused and judgmental.

660.    Jan observed that Shannon's and Joe Jr.'s arrests had a strong impact on Trevan. Teachers sometimes gave him a hard time about his brothers and eventually Sheila home schooled him until he was about fifteen. Jan also has observed the arrests' continuing impact on Sheila. She tells Jan that her loss is too painful and she "doesn't want to do this any more." Sometimes her eyes look dead. Jan believes that Shannon's execution would "be the end of Sheila."

661.    As he became a young man, Shannon was known for taking extraordinary steps to help and protect those who were vulnerable. When he was a teenager, his aunt, Peggy Black, who lived in rural Mississippi, was in the process of selling her home. The real estate agent brought a middle-aged doctor to view the home and she took him around her property line in her golf cart. The doctor expressed an interest in buying and said he would be in touch. That night, the police called Peggy and told her that if she stayed in the house she should keep her doors locked, because the potential buyer was a sham who was wanted for murder. They explained that he was a serial killer who identified his victims by touring houses up for sale. Frightened because her husband was away, Peggy called Sheila. Shannon got on a plane to Mississippi and spent two weeks with his aunt, patrolling the perimeter at night and making sure the doors were locked and no one was coming in. Peggy recalled that during his stay, Shannon was gracious and helpful. He would come to her room after she went to bed, perhaps to check on her, saying, "And another thing," or "I've

got to tell you one more thing." During his visit, he helped her hold a yard sale and prepare for the move.

662. Shannon often showed compassion to friends in trouble. Joe Jr. remembered how upset Shannon was during high school over one friend who suffered a drug overdose and another girlfriend who was abused. When another high school friend was hospitalized during a trip to Europe, Shannon wanted to get on a plane to go to the friend's bedside, but was too young to take such a trip alone. Sheila recalled that, when a female friend gave birth after her boyfriend abandoned her, Shannon brought her to the hospital and stayed with her until her baby was born.

663. Trial counsel could have offered additional evidence about the feelings that helped to fuel his protective behavior, and additional instances of the protective behavior itself. In his teens, Shannon looked for causes. He experienced an overwhelming sense of responsibility and self-blame for events that he could not, but thought he should be able to, control. Once, as a result of a personal loss that he thought he should have prevented, he endured a period of extreme sadness, guilt, self-loathing, and lack of pleasure in his usual activities. He thought about suicide and became isolated, irritable, and vegetative. He even quit martial arts for a time. SA 1680-81.

664. During this period he would deliberately place himself in high-risk situations to assuage his need for self-punishment. He would have viewed killing himself as a "cop-out" or weakness, but being punished or even killed would have provided relief. SA 1681. Eventually, he emerged from his depression and resumed martial arts. However, he continued attempting to blunt his emotions and avoided showing anger, fear, or weakness. SA 1681.

665. Shannon volunteered at a women's shelter for a short period. One evening a domestic abuser came to the shelter trying to reach his victim, who was inside. Shannon went out

to the parking lot and gave the batterer a beating. He was so upset that he does not remember going out to the parking lot. He has amnesia for the entire incident. SA 1682.

666. During his incarceration, Mr. Agofsky experienced another bout of depression after hearing a report that a female pen-pal to whom he had stopped writing had committed suicide. He felt severe guilt and responsibility for what had happened, disproportionate to his decision to stop writing to her. His correspondence relationship with a second female pen-pal then ended. After these events, visitors noticed Mr. Agofsky's flat affect, sad mood, impoverished speech, and expressions of hopelessness. He was not writing or working out and had lost pleasure in his usual activities. He remained in this state for several months. SA 1692-93.

667. Joe Jr., Shannon's brother, could have described many examples of his protective behavior: his visit to an aunt who was terrified about reports of a serial killer in the neighborhood, his concern for a friend who overdosed in high school, another who endured domestic abuse, and a third who was injured in a car accident; his concern for the sick inmates he cared for when incarcerated at the medical center in Springfield; and his protection of female inmates during a riot in the jail in Oklahoma. SA 1829; 1950-51.

668. Mr. Agofsky emerged from the traumatic events of his childhood with a strong impulse to play a protecting role. Because, as a result of their deficient investigation, trial counsel knew nothing about it, neither could the jury. If the jury had learned about this side of Mr. Agofsky's personality, they could have given it independent mitigating weight, or it could have provided context for some of the prison behavior that the government urged in aggravation. There is a reasonable probability that, but for trial counsel's unreasonable failure to uncover and present this evidence, alone and in combination with the other evidence described elsewhere in this Motion, the jury would have spared his life.

269

669. Trial counsel's failure to obtain and present evidence that Mr. Agofsky was brought up to provide refuge and protection to vulnerable persons who had a claim on his loyalty, and readily took on that role from a young age, deprived the jury of information about both important positive qualities and major stresses in his background. There is a reasonable probability that, but for this deficiency, alone and in conjunction with the deficient performance described herein, the outcome of the penalty phase would have been different. U.S. Const. Amend. VI; *Strickland v. Washington,* 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000).

> 4. The Defense Never Uncovered Or Presented Evidence That Mr. Agofsky Has The Support Of Extended Family.

670. The defense made no effort to interview extended family members. Through the information they could have provided, the jury could have learned more about Mr. Agofsky's background and his place in the wider family and his community. As demonstrated in the following paragraphs, many of these extended family members (and/or their children) and friends would have been willing to testify in Mr. Agofsky's behalf.

671. Midge Malchupa, Sheila Agofsky's older sister, described their father (Shannon's grandfather) as extremely strict and abusive, a miner and logger who caught squirrels to put some meat on the table. In his later years, he mellowed and was financially generous to his children. Midge, in turn, married a violent man who controlled her and told her exactly where she could and could not go. He was more violent to her and her children than her father had been. Even after she left him, he harassed her, breaking into her home one night and beating her so severely that she thought he would kill her.

672. Midge remembered sharing her home with Joe Sr. and Sheila for a while in California while they looked for a place to live. Joe Jr. always worked hard and Midge liked him.

She knew both Joe Jr. and Shannon as small children, and remembered Shannon as an easy-going child who loved to joke and tease.

673. Midge was at Sheila's home when the news of Joe Sr.'s death arrived. Ironically, Midge had come to help Sheila pack for a move closer to Joe Jr.'s job at the oil rig in the Gulf of Mexico. Sheila was devastated by the news and began to hyperventilate so severely that Midge and her parents brought Sheila to the hospital in Stella. The arrival of Joe Jr.'s remains brought her no closure as he had burnt to death and there was little of him left except a belt buckle.[93] Sheila remained depressed for a long time afterward.

674. Midge would have testified for the defense if asked.

675. Midge's and Sheila's sister, Peggy Black, also remembered Shannon's "nice, nice" personality as a young child. He had private jokes with her, mimicking people they met by exaggerating their traits. He was funny and witty. Peggy never saw any indication of violence or aggression in Shannon. She watched him at karate twice and noted that he always stayed within the rules.

676. Peggy could have described Joe Sr. as a quiet man who dearly loved Sheila and the children. She recalled that, when his plane crashed because it had run out of fuel, her husband, Joe Black, went out to see the site of the crash. The pilot, who knew the area, had been attempting to land in a small body of water and had only missed a successful emergency landing by a few feet. There was nothing left of the bodies but ashes, which were divided among the victims' families.

---

[93] When Sheila's relatives said that the plane crash left no remains, they were not speaking metaphorically. Joe Sr.'s death certificate, written in Spanish because the crash occurred in Mexico, reads under cause of death, "Quemado en super corporal total. Calcinacion total." A290. "Quemar" means "to burn" and "calcinado" means "calcined." *See* www.Spanishdict.com. In English, "calcine" means "to convert into calx by heating or burning," and "calx" is "the oxide or ashy substance that remains after metals, minerals, etc. have been thoroughly roasted or burned." *Webster's New Universal Unabridged Dictionary* (Random House Value Publishing 1996).

The only tangible remnant of Joe Agofsky Jr. was a belt buckle. Joe Black flew back with these "remains," but they did not provide closure for Sheila and the boys because there was nothing for them to see. The boys' father went on a work trip and they never saw him again.

677.    At the funeral, Peggy noted that Joe Jr. came to stand with her and her husband. Sheila appeared to be in a state of shock, and Peggy would later learn that Sheila could hardly remember the funeral. Shannon, a nine-year-old, was standing in the corner of the room instead of going to any one for solace. And no one was taking care of his comfort. He seemed shocked and confused, not only by his father's death, but also by Sheila's reaction. Peggy went up to him and put her arms around him. He was pale and speechless.

678.    Peggy could have described the members of Sheila's immediate family, the Cousattes. The brothers and sisters were born in the following order: Bud, Peggy, Midge, fraternal twins Sharon and Aaron, Sheila, Sammy, and Joy. Peggy, as the oldest daughter, spent most of her childhood helping her mother. The family was poor, especially when the older children were young, and made their own soap and canned their own vegetables. Their father (Grandpa Cousatte to Shannon and Joe Jr.) worked hard as a lumberjack and lead/zinc miner.

679.    Peggy recalled receiving "switchings" from her mother. Although she did not recall any severe beatings from her father for herself, she did know him to administer them to other children in the family. Once Bud and a friend hid by a well and waited for Peggy and Midge to walk by on their way home from school. They picked up the two girls and held them over the edge, telling them they were going to throw them to their deaths. Her father caught the boys in the midst of this ordeal and beat Bud severely.

680.    Peggy could have told the defense that her younger brother Sammy was a favored child. He grew up, however, to be a heavy drinker like his father and died of alcohol-related causes.

272

Sammy's death sent her father into a deep depression. In later years, Peggy's mother developed diabetes and heart problems. Eventually she entered a nursing home, partly because of these health issues and partly because she was no longer safe from Peggy's father. Peggy visited her mother in the nursing home daily for five years. In the end, her father, who had developed dementia and then prostate cancer, was placed there as well. They died within months of each other.

681. Peggy could also have described the impact of the years of trial proceedings in Missouri and Oklahoma on Sheila and Trevan. Sometimes Peggy would baby-sit for Trevan when Sheila went to court, but mostly they packed him up and he traveled with them to the trials. He grew to hate school; Peggy suspected that he was tormented quite often. Sheila removed him from school and home schooled him, and he grew up as a loner. Shannon's execution would be devastating to the family and Peggy cannot imagine how they will manage.

682. Peggy would have testified for the defense if asked.

683. Debbie Cousatte, Bud's daughter, remembered that she came to Noel in the early 1980s, shortly after Joe Sr. had died, she was taken aback by the change in Sheila, who had "lost her anchor." Sheila was broke, working in a chicken factory, and leaning heavily on the boys.

684. Rhonda Polvado, the daughter of another of Sheila Agofsky's sisters, Sharon, could have testified about her long-standing support of the Agofsky brothers during their incarceration and provided background information about them and their family during their childhood and youth.

685. Like other family members, Ms. Polvado remembered Joe Sr. as a very "hands on" father who "doted" on his wife and boys. She was about fifteen years old when he was killed. She remembered that, for a while after his death, a grieving Sheila was not available to the boys.

686. Ms. Polvado was a victim of physical abuse in her immediate family, and heard stories about the severe beatings, in the previous generation, that her grandfather inflicted on her mother, her grandmother, and her aunts and uncles. She had a baby as an unmarried teenager, battled with her immediate family over his custody, and became estranged from them for a number of years during the time of the Agofsky brothers' prosecution and incarceration.

687. Ms. Polvado learned about Joe Jr. and Mr. Agofsky's situation in the mid-1990s and began visiting them. Over the last several years she has visited them, accepted phone calls from them, corresponded with them, and provided support to them on a regular basis. She knows that the brothers continue to care very deeply for each other. She would have been willing to testify in their behalf but was never contacted by the defense.

688. Joy Cousatte Johnson, Sheila Agofsky's youngest sister, could also have provided information about Mr. Agofsky's background and upbringing. She remembered Shannon, from birth, as a good-hearted person who was always a giver and a care-taker and never aggressive. He always "took up" for the underdog. He was a mature child who could chat and engage in adult conversation from six or seven years old. He was bright, with an excellent memory, and used to drive his Aunt Joy "nuts" with knock-knock jokes. When he ran out of known jokes he would make up his own. As a small boy, he stayed with Joy after she had had a new baby, and helped out by fetching baby supplies, collecting delivered meals, and washing dishes.

689. Joy recalled Sheila's devastation after Joe Sr.'s death. For years, Sheila and the boys could not believe he was dead, because there was no body. For a time, Sheila stayed in bed a lot and Shannon took on a caregiver role.

690. As a teenager, Shannon would drive himself down to visit Joy and her husband Johnny, helping them paint their house and run their drive-in movie theater. At that stage of his

life, they were amused to note, he tried to act "macho" but was afraid of the dark. Once they sent him out with a flashlight at the movie theater to watch for teens climbing over the wall. Shannon returned to the lighted office in no time.

691. Joy recalls Shannon's kindness to his Aunt Peggy (her sister) when she was afraid of a serial killer who had posed as a prospective buyer of her home. Shannon, who was a "big lanky kid" by then, traveled to stay with Peggy so that she would not have to be alone in the house.

692. Joy could have testified that Sheila has told her that, if Shannon is executed, she will commit suicide. Joy believes that this is a serious threat.

693. Bob Billbe is the father of Sheila Agofsky's third son, Trevon. He dated Sheila for a number of years and was married to her for a short time. No one from the defense ever contacted him, although he would have been willing to testify for the defense. The prosecution flew him to Beaumont twice, because of letters Mr. Agofsky had written to him, but never called him as a witness. Billbe could have described his marriage to Sheila, the birth of their son, and the effect on him of his older brothers' legal troubles.

694. Shayna Tuttle, the wife of Joe Jr., would have testified for her brother-in-law if asked. She remembered Shannon as exceptionally respectful and protective of women. Many of his friends were jealous of his "luck" with girls. Neither Shannon nor Joe Jr. drank, and Shayna, who had been a light drinker, stopped when she married Joe Jr.

695. Joe Jr. was arrested for the Noel State Bank robbery when Shayna was four months pregnant with their first child, four days before their second anniversary. She gave birth to "little Joe" (whom the family call "LJ") while Joe Jr. was incarcerated in Springfield. When the baby was four days old, she brought him to the jail to meet his father. Joe Jr. cried when he saw the baby but was not allowed to hold him. Later, in Oklahoma, where contact visits were allowed, both Joe

275

Jr. and Shannon held the baby. Joe Jr. was very nervous and excited and Shannon was more comfortable handling him.

696. Sheila opened her home to Shayna and LJ after Joe Jr.'s arrest. Trevan, who was seven at the time, was crazy about the baby. After a year and a half, however, Shayna left town because she knew that if she stayed her son would always have been "haunted."

697. No one from the defense ever interviewed any member of the family of Joseph Agofsky, Sr., depriving the jury of an important potential source of information about Shannon's background. Joe Sr.'s sister, Terry Bryant, and half-brother, Leon Rondeau, for example, would have been willing to testify for the defense, if asked. A reasonably thorough investigation would have disclosed that Joe Sr. was raised by a highly abusive mother who, her children later suspected, suffered from an undiagnosed genetic mental illness, and who also drank heavily. Joe Sr.'s sister Terry remembers him as a quiet, shy child who never stood up for himself, wet the bed, and sleep-walked. Their mother would physically abuse him and belittle him. She treated her other children in a similar manner, and both Joe Sr.'s natural father and, later, his stepfather, were largely absent and did little or nothing to protect their children from their mother. Nevertheless, when he grew older, Joe Sr. was exceptionally kind to his much younger step-siblings. He taught his brother Leon to drive and play ball and bought the children burgers or other items. They never saw him get mad or say a complaining word about their mother, even though she continued to belittle him on his trips home from military service.

698. Information about Joe Sr.'s upbringing could have helped the jurors understand the man who built a home with Sheila and began raising their sons, which could in turn have assisted the jurors to understand the atmosphere in which Shannon passed his childhood and Shannon's

276

own development. Moreover, Shannon's paternal relatives love him and would have been willing to testify in his behalf, but the jurors never knew that because the family were never asked.

699. Trial counsel had in their possession Mr. Agofsky's address book, which contained contact information for multiple family members, but counsel contacted none of them. SA 559-60.

700. Peggy Black, Mr. Agofsky's maternal aunt, could have provided a statement, or testified, about many aspects of his background. SA 1970. She could have described Sheila's and Joe Sr.'s frequent moves, often to poor and dangerous places. She could have described Shannon's sense of guilt over the fact that his father was killed coming home for his birthday. She remembered Shannon as a child who was little for his age, fearful, and a target for bullies, until martial arts became a way of life for him. As he reached his teenage years, Peggy recalled, Shannon always seemed to want to protect people—Peggy herself, his immediate family, classmates with personal problems, and later weaker inmates in prison. Peggy could have described, as well, Shannon's many injuries and the impact on him of the members of her family who struggled with alcoholism, addiction, and domestic abuse. SA 1970-77.

701. Joy Johnson, another maternal aunt, recalled visiting Sheila at the hospital after Shannon was born in a forceps delivery. The baby had large lines across his face where the forceps had dug in, and his head was swollen, with one side bigger than the other. SA 1998-99. Sheila and Joe Sr. moved a lot and lived in some rough places. As he grew up, Shannon was small for his age and other children picked on him. This was a problem until he eventually learned martial arts. He was a fearful child, scared of the dark and scared that wolves would get him. SA 2001, 1999. Joy remembered that Joe Sr.'s jobs sometimes kept him away from home a lot and he and Sheila

sometimes had conflicts because she would not let him discipline the children when he felt they needed it. SA 1999.

702. Joy vividly remembered how devastated the whole family was when Joe Sr. was killed in an airplane crash on his way home from his job on an oil rig. The fact that his father was coming home for his birthday made it especially hard for Shannon. SA 2000. His mother's depression made it even harder. The whole family was worried about Sheila, who confided to Joy that she was suicidal, often falling asleep with a gun in her mouth. She stayed in bed a lot and Shannon had to be her care-giver. For years, she would not believe in Joe Sr.'s death, insisting that he could still be found somewhere. SA 2000.

703. At the same time, Shannon was enduring mistreatment from local boys. Sheila decided to enroll him in martial arts classes, insisting that it might do him good. At the beginning, Shannon said he did not like fighting and did not want to do martial arts, but Sheila insisted. Joy and her father had discussions about the fact that Shannon did not want to fight. It surprised Joy that he stayed with it for so many years, but she could see that the discipline helped him become a stronger person. SA 2001. He became a real expert in martial arts, trusted by his instructors to teach classes of younger kids and beginners. SA 2002. He also participated in tough man fighting contests where he endured many injuries, in the head and elsewhere. SA 2003. He had other injuries, including a motorcycle crash and two auto accidents in one day. SA 2003. He was also exposed to alcoholism, addiction, and different kinds of abuse in his family. *Id.* Sheila could be hard on Shannon herself. Joy remembers Sheila calling to tell her that she had punched Shannon in the mouth on two different days and "busted his lip" each time. SA 2001.

704. Joy and her husband were amused to notice that, as a teen, Shannon was still afraid of the dark when they asked him to help out checking the grounds at their drive-in theater. SA

278

1995. He was a kind young man who always "[took] up for the underdog," whether it was his aunt Peggy, afraid to be alone while her husband away, or other inmates in prison. SA 1996. He protected his mother after his father's death. Later, when he endured teasing at school because Sheila had become pregnant with Trevan, he never told Sheila, to spare her feelings. *Id.* Shannon was a great brother to Trevan. SA 1996.

705. Another of Sheila Agofsky's sisters, Midge Malchupa, could have provided "many details about his life and background." SA 2537. Midge knew that Sheila had many miscarriages and a difficult time delivering Shannon, and that Sheila and Joe Sr. moved a lot and had trouble making ends meet. SA 2538. She was with Sheila when the news arrived of Joe Sr.'s death and could have described how devastated both Shannon and Sheila were. "I saw how he clutched himself and rocked back and forth." SA 2539. She could have described Sheila's severe depression after Joe's death, Shannon's beginning martial arts classes and entering "tuff man" fighting competitions. SA 2539-40. She could have described Sheila's family background, explaining that the family was very poor and their father would whip the children as discipline. SA 2537.

706. No one from Shannon's defense ever contacted Midge, although she has always been close to Shannon and Sheila. If she had been contacted in 2004, she would have given a statement to his lawyers, an investigator, a psychologist, or anyone else who would try to help Shannon. She would have told the defense team about other family members if they had asked her to do so. She would have been willing to testify on Shannon's behalf, share her information with the jury, and ask them not to sentence Shannon to death. SA 2540-41.

707. Peggy Black, Joy Johnson, and Midge Malchupa are Sheila Agofsky's sisters. They know most of the details that Sheila has provided about their nephew's upbringing, including the hardships he encountered, and other details about his family background. They could have

provided that information by testifying on his behalf at trial, speaking to anyone working for his defense, providing written declarations, or helping to contact other family members. If Shannon had objected to having Sheila testify, they could have spoken to him to help persuade him to agree to it, and if he continued to resist, they could have provided that information for her in their own testimony. No one from the defense ever asked them to do so. SA 1975, 1998, 2541. Trial counsel failed to contact any of them, despite the fact that the defense had contact information for both Peggy Black and Joy Johnson in Mr. Agofsky's address book and they both would have been willing to put counsel in contact with any other family members. SA 650, 657.

708.    The defense also could have provided information from Mr. Agofsky's cousins. Rhonda Polvado is the daughter of Sharon Whatley, another of Sheila Agofsky's sisters. SA 2298. Rhonda knows the Agofsky family well. Sheila and Joe and their two boys lived with Rhonda's family in Oklahoma for a number of months when Shannon was four or five years old. SA 2298. Rhonda was older, closer to Joe Jr.'s age. She remembers that Shannon had an abnormal amount of fear of being hurt in some way. He was unusually gullible and would give his prized possessions to anyone. He wanted very badly to be liked. SA 2299-3000.

709.    As Rhonda and Shannon grew up, she saw Shannon's family at gatherings at their grandparents' house. She could have confirmed and supplemented information from her aunts about Shannon's exposure, and her own, to family members who struggled with addictions and abuse. Their granddad was a heavy drinker who loved to make moonshine and homemade wine. He behaved in a controlling way to their grandmother, who never learned to drive, and was abusive to her. He beat Rhonda's mother and Shannon's mother when they were teenagers. Rhonda's father and her maternal uncles (also Shannon's maternal uncles) battled alcoholism, and Rhonda's brother and some of her Aunt Midge's children (Shannon's cousins) have struggled with drug

dependency. Rhonda was always afraid of their uncle Buddy, Sheila's and Sharon's brother. He "gave the children the creeps;" when one of them cried it seemed to excite him. He molested his daughters and served time for sexual crimes. Rhonda's own brother, Tony Whatley, molested her when she was about eleven, and she later learned that molested their other brother, Kevin. Rhonda could have testified that Shannon was exposed to the abuse and addictions in his family. He "lived it, and knows this history." SA 2300-01.

710.    Rhonda, like her aunts, could have confirmed how devastated Shannon and his family were over Joe Sr.'s death. Shannon seemed "totally freaked out" at the time and scared for his mother. SA 2302. Sheila has told Rhonda how hard it was for her to focus after losing Joe Sr. She would go to sleep after drinking, only to wake up and realize that she had a loaded gun which she had placed in her mouth, considering suicide. Shannon would try to protect her from herself and try to take care of her. He physically had to get her to bed, afraid that she would kill herself. Sheila has told Rhonda that she feels very guilty about what Shannon went through, because he was so young at the time. SA 2302-03.

711.    No one from Shannon's defense ever contacted Rhonda before his 2004 trial. She has maintained regular contact with Shannon and Joe since 1999. She and Shannon write to each other and speak by phone regularly. If she had been contacted, she would have provided information to the defense attorneys or investigator and would have testified if asked. She could have helped the defense team locate and work with other family members. Rhonda believes that Shannon would not have prevented his mother from testifying if he had understood that she had information the jury needed to hear and that she wanted to testify for him. Even if he had resisted letting Sheila testify, Shannon's trial counsel could have asked Rhonda or any other family member to persuade him to allow it. Rhonda feels certain she could have persuaded him, but even

281

if no one had success at that, she could have testified herself to much of the same information Sheila could have provided. SA 2303-04.

712.    Trial counsel also never contacted Deborah Cousatte, another first cousin of Mr. Agofsky's and the daughter of his Uncle Bud, Sheila's brother. SA 2295. Sheila and Bud lived near each other for many years, and Shannon had a lot of contact with him and his family. SA 2295. When Deborah was very small, her mother, Marilyn, informed on Bud on a company theft charge and he was incarcerated. As he neared release, Marilyn was so frightened that she was hospitalized with a nervous breakdown. Bud took revenge on Marilyn when he got out by kidnapping Deborah, age three, and her brother Victor, age two, at knifepoint from their maternal grandmother and bringing them to California. Except for one short visit when she was five, Deborah never saw her mother until she was eighteen. SA 2295.

Deborah has always been afraid of her father:

> While we were growing up, Buddy would hire "babysitters" who would become his sexual partners, along with other women who came and went. He is a convicted pedophile and he sexually abused me during my childhood. I can remember bleeding from my vagina as early as age five or six, and I can remember my father frequently hugging me with an erection. He encouraged me to be "girly" and climb up into his lap, and because I learned to manipulate him I was not beaten. But he severely beat my brother Victor, who grew up to be mentally ill, paranoid, and violent, and committed suicide, with a gun on Easter Sunday.

SA 2296.

713.    Deborah was a teenager, living with Bud near Sheila and Joe Sr., when Shannon was born. It was well known in the family that Sheila had trouble carrying babies. Deborah was present for one of the many miscarriages Sheila had before she finally managed to carry Shannon to term. Sheila had a difficult labor and Shannon was delivered by forceps. SA 2296.

714. Deborah could have confirmed that her grandfather Cousatte and two of his sons, Aaron and Sammy, were all alcoholics. SA 2296. She could also have reported on how devastated Sheila was after Joe Sr.'s death. Deborah returned to Noel after living out state and was taken aback by the change in Sheila. Deborah believed that there had been a rift between Joe and Sheila at the time of Joe's death, and they never had a chance to make up. When Deborah saw Sheila, Sheila had lost her anchor and was broke, working in a factory. The stress seemed to have brought out a tendency to depression in her, and some of what she said just did not make sense. SA 2296-2297.

715. No one from Mr. Agofsky's the defense ever interviewed Deborah in preparation for the 2004 trial. If she had been contacted, she would have talked to the defense team and would have been willing to testify for him. SA 2297.

716. Mr. Agofsky argues that his trial counsel were deficient in failing to contact his paternal relatives. *See infra* at ¶¶ 697–700. His father's siblings could have provided additional information in the form of statements or testimony. Leon Rondeau is the younger half-brother of Mr. Agofsky's father, Joe Sr. SA 2000. Leon and his wife visited Joe Sr. and Sheila several times a year when both couples were newly married and living in California. Joe's and Leon's mother did not like Sheila and would comment that she spoiled her boys. Leon tended to agree that Sheila "gloated on" them. SA 2001. Joe Sr. and Sheila moved to Missouri to be near her parents when the boys were small. Leon saw Joe Sr. only once more before he died, when Joe stopped in during a run to California driving a truck with Sheila's brother Bud. SA 2002.

717. When Sheila first called Leon with the news of Joe's airplane accident, she was certain that Joe was still alive. She clung to hope even after she received the final call saying that no one had survived. SA 2002. Leon believed that, while Joe loved Sheila, there had been some

283

tension in the marriage at the time of his death and that this affected Sheila's sense of loss even more. SA 2002. Leon, his older sister Theresa, and their mother attended Joe's funeral. SA 2002.

718.    A number of years later, when Shannon was around seventeen, Leon took a motorcycle ride to Missouri to visit Sheila and her boys for a week. SA 2002. He went caving and canoeing with Joe Jr. and Shannon. He found both boys very respectful and was especially impressed with Shannon's way with Trevan, wrestling with him, teasing him, and tickling him. SA 2002. He was also impressed when he attended Shannon's martial arts tournament:

> When we arrived, children from his club and their mothers came up to him and had great interaction. The kids were all excited and their mothers showed appreciation of Shannon's individual attention to each of them. I felt like I got to see Shannon's soft side and it was good. It was very obvious to me that Shannon was well liked and enjoyed the children. Shannon won first place in both forms and fighting that day. Shannon and I got to spend several hours alone together in his car while going to and from the tournament. I was impressed with him and his confidence in himself, his devotion to his family, and friends. I asked him if he had any plans to go to college. He told me that he wasn't going to go, that maybe later on he would consider it. When I was in the middle of my importance of school lecture, he stopped me and assured me that he was a good student and school was easy for him. He said he could be a doctor or lawyer if he wanted, but he wanted to pursue his martial arts, to study under the grand master and get his black belt. He wanted to fight professionally, to challenge the best. I took it as an obsession similar to that which drives Olympians who develop their talents and bodies to be the best. A dream I once had. I told him that while pursuing that goal he needed to make a living. He already had a plan which for a 17 year old is very impressive. His plan was to go into business as a distributor of various goods. He was going to contact manufacturers of various products and consolidate them into one catalog. He would be the middleman between them and the customer. Not a totally thought out plan but something he was considering.
>
> Shannon was proud of the fact that he never did drugs or alcohol. He was a young man who honored integrity, honesty and bravery. He wanted to be a body guard, a protector. A career he pursued after high school.

SA 2002-2003.

719. Leon could have recounted his family's mental health history. He describes himself as a recovering alcoholic who has struggled with depression for most of his life and has received medication for anxiety attacks. He believes that his father was an alcoholic. His mother, Edna Boucher Agofsky Rondeau, was short-tempered, unpredictable, and physically violent to her children. She may have suffered from bipolar disorder. SA 2000-2001. Leon recalls her humiliating treatment of Joe, even when he returned home from the Army as a young man, and his anger because Joe never stood up to her or said anything bad about her. SA 2001.

720. Leon's older half-sister, Theresa Bryant, was Joe Sr.'s older full sister. SA 1978. Trial counsel had contact information for Theresa in their possession. SA 651. She could have described Joe as a quiet, shy boy who would not stand up for himself. Their mother was prone to rages, beatings, and belittling treatment. SA 1978. Leon Sr., Theresa's stepfather, never protected the children from their mother, and apologized to Theresa for this when he was older. SA 1979. Their mother apologized to Theresa on her deathbed for her treatment of the children and told her that she loved them. SA 1979. Theresa could have provided additional details of family mental health history. Leon's sister Annette, Theresa's half-sister, suffers from depression that more than once has required hospitalization. SA 1980. Leon's and Annette's brother Henry, who was six weeks premature, died at a few weeks old with severe neurological problems. SA 1979.

721. No one from Mr. Agofsky's defense ever contacted Theresa or Leon in 2004. They both would have been willing to testify at his trial or to provide information to his defense. SA 1980, 2003.

722. Mr. Agofsky has many relatives who have known him all his life and who would gladly have worked with his defense team and testified on his behalf. They could have given detailed information about the hard times he endured as a child, described his family background,

285

and explained the importance of martial arts in his life. They could have provided vivid anecdotes from Mr. Agofsky's past. If Mr. Agofsky had objected to his mother's testimony, they could have helped to persuade him to let her testify, or her nearest relatives could have taken the stand and spoken for her, and for him. There is a reasonable probability that, but for trial counsel's unreasonable failure to uncover and present the evidence Mr. Agofsky's extended family could have provided, alone and in combination with the other deficiencies described herein, the jury would have spared his life.

723.    Because the defense failed to conduct a reasonably complete mitigation investigation, they never learned about the existence of many family members, much less about the stories they could have told of the strengths and stresses in Mr. Agofsky's immediate and wider families, or their support for Mr. Agofsky. Trial counsel's performance in this respect was deficient. There is a reasonable probability that, but for this deficiency, alone and in conjunction with the deficient performance described herein, the outcome of the penalty phase would have been different. U.S. Const. Amend. VI; *Strickland v. Washington,* 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000).

### 5.    Trial Counsel Neither Investigated Nor Presented Evidence Of The Important Role Of Martial Arts In Mr. Agofsky's Life.

724.    The defense never made any effort to explain the important role of the martial arts in Mr. Agofsky's life and never interviewed any of his teachers.

725.    Gerald Edmondson, one of the twin brothers who ran the local martial arts school that Shannon attended for many years, remembered that Shannon first attended shortly after losing his father. At the beginning, he was a bit fragile, but he never whined or dropped out, and moved through the ranks with great discipline. He was one of only about 20 students in 20 years to earn a black belt at the school and the first and youngest student ever to do so. Earning the black belt

required a great deal of skill and Shannon was an exceptional student. As a teenager, Shannon became a teacher in the school, and Edmondson remembered him as his best stand-in or apprentice instructor. Shannon had a way with the kids, and they idolized him as a role model. A514-15.

726.    Edmondson felt a special bond with Shannon, and believed that Shannon, as one of his best pupils ever, was entitled to his continued loyalty. A515. In later years, when Edmondson distanced himself from Shannon, he felt that he had let Shannon down.

727.    Shannon's behavior at both Edmondson's school and at the high school was good, as was required for continued affiliation with Edmondson's school. But Shannon's behavior was not just minimally compliant; he had great respect for the ranks within the Hwa Rang Do discipline and was respectful to his teachers. At the local high school, too, the vice principal, Mr. Cunningham, commented on Shannon's exceptional manners. A514-15.

728.    Sheila also took some karate classes when Shannon first joined the school, but remained at the beginning level. Joe Jr. also took classes but was not as disciplined as Shannon.

729.    As he advanced, Shannon developed strength, agility, and perseverance. Eventually he became a talented competitor whom "you couldn't hurt," not so much because of sheer strength as because of his athleticism. He represented the school well across the mid-west and south. He was outgoing without being obnoxious. A514.

730.    By the time Shannon reached age 16, the Edmondson brothers could call him at any time to teach any class, for either children or adults, and could count on him to do it. He commanded respect from the students and was a role model for the younger students. Gerald Edmondson remembered that the young ones idolized him. A514.

731.     Edmondson believed that, in a prison environment, Mr. Agofsky would have the skill level he would need to protect himself and others, and would in fact play that protective role. A514.

732.     Although he was subpoenaed by the prosecution for Mr. Agofsky's Oklahoma and Missouri trials, and again for his Beaumont trial, Edmondson was never called as a witness. When the prosecuting attorneys interviewed him the night before they planned to call him at the Beaumont trial, he told them about Mr. Agofsky's character and insisted that the crime facts directly conflicted with the Shannon he knew, explaining that Shannon's code of ethics would not permit a killing that was not in self-defense. The prosecutors decided not to use him as a witness. He was never contacted by any of Mr. Agofsky's defense attorneys, although he would have been willing to work with the defense if asked. A512-13.

733.     Robert Duggan, Mr. Agofsky's former instructor at ESI, the executive security school Mr. Agofsky attended immediately after graduating high school, could have provided mitigating information about the principles he learned there:

> The art of Hwa Rang Do teaches [a] Code of Honor that is recited during training and in all publications . . . Repeated [is] the following: Loyalty to one's Country, Loyalty to ones parents, trust and brotherhood among friends, courage never to retreat in the face of the enemy, and Justice. Never take a life without cause. It was my memory of Shannon that he abided by this code as a matter of personal honor.

A33-34.

734.     Family members could have identified photos that helped document Mr. Agofsky's long-standing and serious devotion to his martial arts training: A328 (Shannon, shortly after his father's death, posing in his karate uniform in Noel); A329 (Shannon, with Trevan, wearing his Hwa Rang Do shirt on his sixteenth birthday); A330 (Shannon with an infrared massage gadget he received for Christmas for the muscle aches he developed in martial arts).

735.    The prosecution made Mr. Agofsky's martial arts training a part of its evidentiary presentations at both the guilt and penalty phases of trial. *See, e.g.,* Tr. Vol. 19, 188 (Duggan testimony); Tr. Vol. 21, 136 (letter to Jensen). The defense could have responded by demonstrating that Mr. Agofsky's training had an important influence on his development, and highlighting the discipline and devotion he displayed in mastering a demanding art. Because such a presentation could have rebutted or ameliorated the government's case for death and provided strong reasons for imposing a life sentence, counsel's failure to investigate and present evidence concerning martial arts was deficient performance. *See Rompilla v. Beard*, 545 U.S. 374 (2005). There is a reasonable probability that, but for this deficiency, alone and in conjunction with the deficient performance described herein, the outcome of the penalty phase would have been different. U.S. Const. Amend. VI; *Strickland v. Washington,* 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000).

### 6.    The Defense Did Not Seek Out Local Friends And Teachers

736.    The defense never attempted to interview any of Mr. Agofsky's elementary or high school teachers, family friends, or others who knew him during his school years. Several were available in 2004 and would have been willing to provide information about his background.

737.    For example, Richard Davis was Shannon's sixth grade teacher and taught him again in high school He remembered Shannon as a good student who was well-behaved. In elementary school, he was well-liked, was not picked on, and was never "mean" to other children. As a high school student, Shannon was an analytical boy who thought before he spoke. Davis would have been willing to testify on Shannon's behalf.

738.    Dr. Richard Wooden, a local veterinarian, had a daughter, also called Shannon (Shay), who was on the high school debate team with Mr. Agofsky. Mr. Agofsky often visited

Wooden's home, along with other members of the team, and Wooden knew him to be a nice boy who behaved in a deferential way to his daughter.

739.    James Shannon could have testified that he met Mr. Agofsky when they worked together at the grocery store in Noel during high school. Years later, after Mr. Agofsky returned from California, they trained together with Gerald Edmondson for tough man amateur boxing competitions. Mr. Shannon remembered Mr. Agofsky as "straight laced," someone who would accompany him to parties and not drink. He never knew Mr. Agofsky to "just hit" someone out of anger; this was not condoned in Hwa Rang Do.

740.    Eddie Sumner also met Mr. Agofsky when they worked at the grocery store when they were 13 or 14 years old. Sumner did not attend the local high school, but through Shannon began attending karate classes. During the year and a half before Shannon's arrest, Sumner sparred with Shannon often and attended the Saturday morning class that Shannon taught. He remembered Shannon as a good martial artist, although some thought that he did not have "that aggressive edge."

741.    Sumner socialized with Mr. Agofsky. They took canoe expeditions, sometimes with James Shannon, and went out in the evenings. Like James Shannon, Sumner recalled that Mr. Agofsky did not drink although the rest of them did. Mr. Agofsky was a charming young man who could say outspoken things and get away with it. He was "lucky" with women.

742.    Jan Varner could have provided helpful information and testimony. SA 2005. Ms. Varner met Sheila Agofsky in martial arts class, a few years after Joe Sr.'s death, when Ms. Varner was seventeen or eighteen. Sheila took Jan under her wing and Jan visited almost every day. She remembered Shannon as the family clown. At that time, Sheila regularly went to the country club where she enjoyed drinking and throwing darts. Sheila could be short-fused and judgmental, and

290

strict with her children. She once told Jan that she had hit Shannon's younger brother, Trevan, so hard that she knocked him out. Jan often saw Shannon's Uncle Bud at Sheila's home and remembered him as crude and sexualized in his conversations. *Id.* No one from Mr. Agofsky's defense ever contacted Ms. Varner in 2004. She would have been, and remains, willing to speak to the defense and testify in Mr. Agofsky's behalf. SA 2005.

743. The defense also could have obtained helpful information and testimony from Brenda Bryson, whose son Ryan began taking Shannon's martial arts classes as a ten-year-old and continued for two to three years. SA 2535. Ms. Bryson could have described how the teenage Shannon interacted with the students:

> Shannon was so good with the kids, he never raised his voice and was incredibly patient with them. Before class they would talk, play and goof around, but when Shannon said it was time for class they all lined up immediately. They were there to learn and he tolerated no horseplay. When the classes were over the kids would run up and talk to him. Most guys that age would rather have been out with friends or talking to girls and not want to spend their time hanging around with kids. But Shannon would stay and talk to them. And they listened to him.

> Shannon would get the kids ready for competitions. Then Shannon would always be at the competition with them. They all did well in the competitions. After competitions Shannon would sit down with the kids and go through their moves with them and show them what they can do different next time. And Shannon was so proud. He referred to his students as "his kids."

SA 2535. Bryson could have described how Shannon gave Ryan extra lessons for free, and how Ryan, who did not have a father in his life, bonded with him. At competitions, Ryan would head straight for Shannon as soon as he arrived. Ryan was very proud when he advanced to a level at which Shannon began to shake his hand and bow to him. SA 2535, 2536. Ms. Bryson believes Ryan learned to protect his younger brother from Shannon. *Id.*

744. Bryson could also have described Shannon's self-discipline:

I have never seen Shannon be violent or aggressive. He does not start fights. He was very self-disciplined. I have seen him provoked on multiple occasions and he always walked away. Guys would walk by the martial arts studio on the street and make rude remarks about martial arts directed at Shannon. It would have been so easy for Shannon to fight them for what they said. The kids would be offended and ask Shannon, "What are you going to do about it? You're a black belt go show them." But Shannon would tell them it wasn't worth making a big fuss over it and to let it go. I saw him walk away from several instances like that. Another time Ryan and I went to see Shannon in a kickboxing competition in Bartlesville. After Shannon's competition, some guys were mouthing off making rude remarks to him. Shannon could have reacted and gotten mad, but he didn't let it affect him. He just walked away.

SA 2535.

745. Ms. Bryson would have been willing to testify on Shannon's behalf in 2004. "I never understood why no one ever called us to testify on Shannon's behalf. I was waiting. I would have then and I still would today." SA 2536.

746. People who knew Mr. Agofsky before he entered prison, but who were not related to him, could have provided an otherwise missing dimension to the jury's understanding of his background. There is a reasonable probability that, but for trial counsel's unreasonable failure to uncover and present this evidence, alone and in combination with the other evidence described elsewhere in this Motion, the jury would have spared his life.

747. A reasonably complete mitigation investigation should have included interviews of members of the community where Mr. Agofsky spent his childhood and adolescence. Trial counsel's failure to insure that such an investigation occurred was deficient performance. There is a reasonable probability that, but for this deficiency, alone and in conjunction with the deficient performance described herein, the outcome of the penalty phase would have been different. U.S. Const. Amend. VI; *Strickland v. Washington,* 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000).

292

### D.     Counsel Failed To Investigate Readily Available Prison Mitigation.

748.    The defense made virtually no effort to identify and elicit mitigating evidence that was available from other inmates, who could have testified about important facets of the eleven years of Mr. Agofsky's life that preceded the Plant incident, instead of leaving the government to place before the jury nothing from those years but his disciplinary infractions. These witnesses could have testified that he frequently played a positive role among his fellow inmates, earned the loyalty and respect of many of them, and especially played a protective role toward some inmates more vulnerable than himself.

749.    For example, the defense did not call Thomas Farrugia, an inmate whom Bennett interviewed on March 5, 2004. The only mitigating information Bennett obtained from him was that he knew that Mr. Agofsky was not in any gang and "did not take orders from anyone." The defense never presented even that limited information through any source.

750.    Farrugia, however, could have provided much more extensive mitigating information. He met Mr. Agofsky when they were both confined at USP Beaumont, where Farrugia was a leader of the Jewish congregation. Although there was anti-Semitism at the prison, Farrugia never encountered any from Mr. Agofsky. In fact, Mr. Agofsky shielded Farrugia from the bias of other inmates. Sometimes, Farrugia would sit in the dining hall and hear mutterings about "he's a Jew," but never when Mr. Agofsky was around. In addition, because he was known to have money and is older than many inmates, Farrugia might have been vulnerable to extortion. Mr. Agofsky's public association with Farrugia prevented trouble because other inmates respected him. A516. Sometimes, Mr. Agofsky would call Mr. Farrugia over to chat while sitting at a table with inmates Farrugia believed to be neo-Nazis, or Mr. Agofsky would eat meals with Farrugia or walk with him in the recreation yard. Farrugia also knew Mr. Agofsky to protect other inmates

293

from abuse or harassment. For example, when Gerald Johns repeatedly found his locker broken into, Mr. Agofsky spoke up for him and the break-ins stopped.

751.    Farrugia sent Black a letter saying that Mr. Agofsky was a loner and, while well respected, was "nobody's boy." He was not part of any gang. Farrugia enclosed a photocopy of a photograph of Mr. Agofsky standing next to him with a hand on his shoulder. A331. But Black never presented either the letter, the photograph, or Farrugia's testimony.

752.    Another inmate who knew Mr. Agofsky at USP Beaumont, Matthew Lindsey, could have testified, if asked, about the constructive role Mr. Agofsky played within the prison. Lindsey met Mr. Agofsky at Beaumont in 1999 and they were in the SHU in 2000 at the same time. Lindsey was transferred to another prison before the Plant incident in 2001. Before his transfer, however, Lindsey got to know Mr. Agofsky as a "standout individual" because he was not involved in drugs and gangs. He also had a "good attitude." For example, Mr. Agofsky would put together sports teams composed of good players from a variety of ethnic backgrounds, thus preventing ethnic conflict. A525-26.

753.    Lindsey could have testified that Mr. Agofsky played a peacekeeping role at Beaumont in the aftermath of the riot at Lompoc a few years earlier. Initially, Mr. Agofsky and one black inmate were the only inmates at Beaumont who had been involved at Lompoc. There was no trouble between them even though they were on the same unit. Later, when a sizeable group of inmates from Lompoc transferred into Beaumont, Lindsey heard talk among the black inmates about "getting" the white inmates. Mr. Agofsky played an instrumental role in making sure there was no racial trouble, by talking to people from both sides. A526.

754.    Lindsey could also have testified about the urgent need for federal inmates to take a defensive stance toward other inmates, the importance of regional loyalty among the inmates,

and the violent atmosphere at Beaumont. Lindsey, who is from Detroit, was imprisoned at a medium security prison in Phoenix, where he was attacked in the prison library by a sexual predator who was from Arizona. Several hundred inmates in that institution were also from the same geographic area. When Lindsey was attacked, all the other inmates got out of the library and he was left alone to defend himself against his heavier attacker. He believed that part of the reason no one defended him was that he was a geographic outsider. Nevertheless, Lindsey prevailed, after a struggle, and stomped the attacker to death. He was tried for murder and acquitted on the basis of self-defense. A525.

755. Until this attack, Lindsey had been serving his time in medium security institutions whose inmates were younger, had shorter sentences, and were mostly non-violent. After his acquittal, however, he was transferred to Beaumont, where the inmates were older and included many inmates serving life sentences. It was the most dangerous federal facility and violence was common. A525.

756. Gary Welch, who was Mr. Agofsky's cellmate in the Ottawa County Jail in Miami, Oklahoma, for about seven months in the mid-1990s, could have testified about Mr. Agofsky's close relationship with his brother, his loyalty as a friend to Welch, and the risks Mr. Agofsky and Welch both took to protect female inmates when a riot broke out in the jail. No one from the defense ever contacted Welch. A537.

757. Welch entered the jail following his own arrest and initially shared a cell with Joe Agofsky. They became friends. Later Welch celled with Shannon and they also became friends. Welch had never seen brothers as close as Joe and Shannon; one of them never had a cross word to say about the other. Shannon was also a good friend to Welch. He shared anecdotes and stories, kept Welch laughing, and taught him sparring moves. Sometimes they would spar using their flip-

flops as boxing gloves. Shannon would keep their morale up, encouraging Welch to do pushups and a regimen of martial arts exercises daily. A537.

758. Welch also remembered an occasion when several inmates escaped the jail through a manmade hole, but other inmates were unable to make it through. A332-333. These inmates took a guard hostage, injured him, and took his keys to all the cells and institutional doors. In an atmosphere of yelling and screaming, some inmates opened Welch's and Shannon's cell. Initially, Shannon wanted to remain in the cell to avoid escape charges, but when Welch expressed concern that the inmates would get into the women's section and hurt them, the two of them went and stood at a door that had to be opened before the men would get to them. One of the inmates with keys also had a knife and was threatening to get in the door. Welch and Mr. Agofsky stood there and would not let it happen. Welch recalled that the acting administrative officer of the jail later came to their cell and thanked them. A537.

759. Like Welch, Todd Gilbertson, who shared a cell with Mr. Agofsky at USP Atlanta, could have described him as an interesting person to live with. Mr. Agofsky was good with words and a great story teller. A522.

760. Roderick Russell, who had served time with Mr. Agofsky in several institutions, could have testified about his constructive presence in those institutions. Mr. Agofsky did not use drugs and worked out every day. Russell observed Mr. Agofsky help other inmates break their drug habits by spending time with them and sometimes paying their debts so that they could have a fresh start. He saw Mr. Agofsky provide support to another inmate, who was discouraged to the point of suicide over his imminent transfer to the Administrative Maximum Security facility in Florence ("ADX"), by convincing him that there were ways to keep himself occupied and strong there, by reading, working out, and educating himself. Russell also helped Mr. Agofsky when he

attempted to organize a leukemia drive at Lompoc, but the administration would not approve of their plans. A527-28.

761. Jeff Milton, who was incarcerated with Mr. Agofsky at USP Lompoc, could have described an occasion when Mr. Agofsky saved his life. At Lompoc, Milton's cell was on the second tier of the same block where Mr. Agofsky was housed. Once in about 1997-98, Milton obtained some "tar," injected it, and had an adverse reaction that nearly killed him. He was unconscious when Mr. Agofsky used CPR to save his life, but learned about it later. Mr. Agofsky watched over him for a day and half to be sure he did not die, while Milton drifted in and out of consciousness. Mr. Agofsky brought him ice and stayed with him until he was completely well, arriving at his cell as soon as the doors opened each day to stay with him.

762. Mike Fitzgerald, who was incarcerated with Mr. Agofsky at USP Beaumont, could have testified for the defense. The defense subpoenaed him to Beaumont but did not call him as a witness. Bennett and Black only asked him about what he could say about prison violence in general.

763. When Fitzgerald arrived at Beaumont, he was the only person from Boston. He tried to carry himself well. He does not use drugs, gamble, or drink, which helped him to stay out of trouble. But he was older, and knew that being older and alone in general population meant that some inmates could see him as a target. He spent time with Mr. Agofsky every day and they became close. Inmates would see him walk in the yard with his friend Shannon and they would know that they could not prey upon him. Because Fitzgerald had heart problems that required medication, Shannon worked out a cardio program for him to do every day. Shannon would help other inmates work out routines like walking and doing pushups. Fitzgerald and Shannon would work out on the benches in the exercise yard. A519.

764.    Fitzgerald could have testified that "Shannon always went for the underdog and he always wears his heart on his sleeve." Sometimes people took advantage of him because of this. Fitzgerald could also have testified that Shannon is not a hater, meaning that he is not a racist. His rule for everybody was to "act right;" if they did so, "then they were fine by Shannon." He never heard Shannon complaining about race or religion. His only concern was "keep your word." A519.

765.    Fitzgerald remembered that Shannon was not a member of a big crowd, but he would be "all over the yard." When Fitzgerald walked with him, other inmates would be calling him here and there. He was a "shock collar" because he would reason with people. He stopped a lot of "beefs." He could have walked away from those situations instead of getting involved, but he had some influence because inmates respected him on the yard. Fitzgerald could have testified that in three years he never saw Shannon get mad. When Shannon saw trouble, perhaps an older inmate bullying a younger one, he would do what he could to stop it. Fitzgerald never saw Shannon bullying or intimidating anyone or using his martial arts in an intimidating way. A519-20.

766.    Fitzgerald would have been willing to testify if the defense had called him as a witness. A520.

767.    Gerald Miller could have described race relations in the prison environment and his first-hand knowledge of the constructive role Mr. Agofsky had played. Miller was incarcerated at Beaumont from 1999 to 2004. No one from the defense ever interviewed him.

768.    Miller could have testified that the prison system in general is very segregated. Even in the mess hall whites and blacks sit separately. If an inmate of one race is placed in a cell with one of another race, both inmates often feel they have to do something aggressive because otherwise they will not feel safe going to sleep in the same cell. Also, inmates are territorial and form loyalties according to regional origin.

769. Miller has often known authorities to place inmates together who should not be together, because of regional or racial loyalties. For example, Miller, who is from New York, was once placed in a cell with an inmate who the prison authorities suspected of killing another inmate from New York. They managed to avoid attacking each other, but it was a dangerous situation. USP Atlanta has a particularly bad reputation for housing blacks and whites together in the SHU (where newly arrived inmates as well as segregated inmates are housed), and for generating many fights in consequence.

770. Despite the segregation, Miller, a black inmate, knows that Mr. Agofsky was not a race predator and earned respect from inmates of other races. According to Miller, "we would love to have him in this jail" because there would be no race riots. Mr. Agofsky had clout. He was also known for protecting people. For example, if an "old dude" owed money, Mr. Agofsky might pay his debt, or convince the inmate to whom the older inmate owed money to "give him a pass."

771. The defense did not call Pete Carrion, whom Bennett had interviewed, and who could have provided testimony on Mr. Agofsky's behalf at the penalty phase. Carrion would have described Mr. Agofsky as a soft-spoken person who showed respect, never "cussed," and was a good listener. He was not a racist; everyone, of all races, spoke to him. Mr. Agofsky and his friend, Michael McLarty, could not walk more than twenty yards without someone saying "hi" to them. A505.

772. Carrion could have described Mr. Agofsky's concern after Carrion's mother died and Carrion began using heroin. Mr. Agofsky and McLarty often came by to be sure he was doing all right and urge him to be careful with his drug use. A505.

773. The defense could have called Randy Seitzinger, who knew Mr. Agofsky at Beaumont and could have described his reputation among his fellow inmates and his own

recollections about him. Shannon's word was good and he never lied. He did not use drugs or, unlike most inmates, even smoke marijuana. Instead of joining a gang, he was on his own. This is also rare in prison. Most prisoners join gangs because there is power in numbers and because they want to belong. Seitzinger has also avoided gang membership but that is not easy because gangs provide protection. Seitzinger, like Mr. Agofsky, handles his problems on his own, but not every inmate can do that. A536.

774. The defense did not elicit mitigating evidence from Billy Santiago, who testified at the guilt phase about the Plant incident. Bennett did not learn any mitigating facts from Santiago when he interviewed him. If asked, Santiago could have testified that Mr. Agofsky avoided problems and tried to stop fights. For example, if one inmate was threatening another over a debt, Mr. Agofsky might pay the debt and then the debtor would owe him and avoid the threatened violence. Mr. Agofsky reminded Santiago of the Michael Scofield character in the TV drama *Prison Break*: he was intelligent, furthered his education in prison, helped people out, and would sacrifice himself for a friend. A533.

775. The defense could have presented the testimony of Ralph Cutchins, who got to know Mr. Agofsky well while they were confined in the control unit at ADX, the maximum security facility in Florence, Colorado. He remembered Mr. Agofsky as a quiet and laid-back person, with a sense of humor, who did not use drugs and worked out to stay fit. Mr. Agofsky was very intelligent and liked to read. He and Mr. Agofsky played Jeopardy every night while they lived in the control unit. A507-08.

776. Other inmates could have described Mr. Agofsky as a person who was strong and independent enough to keep clear of gang membership, who was skillful at mediating and defusing conflicts between individuals and groups, and who earned the respect of inmates from all racial

and ethnic backgrounds. The inmates who would have been willing to testify on his behalf are white, black, Hispanic, and Jewish. Instead, the jurors learned nothing about those eleven years of Mr. Agofsky's life except for a bare litany of disciplinary infractions introduced by the government in aggravation. The defense did not even provide any context about the prison culture in which those infractions occurred, except for a few pages of testimony by a sociologist from Houston who cited no data and had never met Mr. Agofsky. Tr. Vol. 22, 236.

777. In addition to the twelve inmates who could have provided information about Mr. Agofsky during his years in prison (described elsewhere in this motion), the defense could have called several others to testify about Mr. Agofsky's positive actions and attitude in the prison environment.

778. Kerry Dixon, who knew Mr. Agofsky during his time in general population at USP Beaumont, had spent many years in both state and federal prisons and could have explained what life was like for inmates in the BOP. And he could have explained Mr. Agofsky's constructive influence in the general population. SA 2028. Jay Bennett interviewed Dixon at Beaumont in March 2004. Dixon gave him background about Mr. Agofsky and Plant, and passed along rumors he had heard in general population about the identities of possible government informants. The defense did not call Dixon as a witness at trial. SA 619-29, 2028-29.

779. Dixon met Mr. Agofsky when Mr. Agofsky arrived at Beaumont and they were housed in the same area. Dixon remembered Beaumont as a very dangerous place, where everybody had a "shank" or homemade weapon, or access to one if they needed it. Most inmates belonged to gangs for protection against the inmate violence. Mr. Agofsky, however, was not a member of any gang and did not need to be. Because Mr. Agofsky was fair and calm and could communicate with all kinds of people, inmates would bring their problems to Mr. Agofsky and his

friend Lug (Mike McLarty) for resolution. Mr. Agofsky could handle situations in ways that would minimize trouble. Mr. Agofsky was known for taking on problems from all inmate groups and finding non-violent ways to resolve them. SA 629, 2028.

780. For example, one time an inmate was very frustrated about an incident and told Mr. Agofsky he was going to stab a particular person. Mr. Agofsky successfully encouraged the other inmate not to do so, explaining that it would make the situation worse, not better. Because Mr. Agofsky was so calm and reasonable, the inmate calmed down and took Mr. Agofsky's advice. SA 2028.

781. Everyone respected Mr. Agofsky, from all groups, including whites, blacks, and Hispanics. He worked hard to help keep trouble from erupting, negotiating on behalf of white inmates with leaders of the black and Mexican inmates. Likewise, leaders of those groups would approach Mr. Agofsky if they had a problem with one of the white inmates or even with a member of their own groups. In this way, although Mr. Agofsky himself was not a member of any gang, he helped to keep peace. SA 2028-29.

782. Because Dixon grew close to Mr. Agofsky, Mr. Agofsky would share his feelings with him. Mr. Agofsky often spoke about his mother and his brother, Joe, who was incarcerated in another prison. Mr. Agofsky worried constantly about Joe's well-being, and said that he felt terrible about the pain and trouble that his conviction and prison sentence had caused his family. Although some inmates took advantage of their families, Mr. Agofsky would never ask his mother for anything, not money or anything else, because he did not want to cause her any trouble. SA 2029.

783. Dixon considered Mr. Agofsky one of the finest men he had ever met, a man of integrity who was completely loyal to those he respected and cared about. Dixon was contacted

302

briefly by someone from Mr. Agofsky's defense in 2004, and told the person he spoke to that he would be happy and even honored to testify at the capital trial. SA 2029. Bennett's interview memo does not indicate that he asked Dixon about Mr. Agofsky's character. SA 629. Dixon expected the defense to bring him to court, but never heard from them again. He would have been happy to testify if Mr. Agofsky's defense had asked him to do so. SA 2029.

784. Michael Fitzgerald was subpoenaed by the defense, but was not called to testify at trial. Mr. Fitzgerald could have told the jury, on the basis of his personal knowledge, that Mr. Agofsky "was not a bully. Shannon always went for the underdog." SA 2059. Fitzgerald came to prison as an older inmate with some health problems. Being older, vulnerable, and alone on the yard could have made him a target. Mr. Agofsky hung out with Fitzgerald every day for three years. During that time, Mr. Agofsky also helped Fitzgerald work out a cardiovascular exercise routine to help with his heart problems. SA 2059.

785. Fitzgerald would have told the jury that Mr. Agofsky "was respectful with people and people respected him. Because he had respect of so many people on the yard, Mr. Agofsky stopped a lot of beefs, and he helped a lot of people." *Id.* Fitzgerald would have testified that Mr. Agofsky diffused conflict on the yard, getting involved in situations that he could have walked away from. Fitzgerald would have explained that Mr. Agofsky did this because he "lived by a code, his rule for everybody was to act right, and if people acted right, then they were fine by Mr. Agofsky." SA 2059. Fitzgerald would have told the jury that in three years with Mr. Agofsky, he never saw him get mad or use his martial arts to intimidate people. SA 2060.

786. Fitzgerald was subpoenaed to Beaumont before trial, but never called as a witness. No one from Mr. Agofsky's trial team ever interviewed him before they subpoenaed him. SA 2057. Bennett testified that he did not know why the attorneys had subpoenaed Mr. Fitzgerald. SA

554. Charles Glave, who was on the Beaumont recreation yard on January 5, 2001, was incarcerated with Mr. Agofsky at both USP Beaumont and USP Lompoc. He never knew Mr. Agofsky to "provoke any kind of problem or fight. He would give the shirt off his back." SA 2072.

787.     Jeff Milton could also have described Mr. Agofsky's behavior during his time at USP Lompoc. At one time, Milton was in a cell on the second tier of the same cell block as Mr. Agofsky. In late 1997 or early 1998, Milton injected some black "tar" heroin he obtained from another inmate and passed out shortly afterwards because of a bad reaction to the drug. Mr. Agofsky watched over him for a day and a half to be sure he did not die as he drifted in and out of consciousness. Milton was told that when he first passed out, Mr. Agofsky used CPR to save his life. While he recovered, Mr. Agofsky would come to his cell each day as soon as the doors opened, bring him ice, and stay with him to be sure he was all right. SA 2108. Milton could have testified about the unwritten rules of behavior among inmates in the BOP. For example, if a white inmate is placed into a cell with a black inmate, and does not fight with the black inmate, the white inmate will have to face consequences from other white inmates. He will have to live with the consequences for the rest of his life. The white inmate has no choice but to fight the black inmate, no matter how he feels about the situation personally. SA 2036.

788.     Frank Early, who was also on the recreation yard on the day of the Plant incident and knew Mr. Agofsky in Beaumont, characterized him as "one of the rare inmates who was independent enough to stay out of a gang. He was someone who was respected by all groups and was not a racist." SA 2042.

789.     The defense could have called Andres Campillo, another inmate from the recreation list, who knew Mr. Agofsky during his time at USP Beaumont. Campillo could have described Mr. Agofsky's reputation. He had a good reputation with his fellow inmates and was not someone

who started trouble. He was not involved with drugs and would mitigate problems and calm inmates down when trouble was brewing. SA 2020, 2015.

790.    The defense could have called Bruce Spring, who also knew Mr. Agofksy at USP Beaumont. Spring and Mr. Agofksy were cellmates during the period when they were both on the compound (in general population). Spring could have described Mr. Agofsky as well respected. He was a "stand up guy" who spoke to everyone and kept peace. Although Mr. Agofsky himself was not a gang member, he was able mediate conflicts among the gangs. SA 628.

791.    Bennett interviewed Spring at Beaumont in April or May of 2004 for about half an hour. Spring gave him background information about Mr. Agofsky and Plant. Bennett asked general questions about Spring's relationship with Mr. Agofsky and what life was like at Beaumont. The investigator never asked any specific questions about the Plant incident, the Michael Miele incident, or other individuals who were in the recreation cage with Mr. Agofsky during the Plant incident. Bennett told Spring that Mr. Agofsky's trial lawyer would be in touch, but Spring never heard from any lawyers. SA 2311.

792.    Russell Dinovo, who knew Mr. Agofsky in Atlanta, would have testified that Mr. Agofsky was soft-spoken and calm, and was not aggressive. Dinovo would have told the jury how Mr. Agofsky "quashed" problems in the prison. SA 2025. Todd Gilbertson, who celled with Mr. Agofsky in Atlanta, would have testified that Mr. Agofsky was good with words and a good story-teller. SA 2069.

793.    Artie Dufur, who knew Mr. Agofsky in Lompoc, could have undermined the government's claims that he would be a future danger if he received a life sentence. Dufur was already incarcerated when Mr. Agofsky came to prison. Although there were plenty of opportunities for fights, Dufur never saw Mr. Agofsky harm anyone. In fact, Mr. Agofsky was

305

sought after to help diffuse disputes between warring factions and although not himself involved in any gangs was accepted by many diverse groups, including those predominately of other races and religions. SA 2031.

794.     Dufur could also have testified to the many positive aspects of Mr. Agofsky's prison adjustment at Lompoc. Although drugs were prevalent and easy to obtain, Mr. Agofsky never touched them but rather was involved in helping others to stay off drugs. He also went out of his way to help young and otherwise vulnerable inmates. He was active in a proposed program for inmates to donate bone marrow for children with Leukemia, and he collected money for charities, including an annual Christmas toy drive. SA 2032.

795.     Reginald Gilbert-Bey could have described Mr. Agofsky as an extremely respectful, well-mannered, polite, and intelligent person. SA 2065. Although they were not friends, Gilbert-Bey noticed his respectful way of acknowledging people, including himself, when he was around them. He also could have described Mr. Agofsky's kindness to Richard Ward, who had attempted suicide several times and received the nickname of "hangman." White inmates were a small minority at Beaumont, perhaps as low as 10%, and because of their minority status and the extreme violence in the prison, many of them lost their equilibrium there. Gilbert-Bey remembered Mr. Agofsky telling him that he was talking to Ward, trying to mentor him and encourage him to be strong. SA 2066.

796.     In addition, counsel could have elicited mitigating testimony from the few inmates whom they called as witnesses at the guilt-innocence phase of trial. As described above, there is mitigating evidence the defense could have elicited from Billy Santiago, who described Mr. Agofsky as a person who avoided problems and tried to stop fights. *See* ¶ 774, *infra*. Scott Lawson also told the defense investigator important information that the defense never elicited but could

306

have used at the penalty phase. Mr. Agofsky did not use drugs or alcohol or smoke cigarettes. He worked out every day on the yard along with a lot of inmates, including Lawson. Mr. Agofsky was a "stand up" individual who did not get into trouble on the yard. SA 2083.

797.    Robert Ecker, the third inmate who testified at the guilt-innocence phase, also could have provided mitigating testimony about Mr. Agofsky at the penalty phase. Mr. Agofsky was never in a gang and could take care of himself. Ecker could have described a time when Mr. Agofsky helped him get out of a bad situation. Ecker was in trouble and owed someone money. Mr. Agofsky gave him a couple of books of stamps to resolve his debt and prevent him from getting hurt. SA 2046.

798.    Mr. Agofsky's fellow inmates could have provided compelling mitigating evidence—which could have been interpreted by expert testimony—for the jurors to weigh against the government's case in aggravation. Instead, the defense proffered little but argument that the Bureau of Prisons had the means to isolate him from other inmates and guards.

799.    The defense team's failure to investigate and present any mitigating evidence stemming from the eleven years that preceded the Plant incident was deficient performance. Testimony by Mr. Agofsky's fellow inmates could have served as a counterweight to the government's unadorned parade of disciplinary infractions from those years and could have provided compelling grounds for imposing a life sentence. There is a reasonable probability that, but for this deficiency, alone and in conjunction with the deficient performance described elsewhere in this Motion, the outcome of the penalty phase would have been different. U.S. Const. Amend. VI; *Strickland v. Washington,* 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000).

E. **Counsel Failed To Obtain And Present Appropriate Mental Health Evaluations.**

800.     Trial counsel retained two mental health specialists, but did not insure that they had available to them the results of a comprehensive mitigation investigation, did not insure that they identified and addressed developmental factors with mitigating implications, and did not obtain necessary follow-up examinations required by Mr. Agofsky's history. As a result, counsel formulated their mitigation strategy without the benefit of the information a complete mental health evaluation would have provided. *See Lockett v. Anderson,* 230 F.3d 695, 711-13 (5th Cir. 2000) (counsel's failure to conduct thorough investigation of defendant's personality disorder and brain abnormality, associated with seizure history, was deficient performance because counsel was aware of information, including evidence of head injuries and black-outs, that should have prompted further inquiry); *Conner v. Epps*, No. 01-60701, 54 Fed. Appx. 591, 2002 WL 31730174 (5th Cir. Nov. 18, 2002) (trial counsel's failure to conduct thorough investigation of defendant's mental health was deficient performance); *see also Powell v. Collins*, 332 F.3d 376 (6th Cir. 2003) (counsel ineffective in capital penalty phase for failing to prepare and present mitigating evidence, including independent mental health expert, and for calling court-appointed expert who diagnosed antisocial personality disorder).

801.     Douglas Barlow was the member of the trial team primarily responsible for the penalty phase. Although he was assigned to the case in September 2003, not until April 29, 2004, did he file *ex parte* motions for funds to retain experts, including a psychologist and psychiatrist. Dkt. #s 49-54. He did not seek funding for a mitigation specialist. At an *ex parte* hearing on April 29, Barlow argued that it was necessary to have both a psychologist and a psychiatrist because the former would conduct "a number of psychological tests that psychiatrists do not administer," and also would address "behavioral factors." The psychiatrist would interpret the tests and also could

308

address "the potential for brain disorder, other organic deficiencies." Tr. of Sealed Ex Parte Hearing, April 29, 2004, 2-3.[94] The Court granted counsel's motions to retain the experts. Dkt. 59, 60.

802.    Barlow retained Dr. Dan Roberts, a clinical psychologist from Roundrock, Texas, to evaluate Mr. Agofsky, sending him a package of information on May 13, 2004, and writing to the warden at the Liberty County Jail on May 20, 2004, to secure permission for Dr. Roberts to visit Mr. Agofsky. A334, 335. Barlow asked Roberts to explore mitigation and address the issue of dangerousness for the punishment phase. Roberts conducted two diagnostic examinations of Mr. Agofsky, a telephone interview of his mother, and "collateral" interviews of Liberty Jail guards. A336, 337-338.

803.    Roberts never conducted any psychological or neuropsychological testing of Mr. Agofsky, and the records received from trial counsel contain no evidence that any other diagnostic procedures or tests were performed by any expert.

804.    Barlow also retained a psychiatrist, Dr. Edward Gripon of Beaumont. His records custodian has certified that no report was ever produced and indicated that the office has no records of the evaluation. Gripon did not testify at trial.

805.    Trial counsel failed to ensure that Roberts and/or Gripon conducted the minimally adequate mental health evaluation that the facts of this case required.

806.    First, trial counsel did not provide to the mental health experts, or ask them to undertake, a comprehensive investigation into Mr. Agofsky's background and circumstances. An appropriate investigation should have included a wide-ranging records search and interviews of

---

[94] The Court has granted postconviction counsel's motion to obtain this transcript and the defense *ex parte* motions for expert assistance, but they otherwise remain under seal.

family members and third parties, and would have provided the proper foundation for the experts' assessment. Without a comprehensive fact base, no mental health expert could identify or consider psychological research relevant to the impact of the undisclosed factors. It was trial counsel's responsibility to assure that such an investigation took place. *See* A55, 55-57, A45-46; *see also Rompilla v. Beard*, 545 U.S. 374, 382-83, 390-91 (2005) (criticizing superficial investigation that, while it included consultation of a "cadre" of three mental health professionals, did not rest on comprehensive social history).

807.   Second, the investigation never reached a second phase in which adverse developmental factors were identified, and in which mental health experts provided appropriate follow-up evaluation of those factors and their implications. A46. Even a few hours of preliminary interviews should have identified a number of adverse developmental factors with mitigating implications, including but not limited to: parental death, father absence, family dysfunction, neurological/neuropsychological dysfunction, and youthfulness (age 18) at the time of the prior bank robbery offense, and also at the time of Mr. Agofsky's incarceration. A47-51. The mental health experts did not focus on, develop, or report on the mitigating implications of those adverse factors, or research the relevant literature.

808.   Third, the evaluation did not include referrals to other experts for assessments indicated by Mr. Agofsky's history. In particular, a cursory preliminary review should have revealed a history of potential neurological insults stemming from episodes when Mr. Agofsky received head injuries or his heart stopped. A49-50 (detailing reports of head injuries during automobile and motorcycle accidents, boxing, and martial arts sparring, and cessation of heartbeat during medical treatment). While a comprehensive mitigation investigation could have revealed evidence that required several referrals, at a minimum, Mr. Agofsky's history of neurological

insults required the retention of a board-certified neuropsychologist to conduct a comprehensive neuropsychological assessment, and a careful neurological assessment that could have included imaging techniques such as PET scan or functional MRI. A50-51.

809. Trial counsel called Roberts as a witness for the defense, but his testimony focused primarily on his review of Mr. Agofsky's BOP records and his assessment of his future dangerousness. Tr. Vol. 22, 208-24.

810. In effect, counsel left the experts to fish in the dark for Mr. Agofsky's history, conducting their evaluations in a short time with no idea of what information they might find or whether anyone or anything could corroborate or elucidate what they learned through their evaluative interviews.[95] Partly as a result, important mitigating information, such as Mr. Agofsky's history of head injuries, went undetected, while other information, such as his trauma history, received only glancing development. Finally, trial counsel never obtained necessary follow-up examinations required by Mr. Agofsky's history. *See Walbey*, 309 Fed. Appx. at 803-04; *Adams*, 324 Fed. Appx. at 351-52.

811. A reasonably complete mental health investigation and presentation would have developed the contributions of experts who could have established Mr. Agofsky's neuropsychological impairments, post-traumatic symptoms, and depression. They could have explained the effects of emotional and physical trauma that helped to shape Mr. Agofsky's personality, the role of the martial arts study that dominated his childhood and teen years, and his performance in the prisons where he spent his late adolescence and young adulthood. Expert testimony could have helped the jury understand Mr. Agofsky and his behavior in three-

---

[95] Indeed, Barlow was forced to give notice of potential expert testimony before any of his experts had even visited Mr. Agofsky. Criminal Docket, Doc. 70 (May 13, 2004).

dimensional terms instead of leaving them to work with the government's flat caricature while deciding his fate.

812.    In a case similar to Mr. Agofsky's, *Miller v. Dretke*, 420 F.3d 356 (5th Cir. 2005), the Court of Appeals for this Circuit granted *habeas* relief because trial counsel, like Barlow and Black, failed to develop mental health evidence in mitigation of sentence. At the non-capital sentencing trial, counsel elicited testimony from Miller and her ex-husband concerning her traumatic brain injury, mental health treatment, and memory losses, but counsel made no effort to contact her treating experts because he expected that she would plead guilty in return for a probationary sentence. *Id.* at 358-59. All three experts could have provided evidence of the Miller's organic and emotional impairments. *Id.* at 359. The Court of Appeals faulted trial counsel for deciding not to call Miller's physicians as witnesses without first speaking to them. *Id.* at 362, 363-64. The evidence would have been highly relevant to punishment because it would have provided an explanation for Miller's behavior and for the memory problems that affected her trial testimony. *Id.* at 363. The Court found that counsel's conduct was objectively unreasonable, and, after re-weighing the evidence in aggravation against the totality of the available mitigating evidence, that there was a reasonable probability that the sentencing outcome would have been different but for counsel's errors. *Id.* at 364-66.[96]

813.    In Mr. Agofsky's case, as in *Miller*, trial counsel failed to develop highly relevant mental health evidence that could have served as substantial mitigating evidence:

---

[96] *Accord Worthington v. Roper*, 619 F. Supp. 2d 661, 688-89 (E.D. Mo. 2009) ("[H]ad the trial judge heard testimony from properly prepared defense experts, there is a reasonable probability that petitioner would have received a different sentence."); *McNeill v. Branker, supra,* 601 F. Supp. 2d 694, 721 (E.D.N.C. 2009) (counsel ineffective for failing to investigate social history and develop mental health evidence).

814. *Neuropsychological Assessment.* Dr. Michael Gelbort, a board-certified neuropsychologist, administered a series of neuropsychological tests to Mr. Agofsky. SA 1701-02. He found statistically and clinically significant differences between Mr. Agofsky's high and low test scores. Specifically, Mr. Agofsky's lowest score fell at the fifteenth percentile, meaning that Mr. Agofsky's score was lower than all but 15% of population on that test. His highest score, in contrast, fell at the 98th percentile, an 83 percentage-point difference. SA 1697-98.

815. Dr. Ruben Gur, a board-certified neuropsychologist and professor at the University of Pennsylvania School of Medicine, analyzed Dr. Gelbort's data and prepared a behavioral image, a map of the brain that delineates areas of high and low functioning with different colors. SA 1710-11. He concluded that the test results reflected:

> clinically significant brain damage to the right frontal and right temporal lobes of Mr. Agofsky's brain. The damage to the frontal lobe would affect Mr. Agofsky's impulse control, judgment, emotional lability, and consequential thinking. The damage to the temporal lobe would affect his facility in attribution of intent to others and his memory, especially his memory of faces and locations.

SA 1709.

816. Dr. Gur explained the significance of the wide differences between Mr. Agofsky's high and low scores:

> His scores range from substantially above-average (in the top 99 percent of the population) in some areas of brain functioning to moderately impaired (in the bottom third of the population) in other areas of brain functioning. Specifically, compared to his strengths in reasoning ability and basic intellectual functioning, he has relative deficits in tests designed to assess impulsivity, attention, and working memory. Particularly when surprised or in response to unexpected stimuli, the clinically significant impairments in these areas prevent him from being able to take advantage of his reasoning and intellectual skills.

SA 1711.

817. Dr. Gur found that the results of the testing were consistent with brain damage in the impaired areas, in the front and back of the right hemisphere of the brain, and that Mr. Agofsky's higher functioning in some areas did not undercut the evidence of brain damage in other areas. "Brain damage can happen to anyone regardless of how well he or she functions otherwise." SA 1712-13. The areas of impaired function were consistent with the injuries described in the Romanowski report, which should have prompted any competent neuropsychological expert at the time of trial to administer a neuropsychological test battery. SA 1712. Dr. Gur described how Mr. Agofsky's brain damage could have affected his behavior on January 5, 2001:

> I have reviewed the description of the trial testimony in the briefs prepared for Mr. Agofsky's appeal to the Court of Appeals for the Fifth Circuit. A situation such as that described by the defense witnesses at trial, in which Mr. Agofsky was in a locked recreation cage in a violent prison and was attacked by another inmate, would be the kind of stressful situation in which his impairments could affect his impulsivity and his judgment. Even if, as described by the prosecution witnesses at trial, the other inmate did not physically attack Mr. Agofsky, it would have been consistent with his impairments if he had perceived the presence of a threat and reacted impulsively with unmodulated aggression. An exaggerated startle response when faced with what his brain perceives as a threat, followed by a decisive but reflexive physical reaction, is consistent with what one would expect from a person suffering from frontal and temporal lobe damage.

SA 1715-16.

818. Dr. Gelbort reviewed Dr. Gur's report and found that it accurately reported his test results and accurately described the areas of the brain implicated by the lowest and highest scores. SA 1697. He concurred with Dr. Gur's conclusions:

> Dr. Gur and I concur in our views of Mr. Agofsky's relative deficits in the areas of impulsivity, attention, and working memory. His pattern of scores and his deficits are neuropsychologically significant and consistent with brain damage, as Dr. Gur describes. Mr. Agofsky's pattern of scores and his deficits are consistent with incidents involving head injuries and other potential neurological insults in his background. His history should have prompted inquiry

by a mental health professional. . . . Further, having reviewed the statements of facts prepared by the two sides during Mr. Agofsky's direct appeal, I conclude that the brain damage evidenced by these particular deficits would have affected his behavior in the circumstances described at trial, a fight between inmates locked in a small recreation cage in a violent prison. In my opinion, his brain damage and neuropsychological deficits would have provided substantial mitigating evidence that could have been used at trial.

SA 1698-99.

819. *Trauma History and Its Effects.* Dr. Paula Lundberg-Love, a Professor of Psychology at the University of Texas at Tyler and a diplomate of the American College of Forensic Examiners and the American Psychotherapy Association, evaluated Mr. Agofsky and reviewed records, witness statements, and the reports of other experts. SA 1816. She found his childhood and adolescence noteworthy for a series of traumatic incidents. SA 1817. In addition to the incidents noted by Drs. Gelbort and Gur, which had the potential to cause organic brain damage, Dr. Lundberg-Love described another series of incidents that could have caused chronic traumatic stress, affecting both the development of his brain and his emotional development. SA 1820.

- In his early grade-school years he was chronically a target for beatings by older children on the way to and from school.

- His father died in an airplane accident when he was nine years old.

- His mother thereafter suffered from severe depressive symptoms for an extended period and was emotionally unavailable to him.

- At age nine, he was enrolled in a martial arts school where he was placed in a class with adults, making it necessary for him to train and spar with persons much older and stronger than he was. He continued his studies in that school for ten years.

- As a teenager, in addition to his formal martial arts training, he enrolled in "tuff man" competitions where he sustained repeated injuries.

SA 1820.

820. Having considered the impact of these episodes, Mr. Agofsky's martial arts training, and his years of incarceration beginning in late adolescence, Dr. Lundberg-Love concluded:

> In my professional opinion, based upon the extensive records that I reviewed for this case, as well as the results of my clinical interview of Mr. Agofsky, that the repeated physical victimization perpetrated on him during his childhood, coupled with other instances of childhood trauma such as the death of his father and the depression of his mother, led to the development of significant posttraumatic symptoms such as fear, anxiety, hypervigilance, and powerlessness. He came to view the world as a very dangerous place. Thus, when Mr. Agofsky was introduced to martial arts training, he finally found a coping skill to ameliorate some of his posttraumatic anxiety symptoms and his fear of the world. As he became adept at Hwa Rang Do and internalized its philosophy, Shannon incorporated dichotomous (right and wrong/black and white) thinking as well as a strong commitment to defend the weak and vulnerable. These factors played a significant role in Mr. Agofsky's childhood and adolescent development, and they were reinforced when he was exposed to the violence of the prison system. These same factors – especially hypervigilance and reliance on his martial arts training as a coping skill – would have come into play when he perceived a sudden threat from another inmate in a locked recreation cage. That information, coupled with his organic brain impairment, the etiology of his "protector" behavior, the nature of the prison environment, and the affidavits of inmates that support the issues raised in this affidavit, could have been investigated by his previous counsel and the information could have been presented during the guilt-innocence and/or mitigation phases of his 2004 trial.

SA 1825-26.

821. *Personality Testing and Evaluation.* Dr. Erin Spiers, a clinical psychologist who works with Park Dietz & Associates of Newport Beach, California, evaluated Mr. Agofsky, administered personality tests, and reviewed records, witness statements, and the reports of other experts. SA1788. She identified several areas that could have been explored by a mental health expert in 2004: potential neuropsychological compromise, family psychiatric history, major

traumatic life events, and institutional climate within the Bureau of Prisons. SA 1794-1800.

Regarding Mr. Agofsky's trauma history, she concluded:

> An appreciation of an individual's psychosocial history is inherent to any comprehensive psychological evaluation and is part and parcel of a competent conceptualization. As outlined above, in Mr. Agofsky's case, his history includes myriad elements that can clearly adversely impact psychological development and, in his case, help to mold his rigid dichotomous world view. The cumulative effect of any/all of these incidents should have been considered, examined, addressed, and ruled in or out as part of any comprehensive psychological work-up and could have been presented as mitigating evidence at Mr. Agofsky's 2004 trial.

SA 1798. Regarding Mr. Agofsky's institutional adjustment, Dr. Spiers observed:

> Mr. Agofsky has spent almost half of his life behind bars. As such, it is apparent that his survival has been dependent, in part, upon his ability to adapt to prison culture and to negotiate the demands of his environment. The reality of prison life includes hypervigilance to one's surroundings, the ability to engage in self-protection, and the ability to assert oneself as necessary. Despite the pull toward racial segregation and gang affiliation, Mr. Agofsky appears to have been able to remain independent. This is likely due, in part, to his significant personal identification with the principles of Hwa Rang Do, the particular version of martial arts that Mr. Agofsky practices. Nevertheless, Mr. Agofsky's survival requires him to function within the reality of the context in which he lives. All of this information could have been presented in mitigation in Mr. Agofsky's capital trial in 2004. To disregard the very real impact of institutional environment would be tantamount to disregarding an individual's environment in the free world (e.g., the important distinction of socioeconomic status, race, religion, etc.).

SA 1800.

822.    Dr. Spiers administered the Minnesota Multiphasic Personality Inventory-2 and the Millon Clinical Multiaxial Inventory-III to Mr. Agofsky and found that his test results did not reveal any objective evidence of major mental illness and his clinical profiles were within normal limits. SA 1801. He did not endorse any signs or symptoms of mental illness or personality disorder. SA 1801. The historical information Dr. Spiers had reviewed indicated that he had in the

317

past met the DSM-IV-TR criterial for major depressive disorder. SA 1802. On the other hand, she concluded that he does not meet the DSM-IV-TR criteria for Antisocial Personality Disorder (ASPD) as there was no evidence of conduct disorder before age 15. SA 1803.

> Given the crime(s) for which Mr. Agofsky has been convicted, one might simplistically think a diagnosis of ASPD was indicated. However, even if one were to inappropriately look past the fact that Mr. Agofsky does not meet DSM-IV-TR criteria for ASPD, a critical analysis of Mr. Agofsky's presentation as a whole (e.g., the context/environment in which he lives, his interpersonal relationship history, his ability to remain focused and goal directed, responsibility, and his demonstrated capacity for empathy) reveals that a diagnosis of Antisocial Personality Disorder is not indicated.

SA 1803.

823. *Psychiatric Evaluation.* Dr. Lawson Bernstein, a psychiatrist who is a diplomate of the National Board of Medical Examiners and the American Board of Psychiatry and Neurology, evaluated Mr. Agofsky and reviewed records, witness statements, and the reports of other experts. SA 1757. He found that Dr. Gur's analysis and Dr. Spiers's history and conclusions as to Mr. Agofsky's brain damage and personality traits were consistent with his own findings. SA 1763. On the basis of his own evaluation and the information he had reviewed, Dr. Bernstein concluded that Mr. Agofsky suffers from a mood disorder not otherwise specified, with features of both adjustment disorder with depressed mood and major depressive disorder. SA 1763-64. He further exhibits symptoms associated with PTSD, including marked hypervigilance. SA 1764. Mr. Agofsky's numerous head injuries could account for his "discrete mood disorder episodes." SA 1764. Dr. Gelbort's neuropsychological tests revealed brain damage that, Dr. Bernstein found, was likely the result of head trauma and was consistent with Mr. Agofsky's history. The brain damage impaired Mr. Agofsky's ability to perceive threat and modulate his responses to perceived threat. SA 1764.

824. Dr. Bernstein could have provided opinion testimony concerning the issues before the jury. Mr. Agofsky's conduct on January 5, 2001, was an acute stress reaction prompted by his omnipresent hypervigilance and the perceived threats, and exaggerated by his brain organicity, which rendered him substantially incapable of a measured, contemplative response. SA 1765. His mental disorders and brain damage could have supported statutory mitigating factors, in that his hypervigilance, brain damage, and other factors significantly impaired his ability to assess and modulate his responses to threats, and resulted in severe mental or emotional disturbance at the time of the offense. SA 1766. Furthermore, Bernstein found, the evidence supported non-statutory mitigation:

> Mr. Agofsky's young life was marked by loss, neglect, abandonment (through the death of his father and his mother's inability to maintain the role of a caring mother in the years that followed), and the nearly constant assaults and threat of assault by neighborhood bullies. These affected Mr. Agofsky's ability to form normal interpersonal relations and often resulted in a distrust of the intentions of those around him. The brain trauma likely resulting from years of unregulated or poorly regulated fighting events compounded Mr. Agofsky's ability to perceive threats, moderate his response, and recognize the consequences of his conduct without a substantial time for reflection.

SA 1766.

825. If trial counsel had conducted a reasonable mitigation investigation, and had provided the information they collected to their own mental health experts, those experts would have reached conclusions similar to those summarized above, and could have so testified.

826. Dr. Edward Gripon, the psychiatrist whom Barlow consulted but did not call as a witness, interviewed Mr. Agofsky once at the Liberty Jail on June 4, 2004. Barlow asked Dr. Gripon to let him know if he thought Mr. Agofsky had any obvious mental illness. He did not ask Gripon to address future dangerousness or neuropsychological impairment, or to develop

mitigating factors for the penalty phase. After the evaluation, Gripon spoke briefly to Barlow, who told him he would be in touch, but Gripon never heard from him again. SA 2789.[97]

827.   Gripon did not find that Mr. Agofsky suffered from the kind of obvious and serious mental health condition that was the focus of Barlow's interest, but he learned enough from the prison records he received from Barlow, his evaluation, and the information Mr. Agofsky provided to develop some understanding of Mr. Agofsky's background and functioning. SA 2790. If he had testified, he could have helped the jury to understand why Mr. Agofsky reacted as he did and addressed the government's claims of future dangerousness. *Id.* He and Mr. Agofsky discussed Mr. Agofsky's background, his father's death, his study of martial arts, and his institutional infractions. Mr. Agofsky told Gripon that violence is a significant problem in maximum security settings in the federal prison system and explained how he had managed to survive. *Id.*

828.   Dr. Gripon did not find that Mr. Agofsky was an especially dangerous inmate:

> . . . Mr. Barlow did not ask me to assess Mr. Agofsky's future dangerousness and I did not particularly focus on that aspect of my evaluation. I did not diagnose antisocial personality disorder; in fact, I did not have enough information for any diagnosis on Axis II of the Diagnostic and Statistical Manual, or DSM-IV-TR. . . . If asked, I could have testified that Mr. Agofsky was no more dangerous than any other prisoner who wanted to protect himself from violence. He was not, in my judgment, an inherently dangerous person but was surviving in a dangerous environment.

SA 2791.

829.   Gripon has reviewed the social history information in the Romanowski report and in the declarations of persons who knew Mr. Agofsky. Information of that kind would have enabled

---

[97] *See McNeill v. Branker, supra*, 601 F. Supp. 2d at 719 (finding counsel ineffective, in part, because he "did not ask Dr. Bellard if he could offer evidence in support of any statutory or non-statutory mitigators and did not even discuss the topic of mitigating evidence with Dr. Bellard beyond whether he could diagnose petitioner with an identifiable mental disorder.").

him to form a more reliable assessment of Mr. Agofsky in 2004. SA 2793. In particular, if he had learned of Mr. Agofsky's history of head injuries and other potential insults at that time, he would have recommended that Barlow seek neuropsychological testing. *Id.* Gripon concurs with the conclusions of Drs. Gelbort and Gur that the test results are consistent with brain damage, and with their explanations of how Mr. Agofsky's deficits would affect his behavior and functioning. *Id.*

830. Similarly, Gripon concurs with Dr. Lundberg-Love's assessment of the effects of chronic traumatic stress, and could have explained the emotional and organic effects of such stress in 2004 if he had been asked to do so. SA 2793. Similarly, the results of personality testing administered by Dr. Spiers were consistent with Gripon's own clinical understanding. If similar testing had been performed in 2004, Gripon could have described and interpreted the test results to the jury. SA 2793-94.

831. Gripon also concurs with Dr. Bernstein's "overview of the myriad ways in which a psychiatric assessment could have assisted the defense at both phases of Mr. Agofsky's trial." SA 2794. He could have testified, as Bernstein indicates in his report, that Mr. Agofsky's episodes of depression, along with his brain damage and post-traumatic symptoms, support two statutory mitigating factors, impaired capacity and mental or emotional disturbance. SA 2795. He also endorses Bernstein's description of "how the physically and emotionally traumatic events of Mr. Agofsky's life affected his functioning and should have mitigated his punishment," supporting the non-statutory "catchall" mitigating factor. SA 2796.

832. Dr. Dan Roberts, the clinical psychologist who testified for the defense at Mr. Agofsky's 2004 trial, also testified at his deposition that he himself could have developed and presented much of the same evidence provided to him by postconviction counsel, or else could have made appropriate referrals, if trial counsel had asked him to do so. He could have helped to

develop or present neuropsychological evidence or personality testing if Barlow had requested it, and he could have reviewed information about the traumatic incidents in Mr. Agofsky's past and assessed their effects. SA 759-60. For example, he concurred with several experts who stated that the head injuries and other potential neurological insults included in the social history report of Marilyn Romanowski should have prompted a neuropsychological workup. SA 761-64, 765. He "probably" would have referred Mr. Agofsky if he had known of the incidents, and he would have recommended that Barlow consult a board-certified neuropsychologist rather than conducting the testing himself. SA 764-65. Other potentially significant information in the Romanowski report included the bullying Shannon encountered in Las Vegas, the fact that his mother blamed him for his father's death, his mother's depression, the further bullying in Noel, Missouri, and information about martial arts. Roberts could have presented such information if he had known of it and the court had allowed him to testify about it. SA 765-69.

833.    Roberts had reviewed the reports of Dr. Gelbort and Dr. Gur. He had no reason to doubt the accuracy of Dr. Gelbort's test results[98] and could have explained his report to counsel or the jury. SA 770-771.[99] The pattern of low scores reflected on the tests was possibly consistent

---

[98] Roberts mentioned additional "medical" scans such as "Cat [sic] scans and EEGs and CT scans and MRIs." SA 828. Drs. Gur and Gelbort have explained that those procedures have not replaced neuropsychological testing as a tool for diagnosis and treatment of brain injuries. Neuropsychological tests provide important information about the ways in which an individual is actually *functioning* and the regions of the brain associated with any impaired functions. SA 2780-81, SA 2784.

[99] Roberts expressed curiosity about the norms used to compare Mr. Agofsky's performance on one of the neuropsychological tests to the mean. SA 773. Drs. Gur and Gelbort have explained that Dr. Gur, relying on a procedure he developed and published in peer-reviewed journals, used the best norms available for each test included in the procedure, meaning those that used the largest sample sizes in the methodologically cleanest studies. On the test about which Dr. Roberts testified, Dr. Gur used Heaton's norms. The norms that Dr. Roberts questioned, developed by Halstead and Reitan, were not used. SA 2779, 2784.

with Mr. Agofsky's injuries, and the areas of "neuropsychological weakness" related to those low scores could have affected his behavior. SA 771, 827. He might not have been attentive to what was going on during the fight, might have mis-perceived something, and could have had delayed reactions to what was happening. SA 772-773.[100] Roberts stressed that other factors, besides neuropsychological factors, could have influenced Mr. Agofsky's behavior on the day of the fight: the violent atmosphere in a maximum security prison, his history of martial arts training, and "his history of being beaten up as a kid" would all have contributed to his hypervigilance and readiness "to protect himself in a dangerous situation." SA 774-75.

834.    Dr. Roberts concurred with Dr. Bernstein's observation that Mr. Agofsky is hypervigilant and that during the Plant incident he was reacting in survival mode. While Roberts did not consider Mr. Agofsky incapable of forming intent,

> Sometimes when people are in the middle of a conflict, an extreme conflict, they don't think. The simply act on instinct, adrenalin leads the way, and then drives the behavior, and then afterwards they sometimes don't even remember what just happened because it's sort of a , you know, hysterical dissociative state kicks in. If something like that happened, then he might not be capable of being aware of what he was doing or in control of what he was doing.
>
> Q: Okay. So if his statement said that it's possible that Mr. Agofsky, despite his actions, wasn't intending to kill Mr. Plant, then could you agree with that possibility? Is that what you're saying?

---

[100] Roberts characterized Mr. Agofsky's score on one of the tests analyzed by both Gelbort and Gur as a "pretty normal score," but recognized the wide gap between the highest and lowest scores. SA 773. Roberts has corrected a transcription error that misstated his testimony and understated how low that lowest score was. SA 692. Dr. Gur, who is joined in his opinion by Dr. Gelbort, has responded: "[Mr. Agofsky] had a consistent set of low scores that related to specific regions of his brain and were dramatically lower than his scores on tests related to other regions of his brain. It was this overall pattern that led me to conclude that his scores are consistent with brain damage. It is not 'normal' for someone who scores in the 98th percentile on a number of tests to score below the fourteenth percentile, as Mr. Agofsky did, on other tests." SA 2780, 2784. Furthermore, even standing alone, Mr. Agofsky's lowest score was more than one standard deviation below the mean, in a range that psychologists call clinically significant. SA 2779-80, 2784.

A: Yes.

SA 863.

835.    Not having received any information that would indicate that Mr. Agofsky had a mood disorder in 2001, Roberts could not join Bernstein's opinion that he suffers from a mood disorder not otherwise specified. SA 7857. He concurred with Spiers respecting information that could have been developed in 2004. SA 874. He could have himself administered the personality tests that Spiers performed, and concurred with her conclusions. SA 871.[101] Roberts was not familiar with the neurochemical effects of traumatic stress on the developing brain, and so could not comment on Lundberg-Love's discussion of that subject, but concurred with her discussion of the effects of emotionally traumatic events on Mr. Agofsky's development and his functioning in prison. Roberts, who often deals with the emotional consequences of traumatic incidents in his private practice, could have investigated and presented evidence of this type in 2004 if asked to do so. SA 782-86.[102]

---

[101] At the deposition, Dr. Roberts was uncertain whether Dr. Spiers administered the full MMPI-2. SA 871. In fact, she did so. SA 2785. The prosecutor asked Roberts on cross-examination whether the test was "scored by a computer." SA 870-71. Spiers has responded that she based her conclusions on her independent interpretation of the test results and her clinical observations. The computer-generated interpretive report provided objective data related to the normative population on each scale. Spiers used the computer-generated interpretive report as a cross-check on her own conclusions. SA 2786.

[102] On cross-examination at the deposition, the prosecution questioned Dr. Roberts extensively about statements in Mr. Agofsky's letters concerning the Michael Miele incident and other topics. SA 841-62. These letters were provided to the defense by the government shortly before trial and were introduced at trial. Tr. Vol.19, 287; Tr. Vol. 21, 129-40. The fact that they contained statements that the government used against Mr. Agofsky both at trial and at the Roberts deposition, far from undermining the mitigating value of a reasonably prepared mental health presentation, only underscores trial counsel's deficiency in failing to investigate and prepare to address evidence the government would almost certainly introduce. See Rompilla, 545 U.S. at 385-90; Adams, 324 Fed. Appx. at 352.

836.    Trial counsel chose to consult two mental health experts, but gave them almost no information to work with. As a result, they missed clinically significant brain damage and a significant trauma history, and were unprepared to provide a persuasive evaluation of Mr. Agofsky's functioning and development, or to suggest appropriate referrals. Furthermore, trial counsel made no use at all of Dr. Gripon, a psychiatrist, and never elicited the background information that Dr. Roberts, a psychologist, could have provided. There is a reasonable probability that, but for trial counsel's deficient investigation and presentation of mental health evidence, alone and in combination with counsel's other deficiencies, the jury would have imposed a life sentence instead of the death penalty. The Court must accordingly order an evidentiary hearing and grant relief on this ground.

837.    Trial counsel's failure to procure a complete mental health evaluation, and his decision to call Roberts as a witness without first ensuring that his evaluation was complete, was deficient performance. As a result, Barlow was forced to make strategic decisions regarding the scope of his own direct examination, his responses to the government's evidentiary objections, and his non-responses to the government's improper and misleading cross-examination, on the basis of incomplete information. *See* Ground 12.2(G), *infra.* The information upon which the jury rested its sentencing decision was even more incomplete. There is a reasonable probability that, but for this deficiency, alone and in conjunction with the deficient performance described elsewhere in this Motion*,* the outcome of the penalty phase would have been different. U.S. Const. Amend. VI; *Strickland v. Washington,* 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000).[103]

---

[103] On December 17, 2007, this Court denied postconviction counsel's motion for funds to employ a qualified clinical psychologist to conduct a mental health and violence risk assessment. In his supporting declaration, the expert stated that Mr. Agofsky's history of possible neurological insults and the family history of neurological disorders require further evaluation by qualified professionals. Doc. # 33.

**F.** **Counsel Presented A Poorly Investigated And Prepared Case On Future Dangerousness**

838. According to the prosecution, the "most important" factor supporting a death sentence was Mr. Agofsky's future dangerousness. Tr. Vol. 24, 338. The defense attempted to address this factor through the testimony of its experts, who also provided the basis for their sole argument in favor of life: that the Bureau of Prisons was capable of isolating Mr. Agofsky from other inmates to prevent him from killing or injuring others in the future. Tr. Vol. 24, 342, 354. Because the defense had not conducted a comprehensive social history investigation, the experts' opinions had a weak and superficial factual basis. In addition, their testimony was unsupported by appropriate data and experience, and the defense was unprepared to meet the government's rebuttal testimony.

839. As indicated in ¶¶ 803-04, *supra*, Dr. Dan Roberts, a clinical psychologist, formed an impression of Mr. Agofsky's personality by interviewing him twice, calling his mother for one brief interview, and conducting cursory interviews with the jail guards who had met him during the months immediately preceding the trial. He did not conduct any formal testing, and did not refer to any statistics or the literature of violence risk assessment. Instead, he reviewed records of Mr. Agofsky's incarceration under close confinement conditions at the BOP's Administrative Maximum Security facility in Florence, Colorado ("ADX"), and concluded that Mr. Agofsky "appears to be the type of person who can be adequately controlled." Tr. Vol. 22, 216-24.

840. Dr. Elizabeth Pelz held a Ph.D. in criminal justice and had studied the sociology of inmate societies. Tr. Vol. 22, 233. She testified that, from the "sociological/anthropological perspective," building status and respect is important within inmate societies. She did not comment on cultural practices like "checking in." Tr. Vol. 22, 233-36. Moreover, Pelz made no effort—and apparently was never asked—to review and comment on literature in her field on prison violence

or the factors associated with recidivism. When trial counsel asked whether Mr. Agofsky was "the type of inmate who could cope in ADX Florence without any violence," she declined to comment because she viewed the question as a psychological one beyond her expertise, and trial counsel did not rephrase the question into a form she was qualified to answer. Tr. Vol. 22, 237. Pelz observed that, if Mr. Agofsky were segregated, he would have no opportunity for violence, and stated that she had seen no evidence of aggression toward any guard or BOP employee. Tr. Vol. 22, 237-38.

841. Dr. Pelz wrote no report and has certified that she retained no records of her involvement in Mr. Agofsky's case. A339.

842. Terry Pelz, a corrections consultant with experience in the Texas Department of Criminal Justice, testified that he had reviewed Mr. Agofsky's BOP file and interviewed him. He offered his opinion that the BOP had the capability to house Mr. Agofsky away from others. Tr. Vol. 22, 238-41. He acknowledged on cross-examination, however, that he had never been inside a federal prison and no idea what steps the BOP would take or what its policies and procedures would require for Mr. Agofsky's future. Tr. Vol. 22, 242-43.

843. Mr. Pelz wrote no report and has certified that he retained no records of his involvement in Mr. Agofsky's case. A340.

844. The defense also retained Harvey Cox, a corrections consultant with experience as a warden and high-level administrator in the federal BOP. Cox described the conditions of confinement at ADX and the different levels of security that permitted inmates to earn the privilege of more interaction upon good behavior. Tr. Vol. 22, 189-91. He noted that Mr. Agofsky had been confined at ADX for two and one-half years (until his transfer to the Liberty jail before trial in this matter) without incident, and offered the opinion that, after the Miele assault, the BOP should not have permitted Mr. Agofsky to have recreation with other inmates. Tr. Vol. 22, 192-93. Cox

327

admitted on cross-examination that he had not worked at the Bureau of Prisons for more than a decade. He was unaware of assaults by inmates within ADX and unfamiliar with statistics about inmate conduct within its control unit. He also had no information concerning the rate at which inmates moved out of the control unit, or policies that governed whether they did. Therefore, he admitted, he could not say whether Mr. Agofsky would only stay at ADX "for a temporary period." Tr. Vol. 22, 194-99.

845. In rebuttal, the prosecution called Michael Cooksey, recently retired as an Assistant Director of the BOP, who had helped to design ADX and had served on the executive review panel that met every three months to consider the status of inmates confined in its control unit. Tr. Vol. 22, 246-54. According to Cooksey, an inmate sentenced to life at ADX could eventually be moved to the "open population" where there was contact with other inmates. He testified that since 1995, when ADX opened, there had been 36 assaults on staff. Cooksey opined that, if Mr. Agofsky wanted to assault another inmate in the future, he would have the opportunity "in a few years." Tr. Vol. 22, 256-62. Most inmates in the control unit, he testified, obeyed the rules and got out; only a very few did not. Tr. Vol. 22, 282.

846. Trial counsel did not ask their experts to develop, and they did not develop, critical evidence that could have supported a persuasive violence risk assessment and provided a sound rebuttal to the nonstatutory "future danger" aggravating factor:

- The lack of a comprehensive mitigation investigation prevented the experts from performing a violence risk assessment specific to Mr. Agofsky's background and circumstances. A56-57.

- None of the experts were asked to comment on the importance of a calm demeanor within a prison society, or the risks that other inmates will interpret expressions of emotion or distress as indications of vulnerability. A52.

- None of the experts were asked to comment on the absence of empirical evidence that apparent lack of remorse is predictive of serious violence in American prisons. A52.

328

- None of the experts were asked to address literature showing that, even if Mr. Agofsky could be diagnosed with Antisocial Personality Disorder, that diagnosis would not reliably predict prison violence. A51-52.

- None of the experts were asked to obtain and testify about data concerning inmate assaults in ADX. Experts prepared to testify on that topic could have detailed the relatively minor nature of the assaults and the extreme security conditions available at that facility. A54.

847. Counsel advanced their theory through the testimony of two prison consultants, a criminologist, and a clinical psychologist, but all of them gave superficial testimony unsupported by details about Mr. Agofsky's background, information from persons who knew him, mental health assessments, or data and research about the institutional environment in which he served the eleven years of incarceration that preceded the Plant incident. *See Walbey*, 309 Fed. Appx. at 802.

848. All of this information would have been invaluable to the experts upon whom trial counsel relied for their future dangerousness and prison adjustment presentation. Dr. Craig Haney, a professor of psychology at the University of California at Santa Cruz, who holds both a Ph.D. degree and a J.D. degree, has engaged in extensive research on the psychological effects of living and working in institutional environments, including penal institutions, and the social and institutional histories of persons accused or convicted of violent crimes. Dr. Haney has testified and consulted extensively in capital cases. SA 1893. He explains the importance of an adequate investigation to underpin a defense case on prison adjustment and future dangerousness:

> To prepare a defense case on prison adjustment and/or future dangerousness, counsel must obtain as much information as possible, from as wide a set of sources as possible. In order to truly understand the defendant – the person who will enter and be expected to adjust to imprisonment – counsel must gather information from persons who knew the defendant during his childhood, adolescence, and adulthood, and during any previous periods of incarceration. Counsel must gather records, including school records, family records, medical and mental health records, and prior arrest, prosecution, and institutional records. Counsel must

329

> consult with appropriate mental health experts and seek to obtain any indicated neuropsychological or other relevant testing.
>
> Finally, counsel must seek to obtain in-depth information about certain specific institutional settings and contexts. This must include detailed information about the particular institutions and units in which the defendant was housed in the past, information about the individualized or special circumstances that may pertain to and help explain the defendant's prior adjustment and potentially shed light on any institutional infractions that may appear in his record. Counsel must also acquire as much information as possible about the institutions and circumstances in which the defendant is likely to be confined in the future (i.e., to which he will be expected to adjust). Reliance on institutional records alone is not sufficient to form an accurate and meaningful assessment of prison adjustment and future dangerousness.

SA 1894-95.

849.	In addition to conducting a reasonably thorough mitigation investigation and a reasonably developed mental health assessment, and then presenting the results to the experts who were to testify about Mr. Agofsky's prison adjustment and future dangerousness, trial counsel could have sought and presented research and data to support their claims. As described elsewhere in this Motion, counsel could have presented data showing that in 2001 USP Beaumont was among the most violent penitentiaries in the Bureau of Prisons. Dr. Mark Cunningham, a board-certified clinical and forensic psychologist, describes additional research that could have been presented. SA 1867-68. Research available in 2004 demonstrates that features of the prison environment— rather than features of individual inmates—more powerfully account for inmate violence and inmate defensive reactivity to anticipated or future violence. In social science terms, the research demonstrates that contextual factors matter more than importation factors in predicting future danger. SA 1867, 1878-79.

850.	Dr. Elizabeth Pelz, the criminologist whose testimony Barlow offered at the penalty phase, agrees with Dr. Cunningham that an understanding of correctional context is crucial to

330

assessing the risk of prison violence. SA 2801. Her ignorance of Mr. Agofsky's context and background hampered her ability to offer useful testimony at trial:

> Mr. Barlow wanted me to testify about whether I believed Mr. Agofsky would be able to adjust and live in an administrative segregation prison environment such as the one maintained in the control unit at the Administrative Maximum facility ("ADX") in Florence, Colorado. I told Mr. Barlow prior to trial that, based on the information provided, I could not comment on any type of psychological adjustment. I specifically told Mr. Barlow before trial not to press me on that issue. During my testimony, Mr. Barlow asked me whether I believed that Mr. Agofsky was the type of inmate who, when kept away from other inmates, such as in administrative segregation, he would be able to adequately cope in that environment. My response in front of the jury was that I did not know and that was an area that I should not comment upon because it was more of a psychological issue. I had no choice but to respond as I did, leaving the jury with no response from me about whether Mr. Agofsky could adjust to administrative segregation. I was really surprised when Mr. Barlow asked this since I had specifically told him before trial that I was unprepared to answer this question.

SA 2799-2800 (citations omitted).

851. In contrast, in other cases, Dr. Pelz has worked with defense attorneys who provided her with much more background information about the defendant and the case, including social history reports, psychological assessments of the defendants, and opportunities to interview the defendants and sometimes their family members. SA 2802-03. In those cases, armed with "a very rich and extensive background," she was able to provide an opinion on the details of the incident and the dangerousness of the defendant. SA 2803.[104]

---

[104] *See Worthington v. Roper, supra,* 619 F. Supp. 2d at 687-88 (psychiatric pharmacist, who normally worked with psychologist or psychiatrist but was only defense expert at original trial, "'overwhelmed' by the amount of relevant information that was available and not provided to him before he testified at the penalty hearing," and revised findings after reviewing records and reports of other mental health professionals).

852.     In Mr. Agofsky's case, if Dr. Pelz had received information similar to what she had received from postconviction counsel, she could have commented on many aspects of the case that would have been relevant to future danger and prison adjustment: the effects on individual inmates of a violent environment like the one at Beaumont; the practice of "checking in" and other unwritten prison rules; the role of gangs; the impact of the drug trade on prison violence; and the disfavored role of "snitches" in prison. SA 2800-03.

853.     Prison consultant Terry Pelz, if he had received materials similar to those provided by postconviction counsel, could have provided detailed testimony on Mr. Agofsky's past and future prison adjustment. He concurs with Haney's and Cunningham's conclusions. SA 2813. If Barlow had arranged for Pelz to tour ADX, or asked him to educate himself about administrative segregation in the federal system and obtain statistics about violence there, Pelz could have testified with more authority. Instead, he found himself vulnerable to cross-examination about his unfamiliarity with the federal Bureau of Prisons. SA 2812-13.

854.     Pelz could have described his visit to Mr. Agofsky at the Liberty Jail, where it did not appear to Pelz that the authorities considered Mr. Agofsky especially dangerous:

> I was surprised by how lax the guards were with Mr. Agofsky. The guards called him by his first name. I also remember when the interview was over, the guards left Mr. Agofsky unattended in the security hallway outside the office/broom closet where the interview took place. I also recall that he was not restrained other than handcuffs cuffed in the front. I observed that Mr. Agofsky appeared to get along with the staff, and they certainly did not treat him like a maximum security inmate. Jay Bennett told me that Mr. Agofsky got along with everyone there and had a good reputation.

SA 2807.

855.     If Barlow had asked Pelz to give an opinion on the Plant incident, he could have explained that an inmate in a recreation cage knows that he cannot expect the guards to help him but must protect himself if he is attacked. An inmate in a violent institution like Beaumont, where

332

many other inmates carry knives, must be on guard at all times. SA 2808. Pelz could have explained the inmate practice of "checking in," the role of "snitches," and the strength necessary for an inmate like Mr. Agofsky to remain a loner instead of seeking the protection of a gang. SA 2809-10. He could have testified that, as an Assistant Warden in the Texas prison system, he had known Plant as a suspected drug mule and gang member. SA 2809. Additionally, Pelz could have provided context for Mr. Agofsky's institutional infractions. He recalled telling Barlow that Mr. Agofsky's prison record was not remarkable, and that considering the amount of time he had been incarcerated, he had not received many infractions. SA 2810-12.

856. Harvey Cox, a retired warden and administrator for the federal Bureau of Prisons who now maintains a private consulting practice, was retained by Barlow and testified that the BOP could house Mr. Agofsky securely in a facility like the "control unit" at ADX. Tr. Vol. 22, 186. The government cross-examined him about the fact that he had been retired for eleven years and was unfamiliar with data or other information about assault rates in the control unit, and rebutted his testimony by presenting Michael Cooksey, a high-ranking BOP administrator who had helped advise the Bureau about the design of the control unit, and later sat on the panel that deliberated on those inmates' readiness for release to lower-security conditions. Tr. Vol. 22, 194-202, 246-54.

857. Mr. Cox has reviewed materials he received from postconviction counsel, including the reports of Dr. Mark Cunningham. SA 2815. He would have found data on the almost non-existent assault rates at ADX, like those contained in the Cunningham report, very helpful to support his opinion that the BOP had the means to house inmates like Mr. Agofsky safely and to withstand cross-examination. SA 2815-16. Barlow did not provide Cox with or ask him to obtain such data. In another case, at the request of counsel, Cox obtained data on assault rates at ADX.

He could have made a similar request for data for Mr. Agofsky's trial if Barlow had asked him to do so. SA 2815. Furthermore, if Barlow had asked, Cox could have obtained information like that detailed elsewhere in Cunningham's report, describing assault rates at USP Beaumont, to help demonstrate that it was one of the most violent institutions in the BOP at the time of the Plant incident. SA 2815-16.

858. Dr. Roberts, who had only received prison records from Barlow (SA 719), agreed that the additional types of information that Haney described could all be helpful in preparing a case on prison adjustment. SA 788-94. Dr. Cunningham's conclusions about the importance of contextual factors in assessing the risk of prison violence, Roberts testified, "seem[ed] reasonable," and that research was available in 2004. SA 786-787.

859. Trial counsel sent four experts out to do battle against the government's case for future dangerousness without arming them with information they needed to do the job. They knew about the government's ammunition against Mr. Agofsky—his prison record and prior convictions—but they had no idea of the abundant evidence available for fighting back. As a result, the experts functioned more like sitting ducks than battleships. The prosecution conducted withering cross-examinations,[105] exposing the flimsy factual bases for their opinions (Tr. Vol. 22, 193-201 (Cox), 224-30 (Roberts), 242-43 (T. Pelz)), and argued that the defense evidence supported, rather than contradicted, Mr. Agofsky's future dangerousness. For example, the government's attorney began his opening summation:

> Ladies and gentlemen of the jury, there is a fire burning inside
> Shannon Agofsky. It's been burning and raging ever since the night
> that Dan Short was thrown off the Cow Skin Bridge in Oklahoma.

---

[105] In the case of Dr. Elizabeth Pelz, the prosecutors apparently concluded that defense counsel had done the job for them and conducted no cross-examination. Barlow elicited Pelz's testimony that she was unqualified to give an opinion about Mr. Agofsky's prison adjustment and that she had never met him. Tr. Vol. 22, 236, 237.

Psychologists, his own psychologist called it antisocial disorder. Regular folks, you just call it that he's a killer.

Tr. Vol. 24, 332.[106] Later, he argued:

Question No. 1: "Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant represents a continuing danger to the lives and safety of other persons?" That's the most important question that you will have and the easiest one that you should be able to answer. His own psychologist, at best, painted him as antisocial. At best his psychologist told you that he was antisocial. He said that he has an us versus them attitude. And he said this: the defendant in his mind feels justified in attacking people that he doesn't like."

Future danger? "Yes" and "Yes." . . . I would submit that just the one factor of future dangerousness outweighs any of those mitigating factors that you heard about.

Tr. Vol. 24, 338-39.

860. The prosecutor reiterated the same theme in his rebuttal summation, arguing that "His own psychologist, at best, painted him as antisocial." Tr. Vol. 24, 339. He predicted that, if Mr. Agofsky did not receive a death sentence, he would spend a few years in the control unit and then "rotate out." Tr. Vol. 24, 367. Because counsel had failed to obtain statistics from the BOP about ADX at Florence, Colorado and other control units, they could not effectively cross-examine the government's witnesses and the defense trial experts were ill equipped to respond to questions from the government.

861. Counsel's failure to prepare a reasonably reliable rebuttal to the government's case for future dangerousness, and their presentation of expert testimony on prison adjustment without preparing their experts with the information they needed for well-founded opinions, was deficient

---

[106] As discussed in the next section, this argument mischaracterized Roberts's trial testimony. But Roberts had received no specific information about Mr. Agofsky's childhood and youth with which he could have counteracted the cross-examination at trial about conduct disorder, enabling the prosecutor to distort the testimony in summation.

performance that prejudiced the defense. There is a reasonable probability that, but for counsel's deficient performance in this respect, alone and in combination with their other deficiencies, the outcome of the penalty phase would have been different. It is reasonably probable that the jurors would have spared Mr. Agofsky's life if trial counsel had given them some reason to do so besides speculation about whether the Bureau of Prisons could guarantee that he would never get into another fight

862.    Trial counsel chose to consult two mental health experts, but gave them almost no information to work with. As a result, they missed clinically significant brain damage and a significant trauma history, and were unprepared to provide a persuasive evaluation of Mr. Agofsky's functioning and development, or to suggest appropriate referrals. Furthermore, trial counsel made no use at all of Dr. Gripon, a psychiatrist, and never elicited the background information that Dr. Roberts, a psychologist, could have provided. There is a reasonable probability that, but for trial counsel's deficient investigation and presentation of mental health evidence, alone and in combination with counsel's other deficiencies, the jury would have imposed a life sentence instead of the death penalty. The Court must accordingly order an evidentiary hearing and grant relief on this ground.

863.    Trial counsel's failure to uncover and present detailed information available through their own experts, or to seek out other experts who could present it effectively, to support their only mitigation theory and rebut what the prosecution described as its most important non-statutory aggravating factor was deficient performance. There is a reasonable probability that, but for this deficiency, alone and in conjunction with the deficient performance described elsewhere

in this Motion, the outcome of the penalty phase would have been different. U.S. Const. Amend. VI; *Strickland v. Washington,* 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000).[107]

> **G.** **Counsel Failed To Advocate For The Introduction Of Admissible Mitigating Evidence, To Object To Misleading Cross-Examination And Summation Arguments, Or To Object To The Submission of Factually Unsupported or Inadmissible Non-Statutory Aggravating Factors To The Jury.**

864. Trial counsel failed to engage in vigorous advocacy during the penalty phase. Counsel made no effort to convince the court that the governing statute made background evidence compiled by his psychologist admissible; failed to object to misleading and damaging cross-examination that implied, inaccurately, that Mr. Agofsky met the criteria for antisocial personality disorder; and then made no objection during the prosecutor's initial summation when he further exaggerated what the expert had said during the misleading cross-examination. Counsel neither moved to dismiss nor sought the amendment of non-statutory aggravating factors that the prosecution's evidence failed to establish. In all of these respects, counsel's performance was prejudicially deficient. *See Lyons v. McCotter*, 770 F.2d 529 (5th Cir. 1985) (counsel ineffective for failure to exclude or limit damaging cross-examination testimony that was almost certainly inadmissible; lack of any limiting instruction enabled prosecutor to refer to evidence in closing); *Sessions v. State*, 129 S.W.3d 242 (Tex. Ct. App. 2004) (counsel ineffective for failing to object to inadmissible expert testimony).

---

[107] As noted *supra,* on December 17, 2007, Judge Heartfield denied postconviction counsel's motion for funds to employ a qualified clinical psychologist who is qualified to conduct, not only a mental health evaluation, but also a violence risk assessment. Doc. # 33. This Court denied Mr. Agofsky's renewed motion for funds, for both the clinical psychologist and a neuropsychologist, filed on March 25, 2008.

1.    Counsel Failed To Advocate Effectively For Clearly Admissible
Mitigating Evidence That The Court Erroneously Excluded.

865.    The only social history investigation conducted by the defense consisted of one phone call by psychologist Dan Roberts to Mr. Agofsky's mother, and the defense further failed to obtain and present the fruits of an appropriate mental health evaluation. At the penalty phase of trial, defense counsel, Barlow, failed even to ensure that the limited social history that Roberts had compiled was presented to the jury, but instead permitted the prosecution's unsound hearsay objection to derail the presentation.

866.    Dr. Roberts testified that he met with Mr. Agofsky for "some hours on more than one occasion." Tr. Vol. 22, 210.[108] Barlow then posed a series of questions about "background information":

> Q: And when you began this type of an investigation do you start out gathering background information?
>
> A: Yes, sir.
>
> Q: Would you relate to the jury, briefly, what background information that you were able to obtain about Mr. Agofsky?
>
> A: He was born second of three children. His family of origin was in Missouri. His father was killed when he was eight or nine years old. He continued to live there with his mother and brother, and later a younger brother was - -

Tr. Vol. 22, 211.

867.    The prosecutor objected that "all of this" was "rank hearsay." Tr. Vol. 22, 211. Barlow responded that "the rules of evidence do not exclude hearsay at this portion of the trial" and that in any case the background information was part of the basis for Roberts's opinions. The Court ordered Barlow to limit the testimony to the parameters set by the Federal Rules of Evidence:

---

[108] He sought payment for two interviews. A336, 337-338.

338

> THE COURT: Background information is necessary; but keep in tune with, I believe, it's rule 703, 704 about underlying data.
>
> MR. BARLOW: Yes, Your Honor.
>
> THE COURT: That is not, in fact, admissible and this Court says it isn't.

Tr. Vol. 22, 211.

868. Counsel then abandoned any attempt to elicit whatever information Roberts had gathered, obtaining only Roberts's assent that "following the death of Mr. Agofsky's father, he still lived a relatively normal life," and a recitation of the few people with whom Roberts had discussed Mr. Agofsky's case (Mr. Agofsky himself, his mother on the phone, and "some of the people who worked at the jail in Liberty"). Barlow proceeded to question Roberts about his review of the discovery provided by the government. Tr. Vol. 22, 212.

869. Although neither Roberts nor anyone else conducted an independent social history investigation, he did interview Mr. Agofsky twice and conducted a few cursory collateral interviews. He could have provided information about the upbringing and family circumstances that shaped Mr. Agofsky's personality, and also some mitigating anecdotes stemming from his years in prison.[109] For example, Roberts could have testified that Mr. Agofsky told him:

- His father was killed in a plane crash when he was in third grade, following which the family moved to Noel, Missouri, where he graduated high school in 1989. A269.

- He began martial arts training at ten years old, after his father died, because his mother wanted him to have a male influence. Mr. Agofsky continued his training in the Korean art of Hwa Rang Do until the time that Roberts interviewed him. When he reached high school, he participated in martial arts tournaments and frequently won. He told Roberts that, while incarcerated, he worked out for five to six hours a day, seven days a week. A274, 278, 281.

- He got in trouble in high school only one time, for possessing "spanish fly," an aphrodisiac elixir that he ordered from a magazine. *See* The Urban Dictionary,

---

[109] Alternatively, if trial counsel had conducted a reasonable investigation, they could have presented the same information directly through Mr. Agofsky's mother and others.

*available at https://www.urbandictionary.com/define.php?term=spanish%20fly.*
The school authorities permitted him to return the next day when the police said it was not illegal. A269.

- He participated in high school theater, working as production or stage manager, acting, or building sets for plays like "Kiss Me Kate." He was a member of the debate team, which conducted extemporaneous speaking contests and Lincoln-Douglas style debates. A281.

- After graduating high school, Mr. Agofsky went to Aspen, Colorado, to attend Executive Security International, a school owned by a martial arts expert. Mr. Agofsky wanted to become a bodyguard. He finished the course, but could not get a job because he was not yet old enough to carry a gun. After returning home for a short time, he got a job at Hwa Rang Do International Headquarters in Downey, California, working as a black belt instructor and receiving further training. A270.

- After Mr. Agofsky's incarceration, he and a cellmate named Gary Welch were held in the county jail in Ottowa County, Oklahoma, during Mr. Agofsky's Oklahoma trial. When a number of other inmates attempted a jail break and got temporary control of the jail, Mr. Agofsky and Welch went to the cells where women were housed to protect them from the rioting inmates until a SWAT team arrived. A258, 273.

- During this same period, Mr. Agofsky persuaded guards, who had been ignoring an inmate named Pam Redden who was having a miscarriage, to take her to the hospital. A258, 273.

- Mr. Agofsky gave Roberts permission to talk to his mother, aunts, cousin, and friend Donald, and promised to send information about others, including names of relatives and people at the jail. He gave Roberts his mother's phone number. A268.

870. Roberts conducted one collateral interview of Sheila Agofsky, Mr. Agofsky's mother, by telephone. He could have testified that she told him:

- Her son was born after she had several miscarriages, and had a sunny personality. A263.

- Shannon's father died several days before his ninth birthday. After that he was afraid to go to school, and had stomach and headaches. His mother learned that he was being beat up at school. She enrolled him in a martial arts class whose teachers—two brothers—became big brother or father figures for him for the next nine or ten years. A263.

- To Sheila, distraught after the loss of her husband, Shannon became the man of the house, entertaining her with jokes and singing and becoming a protector and advisor for the family. A263.

340

- Shannon had many female friends while in high school. He took one of them, whose boyfriend had abandoned her, to the hospital and stayed with her while she delivered her baby. A263.

- Shannon gave his mother no trouble while he was growing up, except that he did not clean his room. He had an A to B average in high school and liked school. A264.

- Shannon skipped his high school graduation to enroll in a bodyguard training course called ESI, but returned home after completing the course, with thoughts of becoming a Navy Seal because, at the time, he was still too young to carry a gun as a bodyguard. A264.

- He taught his own martial arts class and was popular with the students. A265.

- When a female relative was frightened that a serial killer had been casing her house, he went to stay with the relative to protect her. A264.

- He rescued a sheriff-marshal who was being dragged through a parking lot by a truck driven by a troublesome drunk. A265.

871. Roberts briefly interviewed a number of correctional officers at the Liberty County Jail, where Mr. Agofsky was housed at the time Roberts was evaluating him. If permitted, he could have testified:

- Captain Cook described Mr. Agofsky as a model prisoner. A255.

- Ms. Marshall told him that Mr. Agofsky had been housed in her "segregation" building, and not the maximum security building across the street, during the entire time of his incarceration. He spent all his time exercising and reading and had a great sense of humor. A255. Officer Marshall also told Roberts that Mr. Agofsky had been very respectful every time she had had contact with him. His attitude towards women had always been protective. One day, Mr. Agofsky yelled at, but did not threaten, another inmate who insulted a woman guard. A267.

- Ms. Chapman told Roberts that Mr. Agofsky was always cooperative and very respectful, and gave her no problems ever. He stayed quiet, kept his cell clean, and exercised a lot. A255.[110]

- Officer J. Petty told Roberts that Mr. Agofsky was always nice and made no trouble for staff or inmates. He smiled a lot and was always in the same mood, a good one. He was responsive to questions or directions. Once, his cell door accidentally opened and he just went and told the officers about it. He never asked for special favors and Petty was not afraid of him. A266.

872. All of these mitigating facts were admissible under the controlling statute and the Eighth and Fourteenth Amendments to the Constitution. Title 18 U.S.C. § 3593 describes the "information" that a defendant may present at the penalty phase of a capital trial, and explicitly provides that it need not be admissible under the rules of evidence:

> The defendant may present any information relevant to a mitigating factor. . . . Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

18 U.S.C. § 3593(c); *see United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998) ("[T]he relaxed evidentiary standard does not impair the reliability or relevance of information at capital sentencing hearings, but helps to accomplish the individualized sentencing required by the constitution."); *see also United States v. Purkey*, 428 F.3d 738, 756 (8th Cir. 2005) (quotations omitted) ("The Federal Death Penalty Act (FDPA) erects very low barriers to the admission of evidence at capital sentencing hearings.").

---

[110] Barlow called Ula Ann Chapman as a witness, but elicited no information from her except that Mr. Agofsky was respectful and compliant. He did not ask Chapman how he spent his time and thus did not present even the limited information that Roberts had gathered. Tr. Vol. 22, 203-06. Barlow also elicited a general statement from Roberts, on redirect examination, that other guards and the warden had told him Mr. Agofsky was "no problem," but again Barlow did not present the other information Roberts had gathered from correctional personnel. Tr. Vol. 22, 231.

873. This provision has a firm constitutional basis. Under the Eighth and Fourteenth Amendments, the defendant may not be precluded from presenting, nor the sentencer from considering, any information that would constitute a basis for a sentence less than death. The Supreme Court has long recognized "that the imposition of death by public authority is . . . so profoundly different from all other penalties," and that the sentencer must be able to give "independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *see also United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998) ("[T]he defendant must be given the opportunity to introduce information regarding mitigating factors, without traditional evidentiary restraints, in order to provide the jury with the fullest possible information about the defendant."). The Supreme Court has "spoke[n] in the most expansive terms" in determining the relevance standard for mitigating evidence. *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (citing *McKoy v. North Carolina*, 494 U.S. 433, 440-41 (1990)). Indeed, the Supreme Court has held that excluding mitigating evidence on the ground that it constitutes hearsay violates the Due Process Clause of the Fourteenth Amendment, stating that "'the hearsay rule may not be applied mechanistically to defeat the ends of justice.'" *Green v. Georgia*, 442 U.S. 95, 97 (1979) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). As the Supreme Court recently observed, "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Tennard*, 542 U.S. at 285 (quoting *Payne v. Tennessee*, 501 U.S. 808, 822 (1991)).

874. Barlow made no attempt to argue that the mitigating information gathered by Dr. Roberts was relevant and admissible under both the controlling statute and the Constitution. In response to the prosecutor's initial objection, he stated that "the rules of evidence" did not exclude

343

hearsay "at this portion of the trial." It was not clear which rule he had in mind. His failure to

object moments later (Tr. Vol. 22, 211) when the Court cited Federal Rules of Evidence 703 and

704 implies that he, too, thought that those rules governed. But those rules do not make hearsay

categorically admissible, even when an expert relies it. Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. Rule 703 assumes that the expert's underlying data are inadmissible unless their

probative value substantially outweighs their prejudicial effect, but Barlow did not even attempt

to persuade the court—despite the fact that Roberts had gathered information with extremely

substantial mitigating value—that the information met that standard. The court accordingly ruled

that the evidence "is not in fact admissible" under that rule. Tr. Vol. 22, 211. Neither the Court nor

counsel mentioned Fed. R. Evid. 1101(d)(3), which specifically states that the Rules of Evidence

do not apply to sentencing proceedings.

875. Furthermore, Barlow made no effort to argue that the mitigating information

Roberts had gathered was admissible under the specific provision of 18 U.S.C. § 3593(c) and the

Eighth and Fourteenth Amendments as interpreted by *Lockett*, *Eddings*, and their progeny. Unlike

Rule 703, the statute, with constitutional underpinnings, assumes that such information is

admissible at the penalty phase of a capital case, unless it creates unfair prejudice, confuses the

issues, or misleads the jury. The court made no finding—and could not have done so appropriately

on this record—that the evidence was prejudicial, confusing, or misleading

344

876. Mr. Agofsky's hearsay statements to Dr. Roberts during his evaluation were admissible for three reasons: (1) hearsay is admissible at the penalty phase of a capital trial unless "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury," 18 U.S.C. § 2593(c); (2) hearsay is always admissible in federal sentencing proceedings, *see* F.R. Evid. 1101(d)(3);[111] and (3) even under Federal Rule of Evidence 703, which the court erroneously applied without any objection from Barlow, hearsay that forms the basis for an expert's opinion is admissible if the judge determines that its "probative value in assisting the jury to evaluate the expert's opinion substantially outweighs [its] prejudicial effect." Furthermore, Mr. Agofsky contends, the admissibility of his proffered mitigating evidence was constitutionally guaranteed.[112]

877. Barlow's failure to argue the controlling statute and rules to the court was deficient performance.[113] In addition, he was deficient in failing, at a minimum, to attempt to satisfy the requirements of Rule 703, which he could easily have done by asking Roberts appropriate questions. Roberts could have testified that it is customary in his field for professionals to interview patients whom they evaluate, and to use what they learn from those conversations in forming their opinions. Roberts could have explained to the court—and the jury—why the patient's own statements are important. SA 743-44. Roberts could thus have provided a basis for a Rule 703

---

[111] The prosecution made this very point at a pretrial hearing, opposing a hearsay objection by Mr. Black with a citation to Rule 1101, and arguing that hearsay is admissible at federal sentencing proceedings. Tr. Vol. 5, 41-43. Neither party adverted to this discussion when the prosecutor made his hearsay objection during the defense penalty phase presentation.

[112] *See, e.g., Tennard v. Dretke*, 542 U.S. 274, 284 (2004); *Green v. Georgia*, 442 U.S. 95, 97 (1979); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978); *Chambers v. Mississippi*, 410 U.S. 284, 502 (1973).

[113] *See Lyons v. McCotter*, 770 F.2d 529 (5th Cir. 1985); *Sessions v. State*, 129 S.W.3d 242 (Tex. Ct. App. 2004).

argument by Barlow that the probative value of the information Roberts had gleaned directly from Mr. Agofsky, for purposes of evaluating Roberts's expert testimony, outweighed its non-existent prejudicial effect.

878.    Dr. Roberts was prepared to testify, until the prosecutor objected and Barlow abandoned that line of testimony, about Mr. Agofsky's background, which he had discussed with Barlow. SA 743, 748. Based on his own interviews, Roberts could have presented evidence concerning Mr. Agofsky's capacity for empathy and urge to protect the vulnerable, both before and after his incarceration. SA 743-46, 796. He could have described highly goal-directed behavior in childhood, good grades in school, absence of disciplinary problems, and ten years of work toward attending the executive security institute in Colorado. SA 746, 796. Although he never heard about the bullying and beating the young Shannon endured in the first grade, Roberts could have described some bullying he encountered during his later school years. SA 747. He could have described Mr. Agofsky's protectiveness toward women. SA 746, 797. He could have described his father's death and his mother's "distraught" state afterwards, and explained that martial arts were important to him, with his teachers serving as father figures. SA 797.

879.    Barlow's deficient failure to resist the government's unsound hearsay objection, and his failure to ensure that the clearly admissible information Roberts had gathered was presented to the jury, prejudiced the defense, by depriving Mr. Agofsky of the only evidence gathered by his defense team that even began to present him in a human light to the jury. Because the information Roberts had gathered was the only information the defense had collected that could have given the jurors an inkling of Mr. Agofsky's identity as a human being, Barlow's cavalier abandonment of his half-hearted effort to present it had a devastating impact on the defense. There is a reasonable probability that, but-for this instance of deficient performance, alone and in

346

combination with the other deficient performance discussed elsewhere in this Motion, the jury would have spared Mr. Agofsky's life. *See Strickland*, 466 U.S. 668.

> 2. Counsel Failed To Object To Unfounded Cross-Examination About Mr. Agofsky's Non-Existent Antisocial Personality Disorder And Other Improper Questions.

880. Barlow also failed to prevent or neutralize damaging and unfounded testimony elicited by the prosecution. During his cross-examination of Dr. Roberts, the prosecutor, Mr. Stevens, having prevented the defense from eliciting any evidence about Mr. Agofsky's upbringing and conduct before his incarceration, suggested without defense objection that Mr. Agofsky would satisfy the criteria for antisocial personality disorder, but for the fact that Roberts had no information about his behavior before age eighteen:

> Q: And were you able to determine whether he fits antisocial personality disorder?
>
> A: He does not.
>
> Q: And is it a reason he does not because you're not able to formulate activities or dispositive behavior prior to eighteen?
>
> A: Yes, sir.
>
> Q: Otherwise he would fit antisocial personality disorder, wouldn't he?
>
> A: He very likely would.

Tr. Vol. 22, 224-25.

881. Mr. Stevens's questions were misleading because they implied that, but for lack of information about Mr. Agofsky's behavior before age eighteen, he would fit the criteria for antisocial personality disorder, which requires evidence of a persistent pattern of disregard for the rights of others that begins in childhood or early adolescence. Tr. Vol. 22, 226. As both Dr. Roberts and Barlow knew, however, Roberts had in fact interviewed Mr. Agofsky and briefly interviewed his mother about his early life. Roberts had learned from them that Shannon had no disciplinary

347

problems as a teen, was a responsible high school student and disciplined student of martial arts, and had behaved in an empathetic, protective manner to relatives and friends. Roberts's preliminary investigation thus directly contradicted a diagnosis of antisocial personality disorder.[114] Yet neither through an objection nor through redirect examination did Barlow attempt to prevent or correct the prosecutor's misleading questions.

882. Although Mr. Stevens had elicited Roberts's opinion that Mr. Agofsky did *not* meet the criteria for antisocial personality disorder, Barlow also made no objection as the prosecutor reviewed each of the diagnostic criteria of that disorder with Roberts, securing his agreement that each of those criteria appeared in the Diagnostic and Statistical Manual. Tr. Vol. 22, 226-27. In fact, Roberts's examination indicated that most of those criteria except a history of assaults—in a violent prison environment—had no application to Mr. Agofsky. There was no evidence that he frequently disregarded the wishes, rights, or feelings of others, that he was deceitful or manipulative, that he lied, used an alias, conned others, or malingered, or that he was irresponsible or incapable of remorse. Indeed, the limited information Roberts had gathered pointed in the opposite direction. Yet Barlow made no effort to prevent or neutralize the prosecutor's questions.

883. Further, Barlow did not attempt on re-direct examination to elicit the substantial difference between "Adult Antisocial Behavior" and "Antisocial Personality Disorder" in the DSM-IV. The former classification is a "V-code," used to identify a "focus of clinical attention" that, by definition, is *not* due to a mental disorder such as a personality disorder. Adult antisocial behavior can be the outgrowth of recurrent traumatic exposures (e.g., PTSD), or a survival strategy

---

[114] Furthermore, a reasonable investigation would have disclosed further voluminous additional evidence from Mr. Agofsky's childhood and early adolescence that would have contradicted any notion that he satisfied the criteria for antisocial personality disorder or one of its necessary preconditions, conduct disorder in childhood.

in pathological contexts such as some prison settings. *See* A51. Roberts did not explain the distinctions between the behavior and the disorder in his testimony and Barlow never attempted to elicit it.[115]

884.    Nor did Barlow object to another series of questions, which Roberts was unqualified to answer. Stevens repeatedly asked tautologous questions of Roberts, who was a clinical psychologist and not a prison expert, about whether the prison could prevent Mr. Agofsky from assaulting another inmate if he wanted to assault him and had the opportunity. Tr. Vol. 22, 228-30. Barlow's only response on redirect examination was to elicit Roberts's testimony that he did not observe Mr. Agofsky assault any guards or inmates when Roberts went to the Liberty County Jail to interview him, and that the guards told him that Mr. Agofsky had not caused any problems. Tr. Vol. 22, 230-31.

885.    The prosecutor, after preventing Dr. Roberts from describing for the trial jury the information he had learned from Mr. Agofsky and his mother about his childhood, then conducted a misleading line of questions on cross-examination. First he secured Roberts's assent that Mr. Agofsky "fits the composition of adult antisocial *behavior*." Tr. Vol. 22, 224. Then he suggested that Mr. Agofsky would satisfy the criteria for antisocial personality *disorder* ("ASPD"), but for the fact that Roberts had no information about his behavior before eighteen.[116] He elicited Roberts's agreement that the only reason he could not find ASPD was that "you're not able to

---

[115] Ironically, when the same subject arose at a hearing out of the jury's presence on the admissibility of the testimony of BOP psychologist Jim Mann, Ph.D., Barlow did secure Mann's acknowledgement on cross-examination that "adult antisocial behavior" is not a mental illness recognized by the American Psychological Association and that Mr. Agofsky does not fit the criteria for antisocial personality disorder. Tr. Vol. 21, 164.

[116] To conform with the recognized criteria for ASPD, the prosecutor should have asked about behavior before age fifteen. SA 751.

formulate activities or dispositive behavior prior to eighteen." Tr. Vol. 22, 224-25. Barlow neither objected nor attempted to rehabilitate Roberts following this line of questioning. *See Walbey*, 309 Fed. Appx. at 803-04 (counsel ineffective, in part, for failing to rehabilitate own expert following damaging cross-examination on antisocial personality disorder).[117]

886.     Roberts could have explained on redirect examination that "adult antisocial behavior" is a V-code in the DSM-IV, the diagnostic and statistical manual of the American Psychiatric Association. A V-code in that manual provides "descriptive" information "that wouldn't technically be considered a significant illness in and of itself." SA 750. The "adult antisocial behavior" code applies to a person who has exhibited some antisocial or criminal behavior. The designation indicates nothing other than the fact of the past acts. *Id.*

887.     Further, Roberts could have testified that Mr. Agofsky did not meet the criteria for ASPD, which is not a V-code but a personality disorder in the DSM-IV. At the time of his testimony in 2004, he had no evidence "at all" that Mr. Agofsky had suffered from conduct disorder before age 15, one of the criteria for ASPD. SA 751. He had no evidence that Shannon habitually lied, conned people, used aliases, was consistently irresponsible, or engaged in fire-setting or cruelty to animals or younger children, stealing from other children, or truancy. SA

---

[117] Of course, if trial counsel had conducted an independent social history investigation and provided Roberts with its results, his damaging testimony on this topic could have been prevented altogether. *See Johnson v. Bagley, supra,* 544 F.3d at 605 ("This unhelpful testimony [concerning ASPD from the defense expert] could have been prevented if the attorneys had conducted a competent investigation and given Hawkins a more complete picture of Johnson's background[.]").

752.[118] He could have explained that the DSM diagnoses are not meant to be predictive, but descriptive. To predict future behavior, one would need to know not only an individual's DSM diagnosis but also historical and demographic data and information about the environment. SA 752-23.[119]

888.    Barlow's failure to object to the prosecution's damaging cross-examination was deficient performance. *See United States v. Hylton*, 294 F.3d 130 (D.C. Cir. 2002) (counsel ineffective for failure to object to inadmissible co-conspirator testimony); *Burns v. Gammon*, 260 F.3d 892 (8th Cir. 2001) (counsel ineffective for failure to object to prosecutor's improper comment in rebuttal closing argument). The prosecution alleged as a non-statutory aggravating factor, and stressed to the jury, that Mr. Agofsky would be dangerous in the future, and the prosecutor's improper examination virtually insured that the jurors would find this factor. Barlow's failure to take any steps to prevent the prosecutor's misconduct had outcome-determinative

---

[118] Indeed, Roberts learned many facts from the postconviction investigation that affirmatively contradicted the criteria for conduct disorder. SA 796-97. As Dr. Spiers has explained, conduct disorder is a "gatekeeper" criterion for antisocial personality disorder. Its presence indicates that antisocial traits have persisted across several life stages and represent a longstanding characterological personality pattern. If the gatekeeper criterion is not satisfied, a diagnosis of ASPD cannot be made. The postconviction information Spiers reviewed reflected, "not just an absence of information about conduct disorder, but extensive information that contradicts conduct disorder." SA 2787.

[119] At the deposition, the prosecution cross-examined Roberts, improperly, about whether the government could have responded to a defense mental health presentation by attempting to prove that Mr. Agofsky met the criteria for a "psychopath" in the Hare Psychopathy Checklist. SA 836-40. Aside from the impropriety of asking Dr. Roberts to speculate about what the prosecution would have done in response to a different presentation in 2004, the prosecutor asked Dr. Roberts about only eight of the items on the checklist; Dr. Roberts did not agree that many of those eight items even applied to Mr. Agofsky. Furthermore, the fact that some undiscovered or unpresented mitigating evidence might have drawn a prosecution response does not undo counsel's ineffectiveness in failing to conduct a reasonable investigation and engage in reasonable advocacy. *See Adams,* 2009 WL 1069330 at \*7; *Walbey*; 309 Fed. Appx. At 804-05; *see also Williams v. Taylor*,529 U.S. 362, 396 (2000) .

potential, but for which there was a reasonable probability of a different outcome. *Strickland,* 466 U.S. 668.

> 3. Trial Counsel Failed To Object To The Prosecutor's Misleading Summation Remarks About The Defense Psychologist's Diagnosis.

889. Barlow exacerbated the effect of his failure to present the mitigating information his own expert had collected, and his failure to object to the prosecutor's misleading cross-examination, by failing to object to the summation, which misstated the evidence in a highly prejudicial manner. Both prosecutors argued on summation that Mr. Agofsky should be put to death for his antisocial personality disorder. Mr. Batte argued:

> Ladies and gentlemen of the jury, there is a fire burning inside Shannon Agofsky . . . . Psychologists, his own psychologist called it antisocial disorder. Regular folks, you just call it that he's a killer.
>
> * * *
>
> It is time to put that fire that is raging inside him out for good.

Tr. Vol. 24, 332-33. Later, addressing the non-statutory aggravating factor that alleged Mr. Agofsky's future dangerousness, Batte referred again to Roberts's testimony, inaccurately, arguing that "his own psychologist painted him at best as antisocial." Tr. Vol. 24, 338.

890. Not until Mr. Stevens read from the DSM criteria for antisocial personality disorder in his rebuttal summation did the defense finally object, but the objection was not sustained and the damage was done:

> And I think the telling testimony of what will happen if he is not assessed the death penalty is this: the testimony of their own psychologist. I asked him about antisocial personality disorder. It's a pervasive pattern and disregard for and violation of the rights of others. The defendant fails to conform to social norms with respect to lawful behavior. People like him disregard wishes, rights, and feelings of others. They are frequently deceitful and manipulative. They repeatedly lie, use alias, con others, malingerer, tend to be irritable and aggressive, and may repeatedly get into physical fights. Tend to be consistently and extremely irresponsible.

Tr. Vol. 24, 374-75.

891.     When Black objected on behalf of the defense that the argument did not conform to Roberts's testimony, the Court simply told the jurors that their recollection would control. Tr. Vol. 24, 375. Stevens continued with his exegesis of the characteristic traits of antisocial personality disorder, most of which contradicted what Roberts had learned about Mr. Agofsky:

> And the psychologist stated that people with antisocial personality disorder show little remorse for consequences of their acts and they blame others for being foolish, helpless or deserving their fate. They may minimize the harmful consequences of their actions and may simply be indifferent.

Tr. Vol. 24, 375-76.

892.     Stevens's argument was blatantly misleading. There was *no* evidence that Mr. Agofsky demonstrated most of the traits Stevens listed, and Roberts had simply assented that Stevens had correctly read the criteria from the DSM. Barlow should have objected immediately and forcefully to the entire deceitful line of argument, as he should have objected to the cross-examination. Counsel's performance in this respect was deficient, and prejudicial for the same reasons as the failure to object to the prosecutor's misleading cross-examination. *See Strickland*, 466 U.S. 668.

893.     In addition, the prosecutor committed misconduct and deprived Mr. Agofsky of a fair penalty hearing when he argued that it was the jury's patriotic duty to sentence Mr. Agofsky to death:

> And finally, Walter Lord, a great historian, wrote a great novel, "A Time to Stand." It was about our war of independence for the State of Texas -- and by the way, you might know that the constitution of the Republic of Texas begins with the same worded preamble of the constitution of the United States. And he wrote: "They came from all parts of the country. As a group they had little in common, yet these Texans have everything, *for they were all Americans sharing together a fierce love of liberty and a deep belief that the time had come to take their stand to keep it.*"

353

Well, sometimes the fight finds us when we are placed in positions of being responsible citizens and making decisions of other's conduct, **it's time for you to stand.** The decision is clear, there is only one option. The death penalty is the only fair option based upon this evidence, based upon the defendant's own conduct, time to hold him accountable. Thank you.

Tr. Vol. 24, 376-77 (emphasis added).

894.    In *Viereck v. United States*, 318 U.S. 236 (1943), while remanding on different grounds, the Supreme Court condemned statements by the prosecutor regarding jurors' patriotism as irrelevant to any facts or issues in the case. The remarks found prejudicial were as follows:

In closing, let me remind you, ladies and gentlemen, that this is war. This is war, harsh, cruel, murderous war. There are those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps.

This is war. It is a fight to the death. The American people are relying upon you ladies and gentlemen for their protection against this sort of crime, just as much as they are relying upon the protection of the men who man the guns in Bataan Peninsula, and everywhere else. They are relying upon you ladies and gentlemen for their protection. We are at war. You have a duty to perform here.

As a representative of your Government I am calling upon every one of you to do your duty.

*Viereck*, 318 U.S. at 247 n. 3.

895.    The court concluded that the purpose of the appeal to patriotism could have only been to arouse passion and prejudice, and admonished the prosecutor to refrain "from improper methods calculated to produce a wrongful conviction." *Id*. at 246 (quoting *Berger v. United States*, 295 U.S. 78 (1935)). The remarks at issue here were every bit as inflammatory as those condemned in *Viereck*. Both made unabashed appeals to patriotism; both incited the jury with wartime references, and both exhorted the jury, as good "Americans," to find for the government.

354

896.    Insofar as trial counsel failed to properly object to the comments by the prosecutor, they were ineffective. As demonstrated above, the remarks were highly inflammatory and injected the extrinsic concerns of patriotic duty into the life/death calculus. There is a reasonable probability that, but for the defense failure to object to this highly improper appeal, at least one juror would have voted for life and the outcome of the penalty phase would have been different. Thus, alone and in conjunction with the other instances of deficient performance described elsewhere in this Motion, counsel's errors prejudiced the defense. U.S. Const. Amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000).

4.    Counsel Failed To Seek The Dismissal Or Amendment Of Inadmissible Or Factually Unsupported Non-Statutory Aggravating Factors.

897.    At the close of the evidence, Black made two motions with respect to the aggravating factors, arguing that statutory factors 2 and 3 were multiplicitous and that the non-statutory factors must be dismissed because they had not been alleged in the indictment. Tr. Vol. 24, 288-89. He otherwise made no objection to the submission of any of the aggravating factors in the form alleged in the indictment. He made no motions that addressed the sufficiency of the prosecution's evidence to support them.

898.    Neither at the close of the evidence nor at any earlier time did trial counsel object to non-statutory aggravating factor #3, which alleged that Mr. Agofsky demonstrated a lack of remorse following the commission of the offense. Tr. Vol. 24, 322-23. This factor, by alleging a negative, placed an unconstitutional burden on the defense to rebut it and violated Mr. Agofsky's Fifth Amendment right to remain silent at the penalty phase. U.S. Const. Amend. V; *see Dawson*

*v. Delaware*, 503 U.S. 159 (1992). Trial counsel's failure to seek its dismissal on that basis was deficient performance.[120]

899.    Nor did the defense seek either the dismissal or the amendment of non-statutory aggravating factor #2, which read:

> Defendant has a significant history of disciplinary violations while he has been incarcerated including threatening other inmates, being involved in a riot among a group of inmates, and on at least two occasions prior to the victim Luther Plant's murder being found in possession of handmade metal weapons.

Tr. Vol. 21, 15. While the government introduced evidence of two assault-related infractions that, it argued, helped to support this factor (Tr. Vol. 24, 339), it introduced no evidence that Mr. Agofsky ever threatened another inmate.

900.    Furthermore, the account of Officer Matt, the government's only witness on Mr. Agofsky's "involve[ment] in a riot" failed to establish that Mr. Agofsky played a culpable role in the outbreak of a disturbance that involved dozens of other inmates.[121] Matt testified that he saw an argument begin, and saw Mr. Agofsky "right in that area doing some of the yelling," following which "it just erupted." Tr. Vol. 21, 74-76. While Matt did not see, as another officer reported, that a black inmate threw the first punch, all he did see to explain how the fight started was one black inmate "arguing" with several white inmates. Tr. Vol. 21, 80-83.

901.    With Matt's testimony insufficient to establish Mr. Agofsky's instigation of a riot and no evidence of threats, the evidence the government presented to support this factor was legally

---

[120] In addition, if counsel had conducted a reasonable investigation, the defense could have presented evidence that explained the context of Mr. Agofsky's remarks immediately following the incident, *see* ¶¶ 128-32, *supra,* and other relevant evidence in the defense's possession.

[121] Moreover, as discussed in ¶¶ 489-94, *supra,* the defense failed to investigate and present readily available evidence that could have undercut Matt's account.

insufficient to establish it beyond a reasonable doubt and irrelevant to the jury's assessment of his culpability. *See* 18 U.S.C. § 3593(c); *see also Zant v. Stephens*, 462 U.S. 862, 885 (1983) (noting that sentencer may not impose death penalty on basis of factors that are either constitutionally protected or impermissible or "totally irrelevant" to the sentencing process). Counsel's failure to seek the dismissal of the factor, or at least its amendment to excise or modify the first two grounds alleged before its submission to the jury, were prejudicially deficient performance. *See Strickland*, 466 U.S. 668.

902.    Both the testimony of Mr. Agofsky's "own psychologist," as misleadingly characterized by the prosecutor, and the non-statutory aggravating factors figured prominently in the prosecution's summation. There is a reasonable probability that, but for the defense failure to ensure the introduction of clearly admissible mitigating evidence, and to object to a misleading cross-examination and inaccurate summation argument about Mr. Agofsky's purported antisocial personality disorder, and but for the defense failure to seek the dismissal or amendment of unsupported or inadmissible non-statutory aggravating factors, at least one juror would have voted for life and the outcome of the penalty phase would have been different. Thus, alone and in conjunction with the other instances of deficient performance described elsewhere in this Motion, counsel's errors prejudiced the defense. U.S. Const. Amend. VI; *Strickland v. Washington,* 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000).

### 5.    Counsel Failed To Seek A Unanimity Of Theory Charge As To The Non-Statutory Aggravating Circumstance, Future Danger.

903.    The question of future dangerousness permeated the penalty phase and was the principal consideration for both parties in their respective presentations. Trial counsel eschewed virtually any mitigation case and devoted the entire penalty hearing presentation to rebutting the non-statutory circumstance—put forth based on multiple theories with distinct facts in support—

357

that Mr. Agofsky was a future danger and would likely kill again in prison. Yet the court failed to charge, and counsel failed to request, a unanimity of theory charge. Mr. Agofsky's rights to due process, a unanimous jury and the effective assistance of counsel were violated.

904. The government had three distinct theories in support of this aggravating circumstance, all of which were contested, though ineffectively, by the defense.

- Mr. Agofsky had historically displayed a pattern of unprovoked assaults and thus it was likely this pattern would persist in the future (proved through specific instances of prior conduct).

- The Bureau of Prisons did not have the capacity to adequately restrain Mr. Agofsky and prevent future assaults (proved through various experts, both defense and prosecution).

- Mr. Agofsky displayed antisocial traits (proved through defense expert Dan Roberts).

905. The theory and proof of each was conceptually distinct and each theory of this aggravating circumstance could be found individually even if a juror had rejected the alternative theories. Yet the court failed to instruct that the jury unanimously agree as to at least one of the three factual predicates before it could find this circumstance. The failure to so instruct violated Petitioner's rights under the Sixth and Fourteenth Amendments.

906. In pursuit of the first theory, the past equals the future, the prosecutor invoked Petitioner's prior record and disciplinary infractions. Referencing these incidents, he elicited opinion evidence from defense expert Dan Roberts that the "best prediction of future violence the evidence of violent past." Tr. Vol. 22, 231-32.

907. The same circumstance was then proved a different way and with different facts— evidence was elicited that despite increased security measures the federal prisons were incapable of preventing future violence. To prove this the prosecution relied on both its own and defense experts. For example, it elicited from former prison warden—and defense expert—Harvey Cox

358

that "super- max" lock-down conditions are not mandatory under BOP policy and that an inmate who shows good behavior is eligible to be removed from such restrictive conditions after five to six years. Tr. Vol. 22, 198.

908.    Government expert Michael Cooksey, a former BOP administrator, testified that if the jury imposed a life sentence, Mr. Agofsky would initially be placed in "super-max" conditions but in as little as a "few" years "probably" would be able to come into contact with other prisoners in a less restrictive type of incarceration. *Id*. at 253-83. Cooksey also warned that even in "super-max" conditions, guards can be subject to assaults by inmates, and he cited statistical evidence to that effect. *Id*. at 258.

909.    The government's third factually distinct theory was that Mr. Agofsky suffered from a mental disorder that rendered him "antisocial." From defense expert Dan Roberts, a psychologist, the prosecution elicited that Mr. Agofsky "fits the composition of adult antisocial behavior," and that the "essential feature of antisocial personality disorder is a pervasive pattern of disregard for and violation of the rights of others." *Id*. at 224.

910.    In closing the prosecutor argued the antisocial theory:

> Ladies and gentlemen of the jury, there is a fire burning inside Shannon Agofsky. It's been burning and raging ever since the night that Dan Short was thrown off the [Cowskin] Bridge in Oklahoma. Psychologists, his own psychologist called it antisocial disorder. Regular folks, you just call it that he's a killer.
>
> ***
>
> His own psychologist, at best, painted him as antisocial. At best his psychologist told you that he was antisocial. He said that he has an us versus them attitude. And he said this: the defendant in his mind feels justified in attacking people that he doesn't like.

Tr. Vol. 22, 339.

911. The Fifth Circuit has routinely insisted on unanimity as to each theory of conduct where the "beyond a reasonable doubt burden" applies.

> Like the "reasonable doubt" standard, which was found to be an indispensable element in all criminal trials in *In re Winship*, 1970, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, the unanimous jury requirement "impresses on the trier of fact the necessity of reaching a subjective state of certitude on the facts in issue." 397 U.S. at 364, 90 S.Ct. at 1072, 25 L.Ed.2d at 375. The unanimity rule thus requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged. Requiring the vote of twelve jurors to convict a defendant does little to insure that his right to a unanimous verdict is protected unless this prerequisite of jury consensus as to the defendant's course of action is also required.

*United States v. Gipson*, 553 F.2d 453, 457-58 (5th Cir. 1977); *United States v. Correa-Ventura*, 6 F.3d 1070, 1078 (5th Cir. 1993) ("We note that there are two levels of unanimity necessarily involved in this question: unanimity as to verdict and unanimity as to the critical facts necessary to support that verdict").

912. The *Gipson* court endorsed the concept of "distinct conceptual groupings." *Id*. at 478. The complaint in *Gipson* was that the defendant could be found guilty if found to have committed any of six prohibited acts ("receiving, concealing, storing, bartering, selling, or disposing on a stolen vehicle moving in interstate commerce that the defendant knew to be stolen"). The Court found, "These six acts fall into two distinct conceptual groupings; the first consisting of receiving, concealing, and storing, and the second comprised of bartering, selling, and disposing." *Id.* at 458. The instruction in *Gipson* did not distinguish between the distinct groupings, "Thus, under the instruction, the jury was permitted to convict Gipson even though there may have been significant disagreement among the jurors as to what he did. The instruction was therefore violative of Gipson's right to a unanimous jury verdict." *Id*. at 458-59.

913.     The reasoning of *Gipson* is completely analogous to the future dangerousness aggravating circumstance. The government urged conceptually distinct theories with conceptually distinct factual predicates. There was a very real risk that the jury disagreed as to any one theory, thus failing to reach unanimity, yet due to the lack of a "unanimity of theory" charge reported a "unanimous" finding.

914.     Trial counsel was ineffective for failing to request this charge. Counsel did not present a case for mitigation; rather the sole theory of penalty phase defense was to refute the proof that the "defendant represents a continuing danger to the lives and safety of other persons." Tr. Vol. 22, 305; SA 2765. Because counsel put all their eggs in this one basket, it was critical that the government be held to its burden of proving its case beyond a reasonable doubt to all twelve of the jurors.

915.     As demonstrated above, Mr. Agofsky was prejudiced. No other aggravating circumstance was contested by the defense team and no other mitigation case presented. The government, on this dispositive circumstance, took a scattershot approach, seeking a verdict premised on diverse theories and factual predicates all under the amorphous rubric of a "continuing danger to the lives and safety of other persons." This Court can have no confidence the jury was in agreement on this critical circumstance. Accordingly, trial counsel's deficient performance in failing to seek a "unanimity of theory charge" prejudiced the defense by creating a reasonable probability of a death sentence when the jury otherwise would have voted for life.

**H.     Counsel's Deficient Performance Prejudiced The Defense.**

916.     Trial counsel's penalty phase deficiencies, individually and cumulatively, prejudiced the defense.

917.     Both Barlow and Black made closing arguments, but, as at the guilt phase, their deficient investigation and presentation of evidence left them with little to discuss. Each of them

argued, in essence, that the Bureau of Prisons had the ability to prevent Mr. Agofsky from committing future violence. Tr. Vol. 24, 342, 354. But they offered the jurors no affirmative reason to spare his life.

918.    If trial counsel had conducted a reasonable investigation and made reasonable decisions respecting the presentation of evidence and argument, the jurors could have retired to deliberate on a very different case. They could have heard the testimony of family members who loved and supported Mr. Agofsky and described his upbringing and background. They could have learned about the death of his father, which overshadowed his childhood, and the martial arts discipline that provided a new polestar throughout his youth, even behind bars. They could have learned how Mr. Agofsky reacted to his childhood grief by developing a strong impulse to protect the vulnerable. They could have considered the testimony of fellow inmates of all ethnic backgrounds describing his constructive behavior in prison and explaining the violent conditions in which he and they attempted to maintain their dignity and stay alive. And they could have considered the testimony of experts whose opinions rested on an appropriately detailed factual base, free of the misleading questions and arguments of the prosecution.

919.    The jurors could have also learned about Mr. Agofsky's hard childhood and family background, the lifeline he found in the martial arts, the beatings he took, and the emotional and neuropsychological scars he carries. They could have learned how he carried his past with him to prison and how he learned to survive there. They could have learned the mitigating information detailed in the sections above, not only through Dr. Roberts, but also through the direct testimony of Mr. Agofsky's family, friends, and teachers, other inmates, and the social worker who prepared the social history report. Not only Dr. Roberts, but all the experts Barlow himself consulted—Drs. Gripon and Pelz, Mr. Pelz, and Mr. Cox—could have interpreted the information for the jury and

provided their expert opinions to assist the defense. Additional mitigating evidence, set forth elsewhere in this Motion, could have been developed and presented, and counsel could have advocated effectively for Mr. Agofsky's life during the penalty phase. Instead, the jurors learned nothing about Mr. Agofsky from the defense except that he should be kept away from other inmates—and, by the end of the prosecution's rebuttal case, the jurors could not have felt confident that the BOP could even accomplish that. There is a reasonable probability that, but for all of counsel's deficient performance in the investigation and presentation of both phases of trial, set forth elsewhere in this Motion, the jury would have imposed a life sentence. *See Williams*, 529 U.S. at 297-98; *Wiggins*, 539 U.S. at 535-36; *Strickland*, 466 U.S. 668. The Court must accordingly grant an evidentiary hearing and relief on this ground.

920. There is a reasonable probability that, considering all of the potential mitigating and rebuttal evidence and argument that trial counsel failed, as a result of their deficient performance, to present, together with all the evidence trial counsel did present at the penalty phase, and weighing that evidence against the aggravating factors, at least one juror would have voted differently and the penalty phase would have had a different outcome. *Williams*, 529 U.S. at 397-98; *Wiggins*, 539 U.S. at 535-36; *Strickland*, 466 U.S. 668.

921. For each of the reasons set forth in this petition, and for all of them cumulatively, counsel's deficient performance prejudiced the defense. Accordingly, Mr. Agofsky was deprived of the effective assistance of counsel guaranteed to him by the Constitution of the United States. U.S. Const. Amend. VI.

### III. GROUND 12.3: APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE.

#### A. <u>Introduction</u>

922.     Appellate counsel raised only three claims that had any prospect of relieving Mr. Agofsky of both his death sentences, or of his conviction, in the Court of Appeals. A fourth claim, which successfully argued that Mr. Agofsky's conviction on both counts of the indictment subjected him to double jeopardy, necessarily resulted in the dismissal of only one of those counts. The other three claims included in appellate counsel's brief were concededly foreclosed by binding precedent, and had a chance to win, if at all, only through *en banc* review (which counsel did not seek) or in the Supreme Court. And counsel failed to raise several preserved and unpreserved claims—including errors in jury selection, summation comments on the defendant's exercise of his Fifth Amendment rights respecting his justification defense, a burden-shifting instruction on the difference between murder and voluntary manslaughter, and the exclusion of relevant mitigating evidence—that likely would have secured relief. Counsel's anemic appellate assistance constituted prejudicially deficient performance.

923.     "A criminal defendant has a constitutional right to receive effective assistance of counsel on direct appeal." *United States v. Phillips,* 210 F.3d 345, 348 (5th Cir. 2000) (citing *Hughes v. Booker,* 203 F.3d 894, 895 (5th Cir. 2000)). A reviewing court must analyze a defendant's claim of ineffective assistance of appellate counsel using the familiar two-part *Strickland* test. *Smith v. Robbins,* 528 U.S. 259, 285-86 (2000); *see also Phillips*, 210 F.3d at 348 (citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *United States v. Williamson,* 183 F.3d 458, 462 (5th Cir. 1999)). First, the court determines whether appellate counsel's performance was constitutionally deficient. Second, it determines whether that deficiency prejudiced the defendant. *Id.* When a claim of ineffective assistance of counsel is premised on counsel's failure to raise an

issue on appeal, "the prejudice prong first requires a showing that [a reviewing court] would have afforded relief on appeal." *Phillips,* 210 F.3d at 350; *see also Smith v. Robbins*, 528 U.S. at 286. Thus, the court must "counter-factually determine the probable outcome on appeal had counsel raised the argument." *Phillips*, 210 F.3d at 350 (citing *Williamson,* 183 F.3d at 463); *accord United States v. Reinhart,* 357 F.3d 521, 530 (5th Cir. 2004).

924. A counter-factual assessment of the outcome of Mr. Agofsky's appeal compels the conclusion that, but for appellate counsel's deficient performance, there is a reasonable probability that he would have obtained guilt-innocence phase or penalty phase relief. U.S. Const. Amend. VI.

**B.** **Appellate Counsel's Role In The Case**

925. Mr. Agofsky's trial attorneys, Barlow and Black, were initially assigned as counsel for Mr. Agofsky's appeal. Dkt. 182, 199, 200. The record on appeal was filed February 14, 2005. A342. Shortly after, on February 18, Black filed a motion to substitute counsel. A341, A343.[122] The clerk initially denied the motion on March 14, and Black obtained two extensions of time to file the brief, but on June 8, 2005, after Barlow and Black filed a motion to "reurge" their own relief as appellate counsel, the Court of Appeals granted the motion. A344-47. On June 8, 2005, Marjorie A. Myers, the Federal Defender for the Southern District of Texas, was substituted as counsel, and Brent E. Newton, an Assistant Federal Public Defender in Ms. Meyers's office, entered an appearance. Dkt. 226, A348-50. Mr. Newton wrote to Mr. Agofsky to introduce himself

---

[122] Mr. Agofsky would later write to Newton that, on June 17, he had received a letter from Barlow advising him (inaccurately) that the court had rejected the motion to substitute counsel and that his choices were to accept Barlow's assistance or represent himself. In May, Barlow had written to Mr. Agofsky advising him (inaccurately) that his appeal had been denied. Newton was the first attorney to sign and stamp his legal mail to Mr. Agofsky properly, which meant that his previous letters from his attorneys had been opened pursuant to institutional regulations. A346.

on June 14, advising him that he had "a good deal of experience handling capital cases," that he would ask the Fifth Circuit for an extension and would begin working on the case in "a matter of days," and that he would attempt to visit Mr. Agofsky in person in Florence, Colorado, where he was then incarcerated, "time permitting." A351.

926.    Newton received an official copy of the transcripts and told Mr. Agofsky that he began work on his appeal on June 24. A352. A paralegal prepared 39 pages of notes on Transcript Volumes 1-25 (A353, 354-393), but did not take notes on the first two volumes, the seven volumes of jury selection (A354, 362), a hearing regarding an individual juror, and the instructions to the jurors on their responsibilities. (A364). Not only did the paralegal take no notes on jury selection, but it appears that Newton never obtained the jury questionnaires or strike lists. He or the paralegal listed a number of potential issues to brief: the constitutionality of the death penalty; the prejudicial use of a videotape at trial (not preserved); allowing the defendant's statements to correction officers; allowing testimony about the prior Miele assault; no election of counts; the leaking of the defense witness list to the government; the selection of the venire from voter registration lists; and the fact that jurors' answers to mitigating factors were "clearly against evidence." A393.

927.    Newton sent Mr. Agofsky a copy of the paralegal's notes, and obtained "special permission" to make photocopies for the guilt-innocence and penalty phase transcripts and supply them to his client. A394, 395. He arranged a telephone conference with his client on September 20, 2005. A396-97. The brief was filed on October 3, 2005, and sent to Mr. Agofsky the same day. A398-399. Following receipt of the government's brief on January 11, 2006, Newton filed a reply on January 26, 2006, and sent a copy to Mr. Agofsky. A400, 401-02.

928.    Mr. Newton never visited Mr. Agofsky. They spoke twice by telephone, once early in the appeal when Newton introduced himself, and once when Newton attempted, unsuccessfully, to persuade Mr. Agofsky not to testify for another inmate at that inmate's capital trial.

929.    Oral argument was held on June 5, 2006. A403-04. Newton's file contains one page of preparatory notes. A405. On July 28, 2006, the Court of Appeals rejected all but one of Newton's claims. Mr. Agofsky's convictions were vacated on Double Jeopardy grounds and the case was remanded to this Court with instructions to impose, at the government's election, a guilty verdict and death sentence for either Count 1 or Count 2. *United States v. Agofsky,* 458 F.3d 369 (5th Cir. 2006). Newton advised Mr. Agofsky by letter dated July 31, and told him that, because Newton considered filing a petition for rehearing *en banc* "futile," he would next petition the United States Supreme Court for a writ of *certiorari.* A406.

930.    Newton's *certiorari* petition, filed on October 17, 2006, and sent to Mr. Agofsky the same day, followed by a reply brief filed and sent to Mr. Agofsky on December 22, was denied on January 22, 2007. *See Agofsky v. United States,* 549 U.S. 1182, 127 S.Ct. 1149 (2007). A407-08, 409-10, 411. The file does not contain a letter advising Mr. Agofsky that *certiorari* had been denied, but Newton wrote to him on February 1, 2007, stating that he understood that his original letter telling Mr. Agofsky of the Supreme Court's denial had not been received. He told Mr. Agofsky that the case would now be remanded to this Court for the prosecution to elect one of the two counts, and that that proceeding could be followed by a new appeal or a motion to vacate judgment pursuant to 28 U.S.C. § 2255. A412.

931.    On March 30, 2007, after *certiorari* had been denied, the Honorable Thad Heartfield reconvicted and resentenced Mr. Agofsky to death, pursuant to the Fifth Circuit's mandate, on Count 2 of the superseding indictment. The government elected to dismiss Count 1.

Mr. Newton appealed the resentencing to the Fifth Circuit on Mr. Agofsky's behalf, under Docket No. 07-40330, arguing that his conviction under, and death sentence for, Count Two were invalid in view of the jury's finding that he did not commit the murder "intentionally." The Fifth Circuit denied that appeal in January of 2008. *United States v. Agofsky*, 516 F.3d 280, 281 (5th Cir. 2008)

932.    Shortly after postconviction counsel's appointment, Mr. Newton sent them a copy of his file, and over the ensuing months he responded to their inquiries.

### C.    Appellate Counsel Failed To Provide Reasonably Vigorous Representation.

933.    Appellate counsel failed to engage in vigorous advocacy, filing short and superficial briefs in the Court of Appeals and failing to raise many issues that individually or cumulatively could have secured relief for his client on both counts of the indictment. *See United States v. Bass*, 310 F.3d 321, 329-30 (5th Cir. 2002) (counsel's failure to raise insufficiency of evidence on one count on direct appeal was deficient performance and prejudiced the defense); *Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001) (appellate counsel's failure to raise jury selection claim was ineffective assistance).

934.    Newton's opening brief encompassed only 25 pages of legal argument and raised only seven claims (A413- 478), two of which, he acknowledged, were foreclosed by Fifth Circuit precedent and were raised only to preserve the issues for further appeal. A449. He devoted only 21 pages of argument to claims for which relief was not foreclosed. (A450-470). The five claims reflected only light research:

- Issue One (Double Jeopardy): nine cases cited, only two from the Fifth Circuit and one from another Circuit, and the rest from the Supreme Court;

- Issue Two (jury's note about polling reflected consideration of arbitrary factor at guilt phase): three cases cited, all from the Supreme Court and none from the Fifth Circuit or other circuits;

- Issue Three (inconsistent findings at guilt and penalty phases re intent): three cases cited, only one from a lower court and none of them supporting a grant of relief for inconsistent verdicts;

- Issue Four (insufficient evidence of "heinous and cruel" factor): five cases cited, only three from the Fifth Circuit and two from the Supreme Court;

- Issue Five (duplicative aggravating factors): six cases cited, five from the Fifth Circuit.

In all, the brief cited 26 cases in support of claims that were not foreclosed by circuit precedent. It raised no claims concerning jury selection, no evidentiary claims, no instructional error claims, and no claims concerning prosecutorial conduct.

935. The reply brief contained only eleven pages of legal argument (A485-95), and advised the Court of Appeals that a Supreme Court decision had overruled the case upon which Issue Five had relied, leaving only four issues for which relief was not foreclosed by binding precedent. One of the four remaining claims, the Double Jeopardy claim, could not, and (when the Fifth Circuit eventually ruled) did not, do more for Mr. Agofsky than remove one of his two convictions and death sentences.

936. Mr. Newton did not raise two claims, one of which was raised below and the other of which was structural error that did not require the appellant to satisfy the plain error rule to obtain relief. *See* Fed. R. Crim. P. 52(b).

937. He did not challenge the seating of jurors who were not life-qualified as required by *Morgan v. Illinois*, 504 U.S. 716 (1992). *See* Ground 12.4, *infra.*

938. He did not challenge the prosecutor's argument in summation, to which trial counsel had objected that it constituted an improper comment on Mr. Agofsky's exercise of his Fifth Amendment rights, or the adequacy of the Court's curative instruction. *See Freeman v. Lane*, 962 F.2d 1252, 1257 (7th Cir. 1992) (appellate counsel's failure to raise on direct appeal the prosecutor's improper comment on defendant's failure to testify was objectively unreasonable and

369

deficient, providing cause and prejudice permitting habeas review of the claim); *Matire v. Wainwright*, 811 F.2d 1430, 1437-38 (11th Cir. 1987) (appellate counsel ineffective for failing to raise issue of admitting evidence of defendant's post-arrest silence). The prosecutor argued:

> What's most important is never did he claim self-defense. . . . Never has self-defense been raised. Does it make sense if you're going [sic] make a statement the first thing out of your mouth is, hey, he tried to hit me. That guy, I'm defending myself, not it's a Bernie Conspiracy.

Tr. Vol. 20, 397-98.

939.    Trial counsel objected and, upon his request, the Court issued a brief curative instruction (*id.* at 399), but appellate counsel did not litigate the adequacy of the instruction or the prejudicial impact of the prosecutor's remarks.[123] *See United States v. Moreno*, 185 F.3d 465, 474-75 (5th Cir. 1999) (observing that sustained objection to government's reference to defendant's silence and a curative instruction do not automatically mean no constitutional violation occurred and still requires assessment of impact of testimony on jury's verdict); *Chapman v. United States*, 547 F.2d 1240, 1249 (5th Cir. 1977) ("When the prosecution uses defendant's post-arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous" where the prosecutor's use strikes at the "'jugular' of the defendant's story.") (citing *United States v. Harp*, 536 F.2d 601, 603 (5th Cir. 1976)).

---

[123] If Newton had raised such a claim, the fact that the prosecutor had elicited testimony from a corrections officer, without objection, that Mr. Agofsky had never told him he acted in self-defense from the time of the incident to the time of trial, could have supported an argument that the summation remarks were not harmless error. Tr. Vol. 18, 61. *See* ¶¶ 347-48, *supra,* and 933, *infra.*

370

940.    Newton did not raise substantial guilt-innocence phase, plain-error issues that, individually or cumulatively, could have secured appellate relief for his client:

- The burden-shifting instruction on the relationship between the greater offense of murder and the lesser-included offense of voluntary manslaughter, which failed to explain that the government must disprove heat of passion in order to prove the malice necessary for the greater offense. *See* ¶¶ 301-04, *supra*.

- The failure to instruct the jurors to consider both the testimony of Richard Ward and Mr. Agofsky's alleged oral statements with caution. *See* ¶¶ 305-10, *supra*.

- The prosecutor's improper examination of Officer Matt, violating Mr. Agofsky's Fifth Amendment rights, about whether he had told Matt he acted in self-defense at any time from the time of the offense to the time of trial. *See* ¶ 348, *supra*.

941.    Newton did not raise substantial penalty phase plain-error issues that, individually and cumulatively, could have secured appellate relief for his client:

- The exclusion of clearly admissible mitigating evidence, which formed part of the basis for the opinion of the defense psychologist, Dr. Dan Roberts. *See* ¶¶ 866-74, *supra*.

- The prosecutor's factually unfounded and improper cross-examination of Dr. Roberts about Mr. Agofsky's non-existent antisocial personality disorder and other improper questions. Because a government psychologist who testified outside the jury's presence, Dr. Jim Mann, conceded that Mr. Agofsky does not fit the criteria for antisocial personality disorder, the impropriety of the prosecutor's examination clearly appeared on the record. *See* ¶¶ 880-84, *supra*.

- The prosecutor's misleading summation remarks about the defense psychologist's diagnosis, a potential appellate claim which was partially preserved. *See* ¶¶ 889-90, *supra*.

942.    Mr. Newton has advised postconviction counsel that he has no independent recollection of whether he identified or why he did not raise any of the claims above but that his general practice is to raise issues as plain error only if he can make a non-frivolous argument that all the *Olano*[124] criteria have been satisfied. A498. If he did identify any of those issues, he

---

[124] *United States v. Olano*, 507 U.S. 725 (1993).

"necessarily would have concluded that I couldn't make a good-faith argument that the issue(s) constituted reversible 'plain error' or should be subject to de novo review." A498.

943. Appellate counsel's failure to raise potentially meritorious claims, or to litigate vigorously the four claims he did raise for which relief was not foreclosed by binding precedent, was deficient performance. There is a reasonable probability that, but for these instances of deficient performance, individually and cumulatively, the outcome of Mr. Agofsky's appeal would have been different and he would have secured guilt-innocence phase or penalty phase relief. U.S. Const. Amend. V, VI; *Smith v. Robbins,* 528 U.S. at 285-86; *Phillips,* 210 F.3d at 348.

### D. Mr. Newton's Affidavit

944. As the Court ordered on February 10, 2009 (Doc. 70), Mr. Newton prepared an affidavit responding to the allegations concerning his representation and sent it to counsel for the parties on March 4, 2009. SA 2349. He provides only a general "defense" of his briefing on direct appeal. SA 2357-58. He does not specifically discuss any claim he included in his brief, or explain why he failed to develop the claims in greater detail.

945. With respect to claims enumerated above that Newton could have included, but did not include, in Mr. Agofsky's direct appeal, Mr. Newton states that he has no independent recollection of identifying or considering any of them. He states, however, that he believes that "there was not any realistic possibility" that any of the claims would have succeeded under Fifth Circuit law and that he therefore "would not have identified them as worthy of inclusion in the opening brief." SA 2352.[125]

---

[125] *See Wiggins*, 539 U.S. at 526-27 (state courts unreasonable when they assumed counsel had strategy inconsistent with their actions at trial); *Kimmelman v. Morrison*, 477 U.S.365, 386-87 (1986) (under *Strickland*, courts cannot use hindsight to supply a strategy four counsel); *Griffin v. Warden*, 970 F.2d 1355, 1358 (4th Cir. 1992) ("courts should not conjure up tactical decisions an attorney could have made, but plainly did not") (citing *Strickland, Kimmelman*).

946.     Assuming a prosecutorial role, Mr. Newton devotes the bulk of his affidavit to a legal argument that none of the claims that he failed to raise has any merit. SA 2352-57. However, as explained elsewhere herein, Mr. Agofsky could have obtained genuine appellate relief, on either claims that Mr. Newton did raise or claims he did not raise, if Newton had provided effective assistance.

### 1.     The Inconsistent Verdict Claim

947.     As noted, a more diligent approach to briefing the claims Mr. Newton included in Mr. Agofsky's appeal could have affected the outcome. For example, he could have used Claim Three of his initial brief to convince the Court of Appeals that the tangled burden-of-proof and definitional errors in the murder and manslaughter instructions had so confused the jury that they caused irrational, unconstitutional, and remediably inconsistent guilt and sentencing verdicts. *See* Ground 12.1(I), *supra*. But Newton missed the instructional errors and thus had no specific arguments for making an exception to the ordinary rule that appellate courts will not grant relief for inconsistent verdicts. Nor did he provide a constitutional basis for such an exception.

948.     In his initial brief, Newton argued that "The jury's special finding that the murder was not committed 'intentionally' contradicts the jury's earlier finding that the murder was committed in a 'willful,' 'deliberate,' 'malicious,' and 'premeditated' manner." A458. Citing *United States v. Powell*, 469 U.S. 57 (1984), and *United States v. Dotterweich*, 320 U.S. 277 (1943), he acknowledged that inconsistent verdicts are not ordinarily subject to appellate review. A459. He sought to distinguish the *Powell* rule, however, arguing that the jury's guilt-innocence phase finding was not a verdict because, in the federal system, a "judgment of conviction" cannot be imposed before sentence and thus the conviction was not yet final. Therefore, he contended, *Powell's* rule against reviewing inconsistent verdicts did not apply. He cited only a single Third Circuit case, which concerned a different subject, in support of the argument. A460 (citing *Kapral*

373

*v. United States*, 166 F.3d 565, 569 (3d Cir. 1999)). Second, Newton advanced a two-sentence argument that, even if the jury's second finding was an otherwise unreviewable inconsistent verdict, the "flagrant inconsistency" demonstrated that the death penalty had been arbitrarily imposed. He cited only 18 U.S.C. § 3595(c)(1), which requires an appellate court to grant relief if a death sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor." He cited no constitutional or decisional authority and advanced no record-based explanation of how the inconsistent verdicts denoted juror arbitrariness. A461.

949.    The Court of Appeals rejected the claim summarily, simply stating that it found "no merit" in his argument that his conviction or sentence on Count Two was "invalid" because the jury may have rendered inconsistent verdicts, and citing *Dunn v. United States*, 284 U.S. 390 (1932), and *Powell*. *See United States v. Agofsky*, 458 F.3d 369, 375 (5th Cir. 2006) (SA 2521).

950.    The Court of Appeals did grant technical relief on a double jeopardy claim, raised by trial counsel before trial and presented by Newton on appeal. It vacated both capital convictions and remanded to the district court with directions to allow the government's election of one of the counts, and then to reconvict and resentence Mr. Agofsky to death on the remaining count. 458 F.3d at 375 (SA 2528). On remand, the government elected Count Two, premeditated federal murder (Criminal Docket No. 245). Mr. Agofsky appealed again (Criminal Docket No. 247). By this point, postconviction counsel had been appointed to investigate and prepare a potential motion for relief from judgment pursuant to 28 U.S.C. § 2255. Mr. Newton, however, again represented Mr. Agofsky on the resentencing appeal, raising, again, the claim that the jury's inconsistent findings on intent at the guilt-innocence and penalty phases required relief. SA 2674.

951.    This time, Mr. Newton tried somewhat harder, but had to contend with the law-of-the-case doctrine. He argued that the court should apply the doctrine's exception for a prior

decision that was clearly erroneous and would work manifest injustice. SA 2875-76 (citing *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002)). In support, he noted with apologies that he had found a Supreme Court decision that he had previously overlooked, and also argued that the panel entirely had failed to address his "compelling" argument that the inconsistent verdicts were reviewable for passion, prejudice, or arbitrariness under § 3595(c). SA 2676-77 (at 12). Further, he observed, law of the case would not bar the claim if he later sought *en banc* review on Mr. Agofsky's behalf. SA 2677.

952. On the merits, Newton explained, as he had in the initial appeal, why the verdicts were inconsistent. SA 2680-82. Then, in contrast to the initial appeal, he cited cases that, at least, addressed claims somewhat similar to the one he was making. He cited *Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385, 400 n.11 (1972), which stated in footnoted dicta that the remedy for an inconsistency between a general verdict and a finding in a special sentencing interrogatory is a new trial. SA 2682. He cited two other cases that referred to *Pipefitters,* also in dicta. SA 2683 (citing *United States v. Lucarelli*, 490 F. Supp. 2d 295, 299-300 (D. Conn. 2007); *Blackwell v. Cities Service Oil Co.*, 532 F.2d 1006, 1008 (5th Cir. 1976)). However, he did not explain the reasons for the *Pipefitters* dictum, discuss how it applied in this case, or link it to any constitutional doctrines governing capital cases.

953. Turning to his argument that the court should exercise its § 3595(c) power to grant relief for juror passion, prejudice or arbitrariness, Newton cited *United States v. Johnson*, 223 F.3d 665, 676 (7th Cir. 2000). SA 2683-84. Johnson, like Mr. Agofsky, sought relief for inconsistent verdicts. The Court of Appeals for the Seventh Circuit rejected the claim, but stated that "if the inconsistencies were such as to indicate the verdict was a product of irrationality, it would have to be set aside under § 3595(c)." Mr. Newton noted a district court opinion that cited *Johnson* with

approval. SA 2684. But, once again, he made no attempt to explain why, on this record, Mr. Agofsky's jury had behaved irrationally, or to make any claim of constitutional error.

954. The Court of Appeals again rejected the claim. *See United States v. Agofsky*, 516 F.3d 280 (5th Cir. 2008) (SA 2529). It noted that *Pipefitters* was not decided on the basis of the inconsistency between the general verdict and the special interrogatory, and that *Pipefitters* said nothing about *Dunn* or *Powell*. 516 F.3d at 284 (SA 2532-33). And it noted that *Johnson* had rejected the defendant's §3595(c) claim respecting inconsistent jury findings. *Id.* at 285 (SA 2533). Because the court found "nothing irrational about the jury's findings" in Mr. Agofsky's case, it found no "manifest injustice" in the prior panel's rejection of the inconsistent verdict claim. *Id.*

955. Newton's performance on this claim was deficient because he failed to present any authority at all in support of his two arguments in the initial direct appeal, provided the Court of Appeals with no case-specific explanation of why the juror's verdict resulted from arbitrariness, and provided no constitutional basis for the claim. His reiteration of the same claim in the resentencing appeal was still too little and much too late. He had no convincing reason for not treating the court's first ruling as law of the case. The dicta from the Supreme Court in *Pipefitters* arose from a different context and were only dicta unrelated to any doctrine governing capital cases. His citation to *Johnson* was deficient because he did not explain why Mr. Agofsky should prevail on the inconsistent verdict claim while Johnson had lost.

956. Newton could, however, have briefed the claim in a manner that would have required relief. He could have begun by citing *Johnson* in the initial direct appeal and explaining the controlling distinctions between that case and Mr. Agofsky's. Johnson challenged his jury's inconsistent findings on mitigating factors that were equally applicable (or inapplicable) to each of the murder counts on which he faced the death sentence. 223 F.3d at 675. Judge Posner, writing

for the Seventh Circuit panel, wrote that the inconsistencies were not "such as to indicate that the verdict was a product of irrationality." *Id.* at 676. He recognized that several jurors were likely "of two minds" about the existence of some mitigating factors, or disagreed among themselves. But the jurors were required to agree only about the verdict, not about every fact. And every juror, no matter what his or her mitigating findings, had agreed that the aggravating factors outweighed any mitigating factors found. *Id.* In other words, there was "no reason to suspect that any juror was in doubt about the bottom line . . . [and thus] no basis for thinking that he had voted irrationally." *Id.*

957. As Mr. Newton could have explained in his initial direct appeal brief, if he had uncovered *Johnson* in time to include it, or could at least have explained in his resentencing appeal brief, after he uncovered *Johnson*, Mr. Agofsky's case is very different. The inconsistent jury findings concern the mental element that made him death-eligible or -ineligible, not subsidiary mitigating factors. The circumstances provide *every* reason to suspect that the jurors were "in doubt about the bottom line." The burden-shifting, erroneous, and confusing murder and manslaughter instructions underscore that conclusion. *See* Ground 12.1(I), *supra*, and Ground 12.3(D)(5)(iii), *infra.* Accordingly, the Court of Appeals could and should have found that the inconsistent verdicts of Mr. Agofsky's jury were irrational and arbitrary, and required relief under 28 U.S.C. § 3595(c).

958. Additionally, Newton could have placed his § 3595(c) argument on a constitutional basis. First, due process is violated when a verdict could have been based on alternative grounds, one of which was appropriate and another of which was improper, and it is impossible to tell which formed the basis for the verdict. *Yates v. United States*, 354 U.S. 298, 312 (1957); *Stromberg v. California*, 283 U.S. 359, 367-68 (1931); *Bollenbach v. California*, 326 U.S. 607 (1946). Moreover, in capital cases the fundamental requirement of heightened reliability is the keystone in making "the determination that death is the appropriate punishment in a specific case." *Woodson*

*v. North Carolina*, 428 U.S. 280, 305 (1976). Because there is "[a] qualitative difference between death and any other permissible form of punishment, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Zant v. Stephens*, 462 U.S. 862 884-85 (1983) (*quoting Woodson)*. This requirement of heightened reliability functions as "inherent restraint on the arbitrary and capricious infliction of the death sentence," *Zant*, 462 U.S. at 878 (citing *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980)).

959.    There must be a discernable rational basis for findings that lead to a death sentence. "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1976).[126]

960.    These considerations apply with equal force to guilt-innocence stage error:

> To insure that the death penalty is indeed imposed on the basis of "reason rather than caprice or emotion," we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination.

*Beck v. Alabama*, 447 U.S. 625, 638 (1980) (footnote omitted).

961.    Lower courts have applied these principles to the analysis of challenges to inconsistent jury findings at sentencing in capital cases. The dispositive factor, as in the non-

---

[126] *See also McCleskey v. Kemp*, 481 U.S. 279, 335 (1987) ("[W]e have demanded a uniquely high degree of rationality in imposing the death penalty."), 1570 (Brennan, J., dissenting)); *Caldwell v. Mississippi*, 472 U.S. 320, 329, n.2 (1985) ("[T]his Court has gone to extraordinary measures to insure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake," *quoting Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring)); *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980) (reason rather than caprice or emotion required); *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) ("reasoned determination" by a jury).

constitutional claim rejected in *Johnson*, is whether the jurors reached rational conclusions about their ultimate life-or-death determination, despite any potentially inconsistent subsidiary findings. *See Wainwright v. Lockhart*, 80 F.3d 1226, 1231-32 (8th Cir. 1996) (no Eighth Amendment or due process violation because of inconsistent mitigating findings on factors equally applicable for both murders, because jury clearly decided aggravating factors outweighed mitigating) (cited in *Johnson*); *Williams v. Clarke*, 40 F.3d 1529, 1537-38 (8th Cir. 1994) (constitutional question is whether state court's reliance on inadequately narrowed aggravating factor was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation) (cited in *Wainwright*).

962.    Newton could also have elaborated persuasively on his other argument, that the jury determinations on mental state at the guilt-innocence and penalty phases were two parts of one verdict and had to be consistent to be rational. In the initial appeal he only hinted at the argument by pointing out that a verdict is not final until sentence is imposed. A460. In the resentencing appeal he cited *Pipefitters*, SA 2682, but he could have gone further.

963.    While the guilt-innocence verdict was a *general* verdict ("guilty" or "not guilty"), *see* guilt-innocence phase verdict form, SA 2753, the penalty phase verdict was a *special* verdict asking the jury if the "Government has established beyond a reasonable doubt that the defendant, Shannon Wayne Agofsky, intentionally killed the victim, Luther Plant." The jury answered that question "no." SA 2757. The *Powell* court was concerned with the potential windfall a defendant could receive based on inconsistent verdicts:

> Inconsistent verdicts therefore present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to

379

allow the defendant to receive a new trial on the conviction as a matter of course.

*Powell*, 469 U.S. at 65.

964. The concern in *Powell* does not obtain here as a reviewing court can determine "whose ox has been gored." One verdict was a general "guilty" predicated on an array of flawed instructions, whereas the second was a specific finding that the government failed to prove Mr. Agofsky " intentionally killed the victim, Luther Plant." This is not case such as *Powell* where the irrationality may have worked to the defendant's benefit; here, it did not. In each verdict, the jury selected the most severe option available to them, convicting Mr. Agofsky of two counts of capital murder in the first verdict and sentencing him to death on both counts in the second verdict. Mr. Agofsky was harmed by the irrationality of their inconsistent findings in a way that offended due process and the Eighth Amendment, but Newton failed to argue the crucial distinctions between *Powell* and Mr. Agofsky's case, with the result that the Court of Appeals relied on the ordinary *Powell* rule.

965. Newton raised neither of these constitutional arguments, and failed to identify how Mr. Agofsky was prejudiced, particularly how the likelihood of juror confusion rendered the verdicts unreliable. He failed to demonstrate persuasively that *Powell* and other Supreme Court precedent, and also *Johnson* and 28 U.S.C. § 3595(c), actually supported his claim. In *Powell* the Supreme Court declined to grant relief "as a matter of course," leaving open an avenue for relief in circumstances such as those here, where the verdict was most certainly a product of jury irrationality and thus unconstitutional. In *Johnson* the court recognized that inconsistent penalty phase findings that signaled jury indecision about "the bottom line" would require § 3595(c) relief. Newton was deficient for failing to develop any of these constitutional and statutory arguments in either his initial brief or his attempt at a "do over" in the resentencing appeal.

380

## 2.    The Claim Concerning The Jury's Note

966.    Mr. Newton raised a claim concerning a note the jurors sent during deliberations, asking if they would be polled individually if they rendered a life verdict. Newton inferred that one or more jurors were considering a life sentence and were reluctant to vote for life. He asserted that the jurors' communication denoted "arbitrariness," prohibited by both 28 U.S.C. § 3595(c)(1) and the Constitution, and contended, implicitly, that the record sufficed to establish grounds for a new trial. A456-57. Mr. Newton does not say in his affidavit why he did not develop this claim (or any other claim) in more detail.

967.    Mr. Newton's brief on direct appeal included no discussion of the rules that ordinarily require deference to a trial court's supervision of jury communications and deliberations, and ordinarily preclude impeachment of a jury's verdict. He made no attempt to argue that the trial court should have conducted a hearing or that there was a reasonable possibility that extraneous prejudicial influences had been brought to bear on the jury. *See United States v. Johnson,* 495 F.3d 951 (8th Cir. 2007) (applying standard in federal capital prosecution); *see also United States v. Webster,* 750 F.2d 307 (5th Cir. 1984) (no presumption of prejudice for juror misconduct intrinsic to a juror, as opposed to misconduct related to external influence). Nor did he address Federal Rule of Evidence 606(b), or explain how the case fell into one of its exceptions. In order to make that case, he would have had to explain, again, how extraneous prejudicial information had been brought to the jurors' attention, or outside influence had been brought to bear upon them. *See United States v. Jackson*, 549 F.3d 963, 984 (5th Cir. 2008) (citing Fed. R. Evid. 606(b) and holding that it does not authorize admission of evidence that jurors misunderstood instructions).

968.    Newton invoked the statutory and constitutional rules against arbitrariness in capital cases without arguing that the ordinary rules for review of jury deliberations did not apply

to such claims and without, alternatively, establishing that Mr. Agofsky's case required relief under the ordinary rules. His failure to develop this claim was deficient.

### 3. The "Heinous and Cruel" Claim

969.     As described above, Newton's failure to develop the claim that the evidence for the statutory aggravating factor that the murder was "heinous, cruel, and depraved" was legally insufficient. *See supra*, ¶ 934. In his brief, Newton cited *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), *overruled on other grounds*, *United States v. Martinez-Salazar*, 528 U.S. 304, 310 (2000), which addressed a different (instructional error) claim but provided a construction of this factor under the Federal Death Penalty Act. A463. The *Hall* court stated that the factor required a showing of torture (which required evidence of abuse while the victim was conscious) or serious physical abuse (which required more than the amount of injury necessary for death plus intention to inflict abuse apart from the killing). *Hall*, 152 F3d at 414-15. Newton applied this definition to the facts of Mr. Agofsky's case, arguing that (1) the jury had not found torture and in any event there was no evidence that Plant was conscious; (2) that the incident was too short to establish an intent to cause abuse apart from the killing, and (3) the "gruesomeness" of the killing was not in itself enough to establish serious physical abuse. A463-65. He argued that the error was not harmless beyond a reasonable doubt because the jurors' note indicated that at least some of them were considering a life sentence. A466.

970.     The only authorities Newton cited in support of his arguments were *Hall* and *Godfrey v. Georgia*, 446 U.S. 420 (1980), which both concerned the need for narrowing construction to save this factor (and a similar Georgia factor) from unconstitutional vagueness, and *United States v. Jones*, 132 F.3d 232, 252 (5th Cir. 1998), which set forth the harmless error standard for review when the prosecution relies in part on unconstitutional non-statutory

aggravating factors. He did not cite any case that specifically supported his three arguments for finding the government's proof in sufficient.

971. For example, he did not cite any cases respecting Plant's possible unconsciousness during the assault. Numerous state courts addressing comparable aggravating factors have concluded that conduct occurring after the victim has lost consciousness or has died may not be considered by the fact-finder in assessing the "heinousness" of a murder.[127] Similarly, Mr. Newton made no effort to support his *Godfrey* argument—that the victim's injuries alone could not establish the factor—with more recent precedent. Nor did Newton call the court's attention to any cases that addressed similar sufficiency claims. Such authority was and is readily available.[128]

972. Newton's failure to conduct the research necessary to present this claim in a persuasive manner was deficient performance.

### 4. The Claims Barred By Circuit Precedent

973. Mr. Newton raised two claims in his initial brief that, he acknowledged, were foreclosed by Circuit precedent, and indicated that he was only raising them to preserve Mr.

---

[127] *See, e.g., Hayes v. State*, 845 P.2d 890, 892 (Okl. Cr. App. 1992)*; Rhodes v. State*, 547 So.2d 1201, 1205 (Fla. 1989); *Jackson v. State*, 451 So.2d 458, 463 (Fla. 1984); *Herzog v. State*, 439 So.2d 1372, 1380 (Fla. 1983); *State v. Hunt*, 371 N.W.2d 708, 721 (Neb. 1985), *overruled on other grounds*, 399 N.W.2d 706 (Neb. 1986); *State v. Hamlet*, 321 S.E.2d 837, 846 (N.C. 1984).

[128] *See, e.g., State v. Schackart*, 947 P.2d 315, 326 (Az. 1997) (evidence did not support "gratuitous violence" necessary to establish "heinous" factor where majority of injuries associated with means of killing); *State v. Lee*, 944 P.2d 1204, 1219 (Az. 1997) (no showing of violence beyond that necessary to kill when killing effected with four gunshots and no showing of time between them or sequence); *State v. Richmond*, 886 P.2d 1329 (Az. 1994) (no "gratuitous violence" as required for "heinous" factor where no showing defendant knew victim was dead after first pass of car); *State v. Lloyd*, 552 S.E. 2d 596, 629-31 (N.C. 2001) (where four shots fired in quick succession, "we fail to see that this evidence suggests that defendant carried out this shooting in a fashion beyond that necessary to effectuate the victim's death," and evidence legally insufficient to submit "heinous, atrocious, and cruel" factor to jury); *Olsen v. State,* 67 P.3d 536, 581 (Wyo. 2003) (victims' mental anguish while waiting to be shot insufficient to establish intentional infliction of torture necessary to prove factor).

Agofsky's rights to raise them as part of a petition for *en banc* review or a petition for *certiorari*. A471-75. A third claim had also been foreclosed by the time of the reply brief. A495. But Newton never sought *en banc* review in the initial appeal and did not include any of these claims in the resentencing appeal. His failure to seek *en banc* review, after raising these claims only for the purpose of preserving Mr. Agofsky's right to such review, was deficient performance.

### 5. The Claims Not Raised

974.    Mr. Newton failed to raise additional claims that would have required relief if he had identified, researched, and presented them to the Court of Appeals.

#### i. *The Fifth Amendment Claim*

975.    In violation of Mr. Agofsky's Fifth Amendment right to silence and due process, the prosecution elicited evidence that Mr. Agofsky failed, following the incident, to tell the assigned correctional officer that he was acting in self-defense, and in closing asked the jury to infer guilt because Mr. Agofsky "never" at any time asserted his self-defense claim. Appellate counsel failed to raise these claims. In his affidavit composed on behalf of the government, Mr. Newton claims that he routinely "winnows" weaker issues and then baldly asserts, "Unpreserved issues subject to the plain error standard generally tend to be weaker issues." SA 2352. Consequently, Mr. Newton raised *no claims* under the plain error exception. Newton misapprehends the role of plain error, particularly in capital cases. The plain error rule permits an appellate court to reach an otherwise unpreserved claim. There is nothing inherently "weaker" about such claims and it was unreasonable for counsel to reject these claims out-of-hand simply because they fell under the rubric of "plain error." Rather it was counsel's responsibility to review each claim on its merits, including unpreserved claims, and raise any claim that was meritorious. As an objectively reasonable appellate attorney would have raised this issue for plain error review,

and there is a reasonable probability the Fifth Circuit would have found plain error had the issue been raised, counsel was ineffective under *Strickland*.

976. Contrary to counsel's assertions that he declined to raise the claim because it was in the weaker "plain error" category, by his own admission the claim was not raised because he failed to perceive any error in the first instance. As to the eliciting of Mr. Agofsky's failure to claim self-defense to Officer Matt, counsel failed to recognize any error at all, concluding that Mr. Agofsky's failure to "mention self-defense during those two conversations [with Matt]" was not a *Doyle* or *Miranda* violation. SA 2354. As to the prosecution's exploitation of Mr. Agofsky's silence, where at closing the prosecution urged rejection of self-defense because "[w]hat's most important is *never* did he claim self defense" Tr. Vol. 20, 397-98, counsel similarly failed to perceive any error ("I did not believe that the prosecutor's argument was really aimed at Mr. Agofsky's pretrial silence." SA 2354). Thus this is not a case where counsel recognized the error and made a strategic decision not to pursue an otherwise meritorious claim; counsel failed to perceive that the claim had any merit. Even if counsel had consciously rejected the claim on some "lesser merit" theory, counsel was nevertheless ineffective for failing to recognize that relief was compelled by United States and Fifth Circuit precedent. Moreover, any claim of strategic winnowing rings hollow as counsel raised *no guilt-phase claims at all* and counsel chose instead to pursue two sentencing claims in which he was compelled to concede relief was foreclosed by prior circuit precedent. A449. This decision was objectively unreasonable.

977. These claims meet the standard for relief under the plain error rule. The prosecutor elicited testimony that Mr. Agofsky failed to assert self-defense *at any time,* including the time immediately post-incident and continuing through the time of trial:

Q: Did he say anything about self-defense to you?

A: No, sir.

385

Q: Did he say anything about self-defense to you *at any time*?

A: No, sir.

Q: *From January 5, 2001, until today*?

A: No, sir.

Tr. Vol. 18, 61 (emphasis added).

978. Trial counsel made no objection to this line of questioning. In closing, the prosecutor exploited Mr. Agofsky's silence and repeatedly argued that Mr. Agofsky "never" told the authorities that he acted in self-defense ("What's most important is *never* did he claim self defense ... "*Never* has self defense been raised." ... "The defendant ... *never* said anything about self defense. He has *never* said self defense." Tr. Vol. 20, 397-98, emphasis added). The sole objection during summation was overruled and the jury was instructed only that Petitioner "does have a right not to testify and to remain silent, and the burden is always on the government." Tr. Vol. 20, 398.

979. As with the questioning of Matt, the prosecutor's persistent emphasis on "never" encompasses both pre- and post-arrest silence. When finally an objection came, it was overruled. The jury was never instructed to disregard the comments or that it could not consider post-arrest silence in determining whether the Commonwealth had met its burden of proving Agofsky did not act in self-defense. On the contrary, when the objection was overruled, the prosecutor continued to hammer the theme that self-defense should be rejected in light of Petitioner's silence "at any time." This is precisely the harm *Doyle* protects against. *Doyle v. Ohio*, 426 U.S. 610, 618-619, n.11 (1976) ("it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial").

980. No *Doyle* exception applies here. Mr. Agofsky did not testify in this case; thus his silence is not admissible to "impeach" him. The *Doyle* exception is limited to the narrow

circumstance where a defendant's testimony at trial is inconsistent with events or statements at the time of arrest for which, in fairness to the government, reference to silence may be necessary. *Doyle v. Ohio*, 426 U.S. 610, 620 (1976) ("It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest"). Nor, for obvious reasons, does his silence properly impeach the witnesses who swore Plant was the initial aggressor. *See, e.g., Hassine v. Zimmerman*, 160 F.3d 941, 949 (3d Cir. 1998) ("The *Doyle* footnote exception only permits the prosecution to use post-arrest silence to impeach the credibility of the defendant's version of what he did following arrest; the government cannot use the silence to impeach the exculpatory story itself or to draw inferences suggesting the defendant's guilt"). Mr. Agofsky was advised of his right to remain silent and was entitled to rely on that representation.[129] Furthermore, the *Doyle* protections apply even in the absence of formal *Miranda* warnings. *See United States v. Moore*, 104 F.3d 377, 386-87 (D.C. Cir. 1997) ("Supreme Court's purpose in requiring the arresting authorities to advise a defendant of his right to silence and counsel in *Miranda* was to assure that those rights were properly safeguarded before any statements he made could be used against him, not his silence . . . to hold . . . that the failure to give those same warnings permits the

---

[129] At his initial appearance, the court told him, "The right to silence means that you're not required to make any statements. If you've already made statements, you're not required to make any additional statements. You're not required to even answer the Court's questions. If you elect to remain silent, no harm will come to you. Nobody will try to force you to speak. Nobody will automatically assume that you're guilty." Initial Appearance Transcript, September 25, 2003, at 3-4.

state to use a defendant's silence against him turns a whole realm of constitutional protection on its head.").

981. The Fifth Circuit has made clear that *even if* some inquiry into a defendant's silence is allowed, it must be narrowly tailored to its permissible purposes and the jury so instructed. In *United States v. Rodriguez*, 260 F.3d 416, 421-22 (5th Cir. 2001), the prosecutor extensively cross-examined the defendant about his failure to tell authorities that his alleged theft was really a security test. In closing argument, the prosecutor emphasized the defendant's failure to come forward with the explanation sooner. The Fifth Circuit held that this violated *Doyle*. Although it was permissible to "clarify Rodriguez's direct testimony that possibly implied that he had given his exculpatory story to the postal inspectors during his initial interrogation," *id*. at 422, n.2, the prosecutor went too far in his closing argument:

> Consequently, in the present case, we conclude that the prosecutor, in his final comment during his closing argument, went beyond permissible impeachment and argued that the jury should infer Rodriguez's guilt directly from his post-arrest silence. The prosecutor argued that "the most important evidence in this case concerning Mr. Rodriguez's intent" was the contrast between his trial testimony and his failure to give his exculpatory story to the postal inspectors or supervisors: "On May 19, when the inspectors took him upstairs, he did not say ..., 'Hey, this is a security test.' ... And when management came in to talk to him about his job status, he did not say, not one time and not a peep, 'This is just a security test.' " Plainly, the prosecutor urged the jury to consider Rodriguez's silence as direct evidence of his guilt or knowing intent to fail to remit the deposit bags to the designated depository.

260 F.3d at 421-22.

982. The parallels to this case are strong. In *Rodriguez*, the defendant was asked:

> Q: You never voiced your innocence to a single person after they picked you up on May 19, 1998, did you, sir?

> A: No, sir.

> 260 F.3d at 420.

388

Here, Matt was asked:

> Q: Did he say anything about self-defense to you at any time?
>
> A: No, sir.
>
> Q: From January 5, 2001, until today?
>
> A: No, sir.

Tr. Vol. 18, 61. In both cases the prosecutor argued the defendant's silence was the "most important" evidence of guilt in the case. As in *Rodriguez*, even if the prosecutor was entitled to explore a supposed inconsistency between Mr. Agofsky's remarks to Matt and his claim of self-

defense,[130] he went too far in arguing that Mr. Agofsky's continuing silence up to the time of trial was evidence of his guilt.[131]

983.    This unfair inference was "particularly egregious," and the error one that "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings," *United States v.*

---

[130] Treating Mr. Agofsky's alleged reference to an obscure black comedy, "Weekend at Bernie's" ("Bernie's") as a statement positing a defense to murder inconsistent with his trial defense (and thereby opening the door to exploit Mr. Agofsky's silence) borders on the ludicrous and was invoked for the purpose of avoiding the rule in *Doyle*. In Bernie's, the two protagonists had to pretend that the victim, their crooked boss, was still alive so as to avoid becoming victims themselves of a hit man associated with his fraud. The prosecution set up a straw man by characterizing this supposed reference as a "defense" and then attempted to pigeonhole this comment into a *Doyle* exception. In *United States v. Laury*, 985 F.2d 1293, 1303 -1304 (5th Cir. 1993), the Fifth Circuit has rejected a similar attempt to circumvent *Doyle*:

> Although Laury made post-arrest statements to FBI agents, he did not discuss his whereabouts during the robbery. Therefore, nothing Laury told the FBI agents was inconsistent with his trial testimony that he was at a party on the date of the bank robbery. The prosecutor did not comment on what Laury told FBI agents, but on what he did not tell them. Jurors would naturally and necessarily view the prosecutor's line of questioning on cross-examination, as well as his statement in closing argument, as an attack on Laury's credibility. On cross-examination, the prosecutor suggests an implausible scenario-that Laury would prefer to languish in jail than tell the FBI about his alibi. The prosecutor meant to suggest that Laury's alibi was not disclosed prior to trial because it was not true, for the prosecutor's comments could not have served any other purpose. Therefore, the prosecutor's "manifest intent" was to comment on Laury's post-arrest silence with regard to his alibi. Only "[w]hen a defendant chooses to contradict his post-arrest statements to the police ... [does] it become[ ] proper for the prosecutor to challenge him with those [post-arrest] statements and with the fact that he withheld his alibi from them." *Lofton v. Wainwright*, 620 F.2d 74, 78 (5th Cir.1980). Because Laury's post-arrest and trial statements were not inconsistent, we view the prosecutor's comments as comments on Laury's post-arrest silence, and therefore in violation of *Doyle*.

*United States v. Laury*, 985 F.2d 1293, 1303 -1304 (5th Cir. 1993). Under *Laury*, the comment has to be truly inconsistent to permit impeachment. That was not shown here.

390

*Garza*, 807 F.2d 394, 396 (5th Cir. 1986), and thus relief would have been compelled upon plain error review.

984. The Fifth Circuit has reviewed *Doyle* claims for plain error. *See United States v. Urbina*, No. 02-4046, 2003 WL 1923012, at \*1 (5th Cir. April 3, 2003) (finding *Doyle* violation but denying relief "because the testimony was not significant in the context of the entire trial"). Here, in a clear and obvious *Doyle* violation, the prosecutor argued that the fact that Mr. Agofsky "never," from the time of the incident until trial (and encompassing the post-arrest period) asserted that self-defense was the "most important" factor they should consider in assessing whether to accept the defense. Tr. Vol. 20, 397. This was a close case with two witness testifying that Plant, a violent career criminal, was the initial aggressor. Weapons were easily introduced into the cages and the guards incapable of intervening. This "most important," and likely dispositive, factor was one the jury should never have heard, much less considered in its guilt deliberations. Mr. Newton was deficient for failing to identify and raise this claim.

### ii. The Morgan Claim

985. Ground 12.4, *infra*, challenges the trial court's decision to seat two jurors who were not "life-qualified" because their overriding pro-capital punishment views precluded them from considering mitigating evidence. *See infra*, Ground 12.4 (citing *Morgan v. Illinois*, 504 U.S. 719 (1992)). Mr. Newton responds that this claim "would not have struck me as worthy of inclusion in

---

[131] Notably, in *Rodriguez*, a "curative" instruction similar to the one given here did not "cure" the error. There, after several improper references, the defense counsel finally objected that "it's a comment on his right not to say anything" and the court sustained the objection, instructing the jury to "disregard any suggestion that Rodriguez did not have a right to remain silent." 260 F.3d at 420. The Court found that despite this admonition, "The prosecutor ... continued to dwell upon Rodriguez's post- *Miranda* warning silence and, in effect, argued that the jury should infer that Rodriguez was guilty of willingly and knowingly failing to remit the deposit bags to the designated depository because he chose to remain silent ..." *Id.* Here the sole objection was overruled and as in *Rodriguez*, the prosecutor continued to argue Mr. Agofsky's guilt based on his silence.

the brief under the plain error standard." SA 2355. He argues that the claim lacks merit because the appellate court had an obligation to give "substantial deference" to the trial court's implicit finding on bias, that the defense had the burden of proving bias, and that trial counsel did not attempt to do so.[132]

986.    Mr. Newton states the standard of review without giving any reason for concluding that Mr. Agofsky's *Morgan* claim could not meet that standard. In fact, for both jurors, the choice of sentence turned upon evidence of guilt or of premeditation, necessarily making mitigating evidence irrelevant to them. Both jurors sat on Mr. Agofsky's jury. Accordingly, Mr. Newton could have satisfied the plain error standard by demonstrating that two jurors who sat on Mr. Agofsky's jury were not qualified to deliberate impartially on the appropriate sentence, and that the trial court's decision to seat them, lacking record support, was an abuse of discretion. *See United States v. Nelson*, 347 F.3d 701, 710-11 (8th Cir. 2003). "If even one such juror is empanelled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan*, 504 U.S. at 729. Mr. Newton's failure to raise this claim was deficient performance.

> iii.    *The Claim Concerning the Burden-Shifting and Erroneous Murder Instructions.*

987.    The trial court unconstitutionally failed to instruct the jury that the prosecution had the burden of disproving heat of passion in order to prove the malice required for a murder conviction. Indeed, the court charged the jury on heat of passion only in connection with manslaughter, and even then never told the jurors that Mr. Agofsky was entitled to the benefit of any reasonable doubt about whether he acted in the heat of passion—and hence an acquittal of murder and conviction of no more than manslaughter. The court never explained that malice and

---

[132] This Motion also argues that trial counsel were ineffective in jury selection, in part because of their failure to challenge these jurors. *See* Ground 12.1(H).

heat of passion were, by definition, mutually exclusive. In all these respects, the murder instructions plainly violated *Mullaney v. Wilbur*, 421 U.S. 684 (1975), then a twenty-nine-year-old precedent of the Supreme Court. As described above, Mr. Newton was ineffective for not challenging the instruction on appeal. *See Sanders v. Cotton*, 398 F.3d 572 (7th Cir. 2005) (appellate counsel ineffective for failing to challenge, on direct appeal, failure to charge jury that state had burden of disproving "sudden heat").[133]

988.    Mr. Newton responds that even if he had identified this point he would not have raised it. SA 2352, 2355-56. He maintains that it would have been unworthy of inclusion because (1) the instruction tracked the Fifth Circuit pattern jury instructions; (2) the claim was foreclosed by the panel opinion in *United States v. Molina-Uribe*, 853 F.2d 1193 (5th Cir. 1988), *overruled on other grounds*, *United States v. Bachynsky*, 934 F.3d 1439 (5th Cir. 1991), and (3) language in the panel opinion in *United States v. Browner*, 889 F.2d 549, 552 (5th Cir. 1989), indicating that "the malice element . . . implicitly forced prosecutors to disprove the existence of adequate provocation," was only dicta and, to the extent it contradicted *Molina-Uribe*, could not overrule another panel. SA 2356. Nevertheless, Newton acknowledges that, having represented Molina-Uribe in his § 2255 appeal, he was aware that similar instructions had been challenged on *Mullaney* grounds. *Id*.

989.    None of Newton's reasons can justify bypassing a claim that an instruction central to the defense flatly contradicted well-settled Supreme Court precedent.

990.    *First*, pattern instructions are only guides. *See United States v. Williams,* 20 F.3d 125, 132 (5th Cir. No. 1994) (while the Pattern Jury Instructions provide a useful guide for the

---

[133] Newton was also ineffective for failing to brief and argue additional deficiencies in the murder instructions delineated in Point I.I., *supra.*

district courts, they are not law); Fifth Circuit Pattern Jury Instructions, Introduction (2001), *available at* http://www.lb5.uscourts.gov/juryinstructions//crim2001.htm (last visited Aug. 30, 2009) (pattern charges "do not presume to be a legal treatise," but are rather "an aid to guide your instructing the jury on each individual case"). In this instance, the Circuit's pattern instructions give inaccurate guidance. Every other Circuit that provides a pattern instruction for murder and voluntary manslaughter directs the district judge to give an instruction complying with *Mullaney* in a heat of passion case. *See* Eighth Circuit, Model Criminal Jury Instructions (2009), Nos. 6.18.1111A ("If the defense of heat of passion is raised, the instruction should be modified to add "and not in the heat of passion as submitted in instruction ___."); Ninth Circuit Model Criminal Jury Instructions, No. 8.90, Murder - Second Degree, Comment (suggesting the following language once defendant raises heat of passion: "The defendant claims to have acted in sudden quarrel or in the heat of passion caused by adequate provocation, and therefore without malice aforethought. . . . In order to show that the defendant acted with malice aforethought, the government must prove the absence of heat of passion beyond a reasonable doubt."); Tenth Circuit, Criminal Pattern Jury Instructions (2005), No. 2.52, Use Note (citing *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985), and indicating that defendant who sufficiently raises heat of passion defense entitled to instructions informing jury of theory of defense and government's burden of proving absence of heat of passion in order to convict); Eleventh Circuit, Pattern Jury Instructions (Criminal Cases), 2003, No. 46.2, at 296-97, Annotations and Comments ("Once evidence is presented that the defendant's capacity for self-control was impaired by an extreme provocation, the burden is on the Government to prove beyond a reasonable doubt the absence of sudden quarrel or heat of passion before a conviction for murder can be sustained."). *Links to Out-*

*of-Circuit Pattern Instructions available at* http://www.lb5.uscourts.gov/juryinstructions/ (last visited August 31, 2009).

991. *Second*, *Molina-Uribe* does not control Mr. Agofsky's case. As explained in Ground 12..1(I), *supra*, in Mr. Agofsky's case, in contrast to *Molina-Uribe,* the malice element was presumed, and the instruction was central—not irrelevant—to the defense presented at trial. Thus, in Mr. Agofsky's case, the instruction violated not only his due process right to proof beyond a reasonable doubt of every element of the offense, but also his due process and compulsory process right to present a defense. Furthermore, *Molina-Uribe* could not survive *Apprendi* or the Eighth Amendment standards that govern a capital case. In any event, Mr. Newton pursued three other claims foreclosed by prior panel opinions, ostensibly to preserve them for possible *en banc* review that he then failed to seek. Even if *Molina-Uribe* did control this case, Mr. Agofsky's instruction so obviously violated *Mullaney* that Mr. Newton, who admits that he represented Molina-Uribe and was aware of this issue, should have identified it in Mr. Agofsky's case, raised it, and sought *en banc* review.

992. *Third*, while the *Browner* language was dictum, it was dictum that simply restated what was obvious from *Mullaney* and the plain language of the statute defining manslaughter: "Manslaughter is the unlawful killing of a human being *without malice* . . . upon a sudden quarrel or heat of passion." 18 U.S.C. §1112 (emphasis added). Courts have frequently repeated the same point made in *Browner*. In *Lizama v. U.S. Parole Com'n*, 245 F.3d 503, 506-07 (5th Cir 2001), the Court of Appeals observed:

> Specifically, Lizama contends that he killed in a "heat of passion" induced by Hernandez's blow to the back of his head, which negates the existence of malice, an essential element of second degree murder. A defendant who kills in a heat of passion in response to adequate provocation is guilty only of voluntary manslaughter. *United States v. Browner,* 889 F.2d 549, 552 (5th Cir.1989).

*See also* Note, Fifth Circuit Pattern Jury Instructions (2001), No. 2.56, Murder Second Degree, *available at* http://www.lb5.uscourts.gov/juryinstructions//crim2001.htm (last visited Aug. 30, 2009) (endorsing *Lizama*'s "recent discussion of this statute").

993.    In *Sanders v. Cotton, supra,* 398 F.3d 572, the Court of Appeals for the Seventh Circuit granted *habeas* relief for the ineffective assistance of appellate counsel. Like Mr. Newton, Sanders's appellate counsel did not raise a *Mullaney* claim challenging a murder/manslaughter instruction that, like the one in Mr. Agofsky's case, failed to place the burden of proving "sudden heat" on the prosecution. 398 F.3d at 577. As under federal law, Indiana law provides that "sudden heat" negates malice. *Id.* The Court of Appeals elaborated:

> Here, the jury instructions do not contain any statement that properly places the burden of proof on the State for showing the absence of sudden heat to gain a murder conviction. Rather, the only time the jury instructions mention the burden of proof for sudden heat is in the manslaughter instructions, where they erroneously require the State to prove the presence of sudden heat. . . . [T]he jury was never informed of each of the required elements of the government's proof for murder and attempted murder, and if the jury was not required to find Sanders guilty beyond a reasonable doubt on all the elements of murder and attempted murder, he did not receive the protections of federal due process. The Indiana appellate court's reliance on the manslaughter instructions' mitigation language to correct the erroneous instructions was unreasonable because advising the jury that sudden heat is a mitigating factor does nothing to inform it that the absence of sudden heat is an element of murder or attempted murder and that it is the prosecution that bears the burden of proof.

*Id.* at 582. The Court accordingly granted *habeas* relief. *Id.* at 585.

994.    In Mr. Agofsky's case, the murder and manslaughter instructions unconstitutionally shifted the burden of proof in the same manner as in *Sanders*, and suffered from numerous other deficiencies enumerated in Ground 12.1(I), *supra.* Newton could have established that the erroneous instructions were highly prejudicial by pointing to the inconsistency between the jury's premeditation finding at the guilt-innocence phase and its finding of no intent at the penalty phase.

396

For a jury struggling with uncertainty over the level of culpability necessary for conviction of the greater offense, a burden-shifting and otherwise erroneous instruction could have meant the difference between death-eligible murder and manslaughter. Mr. Newton's failure to present that argument to the Court of Appeals was deficient performance.

> iv.     The Failure to Admonish Jurors to Consider Certain Testimony With Caution

995.    Mr. Agofsky argues above that Mr. Newton was deficient for failing to challenge an instruction that the trial court told the jury concerned "immunity." The instruction admonished the jurors to view certain types of evidence with caution, including the testimony of witnesses with "an interest in the outcome of the case." Tr. Vol. 20, 349-50. Richard Ward, the only eyewitness who testified for the government, acknowledged that he might receive some consideration for his testimony in the terms of his supervised release. Tr. Vo. 19, 232-33. Yet the instruction was so misleadingly phrased that the jury could have had no idea it could apply to Ward, who had not received immunity for his testimony and did not appear by name in the instruction although he was the only witness to whom it applied.

996.    Mr. Agofsky argues that Mr. Newton's failure to challenge the instruction as plain error was deficient performance. *See supra*, Ground 12.3(C). Newton responds that he could not have satisfied the "prejudice" prong of the plain-error standard because the court gave the "immunity" instruction. He ignores Mr. Agofsky's argument that the "immunity" instruction was useless because the jury could not tell that it applied to Ward. He also ignores Ward's key role in the trial. The government procured its only eyewitness's testimony at the last minute, over two years after the offense and shortly after he had been denied early release. Although he denied receiving any explicit promises, he admitted that he testified with some hope of favorable

treatment. Newton could have made a very persuasive argument that the court's failure to insure that the jury scrutinized his testimony with caution severely prejudiced the defense.

997.    Mr. Newton makes an equally beside-the-point response to Mr. Agofsky's argument that he should have challenged the instruction on Mr. Agofsky's statement to Officer Matt. The instruction directed the jurors to determine only the statement's voluntariness and not its accuracy. It told them to consider the evidence concerning the statement "with great care," but only in determining whether it "was knowingly and voluntarily made." Tr. Vol. 20, 352-53. The defense contended, not that this statement was involuntary, but that Officer Matt mis-remembered what Mr. Agofsky had said. Accordingly, the instruction failed to advise the jurors appropriately of their duties. *See Crane v. Kentucky*, 476 U.S. 683, 688 (1986) (holding that exclusion of testimony concerning circumstances of confession denies defendant opportunity to challenge credibility of testimony before jury).

998.    Newton rejects this claim, asserting that he "could not have made a non-frivolous argument under the rigorous 'prejudice' prong of under the plain error standard, particularly in view of the . . . 'voluntariness' instructions[.]" SA 2356. His reliance on the voluntariness instruction as a reason for not challenging the voluntariness instruction, without addressing the court's failure to require the jurors to determine whether Officer Matt had reported the statement accurately, is circular and non-responsive. And he could have made a strong prejudice argument; the prosecution relied heavily on Matt's account of Mr. Agofsky's statement to support its argument for first-degree murder. Beginning on the first page of his summation, the prosecutor argued that "the heart of the matter" was Officer Matt's testimony and Mr. Agofsky's "own statements," urging the jurors to infer from Matt's version that "It means premeditation, premeditation." Tr. Vol. 20, 366-67. Newton's failure to raise this point was deficient.

*v.*    *The Erroneous Exclusion of Mitigating Evidence*

999.    As explained in Ground 12.2(G)(1), *supra*, trial counsel began to elicit a description of Mr. Agofsky's background from Dr. Dan Roberts, but stopped short when the trial court sustained the prosecutor's unsound hearsay objection. *See* Point 12.2(G)(1). The governing statute, a rule of evidence, and the Constitution all require federal district courts to receive relevant hearsay evidence offered in mitigation at a penalty trial. *See* 28 U.S.C. § 3593(c); *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (citing *McKoy v. North Carolina*, 494 U.S. 433, 440-41 (1990)); *Green v. Georgia*, 442 U.S. 95, 97 (1979); Fed. R. Evid. 1101(d)(3). The trial court's exclusion of the background information Dr. Roberts had gathered from Mr. Agofsky and his mother was plain error that Newton could and should have raised on direct appeal.

1000.    Newton now responds that he would not have identified the claim because the mitigating information identified comes from extra-record sources and thus was not part of the record on appeal. SA 2357. While Mr. Agofsky does offer extra-record evidence to support his related claim that trial counsel were ineffective for abandoning any effort to introduce background hearsay information that Dr. Roberts could have provided, *see* Ground 12.2(G)(1), the record on direct appeal already contained everything Newton would have needed to demonstrate plain error, using the four-part test of *United States v. Olano*, 507 U.S. 725, 732 (1993). First and second, the court committed error that was "plain"; the ruling contradicted the governing statute and evidence rule, and the Constitution. *See Olano* 507 U.S. at 732. Mr. Newton does not assert otherwise.

1001.    Third, the error affected Mr. Agofsky's substantial rights, *see id.* at 732 (citing F.R. Crim. P. 52(b)), because there was a reasonable probability that, but for the error, the result of the penalty phase would have been different. A reasonable probability is less than "more likely than not," but is sufficient to undermine confidence in the outcome of trial. *See United States v. Holmes*, 406 F.3d 337, 365 (5th Cir. 2005) (equating *Olano* "affects substantial rights" standard with

*Strickland* "reasonable probability" standard, 466 U.S. at 694). Mr. Newton knew from the record that Dr. Roberts had interviewed Mr. Agofsky and his mother, and learned that Mr. Agofsky had lost his father as a child, that he had two brothers, and that he had grown up in Missouri. Tr. Vol. 22, 211-12. Not a single scrap of other evidence at the penalty phase gave the jury any reason to view Mr. Agofsky as a human being. Furthermore, as Newton was aware, the jurors were divided or conflicted about the presence or absence of intent to kill and thus about Mr. Agofsky's guilt of capital murder. Even the limited record facts at Newton's disposal thus establish at least a reasonable probability—that is, at least a probability less than more likely than not—that the outcome of the penalty phase would have been different if the jury had learned background information from Dr. Roberts. *See Skipper v. South Carolina*, 476 US 1, 8 (1986) (granting relief because Court "cannot be confident" that exclusion of mitigating evidence had "no effect" on penalty verdict, and "reasonably likely" that exclusion "may have affected" jury's decision); *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000) (erroneous exclusion of surrebuttal testimony by defense mental-health expert was not harmless beyond a reasonable doubt).

1002. Finally, Newton could have argued convincingly that the Court of Appeals should exercise its discretion to grant relief because the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736. The erroneous exclusion of relevant mitigating evidence, especially mitigating evidence as conventional and crucial as a description of the defendant's family background, was a grave injustice. As the Court of Appeals has recently stated:

> The *Tennard* Court stated that, rather than a test for "constitutional relevance," the Court's ruling in *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), taught that juries must be permitted to give effect to any mitigating evidence that holds general relevance:

> [T]he meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard--any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence--applies. Id. at 2570 (citations and internal quotations omitted).

*Tennard v. Dretke*, 442 F.3d 240, 254 (5th Cir. 2006) (citing *Tennard v. Dretke*, 542 U.S. 274 (2004)). The trial court's ruling deprived Mr. Agofsky of that constitutional right, enshrined in a long line of Supreme Court cases (*see, e.g., id.*, 542 U.S. at 285), as well as the controlling statute and evidence rule. Mr. Newton could easily have demonstrated plain error and his failure to challenge the trial court's obviously erroneous ruling was deficient performance.

vi.    *The Improper Cross-Examination and Argument on Antisocial Personality Disorder*

1003.  Mr. Agofsky argues above that Mr. Newton was deficient for failing to challenge the prosecutor's misleading cross-examination and summation argument on Mr. Agofsky's non-existent antisocial personality disorder ("ASPD"). *See* Ground 12.3(C). Mr. Newton states that he would not have identified this claim because the prosecutor's misleading actions "did not impair the strategy of the defense," which, as Newton construes it, entailed admitting that Mr. Agofsky would present a future danger unless prison officials controlled him. Misconstruing the record, Newton concludes that:

> Furthermore, the defense expert himself agreed on cross-examination that Mr. Agofsky would qualify as having ASPD but for the fact that the expert was "not able to formulate activities or dispositive behavior prior to [age] eighteen." Regardless of whether this expert opinion was incorrect and regardless of whether the prosecutor's own expert offered a contrary opinion outside of the jury's presence, it was the opinion offered by the defense's own expert to the jury—and was part of the record that confronted me on direct appeal as appellate counsel.

SA 2357.

401

1004.    In fact, the prosecution never presented any expert testimony to counter Dr. Roberts. More important, Newton understates the impact of the prosecutor's misleading use of Dr. Roberts's responses. As trial counsel established at a hearing out of the jury's presence in connection with another witness, Mr. Agofsky does not suffer from ASPD and the "V-code" of adult antisocial behavior is not a mental disorder. Tr. Vol. 21, 164. It was misleading to question Dr. Roberts at length about a diagnosis that did not apply to Mr. Agofsky. While Mr. Newton does not believe that the ASPD label, a personality disorder diagnosis, damaged the defense, the prosecutor apparently anticipated that it would. He spent over half of his cross-examination attempting to make the ASPD label stick. Tr. Vol. 22, 224-28. And Mr. Newton does not even address the very beginning of the prosecutor's penalty phase summation, in which he leaped misleadingly from "adult antisocial behavior" to ASPD to name-calling: "[H]is own psychologist called it antisocial disorder. Regular folks, you just call it that he's a killer." Tr. Vo. 24, 332-33.

1005.    In a case in which Mr. Agofsky faced the death penalty for a fight in a dangerous prison, an inaccurate prosecutorial argument that Mr. Agofsky's own expert had rendered a "diagnosis" that he had a "disorder" that made him a "killer" was devastating and, ultimately, damning. Mr. Newton's failure to perceive the importance of the prosecutor's dishonest elaboration on a fictional diagnosis was deficient performance.

### 6.    Conclusion

1006.    Mr. Newton sketched out only four claims that the Court of Appeals panel had the power to address, one of which, the double jeopardy claim, could relieve Mr. Agofsky of only one of his death sentences. As Mr. Agofsky could only die once, he needed a basis for relief on both capital murder counts if his appeal was to do him any good. At least one of the claims Mr. Newton outlined in his brief, the inconsistent verdict claim, could have won him a new trial—if Mr. Newton had located authority whose analysis supported his argument and had explained to the Court of

Appeals how the inconsistency arose from juror arbitrariness and thus required reversal. Newton failed to raise other winnable grounds for appeal, including the prosecutor's unconstitutional comments on Mr. Agofsky's right to remain silent, a burden-shifting instruction on the relationship between murder and manslaughter, and the trial court's erroneous exclusion of relevant mitigating evidence. He raised not a single claim that would have required a new trial of Mr. Agofsky's guilt or innocence.[134] In all these respects, Newton's performance was deficient. There is a reasonable probability that, but for Mr. Newton's failure to make a serious effort to secure relief for his client, the outcome of Mr. Agofsky's appeal would have been different. For all the reasons above and elsewhere in this Motion, Mr. Agofsky received ineffective assistance of appellate counsel. U.S. Const. amend. V, VI. This Court must accordingly order an evidentiary hearing and grant relief on this ground.

---

[134] At the very least, Newton could and should have argued that the double jeopardy violation required a new trial, not only of the penalty phase, but of the guilt-innocence phase. Requiring the government to elect one count, after conviction for both, could not make Mr. Agofsky whole for the trial court's failure to require the election before trial. The multiplicitous counts permitted spillover prejudice from the "murder by a life-sentenced inmate" count (Count 1), which informed the jury of an otherwise inadmissible eleven-year-old offense and the resulting life sentence, on the "federal murder" count (Count 2). On the other hand, Count 2, which required premeditation, created its own spillover effect on Count 1, which did not. It was largely because the government had the burden of proving premeditation that the government sought to introduce the otherwise inadmissible, and highly inflammatory, Miele assault evidence at the guilt-innocence phase pursuant to Fed. R. Evid. 404(b). *See* Tr. Vol. 17, 36-37, 41 (prosecutor argues Miele assault relevant to showing of planning and intent). Newton was deficient for failing to point out on appeal that, if the district court had properly dismissed one count pretrial, trial counsel would not have been forced to fight the spillover prejudice battle on two fronts at once.

403

## IV. GROUND 12.4: MORGAN-EXCLUDABLE JURORS WERE SEATED ON THE FINAL JURY.

1007. *Morgan v. Illinois*, 504 U.S. 719 (1992), stands for the proposition that a defendant is entitled to directly inquire whether a juror would "automatically" vote for the death penalty upon conviction regardless of the circumstances (the so-called "reverse" *Witherspoon* question). *Id.* at 729.[135] Such "ADP" jurors are properly excluded because they "obviously deem mitigating evidence to be irrelevant to their decision to impose the death penalty; they not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." *Id.* at 736. The *Morgan* standard of exclusion (sometimes also referred to as "life qualification"), however, encompasses more than the class of ADP jurors, i.e., those who would automatically choose death as a general proposition for all convicted of murder. Pursuant to *Morgan*, "[a]ny juror to whom mitigating factors are . . . irrelevant," not merely those jurors who "obviously" deem it so, "should be disqualified for cause, for [they have] formed an opinion concerning the merits of the case without basis in the evidence developed at trial." *Id.* at 738-39. This much was recognized by Justice Scalia: "The Court today holds that the Constitution requires that voir dire directed to this specific 'bias' be provided upon the defendant's request; and that the more general questions about 'fairness' and ability to 'follow the law' that were asked during voir dire in this case were inadequate." *Id.* at 739 (Scalia, J., dissenting).

1008. Seated Juror #23 indicated that he would impose the death penalty automatically for premeditated murder. Tr. Vol. 10, 67. While he initially stated that he would be willing to

---

[135] General inquiries are insufficient to accomplish this. *Id*. 736. Rather, prospective jurors must be adequately questioned so as to determine whether their pro-death penalty views would "'prevent or substantially impair the performance of his duties in accordance with his instructions and his oath.'" *Id*. at 729 (quoting *Adams*, 448 U.S. at 45).

weigh the aggravating factors against the mitigating factors, he later stated that the death penalty would be "appropriate" for "premeditated" murder. After the prosecutor explained that the court would instruct him that a defendant was death-eligible for both premeditated and malice murder, he stated that those instructions did not "trouble" him, but he did not modify his initial statement of when death would be appropriate, namely for a conviction of premeditated murder. Tr. Vol. 10, 68-69. It thus appears from the record that Juror #23 would automatically impose the death penalty if the jury found Mr. Agofsky guilty of premeditated murder.

1009.   Seated Juror #58 similarly indicated that he would impose the death penalty automatically if the jury found the defendant's guilt. Tr. Vol. 12, 45. Juror #58 wrote on his questionnaire that crimes were appropriate for the death penalty where "there was strong evidence proving it was intentional." *Id*. at 47. He indicated that a death verdict would depend upon the circumstances, but he followed by stating, "If there would be enough evidence to convict them of their crime and there's enough evidence to convict (sic) that they did it, then I do believe that they would need to receive it." *Id*. at 45.

1010.   A juror whose choice of sentence rests upon evidence of guilt or evidence of premeditation necessarily considers mitigating evidence "irrelevant" under *Morgan*. 504 U.S. at 738-39. The presence of Juror #s 23 and 58 on the jury violated *Morgan*, which prohibits the empanelling of jurors who will automatically sentence the defendant to death, if he is found guilty. "If even one such juror is empanelled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan*, 504 U.S. at 729. The failure to excuse these unqualified jurors thus requires reversal of Mr. Agofsky's death sentence.

## V. GROUND 12.5: THE GOVERNMENT WITHHELD FAVORABLE EVIDENCE THAT WAS MATERIAL TO GUILT OR INNOCENCE AND TO PUNISHMENT.

1011. The government withheld evidence material to both phases of trial, keeping from the defense information that undermined the opinion testimony and credibility of government witnesses, evidence that implicated others or could have been used to rebut the government's proofs in the Noel State Bank case (the basis for several aggravating factors), and evidence that could have been used in mitigation of punishment. It thus violated Mr. Agofsky's right to due process of law. U.S. Const. Amend. V; *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

1012. A prosecutor has a constitutional duty to provide the defense with any evidence favorable to the accused, and material either to guilt or innocence or to punishment. A prosecutor's suppression of such evidence violates due process, irrespective of the prosecutor's good or bad faith. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Brady*, 373 U.S. at 87); *Kyles v. Whitley*, 514 U.S. 419 (1995); *Giglio v. United States*, 405 U.S. 150 (1972).

1013. "Favorable" evidence can take many forms. It can include evidence tending to negate the defendant's guilt or implicate another. *See Graves v. Dretke*, 442 F.3d 334, 343 (5th Cir. 2006) (relief granted because evidence implicating co-conspirator's wife was exculpatory although state argued it was consistent with "three person" theory); *DiLosa v. Cain*, 279 F.3d 259 (5th Cir. 2002) (relief granted because of suppression of evidence that would have corroborated defense that defendant's wife killed by unknown intruders); *Guerra v. Johnson* , 90 F.3d 1075, 1080 (5th Cir. 1996) (relief granted because police failed to disclose material information regarding who was seen carrying murder weapon moments after shooting); *cf. Finley v. Johnson*, 243 F.3d 215 (5th Cir. 2001) (relief granted under "actual innocence" exception to procedural default bar, because suppressed evidence that victim had been subject to restraining order highly "probative of" defendant's "necessity" defense); *Hudson v. Whitley*, 979 F.2d 1058, 1064 (5th Cir. 1992) (cause

and prejudice for successor petition established because state suppressed evidence that eyewitness originally identified third party).

1014. Favorable evidence within the *Brady* doctrine can include evidence that undermines the credibility of a government witness. *See Banks*, 540 U.S. at 691; *Giglio*, 405 U.S. at 154; *United States v. Sipe*, 388 F.3d 471, 491-92 (5th Cir. 2004) (relief granted for suppression of evidence showing bias of government star witness, of more substantial benefits to other witnesses, and of prior charge on which government witness had been acquitted); *United States v. Fisher,* 106 F.3d 622, 634-35 (5th Cir. 1997),[136] (relief granted because government failed to disclose FBI report directly contradicting key witness); *see also Dickson v. Quarterman*, 462 F.3d 470, 477 (5th Cir. 2006 ) (rejecting claim on non-materiality grounds but criticizing state for failing to turn over interview statements by two key witnesses in death penalty case). The government must disclose agreements with witnesses whether or not they are "final." *See United States v. Bagley*, 473 U.S. 667, 683 (1985) ("The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction")

1015. Favorable evidence within the *Brady* doctrine can also include evidence relevant to punishment. *See Banks*, 540 U.S. at 691 (penalty phase witness's informant status was *Brady* material); *East v. Johnson*, 123 F.3d 235, 237-38 (5th Cir. 1997) (reversing death sentence because government failed to disclose criminal record of key witness used to prove future dangerousness, which would have led to other information further undermining her credibility).

1016. The duty to disclose favorable evidence is not limited to evidence in the actual possession of the prosecutor. Rather, it extends to evidence in the possession of the entire

---

[136] *Abrogated on other grounds by Ohler v. United States,* 529 U.S. 753 (2000).

407

prosecution team, which includes investigative and other government agencies. *See Kyles*, 514 U.S. at 437; *see also Strickler v. Greene*, 527 U.S. 263, 275 n.12 (1999).

1017. Withheld evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See Graves*, 442 F.3d at 339 (quoting *Kyles*, 514 U.S. at 433); *Dickson*, 462 F.3d at 477. To demonstrate materiality, a defendant need not show by a preponderance that the suppressed evidence would have resulted in a different verdict, but rather whether the suppressed evidence undermines confidence in the outcome. *Graves*, 442 F.3d at 339 (citing *Kyles*, 514 U.S. at 434). The defendant need not establish that the suppressed evidence would have rendered the proof of guilt insufficient; harmless error analysis does not apply; and the reviewing court must consider the materiality of *all* of the suppressed evidence collectively, not item by item. *Id.* at 340 (citing *Kyles*, 514 U.S. at 435-36).

1018. In Mr. Agofsky's case, the government repeatedly violated these constitutional standards, although the defense put the government on notice that it sought disclosure of exculpatory and impeachment evidence relevant to either Mr. Agofsky's guilt or innocence or the penalty. *See* Dkt. #32, pp. 7, 10; *see also* Dkt. #38.

1019. For example, the government elicited the opinion testimony of Mr. Agofsky's former teacher at the Executive Security Institute in Aspen, Robert Duggan, that the use of force under the circumstances of this case was not "necessary to be used in self defense." Tr. Vol. 19, 210-11. The prosecution relied on Duggan's opinion in summation, arguing that his testimony was "critical." Tr. Vol. 20, 371. However, the prosecution failed to disclose to the defense that one of Mr. Agofsky's first teachers, Gerald Edmondson, who had known Mr. Agofsky from the age of

nine and taught him for nearly ten years, held a contradictory opinion and would have been willing to offer that opinion in his defense at trial.

1020. Shortly before the trial in Beaumont, someone from the prosecution called Edmondson and told him that the government wanted to call him as an expert. Someone talked to him on the phone about the case, and later the government flew him down to Beaumont for the trial. Three government representatives visited him at his motel at about 7:00 p.m. the night before he was to testify. A512.

1021. The interviewers asked Edmondson his expert opinion about whether the use of force in this case had been excessive. He told them that "we could not know whether it was excessive force," it was not necessarily excessive just because someone had died, and that he could not know Mr. Agofsky's intent except that he intended to survive in a prison environment. Edmondson told the interviewers: "Force is not excessive if you are trying to survive. This is a prison, it's not Main Street. You life will depend on your judgment. Are you going to give this guy the benefit of the doubt, and can you afford to?" A512.

1022. After giving the prosecutors his expert opinion, Edmondson insisted on telling them that their description of Shannon and the crime facts were in direct conflict with the Shannon he knew. Shannon lived by a code of ethics that would have prohibited a killing that was not in self-defense. When confronted about the fact that the murder was "gruesome," Edmondson repeated. "It was in prison, and I wasn't there, and you weren't there, and I just don't think that we can say what happened." A512.

1023. The next day at the courthouse, Edmondson sat in the hallway until a member of the prosecution team came out of the courtroom, thanked him for coming, and told him that the

government would not be calling him as a witness. Almost immediately, Edmondson and Duggan, who had testified already, were brought to the airport for a flight back to Tulsa. A512-13.

1024.   Several months before the trial in Beaumont, before Edmondson had been subpoenaed by the government, he received a call from the defense asking if he would be willing to testify for Mr. Agofsky. Although he was told that the defense would contact him in the future to talk about details, he never heard from them again. And the prosecution never informed the defense of the favorable information that Edmondson disclosed on the eve of his testimony, during the trial—that Edmondson could have contradicted Duggan's opinion about Mr. Agofsky's need to use force when Plant attacked him. A512.

1025.   Thus, the government failed to disclose to the defense information from Edmondson that would have been favorable if presented at the guilt phase to rebut Duggan's expert opinion, or at a minimum could have been presented in mitigation at the penalty phase.

1026.   Furthermore, the government failed to disclose that, between the time of Mr. Agofsky's Oklahoma conviction in 1997 and the 2004 Beaumont trial, information came to light that severely undermined the credibility of the FBI tape expert, Robert Webb, who testified in the Oklahoma trial and claimed that he had conclusively "matched" the piece of tape found in the river (allegedly containing Mr. Agofsky's fingerprints) with the one connected to the chair in which the victim was found. In the intervening years, it has become clear that Webb has falsified evidence and presented false testimony in several cases. Because this information about the government's witness came to light in the course of official government investigations, it should have been disclosed to the defense.

1027.   The government also violated *Brady* by withholding crucial exculpatory evidence that would have undermined the testimony of prison-yard witness Richard Ward, the sole witness

to claim that Mr. Agofsky was the initial aggressor in the January 5, 2001 cagefight. Undisclosed was an agreement with Ward for early release, and favorable treatment upon release, from prison in exchange for his testimony. A further violation of *Giglio v. United States*, 405 U.S. 150, 153 (1972), occurred when the government stood silent in the face of denials by Ward that an agreement existed.

1028. Ward had always claimed he did not see the incident, which even by the government's account only lasted about eleven seconds. Over three years later, on February 9, 2004, Ward received news that his request for supervised release to a Community Corrections Center had been denied, *see* SA 2378 *(Letter of February 9, 2004 from Mike Wright to Marilyn S. Taylor)*, despite an earlier favorable recommendation. *See* SA 2379-*2380 (Program Review Report, January 13, 2004).*[137] Ward soon changed his tune and pronounced for the first time that he did see the incident. *See* SA 2548 *(Ward FBI Interview of May 14, 2004)*. He coupled this belated revelation with a specific request for assistance from the FBI in gaining favorable treatment regarding his future release. *See* SA 2382 *(Ward FBI Interview of June 19, 2004)* ("Ward asked if he could have his supervised release commuted."). The government consistently denied making Ward any promises in exchange for his testimony ("Ward was told he that he would not be promised any reward for his testimony and that any reduction in sentence would be up to the prosecutors in his original sentencing case and the court that sentenced him"). *Id.*

1029. It is now clear that the government failed to disclose the full extent of its agreement with Ward, an agreement which induced him to lie at trial.[138] Contrary to its assertions at trial, the

---

[137] Ward filed a grievance noting his favorable recommendation. See Request to Staff Member of May 6, 2004. Reconsideration was denied on May 19, 2004. See Response to Request to Staff Member of May 19, 2004. SA 2546, 2547.

[138] Ward now admits he cannot say who was the initial aggressor. See SA 2128-2129.

411

government "promised [Ward] a new beginning thru (sic) a witness protection program," assured him he would be released "7 days after court" and that he " would not be subjected to supervised release" upon his discharge from prison. *See* SA 2131 *(Declaration of Richard Ward)* at 4. Government agents further advised Ward that he would have to "trust" them as they would not commit the agreement to writing ("They told me they would not put it on paper and I would have to trust them"). *Id.* Ward was instructed as well to conceal this agreement. "They told me this can not be disclosed because it would ruin the case. They told me that I have to get it across that this is the right thing to do. That was very important." *Id.*

1030. In addition to these undisclosed promises, Ward was meticulously coached to give the testimony the government insisted on.

> They told me that I have to get it across that this is the right thing to do. That was very important.
>
> During meetings with the prosecutor and another unknown investigator, I was told not to lie. I was told that I knew [Plant] was viciously stomped on and that I saw the whole fight. The investigator frequently got mad while he was scripting me. They were almost playing good cop, bad cop. They wanted me to minimize any contact with Shannon. When I said I had greeted him, they said you mean you just nodded. They would interrupt me with the information they wanted. They did not want the jury to think Shannon and I were friends.
>
> ***
>
> They promised to give me a release 7 days after court. After I testified I was never able to get in contact with them again.

*Id.* at 2131, 2134.

1031. The undisclosed agreement and the government's failure to correct false testimony violated *Brady* and *Giglio*. Even more egregious is the government's active solicitation of Ward's help in concealing the agreement. While publicly claiming no agreement, it secretly concealed the

412

true arrangement—if Ward cooperated, he would be assisted in getting out, have his supervision period rescinded, and would get a "new beginning" in the witness protection program.

1032.   Due process and the defendant's right to confront the prosecution's witnesses are violated when a prosecutor affirmatively hides, and the witness fails to reveal, impeachment evidence. *Brady v. Maryland*, 373 U.S. 83 (1963); *Banks v. Dretke*, *supra*, 540 U.S. 668; *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Even tacit agreements are subject to disclosure under *Brady*.[139] Due process was violated when the government failed to disclose the true extent of its agreement with Ward.

1033.   A further due process violation occurred when the government failed to correct Ward's false trial testimony:

> Q.      As far as being promised any rewards for your testimony, let's get that clear. What do you understand any agreements have been by the government for you coming today to testify?
>
> A.      No one has actually promised me anything.

Tr. Vol 19, at 238.

---

[139] *See, e.g., United States v. Moore*, 283 Fed. Appx. 218, 218, 2008 WL 2477637, at *1 (5th Cir. 2008) (tacit agreements, if proven, violate *Brady*); *Douglas v. Workman*, 560 F.3d 1156, 1185 - 1186 (10th Cir. 2009) ("A deal is a deal - explicit or tacit. There is no logic that supports distinguishing between the two."); *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) ("The existence of a less formal, unwritten or tacit agreement is also subject to *Brady*'s disclosure mandate"; relief denied as "[t]he fact that [the witness] desired favorable treatment in return for his testimony in Bell's case does not, standing alone, demonstrate the existence of an implied agreement"); *Wisehart v. Davis*, 408 F.3d 321, 323 (7th Cir. 2005) (recognizing that if there was a "tacit understanding that if [the witness'] testimony was helpful to the prosecution, the state would give him a break on some pending criminal charge" ... "Express or tacit, either way there would be an agreement, it would be usable for impeachment, and it would have to be disclosed to the defense."); *Reutter v. Solem*, 888 F.2d 578, 582 (8th Cir.1989) ("[t]he fact that there was no agreement ... is not determinative of whether the prosecution's actions constituted a *Brady* violation requiring reversal.... We hold that, viewed in the context of petitioner's trial, the fact of [the witness'] impending commutation hearing was material ... and that petitioner therefore is entitled to relief"); *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) ("[F]acts which imply an agreement ... bear on [the witness's] credibility and would have to be disclosed").

1034. "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal quotations omitted); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Napue v. Illinois*, 360 U.S. 264 (1959).

1035. The suppressed evidence was material. Ward's testimony was crucial to the case as he was the only trial witness to claim that Mr. Agofsky was the initial aggressor. His credibility was already suspect and this additional information could well have been dispositive in the minds of the jurors. Ward failed to come forward until three years after the incident and then unabashedly requested help with the term of his release in exchange for his testimony. Ward was severely mentally ill, admitting to a history of blackouts, suicidal ideation, "hearing voices" and other hallucinations, and drug abuse in prison. Tr. Vol 19, at 233-35. Indeed, the ostensible reason[140] his release was denied was his mental illness:

> Ward was diagnosed with having an uncontrolled significant disorder. As a result, he was prescribe[d] anti-psychotic medications to aid him with his disorder. Inmate Ward has refused to utilize the medications since his arrival at this facility. Psychology staff has been counseling him due to his history of suicidal behavior.
>
> Based on this information, the Unit Team feels inmate Ward is a safety concern if placed in a Community Corrections Center due to his non-compliance with the Bureau of Prisons programs.

*See* SA 2378 *(Letter of February 9, 2004 from Mike Wright to Marilyn S. Taylor)*.

---

[140] Upon information and belief, and subject to receipt of additional discovery, it is clear the prison delayed Mr. Ward's release not because he was a threat in the community but so that his "cooperation" in the Agofsky prosecution could be coerced by the threat of continued incarceration. As of January 13, 2004, noting Ward's "good work performance" and "clear conduct," his Unit Team recommended Ward for "CCC placement." *See* SA 2379 *(Program Review Report, January 13, 2004.)* Yet three weeks later he was deemed a "safety concern" and his release denied.

1036.   There is a reasonable probability that, but for the government's failure to disclose evidence favorable to the defense, the results of the guilt-innocence phase and/or the penalty phase of Mr. Agofsky's capital trial would have been different. *See Kyles,* 514 U.S. at 433. The non-disclosure accordingly violated Mr. Agofsky's right to due process of law. U.S. Const. Amend.

1037.   Had the jury learned that, in addition to Ward's interest in tailoring his testimony to help the government and his severe mental illness, he was the beneficiary of an undisclosed deal, there is a reasonable probability that the outcome would have been different. For these reasons and those described elsewhere in this Motion, the Court should order an evidentiary hearing and grant Mr. Agofsky relief on this ground.

**GROUND 12.6: THE TRIAL COURT ERRED IN FAILING TO DISMISS THE INDICTMENT WITH PREJUDICE FOR PRE-ARREST DELAY AND VIOLATION OF PETITIONER'S CONSTITUTIONAL AND STATUTORY SPEEDY INDICTMENT RIGHTS, WHERE THE DELAY WAS INTENTIONAL AND DESIGNED TO HAMPER THE DEFENSE AND MR. AGOFSKY WAS PREJUDICED.**

1038.   The incident occurred on January 5, 2001 yet Mr. Agofsky was not arrested until August 21, 2003, a delay of over two and one-half years. The delay was orchestrated by the government to ensure favorable witnesses would be dispersed throughout the penal system or released and thus impede any attempt to build a defense. Mr. Agofsky was prejudiced, notwithstanding counsels' meager attempt at investigation, rendering it difficult to secure witnesses and exposing them to claims of diminished memory and tailored testimony, and subject to impeachment for failing to come forward sooner. Prior counsel were ineffective for failing to raise this claim. Mr. Agofsky's rights to due process and effective assistance of counsel were violated.

1039.   Prearrest delay violates due process if it appears that the delay was unreasonable and that it was prejudicial to the defendant in the presentation of his case. *United States v. Lovasco*, 431 U.S. 783, 789-90 (1977); *United States v. Marion*, 404 U.S. 307, 324-26 (1971). To prevail on such a claim, a defendant must show prejudice and intent by the prosecution to gain a tactical advantage. *Marion*, 404 U.S. at 324; *Davis v. Quarterman*, No. 3:08-cv-00715-B, 2009 WL 2150865, at *7 (N.D. Tex. July 16, 2009).

1040.   By January 24, 2001, within weeks of the incident, the government had already announced not only its intention to prosecute but to seek the death penalty as well. *See* SA 2550 (letter of January 24, 2001 from Special Agent in Charge Richard Mosquera to Warden Ernest Chandler). Yet another two and one-half years transpired before Mr. Agofsky was charged. The government had no legitimate reason to delay prosecution in this case; rather it was designed to gain a tactical advantage and undermine any prospective defense. All the witnesses were available

and it had within days announced its intention to prosecute. Rather, the bad faith delay was designed to impede the defense as the FBI knew virtually all of the eyewitnesses did not support the government's version of the events. By building in delay it knew these witnesses, if ultimately called by the defense, would be vulnerable to accusations their testimony was manipulated and subject to impeachment for failing to come forward initially. Indeed, this is exactly what happened; the only two eyewitnesses were both cross-examined about their failure to come forward sooner. *See* Tr. Vol 19, 311-12 (defense witness Robert Ecker impeached with failure to forward sooner); Tr. Vol 19, 322 (defense witness Billy Santiago impeached with failure to forward sooner). Production of witnesses was hampered as well. An additional witness who could testify Plant was the initial aggressor, Armondo Lopez, had been discharged by the time of trial and ultimately the defense failed to produce him. SA 550. Yet another witness, Mark Williams, had died in the interim and would have supported the defense version of events. *See* Declaration of Randy Seitzinger (SA 2117) (talking in Cage Three with Mark Williams when they observed Plant throw the first punch).

1041. The government, which all along intended to prosecute Mr. Agofsky, delayed its case indefinitely until it was confident the witnesses were dispersed and the defense hampered in producing witnesses and with the knowledge that these witnesses, by time of trial, would be vulnerable to impeachment for failing to come forward sooner.

1042. Counsel failed to raise this meritorious claim in a timely manner and thus his performance was deficient. As demonstrated above the delay was in bad faith and hampered the defense. Prejudice has been amply shown. Mr. Agofsky's rights to due process and effective assistance of counsel under the Fifth and Sixth Amendments were violated. A new trial must be granted.

**VI.      GROUND 12.7: NEW EVIDENCE ESTABLISHES THAT PETITIONER WAS CONVICTED IN THE SHORT CASE AND SENTENCED TO DEATH IN THE PLANT CASE ON THE BASIS OF INACCURATE AND UNRELIABLE EXPERT SCIENTIFIC TESTIMONY, IN VIOLATION OF HIS DUE PROCESS AND EIGHTH AMENDMENT RIGHTS.**

**A.      The National Academy Of Sciences Report**

1043.  On February 18, 2009, the National Academy of Sciences ("NAS" or the "Academy") issued a landmark report regarding the state of forensic science in this country. *See* Nat'l Acad. of Sci., Strengthening Forensic Science in the United States: A Path Forward (Feb. 2009) (hereinafter "NAS Report"). SA 2817. The NAS, which is the preeminent scientific organization in the United States, was commissioned by Congress to study the forensic sciences and to issue the instant report. This Report concludes that "with the exception of nuclear DNA analysis . . . *no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source."* SA 2837 (NAS Report at S-5) (emphasis added.) The NAS Report further recognizes that "there is a notable dearth of peer-reviewed published studies establishing the scientific bases and validity of many forensic methods," *Id.* at 5-6, including latent print analysis. SA 2837-44.

1044.   Further, the NAS report "concludes that every effort must be made to limit the risk of having the reliability of certain forensic methodologies judicially certified before the techniques have been properly studied and their accuracy verified." *Id.* at 3-1. This conclusion has direct implications for the verdicts rendered in the Short murder trials where the only physical evidence that tied Mr. Agofsky to the scene of the crime a fingerprint "match" found on a piece of duct tape found near the location at which Mr. Short's body surfaced in a lake. Two FBI agents testified at trial. One, Robert Webb, testified that the edge of this piece of duct tape matched precisely the edge of a piece of duct tape attached to the chair in which Mr. Short was found. The other, Russell

418

Davey, an FBI latent print examiner, testified without qualification that the two fingerprints found on this duct tape could be individualized to Mr. Agofsky. This is the very type of testimony the NAS Report found to be unacceptable, because of the lack of scientific studies to support such broad claims.

1045. The NAS is plainly critical of forensic experts testifying to "absolute" identifications, like the testimony presented in this case. "Claims of 'absolute' and 'positive' identification should be replaced by more modest claims about the meaning and significance of a purported 'match'." *Id.* at 5-12 (SA 2876). "Imprecise or exaggerated expert testimony has sometimes contributed to the admission of erroneous or misleading evidence." *Id.* at S-3 (SA 2835).

1046. The NAS also recognized that the law's greatest dilemma in its heavy reliance on forensic evidence concerns the question of whether—and to what extent—there even is *science* in any given "forensic science" discipline. As the Report finds:

> Two very important questions should underlie the law's admission of forensic evidence in criminal trials: (1) the extent to which a particular forensic discipline is founded on a reliable scientific methodology that gives it the capacity to accurately analyze evidence and report findings and (2) the extent to which practitioners in a particular forensic discipline rely on human interpretation that could be tainted by error, the threat of bias, or the absence of sound operational procedures and robust performance standards. These questions are significant. Unfortunately, these important questions do not always produce satisfactory answers in judicial decisions pertaining to the admissibility of forensic science evidence proffered in criminal trials.

*Id.* at S-7 (SA 2839).

1047. The NAS emphasized the pressing need to insure the reliability of forensic testimony. "Law enforcement officials and the members of society they serve need to be assured that forensic techniques are *reliable*. Therefore, we must limit the risk of having the reliability of

419

certain forensic science methodologies condoned by the courts before the techniques have been properly studied and their accuracy verified." *Id.* at 3-19-20. Nevertheless, the NAS notes judicial reluctance to subject forensic testimony to appropriate scrutiny. "[S]ome courts appear to be loath to insist on such research as a condition of admitting forensic science evidence in criminal cases, perhaps because to do so would likely 'demand more by way of validation than the disciplines can presently offer.'" *Id.*

1048. This report seriously undermines the reliability of critically important fingerprint testimony presented by the Government at Mr. Agofsky's trial for the Daniel Short murder to establish Mr. Agofsky's participation in this crime. The conviction in the Short case was in turn was used in the Plant trial as the basis for three of the aggravators submitted to the jury during the penalty phase of trial.

1049. The NAS Report has particular force because it was not developed at the request of the criminal defense bar, but in response to a request from Congress. The report reflects the generally accepted consensus of the scientific community. The NAS is a private, non-profit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare of the United States. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters.[141]

---

[141] *See* http://www.nasonline.org/site/PageServer?pagename=ABOUT_main_page. "Members and foreign associates of the Academy are elected in recognition of their distinguished and continuing achievements in original research; election to the Academy is considered one of the highest honors that can be accorded a scientist or engineer." *Id.* "The Academy membership is comprised of approximately 2,100 members and 380 foreign associates, of whom more than 200 have won Nobel Prizes." *Id.*

1050. The NAS was signed into being by President Abraham Lincoln on March 3, 1863, at the height of the Civil War. As mandated in its Act of Incorporation, the NAS has, since 1863, served to "investigate, examine, experiment, and report upon any subject of science or art" whenever called upon to do so by any department of the government. The Academy's service to government has become so essential that Congress and the White House have issued legislation and executive orders over the years that reaffirm its unique role. *Id.*

1051. The NAS Report thus demonstrates, as discussed in detail below, that the expert scientific testimony relied upon by the Government in this case, is neither scientifically accurate nor reliable. Indeed, there is no scientifically reliable basis to support the scientific testimony used to link Mr. Agofsky to the murder of Daniel Short or the related robbery of the Noel State Bank. Consequently, the jury's guilty verdicts in the Short case and death sentence in the Plant case are likewise unreliable.

**B.** **The Due Process And Eighth Amendment Standards Governing Analysis Of The New Evidence**

1052. The NAS Report reveals that Mr. Agofsky's convictions and death sentence were based on unreliable evidence, in violation of due process and the Eighth Amendment. "Reliability is ... a due process concern." *White v. Illinois*, 502 U.S. 346, 363-64 (1992). Hence, the Due Process Clause requires that criminal convictions be reliable and trustworthy. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974); *Thompson v. City of Louisville*, 362 US 199, 204 (1960). The use of exaggerated, inaccurate, or misleading testimony, such as that presented by the Government here, deprives a defendant of a fair trial if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *see also Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Giglio v. United States*, 405 U.S. 150 (1972).

1053.   The requirement of reliability stretches across our criminal justice system and is the backbone of much constitutional analysis. For example, due process precludes the admission of identification evidence if, under the totality of the circumstances, the identification process was impermissibly suggestive so as to give rise to a substantial risk of misidentification. *Stovall v. Denno*, 388 U.S. 293 (1967). Indeed, the linchpin for the admission of identification testimony is its reliability. *E.g., Manson v. Braithwaite*, 432 U.S. 98, 114 (1977); *Neil v. Biggers*, 409 U.S. 188 (1972). The due process inquiry applicable here is therefore whether the new evidence "could... in any reasonable likelihood have affected the judgment of the jury" in its determinations of guilt and in its sentence of death.

1054.   Similarly, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion); *see also Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980); *Mills v. Maryland*, 486 U.S. 367, 383-84 (1988). This need for heightened reliability requires "*accurate* sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die," *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (plurality opinion), and invalidates death sentences imposed as a result of the jury's consideration of materially inaccurate evidence. *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (Eighth Amendment does not permit a death sentence to be imposed by a jury that was allowed to consider materially inaccurate evidence); *Tuggle v. Netherland*, 516 U.S. 10, 14 (1995) (same). As discussed below, the jury's death verdict here was based in significant part on materially inaccurate and unreliable pseudo-scientific evidence. As such, Mr. Agofsky's death sentence cannot stand.

C.   **The Unreliable Fingerprint Testimony**

1055.   While fingerprint evidence has a long history of acceptance by state and federal courts as a legitimate forensic science, the NAS Report requires re-examination of that view. The

NAS Report devotes considerable attention to deficiencies in forensic fingerprint practices. Virtually all of the general failings of forensic science are found in the area of friction ridge analysis—the method of fingerprint analysis used in Mr. Agofsky's case. The NAS Report findings on fingerprints (*See* SA 2871-78) include:

1056.   The training of personnel to perform latent print identifications varies from agency to agency. Agencies may have a formalized training program, may use an informal mentoring process, or may send new examiners to a one- to two-week course. NAS Report at 5-8.

1057.   The ACE-V methodology (Analysis, Comparison, Evaluation, and Verification) commonly used in latent print identification does not rest on a reliable factual foundation does not specify particular measurements or a standard test protocol and examiners must make subjective assessments throughout. *Id.* at 5-9.

1058.   Outcome of a friction ridge analysis is not necessarily repeatable from examiner to examiner because of its subjectivity and further experienced examiners do not necessarily agree with even their own past conclusions when the examination is presented in a different context sometime later. *Id.*

1059.   The subjectivity is intrinsic to friction ridge analysis, as can be seen when comparing it with DNA analysis ... [T]he process does not allow one to stipulate specific measurements in advance, as is done for a DNA analysis. Moreover, a small stretching of distance between two fingerprint features, or a twisting of angles, can result from either a difference between the fingers that left the prints or from distortions from the impression process. For these reasons, population statistics for fingerprints have not been developed, and friction ridge analysis relies on subjective judgments by the examiner. Little research has been directed toward developing population statistics, although more would be feasible. *Id.* at 5-10.

1060. The criteria for identification are much harder to define because they depend on an examiner's ability to discern patterns (possibly complex) among myriad features and on the examiner's experience judging the discriminatory value in those patterns. The clarity of the prints being compared is a major underlying factor. For 10-print fingerprint cards, which tend to have good clarity, even automated pattern-recognition software (which is not as capable as human examiners) is successful enough in retrieving matching sets from databases to enjoy widespread use. When dealing with a single latent print, however, the interpretation task becomes more challenging and relies more on the judgment of the examiner. *Id*.

1061. At present, fingerprint examiners typically testify in the language of absolute certainty. Both the conceptual foundations and the professional norms of latent fingerprinting prohibit experts from testifying to identification unless they believe themselves certain that they have made a correct match. Experts therefore make only what they term "positive" or "absolute" identifications—essentially making the claim that they have matched the latent print to the one and only person in the entire world whose fingertip could have produced it . . . Given the general lack of validity testing for fingerprinting; the relative dearth of difficult proficiency tests; the lack of statistically valid model of fingerprinting; and the lack of validated standards of declaring a match, such claims of absolute, certain confidence in identification are unjustified . . . *Id*. at 3-17, n.79.

1062. Although there is limited information about the accuracy and reliability of friction ridge analyses, claims that these analyses have zero error rates are not scientifically plausible. *Id*. at 5-12

1063. ACE-V provides a broadly stated framework for conducting friction ridge analyses. However, this framework is not specific enough to qualify as a validated method for this type of

424

analysis. ACE-V does not guard against bias; is too broad to ensure repeatability and transparency; and does not guarantee that two analysts following it will obtain the same results. *Id.*.

1064.   Error rate is a much more difficult challenge. Errors can occur with any judgment-based method, especially when the factors that lead to the ultimate judgment are not documented. Some in the latent print community argue that the method itself, if followed correctly (i.e., by well-trained examiners properly using the method), has a zero error rate. Clearly, this assertion is unrealistic, and, moreover, it does not lead to a process of method improvement. The method, and the performance of those who use it, are inextricably linked, and both involve multiple sources of error (e.g., errors in executing the process steps, as well as errors in human judgment). *Id.* at 5-13.

1065.   Uniqueness and persistence are necessary conditions for friction ridge identification to be feasible, but those conditions do not imply that anyone can reliably discern whether or not two friction ridge impressions were made by the same person. Uniqueness does not guarantee that prints from two different people are always sufficiently different that they cannot be confused, or that two impressions made by the same finger will also be sufficiently similar to be discerned as coming from the same source. The impression left by a given finger will differ every time, because of inevitable variations in pressure, which change the degree of contact between each part of the ridge structure and the impression medium. None of these variabilities—of features across a population of fingers or of repeated impressions left by the same finger—has been characterized, quantified, or compared. *Id.*

1066.   At Mr. Agofsky's trials for the murder of Daniel Short, the government introduced testimony of FBI fingerprint analyst Russell Davey. Agent Davey testified that he processed, compared, and matched latent prints with prints from Mr. Agofsky. Agent Davey compared prints found on two pieces of duct tape, one of which was found on the chair into which Daniel Short

had been taped before being drowned, the other of which was found on the shore of the lake in which Mr. Short's body surfaced a week after he had disappeared. Agent Davey testified that he had been able to match the latent fingerprints with the known inked prints of Mr. Agofsky, using a process whereby the ridges of the latent fingerprints are analyzed and then compared against known inked prints. This process of fingerprint identification is known as "friction ridge analysis."

1067.   The techniques used by Agent Davey to link Mr. Agofsky's fingerprints to the processed latent fingerprints were deficient and unreliable. Virtually all of the failings of forensic science in the area of friction ridge analysis identified in the NAS Report are present in this case. The findings were not and cannot be demonstrated to be reliable or based on valid science.

1068.   The admission of unreliable fingerprint evidence taints the integrity of the trial process and denies a defendant a just and fair trial. *See Napue*, 360 U.S. at 271. The new evidence demonstrating the unreliability of Agent Davey's testimony is neither cumulative nor corroborative of evidence presented at trial. *See id.* Indeed, at trial, the defense presented no evidence undermining the scientific validity of the experts' fingerprint testimony. Further, the new evidence does not simply impeach Davey's testimony—it invalidates it.

1069.   Accordingly, there is a reasonable likelihood that this new evidence would have resulted in a different outcome in the penalty imposed in the Plant case. The fingerprint testimony given by Agent Davey provided a false scientific basis in the Short murder trials that eliminated doubt in the government's otherwise extraordinarily weak case against Mr. Agofsky. Without Davey's testimony, couched in unequivocal, categorical terms as it was, there is little chance the jury hearing the Short case would have convicted Mr. Agofsky of the robbery or murder for which he was being tried. The concerns raised by the NAS Report would certainly have caused the Plant jury to assess Mr. Agofsky's convictions of the Short murder in a very different light and to

426

question whether the government had indeed proved Mr. Agofsky's guilt in those trials beyond a reasonable doubt. Because the Short conviction provided such a significant part of the case in aggravation for the government, undermining the reliability of the verdicts in those cases is likely to have resulted in one or more votes against the imposition of death in the Plant trial.

### D. Conclusion

1070. Given the new evidence undermining the reliability of the Government's expert evidence described above, an evidentiary hearing is necessary to determine the precise impact of the NAS Report's findings on the scientific evidence at issue. Petitioner requests that the Court hold an evidentiary hearing to address this matter.

## VII.      GROUND 12.8: MR. AGOFSKY IS INNOCENT OF CAPITAL MURDER.

1072.   Of the twenty-eight potential eyewitnesses on the Beaumont SHU recreation yard on the day of the fight between Mr. Agofsky and Plant, the government could muster only one: Richard Ward, a mentally ill drug addict who initially told the FBI that he did not see what happened, and only turned on Mr. Agofsky over three years later, on the eve of Mr. Agofsky's trial, after prison officials abruptly dropped plans to release him to a halfway house and the FBI promised him unsupervised release to the witness protection program. Ward has now recanted. He states:

> I did not see the beginning of the fight between Shannon Agofsky and Luther Plant and do not know who started the fight. When I first looked, I saw a blur and thought that Shannon had hit Luther Plant (Tootie) with the palm of his hand. The FBI coached me that he must have hit Tootie with his elbow because Shannon had an indentation from Tootie's tooth near his elbow area.
>
> At the beginning of the fight my view was obscured by Shannon's back. When I realized there was an incident I turned away from the fight . . . I knew I did not have much time left and I did not want anyone to think I could be involved in this incident.

SA 2128-29.

1073.   Nine witnesses state that Luther Plant started the fight and Mr. Agofsky acted only to defend himself. *See* SA 2113 (Billy Santiago), SA 2040 (Robert Ecker), SA 2117 (Randy Seitzinger), SA 2079 (Melvin Hauser), SA 2062 (Reginald Gilbert-Bey), SA 2097 (Robert McKinn), SA 2071 (Charles Glave), SA 2014 (Andres Campillo), SA 2035 (Frank Early). The only witness who has ever testified otherwise now admits that he did not see how the fight began. The evidence establishes a valid claim of self-defense and thus Mr. Agofsky's innocence of capital murder. *See United States v. Branch*, 91 F.3d 699, 714 (5th Cir. 1996) (citing *United States v. Feola*, 420 U.S. 671 (1975)). Mr. Agofsky is therefore entitled to postconviction relief on the ground that the conviction and death sentence of an innocent man violates due process of law. U.S.

Const. amend. V; *Herrera v. Collins*, 506 U.S. 390 (1993); *see also House v. Bell*, 547 U.S. 518, 537 (2006)*; Schlup v. Delo*, 513 U.S. 298 (1995)*; Wolfe v. Johnson*, 565 F.3d 140, 163-66 (4th Cir. 2009) (remanding for hearing on actual innocence claim where sole witness who implicated the defendant and who had received benefits for his testimony, recanted). This Court must accordingly order an evidentiary hearing and grant relief on this ground.

**VIII.    GROUND 12.9: TRIAL COUNSEL'S AFFIDAVITS CONTAIN FACTUALLY INACCURATE AND NON-RESPONSIVE ALLEGATIONS, SPECIFICALLY NEGATED BY THE TESTIMONY AND STATEMENTS OF NUMEROUS PERSONS, INCLUDING MR. AGOFSKY.**

### A.    <u>Introduction</u>

1075.    On February 9, 2009, this Court entered an Order (Doc. 70) directing trial counsel, G. Patrick Black and Douglas M. Barlow, to submit affidavits responding to the claims originally raised in Mr. Agofsky's Amended § 2255 Motion. Both attorneys served the affidavits on Mr. Agofsky's current post-conviction counsel and on counsel for the government. *See* Response and Affidavit of G. Patrick Black, Esq., March 13, 2009 (SA 2316); Affidavit of Douglas M. Barlow, Esq., March 13, 2009 (SA 2330).[142]

1076.    The affidavits contain factually inaccurate allegations. In addition, they are vague and often non-responsive to Mr. Agofsky's very specific claims. The Amended § 2255 Motion advanced claims that Mr. Agofsky's trial attorneys were ineffective for:

- failing to interview or present specific inmate witnesses who could have supported self-defense and heat of passion, either by providing eyewitness testimony that Plant started the fight or by providing relevant background information about Plant's reputation, the violent atmosphere at USP Beaumont, and prison culture;

- failing to interview or present helpful testimony from specific, potential government witnesses;

- failing to obtain or present specific expert testimony that could have supported the defense at the guilt-innocence phase;

- failing to conduct an adequate voir dire in connection with specific jurors and overall;

- committing prejudicial errors in the presentation of the case at the guilt-innocence phase of trial;

---

[142] Mr. Agofsky responds to the affidavit of his appellate counsel, Brent E. Newton, Esq., in Ground 12.3(D).

- failing to conduct an independent investigation of the government's case in aggravation, including Mr. Agofsky's prior convictions and disciplinary infractions;

- failing to conduct a reasonable mitigation investigation by compiling and presenting a social history supported by reasonable efforts to interview specific family members, friends, and teachers;

- failing to investigate and present mitigating evidence readily available through specific inmates personally acquainted with Mr. Agofsky;

- failing to obtain and present appropriate mental health evaluations and presenting a poorly investigated and prepared case on future dangerousness; and

- committing prejudicial errors in the presentation of the defense case during the penalty phase.

1077. As discussed in greater detail below, Black and Barlow respond to these claims either with general assertions that they did conduct an adequate investigation and did provide effective courtroom representation, or with more specific, usually false, assertions blaming Mr. Agofsky and his family for the deficiencies in counsels' conduct of the case. *But see Rompilla*, 545 U.S. at 381 (counsel had a duty to investigate despite family attitude); *Adams*, *supra*, 342 Fed. Appx. at 347-49 (same).

1078. Mr. Agofsky has replied to his former attorneys' allegations in an affidavit denying and explaining, where explanation is necessary, his former attorneys' allegations. *See* Affidavit of Shannon Agofsky, August 6, 2009 SA 2359. Mr. Agofsky's responses are described in full below. Moreover, the witness statements and other evidence presented and summarized in Mr. Agofsky's Amended § 2255 Motion and this Supplement—including the statements or deposition testimony of all five experts retained by trial counsel—contradict Black's and Barlow's defensive claims, support Mr. Agofsky's pleadings and affidavit, and demonstrate the ineffective assistance they provided in undertaking to defend his life.

## B.    Luther Plant Investigation

1079.    Black generally alleges that the defense team conducted a proper investigation:

> Trial counsel provided effective assistance of counsel to Mr. Shannon Agofsky at all times. The case was properly and fully investigated. Numerous witnesses were contacted and interviewed prior to trial. Counsel's investigator traveled to several states and prison facilities to speak with many potential witnesses. Trial counsel visited and inspected the crime scene at the United States Penitentiary and also arranged for their prison expert, Mr. Pelz, to tour the facility and location.

SA 2323.

1080.    He states that he subpoenaed six and called three inmate witnesses at the guilt-innocence phase, but the jury chose not to believe them. SA 2323, 2326. Further, he claims, some of the inmate witnesses whose statements appear in the appendix to the Amended § 2255 Motion did not provide the same information in 2004. He gives only one example, that of Pete Carrion, whose statement is discussed in Ground 12.1(D). SA 2327.

1081.    Barlow also generally claims that the defense team performed a thorough investigation, stating that "Over the course of many months, we conducted interviews with Agofsky, as well as persons who knew him in prison, as well as out of prison." SA 2335. He states that Mr. Agofsky gave the defense the names of witnesses from the recreation yard and "our investigator attempted to locate and interview all of the persons who had relevant information at that time." SA 2337. He asserts that the defense team presented at trial "the only actual eyewitnesses we were able to locate and who were willing to testify as to who swung first and that Agofsky acted in self-defense." SA 2340.

1082.    These allegations are denied, and are contradicted by the evidence set forth in Ground 12.1. In his accompanying affidavit, Mr. Agofsky explains how surprised he was to learn that counsel had subpoenaed only six witnesses to his capital trial. Mr. Agofsky believed, up until

the time of his trial, that his attorneys had a list of approximately thirty witnesses whom they intended to subpoena in his defense. SA 2372. Correspondence from Black's file supports his belief. In a letter dated February 8, 2004, Mr. Agofsky makes "comments on witness subpoenas," corrects the spelling of number 15 on the list, and asks for more information about number 19, whom Mr. Agofsky does not know. SA 674. In another letter, written near the beginning of trial, Mr. Agofsky refers to Gerald Miller, an African-American inmate present at the Lompoc incident who could have testified that it was fight on the yard, and not a riot. SA 672. As Mr. Agofsky explains in his affidavit, "my letter refers to Mr. Miller as 'the black guy on our list.' I was referring to the list of approximately 30 inmates maintained by my defense team of witnesses. It was my understanding up until trial that they intended to subpoena most if not all of these witnesses." SA 2372.

1083. Barlow makes few assertions that relate to specific witnesses. He states that "other information we had obtained through investigation" indicated that the Luther Plant incident "was a preplanned 'hit' for which Agofsky had been compensated." SA 2337. Neither Bennett nor Black supports this assertion, and it is denied. The record suggests that if Barlow acquired this idea, he did so, not from his own investigation, but from discovery provided by the government. First, an FBI report supplied to the defense by the government, summarizing a statement by a cooperating witness, Jaycob Vidana, alleges that the fight was a planned "hit." SA 2551-52. Vidana did not testify at trial and has recanted. He did not see who started the fight and believes it was mutual combat. He is a schizophrenic who was using "a lot" of heroin in both 2001 and 2004. SA 2121-27. Another document supplied to the defense by the government, a report by a BOP Special Investigation Service agent, contains a statement by an inmate named James Stephens. SA 2553

Stephens did not testify for the government at trial either. Mr. Agofsky himself has always denied that the incident was a "hit": "I was not compensated for it. I was defending myself." SA 2369.

1084. Black also states that Bennett contacted Officer Christopher Matt, who was on the recreation yard on the morning of January 5, 2001, but did not see the beginning of Mr. Agofsky's fight with Plant. SA 2328. Although Bennett asserted in his deposition that he did in fact interview Officer Matt, he could not recall when he did so. In addition, he did not recall taking notes or memorializing the interview in any way. SA 561. No one from the defense team told Mr. Agofsky that they had interviewed Officer Matt. SA 2363. Mr. Agofsky wrote letters in which he suggested topics to cover with Officer Matt. SA 675, 2554-55. As Mr. Agofsky points out in his affidavit, "evidently from Mr. Black's cross-examination of him they never did ask him those things." SA 2363.

1085. Both Black and Barlow claim that the defense contacted Robert Duggan, Mr. Agofsky's former teacher, who allegedly said that he had no personal recollection of Mr. Agofsky's attendance at his academy. They claim that Mr. Agofsky told them that he and Duggan had parted on "less than favorable terms." SA 2325, SA 2338. According to Black, the defense obtained course materials and books used by the academy. SA 2324-25. The postconviction investigation and documentary evidence contradict these claims, which are denied. When postconviction counsel contacted Duggan in late 2007, he remembered Mr. Agofsky and provided information about him. A33-36. The materials from Duggan's academy that trial counsel turned over to postconviction counsel bear the government's bates stamp numbers and were provided by the government in discovery. SA 2429-59. The materials received from Black do not include the "mini-manual" on unarmed defensive tactics that Mr. Agofsky asked counsel to obtain, in support of his justification defense. SA 2367, SA 2460.

1086.   Contrary to trial counsels' assertions, Mr. Agofsky affirms that "I never told Mr. Barlow, Mr. Black, or Mr. Bennett that my time at Duggan's ESI school ended badly." SA 2367. Instead, as demonstrated in his letters to counsel, Mr. Agofsky made multiple suggestions for ways Duggan's testimony could be helpful to the defense:

> I suggested to Mr. Barlow that they look into a portion of Duggan's ESI curriculum that covered something called the tachy-psych effect (a phenomenon in response to a life threatening situation in which a person's ability to react and reason under pressure is degraded and distorted). This, I thought, would be helpful in supporting our case in self-defense. I also asked them to obtain Duggan's mini-manuals to support the defense. I am not aware that they ever did so. (See, e.g., Bates 6692).[143]
>
> ....
>
> While the defense did get some of Duggan's materials from a website, they did not obtain the materials that I asked them to request from Duggan himself. The "mini-manuals" that had been used for my ESI training, which discussed techniques for responding to lethal force and the tachy-psyche effect, would have supported my self-defense claim, but my attorneys did not request them. The materials used by the defense to cross examine Mr. Duggan were provided by the Government in conjunction with the case.

SA 2367-68.

1087.   Mr. Duggan himself maintains that no one from the defense team ever contacted him. A33, A36. Additionally, Mr. Agofsky "was never told that Mr. Bennett or any other member of my team spoke to Duggan." SA 2367-68. Duggan would not have said he did not remember Mr. Agofsky. Duggan had sent Mr. Agofsky's black belt certificate to his mother, Sheila Agofsky, only a few years previously. *Id.*

1088.   Thus, Black's and Barlow's few specific assertions concerning their investigation of the Plant incident are denied. Furthermore, Mr. Agofsky has proffered the testimony of seven

---

[143] *See* SA 2460.

uncalled eyewitnesses and numerous background witnesses who would have testified that Plant started the fight or offered other helpful information, and whose names and register numbers Black and Barlow received from the government. He has proffered other helpful information from Robert Duggan and Gerald Edmondson, and from trial experts Gripon, Elizabeth Pelz, and Terry Pelz. Neither Black, Barlow, nor Bennett has offered a convincing explanation for not interviewing and presenting them at trial.

C. **Trial Counsel's Interactions With Mr. Agofsky.**

1089. Both Black and Barlow attempt to deflect attention from themselves to Mr. Agofsky, blaming him for meddling in their investigation. Their allegations that he interfered are false and distorted. Black states:

> On more than one occasion he became very upset that trial counsel had contacted potential fact witnesses or family members because he "had not given the OK" for trial counsel to contact them. He specifically instructed trial counsel to never contact any potential inmate fact witness unless he had communicated with the person first.

SA 2325.

1090. He claims that Mr. Agofsky "selected and approved" the six inmates the defense subpoenaed. Black chose to call three as witnesses, Ecker, Santiago, and Lawson, and rejected the other three, Fitzgerald, Spring, and Rivera, on the basis of his "personal interview of them, trial tactics, evidentiary issues, and his assessment of their credibility." SA 2326. But the three rejected inmates were not present on the recreation yard at the time of the Plant incident and had no first-hand information to contribute regarding the fight itself, no matter what strategy the defense adopted or how Black viewed their credibility.

1091. Similarly, Barlow states that "the actual eyewitnesses changed regularly according to Agofsky." He claims that, after evaluating the testimony of the three eyewitnesses who testified

436

for the defense, the team decided that "calling other witnesses whose testimony we perceived to be weaker would have been counter-productive." SA 2340-41. Like Black, Barlow does not address the fact that the remaining three subpoenaed witnesses were not potential eyewitnesses at all.

1092. Contrary to counsel's assertions, the list of potential eyewitnesses in the recreation cage of the Beaumont SHU on January 5, 2001 never changed. The government turned over that list to the defense team in early 2004. SA 2570-76. Before the defense received that discovery, Mr. Agofsky provided counsel with the names that he did have, so that they could begin their investigation while waiting for the government to turn over the official list. SA 2362. Mr. Agofsky explained how to obtain his address book, where he had written down the names of other prisoners who were on the yard that day three years earlier. SA 670, SA 2362. Mr. Agofsky did not know every inmate on the yard that day, nor did he have all of their names or inmate numbers. SA 2362. Once the government turned over the list, however, the defense had the name and inmate number of every single potential eyewitness. Mr. Agofksy also asked the defense team to obtain the recreation logs from the yard the day of the incident, which contained the names of all eyewitnesses. SA 2362. Trial counsel made no such request.

1093. Mr. Agofsky was involved in his defense, and he did not want to die. SA 2377. His letters and affidavit show that he was attempting to cooperate with his trial attorneys. His suggestions of potential witnesses only changed when the theory of the case, as it was communicated to him by the defense, changed. SA 2363. For example, in his initial letters he suggested ways counsel could show that he was not a member of the Aryan Nation. Later, when the defense's theory of the case changed, he suggested how to counter allegations that he was a

437

member of the Aryan Brotherhood. *Id*. Mr. Agofsky's suggestions were not, as counsel allege, "control" or "manipulation," but the efforts of a man zealously advocating for his own defense.

1094. Barlow accuses Mr. Agofsky of persistent obstructive behavior:

> Agofsky was quite cordial and cooperative so long as we followed his dictates. We quickly learned that Agofsky intended to control the process exclusively directing our every move. We were not to file any motion or request except upon his instruction, and he became angry at any disobedience of his orders.

SA 2335-36.

1095. With respect to the investigation of the Plant incident, Barlow falsely accuses Mr. Agofsky—who at the time was in pretrial detention in a private jail in Liberty Texas, while most of the potential witnesses were in BOP facilities all over the country—of "manipulating" witnesses:

> Agofsky instructed us not to speak with any witness without his prior approval or instruction, and told us that it would be necessary for him to speak with each witness individually before our attempts. He became angry when our investigator made attempts to contact some witnesses without his prior approval. If we failed to follow his instructions, he promised to sabotage our efforts on repeated occasions throughout our representation. During the course of our efforts to locate these fact witnesses, Agofsky instructed us to cease looking for further witnesses from the recreation cage because he had exhausted his list of potential witnesses through his contacts. . . . We gathered the distinct impression that Agofsky was manipulating witnesses along the way, and even during trial.

SA 2337-38.

1096. Trial counsel's allegations that Mr. Agofsky tried to control their investigation and manipulate witnesses are denied. Mr. Agofsky did not tell counsel that he would need to talk with each witness. SA 2361. He did, however, ask that the team talk to him first before they interviewed prison witnesses. *Id*. He was concerned about gang issues in the prison. *Id*. In his affidavit, Mr.

438

Agofsky discusses the reasons for his concern. First, Mr. Agofsky was concerned about asking

gang members directly for help and then becoming indebted to them.

> Prison is a dangerous place, where I have to live, and I do not want to be indebted to gang members, from gangs such as the Aryan Brotherhood or the Dirty White Boys. If I placed myself under obligation to a gang member for saving my life I could have found myself pressured to reciprocate by doing gang business. After managing for so many years to keep free of gang obligations in violent prisons, I did not want my attorneys or their investigator inadvertently entangling me in a gang. I explained my reasoning to Mr. Bennett.

SA 2359-61.

1097. Indeed, Mr. Bennet himself admitted in his deposition testimony that this was a

valid concern. SA 555.

1098. Second, Mr. Agofsky was concerned because his defense team was spreading

rumors among the prison population about the identity of the government informant.

> [W]e knew that one or more inmates were cooperating with the government. At the same time, I knew that several of the inmates who were on the recreation yard during the Plant incident, or who had other pertinent information, were affiliated with gangs. It would have been very dangerous to me, my brother, and family if one of these witnesses got the inaccurate impression that I and my defense team thought he was a snitch, or if my defense team even created the impression that he might be a snitch. I was worried that one of these witnesses could have retaliated against me. If they couldn't reach me, because I was incarcerated under high security, they could have reached my brother, who was in general population, or they could have gone after my family. I was gravely concerned about making sure my own defense did not get me, my brother, or my family murdered. This is why it was so critical that the defense team proceed with care. Jay Bennett carelessly told inmates that other prisoners were snitches and I did not trust him to handle this with the requisite caution.

SA 2360.

1099. Mr. Agofsky's fears were warranted. Although Bennett denied in his deposition

that he discussed who the snitches were with other inmates, SA 555, his letters demonstrate

439

otherwise. In one letter, Bennett told Thomas Farrugia that Jaycob Vidana was the suspected informant. SA 645. Doing so potentially put Vidana in serious danger, especially since he was housed in the same prison with Mr. Farrugia. In another letter, Bennett "outed" Vidana to Armondo Lopez. SA 644. Bennett also told a number of prisoners that he believed Ben Masters was the informant, which was not true. As Mr. Agofsky discusses in his affidavit, "Mr. Masters is a known member of the Aryan Brotherhood. Thus, Bennett's indiscretion could have had dangerous consequences for both Mr. Masters and myself." SA 2360.

1100. Third, at the time of the investigation, the government was pursuing several large capital RICO prosecutions of alleged members of the Aryan Brotherhood ("AB"). SA 2360-61. Accusing other inmates of being involved with the AB could have exposed them to federal prosecution. Mr. Agofsky explains in his affidavit:

> I was very concerned that my defense team might suggest to a potential witness that I was identifying him as an AB member when he was not actually a member or didn't want to be known as a member. Even asking inmates to self-identify as members of the AB could have opened them to capital RICO prosecution. This, too, could have gotten me, my brother, or my family murdered. So I wanted to be sure my defense team never said to an inmate "Shannon knows you're AB" or even said the name "AB" to any inmate unless the inmate brought up the subject himself. This is clear from my letters to Denise Callier and Jay Bennett, in which I repeatedly instruct them not to ever mention the term AB before an inmate did.

SA 2360-61; *see, e.g.*, SA 2507.

1101. Mr. Agofsky's recollection is well supported by the documentary evidence. In several letters turned over by trial counsel to postconviction counsel, Mr. Agofsky urges Bennett to proceed with care inside the prison, especially with regard to the Aryan Brotherhood. For example, at one point in the case, the defense believed that inmate Ben Masters might be cooperating with the government and Bennett was planning a trip to USP Marion to interview

other inmates about Masters. In a letter dated April 10 (SA 687), Mr. Agofsky asked Bennett to first visit Masters himself at ADX in Florence, Colorado, to try to find out if Masters was an informant, before talking to other inmates about Masters. Mr. Agofsky's reasons for doing so were self-preservation and protection of his family. "If Masters or associates of his had learned that we were spreading the word we thought he was a snitch, and it was not true, there could have been serious consequences. And, in fact, it turned out that Masters was not cooperating with the government and Bennett was operating under a false assumption." SA 2360.

1102.   Although he wanted his team to proceed with caution, Mr. Agofsky "did not attempt to control contacts with other witnesses." SA 2361. His correspondence with his team contains examples of his deference to them. In one letter, Mr. Agofsky mentions that he has learned that Bennett is going to see Charles Glave and wonders who he is. Later in the letter, after making detailed investigation suggestions, he interjects, "Please don't think I'm trying to tell you how to do your job[.]" SA 2507. Similarly, Mr. Agofsky states that he "provided letters of introduction for Bennett to bring with him to some of the inmate witnesses, so that they would know that he was not with the prosecution and so that they would have something to show to other inmates to demonstrate that their visitor was not with the prosecution." SA 2361. The correspondence turned over to postconviction counsel by Black includes an example of such a letter, written to Thomas Farrugia. SA 2556. In addition, Mr. Agofsky gave to his counsel his full address book to aid in their investigation SA 2361, SA 648. Mr. Agofsky did not, as counsel allege, "insist on speaking to witnesses before the defense contacted them."

1103.   As discussed above, Mr. Agofsky had many suggestions for the investigation of his case and communicated them to Bennett and his attorneys in writing and orally. Bennett has acknowledged and Mr. Agofsky has stated that he had legitimate concerns about his own safety

441

and that of his family if Bennett failed to take care in contacting certain inmate witnesses. SA 555, 2359-61. Mr. Agofsky did not, however, obstruct the investigation. And, regardless of how he behaved, his trial team had a constitutional obligation to conduct a thorough investigation, particularly in a case in which the names and register numbers of the potential guilt-innocence eyewitnesses appeared on a list supplied by the government.

### D. Trial Counsel's Inadequate Investigation Of Mr. Agofsky's Background

#### 1. Mr. Agofsky's Prior Convictions And Infractions

1104. Neither Black nor Barlow claims that the defense made any effort to investigate Mr. Agofsky's prior disciplinary infractions, and Bennett has testified that they did not ask him to do so. SA 555. Regarding Mr. Agofsky's prior convictions, both attorneys claim generally that they did investigate them and also claim that Mr. Agofsky did not want them investigated in any event. Both allegations misstate the facts and are denied.

1105. According to Black, Bennett drove to Oklahoma City to obtain 24 boxes of materials and transcripts, from the archives of the Oklahoma Indigent Defense System ("OIDS"), relating to Mr. Agofsky's prior trial for the Noel State Bank case. SA 2325-26. He says that he spoke to Mr. Agofsky's Oklahoma attorney, Deborah Maddox, more than once but would not have used her opinion that he is innocent, even if it were admissible, for fear of "opening the door" to all of the evidence and prejudicial facts of that case. He claims that Mr. Agofsky told trial counsel he did not want to "relitigate" that offense because of "family concerns and involvement." SA 2326.

1106. Barlow states that "it would have been 'suicide by trial' to try to convince the jury that Agofsky was innocent of the prior capital murder case, especially when Agofsky chose not to discuss the facts of that case with us." SA 2339. He claims that he "would have lost all credibility with the jury" in attempting to persuade them of his only mitigation theory, that "Agofsky did not

442

need to die, because the BOP could securely house him forever." SA 2339. He does not point to any efforts he made to investigate the facts of Mr. Agofsky's prior convictions except to blame Mr. Agofsky, falsely, for not "cooperating." SA 2337. He states that Mr. Agofsky refused to reveal "pertinent information" concerning the specifics of his "prior significant offenses, such as the Dan Short capital murder."[144] SA 2337.

1107.  These allegations are denied. Neither Black nor Barlow ever asked Mr. Agofsky for details about the Noel State Bank case, such as information about the evidence or the witnesses. SA 2364-65. Contrary to Black's allegations, he never told counsel that his family was involved. Mr. Agofsky has always maintained, and continues to maintain, that he and his family are innocent of that crime. SA 2365.

1108.  Nor did he tell counsel that he did not want to litigate his own involvement in that case. SA 2365. Instead, Mr. Agofsky urged his trial counsel to investigate his prior conviction. He asked them repeatedly to obtain the Oklahoma transcript for that reason. In one letter to counsel, he explained that the transcript would be very useful in his attempt to prove his innocence. SA 677. Contrary to Black's affidavit, counsel told Mr. Agofsky that they did not obtain the Oklahoma transcripts. SA 2366, SA 675. Although Bennett stated in his deposition that he had picked up 24 boxes from OIDS, he admitted that he never looked inside the boxes. SA 558. The transcripts of Agent Farley's prior testimony that Black and Barlow had available for their trial preparation were turned over to them by the government, and not obtained by the defense. SA 2366.

1109.  Capital counsel have a fundamental obligation to investigate the government's case in aggravation. *See Rompilla*, 545 U.S. at 385-89 (investigating prior conviction the government

---

[144] Mr. Agofsky had only one other prior conviction, for two counts of interstate transportation of firearms.

has said it will use is "a sure bet"). Further, they must undertake a reasonable investigation *before* formulating strategy. *See, e.g., Martinez-Maeias, supra*, 810 F.Supp. at 819. As Ground 12.2(B)(2), *supra,* demonstrates, an investigation could have cast doubt on Mr. Agofsky's guilt of the Noel State Bank case and could have uncovered numerous witnesses who could have denied, explained, or provided context for his disciplinary infractions. Black's and Barlow's affidavits only confirm their abdication of duty with respect to this aspect of the case.

### 2. Family And Childhood

1110. *The alleged preparation of a social history.* Black alleges that "trial counsel" met with Mr. Agofsky "numerous times prior to trial" and that Bennett met with him "on nearly a weekly basis." SA 2324. He claims that the team investigated his social history:

> A complete social history and background was obtained by trial counsel. Information as to criminal history, personal and family history, physical condition, mental and emotional health, substance abuse, education and vocational skills, and employment records were obtained. Not only were previously written federal presentence reports obtained and carefully reviewed and discussed with Mr. Agofsky, but trial counsel's investigator drove to Noel, Missouri in March 2004, to personally interview Mr. Agofsky's mother. The investigator spent nearly 4 hours interviewing her in her home concerning the Petitioner's entire life and background. Habeas counsel entirely omits this fact in their Petition.[145]

SA 2324.

1111. Barlow also claims that the defense team conducted an investigation of Mr. Agofsky's background:

> With the assistance of our investigator, we conducted a comprehensive investigation into his background to learn how he had been raised and what led him to his current predicament. We also learned a good deal about Agofsky himself. Armed with

---

[145] As noted above, the investigator may have visited Mr. Agofsky's mother, but the records received from trial counsel include no documentation of such a visit. *See infra*, Ground 12.2(A) n.52; Ground 12.2(C).

> information about him, discovery from the government, and results of our investigation, we formulated a trial strategy that we felt best under the circumstances. . . . We learned that Agofsky was an intelligent person who graduated near the top of his high school class with a promising future but for his foray into a life of crime.

SA 2335-36.

1112. Neither Black nor Barlow confirms the testimony of Bennett that he prepared a written social history report that he gave to Barlow, who (according to Bennett) may have lost it in the hurricane that destroyed Barlow's files in this case. SA 559, 577. Dr. Roberts never saw or heard about such a report or received any information that such a report might have contained. SA 721, 731, 768. Neither did Dr. Gripon ever receive such a report. SA 2788-89.

1113. Trial counsels' account of their interactions with Mr. Agofsky contradict the documentary evidence and Mr. Agofsky's recollection. His first meeting with anyone from his defense was at his initial appearance, which (according to the docket) was held on September 25, 2003. After that, months went by and no one from his defense contacted him at all. According to Mr. Agofsky:

> I first met Mr. Barlow at my arraignment in September 2003. He said he would come down and talk to me in the holding cell after the proceeding was over, but he never came down. I learned during the arraignment that my trial was scheduled for November 17, 2003. No one from my defense team informed me when it was adjourned, on October 23, 2003,[146] until Mr. Bennett and Mr. Barlow came to see me in November. Nor was I aware that they were seeking a continuance. As October went on and I did not hear from my attorneys, I became increasingly worried that they would not be prepared for trial.

SA 2364.

---

[146] On October 23, 2003, the trial court granted a defense motion to continue the trial date to April 19, 2004. Criminal Docket, Doc. 17.

1114. Mr. Agofsky's recollection is supported by contemporaneous letters he wrote to his mother. She gave them to Black, who has turned them over to postconviction counsel. These letters show his increasing anxiety and trepidation as months passed and his capital trial approached, without any contact from his defense counsel. SA 2557, 2562. After November, Barlow came to visit his client only a handful of times. SA 2364-65. Black visited Mr. Agofsky one time, in December 2003, around Christmas, before he had received discovery in the case. According to Mr. Agofsky, "This was the only time that Mr. Black spoke with me outside of the courtroom." SA 2363. Mr. Agofsky estimates that Bennett visited him approximately ten times, not weekly as asserted by counsel. SA 2363. Some of these visits were very brief "drop-ins," perhaps fifteen minutes long, occurring when Bennett would call him out of his cell while he was visiting other inmates in the jail. SA 2363.

1115. Mr. Agofsky also never saw a social history report from his trial team. SA 2367. His recollection of the background investigation conducted by the defense at trial also differs greatly from trial counsel's.

> Virtually all the information my counsel compiled about me was obtained from the government. Though they never asked me to, I did write out my criminal history for them. I never discussed my personal and family history with Mr. Black and only sketchily with Mr. Barlow. Regarding my physical condition, I was asked by Mr. Barlow if I exercised and if I was sick. There was no discussion of my emotions or feelings with counsel. Regarding substance abuse, I told counsel I did not use drugs. Regarding my education and vocational history they just asked if I was a high school graduate. They did not discuss my time at ADX. They discussed my time at the Executive Security International only as part of an attempt to anticipate what Duggan would testify to. I don't think they asked me about prior employment although Dr. Roberts may have done so. They did not discuss my prior Pre-Sentence Investigation reports, and the copy of the Missouri Pre-Sentence Investigation report they gave me was an incorrect copy that did not reflect enhancements that were dropped by the sentencing court following my *pro se* argument.

446

SA 2367

1116.   In addition, counsel made no requests for background documents. Bennett admitted in his deposition that trial counsel did not ask him to obtain any documents from Mr. Agofsky's background. SA 546. Indeed, Mr. Agofsky recalls that the defense team did not even ask him to sign a release for records. SA 2369.

> According to Mr. Barlow, the defense made strategic judgments not to present certain types of mitigating evidence (although in fact the defense had not investigated those types of evidence):
>
> His current claim of organic brain damage was the type of unfounded claim that we felt would detract from the presentation of truthful evidence, and we prepared in that manner.

SA 2336.

1117.   Further, "we did not believe that any of the mitigating evidence that existed would likely overcome the impact of violent acts including two capital murders by Agofsky." SA 2341. Barlow does not explain what type of mitigating evidence "existed" at the time he made this judgment, which is not surprising since he had not developed any except for what Dr. Roberts learned through his own interviews.

1118.   *Alleged negative information about Mr. Agofsky or his family.* Barlow, unlike Black or any other witness, falsely asserts that he learned negative information about Mr. Agofsky and his family. He claims that this information, along with irrelevant factors like Sheila Agofsky's personal theories about the evidence in the Noel State Bank case, drove his penalty phase plans:

> We also learned that one or more of his family members had been suspects in the previous capital murder prosecution involving the death of the bank president Dan Short, which may have attributed [sic] to Agofsky's insistence that we not speak with his family. We made arrangements to interview his mother to obtain background information and arranged for her presence at the trial. Through information that we gained from contact with his mother, we learned that she believed that the Dan Short offense was a large "conspiracy" and that the body buried in Dan Short's grave was that of a black

447

> woman and not Dan Short. I personally spoke with Ms. Agofsky and confirmed that such was the type of information that she intended to reveal had she participated in the trial of his case. This type of information was representative of what we learned form Agofsky's background, and we contemplated offering mitigating evidence concerning the influence his family may have had on his introduction into a life of crime. Agofsky himself implicated other family members and indicated his role in either participating in, or helping to conceal, criminal acts by other family members.

SA 2336.

1119. Barlow did not tell Mr. Agofsky that he ever spoke with his mother. Mr. Agofsky explains in his affidavit that "My mother's love for her sons combined with her adamant belief that we are innocent of this crime has led her to develop theories over the years to try and explain what happened." SA 2366.

1120. Barlow claims that the defense team decided against calling Mr. Agofsky as a witness because of "chilling factors," including boasting about his "violent capabilities" and an incident in which prison guards had to subdue him during an "act of resistance." SA 2343. Barlow falsely claims, with no support from Black, Bennett, or any other evidence, that Mr. Agofsky revealed to his trial attorneys that "he had in fact killed other individuals of which the government was unaware." SA 2344.

1121. Mr. Agofsky denies Barlow's allegation, and denies ever making such a statement to anyone on his trial team.

> I never said such a thing to Mr. Black, Mr. Barlow, or Mr. Bennett or anyone else because it is false. I observe that there are no unsolved murders in the BOP. I never said, as Mr. Barlow states, that I killed anyone in prison on principle. The only person whose death I have caused was Luther Plant, and that happened because he jumped me, I reacted, and I was defending myself.

SA 2372.

1122.  Mr. Agofsky also denies that he "boasted" about a violent incident. He explains that:

> The incident to which Mr. Barlow refers is one in which I refused to come out of a recreation cage because I had been skipped for recreation three prior consecutive times. Before the corrections officers were sent in to remove me, I explained directly into the video camera my reasons for refusing to leave the cell and that it was not out of anger or malice. I was not "bragging" about this incident. In fact, I only told Mr. Barlow about it because he brought the topic up. He said that Dr. Roberts was concerned the government might introduce evidence about an incident when guards were called to remove me from a recreation cage (not a cell). I told him about what had happened, because he asked, but also told him that I did not believe the subject would come up in court because the authorities did not charge me with an infraction for the incident and there was no paperwork on it. I urged him to obtain a copy of the videotape if he was concerned that the incident would be used against me at trial.

SA 2372.

1123.  Mr. Agofsky's alleged resistance to defense contact with and testimony by his family. Black states that Mr. Agofsky resisted his mother's participation in the case:

> For a substantial period of time Mr. Agofsky was very specific that his mother was not to attend the trial or to testify in his behalf under any circumstances. We advised him we wanted her to testify. Mr. Agofsky finally agreed that his mother could attend the trial, but she was not to enter the courtroom at any time unless he gave his prior approval. Trial counsel made financial arrangements for Mrs. Agofsky to travel to Beaumont, Texas for the trial. She did not testify.

SA 2339.

1124.  Barlow makes a broader claim that Mr. Agofsky was generally opposed to background mitigation, but Black, Bennett, and the record do not support him. Further, Mr. Agofsky, Dr. Roberts, Dr. Gripon, other witnesses, and Barlow's own conduct during trial (when he made a too-easily abandoned effort to elicit background information from Dr. Roberts) all contradict his claim. Barlow states:

449

> Agofsky was adamant that we leave his family completely out of the process, despite our entreaties to him. We explained the significance of mitigating information, and he was basically uninterested in presenting any mitigating evidence concerning his family or background whatsoever.

SA 2336. Although Barlow actually began presenting background information through Dr. Roberts—until he was derailed by the prosecution's unsound hearsay objection—he now claims, falsely, that Mr. Agofsky's anticipated opposition to such evidence prevented him from presenting it:

> [W]e concluded that we could very easily lose control of the defensive theory because of the contingency that Agofsky would "act out" or disrupt the proceedings, as he threatened. Agofsky had informed us in no uncertain terms that if we took any action, presented any evidence, or testimony, or raised any issue that displeased him, he was perfectly capable of "blowing up" in the middle of trial in order to disrupt the proceedings, and that he would do so. He wanted no mitigating evidence from his past admitted.

SA 2341-42.

1125. These accusations are denied, and are contradicted by documentary evidence. Mr. Agofsky never objected to counsel's contacting his family members. SA 2369. He was aware that they had contacted two, his brother and his mother, and was not upset about either. *Id*. His asked his defense team to obtain his address book from ADX in Florence, Colorado, which contained contact information for several other family members. SA 648. The address book contained the addresses of his little brother Trevan, his maternal Aunt Peggy, his maternal Aunt Joy, and his paternal Aunt Terry. SA 650, 651, 656, 664. Dr. Roberts testified, and his contemporaneous notes reflect, that Mr. Agofsky specifically told him that he could contact his mother and other family members. SA 730, 913. Counsel never suggested that any family members aside from his mother could or should testify. SA 2367-70.

450

1126. Mr. Agofsky did not refuse to permit his mother to attend the trial. Initially, he was concerned with his mother's attendance at the guilt phase because his cousin was to testify. He did not want his mother to find out because it would cause a rift in the family. SA 2368-69. But he did not try to block her attendance at the penalty phase. In fact, correspondence from Mr. Agofsky to his trial counsel reflect that he asked them to help her with accommodations so that she could attend the trial. SA 2367-70, SA 681.

1127. No one from Mr. Agofsky's defense team ever talked to him about factual or background testimony that his mother could have provided at trial.

> In my first discussion with Mr. Barlow regarding my mother, he asked me if my mom loved me and I said yes. Mr. Barlow said that then she's probably upset about your situation. I said yes again. Mr. Barlow then asked me if I thought she would cry if he put her on the stand. I told him that was not an option because I would not benefit from my mother's tears. He did not tell me of any factual information he would ask my mother to present. He did not suggest that she could testify about my life history and upbringing, or my head injuries or martial arts studies, or my father's death.

SA 2369.

1128. Mr. Agofsky's rejection of Barlow's initial suggestion was a refusal to permit counsel to put her on the stand just to cry. Had counsel discussed the background information that Mr. Agofsky's mother could have testified to, he would have consented to have her testify about mitigation in his penalty phase. He did not want his mother exploited. SA 2367-70.

### 3. Prison Mitigation

1129. As indicated, Barlow alleges that Mr. Agofsky "wanted no mitigating evidence from his past admitted." SA 2342. Barlow's allegation is false. It is unsupported by Black and Bennett and is contradicted by documentary evidence. In his correspondence with counsel, Mr. Agofsky directed counsel to specific witnesses from his eleven prior years of incarceration who could offer mitigating evidence as well as evidence to rebut aggravation. SA 2370-71; *see, e.g.,*

451

SA 672-86. Mr. Agofsky wrote out questions that trial counsel could ask both inmates and guards about his own conduct in prison as well as prison culture evidence. *Id.*; *see also* SA 2566. He provided them with his address book, which contained a number of witnesses who could offer mitigating evidence about him in prison. SA 2371. Mr. Agofsky wrote out the details of every prior disciplinary infraction he had incurred in prison and suggested the names of witnesses who could have helped to provide defenses, explanations, and context to the prior acts alleged by the government. SA 646-47. He directed them to items in his BOP file that he thought would be helpful. Mr. Agofsky was very interested in counsel's presenting mitigating evidence from his prior incarceration and in rebutting aggravating circumstances.

### 4. Consultations With Experts Concerning Mental Health Issues And Future Dangerousness.

1130. The only defense Black makes in his affidavit of the trial team's mental health and future dangerousness presentation is to note that counsel called two Liberty Jail guards and four experts—prison consultants Cox and Terry Pelz, criminologist Elizabeth Pelz, and psychologist Dr. Dan Roberts—at the penalty phase, and argued that Mr. Agofsky's threat of future violence was low and the BOP had proper facilities to safely incarcerate him. SA 2323-24. He does not otherwise respond to any specific allegations concerning the deficient mental health and future dangerousness investigation and presentation.

1131. Barlow, who never investigated whether Mr. Agofsky had brain injuries or other neurological problems, nevertheless claims that "potential organic brain damage was the type of unfounded claim that we felt would detract from the presentation of truthful evidence[.]" SA 2336. He states that he hired "a renowned psychiatrist," but did not use him because he told Barlow that Mr. Agofsky's "penchant for violence was 'off the charts.'" SA 2345. Dr. Gripon is that psychiatrist. He contradicts Barlow's assertion, stating that Barlow never asked him to assess Mr.

452

Agofsky's future dangerousness. SA 2789. Gripon did not diagnose Mr. Agofsky as suffering from antisocial personality disorder and could have testified, if asked, that the V-code "adult antisocial behavior" was a meaningless label when applied to a person in a prison setting. SA 2791. Gripon found Mr. Agofsky no more dangerous than any other prisoner who wanted to protect himself from violence. He was not a dangerous person but was surviving in a dangerous environment, and his prior convictions and infractions had to be assessed in context. When Gripon interviewed Mr. Agofsky at the Liberty Jail, the authorities clearly did not view him as especially dangerous, and his demeanor did not make Gripon apprehensive or uneasy. SA 2791-92. Barlow's allegation regarding Dr. Gripon is denied.

1132.   Barlow also presented the trial testimony of a clinical psychologist (Dr. Roberts), who, Barlow says in his affidavit, "prepared his evaluation based on the background information and investigation we had conducted." SA 2345. Roberts contradicted this claim at his deposition, testifying that he learned whatever he learned about Mr. Agofsky's background only from his own interviews with Mr. Agofsky and his own phone call to Mr. Agofsky's mother. Roberts denied receiving a social history report or any other background information from counsel. SA 721, 731. Barlow's claim that he supplied background information to Dr. Roberts is denied.

1133.   Mr. Agofsky affirms that no one on his defense team ever conducted a full social history investigation in his case.

> My trial defense team never told me that they had investigated my pre-prison background or described specific mitigating information from my pre-prison past that they could present on my behalf. They never told me that they could present testimony about my childhood, the loss of my father, my martial arts training, my high school years, my academic record, or my head injuries. They never told me that they could present testimony from my brothers, my aunts, my cousins, my uncles, or my teachers, and never described for me what factual information those witnesses (and/or my mother) could present or why that would be relevant to potential mitigating factors

453

> and to rebutting aggravating factors. In particular, they never explained the importance of rebutting the government's "future dangerousness" aggravating factor and why my childhood and youth would be relevant to the rebuttal. They never asked family members to speak to me about their willingness and eagerness to testify in my behalf. And, although they gave me a warning that Dr. Roberts was going to visit me, they never told me what subjects he could cover in his testimony.

SA 2370.

1134. In summary, as explained in Ground 12.2, *supra*, voluminous mitigating evidence was available, from family members, teachers, friends, inmates, and experts. Mr. Agofsky wanted to fight for a life sentence and made repeated, documented efforts to suggest potential witnesses to his trial team. He willingly provided family contact and family background information to Bennett and the mental health experts. Mr. Agofsky denies that he impeded trial counsel's investigation and explains certain incidents that they have exaggerated into alleged obstruction. And even if he had put up some resistance to some avenues of mitigation investigation, that did not excuse counsel from conducting one and presenting the most persuasive case for life reasonably available. *See, e.g., Rompilla*, 545 U.S. at 381; *Wood*, 491 F.3d at 203 n.7; *Adams,* 2009 WL 1069330 at \*5. As the attached declarations of witnesses, trial experts (Gripon, Roberts, E. Pelz, T. Pelz, and Cox), and postconviction experts (Gelbort, Gur, Spiers. Lundberg-Love, Bernstein, Cunningham, Haney, Cole, and Eng) all demonstrate, there were many ways to present the mitigating information summarized in this Supplement and the Amended § 2255 Motion.

### E. Trial

#### 1. Jury Selection.

1135. Black insists that he "conducted an effective voir dire and submitted an extensive questionnaire for all potential jurors to answer." SA 2323. Barlow states that he and Black:

> carefully examined each juror with a view toward having an open mind concerning guilt or innocence, but just as importantly, being

454

able to consider the death penalty only as a last resort. We carefully utilized our peremptory strikes to obtain a jury that we believed would be amenable to our overall defense strategy, and committed no error in conducting the entire jury selection process.

SA 2340. Neither Black nor Barlow comments on any decisions they made respecting specific jurors. Their allegations that they conducted an effective voir dire are denied.

1136.  Mr. Agofsky recalls making a specific request to counsel about at least one potential juror during voir dire. A seated juror expressed the belief that any situation in which a person was killed could not constitute legitimate self-defense. SA 2371; Tr. Vol. 11, 97. For that reason, Mr. Agofsky asked his attorneys to strike that juror. In addition, Mr. Agofsky recalled that during voir dire Barlow was often not present. SA 2371.

2.      Counsel's Conduct At The Guilt-Innocence Phase Of Trial.

1137.  According to Black, he was "fully and adequately prepared for trial." SA 2323. He states that he "conducted a thorough and effective cross-examination of Mr. Ward in an attempt to neutralize and discredit his testimony," SA 2327, but does not respond to the specific allegations in the Amended § 2255 Motion (at 75-77) concerning Black's errors in Ward's cross-examination.

1138.  Barlow makes general assertions that the defense raised meritorious objections, protected the record, and presented a "well-reasoned and cogent" argument in summation. SA 2341. He does not respond to any specific allegations concerning the conduct of the trial. Black's and Barlow's non-specific allegations concerning their conduct of the defense are denied.

1139.  Mr. Agofsky was stunned when his counsel called only three inmate witnesses in the guilt-innocence phase of his trial. He "wanted counsel to interview and call many more than two eyewitnesses, and I believed that more than two favorable eyewitnesses were available. I also wanted counsel to present prison mitigating evidence through inmate witnesses, who could have included but should not have been limited to the three other subpoenaed witnesses (Fitzgerald,

455

Spring, and Rivera). I believed that many more inmate mitigation witnesses were available and gave their names to my defense team." SA 2373.

### 3.    Counsel's Conduct At The Penalty Phase Of Trial.

1140.    Barlow and Black defend their penalty phase presentation only with generalities. Barlow describes his efforts to develop his sole mitigation theme—that the BOP could control Mr. Agofsky and isolate him from other inmates, and that he would not pose a threat to guards—through voir dire, openings and summations, cross-examination of government witnesses, and presenting prison experts and jail guards at the penalty phase. SA 2344-45. He states that he would "not have conducted the investigation or trial in any substantially different manner," and that the outcome was the inevitable result of Mr. Agofsky's "past acts." SA 2347-48.

1141.    Barlow states that Mr. Agofsky shaved his head and refused to change from his prison uniform into court clothes between the guilt-innocence and penalty phases. SA 2342. He claims that the team managed to "present mitigating factors," "without Agofsky realizing what was happening" and thus avoid "set[ting] him off in the courtroom." SA 2342.

1142.    In his affidavit, Mr. Agofsky denies Barlow's account and explains that Barlow confused two incidents that occurred during the trial.

> The defense team obtained a suit for me and Mr. Black told me that he had additional shirts for me to wear. During voir dire I wore the same shirt for 5 or 6 days in a row, telling Mr. Black each day that I needed a clean one. By the sixth day, the marshals who transported me to and from court were telling me that I smelled, and they were right. Finally, after the fifth or sixth day, as soon as I arrived at the courthouse around 6 a.m. before court, I told the marshals to tell my lawyers that I was not going to change into the dirty shirt again. Mr. Black came down to see me in the holding cell before court and I told him I was not wearing dirty clothes to court. He went to his car, or sent someone out to his car, and got me a clean shirt. I changed into the shirt and the suit and was ready on time to enter the courtroom. That is the only time I refused to change into court clothes during the trial and it was resolved before court began for the day.

> I did not threaten to shave my head. I simply did so the night after the jury found me guilty. I knew no mitigation investigation had been done and that my attorneys had little evidence to present at the penalty phase. I thought my situation was hopeless, so I shaved my head in protest.

SA 2373. Mr. Agofsky understood that the evidence the defense was presenting was intended to be mitigating, but believed it was ineffective and unpersuasive. "I was well behaved in court not, as Barlow alleges, because I was fooled about what my lawyers were doing, but because I did not want to disrupt the trial." SA 2373-74.

1143. Still without support from Black or Bennett, Barlow claims that Mr. Agofsky "began to become uncontrollable" during the testimony of the former BOP warden (Cox). Barlow falsely states that Mr. Agofsky threatened to stop the proceedings with disruptive behavior, but the defense team "attempted to manage the situation" without attracting the attention of anyone else in the courtroom. SA 2346.

1144. Mr. Agofsky denies Barlow's allegations:

> I did not threaten to disrupt the trial. I have never disrupted or threatened to disrupt any courtroom proceedings over the course of five trials in Missouri and Oklahoma, and never threatened to disrupt proceedings in this case. Judge Heartfield cited my record of good conduct in the courtroom when he denied the government's motion to require me to wear a stun belt during trial.

SA 2373; *see also* Criminal Docket, Doc. 72. Further, as he points out in his affidavit, the marshals were sitting right next to him and would have immediately been alerted by any disruptive behavior on his part. SA 2375.

1145. As described in Ground 12.2(G), Barlow abandoned his only effort to elicit any background information about Mr. Agofsky, turning tail when confronted with an unsound hearsay objection during Dr. Roberts's penalty phase testimony. Neither Barlow nor Black objected to the prosecution's unfounded cross-examination about Mr. Agofsky's non-existent antisocial

457

personality disorder or his misleading summation remarks about that diagnosis, and they otherwise failed to advocate vigorously for Mr. Agofsky during the penalty phase. Neither Barlow nor Black responds specifically to these allegations. Barlow attacks Mr. Agofsky instead, accusing him of actual and threatened disruptive behavior, which Mr. Agofsky denies and Black and Bennett do not confirm. Black says nothing at all about the penalty phase presentation except to list the witnesses who testified for the defense. SA 2323-24.

### F. Trial Counsel's Interactions With Postconviction Counsel

1146. Both Black and Barlow attempt to defend their non-cooperation with Mr. Agofsky's successor counsel, in contravention of their professional obligations,[147] by blaming successor counsel. According to Black:

> Trial counsel did cooperate with habeas counsel and advised them that he would meet with them if they would provide a written waiver of the attorney client privilege signed by Mr. Agofsky. Habeas counsel refused to do so. Instead they provided two documents signed by Mr. Agofsky. The first document, dated April 12, 2007, authorized the release of documents and files by trial counsel to habeas counsel. The second document, dated December 6, 2007, waived the attorney client privilege as to habeas counsel, not trial counsel. (Petitioner's Appendix, A29.) Specifically, it granted permission for Claudia Van Wyk and Jennifer Merrigan to speak with trial counsel. The document did not waive Mr. Agofsky's attorney client privilege as to trial counsel.

SA 2320-21.

1147. Similarly, Barlow alleges:

> The last purported "authorization" signed by Agofsky granted permission for his habeas counsel to speak with Mr. Black and myself, but did not authorize us to release any such information. Again we related that oversight to habeas counsel, and learned that habeas counsel summarily canceled my scheduled interview.

---

[147] *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.13, 31 Hofstra L. Rev. 903, 1074 (2003).

SA 2334.

1148.    Black's and Barlow's descriptions of their interactions with postconviction counsel are denied.

1149.    As Mr. Agofsky indicates in his affidavit, he intended to give full permission for a frank discussion of his trial counsels' representation to them and to his current attorneys. He signed an authorization after discussing it with his postconviction counsel, who explained that its purpose was to permit his prior counsel to reveal otherwise privileged information to his current counsel in the course of an unrestricted discussion of trial counsel's representation. SA 2376. Black's and Barlow's insistence on a "waiver" was in any event unnecessary. Under the ABA Guideline for the Appointment and Performance of Counsel in Death Penalty Cases, his former counsel had an ethical obligation to offer their full cooperation to successor counsel. ABA Guideline 10.13(b), Duty to Facilitate the Work of Successor Counsel, expressly provides that prior counsel's duty includes "providing the client's files, as well as information regarding all aspects of the representation, to successor counsel." The Texas Bar has adopted this guideline verbatim.[148] In addition to the two written authorizations tendered to trial counsel, current counsel also provided trial counsel with a copy of the ABA guidelines governing their legal and ethical obligations. A19-32. Mr. Agofsky's former counsel had a continuing duty to protect his privileged communications,

---

[148] The Texas State Bar Board of Directors adopted guidelines inspired by the ABA Guidelines in 2006. ABA Guideline 10.13 appears verbatim as Guideline 11.8, Duty to Facilitate the Work of Successor Counsel. These Guidelines "articulate the statewide standard of practice for all persons facing the death penalty in the State of Texas," and apply from the outset of the case through postconviction and clemency review. *See* State Bar of Texas, Guidelines and Standards for Capital Counsel (April 21, 2006), Guidelines 1.1, 11.8, *available at* http://www.uta.edu/pols/moore/indigent/txcapitalguidelines.pdf (last visited September 2, 2009).

as did his current counsel, placing any discussions between them under the protection of the privilege as to other persons.[149] Thus nothing excused trial counsel's failure to cooperate.

1150. Even if a waiver had been necessary, moreover, the language of Mr. Agofsky's notarized authorization would have sufficed: it authorized Van Wyk and Merrigan to meet with Black and Barlow and "discuss with them all matters arising from their representation of me," including but not limited to "any matters protected by the attorney-client privilege." A29. Finally, Black and Barlow never objected to the form of the December 6 authorization in 2007, but waited until this Court ordered them to submit affidavits to quibble about its wording. *See* A32 (letter from G. Patrick Black to Claudia Van Wyk, December 6, 2007, describing reasons for refusing to meet).

### G.   **Conclusion**

1151.  Mr. Agofsky describes his 2004 trial and the attorneys who represented him:

> Mr. Black and Mr. Barlow both say that I was very involved in my investigation and it is true. I wanted to defend myself at the guilt-innocence phase of my trial and make the jury understand that the Luther Plant incident was a case of self-defense. I was very afraid that my attorneys were not investigating my case or preparing for trial thoroughly and were not developing favorable evidence. I tried to do everything I could to suggest avenues of investigation and to work with them. I also wanted my attorneys to conduct a thorough investigation of my prior offenses and infractions. I suggested many witnesses they could have interviewed and could have presented to explain and provide context for them.
>
> I did not want to die in 2004 and I do not want to be executed now. I wanted my attorneys to conduct a thorough investigation to prepare for the penalty phase, make a persuasive penalty-phase presentation to the jury, and fight for my life. I suggested many mitigation witnesses to them. I spoke at length to Dr. Roberts and Dr. Gripon, both of whom I knew might testify for the defense at trial about

---

[149] Because Mr. Agofsky had not yet filed his Amended § 2255 Motion, no implied waiver of the attorney-client privilege was yet in issue. After filing any privilege as to matters outside the scope of allegations of ineffective assistance of counsel remained in full force and effect.

anything I told them, about my family history and background. I would have answered additional questions from them or others to the best of my ability. I told the trial investigator, Jay Bennett, how to obtain my address book, which contained addresses for family members, friends, and potential inmate mitigation witnesses. I explicitly gave Dr. Roberts permission to talk to my mother and my aunts and I anticipated that he might testify in court about whatever they told him. I would have agreed if the defense had called members of my immediate and extended families, my teachers, my friends, and my fellow inmates as witnesses. While I would not have permitted Mr. Barlow to put my mother on the stand just to make her cry, I would have agreed to her testimony about factual information concerning my family background, my childhood and upbringing, the rough times I had, and how I surmounted them. I would have agreed to a presentation that traced my study of the martial arts from childhood to adulthood and explained how it influenced my life philosophy.

I have suffered through some rough times in my childhood and in my adult life as well. I am proud of how I have endured the rough times and navigated dangerous and difficult circumstances. I wish the sentencing jury could have heard my story.

SA 2376-77.

1152. Mr. Agofsky was constitutionally entitled to attorneys who would thoroughly investigate the government's evidence and his defense. It should have been a straightforward task in a case where the government had only one eyewitness and supplied a list with the names and register numbers of 28 other inmates who were present during the fight between Mr. Agofsky and Plant. Trial counsel's presentation of only two of these witnesses, in sketchy testimony that only outlined everything they could have said, fell far short of what they should have done. Seven other eyewitnesses could have said that Plant initiated the fight, and many others could have helped to explain why Mr. Agofsky responded reasonably. There is a reasonable probability that, but for counsel's deficient investigation and other deficient performance, the jury would have accepted his justification defense and acquitted him, convicted of a lesser offense, or at least imposed a life

sentence. U.S. Const. amend. VI; *Strickland v. Washington*, 384 U.S. 456 (1984); *Richards v. Quarterman*, 566 F.3d at 571.

1153. Mr. Agofsky was also constitutionally entitled to attorneys who would make a serious effort to investigate his case in mitigation, *before* choosing a mitigation strategy. The available evidence was substantial and compelling. Defense counsel could have undermined the convictions and infractions that the government offered in aggravation at the penalty phase. The jurors could have heard that Mr. Agofsky's character was molded by trauma and tragedy that affected his world view and his brain. They could have learned that martial arts was his salvation and provided him with a philosophy of life. They could have seen how many family members, friends, and fellow inmates are willing to support him with their testimony or in other ways. And they could have heard from experts who could have explained the impact of everything he has experienced on his development. There is a reasonable probability that, but for his attorneys' deficient investigation and other deficient performance, the sentencing jury would have spared his life. U.S. Const. amend. VI; *Rompilla*, 545 U.S. 374.

1154. For all these reasons, this Court must order an evidentiary hearing and grant him a new trial on both guilt or innocence and penalty.

IX. **GROUND 12.10: MR. AGOFSKY'S PRIOR CONVICTION UNDER 18 U.S.C. § 924(C), WHICH SERVED AS AN AGGRAVATING FACTOR IN SUPPORT OF A DEATH SENTENCE, IS INVALID BECAUSE THE UNDERLYING BANK ROBBERY IS NOT A "CRIME OF VIOLENCE."[150]**

A. **Introduction**

1155. One of the aggravating factors the jury found in Mr. Agofsky's capital case was his prior conviction under 18 U.S.C. § 924(c) for using a firearm during and in relation to a "crime of

---

[150] This claim incorporates and supersedes the amendment filed, with the Court's leave, on June 23, 2016. *See* ECF No. 173 (the "Johnson Amendment").

violence." *See* 18 U.S.C. § 924(c)(1)(A)(ii); *see also* Special Verdict Form, D. Ct. No. 1:03-cr-173-01 (E.D. Tex. July 16, 2004), ECF No. 177, at 8. *See* Exh. A, attached. The count of the Missouri indictment charging the § 924(c) violation (Count 3) alleged that the underlying "crime of violence" was bank robbery, in violation of 18 U.S.C. §§ 2113 (a), (d), and (e) (Count 2 of the same indictment). *See* Superseding Indictment, *United States v. Shannon Wayne Agofsky*, Crim. No. 92-05006 (W.D. Mo. April 16, 1992), at 4. *See* Exh. B.

1156. Chapter 18 U.S.C. § 924(c)(3) defines "crime of violence" as follows:

(3) For purposes of this subsection, the term "crime of violence" means an offense that is a felony and –

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The first clause, § 924(c)(3)(A), is commonly called the "force" clause, and the second, § 924(c)(3)(B), the "residual" clause. As discussed in the sections that follow, the forms of bank robbery of which Mr. Agofsky was convicted cannot qualify as "crimes of violence" under the residual clause because that clause is void for vagueness. *See United States v. Davis*, 139 S. Ct. 2319 (2019); *Johnson v. United States*, 576 U.S. 591 (2015). Likewise, the relevant bank robbery offenses categorically fail to qualify as "crimes of violence" under the remaining force clause because they can be committed recklessly. *See Borden v. United States,* 141 S. Ct. 1817 (2021).

1157. No alternative ground can sustain Mr. Agofsky's conviction. These forms of bank robbery cannot satisfy the force clause because, in addition to their lack of the necessary *mens rea*, they do not require force or intentional threat for their commission.

1158. After *Johnson*, *Davis,* and *Borden*, Mr. Agofsky stands convicted of a non-existent crime and is entitled to acquittal on Count 3 of his Missouri indictment. Given the invalidity of the

§924(c) conviction, a death sentence based in part on that conviction cannot stand. *See Johnson v. Mississippi*, 486 U.S. 578 (1988). Accordingly, Mr. Agofsky is entitled to a new capital penalty phase.

### B. Procedural History

1159. On July 8, 2004, a jury convicted Mr. Agofsky of two counts of murder in the United States District Court for the Eastern District of Texas under Indictment No. 1:03-cr-173. It voted to sentence him to death on July 16, 2004. The superseding indictment on which he stood trial charged, among other aggravating factors, that Mr. Agofsky had a previous conviction for a federal offense, punishable by more than one year, involving a firearm. *United States v. Shannon Agofsky*, Superseding Indictment, D. Ct. No. 1:03-cr-173-01 (Feb. 19, 2004) (Special Finding #7), ECF No. 23, at 3. *See* Exh. C. At the close of the penalty phase, the judge instructed the jury that, as a matter of law, 18 U.S.C. § 924(c) is such an offense. Trial transcript, 7/15/04, at 300-01. The prosecution then referred to the § 924(c) conviction multiple times in penalty phase summation. *Id.* at 337, 369, 371. In its verdict returning a death sentence, the jury found that the § 924(c) conviction constituted an aggravating circumstance. *See* Exh. A (Special Verdict Form, at 8).

1160. Mr. Agofsky appealed his conviction and sentence to the Court of Appeals for the Fifth Circuit under Docket No. 07-40330. That court denied relief, *United States v. Agofsky*, 516 F.3d 280 (5th Cir. 2008), and the Supreme Court denied certiorari on October 6, 2008. *Agofsky v. United States*, 555 U.S. 837 (2008). Mr. Agofsky's motion to vacate or set aside sentence, pursuant to 28 U.S.C. § 2255, is pending before this Court. ECF Nos. 38, 51, 105. The Government has filed its response, Mr. Agofsky has filed his reply (ECF. Nos. 124, 133), and the parties have fully briefed a motion by the Government to strike certain claims. ECF Nos. 112, 113, 117, 119-21. On February 14, 2012, this Court entered an order granting Mr. Agofsky's unopposed motion to stay and hold these proceedings in abeyance to allow him to present newly available eyewitnesses and

other evidence of his innocence of his prior Oklahoma murder conviction in Oklahoma state court. ECF No. 157.

1161. On June 26, 2015, the Supreme Court invalidated a provision of law directly analogous to a provision § 924(c) on the ground that it violated due process because it was unconstitutionally vague. *See Johnson*, 576 U.S. 591. On April 18, 2016, in *Welch v. United States*, 578 U.S. 120 (2016), the Court held that *Johnson* established a new substantive rule of constitutional law that is retroactive to cases on collateral review. On June 23, 2016, this Court granted Mr. Agofsky's unopposed motion to suspend the stay and abeyance, allowed him to amend his § 2255 motion to add a *Johnson* claim, and then reinstated its previous order staying and administratively closing the case. ECF No. 173.

1162. On June 25, 2021, this Court lifted the stay and abeyance and ordered the parties to submit a joint status report explaining the status of the ongoing Oklahoma litigation. *See* ECF No. 186. The parties filed the report on August 26. *See* ECF No. 187. On January 6, 2022, the Court reinstated the stay and administratively closed the case until further order. The Court directed counsel for Mr. Agofsky to advise it within twenty days of the conclusion of the Oklahoma state court proceedings, and to file a status report no later than July 1, 2022, and every six months thereafter. ECF No. 188.

1163. Mr. Agofsky has litigated the invalidity of his § 924(c) conviction directly. He petitioned the Eighth Circuit for authorization to file a successive § 2255 petition in light of *Johnson* and *Welch*, and again in light of *Davis*. The Court of Appeals summarily denied both petitions. *See* Judgment, *Agofsky v. United States*, No. 20-2030 (8th Cir. June 30, 2020); Judgment, *Agofsky v. United States*, No. 16-2185 (8th Cir. Oct. 11, 2016).

1164. More recently, the Supreme Court construed the "force" clause of the ACCA. In *Borden v. United States,* 141 S. Ct. 1817 (2021)*,* the Court held that the statutory term "violent felony" covers only crimes committed knowingly or purposely and does not extend to crimes involving recklessness. Because the least culpable forms of bank robbery under the subsections on which Mr. Agofsky stands convicted, 18 U.S.C. §§ 2113(a), (d), and (e), do not require a purposeful or knowing *mens rea*—or any *mens rea* at all—they are not crimes of violence under *Borden* and cannot serve as predicates for a § 924(c) conviction. *See* 141 S. Ct. at 1822.

1165. Mr. Agofsky has sought habeas relief in reliance on *Borden* in the United States District Court for the Southern District of Indiana, the district where he is incarcerated, pursuant to 28 U.S.C. § 2241. He argues that, because *Borden* announced a new statutory rule and not a new rule of constitutional law, § 2255 is "inadequate or ineffective to test the legality of his detention" and he may proceed under § 2241. *See* 28 U.S.C. § 2255(e). That petition is currently pending. *See* Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241, ECF No. 1, *Agofsky v. Watson*, No. 22-49 (S.D. Ind. Feb. 9, 2022).

1166. Mr. Agofsky has filed this amended claim in this Court to demonstrate that, in light of *Johnson*, *Davis*, and *Borden*, he stands convicted of a non-existent crime and is innocent of violating § 924(c), and that his death sentence relying in part on the § 924(c) conviction cannot stand.

### C.   The Residual Clause Is Void for Vagueness.

1167. As described above, in *Johnson*, 576 U.S. 591, the Supreme Court invalidated the residual clause of the Armed Career Criminal Act ("ACCA") because it is unconstitutionally vague in violation of the Due Process Clause. The Court then held in *Welch v. United States*, 578 U.S. 120 (2016), that *Johnson* announced a new substantive rule that applied retroactively to cases on collateral review. Next, the Court held in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), that the

residual clause of 18 U.S.C. § 16(b) was unconstitutionally vague because of its strong and relevant similarities to the ACCA's residual clause (which had been invalidated in *Johnson*). The provision invalidated in *Dimaya* is relevantly identical to the residual clause contained in § 924(c). Finally, in *Davis*, 139 S. Ct. 2319, the Court held that there were "no material difference[s]" among the residual clauses contained in the ACCA, § 16, and § 924(c), and therefore that § 924(c)'s residual clause is also unconstitutionally vague. 139 S. Ct. at 2326. *Davis* thus conclusively applied *Johnson*'s holding to § 924(c)(3)(B).

1168. This line of authority establishes that Mr. Agofsky's § 924(c) conviction cannot qualify as a crime of violence under the residual clause because the clause is void for vagueness.

**D.** **Section 2113(a) Bank Robbery Cannot Serve As A Predicate Offense For A § 924(c) Conviction Under The Force Clause.**

1. Under *Borden*, The Predicate Offense Must Require A *Mens Rea* Of More Than Recklessness.

1169. In *Borden*, the Supreme Court interpreted the portion of the force clause of the ACCA that requires three or more prior convictions for a "violent felony." To decide this question, the Court employed the "categorical approach:"

> Under that by-now-familiar method, applicable in several statutory contexts, the facts of a given case are irrelevant. The focus is instead on whether the elements of the statute of conviction meet the federal standard. Here, that means asking whether a state offense necessarily involves the defendant's "use, attempted use, or threatened use of physical force against the person of another." § 924(e)(2)(B)(i). If any—even the least culpable—of the acts criminalized do not entail that kind of force, the statute of conviction does not categorically match the federal standard, and so cannot serve as an ACCA predicate.

*Borden*, 141 S. Ct. at 1822 (case citations omitted).

1170. Deciding a question it had previously left open, *id*. at 1825, the Court held that the statutory language did not include crimes of recklessness. Justice Kagan wrote for the plurality:

467

> We must decide whether the elements clause's definition of "violent felony"—an offense requiring the "use of physical force against the person of another"—includes offenses criminalizing reckless conduct. We hold that it does not. The phrase "against another," when modifying the "use of force," demands that the perpetrator direct his action at, or target, another individual. Reckless conduct is not aimed in that prescribed manner. Our reading of the relevant text finds support in its context and purpose. The treatment of reckless offenses as "violent felonies" would impose large sentencing enhancements on individuals (for example, reckless drivers) far afield from the "armed career criminals" ACCA addresses—the kind of offenders who, when armed, could well "use [the] gun deliberately to harm a victim."

*Id*. at 1825 (citation omitted).

1171. Justice Thomas, concurring, reached the same conclusion for different reasons. In his view, "a crime that can be committed through mere recklessness does not have as an element the 'use of physical force' because that phrase 'has a well-understood meaning applying only to intentional acts designed to cause harm." *Id*. at 1835. He and the plurality thus agreed on their ultimate conclusion: a conviction cannot qualify as a "violent felony" unless it has a *mens rea* of more than recklessness.

1172. As Justice Kagan observed, the force clause of the ACCA is "relevantly identical" to the language of the force clause contained in 18 U.S.C. § 16(a). *Id.* at 1824. That language in turn is identical to the language in § 924(c), the provision at issue in this case. *See United States v. Olvera-Martinez*, No. 18-40338, 2021 WL 4166369 (5th Cir. Aug. 27, 2021) (parties agree *Borden* applies to "crime of violence" definition in § 16(a)); *see also United States v. Mejia-Quintanilla*, No. 17-15899, 2021 WL 4282628, at *1 (9th Cir. Sept. 21, 2021) (*Borden* governs question whether a conviction under California's murder statute is "crime of violence" under § 924(c)). Therefore, a conviction cannot qualify categorically as a "crime of violence" under § 924(c) if it

is possible to commit the predicate offense with recklessness or some less-culpable *mens rea*. And,

of necessity, the more-than-reckless *mens rea* must relate to the use of force element.

> ### 2. The Categorical Approach Applies Because § 2113(a) Is Indivisible.

1173. In 1992, 18 U.S.C. § 2113 provided, in relevant part:

> (a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or
>
> Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny—
>
> Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both….

1174. This statute is indivisible. When a statute is divisible, *i.e.*, when it includes alternative elements creating multiple versions of the crime, a court may use the modified categorical approach (by consulting a limited number of documents such as the charging document) to determine which of the various offenses was the offense of conviction. *See Descamps v. United States,* 570 U.S. 254, 260 (2013) (modified approach "helps effectuate the categorical analysis when a divisible statute, listing potential offense elements in the alternative, renders opaque which element played a part in the defendant's conviction"). When, on the other hand, a statute is indivisible, *i.e.*, when it merely lists "multiple, alternative *means* of satisfying one (or more) of its elements," courts must use the categorical approach. *See Mathis*, 136 S. Ct. at 2248 (emphasis added). When a statute "enumerates various factual means of committing a single

element," a court cannot inquire how the defendant committed the offense and rather must consider the least culpable conduct that can satisfy that element as a whole. *Id.* at 2249, 2255. *Mathis* contrasted elements, *i.e.*, "the things the prosecution must prove to sustain a conviction," with factual means, *i.e.*, "circumstances or events having no legal effect or consequences." *Id.* at 2248 (internal quotation marks, alterations, and citations omitted). Alternative elements "define multiple crimes[,]" while alternative factual means are "alternative methods of committing [a] single crime." *Id.* at 2249-50.

1175.   Here, the relevant statutory language of § 2113(a) demonstrates that "force and violence," "intimidation," and "extortion" are three factual "means" of committing the single indivisible crime of bank robbery.

1176.   The statute provides a single penalty for bank robbery that does not depend on whether the defendant used "force and violence," "intimidation," or "extortion." Thus, the terms do not create "two different offenses, one more serious than the other." *Mathis*, 136 S. Ct. at 2249; *id*. at 2256 ("If statutory alternatives carry different punishments, then under *Apprendi* they must be elements."). Instead, each term defines an equally serious way of committing the offense. Section 2113(a)'s text also indicates that these three means are simply ways of completing an element. *See id*. at 2250 (describing "means" as different ways of "fulfilling an element"). That is, "by force and violence," "by intimidation," and "by extortion" are all methods of wrongfully obtaining money from banks.

1177.   A jury may convict a person of bank robbery under § 2113(a) even if jurors do not unanimously agree on *how* the person wrongfully obtained the money, whether (i) by force and violence inside the bank, (ii) by intimidation inside the bank, or (iii) by extortion from outside the bank. *See* H.R. Rep. No. 99-797, at § 51 (giving as an example of "extortionate conduct" the

470

situation where "a perpetrator who, from a place outside the bank, threatens the family of a bank official in order to cause the bank official to remove money from the bank and deliver it to a specified location"). A person could make a demand for money while standing in front of a bank teller, or a person could call the bank teller and make the same demand; a jury need not unanimously decide which happened in order to convict, because the person's location is merely a factual circumstance. *Cf. Mathis*, 136 S. Ct. at 2250 ("Each of the terms serves as an alternative method of committing the single crime of burglary, so that a jury need not agree on which of the locations was actually involved.") (internal quotation marks, citations, and alteration omitted); *United States v. Dixon*, 805 F.3d 1193, 1198 (9th Cir. 2015) ("[T]he jury can return a guilty verdict even if some jurors believe the defendant took property from the victim's person and other jurors believe the defendant took the property from the victim's immediate presence[] [or if] some jurors believe the defendant used force and others believe the defendant used fear.").

1178. Like the Iowa bank robbery statute at issue in *Mathis,* which "itemize[d] the various places that crime could occur as disjunctive factual scenarios rather than separate elements," so too does § 2113(a) itemize the various *ways* that crime could occur as disjunctive factual scenarios. *Mathis*, 136 S. Ct. at 2249. Therefore, under the categorical approach, a § 2113 conviction cannot qualify as a crime of violence if any of the "factual means of committing" it, even the least culpable, does not qualify.

3.     <u>Bank Robbery By Intimidation Cannot Serve As A Predicate § 924(c) Conviction Under *Borden.*</u>

1179. Mr. Agofsky was convicted in the Eighth Circuit. That Circuit's long-standing precedent establishes that bank robbery by intimidation does not necessarily require the purposeful or knowing use of force. Rather, a range of less intentional conduct can support a conviction.

471

1180.   In *United States v. Yockel*, 320 F.3d 818, 821 (8th Cir. 2003), the court upheld a conviction under § 2113(a) even though there was no evidence that Yockel intended to put the teller in fear of any type of injury. Yockel made no sort of physical movement toward the teller, never presented her with a note demanding money, and never displayed a weapon or appeared to have a weapon. *Id.* The court concluded that whether or not a person "intend[s] to intimidate the teller is irrelevant in determining his guilt … the intimidation element of § 2113(a) is satisfied … *whether or not* [a person] actually intended the intimidation." *Id.* at 824 (emphasis in original) (internal quotations omitted). The court has reiterated that "whether the bank robber intended to intimidate is irrelevant"; the objective test for intimidation is satisfied if an ordinary person could infer a threat of bodily harm from a bank robber's speech or actions. *United States v. Pickar*, 616 F.3d 821, 824 (8th Cir. 2010); *accord United States v. Clark*, 695 F. App'x 999, 1000 (8th Cir. 2017) (citing and following *Pickar*); *United States v. Caldwell,* 292 F.3d 595, 596 (8th Cir. 2002) (reiterating that a person's conduct must "'constitute an intimidation to an ordinary, reasonable person'" (quoting *United States v. Smith*, 973 F.2d 603, 604 (8th Cir. 1992))).[151]

1181.   Despite this precedent, the Eighth Circuit held before *Borden* that the statutory language of § 2113, requiring commission of the crime by "force and violence, or by intimidation," satisfies the definition of "crime of violence" in § 924(c). For example, in 2016 the court issued companion decisions denying PFAs because "bank robbery in violation of 18 U.S.C. § 2113(a)

---

[151] *See also United States v. Kelley*, 412 F.3d 1240, 1244 (11th Cir. 2005) ("Whether a particular act constitutes intimidation is viewed objectively ... and a defendant can be convicted under [federal bank robbery] even if he did not intend for an act to be intimidating." (internal citation omitted)); *United States v. Woodrop*, 86 F.3d 359, 364 (4th Cir. 1996) (intimidation element satisfied if ordinary person could infer threat of harm, regardless of whether defendant intended intimidation); *United States v. Robinson*, 527 F.2d 1170, 1172 (6th Cir. 1975) (intimidation found even though defendant made no express threat and gave no "hint" of weapon; rather defendant, who wore a leather jacket and acted "somewhat nervously," kept hands on the counter, visible to the teller, when he demanded money).

and (e) is a 'crime of violence' under 18 U.S.C. § 924(c)(3)(A)." *Holder v. United States*, 836 F.3d 891, 892 (8th Cir. 2016); *Allen v. United States*, 836 F.3d 894, 895 (8th Cir. 2016). The petitioners in these cases had been convicted of § 2113(a) and (e) and sentenced under § 924(c). The Eighth Circuit relied on *United States v. Boman*, 810 F.3d 534, 543 (8th Cir. 2016), which held that the federal robbery statute (18 U.S.C. § 2111) satisfies the force clause under 18 U.S.C. § 924(c)(3)(A). *Holder,* 836 F.3d at 892; *Allen,* 836 F.3d at 895. The court reasoned that bank robbery must satisfy the force clause as well. *Holder,* 836 F.3d at 892, *Allen,* 836 F.3d at 895.

1182. The Circuit has also held more specifically that, even though "intimidation" does not require intent, it can still constitute a threat of physical force. "[T]hreat, as commonly defined, 'speaks to what the statement conveys—not the mental state of the author.'" *Estell v. United States*, 924 F.3d 1291, 1293 (8th Cir. 2019) (quoting *United States v. Harper*, 869 F.3d 624, 626 (8th Cir. 2017)); *Kidd v. United States*, 929 F.3d 578, 581 (7th Cir. 2019) (following *Estell*).

1183. *Borden* abrogates these decisions, which discount the relevance of the actor's intent. Because intimidation can be committed recklessly—or without any intent whatsoever—*Borden* compels the conclusion that bank robbery by intimidation cannot serve as a predicate crime of violence for § 924(c).

### 4. Section 2113(a) Fails To Qualify As A "Crime of Violence" On Additional Grounds.

1184. Under the categorical approach, if bank robbery by intimidation cannot be a "crime of violence," then a § 2113(a) conviction cannot qualify as a predicate crime for a § 924(c) conviction. But even if bank robbery by intimidation does qualify, § 2113(a) fails to qualify for other reasons.

1185. First, bank robbery by extortion, like bank robbery by intimidation, is one of the means of satisfying an element of § 2113(a). Bank robbery by extortion may be committed both

473

without purpose or knowledge and by non-violent means that need not involve fear of physical force. *See United States v. Valdez*, 158 F.3d 1140, 1143 n.4 (10th Cir. 1998) ("an individual may be able to commit a bank robbery under the language of 18 U.S.C. § 2113(a) 'by extortion' without the threat of violence"). As the Supreme Court noted in *Johnson*, "[t]he act of making an extortionate demand … does not, in and of itself, normally cause physical injury. Rather, risk of injury arises because the extortionist might engage in violence *after* making his demand." 135 S. Ct. at 2557. Indeed, a person can commit extortion by putting another person in fear of financial or reputational loss. *See id.* at 2558 ("the typical extortionist" might "threaten his victim by mail with the revelation of embarrassing personal information" rather than threatening a victim with force); *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 320 (S.D.N.Y. Mar. 31, 2016) (extortion by wrongfully threatening to initiate lawsuit); *Azzara v. United States*, Nos. 1:10-cv-8104-CM, 02-cr-1446-CM, 2011 WL 5025010, at *3 (S.D.N.Y. Oct. 20, 2011) (extortion by threatening to give sexually explicit videotapes to employer). A person can also commit extortion by holding a bank employee's family member for ransom without directly using or threatening force against the victims of the extortionate scheme. *See United States v. Carpenter*, 611 F.2d 113, 114 (5th Cir. 1980). As the Supreme Court recognized recently, holding a person for ransom need not involve any violence whatsoever. *See Torres v. Lynch*, 578 U.S. 452, 465-66 (2016) ("The 'crime of violence' provision [of 18 U.S.C. § 16] would not pick up demanding a ransom for kidnapping.").

1186. Bank robbery by extortion does not contain "an element [necessarily involving] the use, attempted use, or threatened use of physical force[,]" 18 U.S.C. § 924(c)(3)(A), much less an element necessarily involving the *purposeful or knowing* use of force. *See Borden*, 141 S. Ct. at 1834 ("Offenses with a *mens rea* of recklessness do not require ... the active employment of force

474

against another person") (Kagan, J.). Accordingly, the availability an extortion theory disqualifies Mr. Agofsky's § 2113(a) conviction as a crime of violence under the categorical approach, even if the availability of an intimidation theory does not.

1187.   Under the categorical approach, therefore, § 2113(a) cannot serve as a predicate "crime of violence" because the "least culpable" of the "acts criminalized" do not entail the requisite purposeful or knowing use of force. *See Borden*, 141 S. Ct. at 1822.

E.      **Sections 2113(d) And (e) Do Not Qualify As Crimes Of Violence Under The Force Clause.**

        1.      Because § 2113(a) Is Not A Crime Of Violence, The Sentence Enhancements Under §§ 2113(d) And (e) Cannot Qualify As Crimes Of Violence.

1188.   Neither § 2113(d) nor § 2113(e) can independently serve as a crime of violence to support a conviction under § 924(c)(3)(A) because both sections require proof of a bank robbery under § 2113(a) or another section of § 2113. Subsections (d) and (e) of § 2113 provide as follows:

> (d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined under this title or imprisoned not more than twenty-five years, or both.

> (e) Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or if death results shall be punished by death or life imprisonment.

1189.   Courts have described § 2113(a) as a lesser included offense of §§ 2113 (d) and (e). *See United States v. Cobb*, 558 F.2d 486, 489 (8th Cir. 1977) ("In order to convict under s 2113(d), the jury must necessarily have found that each element of the s 2113(a) offense, which is a lesser included offense of the s 2113(d) violation, had been established."); *see also United States v.*

475

*Pendegraph*, 791 F.2d 1462, 1466 (11th Cir. 1986) (referring to § 2113(a) as a lesser included offense of § 2113(d)); *United States v. Waters*, 461 F.2d 248, 252 (10th Cir. 1972) (same). Other courts have referred to these subsections as "sentencing enhancements" of bank robbery. *See, e.g., United States v. McDuffy,* 890 F.3d 796, 802 (9th Cir. 2018) ("[Section] 2113(e) is the functional equivalent of the felony-murder rule but in the form of a sentencing enhancement."); *United States v. Carr*, 761 F.3d 1068, 1078 n.2 (9th Cir. 2014) (referring to § 2113(e) as a "sentencing enhancement"); *United States v. Benson*, 918 F.2d 1, 3 (1st Cir. 1990) (referring to § 2113(d) as a "sentencing enhancement"); *cf. Allen*, 836 F.3d at 895 (determining that convictions under § 2113(a) and (e) are predicates for a "crime of violence" without separating the offenses or treating section (e) as a freestanding offense); *Holder*, 836 F.3d at 892 (same).

1190. Because § 2113(a) lacks the necessary *mens rea* and otherwise does not meet the definition of a crime of violence, §§ 2113(d) and (e), *a priori*, cannot qualify as crimes of violence under § 924(c)(3) unless they independently require the qualifying *mens rea*. As discussed below, however, they do not.

2. Neither § 2113(d) Nor § 2113(e) Requires The Requisite *Mens Rea* To Qualify As A Crime Of Violence.

i. *Section 2113(d) Does not Require any Intent to Threaten or Use Physical Force.*

1191. A person violates § 2113(d) when he or she "assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device." The government may prove either that the defendant assaulted another person by the use of a dangerous weapon or device, or that she or he put another person's life in jeopardy by the use of a dangerous weapon or device; it need not prove both. *See* 3 L. Sand et al., Modern Federal Jury Instructions–Criminal ¶ 53.01 (2021) (Sand).

1192. This provision cannot constitute a crime of violence under *Borden* because a defendant may violate § 2113(d) without any intent to threaten or use physical force. *See Morrow v. United States*, 408 F.2d 1390, 1391 (8th Cir. 1969) (the test under § 2113(d) "is an objective one," with the only relevant inquiry being "whether [the victim's] life was put in danger by the use of a dangerous weapon" (internal quotations omitted)). A person can violate the provision merely by carrying a gun during a bank robbery because "he feels secure with it," even without any intent to intimidate another. *United States v. Martinez-Jimenez*, 864 F.2d 664, 667 (9th Cir. 1989). Section 2113(d) requires no nexus between the weapon and the intimidation. A person convicted under that section "need not brandish" the weapon "in a threatening manner" or "make assaultive use of the device." *Id.*; *see also United States v. Bennett*, 675 F.2d 596, 599 (4th Cir. 1982) ("A weapon openly exhibited by a robber during a robbery" without more is sufficient to constitute a violation under § 2113(d).). Therefore, armed bank robbery under § 2113(d) fails to satisfy the necessary intentional *mens rea* under the force clause.

        ii.       *Section 2113(e) Contains no Mens Rea Requirement Besides the State of Mind Required for the Underlying Offense of § 2113(a).*

1193. The last subsection that served as a predicate in Count 3, 18 U.S.C. § 2113(e), requires that, in the course of committing a robbery or eluding punishment for the offense, the defendant either kill a person or force a person "to accompany him without the consent of such person." The offense contains no scienter requirement other than that required for the underlying bank robbery. *United States v. Jackson*, 736 F.3d 953, 958 (10th Cir. 2013). Thus, Courts of Appeals, including the Eighth Circuit, have repeatedly found that § 2113(e) does not require proof that the defendant intentionally or knowingly committed the act of killing or forced accompaniment criminalized by the statute. *See, e.g., Allen*, 247 F.3d at 782 ("Because the plain language of [18 U.S.C. § 2113(e)] says simply 'kills,' and not 'intentionally kills' or 'murders,'

the settled principles of construction direct us to conclude that [Congress] did not intend to add an additional scienter requirement to the killing component of the crime." (quoting *United States v. Poindexter*, 44 F.3d 406, 409 (6th Cir. 1995))); *McDuffy*, 890 F.3d at 802 (holding that "Congress intended to omit a *mens rea* requirement" from § 2113(e) because it "makes no mention of a *mens rea* and even describes the killing in the passive voice"); *United States v. Vance*, 764 F.3d 667, 675 (7th Cir. 2014) ("[It is] irrelevant that Vance appears not to have intended to kill the teller in the second bank robbery. … It is reasonably clear that the language we quoted from [§ 2113(e)] dispenses with any requirement of proving intent to kill."); *United States v. Walker*, 919 F.2d 501, 502 (8th Cir. 1990) (upholding conviction for forced accompaniment under § 2113(e) where teller drove defendant from crime scene pursuant to an instruction from bank manager to "give a customer a ride" and evidence showed she felt "compelled" to do so, even though defendant "never exhibited the weapon to the teller" or "made any threatening gestures").

1194.   Furthermore, a number of circuits have held that § 2113(e) is the equivalent of a felony murder provision and therefore, like felony murder, has no additional *mens rea* requirement besides the *mens rea* required for the underlying offense. *See, e.g., McDuffy*, 890 F.3d at 802 (holding that "the only *mens rea* required [for conviction under § 2113(e) is the *mens rea* necessary to commit the underlying bank robbery"); *Vance*, 764 F.3d at 675 (noting that § 2113(e) "duplicates the felony murder rule"); *Allen*, 247 F.3d at 782 (determining that § 2113(e) "is like common law felony murder" and "does not require a finding of specific intent to kill").

1195.   Under *Borden*, because there is no additional *mens rea* requirement for § 2113(e) and the underlying offense of § 2113(a) does not contain the requisite *mens rea*, § 2113(e) categorically fails to qualify as a "crime of violence."

1196. In summary, none of the bank robbery predicates for Mr. Agofsky's § 924(c) conviction can categorically satisfy the definition of a "violent felony" announced in *Borden*, because each can be committed in a less culpable manner than the definition requires. He is therefore innocent of violating § 924(c).

### F.     Mr. Agofsky Is Entitled to a New Penalty Phase.

#### 1.     The Legal Standard

1197. The Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Accordingly, capital sentencing decisions cannot rest on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Zant v. Stephens*, 462 U.S. 862, 884-885 (1983).

1198. Applying these principles, the Supreme Court in *Johnson v. Mississippi* reversed a death sentence based "on a reversed conviction." *Johnson*, 486 U.S. at 585. In that case, the defendant had been sentenced to death based, in part, on a prior conviction for assault that was overturned after the defendant was sentenced to death. *Id.* at 581. Even though other aggravating circumstances unrelated to the assault remained undisturbed, the Supreme Court held that a new sentencing was constitutionally required because the jury considered the subsequently invalidated prior conviction, this conviction "provided no legitimate support for the death sentence imposed on Petitioner," and there was "a possibility that the jury's belief that petitioner had been convicted of a prior felony would be 'decisive' in the choice between a life sentence and a death sentence." *Id.* at 586 (internal citations omitted). The error "extended beyond the mere invalidation of an aggravating circumstance supported by evidence that was otherwise admissible" and in fact permitted the jury "to consider evidence that [was] revealed to be materially inaccurate." *Id.* at 590.

> It is apparent that the New York conviction provided no legitimate support for the death sentence imposed on petitioner. It is equally apparent that the use of that conviction in the sentencing hearing was prejudicial. The prosecutor repeatedly urged the jury to give it weight in connection with its assigned task of balancing aggravating and mitigating circumstances "one against the other." Even without that express argument, there would be a possibility that the jury's belief that petitioner had been convicted of a prior felony would be "decisive" in the "choice between a life sentence and a death sentence."

*Id.* at 586 (internal citation omitted).

1199. The Court clarified how reviewing courts must assess the invalidation of a sentencing factor in *Brown v. Sanders*, 546 U.S. 212 (2006):

> An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.
>
> . . . . The issue we confront is the skewing that could result from the jury's considering *as aggravation* properly admitted evidence that should not have weighed in favor of the death penalty. See, *e.g., Stringer,* 503 U.S., at 232, 112 S. Ct. 1130 ("[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale"). As we have explained, such skewing will occur, and give rise to constitutional error, only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor.

*Id*. at 220-21.

1200. *Brown* and *Johnson* establish that an invalid aggravator gives rise to constitutional error when it allows jurors to give aggravating weight to invalid or invalidated facts and circumstances. When federal courts find such constitutional error, may then determine whether it was harmless. *See Wilson v. Mitchell*, 498 F.3d 491, 502, 508-11 (6th Cir. 2007) (citing *Brecht v. Abrahamson*, 507 U.S. 619 (1993)); *see also Duest v. Singletary*, 997 F.2d 1336 (11th Cir. 1993)

(invalidation of prior conviction used as an aggravating factor required vacation of death penalty because prior conviction had substantial and injurious effect on sentence (citing *Brecht*, 507 U.S. 619)).

1201. The sentencing package doctrine reinforces the reasons for a resentencing when a prior conviction underlying an aggravating factor is subsequently invalidated. Under the doctrine, courts have recognized that they must view counts of conviction collectively as an entire "sentencing package," not individually, for the purposes of sentencing. *See, e.g.*, *United States v. Bass*, 104 F. App'x 997, 1000 (5th Cir. 2004). Thus, as the Fifth Circuit explained in *Bass*, when one count of a multicount conviction is reversed, "the result is an 'unbundled' sentencing package." *Id.* This result, in turn, requires resentencing, as "the reversal of convictions underlying some, but not all, of the sentences renders the sentencing package ineffective in carrying out the … sentencing intent as to any one of the sentences on the affirmed convictions." *Id.* The same concept should require a reviewing court to grant resentencing when the invalidation of one or more aggravating factors "unbundles" the jurors' weighing process and renders the entire package "ineffective" in carrying out their intent.

2. The Use Of Mr. Agofsky's § 924(c) Convictions In Aggravation Was Constitutional Error, Was Not Harmless, And "Unbundled" The Sentencing Package.

1202. The introduction of the statutory aggravating factor based on Mr. Agofsky's invalid § 924(c) conviction allowed the jurors to give aggravating weight to circumstances they could not otherwise consider. The other two aggravating factors that related to the Noel State Bank robbery focused on the fact that he was serving a life sentence for that offense, and that a death resulted from the offense. *See* Exh. A at 7-9. As the prosecution vividly described in summation, the cause of death had nothing to do with the use of firearms. Trial transcript, 7/15/04 at 332, 369. Introduction of the invalid firearms conviction was constitutional error because the prosecution

481

relied on the conviction and encouraged the jurors to give aggravating weight to facts they could not otherwise have considered as aggravation.

1203.   Introduction of the invalid firearms conviction also had a substantial and injurious effect on the outcome. The prosecution not only charged the § 924(c) conviction as an aggravating circumstance, but also repeatedly relied on it. First, Assistant U.S. Attorney Batte told the jurors that they could consider Mr. Agofsky's conviction for "using a firearm in the commission of a violent crime." Trial transcript, 7/15/04 at 337. In rebuttal, Assistant U.S. Attorney Stevens again referred to the § 924(c) conviction as a reason that a life sentence would be an insufficient punishment for Mr. Agofsky. *Id.* at 369. He also referred to it as part of a "chronology" of Mr. Agofsky's "misconduct." *Id.* at 371. As in *Johnson*, the prosecutors "repeatedly urged the jury to give it weight." *Johnson*, 486 U.S. at 586. Furthermore, the jury expressly found that Mr. Agofsky had *not* intentionally caused the death for which he was on trial, but rather had only intentionally caused serious bodily injury resulting in death. Trial transcript, 7/16/04 at 386-87. The lesser culpability of the underlying crime gave particular importance to the aggravating factors. The prosecution's repeated invocation of an invalid aggravating factor had a substantial and injurious effect on the outcome. *See Brecht*, 507 U.S. 619.

1204.   Moreover, the universe of factors upon which the jury relied in imposing the death penalty has dramatically shifted; the sentencing package that Mr. Agofsky's jury considered has unraveled. The conviction for using a firearm in a crime of violence was a unique facet of the government's case for death, and the weighing process would necessarily have been different without it. Accordingly, Mr. Agofsky is entitled to a new sentencing proceeding.

### G.   Conclusion

1205.   Because Mr. Agofsky's conviction under § 924(c) is constitutionally invalid, the jurors' reliance on the conviction in their decision to sentence Mr. Agofsky to death was

constitutional error and was not harmless. Therefore, the death sentence cannot stand, and Mr. Agofsky is entitled to a new penalty phase. This Court must accordingly grant relief on this ground, independently and in combination with the other claims in Mr. Agofsky's § 2255 motion.

## **FORM QUESTIONS 13-18**

13.     None of the claims in this petition have been previously presented in any proceeding in any federal court (other than this proceeding). Grounds 12.1, 12.2., 12.3, and 12.6 involve ineffective assistance claims that could not have been raised appropriately at trial or on direct appeal. Ground 12.4 raises a structural-error claim that was not raised by appellate counsel. Ground 12.5 raises a *Brady* claim whose factual bases lie outside the record and thus could not have been raised on direct appeal. Grounds 12.7, 12.8, and 12.9 raise claims premised on new evidence. Ground 12.10 raises a claim premised on a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court that was previously unavailable to Mr. Agofsky.

14.     Yes. Mr. Agofsky has the following motions, petitions, or appeals currently pending:

a.  *Agofsky v. Watson*, Case No. 2:22-cv-49-JRS-DLP (S.D. Ind.) (challenging Mr. Agofsky's life sentence, imposed by the United States District Court for the Western District of Missouri in 1992, pursuant to 28 U.S.C. § 2241 and *Borden v. United States*, 141 S. Ct. 1817 (2021)).

b.  *Agofsky v. Oklahoma*, Case Nos. CRF-92-43, 43B (Delaware Co.); CRF-97-41 (Ottawa Co.); CF-97-383 (Payne Co.) (challenging Mr. Agofsky's murder conviction in Oklahoma state court pursuant to Oklahoma's Post Conviction Procedure Act, Section 1080 et seq. of Title 22).

c.  *Agofsky v. Crow*, Case No. 21-cv-670-PRW (W.D. Okl.) (challenging Mr. Agofsky's murder conviction in Oklahoma state court pursuant to 28 U.S.C. § 2254).

15.     Mr. Agofsky's attorneys from preliminary proceedings through imposition of sentence were G. Patrick Black, Esq., Federal Defender, Eastern District of Texas, 110 N. College, Suite 1122, Tyler, TX 75702, and Douglas Barlow, Esq., 485 Milam St., Beaumont, TX 77701-3518.

His attorney on his original appeal to the Fifth Circuit and on his appeal of his reconviction and resentencing to that Court and the Supreme Court was Brent E. Newton, Esq., Assistant Federal Defender, 440 Louisiana Street, Suite 310, Houston, TX 77002-1634.

His postconviction attorneys are Claudia Van Wyk, Esq., and David Zuckerman, Esq., of the Federal Community Defender Office, Capital Habeas Unit, Suite 545W – Curtis Center, 601 Market Street, Philadelphia, PA 19106, and Jennifer Merrigan, Esq., Public Interest Law Clinic, 305 E. 63rd Street, Kansas City, MO 64113.

16.     Mr. Agofsky was originally sentenced on Counts 1 and 2 of Ind. No. 1:03-cr-173, which charged him with Murder by a Federal Inmate, 18 U.S.C. §§ 1118, 1111 (Count 1), and Premeditated First-Degree Murder, 18 U.S.C. § 1111 (Count 2). On March 30, 2007, after his initial appeal, this Court dismissed Count 1 and reconvicted and resentenced him to death on Count 2.

17.    Mr. Agofsky previously served a sentence of 16 months for the interstate transportation of stolen firearms, imposed in the Western District of Missouri on August 2, 1991. He is also subject to a sentence of life plus 60 years for conspiracy, armed bank robbery and the killing of a bank president, and use of a firearm, imposed in the Western District of Missouri under Ind. No. 3:92-cr-5006 on November 23, 1992. Finally, he is subject to a sentence, imposed in Delaware County, Oklahoma, of life without parole for first-degree murder (based upon the same conduct as the federal armed bank robbery conviction), under Ind. No. CRF-92-43. These convictions were unsuccessfully appealed.

18.    This §2255 motion was initially and timely filed on January 17, 2008, after which further proceedings were stayed and held in abeyance. Mr. Agofsky is now filing this complete motion pursuant to the Court's order. *See* ECF No. 190.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Agofsky prays that the Court:

1. Grant funds, as Mr. Agofsky will specifically request by separate motion, with which to pursue a full investigation and presentation of all the claims set forth herein;

2. Upon the resumption of proceedings, permit the government to file an answer and allow Mr. Agofsky reasonable time to file a reply, and to further amend the motion, if warranted;

3. Allow him reasonable time to file legal memoranda in response to defenses asserted and/or motions filed by the government, as well as any necessary briefs in reply;

4. Order discovery procedures as Mr. Agofsky will specifically request by separate motion;

5. Conduct an evidentiary hearing after the completion of discovery, as Mr. Agofsky will request by separate motion;

6. Permit further amendment of the motion if the fact-development procedures (or other developments) so warrant;

7. Allow reasonable time for briefing the merits of grounds asserted in the motion and any amendments thereto, after discovery is complete and an evidentiary hearing is conducted;

8. Vacate Mr. Agofsky's conviction and death sentence and order a new trial of the guilt-innocence and penalty phases; and

9.     Grant such additional relief as may be necessary and to which Mr. Agofsky may be entitled.

Respectfully submitted this 17th day of June, 2022

| | |
|---|---|
| /s/ David Zuckerman | /s/ Claudia Van Wyk |
| DAVID ZUCKERMAN | CLAUDIA VAN WYK |
| Assistant Federal Defender | Senior Staff, Capital Punishment Project |
| Federal Community Defender Office | American Civil Liberties Union |
| for the Eastern District of Pennsylvania | 201 W. Main Street, Suite 402 |
| 601 Walnut Street, Suite 545 West | Durham, NC 27701 |
| Philadelphia, PA 19106 | (919) 433-8533 |
| Tel: 215.928.0520 | cvanwyk@aclu.org |
| Fax: 215.928.0826 | |
| david_zuckerman@fd.org | |
| | |
| *Counsel for Petitioner* | *Counsel for Petitioner* |

**CERTIFICATE OF SERVICE**

I certify that on June 17, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following: **Traci Lynne Kenner**, U.S. Attorney's Office, 110 North College, Suite 700, Tyler, TX 75702; and **Joseph Robert Batte,** U.S. Attorney's Office- Beaumont, 350 Magnolia, Suite 150, Beaumont, TX 77701. Pursuant to Local Rule CV-5(a)(7)(D), I have also separately served these documents on opposing counsel in electronic form.

/s/ David Zuckerman
DAVID ZUCKERMAN
*Counsel for Petitioner*

**STATEMENT PURSUANT TO LOCAL RULE CV-5(a)(7)(C)**

I certify that, pursuant to Local Rule CV-5(a)(7)(C), the Court granted authorization to file this document under seal on January 8, 2009, when it ordered that "[i]f Agofsky raises a claim based upon information contained in" certain document, "his pleadings shall be filed under seal." ECF No. 36. This Motion includes claims based upon information contained in the documents referenced in the Court's January 8, 2009 Order.

/s/ David Zuckerman
DAVID ZUCKERMAN
*Counsel for Petitioner*